RECEIVED

UNTED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK 08 JAN 21 PM 12: 53

U.S. DISTRICT COURT

--------------------------------------------------X

TEACHERS4ACTION,
    On behalf of its Members
    And By Florian Lewenstein,
    Its Treasurer and Spokesperson,
JOHN DOE & JANE DOE TEACHERS 1 - 50-

          PLAINTIFFS

   - VS -

MICHAEL G. BLOOMBERG,
JOEL KLEIN,
NEW YORK CITY
    DEPARTMENT OF EDUCATION,
SUPERINTENDENTS 1 - 10; and
PRINCIPALS 1 – 10;

        DEFENDANTS

--------------------------------------------------X

**JUDGE MARRERO**

CIVIL ACTION

**08 CV 0548**

JAN 2 1 2008
U.S.D.C. S.D. N.Y.
CASHIERS

COMPLAINT
(JURY TRIAL DEMANDED)

## INTRODUCTION

Upon information and belief, Plaintiffs' allegations are that from 2000 until today, the New York City Board of Education has implemented a scheme that discriminates against its most qualified teachers. The goal is to reduce salaries by forcing teachers to quit or be fired. This goal is accomplished through "Temporary Reassignment Centers" (known as "Rubber Rooms") to which the "targeted" teachers are sent. The plan involves Principals notifying "targeted" teachers that they are removed from classes, stripped of teaching responsibilities and reassigned to a Rubber Room, where they wait until (i) charges are brought or they are coerced into accepting deals that include fines and can lead to their terminations. Currently almost 1,000 teachers languish in Rubber Rooms in violation of their due process rights and the chance to clear their names and be restored to their classrooms. The Rubber Rooms constitute racist and discriminatory policies, are the functional equivalent of modern day "internment camps" where

1

"targeted" teachers are banished for months, or even years, before they can fight unfounded charges. The Rubber Rooms undermine sound education policies and deprive students of qualified competent teachers.  The Rubbers Rooms constitutes a fraudulent plan, scheme and/or enterprise through which these Defendants came together to target a particular group of teachers in violation of, Federal laws, including among others, the 5th and 14th Amendments, 42 U.S.C. § 2000 e ("Title VII of the Civil Rights Act of 1964"), 29 U.S.C. § 621 ("Age Discrimination in Employment Act of 1967"), 42 U.S.C. § 1981 ("Civil Rights Act of 1991"), 18 U.S.C. § 1962 et seq. ("The RICO Statute"), 18 U.S.C. § 1341 ("Wire Fraud") and 18 USC 1343 ("Mail Fraud"), relevant New York State laws including New York Consolidated Law, Chap. 40, Part Three, Title K, Art. 190 ("Schemes to Defraud"), New York Consolidated Law, Chap. 40, Part Four, Title X, Art. 460 ("Enterprise Corruption"), as well as NY and Federal laws related to misuse of public funds.

## COMPLAINT

## JURISDICTION

1) The Court has original jurisdiction over Plaintiffs' claims based upon alleged violations of the 5th and 14th Amendments, 42 U.S.C. § 2000 e ("Title VII of the Civil Rights Act of 1964"), 29 U.S.C. § 621 (Age Discrimination in Employment Act of 1967), 42 U.S.C. § 1981 ("Civil Rights Act of 1991"), 18 U.S.C. § 1962 et seq. ("The RICO Statute"), 18 U.S.C. § 1341 ("Wire Fraud") and 18 USC 1343 ("Mail Fraud") and Federal laws related to misuse of public funds.

2) The Court has ancillary and/or supplemental jurisdiction of all Plaintiffs'' state law claims pursuant to 28 USC § 1367.

3) Each of the claims of the named Plaintiffs exceeds the statutory limit of this Court, exclusive of attorneys' fees, costs and interest.

## VENUE

4) Venue is proper in this Court because one or more of the Plaintiffs live in this judicial district, and one of more of the Defendants live and/or do business in this district, and/or the Defendants' unlawful acts occurred within this judicial district.

## PARTIES

### Plaintiffs

5) Plaintiff Teachers4Action[1] is an unincorporated association pursuant to Gen. Association Laws Art. 3.

6) Plaintiff Florian Lewenstein is the Treasurer and Spokesperson of Plaintiff Teachers4Action and is authorized and has standing to commence and prosecute this action, individually and on behalf of Plaintiff Teachers4Action.

7) Plaintiffs John Does and Jane Does 1 – 100[2] are teachers who fall into certain categories, including but not limited to (i) teachers who are presently re-assigned to Rubber Rooms; (ii) teachers in the midst of the administrative discipline process and against whom false charges have been brought; (ii) teachers who were forced, harassed, intimidated and/or coerced to accept onerous or unfair deals, (ii) teachers who suffer loss of property, loss of pay and other monetary losses; (iii) teachers who suffer physical or emotional injuries from being forced into Rubber Rooms; (iv) teachers who cannot get other jobs; and (v) teachers who are otherwise being targeted and victimized as part of the fraud, scheme and enterprise.

---

[1] Teachers4Action™® are in the process of obtaining formal approval by the New York State Department of Education as a Not-For-Profit Corporation and is seeking similar status under the IRS Code Section 501(c ) (3).

[2] The names John Doe and Jane Doe are being used to maintain the teachers' identities because the teachers are fearful of further retaliation.

## Defendants

8) Defendant Michael G. Bloomberg ("Bloomberg") is the Mayor of New York City and in that capacity has direct control over the New York City Public Schools.

9) Defendant Joel Klein ("Klein") is the Chancellor of the New York City Department of Education and together with Bloomberg has control over the New York City Public Schools.

10) Defendant New York City Department of Education ("DOE") is Plaintiffs' employer.

11) Superintendents 1 – 10 are persons who were involved with the targeting of teachers and the fraud, scheme and enterprise as noted below.

12) Principals 1 – 10 are persons who had direct contact with Plaintiffs in the schools to which they were assigned before they were targeted in the fraud, scheme and enterprise as noted below.

## FACTS COMMON TO ALL CAUSES OF ACTION

13) Starting in or about 2002, the office of the Mayor of New York City assumed direct control over the New York City Public Schools.

14) In or about 2003, the DOE was completely reorganized under control of the Office of the Mayor.

15) Since 2000, the DOE has systematically implemented and carried out a plan that discriminates against Plaintiffs' members, who are among the most qualified teachers in NYC and perhaps in the country.

16) The plan and scheme called for the Superintendents and Principals to help Bloomberg, Klein and the DOE reduce the budget for the various districts and schools.

17) The plan and scheme called for Plaintiff Teachers4Action members, and other teachers that fit a certain criteria, to be targeted for discrimination, harassment and intimidation.

18) This would be accomplished by the "targeted" teachers being accused of certain false charges, including but not limited to their (i) allegedly being insubordinate, (ii) their work allegedly being substandard, (iii) their allegedly being physically or emotionally abusive to students or (iv) any other allegedly improper conduct.

19) Once accused of the false charges the "targeted" teachers were to be immediately "re-assigned" to "Temporary Reassignment Centers" (more commonly known as "Rubber Rooms").

20) The targeted teacher would be banished to the Rubber Rooms without just cause and without due process.[3]

21) The "targeted" teachers are/were (i) removed from classes, (ii) stripped of teaching responsibilities and (iii) reassigned to a Rubber Room.

22) The "targeted" teachers are/were (i) those who were over a certain minimum age, (ii) those who had achieved a high pay and benefits level and who had been employees of the DOE for more than a dozen years, (iii) those who dared to challenge and/or question DOE practices and / or the "Rubber Room" procedures, (iv) whistle blowers and (v) those who dared to demand their rights, including seniority transfers and/or due process rights.

23) The "targeted" teachers are/were forced to wait in the Rubber Rooms without due process and the chance to clear their names and be restored to their classrooms.

24) Another goal of the Rubber Room process is to coerce, harass, intimidate and terrorize the "targeted" teachers so that they will be fearful for their personal and professional well-being and will then retire or resign or be "forced" to accept deals involving ruinous fines or termination.

---

[3] The Rubber Rooms are in part the result of agreements made between Plaintiffs' union, the United Federation of Teachers and Defendants Bloomberg, Klein and the DOE; however the implementation of the Rubber Room practices and concept are discriminatory and violate the targeted teachers rights.

25) Once in the Rubber Rooms, the "targeted" teachers are forced to wait until charges are brought, or until they agree to deals that lead to fines, improper charges and/or records placed in their permanent files and can also include termination.

26) The Rubber Room practice involves knowing, intentional, careless, reckless, negligent and/or otherwise improper waste and abuse of public funds.

27) The Rubber Room and the practice of targeting teachers as described above, is/was part of the fraud, scheme and plan to harass and discriminate against certain teachers, hereinafter referred to as "The Fraudulent Scheme".

28) At all times relevant hereto, Defendants Bloomberg and Klein, and/or persons acting in their name and with their authority, were ultimately responsible for the approval of The Fraudulent Scheme.

29) At all times relevant hereto, Defendant DOE and its officials and/or representatives, were charged with the implementation of The Fraudulent Scheme.

30) At all times relevant hereto, Defendant Superintendents were responsible to Defendants Bloomberg, Klein and the DOE to insure that The Fraudulent Scheme was carried out as per the instructions of Defendants Bloomberg, Klein and DOE.

31) At all times relevant hereto, Defendant Principals were responsible to Defendant Superintendents that The Fraudulent Scheme was carried out as per the instructions of Defendants Bloomberg, Klein and DOE.

32) At all times relevant hereto, and to insure that The Fraudulent Scheme was carried out according to the instructions of Defendants Bloomberg, Klein and DOE, the Defendants caused certain written handbooks and/or manuals to be created and distributed which Defendants Superintendents and Principals were ~~to~~ required and/or directed to follow.

33) At all times relevant hereto, the aforesaid written handbooks and/or manuals were mailed and/or electronically delivered to Defendants Superintendents and Principals as part of The Fraudulent Scheme.

34) At all times relevant hereto, in addition to the aforesaid written handbooks and/or manuals Defendants Bloomberg, Klein and DOE caused additional policies and/or guidelines to be created and distributed to Defendants Superintendents and Principals which they were in turn required and/or directed to follow as part of The Fraudulent Scheme.

35) As of early 2000, there were approximately 300 teachers reportedly accused of "misconduct" and/or "incompetence" who were banished to "Rubber Rooms" as part of The Fraudulent Scheme. *See Exhibit 1 – NY Times Article dated March 1, 2000.*

36) As teachers' years of employment, experience and tenure increased so too was the need to banish more and more teachers to the Rubber Rooms, all of which was accomplished by an increasing number of teachers accused of "misconduct" and/or "incompetence" so that they could be banished to "Rubber Rooms", as part of The Fraudulent Scheme.

37) Starting in or about 2004, Defendants Bloomberg, Klein and the DOE, determined that the number of teachers targeted had to be increased so that they could achieve the goal of the Fraudulent Scheme, reduce payroll at the expense of qualified teachers by subjecting them to The Fraudulent Scheme, targeting, harassment, intimidation, coercion and banishment to Rubber Rooms.

38) Upon information and belief, a "Confidential" revision to prior manuals was distributed, by mail and/or electronic transmission, with directions to Defendants Superintendents and Principals outlining and directing them as to what practices they were to follow as part of the Fraudulent Scheme.

39) Upon information and belief, additional instructions and directions were given directly to Defendants Superintendents and Principals outlining and directing them as to what practices they were to follow as part of the Fraudulent Scheme.

40) The additional instructions, directions and policies as set forth in the "Confidential" manual, were followed by the Defendants Superintendents and Principals and caused a dramatic increase in the reports of alleged "misconduct" and/or "incompetence" and new categories for discipline were included to, such as "insubordination", all of which was designed to further the goal of The Fraudulent Scheme.

41) By ~~of~~ mid 2005, there were reportedly over four hundred teachers who had been banished to "Rubber Rooms" as part of The Fraudulent Scheme. *See Exhibit 2 – National Council of Teacher Equality Bulletin dated June 8, 2005.*

42) By mid 2006, there were reportedly approximately 600 "targeted" teachers who had been banished to "Rubber Rooms" as part of The Fraudulent Scheme. *See Exhibit 3 – April 24, 2007 Village Voice Article.*

43) As of 2006, Defendants were already on notice on the basis of reports issued by the Office of Special Commissioner of Investigations ("SCI") that the charges against only half of the "targeted" teachers" were substantiated. *See Exhibit 3 – Village Voice Article.*

44) As of 2006, Defendants Bloomberg, Klein and the DOE, intentionally, maliciously, recklessly, carelessly and/or negligently, disregarded the findings of the SCI and actually directed and increased The Fraudulent Scheme so that more and more teachers were unlawfully "targeted".

45) By the end of 2007, there were estimates ranging from "over 700" to "757" "targeted" teachers who had been banished to "Rubber Rooms" as part of The Fraudulent Scheme. *See*

*Exhibits 4 & 5 – Oct. 15, 2007 New York Sun Article and Sept. 25, 2007 New York Post Article.*

46) The primary purpose of The Fraudulent Scheme was/is to reduce the school budgets.

47) The Rubber Room practice is racist and discriminatory.

48) The Rubber Rooms are the modern day equivalent of "internment camps" where the "targeted" teachers are banished for months, or even years, before they can fight unfounded "charges."

49) Many of the "targeted" teachers in the Rubber Rooms are paid in whole or part from New York State or Federally Funded programs.

50) While in the Rubber Rooms, the "targeted" teachers are still being paid and the "substitute" and/or replacement teachers are also being paid.

## First Cause of Action – RICO Enterprise

51) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

52) The Defendants associated with one another in an enterprise the activities of which affected, interstate as defined in 18 U.S.C. § 1962(c).

53) The Defendants conspired with one another to violate § 1962(c).

54) The Defendants' conduct (hereinafter "The Fraudulent Scheme and/or Enterprise") is as relates specifically to this case of action included the conspiracy to "target" teachers who are/were:

    a.    those who were over a certain minimum age;

    b.    those had achieved a high pay and benefits level;

    c.    those who had been employees for more than a minimum number of years;

    d.    those who dared to challenge and/or question the "Rubber Room" procedures;

e.    those who acted as whistle blowers regarding DOE misconduct, and

f.    those who dared to demand or insist upon their due process rights.

55) The Fraudulent Scheme and/or Enterprise also included Defendants conspiring with one another to, among other things:

a.  force the targeted teachers to wait in the Rubber Rooms without due process and the chance to clear their names and be restored to their classrooms

b.  coerce, harass, intimidate and terrorize the "targeted" teachers so that they will be fearful for their personal and professional well-being so that they would be "forced" to retire, resign or accept deals involving ruinous fines or termination.

56) To accomplish The Fraudulent Scheme and/or Enterprise, Defendants utilized the US mail and used electronic means including but not limited to telephone, faxes and emails.

57) Manuals, instructions, directions and confidential materials that were part of The Fraudulent Scheme were exchanged between Defendants Bloomberg, Klein, DOE, Superintendents and Principals during the period from 2000 to the present.

58) Also, Defendants sent notices and other documents that were part of The Fraudulent Scheme and/or Enterprise to Plaintiffs via the US mail.

59) Defendants use of mail and wire services in the furtherance of The Fraudulent Scheme and/or Enterprise constitutes and/or satisfied the predicate act of racketeering under federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343.

60)    As a direct and proximate result of The Fraudulent Scheme and/or Enterprise, Plaintiffs suffered monetary and other damages.

    **WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii)

exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Second Cause of Action - Fraud

61) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

62) The Defendants associated with one another to defraud the Plaintiffs and other targeted teachers out of salaries and benefits.

63) The Defendants conspired with one another to defraud the "targeted" teachers:

    a.    who were over a certain minimum age;

    b.    who had achieved a high pay and benefits level;

    c.    who had been employees for more than a minimum number of years;

    d.    who dared to challenge and/or question the "Rubber Room" procedures;

    e.    who acted as whistle blowers regarding DOE misconduct, and

    f.    who dared to demand or insist upon their due process rights.

64) The Defendants conspired with one another to, among other things:

    a.  force the targeted teachers to wait in the Rubber Rooms without due process and the chance to clear their names and be restored to their classrooms

    b.  coerce, harass, intimidate and terrorize the "targeted" teachers so that they will be fearful for their personal and professional well-being so that they would be "forced" to retire, resign or accept deals involving ruinous fines or termination.

65) The Defendants' conspiracy to defraud the targeted teachers included false allegations against Plaintiffs and targeted teachers by placing designations in their files and/or charging teachers (i) of alleged "misconduct", (ii) of allegedly being "incompetent", or (iii) of allegedly being "insubordinate".

66) At the time Defendants made the aforesaid charges against the targeted teachers, they knew the charges to be false and untrue.

67) The filing of the aforesaid charges is/was part of the fraud against the targeted teachers.

68) As a direct and proximate result of the aforesaid fraud, Plaintiffs suffered monetary and other damages.

69)    As a direct and proximate result of aforesaid wrongful acts, Plaintiffs suffered monetary and other damages.

   **WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Third Cause of Action - Discrimination

70) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

71) The Fraudulent Scheme and/or Enterprise was designed to and did in fact target certain teachers for discrimination and harassment.

72) The Fraudulent Scheme and/or Enterprise discriminated against teachers:

   a.    who were over a certain minimum age;

   b.    who had achieved a high pay and benefits level;

   c.    who had been employees for more than a minimum number of years;

   d.    who dared to challenge and/or question the "Rubber Room" procedures;

   e.    who acted as whistle blowers regarding DOE misconduct, and

   f.    who dared to demand or insist upon their due process rights.

73) As part of their discriminatory practices, among other things, Defendants:

    a.  forced the targeted teachers to wait in the Rubber Rooms without due process and the chance to clear their names and be restored to their classrooms

    b.  coerced, harassed, intimidated and terrorized the "targeted" teachers so that they would l be fearful for their personal and professional well-being so that they would be "forced" to retire, resign or accept deals involving ruinous fines or termination.

74) At the time Defendants discriminated against the targeted teachers, they knew their actions were discriminatory and unlawful.

75)    As a direct and proximate result of the aforesaid discrimination, Plaintiffs suffered monetary and other damages.

    **WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

<u>**Fourth Cause of Action - Harassment**</u>

76) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

77) The Fraudulent Scheme and/or Enterprise was designed to and did in fact target certain teachers for discrimination and harassment.

78) The Fraudulent Scheme and/or Enterprise harassed teachers:

    a.  who were over a certain minimum age;

    b.  who had achieved a high pay and benefits level;

    c.  who had been employees for more than a minimum number of years;

    d.     who dared to challenge and/or question the "Rubber Room" procedures;

    e.     who acted as whistle blowers regarding DOE misconduct, and

    f.     who dared to demand or insist upon their due process rights.

79) As part of the harassment, among other things, Defendants:

    a.   forced the targeted teachers to wait in the Rubber Rooms without due process and the

        chance to clear their names and be restored to their classrooms

    b.   coerced, intimidated and terrorized the "targeted" teachers so that they would l be

        fearful for their personal and professional well-being so that they would be "forced"

        to retire, resign or accept deals involving ruinous fines or termination.

80) At the time Defendants harassed the targeted teachers, they knew their actions were

    discriminatory and unlawful.

81) As a direct and proximate result of the aforesaid harassment, Plaintiffs suffered monetary and

    other damages.

      **WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or

in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their

individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii)

exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier

of fact; and (iii) attorneys' fees, interest and costs of suit.

### Fifth Cause of Action
### Violation of 5th Amendment Due Process, Equal Protection and Due Process Rights

82) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the

    same were repeated fully and at length herein.

83) The Fraudulent Scheme and/or Enterprise was designed to interfere with Plaintiffs and other

    target teachers "teachers licenses", salaries and due process rights to have the unfounded

    allegations and charges expeditiously investigated and resolved.

84) The Fraudulent Scheme and/or Enterprise was designed to cause targeted teachers to be faced with "unsupported" or "false" or "fabricated" charges, which caused them to be placed in the Rubber Rooms, where they waited for months and years without a chance to clear their names and protect their salaries, licenses and property rights.

85) While in the Rubber Rooms, teachers were deprived of due process and/or the chance to clear their names and be restored to their classrooms

86) While in the Rubber Rooms, teachers were coerced, harassed, intimidated and terrorized so that they would be fearful for their personal and professional well-being so that they would be "forced" to retire, resign or accept deals involving ruinous fines or termination.

87) Defendants' aforesaid acts, violate the 5th Amendment to the Constitution by depriving Plaintiffs of their due process rights and were otherwise unlawful.

88) As a direct and proximate result of the aforesaid violation of Plaintiffs' due process rights, Plaintiffs suffered monetary and other damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

**Sixth Cause of Action**
**<u>Violation of 14th Amendment –Enacting of Laws that Violate Due Process Rights</u>**

89) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

90) During the period from 2000 to the present. Defendants implemented and/or enforced laws, legislation, statutes and/or administrative procedures[4] which were intended to interfere with Plaintiffs and other target teachers "teachers licenses", salaries and due process rights.

91) During the period from 2000 to the present. Defendants implemented and/or enforced laws, legislation, statutes and/or administrative procedures designed to frustrate targeted teachers' ability to expeditiously defend themselves against the "unsupported" or "false" or "fabricated" charges, which caused them to be placed in the Rubber Rooms, where they waited for months and years without a chance to clear their names and protect their salaries, licenses and property rights.

92) The laws, legislation, statutes and/or administrative procedures, implemented and/or enforced by Defendants, deprived Plaintiffs of due process and/or the chance to clear their names and be restored to their classrooms

93) As a direct and proximate result of the Defendants implemented and/or enforced laws, legislation, statutes and/or administrative procedures, in violation of Plaintiffs' due process rights. Plaintiffs suffered monetary and other damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

---

[4] The laws, legislations, statutes and administrative regulations include and are not limited to those which regulate the "3020 a" hearings, which are the only means by which the targeted teachers can defend themselves, but which are little more than "Kangaroo Courts" where the teachers do not have a chance to be exonerated and must ultimately accept deals or administrative rulings that include ruinous fines or termination.

**Seventh Cause of Action**
**Violation of 42 U.S.C. § 2000 e ("Title VII of the Civil Rights Act of 1964")**

94) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

95) The Fraudulent Scheme and/or Enterprise was designed to and did in fact target certain teachers for discrimination and harassment.

96) The Fraudulent Scheme and/or Enterprise discriminated against teachers:

    a.    who were over a certain minimum age;

    b.    who had achieved a high pay and benefits level;

    c.    who had been employees for more than a minimum number of years;

    d.    who dared to challenge and/or question the "Rubber Room" procedures;

    e.    who acted as whistle blowers regarding DOE misconduct, and

    f.    who dared to demand or insist upon their due process rights.

97) As part of their discriminatory practices, among other things, Defendants:

    a.    forced the targeted teachers to wait in the Rubber Rooms without due process and the chance to clear their names and be restored to their classrooms

    b.    coerced, harassed, intimidated and terrorized the "targeted" teachers so that they would I be fearful for their personal and professional well-being so that they would be "forced" to retire, resign or accept deals involving ruinous fines or termination.

98) At the time Defendants discriminated against the targeted teachers, they knew their actions were discriminatory and unlawful.

99)    Defendant aforesaid discrimination of the targeted teachers violate 42 U.S.C. § 2000 e ("Title VII of the Civil Rights Act of 1964").

100)    As a direct and proximate result of the aforesaid discrimination, Plaintiffs suffered monetary and other damages.

101)     As a direct and proximate result of aforesaid wrongful acts, Plaintiffs suffered monetary

and other damages.

   **WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or

in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their

individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii)

exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier

of fact; and (iii) attorneys' fees, interest and costs of suit.

### Eighth Cause of Action
### Violation of 29 U.S.C. § 621 ("Age Discrimination in Employment Act of 1967")

102)    Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if

the same were repeated fully and at length herein.

103)    The Fraudulent Scheme and/or Enterprise was designed to and did in fact target certain

teachers for discrimination and harassment.

104)    The Fraudulent Scheme and/or Enterprise discriminated against teachers:

    a.     who were over a certain minimum age;

    b.     who had achieved a high pay and benefits level;

    c.     who had been employees for more than a minimum number of years;

    d.     who dared to challenge and/or question the "Rubber Room" procedures;

    e.     those who acted as whistle blowers regarding DOE misconduct, and

    f.     who dared to demand or insist upon their due process rights.

105)    As part of their discriminatory practices, among other things, Defendants:

    a.   forced the targeted teachers to wait in the Rubber Rooms without due process and the

      chance to clear their names and be restored to their classrooms

b. coerced, harassed, intimidated and terrorized the "targeted" teachers so that they would ‡ be fearful for their personal and professional well-being so that they would be "forced" to retire, resign or accept deals involving ruinous fines or termination.

106) At the time Defendants discriminated against the targeted teachers, they knew their actions were discriminatory and unlawful.

107) Defendant aforesaid discrimination of the targeted teachers violate 29 U.S.C. § 621 ("Age Discrimination in Employment Act of 1967").

108) As a direct and proximate result of the aforesaid discrimination, Plaintiffs suffered monetary and other damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

## Ninth Cause of Action
## Violation of 42 U.S.C. § 1981 ("Civil Rights Act of 1991")

109) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

110) The Fraudulent Scheme and/or Enterprise was designed to and did in fact target certain teachers for discrimination and harassment.

111) The Fraudulent Scheme and/or Enterprise discriminated against teachers:

a. who were over a certain minimum age;

b. who had achieved a high pay and benefits level;

c. who had been employees for more than a minimum number of years;

d. who dared to challenge and/or question the "Rubber Room" procedures;

19

e.    who acted as whistle blowers regarding DOE misconduct, and

f.    who dared to demand or insist upon their due process rights.

112)    As part of their discriminatory practices, among other things, Defendants:

    a.    forced the targeted teachers to wait in the Rubber Rooms without due process and the chance to clear their names and be restored to their classrooms

    b.    coerced, harassed, intimidated and terrorized the "targeted" teachers so that they would ł be fearful for their personal and professional well-being so that they would be "forced" to retire, resign or accept deals involving ruinous fines or termination.

113)    At the time Defendants discriminated against the targeted teachers, they knew their actions were discriminatory and unlawful.

114)    Defendant aforesaid discrimination of the targeted teachers violate 42 U.S.C. § 1981 ("Civil Rights Act of 1991").

115)    As a direct and proximate result of aforesaid wrongful acts, Plaintiffs suffered monetary and other damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Tenth Cause of Action - Misuse of Public / Taxpayer Funds

116)    Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

117)    The Fraudulent Scheme and/or Enterprise involves the use of monies that are Federal, State and Municipal monies that are intended for specific educational purposes.

118)    As a direct and proximate result of The Fraudulent Scheme and/or Enterprise, Defendants

are causing excessive and/or wasteful payments to be made for educational purposes

programs.

119)    As a direct and proximate result of The Fraudulent Scheme and/or Enterprise,

Defendants are paying "substitute" teachers for services that can, should and would be

performed by the targeted teachers but for the fact that they are forced to sit in the Rubber

Rooms.

120)    The Fraudulent Scheme and/or Enterprise involves misuse and/or waste of public funds

allocated for educational purposes for which Defendants should account so that the monies

can be refunded and then used for proper educational purposes.

    **WHEREFORE,** Plaintiffs demand accounting by Defendants jointly severally and/or in

the alternative for (i) the misuse and/or waste of public funds, and (ii) attorneys' fees, interest

and costs of suit.

    ### Eleventh Cause of Action - Intentional / Negligent Infliction of Emotional Distress

121)    Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if

the same were repeated fully and at length herein.

    a.    The Fraudulent Scheme and/or Enterprise targeted certain teachers (i) who were

over a certain minimum age; (ii) who had achieved a high pay and benefits level; (iii)

who had been employees for more than a minimum number of years; (iv) who dared to

challenge and/or question the "Rubber Room" procedures; (v) who acted as whistle

blowers regarding DOE misconduct  (vi) who dared to demand or insist upon their due

process rights, (vii) by forcing the targeted teachers to wait in the Rubber Rooms without

due process and the chance to clear their names and be restored to their classrooms and

(viii) by coercing, intimidating and terrorizing the "targeted" teachers so that they would

be fearful for their personal and professional well-being so that they would retire, resign or be "forced" to accept deals involving ruinous fines or termination.

122)    The Defendants aforesaid acts were intentional, malicious, reckless, careless, negligent, unlawful and/or improper.

123)    As a direct and proximate result of Defendants aforesaid acts, Plaintiffs suffered emotional injuries, trauma and other related damages.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

**Twelfth Cause of Action - Tortious Interference with Contract and Property Rights**

124)    Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

a.    The Fraudulent Scheme and/or Enterprise targeted certain teachers (i) who were over a certain minimum age; (ii) who had achieved a high pay and benefits level; (iii) who had been employees for more than a minimum number of years; (iv) who dared to challenge and/or question the "Rubber Room" procedures; (v) who acted as whistle blowers regarding DOE misconduct (vi) who dared to demand or insist upon their due process rights, (vii) by forcing the targeted teachers to wait in the Rubber Rooms without due process and the chance to clear their names and be restored to their classrooms and (viii) by coercing, intimidating and terrorizing the "targeted" teachers so that they would be fearful for their personal and professional well-being so that they would retire, resign or be "forced" to accept deals involving ruinous fines or termination.

125)   The Defendants aforesaid acts were intentional, malicious, reckless, careless, negligent, unlawful and/or improper and were designed to interfere with Plaintiffs contracts, licenses and property rights.

126)   As a direct and proximate result of Defendants aforesaid acts, Plaintiffs suffered monetary and other damages.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Thirteenth Cause of Action - Libel, Slander & Defamation

127)   Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

128)   The Defendants acts involved false charges being placed in the targeted teachers' files.

129)   The false charges include allegations that the targeted teachers (i) were allegedly guilty of "misconduct", (ii) were allegedly guilty of "substandard" work, (iii) were allegedly guilty of "physically or emotionally abusing students" and/or (iv) were allegedly guilty of being "insubordinate".

130)   The false charges placed or caused to be placed by Defendants in Plaintiffs files, constituted libel, slander and defamation.

131)   At the time Defendants made and/or caused the charges to be made and/or placed in Plaintiffs files, Defendants knew them to be false.

132) The Defendants aforesaid libelous, slander and/or defamatory statements were intentional, malicious, reckless, careless, negligent, unlawful and/or improper and were designed to cause damage to Plaintiffs.

133) As a direct and proximate result of Defendants libelous, slander and/or defamatory statements, Plaintiffs suffered monetary and other damages.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Fourteenth Cause of Action - Injunctive Relief

134) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

135) Plaintiffs' confinement to the Rubber Rooms causes Plaintiffs to suffer immediate and irreparable harm and damages for which monetary damages are inadequate.

136) Defendants' placement of false charges in Plaintiffs' employment files, Plaintiffs to suffer immediate and irreparable harm and damages for which monetary damages are inadequate.

137) The Fraudulent Scheme and/or Enterprise which has Plaintiffs confined to the Rubber Rooms interferes with Plaintiffs' ability to quickly defend themselves against the false charges so that they can clear their names, have the false charges and all references thereto removed from their files and be restored to their class rooms and teaching responsibilities.

138) Every day that the Plaintiffs are confined to the Rubber Rooms, they suffer additional damages for which monetary relief is inadequate.

24

139)    The ongoing 3020 a Hearings as implemented and/or enforced by Defendants violates

Plaintiffs' due process rights.

140)    The requirement that Plaintiffs participate in the 3020 a Hearings as Defendants are

attempting to enforce them, as presently constituted and which are the functional equivalent

of "Kangaroo Courts", causes Plaintiffs to suffer additional damages for which monetary

relief is inadequate.

**WHEREFORE,** Plaintiffs demand judgment for the following injunctive and equitable

relief (i) closing the Rubber Rooms, (ii) directing that the 3020a Hearings be immediately

enjoined and Plaintiffs not be required to participate in the 3020a Hearings as Defendants are

attempting to enforce them, (iii) enjoining Defendants from issuing any findings or judgments

against Plaintiffs resulting from pending or concluded 3020a hearings, (iv) attempting to enforce

any previously issued findings and/or judgments against Plaintiffs resulting from the 3020a

Hearings dating back to 2000; (v) enjoining Defendants from disclosing to any third party the

false charges that were placed in Plaintiffs' files; (vi) attorneys' fees, interest and costs of suit;

and (vii) such other and further relief as is equitable.

Dated:  January 21, 2008
           New York, NY

Edward D. Fagan Esq.
5 Penn Plaza, 23rd Floor
New York, NY  10001
Tel. (646) 378-2225
Fax (646) 304-6446
Email: ed.fagan@global-litigation-partners.com

EXHIBIT     1

The New York Times

March 1, 2000

# Speed Is Urged In Disciplining Of Teachers

By ANEMONA HARTOCOLLIS

Every day, 300 New York City teachers accused of misconduct or incompetence -- more than are employed in many suburban school systems -- are paid to show up in district offices and do nothing while they wait for a longstanding system of disciplinary hearings to grind on, sometimes for years. Most of the teachers spend the day reading the newspaper.

Yesterday, Harold O. Levy, the interim schools chancellor, said he was so outraged when he learned of a case that dragged on for three years while a teacher accused of hitting children and calling them 'subhuman' received $150,000 in salary and pension benefits, that he decided to crack down.

In a memo sent to the seven members of the Board of Education and a letter to arbitrators, Mr. Levy said he would try to speed the disciplinary process by striking sluggish arbitrators from eligibility lists, ordering Board of Education lawyers to refuse adjournments and asking the State Education Department to withhold payment for arbitrators until the proceedings end.

By September, he said, he wants to cut the backlog of disciplinary cases in half.

"This is a disgrace, a waste of public funds and demeaning to the morale of our vast majority of qualified, hard-working teachers," Mr. Levy said in the letter sent to arbitrators used by the Board of Education.

Randi Weingarten, president of the teachers' union, said she supported Mr. Levy's efforts to streamline the disciplinary process, and educational experts applauded the move for demonstrating how problems long viewed as intractable can be changed through strong management.

"This is one of those things that many people in the system knew about, only everybody let it ride," said Robert Berne, vice president of development at New York University. "I think he's going to take aim at those, and I think that's a plus."

Since he was appointed interim chancellor four weeks ago, Mr. Levy has taken a series of small but pointed actions aimed at leaving his mark on the huge bureaucracy even if he stays on for only a few months. His predecessor, Rudy Crew, had been criticized by his own board for having strong ideas but failing to follow through.

Although state law requires disciplinary hearings for teachers, known as 3020a hearings, to be completed within four months, the average

Speed Is Urged In Disciplining Of Teachers - New York Times

http://query.nytimes.com/gst/fullpage.html?res=9C01E0DD1039F932A357550C0A96...

hearing in New York City drags on for 18 months and costs the system $100,000 in salary and benefits for the sidelined teacher, Mr. Levy said in a memo sent yesterday to the seven-member Board of Education. The longest case has been unresolved for seven years.

Mr. Levy blamed "institutionalized indolence" for much of the delay and said the board had spent $19 million a year just to hire substitute teachers to replace the ones enmeshed in disciplinary proceedings. He said arbitrators, who are paid $500 to $1,000 a day, routinely refuse to schedule consecutive hearing days, even though it is required by law, and often work less than the full day they bill for.

He said he was disturbed to learn that arbitrators try to create balanced track records, finding for teachers some times and the Board of Education other times, so they will not incur the enmity of either side and fail to be rehired.

There are now 372 full-time Board of Education employees assigned to district offices, the memo said. Of these, 267 are tenured teachers, 34 are teachers without tenure, 8 are principals, one is an assistant principal, 5 are custodians and 57 have other jobs he did not identify.

These employees, Mr. Levy said in "rubber rooms," so called because the teachers have nothing to do and are bouncing off the walls with boredom.

Mr. Levy said he wanted to close the rubber rooms within 30 days, and he directed Howard S. Tames, executive director of the board's personnel division, to find work outside the classroom for those employees to do.

In a letter to all arbitrators, he warned that as of June 2000, he would not allow his legal staff to pick any arbitrator "who has a significant, unexplained backlog, or who by his or her actions demonstrates a lack of courage to dismiss teachers who should not be in the classroom."

Mr. Levy said he was particularly upset to learn that one arbitrator, Margaret S. Leibowitz, had taken more than three years -- including 19 months just for deliberation -- to reach a decision dismissing Clifton Hill, an elementary school teacher.

Mr. Hill was accused of "using unnecessary force against students," including striking one, and referring to some students as "subhuman," according to court papers. He denied those charges at the hearings and was ultimately dismissed for insubordination, lateness and absences, a lawyer for the city said.

He was charged in June 1996, and Ms. Leibowitz, who took the case a month later, did not reach a decision to fire him until September 1999. While waiting for a decision, Mr. Hill received $150,000 in salary and benefit contributions.

When the board refused to pay $4,500, the last installment, of Ms. Leibowitz's arbitration fees on the ground that she had violated state deadlines, she sued, board officials said. Yesterday, Mr. Levy and the board countersued for $150,000 in damages, plus interest and costs.

Ms. Leibowitz's lawyer, Harvey Mars, declined to comment yesterday. Neither the Board of Education nor the corporation counsel's office could provide a number for Mr. Hill or his lawyer.

Anthony P. Coles, senior adviser to Mayor Rudolph W. Giuliani, said he saw Mr. Levy's move as a first step in attacking job guarantees for teachers.

"I think he's raising a question as to whether or not tenure has become an obstacle in making sure we have the best possible teachers in our classrooms," Mr. Coles said. "That's a good question to raise."

Mr. Levy did not propose eliminating tenure, but he did suggest that teachers have been given tenure cavalierly. He said he was surprised, given a work force of 78,000 teachers, that the board had sought to dismiss only three teachers for incompetence in the last two years. Most proceedings are brought for misconduct, like corporal punishment or absenteeism, or a combination of misconduct and incompetence.

Board officials said Mr. Levy wanted principals and superintendents to review teachers more seriously before granting tenure, extending their three-year probation if they did not make the grade or refusing tenure altogether. As it is, tenure is granted almost automatically.

Mr. Levy hinted that during contract negotiations, he would pursue other measures to root out incompetent teachers. He said that establishing incompetence was now a difficult process requiring intense perseverance by the principal. Every critical letter can be grieved, and resolving those grievances can take years.

"These problems go to the heart of ridding the system of teachers who cannot perform, and must be a subject of collective bargaining," Mr. Levy said.

Copyright 2008 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Back to Top

EXHIBIT    2

National Council on Teacher Quality

| NCTQ News Bulletin | Publications | Press Room | NCTQ Databases | About Us | Contact Us |
| --- | --- | --- | --- | --- | --- |

Latest Issue
Archives
Subscribe/Respond
TQB Cartoons
Search TQ Topics

## TQ Bulletin

**TEACHER QUALITY BULLETIN** – Volume 6, Number 10
June 08, 2005

Welcome to the Teacher Quality Bulletin!
TQ Bulletin is a monthly e-mail newsletter brought to you by the National Council on Teacher Quality.

In this issue:

**Tenure**

How Does $20 Million Buy You Back

**Retention**

NYC Teachers Advanced Exams

**Et Cetera**

Respect Is an Attitude:
More Teachers, Please
They Just Leave Us Scratching our Heads

**Effective Teaching**

Issue Added in Gotham!
Seeking Good Writers

**Pay and Benefits**

No New Merit Pay for the Lone Star State

**Teacher Preparation and Licensure**

Education Preparation and
Training Rates by Comparison

## Tenure

### NEW YORK'S $20 MILLION RUBBER ROOM
June 08, 2005

*Newsday* reported last week on yet another bureaucratic nightmare in New York City: over four hundred teachers are currently reporting to "borough suspension sites"--empty rooms where allegedly "abusive and inept" teachers wait for their cases to be ruled on by the NYC Department of Education.

They're commonly referred to as "rubber rooms" because the teachers in them have nothing to do--sort of a grown-up detention period. It's a detention period that can last for months or even years, though, and teachers get paid the whole time. The City is spending over $20 million a year on paying these teachers--a lot of money to pay people who are doing nothing.

While the Big Apple may engage in this practice on a grander scale than most school districts, it's a problem that all school districts live with. It's a practice the private sector wouldn't tolerate even if businesses could afford to let fired employees languish around the company lounge for months on end.

Send to a friend

Return to Table of Contents

Ellen Yan, *Newsday*, May 31, 2005

## Retention

### NYC TEACHERS' UNEXAMINED EXODUS
June 08, 2005

Ironically, while New York City spends millions of dollars paying allegedly abusive teachers to twiddle their thumbs in "rubber rooms," many of the Big Apple's more capable teachers keep flying

EXHIBIT     3

**the village VOICE**

NYC Life

# Class Dismissed

Lousy teachers or just political victims: there's got to be a better way to settle teacher disputes than New York's rubber rooms

by **Mara Altman**
April 24th, 2007 11:53 AM

Imagine that your boss wants you to sign a document accusing you of something you don't believe you did—a fireable offense like assaulting someone at work, for example—and your response is not only to refuse to sign, but to let loose a damning accusation that your boss was making up the allegation.

And, for good measure, you call your boss "fat."

Now, in just about any industry you can think of, this would not bode well for your continued employment. But in this case, we're not talking about just any kind of workplace, but perhaps the most dysfunctional employee-employer interface in the history of paychecks.

In other words, the New York City public school system.

When, three years ago, Georgia Argyris, a teacher, was presented with a letter accusing her of yanking the arm of a kindergartner at P.S. 50 in East Harlem, she let loose with a stream of accusations at her principal, Rebekah Mitchell, and added some unkind words about Mitchell's weight.

At another kind of job, Argyris might have called on a union representative to help her fend off what she considered baseless claims (she was denied one). Or she might have been immediately terminated after calling attention to her boss's waistline (she wasn't). Or at the least, the allegations against her, and her counterclaims, might have been reviewed in a timely manner by an impartial third party, someone who wasn't the recipient of Argyris's unwise outburst.

But no, this is the public school system, and there's only one way New York knows how to deal with teachers accused of bad behavior: send them off to a Kafkaesque holding pen, where taxpayers continue to pay their salaries for months as they wait for the glacial pace of what passes for justice, meted out by a sluggish school district and intransigent union.

Argyris, not formally charged with any wrongdoing, would spend the next *year and a half* in this limbo, paid by taxpayers to sit in a childless classroom with other teachers awaiting their own hearings.

It's not hard to see why teachers call this place the "rubber room," where they spend months—and even years, some simply waiting to see what they've been charged with.

The Department of Education, naturally, says that teachers end up for long periods in rubber rooms because their union—the United Federation of Teachers—has made it so difficult to fire lousy teachers.

The UFT, on the other hand, says that it's the DOE that abuses rubber rooms, sending teachers there that principals consider troublemakers. In other words, the union tends to see the rubber room system as the Guantánamo Bay of the school world, where political prisoners are sent by dictatorial principals. (Not surprisingly, the teachers doing time in rubber rooms we spoke to tended to agree with this view.)

Meanwhile, as teachers spend month after month reporting to mind-numbingly boring rooms waiting to be found incompetent (in some cases), or fit to return to teaching (in others), you pay. And pay.

The UFT and the DOE each claim no knowledge of the origin of rubber rooms. One longtime employee says they have existed since at least the late 1960s, but in a different form.

Teachers at that time who were accused of wrongdoing were reassigned to their district office where they were put to work—filing, typing up reports, and organizing data.

Today, teachers simply rot.

When Argyris reported to 333 Seventh Avenue in Manhattan , one of 13 rubber rooms the district euphemistically refers to as Reassignment Centers, she soon realized that her "job" now consisted of joining about 70 other reassigned teachers in daylong sessions of staring at a wall.

"I felt like a vegetable in a chair," she says.

Rubber room hours match that of a typical school day—Argyris would sign in at 8:30 a.m. and be released at 3:20 in the afternoon, with a 50-minute lunch break. Like something out of a dystopian fairy tale, however, this school had no children, just a few cafeteria workers, social workers, and custodians who shared the same lot.

In 2000, there were 385 teachers assigned to rubber rooms. Last month, that number had climbed to 662. Argyris, while she sat and stared at a wall, was paid $62,646 a year. The DOE pays about $33 million a year just in salaries to the teachers in rubber rooms—an amount that doesn't include the salaries of investigators working on the cases of rubber room teachers, the upkeep of the reassignment centers, or the substitute teachers who replace employees like Argyris.

Because teachers in rubber rooms are awaiting their cases to be heard, they aren't technically being punished. But they are restricted from numerous activities—they can't use MP3 players, telephones, or laptop computers. (Most flout those rules, however, and use various devices openly.)

Teachers say they soon learn that their peers are territorial and often cranky. One young teacher serving his fifth month tells the Voice the first thing he was told by a supervisor was not to sit in seats claimed by others. Fights have broken out over less, he was told.

"It's high school on steroids," he says. "Or maybe a mixture between a minimum security prison and a senior home."

To keep occupied, teachers read, play games like Scrabble or chess, or work on their screenplays. Art teachers work on paintings. Masters

degrees get completed. Last year at the Seventh Avenue rubber room, a group of teachers taught each other to knit. Exercise is a popular activity.

Jeremy Garrett, a former teacher, has spent the last two years producing a film about rubber rooms by sneaking in cameras. He says he's known some teachers who actually didn't mind spending years doing little more than showing up every day for a paycheck. "There are people on the inside who are milking the system," Garrett says. "You'd have to expect that, though."

After a recent day of staring at walls, five teachers currently serving time at a rubber room met at a nearby coffee shop. For the benefit of a reporter, they had prepared freshly printed handouts and an agenda, activities they obviously missed. They gave a bullet-point outline, summarizing the reasons they had been reassigned. Each, not surprisingly, claimed to be in the rubber room on trivial or inflated charges.

The DOE, however, says that teachers are only sent to rubber rooms for serious reasons. Some teachers, the DOE says, need to be separated from children because they've been accused of harmful behavior, like sex offenses. Others are awaiting discipline after investigators have confirmed allegations of incompetence or misconduct. And others are in rubber rooms because they've been accused of crimes by outside agencies.

But Argyris, as she sat in the rubber room in 2004, had been given no official reason why she'd been sent there. Previous principals had given her high praise for her work with kindergartners. Lyle Walford, an interim principal who worked with Argyris, says that she was a "great teacher," but also assertive. "She's outspoken," Walford tells the *Voice*. "She doesn't take any guff from anyone."

A former model, Argyris looked young for her age. She claims that from the first day of Mitchell's arrival, the new principal disliked Argyris for some reason, and the accusations of yanking a child's arm was just part of a strategy to get rid of her. The district counters that Argyris had a record of poor attendance, was often late to class, and that Mitchell found herself having to cover for the kindergarten teacher.

Late into the second month of the 2004 school year, a mother of one of the kindergartners said that her daughter's coat was missing and that her arm had been pulled. The student was on Argyris's roster. Argyris maintains she was absent the day of the incident and that the student in question was in another teacher's class. The district, however, countered in a hearing that the records were clear—on the date of the incident, the student was in Argyris's class. Mitchell interviewed some children and concluded that Argyris had mishandled the child. But Jeff Huart, a UFT investigator, tells the *Voice* that the investigation wasn't so clear-cut. "All I do know is that a bona fide eyewitness said the kid was not hit," he says. "The mother and two other kids came back and said Argyris did not hit the kid."

Argyris had never been charged with misconduct before. "She was a well-respected kindergarten teacher and all of a sudden she is an evil person that deserves to be booted from the school?" says a veteran teacher with more than a decade experience at the school. "It doesn't make sense."

Mitchell asked Argyris to sign a letter admitting to roughing up the child. Argyris refused to sign, and that's when she made her outburst about the principal's size. The principal then reported the incident to the regional superintendent, and Argyris was reassigned to the Seventh Avenue rubber room. "She lunged toward me when I gave her the letter," Mitchell tells the *Voice*. "It's a serious allegation and it warranted her being reassigned." But before she left, Argyris secretly made an audiotape of a conversation she had with assistant principal Angela Camiolo, who, in a transcript of the tape, appears to express some sympathy for her.

Argyris went to the rubber room confused and upset. She says she constantly had the urge to cry. Every 10 minutes, she says, she'd get up and go to the bathroom. She composed a letter to Chancellor Joel Klein that was never answered. She called the union frequently and rarely got through.

http://www.villagevoice.com/generic/show_print.php?id=76433&page=all&man&issue=0...

Two months later, still awaiting formal charges, Argyris was scheduled for a grievance hearing over her allegations that she'd been falsely accused. Perhaps naively, she believed she could play her secretly recorded tape of the assistant principal expressing sympathy for her and then get to return to her kindergarten classroom. "That didn't happen," she says.

When Argyris revealed the presence of the tape, the meeting was immediately adjourned. (Mitchell later gave Camiolo a poor rating, and Camiolo has been demoted to a teaching job at another elementary school.)

After the aborted hearing, Argyris went back to the rubber room, where her mental state deteriorated. A therapist prescribed her antidepressants.

"I became a worthless lump that didn't do anything anymore," she says.

On a recent visit to 25 Chapel Street in Brooklyn, a Reassignment Center opened in 2005 and housing at least 100 occupants, a *Voice* reporter found teachers sitting on either side of a long room, just about wide enough for two Cadillacs to park side by side. The teachers looked sedated, like passengers after a cross-country flight, and the room was stuffy with a musty smell, as if the ventilation system hadn't been working right.

A food-delivery boy soon slipped through the door with a bag that smelled like greasy stir-fry. One woman wore a sweat suit, read a magazine, and had her feet up on a chair. Some were sleeping, their heads lulling against the wall, while others played chess and dominos or kept to themselves.

After a room supervisor discovered the intrusion, the reporter was forced out of the room into a hall, where several teachers were power-walking for exercise, but others soon gathered, anxious to speak about their experiences. "You can't use my name," one teacher said pleadingly. "There's a history of retribution. I have to pay my bills, pay for my child and for rent. This is the only job I've had my whole adult life and this is all happening before I'm proven guilty. We're all guilty, but did nothing wrong."

After about an hour, two suit-clad DOE employees arrived. "The head of human resources," one teacher murmured to the next. The crowd scattered. A few moments later, a guard came into the hall and asked the unapproved visitors to leave. When asked why, the guard just shrugged.

Most press mentions of the teachers exiled to the rubber room involve extreme cases that tend to inflame the tabloids. The Office of the Special Commissioner of Investigation (SCI), an independent body headed by Richard Condon and designed to investigate wrongdoings in the DOE, posts press releases of teachers found guilty on its website, where they make for tab fodder.

On March 7, the SCI made public the case of 30-year-old Marcia Amsterdam, who engaged in sexual intercourse with a 13-year-old boy from her school. In another widely reported case, a teacher's lewd e-mails to a 16-year-old student produced six years of litigation (during which the teacher received $300,000 in compensation).

But out of 592 SCI investigations completed in 2006, only 259 were substantiated. The majority of cases are investigated by the Office of Special Investigations (OSI), which is part of the DOE and handles misdemeanor cases like incompetence and corporal punishment. "Before I was there, I thought this place was filed with thieves and molesters," one teacher tells the *Voice*. "There are people with quirks, but we're not all bad."

http://www.villagevoice.com/generic/show_print.php?id=764334&page=altman&issue=0...

Even though many inside are still awaiting decisions, the rubber room has become synonymous with guilt. Some teachers are too embarrassed to tell close family members about their reassignment. One teacher, who has been inside for more than six months, tells the Voice he's managed to keep the truth from his wife.

Teacher advocates say the investigation process wouldn't be so mentally damaging if it could only be handled more quickly. The Voice spoke to teachers who had been serving time in rubber rooms from two months to three years. The DOE says it can't produce an average length of stay, because the district only started keeping track in 2005. According to their contract, teachers must be formally charged within six months of being reassigned or be returned to the classroom. But being charged can then add many more months as a case slowly works its way through a complicated process.

"The length of the process depends on the complexity of allegations and case," DOE spokeswoman Melody Meyer says. "Some investigations take days, others take months."

There are currently only 18 hearing officers handling misconduct cases. Each officer is contracted to meet only five times a month. The backlog of cases is immense.

"We have been saying for years that we want these people out of these places much more quickly," UFT president Randi Weingarten says. "There is no reason for them to be sitting six months or longer without charges being filed."

Hearing officers are chosen jointly by the DOE and the UFT, but are paid for by the New York State Education Department. With New York City officers making up to $1,900 a day, it's a lucrative part-time job, which some critics say leads these officers to overly compromising opinions. "You make a lot of money," says Julia Cohen, a lawyer who specializes in education law. "You want to satisfy both sides."

By July 2005, Argyris still hadn't heard any decisions from the December grievance hearing and the names and faces of her students grew vague in her mind. She had been transferred to a Livingston Street rubber room where she said one man routinely ate crumbs off the floor and where she saw a woman attack a man with a cane.

The Livingston Street rubber room was soon closed and Argyris was transferred to the Chapel Street facility, where the teachers had formed tight cliques. A daily spectacle, she says, was a young couple who had met during their reassignment and had converted a corner of the room into a small love nest, complete with air mattress, sleeping bags, small fridge, and a portable DVD player.

Argyris says that she found a companion too. But it didn't dawn on her, she says, that a teacher accused of telling a student he was going to throw the boy from a window might not make the best boyfriend.

In January 2006, Argyris filed a restraining order after her rubber room boyfriend beat her up. Photographs show that the whites of her eyes were stained red with blood. Black and blue marks ran the circumference of her neck.

Meanwhile, she passed her sixth-month mark in the rubber room without charges, but that milestone didn't, as her contract promised, put her back in a classroom. Instead, the UFT told her to keep showing up. But that was becoming more difficult. She started attending less frequently. And then, in February, she finally received formal charges—for her rubber room absences.

Because of Argyris's numerous absences (65 over the 18-month period), the DOE told her it planned to dock nine months of her salary. If she didn't agree, she would be fired. Instead, she hired a private attorney who drew up another settlement. She agreed to pay $2,500 and

stipulated that if she accumulated another 55 minutes in tardiness, she would be automatically terminated.

The UFT was unhappy that Argyris had signed a private settlement with the district, but it's common for teachers to seek such agreements after they spend months in reassignment. The rubber rooms, in other words, wear them down. (In such settlements, the district collected $310,000 in fines last year.)

Edward Wolf, a lawyer, has made a living for almost two decades defending teachers. He says settling can be dangerous, because the teacher's name will never be cleared. "You're leaving your client with a dirty reputation," he says. "The teacher's got a rap sheet now and it's easy just to bump him off."

But the alternative—waiting for the hearing process to conclude—is increasingly a crapshoot. Last year, 200 teachers were charged with wrongdoing, but only eight were exonerated. Wolf said that five years ago it was common to win several consecutive cases, but now wins are rarer.

After her settlement, Argyris was still stuck in a rubber room. In March 2006, the UFT filed a special complaint on her behalf, charging that principal Mitchell had created a harassing work environment which had led to Argyris being reassigned. An arbitrator ultimately ruled against Argyris, saying that Mitchell had not harassed her.

But during preparations for the grievance hearing, to everyone's surprise, it was found that principal Mitchell had written a letter about a year and a half earlier—in January 2005—rescinding her original allegations that Argyris had yanked a child's arm.

"There was a document exonerating her," UFT investigator Huart says. "I was flabbergasted that this document even existed."

After 18 months in purgatory, Argyris was suddenly released from the rubber room. The teacher was told she could immediately return to her old school, as if nothing had ever been wrong.

Stunned and emotionally spent, Argyris was overwhelmed.

. . . . . . . . . . . . . . . . . . . . . . .

Just thinking of returning to school after so long an absence made Argyris dizzy.

Garrett, the documentary filmmaker, says he's seen several teachers come out of rubber rooms and experience difficulty assimilating to classrooms. "The amount of time you're away from your school indicates something bad to your colleagues," he said. "But really it's the inefficiency of the system."

Argyris shuddered at the idea of being under the supervision of the same woman who accused her of wrongdoing in the first place. "Why would they send me back to the school with that woman?" asked Argyris. "It's like they were setting me up to fail."

The first few days, Argyris failed to show up, which she attributes to feelings of intense anxiety. When she finally came to school, she was offered a third grade class instead of kindergarten, the grade she'd always taught. Argyris asked the union to provide an aide to accompany her in the room; she wanted a witness so that she couldn't be accused of corporal punishment again. The aide was denied, as was a transfer to a kindergarten classroom. Mitchell says Argyris's return was a disaster. "She usually spent the day sleeping in the teachers' lounge or went out in the neighborhood. I was often asked by parents who was the person screaming into the phone or lying in the teachers' lounge." A doctor recommended medical leave for Argyris, but as her medical issues were being resolved, Argyris surpassed the 55-minute tardy stipulation in her settlement agreement. She was terminated a little more than one month after returning to her

school.

Her case won't die, however. The UFT and DOE continue to battle over the original allegations made against her. The DOE seemed incensed that the *Voice* was interested in the Argyris matter; it sent over records of a nine-year-old accusation that Argyris had made racially insensitive remarks to a district employee. Argyris denies the allegation, and was never disciplined for the incident. Repeatedly, DOE officials warned the *Voice* not to write about any aspect of the Argyris case.

Many teachers don't return to school after the rubber room—some retire; one woman the *Voice* talked to vowed to go to private schools; one young man said that when he was cleared he hoped to get a job in another state; another young teacher gave up after a few months in the rubber room and took up nursing.

But the DOE says that the numbers of teachers involved is small. "We're talking about 662 people out of a workforce of 80,000 teachers and roughly 6,000 administrators," Meyer says. "The vast majority is not affected."

The union, meanwhile, says that the rubber room system is preferable to the alternative: suspending teachers without pay until their cases were adjudicated. "There would be even more delays. Cases would drag on forever," Weingarten says. "We want these cases dealt with as soon as possible and not delayed for months and months . . . More than three years ago, I proposed creating a super-arbitrator system to clear the backlog of cases. The DOE rejected that."

Meanwhile, stuck with the rubber room system, life—or something like it—goes on in the city's reassignment centers. Jeremy Garrett, the former teacher who was sneaking into rubber rooms with videocameras to make his film, was arrested on April 18 when teachers objected to his presence. He was charged with criminal trespass.

And also last week, one teacher the *Voice* talked to, Ronald Mortensen Jr., a physical education teacher who worked with special education students, was run over and killed by a car on his lunch break. He was serving his second stint in the rubber room.

EXHIBIT     4

# The Sun

### NEW YORK

October 15, 2007 Edition > Section: New York > Printer-Friendly Version

# UFT Asserts It May Sue City
## Discipline of Teachers in 'Rubber Rooms' Angers Weingarten

BY ELIZABETH GREEN - Staff Reporter of the Sun
October 15, 2007
URL: http://www.nysun.com/article/64521

ADVERTISEMENT

On an issue that is testing President Randi Weingarten's public detente with the city, a new group within the United Federation of Teachers is arguing that the union take a tough stance on the treatment of teachers who have been disciplined.

The group, which has dubbed itself the Teacher Reassignment Center SWAT Team, has been compiling pages of documentation on the so-called rubber rooms where teachers accused of charges ranging from incompetence to sexual assault are held as they await a hearing. More than 700 teachers now sit in rubber rooms, where they receive full pay but cannot enter a classroom, a Department of Education spokeswoman, Melody Meyer, said.

Ms. Weingarten said yesterday she hopes the investigation will end with a deal between the union and the city, and not in the courtroom. The result, she said, will hinge on how the Department of Education responds to new guidelines she plans to send in a letter next week. "If we make a proposal and the Board of Education says, 'No, forget about it,' then we have a problem," Ms. Weingarten said.

She called the issue a "test case" for her new cooperative stance with city officials.

A lawsuit is one route if cooperation fails, the head of the investigative group, Betsy Combier, said.

The centers hold teachers accused of misconduct ranging from criminal charges to incompetent teaching. Tenured teachers cannot simply be fired or pushed to leave their jobs because the UFT contract requires that they first receive a hearing. A panel of arbitrators then decides whether the teacher will be fired, fined, or allowed back in the classroom with no discipline.

Just 11 rooms hold the 700-plus teachers whose cases have not yet been resolved. The backlog has left some teachers on the city payroll for as long as two years before a decision is reached. In the meantime, teachers in the rooms pass the time by watching television, reading books, and writing.

A complaint the UFT sent to a deputy chancellor at the Department of Education, Kathleen Grimm, recently noted the crowded rooms' poor conditions, including inadequate toilet facilities and electrical violations such as exposed wiring.

Ms. Combier said her conversations with about 70 teachers so far suggest that a majority in the rubber rooms are also being denied due process rights — that is, they have been taken out of the classroom and placed in a center for as long as two years without any information as to why. "It's a public relations nightmare for the Board of Education," Ms. Combier said. "They will never live this down. I won't let them."

A Department of Education spokesman, David Cantor, said cooperation is a possibility. "We'll work with the UFT

ADVERTISEMENT



THE DNA ANCESTRY PROJECT

Discover your ancestry through DNA
www.DNAAncestryProject.com

www.dnaancestryproject.com

Ads by Google

whenever we can," he said. "But don't be mistaken. The teachers in the rubber rooms have been accused of serious misconduct and crimes. We will not keep them with kids in schools simply because their contract says they must continue to be paid."

He said there are a few cases in which the city does not tell teachers why they are charged as a way of protecting the investigations against them. He said "virtually all" teachers know why they are in rubber rooms.

Ms. Weingarten's promise to ramp up pressure on the issue of rubber rooms comes as she is facing more pressure to act from inside her union and beyond. Factions have formed within the union to fight on behalf of teachers in rubber rooms, making suggestions ranging from hiring more staff to defend teachers to issuing subpoenas of state agencies on their behalf. One group, the Teacher Advocacy Group, plans to picket the union's Lower Manhattan headquarters Wednesday following a delegate assembly meeting, a retired teacher who is advising the group, Norman Scott, said. The group will carry signs charging that the union has "dropped the ball" on protecting teachers.

An independent filmmaker has also added to the fire with a documentary called "The Rubber Room," which several teachers said has generated interest from such high-profile outlets as Comedy Central's "The Daily Show."

Some in the union ridiculed Ms. Weingarten's push for compromise, saying it will not resolve what they described as the UFT's failure to provide teachers in rubber rooms with strong legal representation. "They need people that have some kind of understanding and background in employment investigations. They have nothing," a teacher who was placed in a rubber room and who is also a lawyer, Jeffrey Kaufman, said.

Ms. Weingarten's new team includes Ms. Combier, who said she has previous paralegal experience, and two journalists at the union's newspaper.

October 15, 2007 Edition > Section: New York > Printer-Friendly Version



THE DNA ANCESTRY PROJECT

www.dnaancestryproject.com

Discover your ancestry with DNA.
www.DNAAncestryProject.com

Ads by Google

EXHIBIT    5



# WHY IS THE CITY PAYING 757 PEOPLE TO DO NOTHING?

By ANGELA MONTEFINISE and MELISSA KLEIN

http://www.nypost.com/php/pfriendly/print.php?url=http://www.nypost.com/seven/093...

*September 30, 2007* -- Just before 9 a.m., they file into large, sometimes windowless rooms.

In some cases, they punch time cards; in others, they scribble their names on a sign-in sheet.

They take their places in plastic chairs either grouped around tables or scattered haphazardly.

Some immediately pull out crossword puzzles or books. Some knit. Others hold golf-putting contests. One takes out his guitar and strums.

One day last week, another, wearing a leotard and tights, spread out on the floor and stretched before practicing ballet against a wall in a corner.

Nearby, gazing out a window, a man slowly fell asleep, his head in his hands.

It's all in a day's work on the city payroll.

For seven hours a day, five days a week, hundreds of Department of Education employees - who've been accused of wrongdoing ranging from buying a plant for a school against the principal's wishes to inappropriately touching a student - do absolutely no work.

In an investigation inside the nine reassignment centers called "rubber rooms" where these employees are sent, The Post has learned that the number of salaried teachers sitting idly waiting for their cases to be heard has exploded to 757 this year - more than twice the number just two years ago - at a cost of about $40 million a year, based on the median teacher salary.

The city pays millions more for substitute teachers and employees to replace them and to lease rubber-room space.

Meanwhile, the 757 - paid from $42,500 to $93,400 a year - bring in lounge chairs to recline, talk on their cellphones and watch movies on portable DVD players, according to interviews with more than 50 employees.

David Pakter, 62, has been in a rubber room for a year for buying a plant for his school and giving students watches he'd made, he said.

The DOE would not discuss ongoing investigations.

Pakter, a former "teacher of the year" honored at City Hall during Rudy Giuliani's mayoral tenure, just bought a new Jaguar with his $90,000 salary for "doing absolutely nothing."

"It's a present from [Schools Chancellor] Joel Klein," Pakter said. "I want to teach, they won't let me teach, but they'll pay me enough to buy a car. Can someone explain this to me?"

Another rubber-room attendant said she was unaware of the reason she'd been assigned there for more than a month. Yet another, an Army reservist who spent almost 3½ years in a rubber room before he retired, begged to be able to go to Iraq instead of staying in DOE Siberia.

"I think I'm the only one who actually had a grievance to get into a rubber room," said Lazarus, who was in this "detention" for six weeks before accusations of verbally abusing a student were dropped.

Sam Lazarus, a social-studies teacher and union rep at Bryant HS in Long Island City, said he and his spotless 23-year teaching record were shipped off to a Queens rubber room last spring that was so "filled to the rafters" that he was forced to sit in a plastic chair outside the room.

Some say the teachers themselves are to blame - their union contract requires a hearing before any tenured employee can be fired.

"The reason the rubber room exists is because of worn-out and, quite frankly, irrelevant union contracts that do more to protect people's jobs than they do to protect kids," said Jeanne Allen, president of the Center for Education Reform, based in Washington, D.C.

Adding to that issue is the fact that the 20 arbitrators who review cases meet, on average, five times a month, or twice a month in the summer, making for a painfully slow and inefficient system.

Meanwhile, some teachers feel they're being attacked in a "guilty until proven innocent" atmosphere in which more powerful principals can easily remove teachers who question the system and students can easily get teachers they don't like removed by making up accusations.

The union now counsels its members to avoid becoming too involved - including even in breaking up student fights - because it could land them in a rubber room.

"Teachers are scared. The system wants to cover itself, not protect us," said Lenny Brown, a physics teacher who landed in the rubber room over accusations that he touched a student's breast in front of the class - a charge he vehemently denies.

The DOE admits it has become more proactive in trying to fire teachers.

"I've been pushing to try to charge more cases," said DOE general counsel Michael Best. "Sometimes I'd rather be more aggressive in terms of things, in getting folks who we should be trying to terminate terminated."

But Best says the system, governed by state law and contractual obligations, is cumbersome.

"I think everybody would like to resolve these cases more quickly," he said.

Randi Weingarten, president of the United Federation of Teachers, says the union is not interested in protecting bad teachers and adds that she is willing to compromise to fix the system. She hopes the future holds a quicker process and a rubber-room system where teachers will at least be working.

The city used to assign teachers under review administrative duties, but that ended with the 2002 school reorganization when district-run rubber rooms were turned into larger, citywide cells.

The DOE says it's handcuffed by a clause in the teacher contract saying rubber-room residents cannot be given "non-teaching duties," but the UFT says administrative work is just fine.

"Right now, the system is terrible for everyone," said Weingarten. "It's in everyone's interest, I think, to change it."

*Additional reporting by Susannah Cahalan and Kathianne Boniello*

*angela.montefinise@nypost.com*

**Home**

NEW YORK POST is a registered trademark of NYP Holdings, Inc. NYPOST.COM, NYPOSTONLINE.COM, and NEWYORKPOST.COM are trademarks of NYP Holdings, Inc.
Copyright 2008 NYP Holdings, Inc. All rights reserved.