UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEACHERS4ACTION, et al., Plaintiffs, v. MICHAEL G. BLOOMBERG, et al., Defendants. | Index No. 08 Civ. 548 (VM) (AJP) **DECLARATION OF CHARLES G. MOERDLER IN OPPOSITION TO PLAINTIFFS' APPLICATION PURSUANT TO 28 U.S.C. § 144** |

CHARLES G. MOERDLER, under penalty of perjury, declares:

I am a member of Stroock & Stroock & Lavan LLP ("Stroock"), counsel for defendants Randi Weingarten, President of the United Federation of Teachers ("UFT"), and the UFT, in the above-captioned action. I have personal knowledge of the facts set forth below.

1. I submit this Declaration in opposition to Plaintiffs' application pursuant to 28 U.S.C. § 144. To place plaintiffs' application in context, Defendants Randi Weingarten and the UFT believe that the Court should be aware of Plaintiffs' counsel's apparent practices in litigating before this and other courts. This is not the first time Plaintiffs' counsel has improperly sought an end run around a judge whose determination he was displeased with, disregarded court orders and made frivolous applications.

**THE PRESENT ACTION**

2. On January 15, 2008, Mr. Fagan sent a letter to Mayor Michael G. Bloomberg and Chancellor Klein, as well as other persons holding political office and the UFT, on behalf of an as yet not formed organization called Teachers4Action. (A copy of the letter and accompanying press advisory is annexed hereto as Exhibit A). The letter makes unspecified allegations of a "Fraudulent Scheme" through which the Board of Education of the School District of the City of New York (the "Board") discriminates against teachers in its use of Temporary Reassignment Centers, sometimes called "Rubber Rooms." The letter demanded that (1) all rubber rooms be closed by January 22, 2008 and all teachers restored to full duty; (2) an independent task force be appointed to report on Rubber Rooms; and (3) a meeting be scheduled on or before January 22, 2008 with representatives of the Mayor, the Board, the UFT and Teachers4Action. The letter also purported to constitute a formal grievance under Article 22 of the collective bargaining agreement ("CBA") between the UFT and the Board. Simultaneously, Mr. Fagan issued a press release on behalf of Teachers4Action summarizing and annexing the letter. Id.

3. Long before Mr. Fagan made his January 15, 2008 splash with allegations of an unspecified "Fraudulent Scheme," the UFT had raised serious concerns in connection with the use of disciplinary actions and Rubber Room assignments. In a letter addressed to elected officials, dated January 15, 2008, UFT President, Weingarten provided background on what had been done in connection with these concerns prior to the formation of Teachers4Action. (A copy of the letter is annexed hereto as Exhibit B). As related in that letter, based upon the

identified concerns, the UFT had previously presented several demands to the Board. Discussions as to these demands were ongoing.

4. Shortly thereafter, on January 21, 2008, Mr. Fagan commenced the instant action in the District Court for the Southern District of New York, entitled "Teachers4Action, et al. v. Michael G. Bloomberg, et al.," 08 Civ. 00548 (VM) (AJP). The Complaint leveled allegations ranging from civil Racketeer Influenced and Corrupt Organizations Act violations to civil rights violations all centered around the placement of teachers into "Rubber Rooms" and the process such teachers receive when ultimately charged with misconduct. Magistrate Judge Andrew J. Peck fairly described the Complaint as having "thrown in everything except the kitchen sink." (January 28, 2008 hearing transcript, *infra*, at 22.) Neither the UFT nor Randi Weingarten were initially named in the action.

5. As appears to be Mr. Fagan's practice, immediately upon commencing the action, Mr. Fagan requested emergency relief from the Court. Indeed, in most of the numerous cases that I have litigated against Mr. Fagan since 1999, that ploy has been his trademark opening salvo (usually for a preservation of evidence order).[1] By letter dated January 23, 2008, Mr. Fagan requested that the Court set an "expedited conference." (Dkt. #4.) Mr. Fagan had only just served the government defendants the day before and had not yet even filed proof of service with the Court. This Court referred Mr. Fagan's request and all pretrial matters to Magistrate Judge Peck, who scheduled a conference for January 28, 2008. At the conference, Mr. Fagan made several requests for extraordinary relief without any apparent basis in law all the while trying to convince the Court of how unusual a case this was

1 The apparent purpose of the ploy is to gain attention and to show his clients that he has the Court's attention.

and create a sense of urgency out of his own disorganization and delay. (A copy of the transcript for the January 28, 2008 hearing is annexed hereto as Exhibit C.) Mr. Fagan's not so extraordinary concerns were, *inter alia*,

(i) that the Board might retaliate against teachers associated with Teachers4Action because of the lawsuit;

(ii) that the Board may not properly preserve all documentary evidence because it is a large bureaucracy; and

(iii) that an individual, who at the time was not yet a plaintiff, had a potential CPLR Article 78 action against the same defendants on a related, but separate issue and that the statute of limitations as to that separate claim was expiring that day.

Ultimately, Judge Peck ordered discovery stayed pending Mr. Fagan filing a suggested more stream-lined amended complaint on February 8, 2008, except that Mr. Fagan was permitted to serve document requests upon the named defendants and a preservation (not production) subpoena on the UFT. (Despite Mr. Fagan's overtures as to the urgency of the discovery issues, no such subpoena was ever served on the UFT.) Magistrate Judge Peck also set a follow up conference for February 8, 2008. Judge Peck suggested to Mr. Fagan that if he needed more time to ensure that the amended complaint was complete, he would allow it. (Ex. C, 37). Mr. Fagan declined and committed to amending the complaint by February 8, 2008. (Id., 48).

6. On February 8, 2008, Mr. Fagan had neither filed an amended complaint nor requested an extension of time to do so. (A copy of the transcript for the February 8, 2008 conference is annexed hereto as Exhibit D.) At the conference, Judge Peck aptly wondered whether "court orders mean anything" to Mr. Fagan. (Id., 2.) (As detailed below, it appears

not.) Mr. Fagan made a half-hearted attempt at excusing his failing by blaming it on a lost laptop.[2] Despite Mr. Fagan's disregard of Judge Peck's prior Order, Judge Peck permitted Mr. Fagan to pick his own new deadline for filing an amended complaint. (Id., 4.) Mr. Fagan chose February 13, 2008. (Id., at 4-6.) Needless to say, Mr. Fagan failed to file an amended complaint on February 13, 2008. Judge Peck again extended Mr. Fagan's time to file an amended complaint until February 22, 2008, noting that this was four days more than Mr. Fagan had requested. (February 14, 2008 Order, Dkt. # 8). Plaintiff's counsel failed to meet even that deadline.

7. Ultimately, on February 25, 2008, Mr. Fagan filed his Amended Complaint, albeit improperly as an "Answer," on ECF. (Dkt. # 9.) The Amended Complaint failed to include what appeared to be voluminous exhibits referenced in its body. Mr. Fagan followed this filing with another filing of something he called a "Notice of Filing of Updated Liste [sic] of Teachers4Action Members and Plaintiffs" on March 4, 2008, also improperly filed as an "Answer." (Dkt. #10.) This document appears to list intended plaintiffs that are not included in the Amended Complaint. Thus, months later, it remains unclear who the plaintiffs are and whether Mr. Fagan will seek to amend the complaint yet again. Moreover, although the Amended Complaint named the UFT and its President, Randi Weingarten, Mr. Fagan failed to serve these defendants for nearly two months. The UFT and Randi Weingarten were finally served on April 16, 2008.

8. Instead of timely serving these defendants, Mr. Fagan used that time to make several more "emergency" applications to this and other Courts. By letter dated March 25,

[2] This unavailable laptop routine has also been a trademark ploy of Mr. Fagan's.

2008, addressed to this Court, Mr. Fagan complained that the government defendants had "retaliated" against plaintiffs forcing them to "defend themselves in The State Hearing [*i.e.*, Education Law § 3020-a disciplinary hearings,] without counsel, and with Arbitrators who Plaintiffs submit are conflicted, biased or improperly designated." (For the Court's convenience, a copy of that letter is annexed hereto as Exhibit E.) These are the same "State Hearings" that plaintiffs complain in their Amended Complaint have not been moving along quickly enough or at all. (See e.g., Amended Complaint, ¶ 39,53.) Based upon this, Mr. Fagan requested that the Court hold a Rule 16 Conference, at which he might request "Emergent Relief and [a] Preliminary Injunction." By endorsement dated the same day, this Court referred Mr. Fagan's request to Judge Peck. (Dkt. # 12.) Judge Peck denied the application, stating that (i) plaintiffs continue to cite emergent circumstances, yet themselves delay in moving the case forward; (ii) the complained of retaliation is inconsistent with plaintiffs' complaints that such hearing are moved along too slowly; and (iii) that the application to your Honor appeared to be an "end-run," around him. (Dkt. # 13.)

9.     Having been denied what he wanted in this Court, Mr. Fagan switched his attention to State Court. On April 8, 2008, petitioner Gloria S. Chavez, identifying herself as one of the Teachers4Action plaintiffs in this case, filed an application for an Order to Show Cause and for a Temporary Restraining Order seeking to stay her § 3020-a hearing until such time as "an arrangement is made whereby [she] is represented by competent counsel paid for or arranged by the United Federation of Teachers." (A copy of that application is annexed hereto as Exhibit F.) Although the application had seemingly been prepared by counsel, petitioner Chavez appeared *pro se* before Justice Abdus-Salaam in New York State Supreme

Court, New York County. My understanding is that Justice Abdus-Salaam heard argument from both parties off the record that same day. At the hearing, Justice Abdus-Salaam recognized that there was no grounds upon which she could issue a preliminary injunction staying the hearings, pointing, *inter alia*, to the fact that there was no irreparable harm because the law provides for multiple levels of appeal and review at the conclusion of a § 3020-a hearing. Justice Abdus-Salaam also said that although petitioner had a right to have an opportunity for counsel to represent her, she did not have an absolute right to an attorney. She commented that counsel for plaintiffs in the instant case should have contemplated the eventuality that accusing the attorneys that represent individual plaintiffs in their § 3020-a proceedings of ethical violations as well as malpractice in such representations would give rise to a conflict of interest that would require them to withdraw. Despite all this, in an attempt to allow Petitioner Chavez some period of time in which to seek private counsel, Justice Abdus-Salaam stayed Ms. Chavez's 3020-a hearing until the return date for the Order to Show Cause, on April 24, 2008, suggesting to her that on April 24, 2008, the Court might simply again advise her that there is not grounds upon which to grant a preliminary injunction.

10. Taking advantage of the results of Petitioner Chavez's test case, on April 14, 2008, Mr. Fagan filed a second follow-up petition and application for injunctive relief before Justice Abdus-Salaam on behalf of Teachers4Action and seven more of its members. Justice Abdus-Salaam ordered that those petitioners' arbitrations also be stayed until April 24, 2008. (A Copy of that application and the signed Order to Show Cause is annexed hereto as Exhibit G.)

11.     It is my understanding that on April 24, 2008, Justice Abdus-Salaam denied all applications for injunctive relief.

12.     By letter dated April 18, 2008, Mr. Fagan made yet another urgent application to this Court for an "expedited" Rule 16 conference to rehash, *inter alia*, issues regarding staying the 3020-a hearings and the genesis of allegedly privileged emails that were the subject of an April 11, 2008 conference before Judge Peck – all issues previously raised with and being handled by Judge Peck.  (A copy of the April 18, 2008 letter is annexed hereto as Exhibit H.)  The application sought an order:

    (i)      sealing the allegedly "intercepted" privileged emails;

    (ii)     enjoining defendants from using the emails in this court or any other court, forum or proceeding;

    (iii)    enjoining the government defendants from sharing the emails with anyone including other defendants in this case;

    (iv)    compelling government defendants to produce all documents relating to the emails, including any evidence of who gave them to Corporation Counsel; and

    (v)     granting defendants limited discovery in connection with the allegedly privileged emails.

The same day, this Court again referred these issues to Magistrate Judge Peck. Simultaneously, Judge Peck, by endorsement on Mr. Fagan's application, again stated that counsel's attempts to get around Judge Peck's authority would not be tolerated.  Judge Peck also reiterated his statement to Mr. Fagan that sanctions would result if he continued on this course.  Judge Peck reminded Mr. Fagan that he had already been permitted to brief the

privilege issue with regard to the emails. (Dkt. # 26.) Instead, Mr. Fagan chose to make further "emergency" applications that serve no purpose other than to frustrate progress.

13.     Unhappy with Judge Peck's direction that the "judge shopping must stop," Mr. Fagan continued to do just that. On April 21, 2008, Plaintiffs filed a "Notice and Declaration of Bias" accusing Magistrate Judge Peck of being biased and seeking his recusal. (Dkt. # 29.) By Opinion and Order dated April 22, 2008, Judge Peck denied Mr. Fagan's request that he recuse himself.

14.     Mr. Fagan again filed a letter reiterating his application to have Magistrate Judge Peck recused on April 23, 2008. (A copy of that letter is annexed hereto as Exhibit I.)

15.     Having failed to put a stop to the arbitration hearings either by accusing the arbitrators of bias or by applications for injunctive relief in this Court and before Justice Abdus-Salaam, Mr. Fagan commenced yet another action by application for an Order to Show Cause on or about April 24, 2008. That action is brought on behalf of Teachers4Action against seventeen Section 3020-a panel arbitrators, alleging the same bias and breaches of law, contract and due process as raised in the proceedings before Justice Abdus-Salaam and this Court. (A copy of that application is annexed hereto as Exhibit J.) That action seeks the same relief already applied for in this Court and in State court: an injunction stopping the 3020-a hearing from continuing against members of Teachers4Action. Nonetheless, Mr. Fagan saw fit to assert in that application that "the within relief has never been previously requested of this court or any other court." Mr. Fagan also did not see fit to designate this action as related to the two already before Justice Abdus-Salaam, as required by the Uniform Civil Rules for the Supreme Court and County Court, 22 N.Y.C.R.R. § 202.6. It is my

understanding that this action was assigned to Justice Kibbie Payne, who held a conference yesterday, Monday April 28, 2008. Mr. Fagan appeared for Teachers4Action and Corporation Counsel appeared on behalf of the City Department of Education. Upon hearing argument, Justice Kibbie agreed that the Department of Education, although not named, was a necessary party to the proceedings and referred the case to Justice Abdus-Salaam as related to the two actions already before her. Based upon that referral, it is further my understanding that Justice Abdus-Salaam heard counsel on the application later that same day. Justice Abdus-Salaam declined to issue the requested stay on the submitted papers.

16.     Mr. Fagan's tactics of making repetitive "emergency" applications for confusing, overlapping and largely frivolous relief, coupled with his ethically questionable litigation strategy, is part of a pattern and practice. Magistrate Judge Peck's admonitions and warnings regarding potential sanction, although proper, are not likely to have much deterrent effect on Mr. Fagan. He has already demonstrated in this Court and others that even the imposition sanctions in the hundreds of thousands of dollars, which he has not paid, will not deter him from improper actions. I have litigated against Mr. Fagan in several matters. Repeatedly, Mr. Fagan has wielded his power as an attorney with flagrant disregard of the authority of courts, the requirements of law and procedure or the rights of individuals. Mr. Fagan's actions in this case and the various related State court proceedings are but the most recent in a litany of procedurally improper and spurious claims. This Court should act at the earliest possible moment to prevent the continuation of Mr. Fagan's abusive and vexatious behavior in order to better focus the issues in the litigation and minimize his ability to inflict unnecessary collateral damage. As described below, Mr. Fagan now owes this Court and a

variety of parties approximately $500,000 for sanctions imposed by the Courts, and that those obligations have been outstanding for years in several instances.

## MR. FAGAN'S ONGOING PATTERN OF MISCONDUCT

17. Mr. Fagan was involved in a 1998 class action concerning the illegal receipt and conversion of property during the Holocaust. That action was settled in 1999. Thereafter, Mr. Fagan commenced several vexatious litigations alleging claims that had already been released in the 1999 settlement as well as seeking related, often nonsensical, other relief. Beginning in 2004, Mr. Fagan filed a spate of related actions on behalf of a fictional entity named "AHVRAM" against various defendants, all of which were related to alleged "Stolen Artwork and/or Collections" from the Holocaust era. These actions were either: dismissed for lack of service, dismissed for failure to prosecute, or dismissed for not following court directives.[3]

18. Mr. Fagan's "AHVRAM" action against Bank Austria Creditanstalt AG (04 Civ. 3600), where I represented Bank Austria Creditanstalt AG, was dismissed by Judge

[3] Deutsch v. Sotheby's Holding Inc., Index No. 04-100902 (N.Y. Sup. Ct. N.Y. Co. Jan. 20, 2004) (dismissed); Association of Holocaust Victims for Restitution of Artwork and Masterpieces, a/k/a "AHVRAM" v. Sotheby's Holding Inc.; a/k/a Sotheby's New York; and a/k/a Sotheby's London, Index No. 04-108810 (N.Y. Sup. Ct. N.Y. Co. June 14, 2004) (dismissed); Association of Holocaust Victims for Restitution of Artwork and Masterpieces, a/k/a "AHVRAM" v. Federal Republic of Germany, and Hans Richel, Bundesminister für Finanze (bearing an S.D.N.Y. caption but apparently never filed); Association of Holocaust Victims for Restitution of Artwork and Masterpieces, A/K/A "AHVRAM" v. Bundesrepublik Österreich a/k/a Federal Republic of Austria, No. 04 CV 5383 (S.D.N.Y. July 9, 2004) (closed by administrative order); Association of Holocaust Victims for Restitution of Artwork and Masterpieces, a/k/a "AHVRAM" v. Federation of Russia, et al., No. 04 CV 08456 (S.D.N.Y. Oct. 27, 2004) (dismissed); Association of Holocaust Victims for Restitution of Artwork and Masterpieces, a/k/a "AHVRAM" v. Republic of Hungary, No. 04 CV 08457 (S.D.N.Y. Oct. 27, 2004) (dismissed); Association of Holocaust Victims for Restitution of Artwork and Masterpieces, a/k/a "AHVRAM" v. United States of America, No. 04 CV 8587 (S.D.N.Y. Oct. 29, 2004) (dismissed). Another action entitled Fagan v. Bundesministerium, No. 05 CV 849 (S.D.N.Y. Jan. 25, 2005) was dismissed for failure to prosecute and failure to follow the court's orders.

Kram for lack of subject matter jurisdiction, and Mr. Fagan was *sanctioned* for his frivolous attempt to circumvent the Bank Austria settlement. In an Opinion & Order dated August 19, 2005, Judge Kram held that Mr. Fagan's

> scattershot pleadings, his disregard for the court and its rules, his flagrant misrepresentations in the Amended Complaint, his circumvention of the Bank Austria Settlement, and his attempt to profit by buying into the litigation constitute subjective bad faith.

(A copy of that Order is annexed hereto as Exhibit K.) Accordingly, Judge Kram fined Mr. Fagan $5,000 and awarded *sanctions* against him in the amount of Bank Austria's attorneys' (Stroock's) fees. By an Opinion & Order dated November 16, 2005, the District Court fixed the amount of sanctions Mr. Fagan was ordered to pay Bank Austria in the amount of $345,520.64. (A copy of that Order is annexed hereto as Exhibit L.) To date, Mr. Fagan has not paid the fine or the sanctions imposed against him in the AHVRAM action.

19. In In re Ski Train Fire in Kaprun Austria on November 11, 2000, MDL No. 1428 (SAS) (S.D.N.Y.), a consolidated multidistrict litigation in this Court presided over by Judge Shira A. Scheindlin, Mr. Fagan purported to represent foreign plaintiffs in various actions brought as a result of a disaster that occurred in November 2000 in which a ski train in Kaprun, Austria caught fire, killing 155 people. There, among other transgressions, Mr. Fagan made numerous and repeated misrepresentations to the Court and the parties concerning the purported testimony of two "secret," "newly-discovered" "whistleblowers" who allegedly possessed personal knowledge relevant to plaintiffs' claims, but who feared for their safety because of threats. As a result, the parties were forced to travel to Germany to depose these so-called "whistleblowers" in April 2007. Not surprisingly, all of Mr. Fagan's

representations turned out to be pure fiction.

20. In a decision dated August 16, 2007, Judge Scheindlin (1) *sanctioned* Mr. Fagan for $5,000 payable to the Court and for defendants' litigation costs and fees in connection with the deposition of the "whistleblowers"; and (2) *disqualified* Mr. Fagan from further representing the plaintiffs in the case. With respect to the imposition of sanctions against Mr. Fagan, the Court held that:

> The evidence is clear and overwhelming: Fagan drastically misrepresented the knowledge of these witnesses – indeed, they had practically no relevant information whatsoever.
>
> * * *
>
> Not only did Fagan misrepresent the knowledge of his so-called whistleblowers, he also misrepresented the status of Ms. Steiner and Mr. Schwarz as secret witnesses whose identity needed to remain confidential for the sake of their safety. On several occasions, in Court and in sworn affidavits, Fagan characterized Ms. Steiner and Mr. Schwarz as "whistleblowers" who were fearful and afraid of intimidating tactics by defendants and their counsel. Under this pretext, Fagan obtained an order of confidentiality from this Court. It is now clear, however, that Fagan's representations were patently false and served absolutely no purpose save to instill a melodramatic air of menace to these proceedings.
>
> * * *
>
> In sum, Fagan made false misrepresentations concerning the so-called whistleblowers and he obtained an order of confidentiality from this Court under false pretenses. Aside from being highly unprofessional, such tactics suggest utter disregard for the Court. In light of the proceeding, this Court finds that Fagan's claims regarding his witnesses were made in bad faith. This finding is bolstered by the fact that Fagan had been previously warned and sanctioned by Judge Kram of this Court for working similar deceptions that wasted judicial resources. As a result, pursuant to this Court's inherent power and section 1927, Edward D. Fagan is hereby fined $5,000 and

> is ordered to reimburse defendants for litigation costs and expenses relating to the depositions of Ms. Steiner and Ms. Schwartz.

(A copy of that Order is annexed hereto as Exhibit M, at 22-24, 27.)

21. The Court also disqualified Mr. Fagan on a number of grounds, including a conflict of interest created by his Chapter 11 bankruptcy filing in the Middle District of Florida, in which he represented that the "single most significant source of funding . . . is a hoped-for settlement of the Kaprun-related litigation pending before this Court." (Id. at 9.) Once again, Mr. Fagan's "pattern of unethical behavior" played a significant part in the Court's ultimate decision to disqualify him as plaintiffs' counsel:

> In recent years, Fagan has engaged in a pattern of unethical behavior. Indeed, this is not the first court to find Fagan's conduct worthy of reproach and sanctions. Fagan's continued participation in the cases at bar presents one of the rare situations in which an attorney's violations of ethical rules warrant his disqualification.
>
> * * *
>
> Moreover, Fagan has already been sanctioned by this Court for having a remarkably similar conflict of interest with respect to litigation he prosecuted on behalf of victims of the Nazi Holocaust. . . . As a result of this interest and additional misconduct – including Fagan's various "deceptions" – the court imposed sanctions on Fagan, ordering him to pay his adversary's litigation costs and fees, and fining him $5,000. The court also noted with dismay that Fagan's litigation tactics "appear[ed] to be part of a pervasive and disturbing [personal] trend."
>
> This past February, Fagan was again formally sanctioned, this time by the Eastern District of New York. By way of background, Fagan had been terminated as co-counsel for plaintiffs in well-publicized litigation involving the now abolished South African apartheid regime. In response to his termination, Fagan "hastily instituted" a related action in the

> same district, and, in "full view of the international and national media," personally served a subpoena on his former co-counsel. The court quashed the subpoena on the ground that it was purely "retaliatory" and "patently frivolous" and awarded Fagan's former co-counsel nearly $15,000 in attorneys' fees and costs.
>
> These prior sanctions bolster my finding that his disqualification in the instant cases is required. Although Fagan's personal stake in this MDL differs from that which he had in the Holocaust litigation discussed above, it is just as unprofessional and deserving of rebuke. . . . By Fagan's own admissions, he has been forced into bankruptcy due to massive debts totaling millions of dollars, and the main source of funding for his Chapter 11 plan are proceeds from a hypothetical global settlement of Kaprun-related litigation. With such a flagrant personal interest in the outcome of these cases, Fagan simply cannot be allowed to continue participating as counsel.

(Id. at 10, 17-19.)

22. Subsequently, by Order dated January 25, 2008, Mr. Fagan was again *fined* by the Court in the amount of $500 for frivolous and harassing filings made to the Court. (A copy of that Order is annexed hereto as Exhibit N.) Mr. Fagan appealed the Court's disqualification decision to the United States Court of Appeals for the Second Circuit. On February 29, 2008, the Second Circuit ordered Mr. Fagan to show cause "why he should be permitted to continue representing the appellants in these cases." (A copy of that Order to Show Cause is annexed hereto as Exhibit O.) In addition, the Second Circuit enjoined Mr. Fagan "from filing any further submissions in any proceeding filed in this Court, with the exception of his response to this order, until further order of the Court." Id.

23. On April 2, 2008, the Second Circuit determination Mr. Fagan's appeal, dismissing it for lack of appellate jurisdiction and affirming Judge Scheindlin's Order

disqualifying Mr. Fagan.[4] (A copy of that Order is annexed hereto as Exhibit P.) In doing so, the Second Circuit wrote

> Fagan is DISQUALIFIED as counsel in the present cases before [the Second Circuit], as well as any future cases relating to the underlying litigation. No further submissions filed by Fagan will be accepted by this Court with respect to the underlying litigation, except for a petition for rehearing of this order or pleadings related to an appeal to the Supreme Court.

24. Mr. Fagan has also been sanctioned in several other cases. See Ford Motor Credit Co. v. Window Headquarters, Inc., 93 Civ. 04135, (MBM) (granting Rule 11 sanctions in amount of $500, plus opposing counsel's fees and costs in the amount of $7,241.99 incurred in connection with opposing a frivolous motion and counter-claims); Frank Marano, et al. v. Edward Fagan, 01 Civ. 6178 (JS) (May 25, 2004 Order adopting Magistrate Judge's recommendation that Mr. Fagan be sanctioned for repeated failure to comply with court orders and that his answer be stricken); Dorothy Molefi, et al v. The Oppenheimer Trust, et al., 03 Civ. 5631 (FB) (February 15, 2007 Opinion and Order ordering sanctions of $14,773.75 to compensate movant for attorneys' fees and costs associated with quashing a frivolous subpoena that was apparently served upon counsel in a related matter in retaliation for excluding Mr. Fagan from arguing in the related matter. Apparently, Mr. Fagan commenced the action for the sole purpose of serving the frivolous subpoena, which he did the same day as commencing the action, without ever serving any party with the complaint or any other pleading.); Window Headquarters v. Ventech, Inc., et al., 91 Civ. 01816 (MBM)

---

4 Mr. Fagan has since requested an extension of time to file a request for rehearing, reconsideration or supplemental record. By Order dated April 22, 2008, Mr. Fagan's time to file was extended to the end of business, yesterday, April 28, 2008, with no further extensions permitted.

(sanctioning Mr. Fagan $200 for filing a frivolous motion without even consulting opposing counsel beforehand).

25.    Contrary to Mr. Fagan's allegations against Magistrate Judge Peck, the only person acting improperly in this case is Mr. Fagan himself.  Once this Court determines the instant application, Plaintiffs UFT and Randi Weingarten intend to move this Court, or Magistrate Judge Peck, as the Court may direct, for an order requiring Mr. Fagan to post security for costs in the amount of $10,000 to insure that any sanctions or costs awarded against him here are paid.  Additionally, we will urge that Mr. Fagan's continuing failure to pay sanction fines due to this Court and his conduct, which has brought on those sanctions, plus his conduct herein be called to the immediate attention of the Committee on Grievances for the Southern District of New York.

**WHEREFORE**, Defendants UFT and Weingarten respectfully requests that

(1) Plaintiffs' application to have Magistrate Judge Peck recused be denied; and

(4) such other and further relief as the Court deems just and proper.

Dated: New York, New York
       April 29, 2008

CHARLES G. MOERDLER

Exh. A



Tel. 718-785-2960 Fax 888-845-8593, Email: teachers4action.info@gmail.com

# PRESS ADVISORY

For Immediate Release Jan. 15, 2008

New York, NY

## NYC TEACHERS ISSUE ULTIMATUM TO CHANCELLOR KLEIN & MAYOR BLOOMBERG - SHUT DOWN RUBBER ROOMS OR ELSE!

From at least 2000 until today, the New York City Department of Education has systematically implemented a plan that discriminates against its most qualified teachers. The primary goal is to reduce salaries by forcing teachers to quit or be fired. It is accomplished through "Temporary Reassignment Centers" (known as "Rubber Rooms") to which "targeted" teachers are sent. Principals notify teachers that they are removed from classes, stripped of teaching responsibilities and reassigned to a Rubber Room, where they wait until charges are brought, or they agree to deals that can include termination. Currently almost 1,000 teachers languish in Rubber Rooms in violation of their due process rights and the chance to clear their names and be restored to their classrooms. Rubber Rooms are racist and discriminatory, modern day "internment camps" where "targeted" teachers are banished for months, or even years, before they can fight unfounded "charges." Many are forced to accept deals involving ruinous fines or termination. Rubber Rooms violate due process and constitute impermissible acts in violation of Title VII of the Civil Rights Acts. Rubber Rooms undermine sound education policies and deprive students of qualified competent teachers.

- **Teachers Demand Chancellor Joel Klein and Mayor Michael Bloomberg Immediately Close All Rubbers Rooms by Jan. 22, 2008 or Face Legal Action;**
- **Teachers Demand City Council Investigate Rubber Rooms, Waste of Public Monies, Violation of Teachers' Due Process Rights, Damage to Teachers, Students and NYC Education System caused by Rubber Room Practice**
- **Teachers Demand Chancellor Klein, Mayor Bloomberg and UFT President Weingarten form Task Force to Fix Rubber Room Problems.**

For more information or interview requests, contact:
Teachers4Action Spokesperson Florian Lewenstein at teachers4action.info@gmail.com

Teachers4Action was formed to protect the rights of NYC Public School teachers & to promote sound education.



Tel. 718-785-2960 Fax 888-845-8593, Email: teachers4action.info@gmail.com

January 15, 2008

Via Fax # 788-2460
Hon. Michael G. Bloomberg, Mayor
Mayor's Office – City Hall
260 Broadway
New York, NY 10007

Via Fax # 212-317-5596
Hon. Chancellor Joel Klein
NY Department of Education
52 Chambers Street
New York, NY 10007

Re: Violation of 5th Amendment, 14th Amendment, Title VII of the Civil Rights Act of 1964 and Other Wrongful Acts against Certain Targeted Teacher

Hon. Mayor Bloomberg and Chancellor Klein:

I write as the Spokesperson and Treasurer for Teachers4Action, an unincorporated association pursuant to Gen. Association Laws Art. 3, that was formed to protect the rights of NYC Public School teachers and to promote sound education policies. Although it was only recently formed[1], Teachers4Action continues to grow on a daily and weekly basis.

This letter is being submitted to you Honorable Gentlemen in part because in 2002, the Mayor's Office assumed direct control over the New York City Public Schools and in 2003 the New York City Department of Education ("DOE") was completely reorganized under this control and supervision. See the attached history that documents the aforementioned takeover and reorganization.

The 1st issue Teachers4Action is tasked to address is the ongoing practice, fraud and scheme ("The Fraudulent Scheme") through which the DOE has systematically implemented and carries out a plan that discriminates against our association members, who are among the most qualified teachers in NYC and perhaps in the country. The evidence that has come into our possession shows that one of the primary goals of The Fraudulent Scheme is to reduce salaries by forcing teachers to quit or be fired. This goal is accomplished, in part, through "Temporary Reassignment Centers" (more commonly known as "Rubber Rooms"), where the "targeted" teachers are banished without just cause and without due process. Our evidence further shows that through The Fraudulent Scheme Principals are directed to notify the "targeted" teachers that they are to be (i) removed from classes, (ii) stripped of teaching responsibilities and (iii) reassigned to a Rubber Room. Once in the Rubber Rooms, the "targeted" teachers wait until charges are brought and hearings conducted, or until they agree to deals that lead to fines, improper charges and/or records placed in their permanent files, or termination. Some teachers resign or take early retirement in despair during this process.

It should also be noted that teachers who are wrongfully charged are precluded from acquiring employment in other school districts.

---

[1] Teachers4Action will be submitting its formal request for approval by the State Department of Education as a Not For Profit Corporation, as well status under the IRS Code Section 501(c)(3).

As your statistics must show, currently almost 1,000 teachers languish in Rubber Rooms in violation of their due process rights and the chance to clear their names and be restored to their classrooms. The Rubber Rooms are racist and discriminatory. They are the modern day equivalent of "internment camps" where the "targeted" teachers are banished for months, or even years, before they can fight unfounded "charges." Through coercion, harassment, intimidation and out of fear for their personal and professional well-being, the "targeted" teachers are forced to accept deals involving ruinous fines or termination.

The Rubber Rooms violate due process and constitute impermissible acts in violation of Title VII of the Civil Rights Acts. The Rubber Rooms undermine sound education policies and deprive students of qualified competent teachers. And, based on the evidence we have discovered, The Fraudulent Scheme and the Rubber Rooms are the direct result of policies that your offices were aware of, agreed to and more importantly continue to implement to this day.

Our evidence suggests that the Fraudulent Scheme also targets teachers, such as whistle blowers, who, are charged for political reasons, or with the agenda of changing the culture of the DOE and attacking tenure, rather than improving instruction. We therefore assert that the 3020a process, which is partly paid for by NYS funds, is being used for improper reasons.

It is ironic that while the Fraudulent Scheme continues and valued teachers rot in the Rubber Rooms, your offices continue to announce "successes" or programs which you tout as demonstrating how the DOE is dedicated to the best interests of students. See attached Jan. 14, 2008 Press Announcement from both your offices.

We have also learned that The Fraudulent Scheme may in fact involve abuse, misuse or waste of New York City, New York State and Federal Funds. Therefore, we are copying the appropriate authorities in NYC and NYS agencies, whose monies may be affected. This letter constitutes a demand for an audit related to the Rubber Rooms, which audit we submit will confirm knowing, negligent or otherwise improper waste and abuse of public funds.

Prior to submitting this letter, we have attempted to get access to documents related to The Fraudulent Enterprise and the Rubber Rooms but requests for access to information and documents by association members or our Union Representatives have been repeatedly denied. In addition, as recently as Friday Jan. 11, 2008, we learned that documents related to the Rubber Rooms have also been withheld and/or concealed from City Council Members on the Council's Education Committee and NYC officials outside the influence of the DOE. This letter constitutes a formal demand for the immediate production of all records related to Rubber Rooms, from 2002 to the present.

These issues are of great urgency to our members and indeed should be of the utmost urgency to each of you. Everyday that these Rubber Rooms and The Fraudulent Scheme continue to operate against our members, and other "targeted" teachers, they suffer, the students suffer and the City suffers.

We therefore make the following demands:

1. All Rubbers Rooms be closed by Jan. 22, 2008 and teachers restored to their classrooms and duties and privileges;

2. An Independent Task Force be appointed to investigate and report on Rubber Rooms, and allegations of Waste of Public Monies, Violation of Teachers' Due Process Rights, Damages to Teachers, Students and the NYC Education System caused by Rubber Room Practice; and

3. A meeting be scheduled to be held on or before Jan. 22, 2008 with delegates from the Mayor's Office, the DOE, the UFT and Teachers4Action, and/or other representatives from these groups, so that together we can openly discuss the extent of this problem, the need for immediate action, and at which meeting we will be prepared to discuss possible amicable resolutions of the issues.

This letter also constitutes a formal grievance pursuant to Article Twenty Two of the Collective Bargaining Agreement, objecting to the Rubber Room practices and demanding that they be ceased immediately for all teachers. We are also attaching a list of the District Superintendents and request that the DOE distribute a copy of this letter to each of them. We deem service on the DOE of this letter as good and effective service on the District Superintendents, who are actors in The Fraudulent Scheme.

We respectfully request the favor of a formal response in writing by the close of business Friday Jan. 18th, confirming receipt of this letter and your response to our three Demands noted above.

Respectfully,

Florian Lewenstein
Spokesperson and Treasurer - Teachers4Action,
individually and on behalf of Teachers4Action members

Attachments

CCs:

- Hon. Elliot Spitzer, Governor, New York State – Via Fax
- Hon. Andrew Cuomo – NYS Attorney General, New York State – Via Fax
- Brian Fleischer, Auditor General - Office of Auditor General – Via Fax
- Office of the Chief Financial Officer, New York City - Via Fax
- Hon. Dennis Walcott - Deputy Mayor for Education and Community Development – Via Fax
- Hon. Christine C. Quinn, Speaker New York City Council – Via Fax
- Hon. Robert Jackson – Education Committee Chairperson - New York City Council – Via Fax
- Hon. Randi Weingarten – President, United Federation of Teachers – Via Fax
- Office of the General Counsel – United Federation of Teachers – Via Fax

Exh. B.



United Federation of Teachers
*A Union of Professionals*

January 15, 2008

Dear Elected Official:

You may have received recently a letter from a group of teachers who have been placed into DOE's "Teacher Reassignment Centers" pending investigations into charges against them. I'd like to give you some background on this situation. Rest assured that the UFT takes very seriously its dual obligation to protect our members' due process rights and our moral responsibility to protect the children of the City of New York.

Accused members have always been initially reassigned to the district office. In the late 80's, in response to the Lisa Steinberg tragedy, the Board of Education required all allegations of corporal punishment to be reported to the central board without preliminary investigation. As a result the principal's ability to simply look into the matter and decide if there was substance to an allegation was curtailed. Still, until the 2002 elimination of operating community school district offices, the Community Superintendents served as gatekeepers and the number of allegations, restorations to service and removals remained essentially the same.

In the last few years, however, without those gate keepers, the number of pedagogues removed from school buildings has grown. There was no authority scrutinizing who was being removed from classrooms or checking the reason for each removal.

In response to the growing numbers and the long periods of time some members were spending in the TRCs, the UFT, believing "justice delayed was justice denied," entered into negotiations with the DOE. Those talks are still ongoing.

After several meetings and consultations with our reassigned members, the UFT put forth the following premises:

- All members must be treated as professionals and as people deserving respect;
- Placement in a TRC should be in close proximity to a member's home or district;
- All TRCs must be housed in safe and appropriate environments without PESH violations, and the UFT will vigorously pursue any violations of this requirement;

52 Broadway, New York, NY 10004   p: 212.777.7500   www.uft.org

Officers: Randi Weingarten *President*, Michael Mendel *Secretary*, Mel Aaronson *Treasurer*, Robert Astrowsky *Assistant Secretary*, Mona Romain *Assistant Treasurer*
Vice Presidents: Carmen Alvarez, Michelle Bodden, Leo Casey, Richard Farkas, Aminda Gentile, Michael Mulgrew

- All members must be informed of the charges, specifications, or allegations against them in a timely manner , and be informed of the identity of their accuser(s);
- Whatever the merits of the case, no one should be removed from his/her school unless he/she is a documented threat/danger to the students or staff;
- Every effort must be made to protect members from being re-assigned merely because of a disagreement with a principal, because they are whistleblowers; or because supervisors consider them too old to teach.

In light of these principles, we have presented the following demands to the DOE:

1. All members are to be presented with charges, including the name of the person making allegations, within 48 hours of removal from the school; allegations of criminal activity shall be an exception to this 48-hour rule.

2. No UFT member should be removed from his/her school or site unless there is reasonable, probable cause, as determined by an unbiased neutral party, that the member may present a danger to students or staff. A Special Master or a panel of three arbitrators should be appointed to determine, within 5 days after a re-assignment takes place, whether or not the educator is a threat to the safety of the school community, based upon the allegation/charges. If not, then the educator shall be returned to his/her school or site immediately.

3. The Department of Education has an obligation to give members the opportunity to do work related to their assignment, even while in a temporary re-assignment center. Chancellor's Regulation C-770 states that "During the period of suspension, all individuals are expected to perform duties appropriate to their assignments, insofar as possible..." A menu of meaningful pedagogical work should be jointly prepared by UFT and DOE. This work shall be conducted in an appropriate work setting as close to the member's original school as possible and may also include professional development courses.

4. All arbitrators at 3020A and medical arbitrators must be required to submit their findings in a timely manner in accordance with contractual obligations.

5. Double moral jeopardy must end. Members who are acquitted on the facts in a criminal trial or other legal proceeding must not be tried again under 3020A.

6. Any member who has not been charged or has not yet begun a hearing within six months of his/her removal from the school setting must automatically be restored to service.

7. Members who are exonerated at a 3020A hearing will have the option of returning to the school from which they were reassigned and the teaching program (or other applicable responsibilities) that they held prior to removal.

8. Only licensed supervisors may be responsible for the administration and supervision of members assigned to the TRC.

The discussions with the employer have been active and ongoing but there is not yet agreement on all matters. However, new sites have been opened to alleviate overcrowding, health and safety standards are being jointly worked on, and arbitrators have been employed to bring the complement up to the contractual requirement.

Additionally, the union has asked members in each Temporary Reassignment Center to elect a representative to meet with the UFT Director of Staff on a regular basis both to bring problems that might arise and to receive and disseminate contractual information to reassigned members.

As to the question of the fairness of the arbitrators, they are jointly selected and either the employer or the UFT may refuse to keep an arbitrator on the panel if they believe the arbitrator is biased. These men and women depend on their neutrality and fairness for their continued employment.

The vast majority of our members use union lawyers during 3020a proceedings. Just as in any other proceeding, if the other side offers a settlement it is the attorney's obligation to inform the member of the offer. While counsel may offer advice, it is the member who decides whether or not to take the offer or go on with the case.

In short, you may assure any constituent who has contacted you that you have inquired and have been assured that the UFT is actively engaged with members in the TRCs and its legal department is advocating for them, making certain that members receive due process rights in a timely manner.

Sincerely,

Randi Weingarten
President

Exh. C1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

TEACHERS4ACTION, *et al.*,

Plaintiffs,

v. 08 Civ. 548 (VM)

MICHAEL G. BLOOMBERG, *et al.*,

Defendants.

------------------------------x

New York, N.Y.
January 28, 2008
10:40 a.m.

Before:

HON. ANDREW J. PECK

Magistrate Judge

APPEARANCES

REGUS WORLDWIDE OFFICE CENTERS
Attorneys for Plaintiffs
BY: EDWARD D. FAGAN

MICHAEL A. CARDOZO,
Corporation Counsel of the
City of New York
Attorney for Defendants
BY: BLANCHE GREENFIELD
Assistant Corporation Counsel

(In open court)

THE COURT: I assume, Mr. Fagan, you have handed this to Ms. Greenfield as well.

MR. FAGAN: I did, your Honor.

THE COURT: Give me a minute to read it.

MR. FAGAN: Thank you, Judge.

(Pause)

THE COURT: I have read the complaint and I have read Mr. Fagan's letter to Judge Marrero, which was memo endorsed sending it over to me. With that, I guess this is your application, Mr. Fagan. So proceed.

MR. FAGAN: Thank you, your Honor. First of all, your Honor, I wanted to introduce my client. The gentleman to my right is Florian Lewenstein. He is the named plaintiff in the entity called Teachers4Action, and behind me sit eight or nine --

THE COURT: I hope they are not math teachers.

MR. FAGAN: Well, I am certainly not, your Honor.

-- teachers who are affected by what is going on and teachers, some of whom I will refer to by name during the course of the hearing and some of whom are concerned about retaliation, which is one of the things that I mentioned.

THE COURT: Let me ask you this. To the extent you have John Does 1 to 50 and Jane Does 1 to 50 as plaintiffs, what does that mean? Are you planning on making the

appropriate application to the court to have anonymous plaintiffs? Frankly, absent something that makes this different than any other employment discrimination or employment-related case, retaliation would be against the law. That doesn't mean that no employer ever retaliates, but I cannot think of a single employment case that I have had in the 13 years I have been on the bench with an anonymous plaintiff.

MR. FAGAN: Your Honor, I am familiar with the hurdle that we must reach in order to go forward with anonymous plaintiffs. I am prepared to start amending the complaint, make that application. I can make that application to your Honor by the end of this week.

As your Honor pointed out, I may not be successful, and I don't want to waste the court's time. What I would propose to do would be to disclose those people in certain categories who are prepared to disclose their identity, to identify them specifically.

THE COURT: Time out. Let's be very clear because there are a lot of issues with respect to the complaint, and perhaps I should let Ms. Greenfield do her own work, but to the extent it affects my docket, either you are going to amend the complaint and change John Doe to Sherlock Holmes, John Watson, and whatever the names are -- obviously, I am using fictitious names, hopefully with a literature teacher back there. Either you are going to amend and name actual teachers or there is no

point in motion papers that say Sherlock Holmes is willing to be named but here is why the other people shouldn't. So either amend them for those who are willing to be named or make your application with respect to the anonymous plaintiffs.

I am not 100 percent up on the case law, but it strikes me as a losing proposition. So if you are going to make that motion, make sure that you have dotted your Is and crossed your Ts because otherwise you are just wasting your money or your client's money and my time.

MR. FAGAN: May I have until Friday to either make that motion or amend the complaint to name those specific individuals in those categories?

THE COURT: And to drop the John Does?

MR. FAGAN: And to drop the John Does.

THE COURT: That is fine.

Let me ask another question while we are lining up our plaintiffs. Is Teachers4Action incorporated or unincorporated, and what is it and what is its standing?

MR. FAGAN: It is an unincorporated association, Judge, of teachers.

THE COURT: Is it a real organization or is it just a group of people who got together because the UFT isn't doing what they want done?

MR. FAGAN: No, Judge, it is a real organization. They have already communicated with the State Board of

Education in order to get the forms -- the State Board has to pass on anything that mentions the name education, any organization that proposes to do that. They are in the process of doing that.

Mr. Lewenstein, the named plaintiff, is a teacher. He is not just an officer of the company, of the association. By the time we get further down the line, the next week or so, we hope to be able to provide you not just with the application that has been made to the State Board, Department of Education, but also the documents that show that they have got it and at least there is provisional authority for the association.

THE COURT: All right. Are all members of the association people who are in the temporary reassignment centers or does it have a different membership?

MR. FAGAN: Every member of the association as is presently constituted is sitting confined in a rubber room somewhere. Later on they will have other goals, there are other things they are going to do, but for these purposes, for now, every one of the people that are in the courtroom today and Mr. Lewenstein and the members of the association itself, Teachers4Action, are confinees in these rubber rooms.

THE COURT: OK. Continue.

MR. FAGAN: Your Honor, may my client interrupt for 30 seconds? I don't know what he wanted to ask me.

THE COURT: Yes.

MR. FAGAN: Thank you.

(Pause)

MR. FAGAN: Judge, we came before the court because there are certain emergent issues. This is not a normal case in the sense of it can go its normal process for motion practice. The reason for that is there are, as I put on the outline, there are certain issues that are pressing for which we submit emergency relief is appropriate in some form. It may not be complete. It may not be everything that we wanted. But there has to be something in order to protect a group of people who have been targeted and who are in one stage or another along the way to being terminated, further confined, harassed, retaliated against, or fined.

The reason I say that is the history of what has gone on with the rubber rooms, as it relates to our application today, is a history where people are, according to us, deprived of their due process rights pursuant to New York State law. They are sent into these rubber rooms, where they are literally confined. They have to punch in time clocks. They walk in every morning, they punch in a time card. They can't leave. Some of them are actually confined to --

THE COURT: They are here today.

MR. FAGAN: Actually, they are here today. They are allowed to take personal days, your Honor.

We are concerned about the issue of retaliation. I

will get to the issue of retaliation, but I only want to focus on the emergency issues right now.

The emergency issues fall into, I would say, three categories. One of them is an issue of preservation of documents. This is not to suggest anything nefarious is going to be done by the DOE. But I am mindful of your Honor's decision in *In Re NTL*. The concern that we have is that somewhere within this vast behemoth of the DOE and all its offices and all its computers and all its recordkeeping systems, the exact same thing that your Honor encountered in the *NTL* case is going to happen. There is going to be --

THE COURT: Are you familiar with the case law with respect to preservation orders in this district?

MR. FAGAN: I am, your Honor.

THE COURT: So how do you satisfy that standard?

MR. FAGAN: I satisfy that standard, your Honor, by --

THE COURT: I guess since you claim to be familiar, what case are you relying upon?

MR. FAGAN: Actually, I briefed the issue in a case called, in the *Kaprune* case.

The issue with regard to preservation -- I do apologize, your Honor. I left my computer at Fed-Ex. I came running over. I have all that information there.

What I am relying on is the issue of the necessity to preserve documents that are going to automatically be recycled

and could be destroyed in the normal --

THE COURT: I guess what I am saying is, once the litigation has commenced, which it has, if not beforehand, the Department of Education has a duty under the federal rules, and you may have now served to wake them up and get this in Ms. Greenfield's control a lot sooner than normally an assistant would be assigned to the case, etc., but under the rules automatically they have preservation obligations. For the court to impose an order under *Treppel v. Biovail Corp.*, the leading case in this district by Judge Francis, there has to be more than just it's a big organization and maybe they won't do what they are supposed to do. If they don't do what they are supposed to do without any court order for preservation up front, they are going to have NTL-like problems down the road. But why should the court impose an order?

MR. FAGAN: The reason that the court should impose an order on them, your Honor, is because, number one, during the past -- the teachers who are here, different teachers can provide testimony that they have asked for information and been denied the information.

THE COURT: That doesn't mean it's been destroyed; that just means they are not entitled to it.

MR. FAGAN: Your Honor, that is correct. Mr. Lewenstein also is a computer expert, and Mr. Lewenstein had communications with people at the DOE where they talk about

the e-mail files are regularly deleted. The e-mail records are regularly deleted because the DOE system is not, or the way their servers are set up they are not big enough or they choose to implement a system where the employees are regularly told to delete e-mails.

Now, again, I am not suggesting anything nefarious, but what I am suggesting is the DOE is a huge organization. There is a way, I believe, to structure a very simple order that informs these people that the procedures that they are implementing right now are procedures that they cannot utilize going forward. They are destroying e-mails related to communications between teachers, they are destroying e-mails related to the rubber rooms and the use of the rubber rooms, and I submit they are also destroying information related to requests that have been made by politicians, city council people, and even the teachers themselves to gain access to the information.

I believe we will be able to meet that hurdle. We can do it by way of affidavits and submissions. I raised the issue because it is a very serious issue.

THE COURT: Let me hear from Ms. Greenfield on it and then if we do have to have formal motion practice on it, you will put in your affidavits. But remember, something that says we tell people to delete e-mails so as not to clog up the system or even e-mails unless saved are deleted automatically

every 30 days, all the stuff that, frankly, is the same at almost any big corporation is a very different story than what happens when a federal lawsuit where federal rules are triggered will apply.

Ms. Greenfield.

MS. GREENFIELD: First of all, good morning, your Honor. I haven't seen you in quite some time.

Counsel started by talking about a group of people. Your Honor, we are not here on a pleading which addresses a group of people. We are here on a pleading where only one named plaintiff is named and there are no factual allegations in the complaint that shows he has any viable cause of action.

Also, while counsel is now speaking about e-mails, I would note that in all the correspondence I have from counsel, while they note the need, he notes the need for this meeting, there is nothing specifically addressed which puts us on notice about what information plaintiffs are claiming are in jeopardy of being destroyed.

The reassignment centers, your Honor, there is no secret about what the reassignment centers are. Everybody in the Board of Education knows about it. I don't know what type of e-mails would bring any additional facts forward to the court about the reassignment centers. They are there. Plaintiff can speak about it. People at the Board of Education can speak about it. The UFT can speak about it.

I can't speak to particular e-mails because I really don't know what counsel is talking about. The Board of Ed has system-wide e-mail addresses, but I don't know what e-mails counsel is talking about that pertain to the claims of this particular plaintiff.

This particular plaintiff, Mr. Lewenstein, from what I understand, your Honor -- and, again, this case was brought to my attention at 4:30 Friday evening, thank you -- he had an allegation of corporal punishment at the end of June 2007. It was investigated by OSI commencing in September of 2007. There was a contact made to the student at issue, his parent, I believe it was September 14, 2007. On September 17, 2007, Mr. Lewenstein was removed from the classroom and sent to a reassignment center. OSI continued its investigation, substantiated the allegation, but sent it back to the Office of Legal Services. They determined that only a letter of reprimand was appropriate. He was returned to the classroom in early January of '08.

Following that, there was another allegation of verbal corporal punishment made, and he has since been reassigned again to the reassignment rooms.

That is the facts that we have right now. Based on that factual scenario, I don't know how this pleading states a viable cause of action, and, therefore, I believe any discussion regarding discovery or preserving any records, your

Honor, is wholly inappropriate.

MR. FAGAN: I thank you for setting forth that chronology, but the chronology that was just set forth by Ms. Greenfield underscores the need for not just preservation of evidence but access to evidence. What Ms. Greenfield just allocuted was 100 percent inaccurate as it relates to a very specific period of time.

In September, the OSI did not contact the student. The student was out of the country. Mr. Lewenstein was sitting very comfortably in his school doing work until one thing happened. On January, the 15th, Mr. Lewenstein sent a letter to the Mayor and to the Board of Education informing them that he believed they were in violation of his rights and the teachers' rights and asking them to do certain things. The very next day Mr. Lewenstein -- I'm sorry, the same day Mr. Lewenstein gets a letter, that is hand delivered to him there in school, that he is being sent back to this rubber room, the reassignment center.

If that is your record, Ms. Greenfield, then I urge the court on that record alone to give us access to every e-mail that names --

THE COURT: We have two different issues. One is preservation.

MR. FAGAN: Yes, Judge.

THE COURT: The other is motions with respect to the

complaint, which I have to tell you has lots of motions to be aimed at. Unless you are telling me -- let's try to be fair across the board here.

Are you telling me that Mr. Lewenstein or Teachers4Action has gone to the EEOC?

MR. FAGAN: Some have.

THE COURT: I am not talking some. I have got at the moment one named individual plaintiff and an organization. So even assuming that, has either Mr. Lewenstein or Teachers4Action filed a Title VII or ADEA complaint with the EEOC?

MR. FAGAN: On behalf of the teachers, the UFT went to the EEOC.

THE COURT: UFT isn't a party here.

MR. FAGAN: It is not, your Honor.

THE COURT: Maybe it should be.

Is there a right to sue letter with respect to Mr. Lewenstein or Teachers4Action or anyone else you are going to be bringing in as a named plaintiff?

MR. FAGAN: There is a right to sue by the union on behalf of its members through the EEOC. I can produce that letter. That came --

THE COURT: Who does that give the right to bring the action? If it is the UFT, then you don't have standing under Title VII or the ADEA. Frankly, I am not sure why the UFT

isn't in here whether as a plaintiff or a defendant to the extent you are attacking a system that is quasi-contractual or perhaps fully contractual.

MR. FAGAN: Your Honor, one of the things that we had envisioned was we had hoped to avoid a fight with the UFT. It is possible that we need to bring them in as a defendant.

On the issue of whether or not Mr. Lewenstein has filed or Teachers4Action filed with the EEOC, they didn't. But the union did.

THE COURT: How does that give you, and are you within the statutory period, number one, even if that gave the right to sue, and, secondly, I would have to see the letter, but I don't see how the fact that party A gets a right to sue letter means that party B with a similar claim gets a right to sue.

For example -- put the UFT aside -- if Mr. Lewenstein had gotten a Title VII right to sue letter from the EEOC, that would not mean that any of the ten people in the back could piggyback it.

MR. FAGAN: Your Honor, what the court is bringing up is a very interesting issue as it relates to what it is that the UFT can do and what it is that the UFT can't do.

THE COURT: I am not interested in what the UFT can do. I am interested in what you can do.

MR. FAGAN: That is correct, your Honor, and I appreciate that. What I am suggesting is that there are

certain elements of the complaint that may be subject to a challenge of failing to go through the EEOC process. That is possible. There are other elements to the complaint that I submit are not subject to that type of challenge. I am prepared to deal with the issues of the various motions to dismiss.

THE COURT: What I am suggesting, counsel, is that, with all due respect to having this for a broader audience than this court, if you want to --

MR. FAGAN: I was just looking to see if there was a broader audience, your Honor. Just plaintiffs.

THE COURT: Whether it is grandstanding for your clients, there was an article in the Daily News and it didn't come from this court. So whether you planted it or they just happened to pick it up, I don't know. But in any event, where I am going, without all the other things, is you have 14 causes of action, at least three or more of which do not seem to state a claim, certainly as pled, and possibly much more. Preservation is one thing. As I say, whether I enter a preservation order or not, the city, the Department of Education is under an automatic obligation with the lawsuit having been started to preserve documents and electronically stored information, and if they don't, they do so at their peril. But to the extent you are talking about emergency access to the documents, I am not going to let this case be

used as a way to get documents for use in the UFT, Board of Ed hearings that come out of these reassignment centers or anything else. So frankly, I fail to see any emergency.

MR. FAGAN: May I address that issue?

THE COURT: Well, first, let's address whether -- I guess I would say this. You have said you wanted until Friday to name certain additional plaintiffs. Unless you are going to either argue that the UFT right to sue letter, which you then have to attach to the complaint, is timely and gives your folks a right to sue in their own name, etc., etc., and that each one, what is their Title VII claim -- I mean, frankly, you are being very creative here, but this isn't a Title VII case. It is certainly not a global Title VII case. I mean, just looking at your client sitting next to you and the ten people in the back, not every single race, creed, etc., can be discriminated against by a global policy.

Now, it may be that the principal of P.S. XYZ has it in for Caucasians and the principal of junior high school 80 has it in for a different ethnic group or a racial group and all of that, but let's cut the garbage from this complaint. If you have what it seems to be is a pure due process case, let's get to the -- misuse of public tax payer funds. Have you looked at the standing cases with respect to that? I mean, I don't want to start saying Rule 11, but if you want all sorts of nice, quick relief, get the garbage out of the complaint.

Because if there is a motion to dismiss, I am not sure what I am going to do with discovery. As it is, you are here two days to five days, whatever it is, after the complaint has served on some but not all defendants, or even if it is all defendants, you are here because of emergency relief in terms of a preservation order.

MR. FAGAN: May I address that, Judge?

THE COURT: Yes.

MR. FAGAN: I am not addressing it in the context of people who can't be specifically identified. There are very specific examples.

By the way, the court's comment about grandstanding, I am not grandstanding here. I wanted my clients to come here so that they could hear your Honor, understand how the case is going, understand all of this, because I specifically do not want to play the game of, I will tell you what the judge said and I will tell you what I think the judge said. I wanted them to hear it directly from your Honor and to see the exchange. That is why they are here.

Two of them, however, are here for very specific and very emergent relief. For example --

THE COURT: They are not plaintiffs yet, though. That is my problem.

MR. FAGAN: Your Honor, they are named as John Does. I can --

THE COURT: You want to amend the complaint, amend it. I will listen to the claim for emergency relief, but I think from what you have said and what you have said in your letter, the emergency relief is they have got a hearing of some sort before the Board of Ed coming up. This is not discovery for that purpose. Damages can alleviate any concerns.

MR. FAGAN: Actually, your Honor, in certain of these circumstances damages cannot relieve some of these concerns. I will give you two examples. One example is a gentleman named Mr. McLaughlin, who is here. Mr. McLaughlin, the time within which Mr. McLaughlin has to file his Article 78 motion for relief expires today.

THE COURT: How long does one have to file an Article 78?

MR. FAGAN: Four months.

THE COURT: Why is that my problem if he waited until the day before it expires?

MR. FAGAN: Your Honor, the reason that it has now become your Honor's problem is we filed the complaint. The complaint has to do with certain issues as they relate to these people, including their violation of due process. Mr. McLaughlin's due process rights, we submit, in the context of the complaint were violated. I met these people three weeks ago. We have had meetings every single week. What I learned is, last night, that a stipulation was -- he was, let's call

it, encouraged to execute a stipulation, and the time within which he has to attack that under Article 78 and based on the information that we now know expires today.

The reason we need that emergency relief is, one, no one is interested in pursuing a course of action that is going to further cause injuries and damages to these people. It is not just money, Judge. Some of these teachers are charged with very serious offenses. I am not suggesting that --

THE COURT: What is the relief you are requesting with respect to this Mr. McLaughlin?

MR. FAGAN: What I am requesting, Judge, with respect to Mr. McLaughlin is -- I set that forth in the proposed evidence preservation order. It would actually be converted to a proposed production order. One, I want the time within which or I submit the time within which he would have to file his Article 78 should be stayed.

THE COURT: What is my authority to do that?

MR. FAGAN: That is the problem. I don't believe your Honor has that authority.

THE COURT: That makes two of us.

MR. FAGAN: Because I don't believe your Honor has that authority, then what Mr. McLaughlin needs is he needs to get access to the -- he needs to get access to those e-mails.

THE COURT: He is not going to get them today. Come on, be serious.

MR. FAGAN: He is not, your Honor, but if he doesn't get them, Mr. McLaughlin's deal was cut at the end of September. If your Honor remembers what I talked about --

THE COURT: What you are asking for is, in essence, some form of preliminary injunctive relief when your clients have sat on their duff until the day before the deadline. You may have picked your worst example because even assuming I said to Ms. Greenfield, you have made a persuasive case, Mr. Fagan, go produce the e-mails, it certainly can't be done between 11:30 or 12:00 when she gets back to her office and 5:00 today.

So once the Article 78 deadline has passed, Mr. McLaughlin will bring his Article 78 and get whatever relief the state courts give him, including any discovery that the Article 78 court is going to give him, or they won't. I don't see the issue.

MR. FAGAN: Let me go back to the issue of sitting on their duff. These clients have not sat back passively. They have utilized literally every opportunity that they could short of commencing this lawsuit in order to gain access to the evidence, including -- Judge, I am only explaining to you and responding to the issue of sitting back passively. They have not sat back passively.

Number one, they have attempted to get the information through freedom of information law under New York State rules, and they have been denied.

THE COURT: Excuse me. Have they taken that to court?

MR. FAGAN: No, Judge. It just happened.

THE COURT: But why me? Why am I so lucky, Mr. Fagan?

MR. FAGAN: The reason you are so lucky, your Honor, is because these particular -- this concept of the rubber rooms and the 3028 process are not just violation of due process, these people are actually considered they are confined. The reason it came to you -- I actually expected us --

THE COURT: This has been going on for years, has it not?

MR. FAGAN: It has, your Honor, but it has only increased in the last two years. It has gotten --

THE COURT: So even the last two years, what I am basically suggesting, if you want to make motions, I will let you make motions. I don't see that you have got a record on this complaint. And with the McLaughlin example, even assuming that John Doe No. 1 is Mr. McLaughlin, I don't see this. What I see is a challenge, in essence an injunctive relief type challenge, to the temporary reassignment centers or, in your language, the rubber rooms to that process. The court will decide that.

The good news for you, as you have appeared in front of me, I believe, and Ms. Greenfield has certainly appeared in front of me, the good news is you are in a rocket docket generally. So things will move. But they are not going to

move with document discovery until a document demand is served that deals with whoever the named plaintiffs are. And of course, if there is significant motion practice against your complaint, since you have thrown in everything except the kitchen sink, that may stay discovery. I don't know that yet. I haven't heard from Ms. Greenfield about that. But if she isn't annoyed by the Title VII and ADEA claims, I certainly am absent seeing a right to sue letter, which is nowhere referred to in the complaint about UFT right to sue, etc.

So what I am suggesting is you and your clients really need to step back, take a deep breath, and do this right.

MR. FAGAN: May I add two more examples, your Honor?

THE COURT: No, because I don't have a document request. I can't do anything absent a document request. If you want to serve a document request on Ms. Greenfield after you amend the complaint, be my guest.

MR. FAGAN: Thank you, Judge.

THE COURT: I will deal with the repercussions of that or whether discovery is stayed or anything else. But neither she nor I can figure out what you want when we have got John Doe plaintiffs, and it is unclear, are you attacking the policy memos from Joel Klein and whoever else in central board set up these so-called rubber rooms or are we attacking the way it applied to Mr. Lewenstein, Mr. McLaughlin, and other unidentified people? I don't know that. I am sure

Ms. Greenfield doesn't know that.

When the complaint is amended to make that clear -- frankly, the factual allegations of the complaint seem to be there are rubber rooms, my clients are suffering, now let me come up with 14 different causes of action without really saying how that applies. So take a step back. Fix it. Once the amended complaint is served, serve a document request. You want to make any other motions, you can make them in writing subject to Rule 11, with client affidavits and legal research, and I will deal with them. If you want to make a motion to expedite anything, we will deal with that.

MR. FAGAN: Your Honor, in light of the court's statement about a document request, may we have permission to serve subpoenas on third parties? The reason I say that is --

THE COURT: Who?

MR. FAGAN: The UFT.

THE COURT: I guess my question is, is the UFT, and this gets back to the shape of the pleadings and necessary parties, is the UFT a necessary party? I don't want them going through discovery in part as a nonparty if either you are going to bring them in or the city is going to bring them in in 30 days or less when the city is to answer the complaint.

Let me ask you, because I am reading between the lines here, is the temporary reassignment center process something that is either contractual or has been negotiated in part with

the UFT and the Board of Ed?

MS. GREENFIELD: Your Honor, it is my understanding that that whole process came about because teachers are paid during the time of their reassignment and it was agreed, and, your Honor, I will have to go back and get more information, that this is where teachers would go to receive their pay during this period when they are under investigation or whatever else is going on before charges are preferred or after charges are preferred. Depending on the seriousness of the allegations, some teachers, it is determined that they should not be returned to the classroom and this is where they remain while they receive their full salary.

MR. FAGAN: Again, unfortunately, I don't believe Ms. Greenfield -- perhaps I am wrong. That is not what my client just told me. There is no contractual provision that authorizes the existence or confinement in rubber rooms. Number two, the law --

THE COURT: Let's take away adjectives. Is there something in the contract that says, or if not the contract the side letters, agreement between the UFT, that if a teacher is coming up on charges that they will be paid their salary and assigned to central board or district office and taken out of their school?

MR. FAGAN: Not according to what my client just told me. The law upon which the issue comes up is a law which

specifically states that the teachers can be suspended with pay, but there is no provision to assign them to a rubber room and no provision in letters that have been sent by the UFT to my clients that suggest that the creation of the rubber rooms is a contractual creation between the UFT and the DOE.

We have also checked before we came in here today that outside of the City of New York the rubber room process or the temporary reassignment center process is not utilized. There are no such things. It is a unique creature --

THE COURT: The UFT is in New York City. I am not saying this is a nationwide practice or even statewide. The question is, what is the UFT's role in this?

MR. FAGAN: But the UFT has to go by the state law, which is 3020(a). 3020(a) has no provision for the rubber rooms, has no provision for the reassignment, and some of the teachers -- we can make a motion on the issue of the rubber rooms. I am prepared to do that.

If Ms. Greenfield produces a document to me that says there is a contract that specifically authorizes the existence, the creation, confinement into rubber rooms, I will be happy to review that. That was one of the things I was asking for or I was going to ask for in my suggestion about evidence preservation and documents to be produced. It was whatever documents they have on the creation of rubber rooms, the implementation of rubber rooms, the assignment to the rubber

Exh. C2

rooms, I think we should get.

THE COURT: All right. Here is what I will let you do. You can subpoena the UFT at this point with a preservation subpoena so that they are on notice of this lawsuit and the obligation to preserve whatever it is you want them to preserve, subject, of course, to their objecting. But at least that will put them on notice as of today, if they don't read the paper, they don't consider the newspaper binding, that they have got potential involvement here whether as a party or as a witness.

But I am not producing any documents to you until I see what the new complaint looks like, whether there is a motion to dismiss in whole or in part, and where we are going with all of this, subject to any other emergency-based motions that you may make.

MR. FAGAN: Apropos of that, Judge, may I make the following suggestion, because I know this is a rocket docket and I certainly don't want to burden the court with unnecessary allegations in a complaint or unnecessary motion practice.

We are filing our amended complaint by Friday, and I will do that. Included in that I would request permission, since I also asked in the letter this should be considered a premotion conference, I would like permission to file a motion to compel certain discovery, evidence preservation issues. I will make that. Combined with that, if your Honor wants to

jump down to the third item on my proposed agenda, it is not just the defendants who wish to make motions. I believe that there is a motion for partial summary judgment to be made --

THE COURT: Then why are we bothering with discovery? You can't have it both ways.

Rule number one, each side gets one summary judgment motion per case. You want to make it now, go right ahead. The city responds with 56(f) that they need discovery from you, that is fine. Frankly, since at the moment we have one plaintiff or one and a half if the organization has standing, all of this talk -- I brought you in quickly because you said emergency -- all of this is premature. You want to make a partial summary judgment motion on what? What violates the law?

MR. FAGAN: The rubber room process.

THE COURT: As far as I am concerned, you want to do this without discovery, let's just jump to the summary judgment stage. I am not giving you expedited discovery for an expedited partial summary judgment motion.

MR. FAGAN: Judge, I was talking about establishing a schedule. A moment earlier --

THE COURT: The schedule is very simple. We are going to have a date for you all to come back and see me in a week or two after I have seen your complaint, see what Ms. Greenfield's response to it is, and since you and I have done most of the

talking I will give her the opportunity to get up and shoot herself in the foot or otherwise --

MS. GREENFIELD: I am going to save it for my motion papers, your Honor.

THE COURT: But seriously, I could give you a complete discovery schedule now and say, OK, you have got three months for discovery, you have got six months for discovery, whatever makes sense, but are you able to tell me now how many plaintiffs we are talking about? And I guess the other thing, as we get into each plaintiff, was assignment to the temporary reassignment center appropriate, which it seems to me is an arbitrable issue or whatever you call the UFT process, that whole process, or are we dealing with, is there something in general in the way that if people have to spend their eight-hour workday or however long teachers work, which is less than eight, if they have to spend 9 to 3 in the reassignment center room, it may be a waste of my tax money, but is the issue is that improper? So I really don't know what you would want to move on.

I am not likely to consider, and of course substantive motions go back to Judge Marrero absent consent from all of you, but the court is not likely to look at is Mr. Lewenstein's case valid, meaning -- I will rephrase it. Is the Department of Education's reason for assigning him into the so-called rubber room valid, did he really physically or verbally abuse a

student or any of that, as opposed to was he given whatever due process rights he was entitled to under the Fifth and Fourteenth Amendment and the education law and whatever else may apply.

So I really think you need to think about it. This is not the replacement for the Article 78s that each affected individual can bring after whatever action the Board of Ed takes based on the facts of those particular hearings.

MR. FAGAN: Your Honor, I absolutely agree. One of the suggestions that I might make to expedite the process is, I certainly don't want to file an amended complaint making certain allegations, on good faith, that don't need to occupy the court's time when in fact Ms. Greenfield has told the court on the record that she believes that there is some document that authorizes the creation of these rubber rooms. She believes there is a contract provision, there is something there that authorizes this.

THE COURT: I am not sure she said contract as opposed to that it has been discussed with the UFT.

MR. FAGAN: Well, your Honor, that is precisely the point that I wanted to get to, which is I am not looking for a whole pie, I am not looking to create a complaint that has frivolous causes of action. I am looking for a very specific issue.

THE COURT: Generally the complaint comes first and

discovery comes second.

MR. FAGAN: It does, your Honor, except in this particular instance, when your Honor was so careful to explain to us about the way we should go forward in this case, and I am very mindful of that, and I am also mindful of the issue of the standing and the issue of whether or not it is even appropriate to include a challenge to the rubber room, what your Honor focused on was the second part of the equation. The second part of the equation is if it is appropriate to assign a plaintiff or to discipline a plaintiff. That is the second part. But the first part is the creation of the rubber rooms themselves.

There is no question that Mr. Lewenstein or other people could in fact, pursuant to contract, pursuant to state law, be charged with whatever the offenses are. That is not the issue. That comes later, whether those charges are proven, and that is not going to be before the court, I don't believe. What goes before the court is whether or not on January, the 15th, in the afternoon, it was appropriate for the Department of Education -- January 15th of this year, for the Department of Education to send Mr. Lewenstein to a preassigned room in which he is going to be confined.

The creation of the rubber room --

THE COURT: Does he want to get paid?

MR. FAGAN: He has a right to be suspended with pay,

your Honor. That is the law. What Ms. Greenfield said --

THE COURT: How is this any different than when police officers are put on administrative duty?

MR. FAGAN: In their precinct.

MS. GREENFIELD: That is not accurate.

MR. FAGAN: In their precinct, Judge.

THE COURT: First of all, there is a difference between a precinct and a school.

MR. FAGAN: Let me give you an example of that.

Actually, she is not here. I'm sorry. She is not here because she lives in Queens, she teaches in Queens, and she was assigned to a rubber room in Staten Island.

These teachers are being sent outside of their district. They are being sent to confinement centers, and all I ask for is if Ms. Greenfield has a document that talks about the creation of the rubber rooms, let us have it. One document.

THE COURT: Then what? Then the case is over?

MR. FAGAN: No, Judge. Well, it could be over for them.

The issue is the rubber rooms, is it a violation of due process -- one of the issues in the case -- is it a violation of due process for the teachers to be confined to the rubber rooms, sent to the rubber rooms, reassigned to the rubber rooms.

THE COURT: Why do we need any discovery on that at all?

MR. FAGAN: The reason we need that discovery is that one of Ms. Greenfield's defenses, and she said it to your Honor, one of her defenses is there is some type of right that exists between the DOE and the UFT that allows them, pursuant to agreement or contract, to send the --

THE COURT: Let me put it a different way and then let me hear from Ms. Greenfield.

Assuming it is not covered by the UFT but the UFT hasn't grieved it and hasn't challenged it, what is it in some law that prevents an employer, even a municipal employer, from saying we have brought you up on charges, the validity of the charges have to be assumed to be true for purposes of your challenge to the rubber room, and we have decided that to make sure you are not out earning money doing something else or that you are not getting a benefit by being suspended with pay, we are going to make you stay in. I know you say it is confinement, and maybe then one gets into how bad are the conditions in the room, but what would prevent an employer from saying, you work with children. Because of the charges against you, you should not be in a school building with children so report to the central office or report to Staten Island and sit in this room from 9 to 3, whatever your normal workday is, punch in and out so that we know whether you are taking sick

leave or personal days or whether you are the equivalent of working and we are going to pay you for that until the charges are resolved?

MR. FAGAN: Your Honor, what prohibits that is the law itself. The law does not provide -- I am talking about the state law -- does not provide for the confinement of teachers into any other location. If they want to be suspended, they are suspended with pay or if --

THE COURT: I'm sorry. If the law just says, and you read it to me before, that the Board of Ed or any other educational district has the right to suspend the teacher with pay and that is all it says, what prevents the board from adopting what it considers reasonable regulations to deal with that?

MR. FAGAN: Your Honor, now we are getting to the issue of the reasonable regulations and the creation of the rubber rooms, and here is why I say that.

The law also provides that each of these teachers be provided notice of their charges. First of all, there has to be an executive session which is convened within five days, voted on, and every teacher who is going to be charged has to receive notice that there has been an executive session, they voted on it, the majority of the people have voted that there are going to be charges made. That is pursuant to the state law.

Second, once they do that, then the teachers themselves have a right to -- they have to be notified not just five days of the charges, then they have to be given very specific notice of what the charges are, with their opportunity to defend. They also, right after that, and I can quote the sections but I would rather paraphrase them for your Honor. They also have a right to have expedited hearings, they have a right to have an unbiased arbitrator, and they have a right to have closure. The process is supposed to be a quick, definitive process so that those teachers who are, let's say, unfortunately --

THE COURT: Now you are changing the issue.

MR. FAGAN: No, your Honor, I am not changing the issue. I am going to the heart of the rubber rooms.

The heart of the rubber rooms are confinement. They are retaliatory. This is not a process whereby teachers are sitting there until they get their day in court. This is a process where some teachers sit there for months and years before they are ever given notice of the charges. This is not an issue of saving taxpayers money. This is an issue of costing taxpayers money. This is not an issue of efficient use of public employees.

By the way, these are not teachers --

THE COURT: When I run for mayor and get elected, we can deal with policy issues. This is a question of law. But

OK.

MR. FAGAN: It is, your Honor.

THE COURT: Let me hear from Ms. Greenfield.

MS. GREENFIELD: Your Honor, I agree, I believe we are mixing some issues here. One, we have a strict issue of law. We don't need discovery about whether or not there are these reassignment centers. There are. It seems like counsel is arguing no matter what we do not have the right pursuant to education law to take people out of their school and reassign them to these places. Whether we can or cannot is an issue of law.

Then there is the issue of whether or not they are getting proper notice or timely notice of the charges against them, and then whether or not they are getting timely hearings. I would just like to note, your Honor, the one named plaintiff we have before us was not charged. The allegation of corporal punishment was substantiated but it was determined not to go forward with charges and all he received was a letter of reprimand.

The allegation was made in June of '07. He was back in the classroom by January of '08. That is what we are talking about. That is the factual scenario that we have here. Until we have other plaintiffs and other factual scenarios, it is hard for me to express to the court what I really think this case is about because I think it is about a lot of different

things, a lot of different challenges. But, your Honor, to me, they all seem to be legal challenges. Not whether or not in this case the charges should have been substantiated against me, but whether or not the process that was employed from the initiation of the reassignment to the rubber room until bringing the charges violated due process. Again, I don't see the need for all this discovery on those legal issues.

MR. FAGAN: She is absolutely right with one caveat. She went right to the heart of it.

MS. GREENFIELD: Thank you.

MR. FAGAN: By the way, with respect to Mr. Lewenstein --

THE COURT: I don't care if the timing is off on that. Let's get to the legal issues.

MR. FAGAN: The legal issue in this case, your Honor, is, are the rubber rooms -- is it permissible to assign these teachers and confine them to the rubber rooms, full stop. Then there are other things that come after that, but that is one of the threshold issues in this case.

Ms. Greenfield has told us, and it is in the record, that she believes there is some type of an understanding that allows that process.

THE COURT: You are missing the point. You are totally missing the point.

MR. FAGAN: I am trying to get discovery.

THE COURT: I understand that. That point I understand.

MR. FAGAN: And I have moved very far back.

THE COURT: Candor is sometimes useful.

MR. FAGAN: Judge, I moved very far back to just one single issue. What is it? Let her produce to us whatever she has --

THE COURT: You are missing the point or, as you candidly admitted, you want discovery of all this regardless of the point.

MR. FAGAN: Not regardless, your Honor. With respect, not regardless.

THE COURT: Let's move on.

I guess my question is this. On the one hand you want to move quickly, and since I run a rocket docket I appreciate that. On the other hand -- Ms. Greenfield shook her head -- as the defense counsel she doesn't.

My question is this. You have got to amend the complaint. Can you do it by Friday or are we being foolish and would you rather have either until Monday, and ruin your weekend, or next Friday?

If you don't want your case to get bogged down, get rid of the John Does, unless you are prepared to make a motion, which you better have good case law on because I don't think you have a chance here, number one. Number two, what is the

facts as to each plaintiff, and you have got lots of the same argument. The fraudulent scheme involved. Is this age discrimination? Is it race discrimination?

MR. FAGAN: It is age discrimination, your Honor, and I didn't have a chance to -- we weren't pleading Title VII --

THE COURT: Stop. You were pleading Title VII.

MR. FAGAN: We weren't pleading Title VII as race, creed, national origin. We were pleading it as amended under the 1991 Civil Rights Act that includes specific age discrimination.

THE COURT: Then you have separate causes of action for Title VII and the ADEA. The ADEA is the amendment to Title VII to get age in it.

Secondly, you have got a 1981 claim, which, unless I am really rusty, is only for race.

MR. FAGAN: Your Honor, I can pull that out. I simply believe that 1981 was amended by 1999 to include a paragraph for age. It was an amendment.

THE COURT: I find that doubtful. But I guess what I am saying is this. If you are going to do it -- RICO, come on. Give me a break. This is a Fifth and Fourteenth Amendment due process case.

If you want to get to the heart of the matter, including getting some discovery -- I am not telling you what to do. You are a lawyer. You get paid to make these

decisions. But if you are bringing any of these causes of action in your amended complaint, and that is why I am saying if Friday is too soon, take more time and let's agree on that, I want you to have researched it. Does your client have standing under the tenth cause of action to bring a claim for misuse of taxpayer funds. The Supremes have just recently dealt with that in the religious context in something else. I can't say I can swear to the case law off the tip of my tongue.

Tortious interference with contract rights. You can't interfere with your own contract.

So please do your research. Get rid of the junk here. Get specific facts as to specific plaintiffs, if that is what you are challenging. Plaintiff Holmes has been in the rubber room for four months with no charges brought and the rubber room is miles away from his or her home. Whatever. Get rid of the boilerplate here. I mean, for a 20-something page complaint, it says very little.

MR. FAGAN: That is correct, your Honor. The purpose of --

THE COURT: You don't have to justify this one. Justify your next one.

MR. FAGAN: May I just speak with my client for a second?

THE COURT: Sure.

(Pause)

MR. FAGAN: I would actually opt for destroying my weekend and going for Monday to file, your Honor.

THE COURT: That is fine.

MR. FAGAN: My suggestion, if I can make a suggestion, Judge.

THE COURT: Yes.

MR. FAGAN: My suggestion would be that, we have got so far the issue of preservation, subpoena to the UFT for preservation, preservation subpoena out to the UFT. We will serve with the amended complaint, we will serve discovery requests on the UFT.

THE COURT: UFT or the board?

MR. FAGAN: I misspoke. They confuse me sometimes they are so close. The DOE. I will make those very specific, with the specific types of e-mails, with the information. That way when we come back to your Honor, let's say mid-next week, unless your Honor is going to push it sooner, when we come back then, hopefully Ms. Greenfield --

THE COURT: How about throw into your time schedule, it would really be nice if you and Ms. Greenfield talked to each other and perhaps some of this can be cut through.

MR. FAGAN: I offered that, and I am hopeful that after --

THE COURT: Offered that? She learned about the case when my secretary called the clerk at 4:30 and said who is

assigned to that and they said nobody. Ms. Greenfield is the supervisor, so she is stuck with it for now.

MS. GREENFIELD: And thank you for that.

Your Honor, counsel did give me the sheet of paper this morning and I said this was a no go. But obviously once I get the amended pleading, we will certainly have a meet and confer with counsel to see what we can do with respect to his discovery.

MR. FAGAN: Is it inappropriate to ask the court to consider directing Ms. Greenfield to produce whatever documents she has with regard to the creation of the --

THE COURT: Yes.

MR. FAGAN: It is inappropriate to ask for that?

THE COURT: You can ask, but the request is denied.

There is absolutely no reason -- either that is a legal issue or -- look, I know your desperate issue here is to get discovery for some reason. I thought lawyers usually like to win a case, not just get discovery.

What Ms. Greenfield said was in the context of should the UFT be involved here, she said, as I recall, and you have all got the transcript, something to the effect of this issue has been addressed with the UFT. She didn't say the UFT contract requires it or anything else. Frankly, I think from what Ms. Greenfield is saying and from what you are saying that as to the ability to do this it seems to be the board's

position that they have the unilateral right to do it. To the extent that any unilateral right when dealing with city unions, particularly UFT, is, well, we have the right to do it but if the UFT is going to scream bloody murder we might try to talk to them and work something out, that may be an additional defense that the city has that the UFT has not challenged this. It doesn't mean that they need the UFT on board for this necessarily.

In any event, I am not ordering them to do anything other than preserve, and even preservation is difficult because still, other than whatever you have mentioned today, other than that, it is unclear to me what you want in discovery.

So what you are going to do is serve a document demand on Ms. Greenfield. You are going to state what form you want ESI in and all that good stuff, and she is going to respond. We will see whether that is expedited, whether it is delayed because of motion practice, because you did a terrible job of amending your complaint, or whatever.

But with all due respect, and with all due respect to the teachers sitting in the back, some of whom may become named plaintiffs shortly, to the extent this is a due process challenge to the rubber rooms, it is mostly a legal issue and it is not something, considering that the rubber rooms have been around for several years, not something that it would appear to require immediate injunctive or other jumping through

hoops relief absent some motion papers, that you have not yet filed, that would convince me otherwise.

The fact that Mr. McLaughlin has until the end of the day today to bring an Article 78 or that someone else sitting in the back of the room has a month to bring an Article 78, I am not interfering with the state court process. People will do what they have to do in state court. The state courts are more than adequate to protect their rights with respect to that.

Moreover, on all of this, you keep calling it confinement like being arrested. Certainly in Section 1983 cases against the police department or police officers have come up with ways for the jury to compensate people for being falsely confined.

So there is very little that, considering the passage of time in general on the reassignment centers, even if it may be novel for some of your clients, it is unlikely that you can make a showing for injunctive relief or other everybody has to jump through hoops.

Moreover, to the extent your requests to Ms. Greenfield for documents, including ESI, are tailored, specific, etc., you have a better chance of getting the court to order that than if it is a blunderbuss request that says every e-mail that talks about the rubber rooms.

MR. FAGAN: Thank you, Judge.

THE COURT: So use your time wisely in both amending the complaint and drafting appropriate document requests and we will go from there.

MR. FAGAN: Your Honor, what we will do --

THE COURT: Your client is waving at you.

MR. FAGAN: May I speak to him for a moment?

THE COURT: Yes.

MR. FAGAN: Thank you, Judge.

(Pause)

MR. FAGAN: Judge, my client pointed out that one of the issues in the rubber room, and I am saying this not to upset the court but there are some issues going on as it relates to things that are happening in the rubber room and things for which, whether it is injunctive relief or guidance from the court, direction to Ms. Greenfield and to the DOE, it would be helpful.

What has happened literally in the last two weeks is that when the DOE learned of the potential action and then when the DOE learned of the action itself, the confinement became even -- and I am using the term confinement and I don't mean to say it to negate what the court has said. I think we will be able to prove that it is confinement. The confinement within the rubber rooms has become even more restrictive, where they are preventing the teachers from even sitting and talking together about what is going on. They are preventing the

teachers -- in a certain way it is draconian.

I am not suggesting that the court has any affidavits to this. The only evidence is that my client, Mr. Lewenstein, could attest to it. He leaned over and said to me to please make the court aware of this.

What I would suggest is that until we come back here next week the DOE should understand that restrictions in the rubber room to people congregating, talking -- by the way, they are not doing anything in the rubber room. They don't have any jobs in the rubber room. They sit in a room as if they are wearing dunce caps, in a room this size. These are not teachers who are accused of the types of conduct that one would think merits this. These are teachers who are accused of incompetence, teachers who are accused of potential insubordination.

So my suggestion, your Honor, is that until we come back here, the DOE and the court, even by way of suggestion on the record, needs to understand these people have a right to sit and talk, they have a right to meet, they have a right to move about the rubber rooms, they have a right to talk about the lawsuits, they have a right to plan. I think that is the First Amendment. Whether they are confined in the rubber room or they are outside talking, they should be entitled to move about freely. And I can put him on the stand. He can attest to it --

THE COURT: Not today.

MR. FAGAN: OK, Judge.

THE COURT: It is 10 to 12.

MR. FAGAN: Thank you, Judge.

THE COURT: When do you want to come back? How does Friday, the 8th sound?

MS. GREENFIELD: Your Honor, can I just get my appointment book from the back?

(Pause)

MS. GREENFIELD: Perfect. Same time, your Honor?

THE COURT: Let's move it up to 9:30.

MS. GREENFIELD: Your Honor, could we do 10:00?

THE COURT: Sure. February 8 at 10:00.

Usual drill. I am going to require both sides, unless there is an economic or other objection, to purchase the transcript --

MS. GREENFIELD: It is done already, your Honor.

THE COURT: -- which contains the court's rulings such as they are. I don't think I have ruled on anything that was definitive enough that it is appealable, so to speak, but for the record and since your clients are sitting here so they know for the future, or maybe they are your clients, pursuant to 28, U.S. Code, Section 636 and Federal Rules of Civil Procedure 6 and 72, any party that is aggrieved by any of my rulings at these conferences has ten business days to file objections with

Judge Marrero.

Failure to file such objections within the ten business day period constitutes a waiver of those objections for all further purposes, including appeals to the Second Circuit or beyond. The ten business days starts running immediately, any time you hear my ruling at a conference, regardless of how long it takes you to get the transcript.

All right. I guess, not that I -- I won't put any comments on other than to say it is my practice at first conferences to remind the parties that they do have the option pursuant to 28, U.S. Code, Section 636(c) to have the case in front of me for all purposes, including jury trial, should the case get that far. Otherwise, you will be in front of me for some things and back to Judge Marrero for substantive motions and trial. That, of course, requires unanimous consent. So if one of you jumped up now and said, I consent, it doesn't matter unless you both consent. Then you are back with Judge Marrero.

MR. FAGAN: I will defer to Judge Greenfield.

MS. GREENFIELD: My mother always wanted me to be a judge.

MR. FAGAN: We have known each other for eleven years, Judge.

MS. GREENFIELD: And he said I don't look a day older.

THE COURT: Before I age any further, I will just say, if you want to talk to your clients -- I know Ms. Greenfield

and her colleagues always have to run it up the flagpole at Corp. Counsel for strange reasons. So if you want to tell me anything about that at the February 8th conference, that is fine.

MS. GREENFIELD: Thank you, your Honor.

THE COURT: I prefer that you get back to me on a combined neutral basis, where one of you flips a coin and does the report for both of you and just says either there is consent, here is the signed form, there isn't consent, without saying I consented but he/she didn't, or that the issue is still under advisement and will get decided further down the road.

MR. FAGAN: Your Honor, because sometimes I don't remember everything that went on, can I just summarize what I believe were what the court allowed us to do?

THE COURT: Sure. Amend your complaint by Monday, serve a preservation subpoena on the UFT as narrowly drawn as possible, and make sure that they understand that it is for preservation, not production. Serve a document demand simultaneous with the amended complaint on Ms. Greenfield, and narrow your complaint as much as possible.

Also, by the way, and this is no longer a summary, it is somewhat new, you have got not only the Department of Education as a department but John Doe defendants and Mayor Bloomberg and Joel Klein. If you need all those folks, first

of all, I doubt there should be anonymous superintendents or principals. Your clients know who did what, and then you would have to serve them. But if this is a challenge not to what happened to one particular client, as you have said, but are the rubber rooms themselves appropriate, that seems to be that the DOE is the appropriate defendant. But you will do what you all want on that.

Seriously, Mr. Fagan, if the complaint has as much junk in it when it is amended as it does now, I will be very inclined to stay discovery while there are motions aimed at it.

MR. FAGAN: Thank you.

THE COURT: Take the hint.

MR. FAGAN: I got the hint, Judge, and we will include more specific allegations as to each plaintiff.

THE COURT: And less causes of action.

MR. FAGAN: Less causes of action and more named defendants.

THE COURT: That I wasn't necessarily inviting other than -- seriously, I am not sure that the UFT doesn't have to be here. You will do what you want and the city will do what it wants, and the UFT, once it gets your preservation subpoena, might move to intervene if no one else brings them in. I will worry about all that.

Make sure the complaint says what it is you are challenging, not just this amorphous we don't like the process,

and make sure your document requests are narrow and focused and we will go from there.

See you next week.

MR. FAGAN: Thank you, Judge.

MS. GREENFIELD: Thank you, your Honor.

(Adjourned)

Exh. D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

TEACHERS4ACTION, et al.,

Plaintiffs,

v. 08 Cv. 548 (VM)

MICHAEL G. BLOOMBERG, et al.,

Defendants.

------------------------------x

February 8, 2008
10:10 a.m.

Before:

HON. ANDREW J. PECK

Magistrate Judge

APPEARANCES

EDWARD D. FAGAN
Attorney for Plaintiffs

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
BLANCHE GREENFIELD
Assistant Corporation Counsel

(Case called)

MS. GREENFIELD: Good morning, your Honor.

MR. FAGAN: Good morning, your Honor.

THE COURT: I guess my question, Mr. Fagan, is why are we here today if there is no amended complaint?

To put it another way, don't court orders mean anything?

MR. FAGAN: Yes, your Honor, they do mean something, and I called on Wednesday.

First of all, when I was here last time, I had

mentioned to the Court that my computer had been lost. I went back. It was in fact stolen. I have been trying to gather the data that was on the e-mails that I had sent out. I have been trying to get that back.

I called to speak with Ms. Greenfield on Wednesday about adjourning today. I called specifically your Honor's chambers, explained the situation, talked about possibly having the conference next week and --

THE COURT: Who did you speak to?

MR. FAGAN: I spoke with Patricia, I believe is your Honor's clerk. The explanation was it's a scheduling conference. The judge doesn't like to adjourn scheduling conferences. I called Ms. Greenfield back, explained that to her, and then we both agreed that we would come in today.

Your Honor, they do mean something to me.

THE COURT: Where, even if you had to scroll it with crayon, was the request for an adjournment of the deadline for filing an amended complaint? Forget about whether this conference is necessary. You may recall, I am sure you do, you said last Monday or Tuesday, whenever it was, Judge, I will get you the amended complaint by Friday. And I said, Are you sure you can do it that fast? I gave you till Monday to give you extra days, etc. We are now sitting here Friday. You have violated a court order.

MR. FAGAN: Your Honor, I was going to send in a letter. I did not send in a letter requesting an adjournment of the time within which to file the amended complaint because I expected to come in and explain to your Honor today --

THE COURT: Forget it. You're wasting my time. You're wasting the time of the eight or ten of your clients who are sitting here.

I can't give you a schedule until I know who the plaintiffs are. When are you going to amend the complaint?

MR. FAGAN: By Monday, your Honor.

THE COURT: I have heard that song before.

MR. FAGAN: Your Honor, since the time that happened, I went out and bought a new computer to try to gather the information. My client didn't go to Europe. He stayed here in the United States to try to gather it. And I committed to Ms. Greenfield just now, actually outside, I told her that we were

going to provide her with the identities of the named plaintiffs and he has been working on the bio so that we can provide that. We are able to do that. I had this conversation with my client this morning.

THE COURT: I am giving you one last chance. If you want Monday, I will order Monday. If you want a week from Monday, I will order a week from Monday. But, if by 5 p.m. on whatever date you choose there is not an amended complaint in the ECF system and physical hard copy on my desk, I will impose sanctions. So pick your date.

MR. FAGAN: Judge, actually, I was expecting Monday at 11:59 because there are times when I file very late at night. Monday the end of the day is fine with me. If the Court wants to have that because Monday at 5 p.m. is the deadline, I can tell the judge --

THE COURT: I don't care. You're missing the point. Since it's not here -- stop, please. Since it's not here by today, and I am not just interested in the ECF copy but a copy that I can read without having to use government paper to print it out, etc., etc., pick your date. If you file ECF by midnight on Monday so you want until Tuesday at 5 p.m., I don't care.

MR. FAGAN: It will be on your desk by 12 noon on Tuesday.

THE COURT: You will have till the end of business on

Tuesday. I don't care how you do it. I am not going to be here Tuesday. Actually, the court is closed on Tuesday, so if you want Wednesday the 13th, that's the date.

MR. FAGAN: Thank you, Judge.

THE COURT: Now, how many named plaintiffs are we going to have, approximately?

MR. FAGAN: Between 18 to 35.

THE COURT: And you have spoken to all of them, not just your client?

MR. FAGAN: No, Judge. I have spoken to all of them. And before their names go in the complaint, they are going to sign off on the description of who they are, how we describe them, and putting them into each one of the causes of action.

THE COURT: OK. At the risk of repeating myself, that's a lot of work to do. If you're sure it's the 13th, that's fine.

Just listen to me for a minute. I don't want you to make a commitment you can't keep, and I don't want a further amendment down the road saying, I only was able to get our act together for 10 of them or 18 of them and now I want to add 17 more a week later. I don't care when you do this, but I want it done once, I want it done right, and I want you to tell me now, this is the last warning, the last issue, when you want to do it by. If it is by Wednesday the 13th at 5 p.m., that's fine. You want till the end of the week, you want another

week, it's not going to matter other than we can't do much in this case till we see what the complaint looks like.

MR. FAGAN: No, Judge. Wednesday is fine.

I would like to alert the Court to the following. There will be plaintiffs who are named, and we have very specific descriptions of those plaintiffs, and then there will be an attachment to the complaint which includes names of additional plaintiffs that are going to fall into one of the different categories. It's not going to have the level of specificity that we have as to the dozen that we have already got, but it's going to name who they are, what has happened to them, what the damages are and what the basis for relief is and in which section they go to.

THE COURT: Why? I don't understand an appendix method. They are either a plaintiff or they are not a plaintiff.

MR. FAGAN: Here is why, Judge. Since we were here last time, and contrary to your Honor's admonition to the DOE, there has been retaliation. This is not speculative. There has been retaliation against a bunch of these teachers and some

of these teachers are fearful of putting --

THE COURT: Stop. I am not accepting John Does.

MR. FAGAN: I wasn't saying John Doe, your Honor.

THE COURT: I must be missing something and it would be much easier if I were reading the complaint instead of

listening to all of this. What I am interested in is are all of these people people who have signed a retainer agreement with you?

MR. FAGAN: Yes.

THE COURT: Then why aren't they all in the body of the complaint?

MR. FAGAN: Your Honor, some will be -- you know what, I will put them all in the body of the complaint. What I am suggesting to your Honor is there is going to be much more detail about some of them than there is about others. That's all I am suggesting.

THE COURT: I am asking why.

MR. FAGAN: Because some of these people cannot gain access to the information, and they cannot sit and do the work in their locations where they are confined because the DOE has prevented them from bringing in computers to work with.

THE COURT: Stop, please. Mr. Fagan, please. That's why there are nights. That's why there are weekends. Either you're ready to bring a complaint for these people that meets Rule 11, that meets the pleading standards of the Bell Atlantic Cromley standard and all of those cases or you're not.

I really don't understand what you're telling me, and I guess what I will say is, you're the plaintiffs' lawyer, do what you want, but there will not be discovery in this case until we have a clean complaint and any motion to dismiss or

anything else that may have to be aimed against it, unless I decide that a motion to dismiss is not likely to resolve things.

MR. FAGAN: All I was saying was some of them will have more detail than others. That's all I was saying. I was actually specifically saying some of the named plaintiffs would be included by name in an appendix in the exact same way they were included in EEOC complaints, the exact same way.

As far as the standards, the Court should also know that what we are also going to put into the complaint, and it's going to come by a letter to the Court, we expect to be asking either your Honor or Judge Marrero for a preliminary injunction hearing, consistent with Burlington, consistent with the standards in this circuit as far as the chilling of free speech.

THE COURT: Please stop. First of all, you're paying by the page. Secondly, my time is not unlimited. If you want to move for a preliminary injunction, make the motion. It goes to Judge Marrero, unless you and Ms. Greenfield stipulate to have it in front of me, or unless Judge Marrero refers it to me for some purposes.

Do what you have to do. Do it right. I am not giving you premotion clearance, I just want you to be clear on that. If Judge Marrero requires premotion clearance, you have got to ask him for it. Whatever you have got to do to make a

8288TEAC.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8288TEAC 9

preliminary injunction motion, quite frankly, I think you're wasting your time, but that's your prerogative.

The reason I say it, just so you know where I am coming from, is the rubber rooms, to use your term, have been going on for quite some time. So for you to meet the preliminary injunction standard for what is in essence an affirmative injunction as opposed to a negative one, I assume, you're either asking for an injunction that says obey the law, don't retaliate, which is somewhat meaningless, or you're asking for an injunction to somehow stop or change the way the rubber rooms operate, which strikes me, gut reaction, obviously without seeing any papers from you, other than the initial complaint, is you're asking for the court to bend over backwards, jump through hoops and do all sorts of amazing things, without there being any reason for that hurry since you have waited this long both to amend the complaint and, more importantly, you have waited this long from the initiation of the rubber room process until now. But you will make the motion and you will convince Judge Marrero or me, whoever winds up dealing with it, that it has merit.

MR. FAGAN: I will, Judge. Just so the Court will know, there is not just precedent in this circuit, but Judge Marrero himself has issued an order, set standards for preliminary injunction hearings. He did it last year in a case called Somoza. We have the standards both of the Supreme Court

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8288TEAC 10

and within this district talking about adverse actions by an employer against an employee. I am not worried about that, Judge.

THE COURT: Make your motion.

MR. FAGAN: Thank you.

THE COURT: Subject to Judge Marrero's premotion clearance rules, if any.

I guess I will put it to the two of you. I am not prepared to start discovery in this case, which is why we had this conference for today, without knowing what the complaint is, what the claims are. If you're telling me that you have gone from 14 claims to one or two, and you want to tell me what it is, I might reconsider.

MR. FAGAN: I can do that, Judge.

THE COURT: Go ahead.

MR. FAGAN: We are talking about hostile work environment. We are talking about --

THE COURT: Has there been an EEOC complaint?

MR. FAGAN: There has, your Honor.

THE COURT: By who?

MR. FAGAN: By Jennifer Saunders. She is actually not here.

THE COURT: Slow down one minute. You told me there are going to be 18 to 35 plaintiffs. Obviously, there may be different claims for different plaintiffs. How many of them

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8288TEAC 11

went to the EEOC?

Page 5

MR. FAGAN: To my knowledge, as far as hostile work environment, there's at least one. I don't know which of the others from -- we are talking about a very specific rubber room, which is at 333 Seventh Avenue.

THE COURT: You have got one Title VII hostile environment claim. When did the right to sue letter get issued?

MR. FAGAN: The right to sue letter hasn't been issued.

THE COURT: Then you can't be here, can you?

MR. FAGAN: Actually, Judge, I will submit the case law that I believe will satisfy your Honor, Judge Marrero, and the standards for why it is that we can take this action with regard to these particular violations at this time.

Let me continue on.

THE COURT: No. It really makes no sense for me to do this orally because I don't think what you're doing makes sense. If you say there are cases that say you can do it, in the complaint submit whatever backup you want to convince me to allow you any discovery. Otherwise discovery is stayed pending further order of the Court.

MR. FAGAN: Your Honor, let me continue because there are certain areas of discovery which, with all due respect, I think your Honor needs to hear this.

We were here last time. Your Honor asked me --

THE COURT: With all due respect, counsel, although there seems to have been a slight disconnect between my secretary and you, but in this case, unlike my normal caseload, this case is so confusing, I will leave that as the word, without knowing what the new complaint is, I can't do anything for you.

MR. FAGAN: I was attempting to give you a summary of responding to what your Honor said last time, which was to weed out what your Honor called garbage. I am attempting to explain that to you.

THE COURT: You have got a hostile environment claim. What else?

MR. FAGAN: We have got a retaliation claim.

THE COURT: Again, under the EEOC laws, Title VII or whatever?

MR. FAGAN: Yes.

THE COURT: OK.

MR. FAGAN: We have got an age discrimination claim, and the plaintiff is here. We have an EEOC letter. We have got a claim against the UFT for a breach of duty of fair representation.

THE COURT: Now we have got a new party who is not even here today.

MR. FAGAN: We do, your Honor, but I have already

spoken to the counsel for the UFT who indicated they were going to come in as an amicus. I didn't understand how they would be doing that, but I spoke with Charles Moerdler of Stroock Stroock & Lavan. They were aware of this case. Actually, they were inquiring themselves about where the EEOC letter was that they themselves have. The plaintiff in that case is a

gentleman named Mr. Sid Rubenfeld. He is here.

I would say those are the primary causes of action.

THE COURT: How many secondaries are there?

MR. FAGAN: What I would like to be able to do is give your Honor not just the complaint but the application for very limited discovery, the way your Honor had specified I should do it. We have additional information. I am not asking for lots of discovery. I am not going to ask for that. We have very pointed information and discovery requests. I will do that, together with the filing of the complaint, and I will do that in a way that I believe your Honor will have an opportunity to consider it.

I have already spoken with Ms. Greenfield. We are scheduled to speak on Tuesday to discuss the issue of who the plaintiffs are, what type of relief it is that we need, where we are going with the complaint, whether we are going for a permanent injunction, whether we are asking for an interim injunction. We did what your Honor directed us to do. The thing I didn't do was file the complaint in time, and I would

like the Court to consider the explanations that I gave for why it is that it wasn't done.

THE COURT: Except for one other thing, and I won't belabor it, which is if you called my secretary on Wednesday, which is what you said, the complaint was due on Monday.

MR. FAGAN: Yes, your Honor.

THE COURT: Fine. Let's put it this way. The UFT is not here yet. Obviously you have to serve them. If you want to make a letter application to me to allow limited discovery from the City or the UFT after they are served, you can make that application and attached to that your proposed Rule 34 request or whatever it is. But at the moment, until I see what this case is about today, not what it was about a month ago when you filed the original complaint, less than a month ago, I am not prepared to allow discovery to go forward, in part -- never mind the in part. I am not prepared to allow discovery to go forward yet.

Moreover, you asked for an emergency conference previously which is how you got here. The City's time to answer the original complaint, let alone any amended complaint, has not yet run. UFT hasn't been served yet with anything. Normally that would trigger a whole period of time for them to answer, time for a 26(f) conference, etc., etc. While I am running a rocket docket, it is not to be for the benefit of getting discovery for the sake of discovery. It is to get the

case appropriately moving.

So when I see the complaint, we can deal with all of that.

MR. FAGAN: Thank you, Judge.

THE COURT: Ms. Greenfield, anything to say from the City?

MS. GREENFIELD: No, your Honor. Having been thinking about it while I am sitting here, I think I will save my comments until I see a copy of the amended complaint.

THE COURT: By the way, one other question, Mr. Fagan. Who are the defendants going to be?

MR. FAGAN: The defendants are going to be --

THE COURT: Besides the UFT.

MR. FAGAN: -- the same named defendants that we have got, Bloomberg, Mayor Bloomberg, Chancellor Klein, the Board of Education, the New York State Department of Education, the UFT, and several principals and superintendents specifically who were involved in some of the actions against the teachers themselves.

THE COURT: All right. Ms. Greenfield, quick question. Is the proper defendant the DOE or the City or both?

MS. GREENFIELD: It could be either, your Honor.

THE COURT: The DOE, unlike the police department, is suable?

MS. GREENFIELD: Yes, your Honor.

THE COURT: OK.

MS. GREENFIELD: Just to be clear, we don't represent the New York State Department of Education. The AG's office would have to be served.

THE COURT: State agency, I don't know what their involvement is on this. I don't need to know. Serve them. That will take longer.

I assume that the principals and superintendents have to be individually served, unless you make some other arrangement with Ms. Greenfield, which she may or may not be able to do.

MR. FAGAN: We were prepared to serve and we intended to serve them all individually and directly.

THE COURT: All right. When does it make sense to come back having allowed all the players to be involved? Normally I would say, OK, we will bring you back next Friday, but I am a little concerned we will not have the new players, the Attorney General's office, the UFT, and anybody else here by then.

MR. FAGAN: My suggestion would be that we bifurcate it a little bit. I will tell you why. The issues as they relate to the UFT and the issues as they relate to the State of New York are discrete and the requests that we are making as it relates to the Department of Education is something that, after your Honor sees the complaint, after your Honor sees the letter

request with regard to discovery, and after your Honor sees a copy of the letter that we are sending to Judge Marrero about the request for a preliminary injunction, I do believe it would be appropriate for your Honor to call us back in next Friday, the following Monday, as soon as is convenient, and that application, when we are going to be here next time, doesn't need to involve at this point the UFT or New York State because they are discrete issues as it relates to the Board of Education.

THE COURT: Ms. Greenfield, any views?

MS. GREENFIELD: Yes, your Honor. Having not seen the amended complaint, I don't know that I can rely on counsel's representation that they are discrete issues because I don't really know what the issues are. Obviously, as it goes to a hostile work environment or retaliation allegedly committed by the Department of Education, I don't need these other parties.

But if it relates to the reassignment centers or anything else, I believe that I would need to see what the specific allegations are before I can determine if the UFT or the New York State Department of Education should be involved in any discovery or conferences involving those matters.

THE COURT: Frankly, I am not exactly sure what the state's role is, but I certainly wonder whether it's appropriate to do anything without the UFT, who may be, if not sitting in between your two tables, may have an interest in

some of the things the plaintiffs want, albeit even though you're suing them as a defendant.

One of the problems I would have is I don't want the department to have to go through certain aspects of discovery twice because you frame it in one way and then the UFT frames it a different way.

I am also not sure, and maybe Ms. Greenfield can help me on this, once the principals and superintendents are served, are they going to be, if requesting it, represented by you, by the UFT, or, because of potential conflicts all across the board here, by something else?

MS. GREENFIELD: Your Honor, as the Court is probably aware, the principals are not represented by the UFT.

Again, not having seen the allegations, we all know that the individuals cannot be defendants in a Title VII action; it is the employer. I don't know what the specific allegations are as to them or the causes of action asserted, but with respect to any individual plaintiff, I would have to interview the principal to find out what happened and determine if representation is appropriate, and if we decline representation, then they would either be represented by their union or by their own privately retained counsel.

MR. FAGAN: What I committed to do with Ms. Greenfield, before your Honor even came in, was to give her the specifics as to each of the plaintiffs by noon today. I have

got those. My client is here. We also included the specific principals so she can conduct her investigation as it relates to who these people are. And then what will happen, your Honor, is they can make whatever decision it is that they want to do with regard to the principals. I don't believe we need the principals here, I don't believe that we need the superintendents here at the hearing as it relates to the DOE.

THE COURT: Don't sue them then.

Look, it is highly unusual to have hearings in a case without all parties being present. I don't know mean the individuals but their lawyers. This is a public courtroom. I am perfectly happy to have all of your plaintiffs here, or whoever the people in the back of the room are, but what I am saying is it is unusual, and I bent over backwards to give you an immediate hearing on your preservation order, but I think we really need to let this case fall into a normal pattern of getting people served and represented, etc.

So if you have urgency between now and the 13th, rethink how many new parties you need to bring in. The UFT, we talked about last time, is probably a necessary party. Whether the principals individually are necessary defendants as opposed

to witnesses under the umbrella of the DOE or whatever, I leave it to you to structure your case, but I am not going to do this merely to satisfy your convenience, meaning let's get everybody served and represented and worry about starting discovery at

that point, unless you need something for the preliminary injunction hearing, which Judge Marrero will then send you back to me to deal with.

MR. FAGAN: All I was trying to do is be responsive to when your Honor raised the issue of bringing us back on Friday. The only ones that I believe would be relevant to bringing us back --

THE COURT: You're repeating yourself and you're not listening to what I just said, which is I see no reason to do anything until everybody who is being sued is represented.

MR. FAGAN: Yes, Judge.

THE COURT: That means we are talking 30 to 60 days from now.

MR. FAGAN: Unless there is an issue that we have articulated by way of a request for either a preliminary injunction hearing or an emergent matter, which I already indicated I would be submitting by way of letters.

THE COURT: Then I will deal with that when I receive the letter, but I am telling you now if you need discovery to deal with an upcoming, whatever the hearings are called, I am not going to give it to you. If you need discovery for the preliminary injunction motion, you will have to state that when you make the preliminary injunction motion. If you need discovery because you're curious or whatever, wait until everybody is served and consider dropping the excess baggage.

MR. FAGAN: Thank you, Judge. I wasn't suggesting anything other than that. I wasn't asking nor did I intend to ask for full-blown discovery.

THE COURT: Any discovery. You get no discovery until everyone is served unless there is an emergency. The emergency would be the preliminary injunction and we will see what is in your preliminary injunction motion papers.

MR. FAGAN: Yes. Thank you.

THE COURT: At this point, I am not going to schedule a date. When all defendants have appeared via counsel, you will contact me, or whenever you want relief on something you will contact me and you will follow the rules, which is you will send me copies of everything you give to Judge Marrero and we will go from there. Discovery is stayed, however, pending further order of the Court.

MR. FAGAN: Thank you, Judge.

THE COURT: I think, Mr. Fagan, in fairness to our tax dollars, you're buying today's transcript.

MR. FAGAN: OK. Thank you.

THE COURT: And making a free copy available to Ms. Greenfield.

One last thing. It's not my issue per se, but I want to make it clear to your clients and the Board of Ed, if these folks are supposed to be in school, in school meaning, as you call it, the rubber room, in order to get paid, then I assume

this is sick leave or personal time or whatever. They are not necessary. They are welcome to be here, but if the Board of Ed only pays people who have to be somewhere, none of them have to be here. I want to make sure there is no misunderstanding on that.

MR. FAGAN: We will certainly take that with regard to future hearings. I didn't know who should be here or who shouldn't be here. The reason that these plaintiffs are here is each of these are the named plaintiffs. They needed to be here --

THE COURT: They did not need to be here. If you wanted them to be here, that's another story.

MR. FAGAN: I didn't finish. I am sorry. I didn't finish my sentence. With respect to the Court, I was going to say something. It's OK. I understand it's the Court's position they didn't need to be here today. I will instruct them they should not consider it as a necessary day and they should consider it to be sick leave. Some of them actually have already been terminated so it doesn't matter whether they were sick or not.

THE COURT: I didn't want there to be any confusion so that later when they are told they are not getting paid or something, you call that retaliation or you say that the judge wanted them here or anything like that. I am happy to have them here, but not at the tax dollar expense.

OK. Make your arrangements with the court reporter.
(Adjourned)

Exh. E

EDWARD D. FAGAN ESQ.
Five Penn Plaza, 23rd Floor, NY, NY 10001, Tel. (646) 378-2225
Email: faganlawintl@aim.com (Official Email Address for Court Documents)
Email : faganlaw.teachers@gmail.com (Email Address for *Teachers4Action* Case)

*March 25, 2008*

*Via Fax (212) 805-6382*
Honorable Victor Marrero USDJ
United States District Court
Southern District of New York
500 Pearl Street, Chambers 660
New York, NY 10007

*Re: Teachers4Action et al v. Bloomberg et al, 08-cv-548 (VM)(AJP)*

Honorable Judge:

I am counsel for Plaintiffs in the above referenced matter. Plaintiffs' Amended Complaint has been filed and served on Blanche Greenfield Esq., counsel for Defendants Michael Bloomberg, City of New York, Joel Klein and New York City Department of Education (hereinafter "NYC Defendants"). [1]

NYC Defendants' counsel Greenfield and I are working cooperatively together to prepare a Proposed Scheduling Order at the Court's Initial Conference, whenever it can be scheduled.

This letter is written because, notwithstanding the cooperation between NYC Defendants' counsel and me, in the last days, certain retaliatory actions have been taken by NYC Defendants, that we respectfully submit require the Court's emergent attention.

Briefly, the retaliatory actions have now taken the form of scheduling and attempting to move Administrative Hearings ("The State Hearings") forward against Plaintiffs in this action. The Plaintiffs are now being forced to defend themselves in The State Hearings before arbitrators who we submit are conflicted, biased or have been improperly designated. In The State Hearings, the punishments that Plaintiffs face include ruinous fines, defamatory comments in their files and possible termination.

As if that were not enough, because of their participation as Plaintiffs in this lawsuit, Plaintiffs have been stripped of their appointed counsel[2] in The State Hearings. In the last few days, Plaintiffs appointed counsel started to send letters announcing withdrawal as their counsel. This withdrawal by appointed counsel in The State Hearings, was unilateral, without Plaintiffs' consent and without prior notice, approval or appropriate Court Order. Plaintiffs submit it is a further violation of their rights.

---

[1] Amended Summonses for service of the Amended Complaint on the additional Defendants named in the Amended Complaint are being submitted separately.

[2] Appointed Counsel in The State Hearings is provided by New York State United Teachers, the parent to Defendant United Federation of Teachers, and is paid for by Defendant United Federation of Teachers. Counsel of record for the plaintiffs (designated as respondents in The State Hearings) is James Sandner Esq.

# EDWARD D. FAGAN ESQ.

-------------

Plaintiffs are being forced to defend themselves in The State Hearings, without counsel, and with Arbitrators who Plaintiffs submit are conflicted, biased or improperly designated.

Plaintiffs submit that The State Hearings, as certain Defendants, now seek to have them move forward, violate their due process and other constitutionally protected rights and merit the Court's emergent attention.

This morning Blanche Greenfield Esq. (counsel for the New York City Defendants) and I are conducting our Rule 26 Conference. The issue of emergent relief and the need to get back into Court on an expedited basis – pending the Court's availability – has already been raised.

The issue of Emergent Relief related to The State Hearings is raised in this letter because (despite objections) hearings are about to be started today against Plaintiffs (Paul Santucci and Gloria Chavez) and other hearings are scheduled for later this week and next week.

Plaintiffs respectfully submit that a Rule 16 Conference at which Plaintiffs' Request for Emergent Relief and Preliminary Injunction could be address by the Court in a way to prevent further irreparable harm to Plaintiffs.

In view of the foregoing, Plaintiffs respectfully request that the Court call such a Conference at its earliest convenience.

Thank you for the Court's consideration.

Respectfully submitted,

Edward D. Fagan

Cc: *Via Fax (212) 805-7933*
Honorable Andrew J. Peck USMJ
United States District Court
Southern District of New York
500 Pearl Street, Chambers
New York, NY 10007

Blanche Greenfield Esq. – Counsel for NYC Defendants - Via Fax
Charles Moerdler Esq. – Counsel for Defendants Weingarten & United Federation of Teachers – Via Fax

James Sandner Esq. - NYSUT – Via Fax

Exh. F

At I.A.S. Part ___ Supreme Court of the State of New York, held in and for the County of New York, at the County Court House, on the ___ day of ___

INDEX NO. 08/105020

Article 78 Petition

NEW YORK STATE SUPREME COURT
NEW YORK COUNTY

GLORIA S. CHAVEZ

PETITIONER

v.

NEW YORK CITY DEPARTMENT OF EDUCATION,

RESPONDENT

BROUGHT BY MEANS OF **ORDER TO SHOW CAUSE**

UPON reading and filing the annexed ~~affidavit~~ Verified Petition of Gloria S. Chavez dated April 8, 2008 and the annexed exhibits thereto, and upon all the pleadings and proceedings heretofore had:

**IT IS HEREBY ORDERED** that Respondent or its attorney show cause before me or one of the Judges of this Court at IAS Part __ , Room __ to be held at the courthouse located at __ Centre Street, New York, New York on April __, 2008 at 9:30 o'clock in the forenoon or as soon thereafter as counsel can be heard, why an Order should not be made:

1. Staying petitioner's Education Law §3020-a arbitration hearing until such time as an arrangement is made whereby Ms. Chavez, the petitioner, is represented by competent counsel paid for or arranged by the United Federation of Teachers which between September 2006 and March 2008 provided NYSUT counsel paid by UFT for

Ms. Chavez.

2. Directing that Earl Pfeffer, Esq. the assigned Hearing Officer/Arbitrator recuse himself from Ms. Chavez's 3020-a proceeding, for having demonstrated bias against Ms. Chavez for releasing his counsel against Chavez' wishes and for not ordering that Chavez be provided new competent counsel once Pfeffer released the NYSUT counsel. The Court taking Judicial notice that Ms. Chavez was assigned NYSUT counsel in September 2006, while NYSUT chose to defend UFT in an Action filed in the SDNY in January 2008 more than 18 months after they undertook to represent Ms. Chavez.

3. Directing such other and further relief in favor of Ms. Chavez as the Court deems just and proper.

**THE WITHIN RELIEF HAS NEVER BEEN PREVIOUSLY REQUESTED** of this Court or any other court.[1]

[1] Incidental to multipart relief requested in Teachers4Action v. Dept. of Educ. and UFT (of which petitioner is a co-plaintiff among 61 teachers), an application for overall injunction of all pending 3020-a procedures was made at a time that NYSUT represented all plaintiffs in that action. Said application may be misconstrued by respondents as akin to item 1. above in that, after NYSUT was allowed to withdraw as counsel to all 61 plaintiffs, a letter to Judge Marrero in the Teachers4Action case (Exhibit [illegible]) indicated that progress of 3020-a proceedings without assigned counsel immediately prejudiced the 3020-a hearings of the herein petitioner and one other teacher. Magistrate Peck responded that the State Court was the appropriate forum to stay State proceedings (see Exhibit [illegible]) and that relief from the 3020-a proceedings themselves was beyond the scope of the federal action which focused on the reassignment of teachers to "rubber rooms" *per se* (of approximately 800 tenured teachers currently so assigned). The instant application is therefore herein submitted to the appropriate court as suggested by the Federal Magistrate. Also, petitioner herein, merely requests a stay until appropriate substitute counsel and an unbiased hearing officer are appointed, and the former is allowed to prepare to defend petitioner in said 3020-a proceeding. The herein petitioner does not request permanent injunction of 3020-a proceedings from this Court.

SUFFICIENT CAUSE THEREFORE BEING ALLEGED, let service ~~pursuant to the CPLR~~ of a copy of this order, together with the papers upon which it is granted, ~~along with service of the complaint~~, upon the Respondents ~~Defendants by the Corporation Counsel of the City of New York at 100 Church Street, New York, New York 10007~~ on or before 5 P.M. on the ___ of April 2008 be deemed good and sufficient service and, it is also directed that the attorneys for the Department of Education *et al.* are to serve any opposition papers to this petition, and file and serve with the IAS Part __ of the Court, and to the Petitioner Gloria S. Chávez on or before April__, 2008. Reply papers, if any, are to be served and filed with Part __ of the Court on or before April__, 2008.

Oral Argument directed:

Honorable

J.S.C.

ENTER:

Honorable

Justice of the Supreme Court of New York

**NEW YORK STATE SUPREME COURT**
**NEW YORK COUNTY**

**INDEX NO.** 08/105020

---

**GLORIA S. CHAVEZ,**

**PETITIONER,**

**V.**

**NEW YORK CITY DEPARTMENT OF EDUCATION,**

**RESPONDENT.**

---

**AFFIDAVIT IN SUPPORT OF Article 78 Petition**

VERIFICATION

Gloria S. Chávez [your name], being duly sworn, deposes and says:

I am the plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof, the same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

Sworn to before me on

8th day of April, 20008

Maria Isabel Lopez
Notary Public

MARIA-ISABEL LOPEZ
Notary Public, State of New York
Registration No. 01LO6067986
Qualified in Queens County
Certificate Filed in New York County
Commission Expires Oct. 28, 2010

Gloria S. Chávez
Sign your name before a Notary

Gloria S. Chávez
Print your name

NEW YORK STATE SUPREME COURT
NEW YORK COUNTY

INDEX NO.

GLORIA S. CHAVEZ,

PETITIONER

~~AFFIDAVIT IN SUPPORT OF~~ Verified Petition

Article 78 Petition

V.

NEW YORK CITY DEPARTMENT OF EDUCATION,

RESPONDENT

New York State ))
))ss:
New York County ))

Gloria S. Chavez being duly sworn deposes and says:

1. I have been employed by the Board of Education [now the Department of Education ("DOE")] for approximately 18 years as a classroom teacher of the Spanish Language with tenure since 1993.

2. My service was rated entirely satisfactory without exception, until 2006.

3. Because of a single instance in which a supervisor promulgated inaccurate information and failed to provide proctoring teachers with all the test materials for

administering the January 2006 Spanish Regents Examination, the proctor-teachers but not the erring supervisor (Assistant Principal) were brought up on disciplinary charges.

4.    The three teachers so charged, comprising the entire Spanish Department of Graphic Communication Arts High School, 439 West 49 Street, New York, New York 10019, were brought up on disciplinary charges pursuant to Education Law § 3020-a, and each of our terminations was sought.

5.    On June 26, 2006, I was reassigned to a teacher reassignment center (or "rubber room"), at 333 Seventh Avenue, New York, New York 10001 where I have been for almost two years.

6.    During these 22 months, I have been stripped of all duties, subjected to unprofessional and disrespectful treatment by clerical level personnel to whom the task of supervising the reassigned teachers has been delegated, and forced to sit in a windowless, generally overcrowded space, where the fire stairs have been sealed up to prevent teachers would be unobserved exit and later reentry during the day, and where numerous Fire and Occupational Hazard Violations (for inadequate air quality and circulation) go uncorrected.

7.    I thereafter, was served with formal charges under the Education Law §3020-a ("3020-a") disciplinary procedure informing me that the single allegation against me was dereliction of duty during the Spanish Regents on January 26, 2006 and for this allegation

the DOE was seeking my termination from my life-tenured employment as a public school teacher.

8.     I was astounded that an error by a supervisor to each of the three subordinates cause each subordinate to have suddenly visited upon me such a reversal of fortune in their teaching careers, while on information and belief the supervisor merely received a formal reprimand.

9.     The DOE is requesting my termination for an alleged single event that represented faithful execution of each of the instructions given to me and administration of each of the test part with which I was provided.

10.     As part of the supposed due process of the 3020-a arbitration, in September 2006 I was assigned counsel employed by New York State Unified Teachers ("NYSUT") to defend me.

11.     My arbitration hearing was finally scheduled at long last and only after much frustrated waiting under conditions of considerable duress, in November 2007.

12.     As other tenured teachers throughout the city were finding themselves similarly reassigned to rubber rooms for retaliatory reasons, or no other reason than they had advanced to higher salary levels and the department seeks to replace them with younger teachers at half the salary, a group of 61 reassigned teachers found the UFT to be

insensitive or impotent to deal with the escalation of reassignment of older, higher paid, always previously considered to be rendering satisfactory service for many years, all in good cognitive health, we teachers, became frustrated and joined together in a group called Teachers4Action.

13.    Sixty-one reassigned teachers, therefore filed an action in the United States District Court for the Southern District of New York claiming violation of our procedural and substantive due process rights and age discrimination by DOE. We later amended our complaint to add the UFT as a Defendant.

14.    We named the UFT as co-defendant for failing to better protect our property rights in our life-tenured positions despite the fact that each of approximately 160,000 members pay over $1,000.00 per year in union dues, separate and independent of any retirement contributions made to the Teachers' Retirement System or any major medical or hospital coverage.

15.    While our first bid for a preliminary injunction to enjoin all 3020-a actions was not yet in a form upon which the requested relief could be granted, we are preparing to re-move for said relief.

16.    Nevertheless, the parent organization to UFT, NYSUT, has withdrawn as counsel from each plaintiff to the action, without any judicial or even substantive quasi-judicial intervention, i.e. there was no argument to all applications to arbitrators who all had long

been assigned to specific cases well before the issue of the action against UFT and DOE ever came to pass, respondents in the 3020-a action were either not heard (because their cases were not yet ready for hearing) or not heeded as in my case where I was summarily directed that I must proceed *pro se* or hire private counsel.

17.    Such action denies me procedural and substantive due process in this my most valuable asset worth at least 90% of my total potential or actual worth, my life-tenured (without regard to age) property interest in my position as a public school teacher for the State and City of New York.

18.    This occurred even though, I for one, was already in the process of my 3020-a arbitration.

19.    Thus, I am now precipitously, and in violation of my due process rights, without counsel to defend me at my 3020-a arbitration hearings.

20.    There can be no semblance, whatever, of procedural due process by an Impartial Hearing Officer, if the proceedings will take place with my significant property rights in my life tenured position by a state actor if the proceedings will go on without counsel for my defense.

21.    The hearing officer cannot be impartial if the hearing officer will not entertain my requests for an adjournment until how the 61 plaintiffs in the federal action each shall be

represented by counsel in these proceedings implemented under the aegis of state action is resolved. **See Exhibit 1 ( Letter of March 2nd, 2008 to Arbitrator Earl R. Pfeffer).)**

22. Further, when I request a brief adjournment of a few weeks which included the Christmas holidays and was for the purpose of being stabilized on a new medication and supported by a formal physician's affirmation for the purposes of the quasi-judicial proceeding, the arbitrator suggested that my entire medical records be provided, and the DOE wanted to subject me to a Education Law §2568 examination.

23. Such attempted use of the §2568 exam is a misapplication of the law, as it provides only for examination to determine whether the teacher is fit for continued service at all or forceful permanent disability retirement is indicated.

24. I, thereafter, requested that the hearing officer, Earl R. Pfeffer, be replaced because the above cited two paragraphs indicated insensitivity, if not actual bias against me. My request was ignored by NYSUT and the UFT. **See exhibit 2 (Letter of February 25th, 2008 to NYSUT General Counsel, James R. Sandner. )**

25. On March 13, 2008 my NYSUT attorney of record, James Sandner and my actual counsel Yvonne Mariette made application to the Hearing Officer to be relieved as my counsel. **(See exhibit 3 (Letters of March 17th and March 14, 2008 from my NYSUT Counsel, Yvonne Mariette and General Counsel James R, Sandner.)**

26. The arbitrator, Earl Pfeffer, granted the NYSUT application to be removed as counsel without argument and without my consent.

27. I was asked whether I wished to hire private counsel, or continue *pro se*. I was never consulted whether I was willing to release my counsel.

28. I attempted to find alternate counsel but was unable to find attorney with 3020-a experience.

29. I informed the arbitrator that I required counsel with experience in 3020-a proceedings. All I have received from the arbitrator are admonitions threatening me that the DOE will simply proceed unopposed at all if I do not participate *pro se* or find counsel to retain. On April 4th, 2008 arbitrator Pfeffer refused to adjourn (even as I explained to him that I am not qualified to represent myself) until the NYSUT representation is re-established or the lawsuit is resolved in court. The arbitrator proceeded with the hearing without my participation and representation. The DOE attorney handed me with a stock of additional discovery material (2" thick and approximately 250 pages) for me to review, minutes before the hearing. I was submitted to listening to incriminating testimony from witness AP Judith Silverman without the possibility of defending myself. **See exhibit 4 (Letter of March 31st, 2008 from Arbitrator Earl R. Pfeffer.)**

30. Arbitrator Pfeffer has scheduled two consecutive hearings on April 9th and April

10th, 2008 dates after which he will dictate a penalty.

31.    This conduct by a supposed impartial hearing office acting under color of state law in presiding over a quasi-judicial State process appears to be in violation of my procedural due process rights under the 14th Amendment of the United States Constitution,

32.    This conduct is especially egregious since it also involves an attempted taking of my property interests in my life-tenure (without regard to age).

33.    I am being stripped of all duties and reassigned to a "rubber room" without the opportunity to work extra session in after-school, evening and summer programs which would have provided me with additional earnings.

34.    Thus, this represents a further violation of my substantive due process rights also under the 14th Amendment of the United States Constitution without any due process for amounts actually deprived as "per session" earnings, in addition to the threatened termination of my career and blackballing from my profession as a public school teacher entirely.

35.    Therefore, the infringement of my procedural due process rights, by an arbitrator in a state run quasi-judicial proceeding, who allowed my counsel to withdraw without my consent, and insist I proceed unrepresented, is a most serious Constitutional violation.

(See Exhibits 5 and 6 (Letter from counsel for the action in the SDNY, and response by Magistrate Judge Andrew J. Peck, respectively).

No previous application has been made to this or any other Court for the relief sought herein.

36. I, therefore, respectfully request that the 3020-a process be stayed until a mechanism whereby I (as well as my 60 similarly situated co-plaintiffs) are represented by counsel appointed or paid by the UFT to represent me (us) at the 3020-a hearings.

Sworn to this 8th day of April 2008

Gloria S. Chavez

Gloria S. Chavez

Maria-Isabel Lopez

MARIA-ISABEL LOPEZ
Notary Public, State of New York
Registration No. 01LO6067936
Qualified in Queens County
Certificate Filed in New York County
Commission Expires Oct. 28, 2010

Notary Public, State of New York
No. 01LO6067936
Qualified in Queens County
Commission Expires 10/28/2010

Exh. G

NEW YORK STATE SUPREME COURT
NEW YORK COUNTY

INDEX NO.

08-105307

TEACHERS4ACTION, ON BEHALF OF
DAVID BERKOWITZ
ROSELYNE GISORS,
LISA HAYES
SIDNEY RUBINFELD,
PAUL SANTUCCI,
MICHAEL WESTBAY, and
MAURICIO ZAPATA

PETITIONERS

V.

NEW YORK CITY DEPARTMENT OF EDUCATION,

RESPONDENT

NEW YORK
COUNTY CLERK'S OFFICE

APR 14 2008

NOT COMPARED
WITH COPY FILE

ORDER TO
SHOW CAUSE

**UPON** reading and filing the annexed April 14, 2008 Verified Petitions and the annexed exhibits thereto, and upon all the pleadings and proceedings heretofore had:

**IT IS HEREBY ORDERED** that Respondent or its attorney show cause before me or one of the Judges of this Court at IAS Part 13, Room 305 to be held at the courthouse located at 71 Thomas Street, New York, New York on April 24, 2008 at 9:30 o=clock in the forenoon or as soon thereafter as counsel can be heard, why an Order should not be made:

Staying Petitioners' Education Law '3020-a arbitration hearing pending the hearing of this application in which the Petitioners are respectfully requesting that the NYC Department of Education be enjoined from proceeding with the 3020-a hearings for the Petitioners until they are represented by competent counsel paid for or arranged by the United Federation of Teachers (which has been the past practice for many years).

**THE WITHIN RELIEF HAS NEVER BEEN PREVIOUSLY REQUESTED BY PETITIONERS** to this or any other Court.[1]

**SUFFICIENT CAUSE THEREFORE BEING ALLEGED,** let service pursuant to the CPLR of a copy of this Order together with the papers upon which it is granted along with service of the complaint, upon the Respondents on or before 5 P.M. on the ___ of April 2008 be deemed good and sufficient service and, it is further ordered that the attorneys for the Department of Education *et al.* are to serve any opposition papers to this Petition, and file and serve with the IAS Part 13 of the Court, and to the Petitioners on or before April__, 2008.

Reply papers, if any, are to be served and filed with Part 13 of the Court on or before April__, 2008.

Oral Argument directed:

______________________________
Hon. Sheila Abdus-Salaam, J.S.C

ENTER:

______________________________
Hon. Sheila Abdus-Salaam
Justice of the Supreme Court of New York

---

[1] As set forth in the Petition, Teachers4Action member Gloria Chavez applied for, Respondents objected to and on April 9, 2008, this Court has granted a temporary stay until April 24, 2008, which is the same relief Petitioners seek. A request for a Conference at which potential injunctive relief related to the 3020-a hearings was made in the action entitled Teachers4Action et al v. Bloomberg et al 08-cv-548 (VM) and Petitioners were directed to make their application to NY State Court. Continuing the 3020-a hearings without counsel prejudices the 3020-a hearings themselves. Petitioners merely request a stay until appropriate substitute counsel is appointed and allowed to prepare to defend Petitioners in said 3020-a hearings. The Petitioner does not request permanent injunction of 3020-a hearings.

NEW YORK STATE SUPREME COURT
NEW YORK COUNTY

INDEX NO.

---

TEACHERS4ACTION, ON BEHALF OF
DAVID BERKOWITZ
ROSELYNE GISORS,
LISA HAYES,
SIDNEY RUBINFELD,
PAUL SANTUCCI,
MICHAEL WESTBAY and
MAURICIO ZAPATA

PETITIONERS

V.

NEW YORK CITY DEPARTMENT OF EDUCATION,
RESPONDENT

---

**VERIFIED**
**Article 78 Petition**

1. Petitioners are tenured teachers employed by the NYC Department of Education (ADOE@) who are charged with various allegations of misconduct that are being adjudicated in 3020-a hearings mandated by NYS Education Law and their Collective Bargaining Agreement.

2. Petitioners were assigned counsel employed by New York State United Teachers ("NYSUT"), as has been past practice for members of the United Federation of Teachers ("UFT") for many years.

3. Petitioners are members of a group, Teachers4Action, who filed an action in United States District Court for the Southern District of New York, Teachers4Action et al vs. Bloomberg et al. 08-cv-548 (VM) claiming violation of procedural and substantive due process rights by the DOE. The complaint was later amended to add the UFT as a Defendant.

4. Teachers4Action named the UFT as co-defendant for failing to better protect its members property rights in life-tenured positions despite the fact that each of approximately 140,000 members pay approximately $1000.00 per year in union dues, separate and independent of any retirement contributions made to the Teachers= Retirement System or any major medical or hospital insurance.

5. The UFT's parent organization, NYSUT, has withdrawn as counsel from each plaintiff to the action, without any judicial or even substantive quasi judicial intervention, i.e. there was no argument to all applications to arbitrators who all had long been assigned to specific cases well before the issue of the Action against the UFT and DOE ever came to pass. Respondents in the 3020-a action were either not heard (because their cases were not yet ready for hearing) or not heeded as in Petitioners cases where they were summarily directed that they must proceed *pro se* or hire private counsel.

6. Thus, in violation of their due process rights under Educ. Law 3020-a and their Collective Bargaining Agreement, Respondent is forcing Petitioners to proceed without counsel with their 3020-a arbitration hearings.

7. If Petitioners substantive due process liberty interests were being threatened because of allegations of wrongdoing for even a token possible sentence of incarceration, Petitioners would be guaranteed counsel under *Gideon v. Wainright*. Far more damaging is what is at stake in the 3020-a process.

8. Not only are Petitioners substantive due process property interests in their life tenure positions (without regard to age) at risk, but their future careers in education are at risk, which for some is the only career they have had.

9. There is national access by all public school districts to the disciplinary status of public school personnel and Petitioners will not be hired anywhere if they are terminated in New York City.

10. Executive Law 296 (New York State Human Rights Law) prevents discrimination against persons in future employment even if they were incarcerated and released, but that protection will not be afforded Petitioners if they are terminated after their 3020-a hearings.

11. There is no protection should Petitioners lose their educational positions because they were not represented by counsel at their 3020-a hearings.

12. Petitioners each have a legitimate expectation to earnings totaling millions of dollars in salary and pension cumulatively for the balance of their life from their property rights in their life tenure.

13. Demanding that Petitioners defend themselves *pro se* in a process conducted by the state of New York, when they have no training or experience to participate meaningfully to do this, represents a taking without due process and in violation of their Amendment XIV, section I, of the U.S. Constitution.

14. Should Petitioners be terminated, they will be bereft of their one considerable asset, deprived of their livelihood and banned from their only profession..

15. The DOE seeks termination or other ruinous determinations against Petitioners. The DOE prosecuting attorneys are not only zealous advocates for their client, they are obsessed to see Petitioners and other Respondents they oppose fired.

16. This conduct by state actors in a quasi-judicial State proceeding appears to be in violation of Petitioners' due process rights under the 14th Amendment of the United States Constitution.

17. Therefore, the infringement of Petitioners procedural due process rights by arbitrators in a state run quasi-judicial proceeding allowing Petitioners' counsel to unilaterally withdraw, and both arbitrator and opposing counsel insisting Petitioners must proceed unrepresented, is a most serious Constitutional violation.

18. The NYSUT attorneys were all released on request. Petitioners saw this done before their very eyes without argument or without the arbitrator asking the Petitioners whether they agreed to the release. Petitioners did not realize they could object to the release.

19. The DOE attorneys were only too happy to have untrained *pro se=s* defending the charges: the easier to get them terminated.

20. Petitioners, therefore, respectfully request that the 3020-a process be stayed until a

mechanism whereby they are represented by counsel appointed or paid by the UFT is arranged to the satisfaction of all parties.

21. Petitioners request that this Order to Show Cause be consolidated with a similar Order to Show Cause, Index # 08/105020, that was filed by Gloria Chavez, another Plaintiff in Teachers4Action et al vs. Bloomberg et al. on the 8th of April 2008 and signed by the Honorable Sheila Abdus-Salaam, J.S.C.

22. The issue in the instant petition is identical to the issue presented in Gloria Chavez's petition, and Petitioners respectfully request that a stay of their 3020-a hearings be granted and their petition be heard before the Honorable Sheila Abdus-Salaam on the 24th of April 2008 together with the petition of Gloria Chavez.

**WHEREFORE**, Petitioners, having been denied their constitutionally protected procedural and substantive due process property interest rights in their life-tenured positions as pedagogues by the State of New York and those acting on behalf of the State of New York, by denying them assigned counsel to protect those rights at impartially conducted 3020-a hearings, Petitioner prays that the Court will stay the 3020-a proceeding until appropriate counsel is obtained on Petitioners' behalf by NYSUT or Petitioners' Union, the United Federation of Teachers.

April 14, 2008

Teachers4Action

Vice President

April 14, 2008 — David Berkowitz

April 14, 2008 — Roselyne Gisors

April 14, 2008 — Lisa Hayes

April 14, 2008 — Sidney Rubinfeld

April 14, 2008 — Paul Santucci

April 14, 2008 — Michael Westbay

April 14, 2008 — Mauricio Zapata

VERIFICATION

**STATE OF NEW YORK )**
**COUNTY OF NEW YORK) ss:**

Being duly sworn, I state that I am a Petitioner in the above-captioned proceeding and that the foregoing petition is true as to my knowledge and experience of the incidents herein described, except as to matters herein stated as on information and belief, and as to those matters, I believe them to be true.

April 14, 2008

Teachers4Action

By: ______________________

April 14, 2008

______________________
David Berkowitz

April 14, 2008

______________________
Roselyne Gisors

April 14, 2008

______________________
Lisa Hayes

April 14, 2008

Sidney Rubinfeld

April 14, 2008

Paul Santucci

April 14, 2008

Michael Westbay

April 14, 2008

Mauricio Zapata

The Aforementioned Petition and Statements
Are Sworn to and Subscribed before me
On this ___ day of April 2008

Notary Seal

SUPREME COURT NEW YORK COUNTY

UCS-840(REV 1/2000)

# REQUEST FOR JUDICIAL INTERVENTION

| Supreme | New York | 08-105304 | April 14, 2008 |
|---|---|---|---|
| COURT | COUNTY | INDEX NO. | DATE PURCHASED |

| For Clerk Only |
|---|
| IAS entry date |
| Judge Assigned |
| RJI Date |

~~PLAINTIFF(S)~~: Petitioners

Teachers 4 Action, on behalf of David Berkowitz, Rosslyn Gibson, Lisa Hayes, Sidney Rubinfeld, Paul Santucci, Michael Westhaver, Mauricio Zapata

~~DEFENDANT(S)~~ Respondents

New York City Department of Education

RECEIVED APR 14 2008

Date issue joined: April 14, 2008 Bill of particulars served (Y/N): [ ] Yes [X] No

**NATURE OF JUDICIAL INTERVENTION** (check **ONE** box only **AND** enter information)

[ ] Request for preliminary conference

[ ] Note of issue and/or certificate of readiness

[ ] Notice of motion (return date:________)
Relief sought ________

[X] Order to show cause
(clerk enter return date:________)
Relief sought Stay

[ ] Other ex parte application (specify: ________)

[X] Notice of petition (return date:________)
Relief sought ________

[ ] Notice of medical or dental malpractice action (specify:________)

[ ] Statement of net worth

[ ] Writ of habeas corpus

[ ] Other (specify: ________)

**NATURE OF ACTION OR PROCEEDING** (Check **ONE** box only)

**MATRIMONIAL**

[ ] Contested -CM
[ ] Uncontested -UM

**COMMERCIAL**

[ ] Contract -CONT
[ ] Corporate -CORP
[ ] Insurance (where insurer is a party, except arbitration) -INS
[ ] UCC (including sales, negotiable instruments) -UCC
[ ] *Other Commercial -OC

**REAL PROPERTY**

[ ] Tax Certiorari -TAX
[ ] Foreclosure -FOR
[ ] Condemnation -COND
[ ] Landlord/Tenant -LT
[ ] *Other Real Property -ORP

**OTHER MATTERS**

[ ] * ________ -OTH

**TORTS**

Malpractice
[ ] Medical/Podiatric -MM
[ ] Dental -DM
[ ] *Other Professional -OPM

[ ] Motor Vehicle -MV
[ ] *Products Liability -PL

[ ] Environmental -EN
[ ] Asbestos -ASB
[ ] Breast Implant -BI
[ ] *Other Negligence -OTN

[ ] *Other Tort (including intentional) -OT

**SPECIAL PROCEEDINGS**

[ ] Art. 75 (Arbitration) -ART75
[ ] Art. 77 (Trusts) -ART77
[X] Art. 78 -ART78
[ ] Election Law -ELEC
[ ] Guardianship (MHL Art. 81) -GUARD81
[ ] *Other Mental Hygiene -MHYG
[ ] *Other Special Proceeding -OSP

Check "YES" or "NO" for each of the following questions:

Is this action/proceeding against a

YES [X] NO [ ] Municipality: (Specify NYC Dept of Education)
YES [ ] NO [ ] Public Authority: (Specify ______)

YES [X] NO [ ] Does this action/proceeding seek equitable relief?
YES [ ] NO [X] Does this action/proceeding seek recovery for personal injury?
YES [ ] NO [X] Does this action/proceeding seek recovery for property damage?

**Pre-Note Time Frames:**
(This applies to all cases except contested matrimonials and tax certiorari cases)

Estimated time period for case to be ready for trial (from filing of RJI to filing of Note of Issue):

☐ Expedited: 0-8 months ☐ Standard: 9-12 months ☐ Complex: 13-15 months

**Contested Matrimonial Cases Only:** (Check and give date)

Has summons been served? ☐ No ☐ Yes, Date______

Was a Notice of No Necessity filed? ☐ No ☐ Yes, Date______

**ATTORNEY(S) FOR PLAINTIFF(S):**

| Self Rep.* | Name | Address | Phone # |
|---|---|---|---|
| [X] | Teachers 4 Action | 30-33 Linden Place | (646) 236-2790 |
| ☐ | | College Point, NY | |

**ATTORNEY(S) FOR DEFENDANT(S):**

| Self Rep.* | Name | Address | Phone # |
|---|---|---|---|
| | NYC Law Department | | |
| ☐ | NYC Dept of Education | 100 Church Street | (212) ~~788-0303~~ |
| ☐ | | New York, NY | |

*Self Represented: parties representing themselves, without an attorney, should check the "Self Rep." box and enter their name, address, and phone # in the space provided above for attorneys.

**INSURANCE CARRIERS:**

**RELATED CASES: (IF NONE, write "NONE" below)**

| Title | Index # | Court | Nature of Relationship |
|---|---|---|---|
| 6 ... Chavez v NYC Dept of Ed. | 08/105626 | Supreme Court | |

I AFFIRM UNDER PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.

Dated: [illegible] 2008

[signature] Vice President
(SIGNATURE)

Teachers 4 Action et al
(PRINT OR TYPE NAME)

30-33 Linden Place
College Point NY
ATTORNEY FOR Petitioners Pro Se

ATTACH RIDER SHEET IF NECESSARY TO PROVIDE REQUIRED INFORMATION

\forms\rji2002.wpd

Exh. H

EDWARD D. FAGAN ESQ.
5 Penn Plaza, 23rd Floor, NY, NY 10001, Tel. (646) 378-2225

# FAX TRANSMISSION

TO: Charles Moerdler Esq. 212 806-6006
Blanche Greenfield Esq. 212-788-032[illegible]

Cc:

FROM: Edward Fagan

RE: Teachers 4 Action et al v Bloomberg et al

Date: April 18, 2008 08-cv-548 Total # of Pages 31

MESSAGE:

See attached letter to Judge Marrero with attachments

*************************************************************************************************

CONFIDENTIALITY WARNING & NOTICE

The information contained in this facsimile message and all attachments is legally privileged and confidential information intended only for the use of the individual or entity named above. If the reader or recipient is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this facsimile is strictly prohibited. If you have received this facsimile in error, please notify the send immediately by calling at (646) 378-2225 and thereafter please DESTROY the facsimile message.

EDWARD D. FAGAN ESQ.
Five Penn Plaza, 23rd Floor, NY, NY 10001, Tel. (646) 378-2225
Email: faganlawintl@aim.com (Official Email Address for Court Documents)
Email : faganlaw.teachers@gmail.com (Email Address for *Teachers4Action* Case)

*Via Fax (212) 805-6382 & Hand Delivery* — *April 18, 2008*

Honorable Victor Marrero USDJ
United States District Court
Southern District of New York
500 Pearl Street, Chambers 660
New York, NY 10007

*Re: Teachers4Action et al v. Bloomberg et al, 08-cv-548 (VM)(AJP)*

Honorable Judge:

I am counsel for Plaintiffs in the above referenced matter. I write to request an expedited Conference at the Court's earliest convenience the week of April 21 – 25, at which Conference certain emergent issues (as set forth in the accompanying Order to Show Cause and related to injunctive relief and potentially dispositive motions) can be addressed. [1]

This letter, the Request for the Rule 16 Conference and the Relief sought in the accompanying Order to Show Cause is addressed to Your Honor because, among other things, Plaintiffs' application relates to injunctive relief and issues related to potentially dispositive Motions.

**Procedural Status of the Case & Certain Related Issues**

Amended Summonses were issued for Defendants United Federation of Teachers ("UFT"), Randi Weingarten ("Weingarten") and Betsy Combier ("Combier") on April 15th and Plaintiffs' Amended Complaint was served on them on April 16th. Affidavits of Service have been filed. With that, all presently named Defendants are before the Court.

The Court should note that Blanche Greenfield Esq., counsel for Defendants Michael Bloomberg, City of New York, Joel Klein and New York City Department of Education (hereinafter "NYC Defendants") are working cooperatively together and we are scheduled to meet next week to discuss certain issues related to Scheduling and Motion practice.

On April 9th NYS Supreme Court Justice Sheila Abdus-Salaam stayed (*Exhibit 1*) a 3020-a hearing of a Teachers4Action member because of her being left without counsel *(as I explained in my March 25th letter – See Exhibit 2)*. On April 15th Justice Abdus-Salaam extended the stay of 3020-a hearings to additional Teachers4Action plaintiffs. *(See Exhibit 3)*. In response to my March 25th letter, Magistrate Judge Peck suggested that any application for stay of 3020-a hearings should be made to the NYS Supreme Court based on Plaintiffs (i) being stripped of the counsel and (ii) being forced into 3020-a hearings without counsel. NYC Defendants have repeatedly stated that if Plaintiffs believe they were entitled to a Stay of 3020-a hearings, such

---

[1] From April 15 to the present, Plaintiffs discussed the issues presented in this application with counsel Blanche Greenfield Esq. and as a courtesy to her agreed to a brief delay in presenting these papers. However, due to events in the last two days and the urgent injunctive and other relief needed, Plaintiffs are compelled to move forward with this application today.

EDWARD D. FAGAN ESQ.

*Hon. Victor Marrero USDJ – April 18, 2008 Letter – Page 2*
*Re: Teachers4Action et al v. Bloomberg et al, 08-CV-548 (VM)(AJP)*

applications should be made to the NYS Supreme Court. However, from April 9 to the present NYC Defendant DOE has refused to honor the Stays and is trying to force Plaintiffs into 3020-a hearings without counsel. Justice Abdus-Salaam will hear that issue on April 24th.

Defendant DOE's actions are an attempt to deprive them of due process and then retaliate against them for attempting to exercise their constitutionally protected freedoms of speech, assembly and petition the Court for redress or grievances. Defendant DOE's allegedly wrongful acts have increased since April 7th and forced Plaintiffs to file the accompanying Order to Show Cause for Injunctive and Other Relief. Prior to making this application, Plaintiffs sought but were unable to resolve these issues with NYC Defendants counsel. Hence the need for this application.

**Need for Injunctive and Other Relief**

The need for Injunctive relief has to do with NYC Defendants Interception and Use of Confidential and Privileged Emails since April 7, 2008.

The relief sought is set forth in the proposed Order to Show Cause includes (i) Sealing the April 3, 2008 Emails (hereinafter the "Intercepted, Confidential and Privileged Documents") that were intercepted from Plaintiff Florian Lewenstein in allegedly violated *18 USC §§ 2511 (1) (a), (c) (d), (e) and (2) (d)*; (ii) Enjoining Defendants from using the "Intercepted, Confidential and Privileged Documents" in this litigation or in any other Court, forum or proceeding; (iii) Enjoining Defendants from sharing, publishing, copying, reproducing and/or allowing the Intercepted, Confidential and Privileged Documents with any other defendant, person or entity; (iv) Compelling Defendants to produce all records related to the Intercepted, Confidential and Privileged Documents; (v) Compelling Defendants to produce phone records, phone logs, memoranda, emails, and other documents disclosing the identities of the persons or entities from which the Intercepted, Confidential and Privileged Documents were shared; (vi) Compelling Defendants to produce phone records, fax logs, memoranda, emails, and other documents confirming the identities of the persons or entities to which the Intercepted, Confidential and Privileged Documents were provided; and (vii) Granting Plaintiffs request for limited discovery of Defendants representatives related to the Intercepted, Confidential and Privileged Documents their receipt, the persons and/or entities from whom/which they were received and to whom/which they were provided.

The injunctive relief and other relief sought is necessary for among other reasons:

a. to insure that electronic evidence that is lost in the normal course of business, is properly secured;
b. to protect Plaintiffs from Defendant DOE's continued use of the Intercepted Confidential and Privileged Documents to relatiate against and intimidate Plaintiffs by making them unable to freely communicate with one another thereby depriving them of their freedom of speech and association;
c. to prevent NYC Defendants from using the Intercepted Confidential and Privileged Documents to interfere with Plaintiffs right to impartial, objective and unbiased Judge, Arbitrators or other triers of fact;
d. to prevent NYC Defendants from concealing the identity of the person(s) or entities who/which electronically intercepted the email transmissions in violation of *18 USC §*

EDWARD D. FAGAN ESQ.

*Hon. Victor Marrero USDJ – April 18, 2008 Letter – Page 3*
*Re: Teachers4Action et al v. Bloomberg et al, 08-CV-548 (VM)(AJP)*

*2511 (1) (a), (c ), (d), (e) and (2) (d)* – whose identity and actions are critical elements t Plaintiffs complaint, may require joinder of additional parties or may be the basis for a partial summary judgment motion related to the liability on certain causes of action against the NYC Defendants, other Defendants and the as yet un-identified Interceptor.

Any delay in granting the requested relief, prejudices Plaintiffs' ability to discover the identity of the person(s) or entity(ies) involved and result in spoliation and/or loss of evidence.

**Alleged Violation of 18 USC §§ 2511**

In pertinent part, 18 USC §§ 2511 et seq states as follows:

> *(1) Except as otherwise specifically provided in this chapter any person who*
> *(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;*
> *(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of this subsection;*
> *(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or*
> *(e) (i) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication . . .*
>
> *(2) (d) It shall not be unlawful . . . for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or any State.*

The April 3rd Emails were intercepted and are being used for the purpose of committing a tortious act to interfere with Plaintiffs' constitutional due process and other rights. Plaintiffs appear to have valid causes of action (i) against the individual(s) and/or entity(ies) who/which were involved in the original interception of the April 3rd Emails, (ii) against Defendant DOE fo its tortious use of the April 3rd Emails and (iii) against Defendant DOE for conspiring with the undisclosed Interceptor of the Emails.

**Authority for Entry of Confidentiality Order**

CPLR 3103 (a) provides in pertinent part *„The court may at any time on its own initiative, or on motion of any party or of any person from whom discovery is sought, make a protective order . to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts".*

The party seeking the confidentiality order should make an initial showing, by a person with knowledge that the data is entitled to and should be protected. *Jackson v. Dow Chem. Co., 214*

EDWARD D. FAGAN ESQ.

*Hon. Victor Marrero USDJ – April 18, 2008 Letter – Page 4*
*Re: Teachers4Action et al v. Bloomberg et al, 08-CV-548 (VM)(AJP)*

*A.D.2d 827, 827, 624 N.Y.S.2d 675, 676 (3d Dep't 1995); Bristol, Litynski, Wojcik, P.C. v. Town of Queensbury, 166 A.D.2d 772, 773, 562 N.Y.S.2d 976, 977 (3d Dep't 1990).*

FRCP 26 (c) provides in pertinent part *"The court may, for good cause, issue an order to prote a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery; and (H) requiring that the parties simultaneously file specified documents or information in sealed envelopes, to be opened as the court directs".*

As this Court recognized in its 2006 decision in *Viada v. Osaka Health Spa Inc. 04 Civ. 2744 (VM)(KNF)* at page 2 *". . . a federal court's power to seal documents takes precedence over [Freedom of Information Act] rules that would otherwise allow those documents to be disclosed." City of Hartford v. Chase, 942 F.2d 130, 135 (2d Cir. 1991) (citations omitted).*

The April 3, 2008 Emails and all documents related to them must be sealed and Defendant DOI must be enjoined from further use of the April 3, 2008 Emails.

**Privilege Attached to April 3, 2008 Emails May Not Be Overcome**

As explained in the accompanying Declaration of Florian Lewenstein, President of Plaintiff Teachers4Action and named Plaintiff, The April 3, 2008 Emails are from Plaintiffs to Plaintiffs and counsel and openly discuss, among other to (i) legal strategy, (ii) targeted defendants, (iii) theories of liability, (iv) the Courts to which claims will be made, (v) the timetable of Plaintiffs claims and (vi) other litigation strategies.

As this Court noted in 2005 at pp. 8 – 9 of its decision in *In Re: Natural Gas Commodities Litigation 03 Civ. 6186 (VM)*:

> *Pursuant to Fed. R. Civ. P. 26 (b) (3), work product privilege may be overcome upon a showing that the party has substantial need for the requested materials in the preparation of the party's case and that the party is unable to obtain the substantial equivalent of the materials by other means without "undue hardship . . . (w)here, as here, the requested documents contain "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative" . . . the required showing of substantial need is particularly stringent. See United States v. Aldman, 134 F.3d 1194, 1204 (2d Cir. 1998); Madanes v. Madanes, 199 F.R.D. 135, 150 (S.D.N.Y. 2001) ("Opinion work product enjoys a near absolute immunity and can be discovered only in very rare and extraordinary cases . . . where weighty consideration of public policy and proper administration of justice would militate against nondiscovery.")*

Such is not the case with regard to the April 3, 2008 Emails.

Contrary to Defendants protestions and suggestions of improper suggestions about actions to be taken by Plaintiffs, the April 3, 2008 Emails do not encourage any type of activity that would cause the April 3, 2008 Emails to lose their privileged status. See *Specialty Minerals v. Pluess-Staufer AG, 98 Civ 7775 (VM) (standards for fraud or crime exceptions to privilege).*

EDWARD D. FAGAN ESQ.

Plaintiffs have pointed these facts out to Defendant DOE and its counsel, provided them with a courtesy copy of Your Honor's above decisions and encouraged them to cease using the Intercepted, Confidential and Privileged Emails. Defendant DOE refused.

Over Plaintiffs objections, Defendant DOE has used the Intercepted, Confidential and Privilege emails in mulitiple different 3020-a hearings, provided copies to Arbitrators, filed copies in the New York Supreme Court and tried to file them with this Court. Defendant DOE must be enjoined to prevent them from continuing to use the Intercepted, Confidential and Privileged Emails in their campaign to intimidate Plaintiffs; to interfere with Plaintiffs ability to freely communicate with one another and their counsel and to further corrupt the 3020-a process thereby causing additional due process violations. Defendants must be stopped.

**Requested Relief Promotes *Twombly* Compliance & Reduces Unnecessary Motion Practic**
Plaintiffs have already reported to the Court that they need to file a Second Amended Complair to address (i) additional constitutional and due process issues related to the 3020-a hearings, (ii) interference with arbitrators, (iii) forcing Plaintiffs into 3020-a hearings without counsel and (iv new issues related to the interception of electronic communications in violation of 18 USC 25 Plaintiffs are mindful of the standards to be met in the Second Amended Complaint and therefo the limited discovery related to the Intercepted April 3, 2008 emails will insure that causes of action comply with standards set forth in *Bell Atlantic Corp. v Twombly 127 S. Ct. 1955 (2007)*

Plaintiffs explained that their request for limited discovery related to the April 3rd Intercepted, Confidential and Privileged Emails was to help the parties avoid having to engage in expensive and lengthy discovery and to help the Court avoid unnecessary Motion practice. Defendant DO refused and appears to be more interested in delays than in the efficient prosecution of this case

**Conclusion**

In view of Defendant DOE's refusal to cooperate with regard to the April 3rd Intercepted, Confidential and Privileged Emails, Plaintiffs are compelled to move forward and request this Court's expedited intervention. Plaintiffs submit that an expedited Rule 16 Conference at whic Plaintiffs' Order to Show Cause for Injunctive and Other Relief could be addressed is the only way to prevent further irreparable harm to Plaintiffs. In view of the foregoing, Plaintiffs respectfully request that the Court schedule call such a Conference at its earliest convenience.

Thank you for the Court's consideration.

Respectfully submitted,

Edward D. Fagan

EDF/lsf
Attachments with hard copy of letter
Cc: Honorable Andrew J. Peck USMJ – *Via Fax (212) 805-7933*
Blanche Greenfield Esq. – For NYC Defendants - *Via Fax # (212) 788-0327*
Charles Moerdler Esq. – For Defendants UFT, Weingarten & Combier – *Via Fax (212) 806-60*

At I.A.S. Part 13 of the Supreme Court of the State of New York, held in and for the County of New York, at the Courthouse, on the 14th day of April 2008

Present: HON. SHEILA ABDUS-SALAAM, Justice

HON. SHEILA ABDUS-SALAAM

NEW YORK STATE SUPREME COURT
NEW YORK COUNTY

INDEX NO.

TEACHERS4ACTION, ON BEHALF OF
DAVID BERKOWITZ
ROSELYNE GISORS,
LISA HAYES
SIDNEY RUBINFELD,
PAUL SANTUCCI,
MICHAEL WESTBAY, and
MAURICIO ZAPATA

PETITIONERS

V.

NEW YORK CITY DEPARTMENT OF EDUCATION,
RESPONDENT

NEW YORK COUNTY CLERK'S OFFICE
APR 14 2008
NOT COMPARED WITH COPY FILE

ORDER TO SHOW CAUSE

UPON reading and filing the annexed April 14, 2008 Verified Petitions and the annexed exhibits thereto, and upon all the pleadings and proceedings heretofore had:

IT IS HEREBY ORDERED that Respondent or its attorney show cause before me or one of the ~~Judges~~ Justices of this Court at IAS Part 13, Room 305 to be held at the courthouse located at Thomas Street, New York, New York on April 24, 2008 at ~~[struck]~~ NOON or as soon thereafter as counsel can be heard, why an Order should not be made:

Staying Petitioners' Education Law 3020-a arbitration hearing pending the ~~hearing~~ determination of the application in which the Petitioners are respectfully requesting that the NYC Department of Education be enjoined from proceeding with the 3020-a hearings for the Petitioners until they are represented by competent counsel paid for or arranged by the United Federation of Teachers (which has been the past practice for many years).

Exhibit 1

~~THE WITHIN RELIEF HAS NEVER BEEN PREVIOUSLY REQUESTED~~ Y ~~PETITIONERS to this or any other Court.~~[1]

SUFFICIENT CAUSE THEREFORE BEING ALLEGED, let personal service pursuant to the CPLR of a copy of this Order together with the papers upon which it is granted ~~along with servic of the complaint~~, upon the Respondents on or before 5PM on the 15th of April 2008 be deemed good and sufficient service and, it is further ordered that if necessary a briefing schedule will be imposed at the April 24th return date. ~~the attorneys for the Department of Education et al are to serve any opposition papers to this Petition, and file and serve with the IAS Part 13 of the Court, and to the Petitioners on or before April __, 2008.~~

~~Reply papers, if any, are to be served and filed with Part 13 of the Court on or before April __, 2008.~~

Oral Argument directed:

SA-S

Hon. Sheila Abdus-Salaam, J.S.C

ENTER:

SA-S

~~Hon. Sheila Abdus-Salaam~~ J.S.C.
~~Justice of the Supreme Court of New York~~

**HON. SHEILA ABDUS-SALAAM**

---

[1] As set forth in the Petition, Teachers4Action member Gloria Chavez applied for, Respondents object to and on April 9, 2008, this Court has granted a temporary stay until April 24, 2008, which is the same relief Petitione seek. A request for a Conference at which potential injunctive relief related to the 3020-a hearings was made in t action entitled Teachers4Action et al v. Bloomberg et al 08-cv-548 (VM) and Petitioners were directed to make the application to NY State Court. Continuing the 3020-a hearings without counsel prejudices the 3020-a hearing themselves. Petitioners merely request a stay until appropriate substitute counsel is appointed and allowed to prepare defend Petitioners in said 3020-a hearings. The Petitioner does not request permanent injunction of 3020-a hearing

# EDWARD D. FAGAN ESQ.

Five Penn Plaza, 23rd Floor, NY, NY 10001, Tel. (646) 378-2225
Email: faganlawintl@aim.com (Official Email Address for Court Documents)
Email: faganlaw.teachers@gmail.com (Email Address for *Teachers4Action* Case)

*March 25, 2008*

*Via Fax (212) 805-6382*
Honorable Victor Marrero USDJ
United States District Court
Southern District of New York
500 Pearl Street, Chambers 660
New York, NY 10007

Re: *Teachers4Action et al v. Bloomberg et al, 08-cv-548 (VM)(AJP)*

Honorable Judge:

I am counsel for Plaintiffs in the above referenced matter. Plaintiffs' Amended Complaint has been filed and served on Blanche Greenfield Esq., counsel for Defendants Michael Bloomberg, City of New York, Joel Klein and New York City Department of Education (hereinafter "NYC Defendants").[1]

NYC Defendants' counsel Greenfield and I are working cooperatively together to prepare a Proposed Scheduling Order at the Court's Initial Conference, whenever it can be scheduled.

This letter is written because, notwithstanding the cooperation between NYC Defendants' counsel and me, in the last days, certain retaliatory actions have been taken by NYC Defendants, that we respectfully submit require the Court's emergent attention.

Briefly, the retaliatory actions have now taken the form of scheduling and attempting to move Administrative Hearings ("The State Hearings") forward against Plaintiffs in this action. The Plaintiffs are now being forced to defend themselves in The State Hearings before arbitrators who we submit are conflicted, biased or have been improperly designated. In The State Hearings, the punishments that Plaintiffs face include ruinous fines, defamatory comments in their files and possible termination.

As if that were not enough, because of their participation as Plaintiffs in this lawsuit, Plaintiffs have been stripped of their appointed counsel[2] in The State Hearings. In the last few days, Plaintiffs appointed counsel started to send letters announcing withdrawal as their counsel. This withdrawal by appointed counsel in The State Hearings, was unilateral, without Plaintiffs' consent and without prior notice, approval or appropriate Court Order. Plaintiffs submit it is a further violation of their rights.

---

[1] Amended Summonses for service of the Amended Complaint on the additional Defendants named in the Amended Complaint are being submitted separately.

[2] Appointed Counsel in The State Hearings is provided by New York State United Teachers, the parent to Defendant United Federation of Teachers, and is paid for by Defendant United Federation of Teachers. Counsel of record for the plaintiffs (designated as respondents in The State Hearings) is James Sandner Esq.

Exhibit 2

# EDWARD D. FAGAN ESQ.

*Hon. Victor Marrero USDJ – March 25, 2008 Letter – Page 2*
*Re: Teachers4Action et al v. Bloomberg et al. 08-CV-548 (VM)(AJP)*

Plaintiffs are being forced to defend themselves in The State Hearings, without counsel, and with Arbitrators who Plaintiffs submit are conflicted, biased or improperly designated.

Plaintiffs submit that The State Hearings, as certain Defendants, now seek to have them move forward, violate their due process and other constitutionally protected rights and merit the Court's emergent attention.

This morning Blanche Greenfield Esq. (counsel for the New York City Defendants) and I are conducting our Rule 26 Conference. The issue of emergent relief and the need to get back into Court on an expedited basis – pending the Court's availability – has already been raised.

The issue of Emergent Relief related to The State Hearings is raised in this letter because (despite objections) hearings are about to be started today against Plaintiffs (Paul Santucci and Gloria Chavez) and other hearings are scheduled for later this week and next week.

Plaintiffs respectfully submit that a Rule 16 Conference at which Plaintiffs' Request for Emergent Relief and Preliminary Injunction could be address by the Court in a way to prevent further irreparable harm to Plaintiffs.

In view of the foregoing, Plaintiffs respectfully request that the Court call such a Conference at its earliest convenience.

Thank you for the Court's consideration.

Respectfully submitted,

[signature]

Edward D. Fagan

Cc: *Via Fax (212) 805-7933*
Honorable Andrew J. Peck USMJ
United States District Court
Southern District of New York
500 Pearl Street, Chambers
New York, NY 10007

Blanche Greenfield Esq. – Counsel for NYC Defendants - Via Fax
Charles Moerdler Esq. – Counsel for Defendants Weingarten & United Federation of Teachers – Via Fax

James Sandner Esq. - NYSUT – Via Fax

**The parties are directed to address the matter [se]t forth above to Magistrate Judge** *Andrew Peck* **to whom this dispute has been referred for resol[ut]ion, as well as for supervision of remaining pretrial pro[cee]dings, establishing case management schedules as ne[ce]ssary, and settlement.**

**SO ORDERED.**

*3-25-08*
**Date**

[signature]
**VICTOR MARRERO, U.S.D.J.**

At I.A.S. Part 13 of the Supreme Court of the State of New York, held in and for the County of New York, at the Court House, on the 15 day April 20

Present: Hon. SHEILA ABDUS-SALAAM

**HON. SHEILA ABDUS-SALAAM**

NEW YORK STATE SUPREME COURT
NEW YORK COUNTY

INDEX NO.

TEACHERS4ACTION, ON BEHALF OF
DAVID BERKOWITZ
ROSELYNE GISORS,
LISA HAYES
SIDNEY RUBINFELD,
PAUL SANTUCCI,
MICHAEL WESTBAY, and
MAURICIO ZAPATA

PETITIONERS

NEW YORK COUNTY CLERK'S OFFICE

APR 14 2008

NOT COMPARED WITH COPY FILE

v.

NEW YORK CITY DEPARTMENT OF EDUCATION,
RESPONDENT

ORDER TO SHOW CAUSE

UPON reading and filing the annexed April 14, 2008 Verified Petitions and the annexed exhibits thereto, and upon all the pleadings and proceedings heretofore had:

IT IS HEREBY ORDERED that Respondent or its attorney show cause before me or one of the ~~Judges~~ Justices of this Court at IAS Part 13, Room 305 to be held at the courthouse located at 71 Thomas Street, New York, New York on April 24, 2008 at NOON ~~in the forenoon~~ or as soon thereafter as counsel can be heard, why an Order should not be made:

Staying Petitioners' Education Law '3020-a arbitration hearing pending the ~~hearing~~ determination of its application in which the Petitioners are respectfully requesting that the NYC Department of Education be enjoined from proceeding with the 3020-a hearings for the Petitioners until they are represented by competent counsel paid for or arranged by the United Federation of Teachers (which has been the past practice for many years).

Exhibit 3

~~THE WITHIN RELIEF HAS NEVER BEEN PREVIOUSLY REQUESTED BY PETITIONERS to this or any other Court.~~

SUFFICIENT CAUSE THEREFORE BEING ALLEGED, let personal service pursuant to the CPLR of a copy of this Order together with the papers upon which it is granted ~~along with service of the complaint~~, upon the Respondents on or before 5 P.M. on the 15th of April 2008 be deemed good and sufficient service and, it is further ordered that if necessary a briefing schedule will be imposed at the April 24th return date. ~~the attorneys for the Department of Education are to serve any opposition papers to this Petition, and file and serve with the IAS Part 13 of the Court, and to the Petitioners on or before April __, 2008.~~

~~Reply papers, if any, are to be served and filed with Part 13 of the Court on or before April __, 2008.~~

Oral Argument directed:

SA-S

Hon. Sheila Abdus-Salaam, J.S.C

ENTER:

SA-S

~~Hon. Sheila Abdus-Salaam~~ J.S.C.

~~Justice of the Supreme Court of New York~~

**HON. SHEILA ABDUS-SALAAM**

[1] As set forth in the Petition, Teachers4Action member Gloria Chavez applied for, Respondents objected to and on April 9, 2008, this Court has granted a temporary stay until April 24, 2008, which is the same relief Petitioners seek. A request for a Conference at which potential injunctive relief related to the 3020-a hearings was made in the action entitled Teachers4Action et al v. Bloomberg et al 08-cv-548 (VM) and Petitioners were directed to make their application to NY State Court. Continuing the 3020-a hearings without counsel prejudices the 3020-a hearings themselves. Petitioners merely request a stay until appropriate substitute counsel is appointed and allowed to prepare to defend Petitioners in said 3020-a hearings. The Petitioner does not request permanent injunction of 3020-a hearings.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------X

**Teachers4Action et al,**

**Plaintiffs** :

**- vs -**

**Michael Bloomberg, et al,**

**Defendants.** :

-----------------------------------------------------------------------X

**CIVIL ACTION #**
**08-CV-548 (VM)**

## ORDER TO SHOW CAUSE FOR INJUNCTIVE AND OTHER RELIEF

**THIS MATTER HAVING COME BEFORE THE COURT** upon the annexed April 15, 2008 Affidavit of Florian Lewenstein, setting forth the need for emergent relief and for good cause having been shown:

Let Defendants Joel Klein ("Klein") and Department of Education ("DOE") or its/their counsel show cause before the Honorable Victor Marrero USDJ, located at United States Distric Court, for the Southern District of New York, 500 Pearl Street, Courtroom 20-B, New York, New York 10007 at a date and time to be set by this Court, so that counsel can be heard, why Plaintiffs should not be entitled to an Order, including the following relief:

1. Enjoining Defendants Klein and DOE from publication, distribution and use of the April 3, 2008 Emails (hereinafter the "Intercepted, Confidential and Privileged Documents") that were intercepted in violation of, among other things,

a. 18 U.S.C. §§ 2511 (1) (a) - *(intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, electronic communication);*

b. 18 USC § 2511 (1) (c) *(intentionally disclosing, or endeavoring to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through th interception of a wire, oral, or electronic communication in violation of this subsection)* ;

c. 18 USC § 2511 (1) (d) *(intentionally using, or endeavoring to use, the contents any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection)* ;

d. 18 U.S.C. §§ 2511 (1) (e) (i) – *(intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication)*

e. 18 USC § 2511 (2) (d) *(unlawful under this chapter for a person not acting unde color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception (where) such*

*communication is intercepted for the purpose of committing . . . (a) tortious act . violation of the Constitution or laws of the United States or of any State) ;*

2. Enjoining Defendants Klein and DOE from publication, distribution and use of the "Intercepted, Confidential and Privileged Documents" in this litigation or in any other Court, forum or proceeding in violation of 18 U.S.C. §§ 2511 (1) (a), (c), (d), (e) (i) and (2) (d);

3. Enjoining Defendants Klein and DOE from sharing, publishing, copying, reproducing and/or allowing the Intercepted, Confidential and Privileged Documents to be shared wi any other defendant, person or entity;

4. Compelling Defendants Klein and DOE to produce all records related to the Intercepted Confidential and Privileged Documents;

5. Compelling Defendants Klein and DOE to produce phone records, phone logs, fax logs, memoranda, emails, and other documents disclosing the identities of the persons or entities from which the Intercepted, Confidential and Privileged Documents were shared

6. Compelling Defendants Klein and DOE to produce phone records, phone logs, fax logs, memoranda, emails, and other documents confirming the identities of the persons or entities to which the Intercepted, Confidential and Privileged Documents were provided; and

7. Granting Plaintiffs request for limited discovery of Defendants Klein and DOE representatives related to the Intercepted, Confidential and Privileged Documents, their receipt, the persons and/or entities from whom/which they were received and to whom/which they were provided.

**SUFFICIENT CAUSE** being alleged therefore:

**IT IS FURTHER ORDERED,** that Defendants NYC, Bloomberg, Klein and DOE sha serve any papers in opposition to this Order to Show Cause, upon Plaintiff at 5 Penn Plaza, 23rd Floor, New York, NY 10001 on or before 5 pm April ____, 2008; and

**IT IS FURTHER ORDERED,** that Plaintiffs shall serve any reply papers in support o this Order to Show Cause, upon Defendants at their below listed addresses on or before 5 pm April ______ , 2008; and

**IT IS FURTHER ORDERED** that service of this Order and supporting papers shall b made on or before April ______, 2008 upon Defendants counsel Blanche Greenfield Esq., NY Law Department, 100 Church Street, 4th Floor, NY, NY and all parties in this action.

**ORDERED**:

Dated: ______________

______________________________
Hon. Victor Marrero, USDJ

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---X

Teachers4Action et al,

Plaintiffs :

- vs -

Michael Bloomberg, et al,

Defendants. :

---X

CIVIL ACTION #
08-CV-548 (VM)

DECLARATION OF FLORIAN LEWENSTEIN IN SUPPORT OF ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION, SEALING AND OTHER RELIEF

Florian Lewenstein, hereby declares and says:

**Introduction**

1. I am a Plaintiff in this action and I make this Declaration in Support of Plaintiffs' Motion for an Order:

   a. Enjoining Defendants Klein and DOE from publication, distribution and use of the April 3, 2008 Emails (hereinafter the "Intercepted, Confidential and Privileged Documents") that were intercepted in violation of, among other things,

      i. 18 U.S.C. §§ 2511 (1) (b) *(intentional use, endeavor to use, or procuring other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication)* ;

      ii. 18 USC § 2511 (1) (c) *(intentionally disclosing, or endeavoring to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information*

*was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection)* ;

iii.  18 USC § 2511 (1) (d) *(intentionally using, or endeavoring to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection)* ; and

iv.  18 USC § 2511 (2) (d) *(unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception (where) such communication is intercepted for the purpose of committing . . . (a) tortious act in violation of the Constitution or laws of the United States or of any State)* ;

b.  Sealing the "Intercepted, Confidential and Privileged Documents" that were intercepted from me and which are protected by Attorney Client Privilege, Attorney Work Product, and 18 U.S.C. §§ 2511 (1) (b) (c) (d) and (2) (d);

c.  Enjoining Defendants from using the "Intercepted, Confidential and Privileged Documents" in this litigation or in any other Court, forum or proceeding;

d.  Enjoining Defendants from sharing, publishing, copying, reproducing and/or allowing the Intercepted, Confidential and Privileged Documents to be shared with any other defendant, person or entity;

e.  Compelling Defendants to produce all records related to the Intercepted, Confidential and Privileged Documents;

    f. Compelling Defendants to produce phone records, phone logs, fax logs, memoranda, emails, and other documents disclosing the identities of the persons or entities from which the Intercepted, Confidential and Privileged Documents were shared;

g. Compelling Defendants to produce phone records, fax logs, memoranda, emails, and other documents confirming the identities of the persons or entities to which the Intercepted, Confidential and Privileged Documents were provided; and

h. Granting Plaintiffs request for limited discovery of Defendants representatives related to the Intercepted, Confidential and Privileged Documents, their receipt, the persons and/or entities from whom/which they were received and to whom/which they were provided.

2. With this application, Plaintiff is submitting the Intercepted, Confidential and Privileged Document – for the Court's *in camera* inspection. *See Exhibit 1.* [1]

[1] By letter of April 10, 2008, Defendants Michael Bloomberg ("Bloomberg"), City of New York ("City"), Joel Klein ("Klein") and New York City Department of Education ("DOE") provided a copy of the document to the Hon. Andrew J. Peck USMJ for the Court's consideration. At the April 11, 2008 Hearing, Plaintiffs informed the Court that they would be making an application for relief related to the Intercepted, Privileged and Confidential Document. Plaintiffs believe this application belongs before the Hon. Victor Marrero because of the nature of injunctive and other relief sought and certain other issues related to the manner in which the Magistrate Judge has (i) addressed certain aspects and/or pre-judged Plaintiffs' prior requests, (ii) misconstrued the nature of relief requested, (iii) misunderstood the causes of action of the Amended Complaint, and (iv) other issues that have affected this case since its filing on January 21, 2008 and which suggest potential bias and/or prejudice by Magistrate Judge Peck, for which a Declaration of Bias is being prepared. However, those issues can and will be fully presented to the Court in a separate filing after the April 11, 2008 Conference transcript is available.

**Relevant Facts**

3. I am the president of Plaintiff Teachers4Action and I am the author of the April 3, 2008 Emails, intercepted and being used – without permission, authority or color of law – by Defendant DOE, in this case, in the 3020-a administrative hearings, and as a means to frighten, intimidate and interfere with our constitutional rights.

4. Defendant DOE is also using the Intercepted, Confidential and Privileged Documents, among other things, in an attempt to retaliate against us and interfere with our freedom of speech.

5. Since April 7, 2008, Plaintiffs have tried to stop Defendants from using the Intercepted, Confidential and Privileged Documents, against Plaintiffs in this action, in NYS Courts, in administrative hearings and as a means to further interfere with our rights.

6. Defendants have refused to comply with our requests and the Intercepted, Confidential and Privileged Documents are being used against us and are causing, and threaten to continue to cause, irreparable harm, injury and prejudice.

7. I am a New York City public school teacher in my eleventh year of service.

8. I have attended Court at every session and have assisted counsel in the prior letter submissions describing the acts by Defendants. Defendant DOE's actions have now risen – or stooped to a new low – in which Defendant DOE and other persons whose identities are hidden from us are using the Intercepted, Confidential and Privileged Documents to interfere in our due process rights, our constitutional freedoms, our livelihoods and our claims in this case.

**April 3, 2008 Email is Absolutely Protected**

9. The Intercepted, Confidential and Privileged Documents were written by me and sent to my private email account, with blind copies to counsel and the Plaintiffs in this action. To the best of my knowledge, the privilege attached to the Intercepted, Confidential and Privileged Documents was not broken.

10. The Intercepted, Confidential and Privileged Documents disclosed a strategy that I proposed to and discussed with counsel, thus rendering it Attorney Work Product.

11. The use of the Intercepted, Confidential and Privileged Documents by Defendant DOE to interfere in our due process rights, our constitutional freedoms, our livelihoods and our claims in this case constitutes a violation of 18 U.S.C. § 2511 (1) (b) (c) (d) and (2) (d).

12. The Intercepted, Confidential and Privileged Documents (i) relate to this action, (ii) discuss legal strategies for this action and other actions in State Courts and administrative hearings, (iii) enumerate other confidential strategies, (iv) disclose targeted parties and actions to be taken, (v) the basis for some of our strategies and (vi) contain other confidential and privileged information related to our claims, defenses and strategies.

13. To my knowledge, at no time did Plaintiffs ever waive the Confidential or Privileged nature or the Intercepted, Confidential and Privileged Documents between myself, Plaintiffs and counsel.

14. Since this case began, Defendant DOE's retaliation against us has taken many forms; however, the interception and unauthorized use of our Intercepted, Confidential and Privileged Documents is perhaps the most outrageous.

15. The fact that the Defendant DOE and its representatives had the Intercepted, Confidential and Privileged Documents was discovered on April 7, 2008 at an administrative hearing involving one of our Teachers4Action members, plaintiff Sidney Rubinfeld.

16. At that hearing, Defendant DOE Senior Counsel Theresa Europe disclosed that she was in possession of two Emails that she claimed had been sent to her by an "anonymous fax".[2] *See Exhibits 1 & 2 – Submitted for the Court's in camera inspection only (hereinafter "Intercepted, Confidential and Privileged Documents").*

17. Plaintiffs immediately objected to Defendant DOE's possession and use of the Intercepted, Confidential and Privileged Documents. Defendant DOE and the arbitrator were noticed that any use of the Intercepted, Confidential and Privileged Documents would be in violation of a NYS Supreme Court Order in a related matter, Edward Fagan et al vs. E-Accountability Foundation, Inc. et al. Defendant DOE and the arbitrator refused to cease and desist, and the Intercepted, Confidential and Privileged Documents were read into the record and marked as exhibits.

18. I have been informed that in the last week, and over Plaintiffs objections, Defendant DOE has used and continues to use the Intercepted, Confidential and Privileged Documents in the 3020-a administrative hearings of Plaintiffs (Gloria Chavez, Paul Santucci, Michael Westbury, Mauricio Zapata and others), and in other ways, to try to interfere with our claims and rights.

19. The Intercepted, Confidential and Privileged Documents were illegally obtained and are being unlawfully used to interfere with our rights and our cases.

20. Despite repeated requests to identify the source of the Intercepted, Confidential and Privileged Documents, to whom copies of the Intercepted, Confidential and Privileged Documents were provided, and to preserve all information related to the Intercepted,

---

[2] As the Court knows, there is no such thing as anonymous faxes these days – they can always be traced. Also, if the transmission was truly anonymous, then Ms. Europe may not have been the intended recipient and as such she unlawfully intercepted the transmission. No matter what, there are violations of the CPLR and other rules which I shall leave to be addressed by our counsel Mr. Fagan.

Confidential and Privileged Documents, Defendant DOE has refused and continues to refuse to cooperate and to disclose this information.

21. Defendant DOE has notes and/or other documents that would identify the source of the Intercepted, Confidential and Privileged Documents, to whom copies of the Intercepted, Confidential and Privileged Documents were provided and to preserve all information related to the Intercepted, Confidential and Privileged Documents. However, they have refused to cooperate and refused to disclose this information.

22. I had an opportunity to review the copies of the Intercepted, Confidential and Privileged Documents that Defendant DOE has and which they are using without permission or authorization. The Intercepted, Confidential and Privileged Documents in Defendant DOE's possession are not the original April 3, 2008 Emails and have been altered.

23. The redactions and alterations were performed by Defendant DOE to prevent Plaintiffs from being able to discover (i) the identity of person(s) who intercepted the Intercepted, Confidential and Privileged Documents, (ii) the identity of person(s) who did the redactions, and/or (iii) the identity of the persons to whom the Intercepted, Confidential and Privileged Documents were distributed.

24. I am a computer engineer with many years of experience. I can state that the Intercepted, Confidential and Privileged Documents that Defendant DOE (i) continues to use in retaliation against Teachers4Action and its members, (ii) continues to distribute are/were not the originals that I sent.

25. Someone or some entity with an AOL email account forwarded the Intercepted, Confidential and Privileged Documents to Defendant DOE, or to a third party who forwarded the Intercepted, Confidential and Privileged Documents to Defendant DOE.

26. Plaintiffs have a claim against whomever or whichever entity it is that forwarded the Intercepted, Confidential and Privileged Documents to Defendant DOE.

27. Based on the actions of Defendant DOE to date, Plaintiffs have a reasonable belief that if the relief sought is not granted evidence and/or documents will be destroyed, altered and concealed so as to interfere with our ability to obtain the information related to (i) the identity of the person(s) who intercepted the Intercepted, Confidential and Privileged Documents, (ii) the identity of the person(s) who did the redactions, and/or (iii) the identity of the persons to whom the Intercepted, Confidential and Privileged Documents were distributed.

**Need for Injunctive Relief Including Entry of Confidentiality Order**

28. Injunctive and other relief, including the entry of a Confidentiality Order, should be granted because Defendant DOE remains unrestrained and continues to use the Intercepted, Confidential and Privileged Documents without authorization or permission.

29. The Intercepted, Confidential and Privileged Documents are being used against us and other members of Teachers4Action.

**Defendant DOE Intercepted / Is Attempting to Use the April 3, 2008 Emails Improperly**

30. Defendant DOE (i) was not intended to be a recipient of the April 3, 2008 Emails, (ii) was not copied on the April 3, 2008 Emails and (iii) should not have the April 3, 2008 Emails in its possession.

31. As noted above, Defendant DOE Senior Counsel Theresa Europe claims that the documents were sent to her anonymously, by fax.

32. One of the allegations that Plaintiffs have made against Defendant DOE was that they have retaliated against Plaintiffs.

33. The Interception of the April 3, 2008 Emails appears to be a violation of US statute 18 U.S.C. § 2511 (1) (b) (c) (d) and (2) (d) over which this Court has additional jurisdiction related to interception of electronic transmission via wire and email.

34. I am told that such an act could be the basis for an additional cause of action against Defendants DOE and unidentified persons or entities who/which intercepted and distributed the emails on or after April 3, 2008.

35. Defendant DOE has continued to use the Intercepted, Confidential and Privileged Documents at every opportunity over the objections of Plaintiffs.

36. On April 7, 2008, Defendant DOE Senior Counsel Theresa Europe failed to disclose or present the full document and specifically the Fax Cover Sheet.

37. On April 11, 2008, for the first time, Defendant DOE Senior Counsel Theresa Europe admitted that the 2 pages were in fact accompanied by a Fax Cover Page. Plaintiffs requested the immediate production of the Fax Cover Page and the fax log showing when the document was received so that Plaintiffs can track down the senders and take the appropriate actions against the sender.

38. NYC Corporation Counsel Blanche Greenfield provided a copy to Magistrate Judge Peck at his request, and he allowed Counsel Edward Fagan and myself to view it. The alleged fax cover sheet, if in fact it was the fax cover sheet in question, was clearly redacted, as there was no fax legend, even a blank legend, at the top of the page.

39. NYC Corporation Counsel Blanche Greenfield angrily informed Teachers4Action Counsel Edward Fagan after the hearing with Magistrate Judge Peck on April 11, 2008 that there was no way Defendant DOE would provide the requested fax log.

40. On April 11, 2008 Magistrate Judge Peck indicated that he would not file the 2 page emails and that they would be kept in chambers pending Plaintiffs submission of whatever Motion they intended to file related to the Intercepted, Confidential and Privileged Documents.

41. I have been informed that on April 14, 2008, Defendant DOE used the Intercepted, Confidential and Privileged Emails at a 3020-a Pre-Hearing Conference with another Teachers4Action Plaintiff, Lisa Hayes.

42. Again, the Plaintiff objected to the use of the Intercepted, Confidential and Privileged Documents.

43. Plaintiff also explained how the Intercepted, Confidential and Privileged Documents were in fact not the best evidence, were not the originals, and had been altered, which on their face is clear that they were altered and/or redacted.

44. Defendant DOE was directed to produce the originals, which Defendant DOE Counsel stated she did not have, because those documents were in the possession of NYC Office of Corporation Counsel.

45. On April 14, 2008, certain Plaintiffs moved in the NY Supreme Court for a temporary stay of the ongoing 3020-a hearings and the type of relief that we believed belonged before this Court and which was outlined in our letter requesting an expedited Rule 16 Conference.

46. I have been informed that in response to Plaintiffs application for a stay, Defendant DOE used the Intercepted, Confidential and Privileged Documents in retaliation for Plaintiffs doing that which Judge Peck and every Arbitrator told us to do – apply for relief in the NY State Supreme Court.

47. Again Defendant DOE did not provide the complete document, did not provide the fax cover sheet, did not provide a clean copy showing the fax legend, did not provide a copy of the document exactly as they received it and continues to attempt to conceal the sender's identity so that they can run Plaintiffs around from Court to Court on issues that should be straightforward and simple.

48. Defendant DOE is using the Intercepted, Confidential and Privileged Documents as a means to inappropriately influence arbitrators, frighten Plaintiffs, and prevent them from freely and openly communicating with one another and their counsel.

49. Defendant DOE is using the Intercepted, Confidential and Privileged Documents as a means to retaliate against Teachers4Action members who are attempting to assert their due process rights.

50. Defendant DOE is using the Intercepted, Confidential and Privileged Documents to silence Teachers4Action, because they claim that the intercepted information relates to some sinister plot or coordinated action by Teachers4Action that is criminal and/or fraudulent.

51. Plaintiffs have done nothing more than stand up for their due process rights and attempt to point out the acts of Retaliation, efforts to interfere with their free speech and to protect themselves from the ongoing campaign against themselves.[3]

52. Since the preparation and filing of the Amended Complaint, additional facts relevant to our causes of action have arisen or come to our attention, including various acts of

[3] It should be noted that Plaintiffs' complaints against the 3020-a arbitrators for improper conduct in relation to forcing Plaintiffs to defend themselves in hearings after the arbitrators allowed Plaintiffs to be stripped of their counsel and deprived of procedural / due process safeguards were based upon advice of counsel other than Mr. Fagan on whose behalf Plaintiffs and Mr. Fagan were and continue to be entitled to rely as Plaintiffs defend themselves and litigate the constitutional issues in this Court.

retaliation, attempts to interfere with our free speech, interference with our constitutional rights and subjecting us to dangerous conditions and further violations of our rights.

53. Plaintiffs need the requested information so that they can prepare an Amended Complaint to include these facts and parties.

54. The limited disclosure will help Plaintiffs and the Court avoid burdensome and unnecessary Motion practice.

55. The limited disclosure might also put Plaintiffs into the position to present the Court with irrefutable evidence of certain of the causes of action in Plaintiffs' complaint.

56. Plaintiffs have a reason to believe that the limited disclosure will allow the Court to be in a position to make expedited decisions – that would avoid months and years of expensive litigation – and will resolve certain liability issues in the case such as:

 a. That NYS Education Law 3020 is unconstitutional and discriminates against Plaintiffs, by allowing Defendants Bloomberg, NYC, Klein, DOE, Weingarten and UFT to change the due process rights to which NYC teachers are entitled on issues related to disciplinary hearings and their teaching certification;

 b. Defendants DOE and UFT violated Plaintiffs rights by entering into a Collective Bargaining Agreement that deprives Plaintiffs and other NYC teachers of their due process rights; and

 c. Defendant UFT violated its duty of fair representation.

57. Plaintiffs believe that it is in the Court's best interests and the interests of justice to insure that these matters are resolved expeditiously and justly.

58. Plaintiffs are teachers in very precarious positions and subjected to hostile work environment and retaliation on a daily basis.

59. Defendants are among the most powerful institutions, politicians and unions in the country. They have virtually unlimited resources, teams of hundreds of lawyers and all the time in the world.

60. Defendants have locked away Plaintiffs and other teachers in Rubber Rooms, charged us with alleged incompetence and/or misconduct, and are retaliating against us for one reason and one reason only – Plaintiffs dared to stand up for and insist upon our rights.

61. The response has been that:

    a.  Plaintiffs have been targeted;

    b.  Plaintiffs have been retaliated against;

    c.  Plaintiffs have been deprived of our rights to free speech;

    d.  Plaintiffs have been deprived of our right to congregate and communicate with each other;

    e.  Plaintiffs have been deprived of our right to witnesses and to prepare our defenses;

    f.  Plaintiffs have been forced into hazardous and hostile work environments;

    g.  Plaintiffs have not been allowed the use of computers, fax machines and Cell Phones; and

    h.  Now communications with between our counsel and us have been intercepted and are being used against us.

## Conclusion

62. In view of the foregoing and on behalf of the other Plaintiffs and members for Teachers4Action, I pray this Honorable Court recognize and grant the relief sought in our Order to Show Cause.

Dated: April 15, 2008

Florian Lewenstein

**DECLARATION UNDER 28 USC § 1746**

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.

Dated: April 15, 2008

Florian Lewenstein

Confidential

Redacted

Document

Exh. I

# EDWARD D. FAGAN ESQ.

Five Penn Plaza, 23rd Floor, NY, NY 10001, Tel. (646) 378-2225
Email: faganlawintl@aim.com (Official Email Address for Court Documents)
Email : faganlaw.teachers@gmail.com (Email Address for *Teachers4Action* Case)

*Via Fax (212) 805-6382 & Hand Delivery* *April 23, 2008*
Honorable Victor Marrero USDJ
United States District Court
Southern District of New York
500 Pearl Street, Chambers 660
New York, NY 10007

*Re:* Teachers4Action et al v. Bloomberg et al, 08-cv-548 (VM)(AJP)

Honorable Judge:

I am counsel for Plaintiffs in the above referenced matter. This letter is being sent as a follow up to my April 22, 2008 letter and after lead Plaintiff Florian Lewenstein and I have had an opportunity to review Magistrate Judge Peck's April 22, 2008 Order *(Dkt. # 30)*.

Plaintiffs request in the April 22, 2008 letter to come before Your Honor at the Court's earliest convenience appears to be even more important and urgent than before. There are (i) outstanding emergent issues related to injunctive relief, (ii) potentially dispositive motions and (iii) issue related to evidence that is at risk of being lost, if immediate action is not taken.[1]

The Lewenstein Declaration of Bias *(Dkt. # 30)* was neither "frivolous", nor filed for improper motives. I submit the comments or purported facts, contained in page 2 of Magistrate Judge Peck's Order, directed at me related to my *"conduct in this litigation," "several requests for 'emergent' relief followed by long delays in properly bringing all parties before the Court,"* and *"failure to follow the Court's directives as to how to proceed"* are inaccurate and not supported by the record. Such comments support why the Declaration of Bias had to be filed in the first place and why Magistrate Judge Peck should have recused himself from this 91-day-old case. Plaintiff Lewenstein has asked, and we request the Court permit him, to submit a Declaration responding to these statements so that this evidence is properly before Your Honor.

Plaintiffs' respectfully request that Your Honor convene a Conference at the Court's earliest convenience (i) to address the emergent issues related to injunctive relief, potentially dispositive motions and evidence that is at risk of being lost if immediate action is not taken and (ii) to establish a briefing schedule on the recusal motion related to Magistrate Judge Peck.

As always, thank you for the Court's consideration in this regard.

Respectfully submitted,

Edward D. Fagan

---

[1] Plaintiffs sought to preserve electronic and other evidence, including fax logs, computer stored data and similar evidence related to the Intercepted, Confidential & Privileged April 3, 2008 Emails. However, to date the NYC Defendants have failed to assist in securing this evidence and documents and Plaintiffs have reasons to believe that this evidence is at risk or already lost.

EDWARD D. FAGAN ESQ.

*Hon. Victor Marrero USDJ – April 23, 2008 Letter – Page 2*
*Re.* *Teachers4Action et al v. Bloomberg et al, 08-CV-548 (VM)(AJP)*

-------------

EDF/lsf
Attachment – 2 pages
Cc: Honorable Andrew J. Peck USMJ – *Via Fax (212) 805-7933*
Blanche Greenfield Esq. – For NYC Defendants - *Via Fax # (212) 788-0327*
Charles Moerdler Esq. – For Defendants UFT, Weingarten & Combier – *Via Fax (212) 806-6006*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 4/22/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TEACHERS4ACTION, on behalf of its Members; FLORIAN LEWENSTEIN, its Treasurer and Spokesperson; et al.,

Plaintiffs,

-against-

MICHAEL G. BLOOMBERG; CITY OF NEW YORK; JOEL KLEIN; NEW YORK CITY DEPARTMENT OF EDUCATION; RANDI WEINGARTEN; UFT; & BETSY COMBIER,

Defendants.

08 Civ. 0548 (VM) (AJP)

**OPINION AND ORDER**

**ANDREW J. PECK, United States Magistrate Judge:**

Plaintiff Florian Lewenstein has requested me to recuse myself because, he alleges, of my "bias," pursuant to 28 U.S.C. §§ 144 and 455. (Dkt. No. 29.) The request is DENIED as frivolous.

The law is clear that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality [recusal] motion unless they display a deep-seated favoritism or antagonism that would make fair judment impossible" and if the Courts' opinion "derives from an extrajudicial source." Litekey v. United States, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994);

see also, e.g., Lightfoot v. Union Carbide Corp., 92 Civ. 6411, 1997 WL 543076 at *2 (S.D.N.Y. Sept. 4, 1997) ("[D]issatisfaction with a legal ruling . . . is an insufficient basis for recusal, for it in effect would allow 'judge shopping' by plaintiffs."), aff'd, 175 F.3d 1008 (table), 1999 WL 110424 at *3 (2d Cir. Mar. 1, 1999), cert. denied, 528 U.S. 817, 120 S. Ct. 56 (1999).

My comments to plaintiff's counsel, Edward Fagan, at the hearings, while perhaps not as politely phrased as he or his client would like, were based entirely on his conduct in the litigation – including several equests for "emergency" relief followed by long delays in properly bringing all parties before the Court, and his failure to follow the Court's directives as to how to proceed – and not based on any extra-judicial knowledge or source.

Accordingly, plaintiff's request that I recuse myself is DENIED.[1]

SO ORDERED.

Dated: New York, New York
April 22, 2008

Andrew J. Peck
United States Magistrate Judge

Copies by fax & ECF to: Edward D. Fagan, Esq.
Blanche Greenfield, Esq.
Judge Victor Marrero

---

[1] To the extent plaintiff's recusal request is also made pursuant to 28 U.S.C. § 144, Judge Marrero will have to rule on that part of plaintiff's application. Pursuant to § 144, I will take no further action in this case until Judge Marrero rules.

C:\OPIN\

Exh. J

AT AN IAS PART 4, OF THE SUPREME COURT OF THE STATE OF NEW YORK, HELD IN AND FOR COUNTY OF NEW YORK, 111 CENTRE STREET, COURTROOM 581, NEW YORK, NEW YORK ON THE ______ DAY OF APRIL 2008.

**PRESENT: HON. KIBBIE PAYNE, JSC**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

**INDEX NO. 08/105845**

**TEACHERS4ACTION, ON BEHALF OF ITS MEMBERS,**

**PETITIONERS**

**V.**

**DEBORAH M. GAINES et al,**

**RESPONDENT**

**ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS**

**UPON** reading and filing the annexed verified petition of Florian Lewenstein dated April 24, 2008 and the annexed exhibits thereto, and upon all the pleadings and proceedings heretofore had:

**IT IS HEREBY ORDERED** that Respondents or their attorneys show cause before me or one of the Judges of this Court at IAS Part ___, Room _____ to be held at the courthouse located at ________________________, New York, New York on April ____, 2008 at 9:30 o=clock in the forenoon or as soon thereafter as counsel can be heard, why an Order should not be made:

Enjoining Respondents from conducting 3020-a hearings against Petitioners until an evidentiary hearing can be held to determine whether Respondents (i) were properly empanelled,

(ii) have fairly and impartially conducted hearings for Petitioners, and (iii) have followed the timing and procedures required by NYS Education Law § 3020-a and the United Federation of Teachers Collective Bargaining Agreement Article 21G.

**IT IS FURTHER ORDERED** that pending the hearing on this Order to Show Cause, Respondents are enjoined from attempting to convene further 3020-a hearings, from sitting as Arbitrators in 3020-a hearings, from issuing any judgments or rulings on 3020-a hearings in progress and from destroying their notes and documents related to the 3020-a hearings that they have conducted to date.

**THE WITHIN RELIEF HAS NEVER BEEN PREVIOUSLY REQUESTED** of this Court or any other court.

**SUFFICIENT CAUSE THEREFORE BEING ALLEGED:**

Let personal service pursuant to the CPLR of a copy of this order together with the papers upon which it is granted along with service of the Petition, upon Respondents on or before 5 P.M. on the ___ of April 2008 be deemed good and sufficient service; and

Respondents or attorneys for the Respondents are to serve any opposition papers to this petition, and file and serve their responsive papers on Petitioner Teachers4Action counsel Edward D. Fagan at his offices on or before April___, 2008; and

Reply papers, if any, are to be served and filed with Part ___ of the Court on or before April__, 2008.

Oral Argument directed:

Honorable ______________________________

J.S.C

ENTER:

Honorable

________________________________________

Justice of the Supreme Court of New YorK

SUPREME COURT OF STATE OF NEW YORK
COUNTY OF NEW YORK

Teachers4Action, on behalf of All its members;

Petitioners

V.

Deborah M. Gaines;
Douglas Bantle;
Stuart Bachner;
Melissa Biren;
James A. Cashen;
James Darby;
Eleanor Glanstein;
Joshua Javitz;
Randi Lowitt;
Andree McKissick;
Earl Pfeffer;
Arthur Riegel;
Martin Scheinman;
Jay Siegel;
Jack Tillem;
Bonnie Weinstock; and
Paul Zonderman.

Respondents

Index # 08/105845

(Conformed)

VERIFIED PETITION PURSUANT TO ARTICLE 78

Petitioner Teachers4 Action individually and on behalf of its members, hereby declares and says as follows:

## Introduction

1. Petitioner Teachers4Action is a group of New York City Public School Teachers. This Petition is brought by Teachers4Action individually and on behalf of its members (as set forth on Exhibit 1).

2. Respondents are a panel of arbitrators who, pursuant to NYS Education Law 3020, sit in

judgment of Petitioners.

**Relevant Facts**

3. The Petition is brought pursuant to CPLR 7803 (1), (2), (3) and (4).

4. The relief is necessary to prevent the manifest injustice that is being committed against Petitioner Teachers4Action and its members by forcing them into 3020-a hearings, without counsel and with Respondent Arbitrators who have violated and continue to violate NYS Education Law and the Collective Bargaining Agreement rules that govern the 3020-a hearings.

5. Respondent Arbitrators are biased and prejudiced.

6. Respondent Arbitrators should not have accepted employment pursuant to NYS Education Law and the Collective Bargaining Agreement.

7. Respondent Arbitrators failed to disclose and/or concealed from Petitioners the conflicts of interest, bias and prejudice.

8. Respondent Arbitrators are attempting to continue their employment, conduct hearings, render verdicts and make decisions in 3020-a hearings that are being conducted by Respondent Arbitrators in violation of the terms and provisions of the 3020-a law and the Collective Bargaining Agreement.

9. After Petitioners discovered Respondent Arbitrators bias, Respondent Arbitrators refused to follow the provisions of NYS law and the Collective Bargaining Agreement, convened hearings, made determinations and issued rulings in violation of the lawful procedures, and which were arbitrary and capricious.

10. After Petitioners discovered the bias, prejudice and improper actions, they notified

Respondent Arbitrators and demanded that they disqualify themselves and not conduct any further 3020-a hearings.

11. Respondent Arbitrators have refused, performed duties and/or actions in violation of NYS law for which CPLR 7803 (1) applies.

12. Respondent Arbitrators have proceeded, are proceeding or about to proceed in violation of NYS law and the terms of the Collective Bargaining Agreement, for which CPLR 7803 (2) applies.

13. Respondent Arbitrators have made determinations in violations of NYS law and the terms of the Collective Bargaining Agreement, and/or which are arbitrary and capricious, for which CPLR 7803 (3) applies.

14. Respondent Arbitrators have made determinations at hearings, based on evidence taken, which evidence was taken in violation or in which hearings evidence was unlawfully suppressed, in violation of NYS law and the terms of the Collective Bargaining Agreement, and/or which are arbitrary and capricious, for which CPLR 7803 (4) applies.

**Relief Sought**

15. The relief sought is to enjoin the arbitrators from continuing to sit in violation of the law and Collective Bargaining Agreement procedures, and who are otherwise biased, prejudiced and should not have accepted employment and should have recused themselves when Petitioners discovered the facts and promptly moved for disqualification.

**Arbitrators Bias & Violation of Arbitration Rules**

16. Plaintiffs have discovered that the Arbitrators have violated and ignored the rules

governing the 3020-a hearings and do so because they are biased against Petitioners

17. Perhaps the most egregious example of Bias that demonstrates that the relief sought is meritorious and warranted is the fact that the lead named Respondent Deborah M. Gaines is or was affiliated with and/or an employee of Petitioners employer. *See Exhibit 2.*

18. Other examples of the need to enjoin Respondent Arbitrators:

    a. Respondent Gaines works in the Mayor's Office of Labor Relations and is a permanent member of the Panel that is sitting in judgment of matters related to Petitioners. Respondents communicate with one another and Respondent Gaines' presence, decisions and advice influences the entire Respondent Panel and prejudices Petitioners rights;

    b. On April 15, 2008, Arbitrator Javitz at a hearing of Petitioner's member Paul Santucci confirmed that he was taking directions from the New York State Education Department about whether or not he should stay the 3020-a hearings until the issue of NYSUT withdrawal and providing alternate counsel was resolved;

    c. After they were put on notice of the Petitioners request that the Arbitrators recuse themselves, each Arbitrator violated the rules governing the arbitrations by ruling themselves and refusing to call for a ruling by, and according to, AAA rules;

    d. Arbitrators have refused to disclose their financial conflicts that raise questions as to their ability to impartially hear the issues in the arbitration, again in violation of AAA rules;

    e. Arbitrators are intentionally concealing evidence and preventing the record from

containing the substantial evidence[1] presented by Petitioners - *See Exhibit 3 – excerpt from McLoughlin transcript showing that Respondent Arbitrator directed certain matters be excluded from the record;*

f. Arbitrators are improperly taking directions from third parties who are improperly influencing the 3020-a hearings – *See Exhibit 4 – Misc Letters directing Arbitrator actions.*

19. Respondent Arbitrators are not moving the 3020-a hearings based upon principles of due process in a forum where Petitioners can challenge the arbitrator, present defenses and evidence, be represented by counsel and have a fair and impartial adjudication.

20. Respondent Arbitrators are acting in violation of NYS law and the Collective Bargaining Agreement related to the 3020-a hearings, are motivated by their own personal pocket books and have concealed their failure to follow the rules for arbitration and their bias and prejudice.

21. Respondent Arbitrators knowingly violate NYS law and the provisions of the Collective Bargaining Agreement related to the conduct, evidence and determinations at or in the 3020-a hearings.

22. Respondent Arbitrators fail to abide by the NYS law and the Collective Bargaining Agreement governing rules related to the 3020-a arbitration.

---

1 In the case of Petitioner Roselyn Gisors, Respondent Arbitrator Eleanor Glanstein also excluded evidence from the Record; in the case of Petitioner Jennifer Saunders, Arbitrator Eric Lawson interfered with and prevented Petitioner from introducing relevant exculpatory evidence that was admitted; in the cases of Petitioners Sydney Rubinfeld, Paul Santuccci, Gloria Chavez, Michael Westbay, Lisa Hayes, Mauricio Zapata, Respondent Arbitrators Scheinman, Lowitt, Javits, Pfeffer and Bauchner failed to submit the recusal motions to the AAA, pursuant to the NYS law and the Collective Bargaining Agreement.

23. Respondent Arbitrators failed to disclose and concealed their actual and potential conflicts.

24. Respondent Arbitrators fail to follow the rules related to disqualification, based on bias and prejudice or appearance of impropriety, including their financial relationship and dependence upon Petitioners employer or other parties in interest.

25. Respondent Arbitrators are attempting to force Petitioners into 3020-a hearings that are being conducted in violation of NYS law and the Collective Bargaining Agreements.

26. Respondent Arbitrators have made or are in the process of making arbitrary and capricious determinations and/or rulings, excluded evidence, altered or precluded evidence from being placed in the record, all of which is in violation of Petitioners' due process rights, affect Petitioners' property rights and for which monetary damages are insufficient.

**Respondent Arbitrators Violated AAA Rules**

27. The Rules of the American Arbitration Association with regard to the qualifications of the arbitrators provides, in pertinent part, the following:

> *Section 11. Qualifications of Arbitrator - Any neutral arbitrator appointed pursuant to Section 12, 13, or 14 or selected by mutual choice of the parties or their appointees, shall be subject to disqualification for the reasons specified in Section 17 . . .*
>
> *Section 17. Disclosure and Challenge Procedure - No person shall serve as a neutral arbitrator in any arbitration under these rules in which that person has any financial or personal interest in the result of the arbitration. Any prospective or designated neutral arbitrator shall immediately*

*disclose any circumstance likely to affect impartiality, including any bias or financial or personal interest in the result of the arbitration. Upon receipt of this information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator. Upon objection of a party to the continued service of a neutral arbitrator, the AAA, after consultation with the parties and the arbitrator, shall determine whether the arbitrator should be disqualified and shall inform the parties of its decision, which shall be conclusive.*

28. The Arbitrators failed to make the necessary disclosures.

29. When Petitioners discovered the issues, they promptly challenged the Arbitrators. However, the Arbitrators failed to follow Sections 11 and 17 of the AAA Rules governing the 3020-a hearings.

30. N.Y.C.P.L.R. § 7504 provides in pertinent part that *"If the arbitration agreement does not provide for a method of appointment of an arbitrator, or if the agreed method fails or for any reason is not followed, or if an arbitrator fails to act and his successor has not been appointed, the court, on application of a party, shall appoint an arbitrator".*

**NYS Supreme Court Has Authority to Disqualify Arbitrator**

31. It has long been recognized that the NY Courts have authority to disqualify an arbitrator. *See In Re Nat'l Union Fire Insurance of Pittsburgh PA 120192 (7-22-2004) 2004 NY Slip Op 51024(U) (Court concludes has inherent power to disqualify an arbitrator before an award has been rendered where there is a real possibility that injustice will result . . . . citing Matter of Astoria Med. Group (Health Ins. Plan), 11 N.Y.2d 128, 132 (1962); and Matter of Grendi (LNL Constr. Mgmt. Corp.), 175 A.D.2d 775, 776 (1st Dept. 1991).*

32. Even an arbitrator's unintentional act may constitute misconduct sufficient to vacate an award. *See In re Albert (Hesney), N. Y.L.J., Sept. 7, 1993, p. 25, col. 5 (Sup.Ct., Rockland Co.) (the court held that the arbitrator's innocent but erroneous statement that he was experienced in computer law was "misconduct" since the "fundamental fairness of the proceeding seemingly was affected by having a person preside over a matter with little or no experience in the field"). To the same effect are Bernstein v. Mitgang, 242 A.D.2d 328, 661 N.Y.S.2d 253 (2d Dep't 1997) (one form of misconduct is the refusal to hear pertinent and material evidence); and Scott v. Bridge Chrysler Plymouth, 214 A.D.2d 675, 625 N.Y.S.2d 266 (2d Dep't 1995) (arbitrator's failure to dispose of the controversy submitted renders award not final and thus subject to vacatur; failure to consider all issues of fact and law that a court would have to consider in order to properly dispose of the same controversy is not judicially reviewable).*

33. An arbitrator exceeds his or her power when the arbitrator makes a completely irrational decision, not when he or she misapplies law or misconstrues facts. *See Local 375 v. N.Y.C. Health & Hosps. Corp., 257 A.D.2d 530, 685 N.Y.S.2d 29 (1st Dep't 1999); Motor Vehicle Accident Indemnification Corp. v. Travelers Ins. Co., 246 A.D.2d 420, 667 N.Y.S.2d 741 (1st Dep't 1998)*

34. An Arbitrators insistence on continuing hearings can also be improper and a basis for vacatur and removal. *See Bevona v. Superior Maint. Co., 204 A.D.2d 136, 611 N.Y.S.2d 193 (1st Dep't 1994) (refusal to grant adjournment was misconduct where such refusal foreclosed presentation of important evidence).*

35. An arbitrator's undisclosed ongoing financial relationship and/or dependence upon one

party is grounds for vacatur and disqualification. *See Fein v. Fein, 160 Misc. 2d 760, 610 N.Y.S.2d 1002 (Sup.Ct., Nassau Co. 1994) (award vacated where arbitrator had ongoing financial relationship with one party, and such fact was not disclosed prior to arbitration).*

36. Disqualification of the Arbitrator should be made at the earliest opportunity and as soon as the challenging party discovers the bias or prejudice and the arbitration should be heard or proceed before new and unbiased arbitrator. *See Santana v. Country-wide Ins. 177 Misc. 1 (1998).*

37. Arbitrator disqualified for failure to disclose nature of relationship with party. See *In Re Application of Seligman v Allstate Insurance Co. 195 Misc. 2d 553 (2003).*

38. Petitioners pray that the Arbitrators be recused and/or enjoined from continuing with 3020-a hearings for their (i) failure to abide by the governing rules of arbitration, (i) failure to disclose their potential conflicts, (iii) failure to follow the rules related to disqualification, based on bias and prejudice or appearance of impropriety, including their financial relationship and dependence on the outcome, (iv) failure to properly address the issues of NYSUT improper withdrawal, (v) taking directions from Respondents and/or interested parties, (vi) forcing Petitioners and Petitioner's members into 3020-a hearings without counsel, (vii) refusal to stay the 3020-a hearings until these issues can be resolved and (viii) improper issuance of awards and/or decisions influenced by their bias, prejudice, lack of impartiality and misconduct in the 3020-a hearings.

**Evidentiary Hearing Necessary**

39. The questions being raised in this Petitioner are those which are permitted pursuant to N.Y.C.P.L.R § 7803 et seq including:

a. Did Respondents fail to perform a duty enjoined upon them by law ? - Answer: Yes !

b. Are Respondents proceeding or attempting to proceed without or in excess of jurisdiction? Answer – Yes !

c. Are or have Respondents made determinations in violation of lawful procedure, or that are affected by an error of law or which are arbitrary and capricious or an abuse of discretion? Answer – Yes !

d. Have Respondents made determinations, as a result of hearings held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence? Answer – Yes they made determinations but no the determinations are not supported by the record or substantial evidence!

**Petitioners Property and Others Rights Are At Risk and Must be Protected**

40. The failure to protect property interests (such as teachers salaries and teaching licenses) and due process right and the use of the arbitrary and capricious standards of review are administrative actions reviewable under CPLR 7803. As relates to Article 78 proceedings related to arbitrations, contested issues of fact warrant evidentiary hearings prior to any determination on the merits. *See Cohoes Firefighter v. Cohoes, 258 A.D.2d 24, 28 [3d Dept 1999] 692 N.Y.S.2d 750, aff'd 94 N.Y. 2d 686 (2000)* .

**Conclusion**

41. In view of the foregoing, Petitioners pray the Court enjoin Respondent Arbitrators from continuing to sit in violation of NYS law and the Collective Bargaining Agreement and/or from attempting to sit in judgment of any arbitration hearings involving Petitioners.

Dated: April 24, 2008

Original Signed & Notarized
Florian Lewenstein, President
Teachers4Action for its members

The Aforementioned Petition and Statements
Are Sworn to and Subscribed before me
On this 24th day of April 2008

Margaret A. Schwartz (original executed)
Notary Seal Reg. # 04SC6152068

**SUPREME COURT OF STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| **Teachers4Action, on behalf of its members**<br><br>**Petitioners**<br>**V.**<br><br>**Deborah M. Gaines et al,**<br><br>**Respondents** | **Index # 105845/08**<br><br><br><br><br>**Supplemental Declaration in Support of Order to Show Cause with Temporary Restraints** |

Edward D. Fagan, declares and says as follows:

1. I am Petitioners' counsel and I am familiar with the facts and circumstances related to this application.
2. I submit this brief Declaration in further support of Petitioners' request as set forth in the accompanying Order to Show Cause.
3. With this Declaration I am attaching a Declaration of Petitioner Paul Santucci related to statements made, in his and my presence, by Respondent Javits, as set forth in the Petition at ¶ 18 b.
4. Prior to submitting this Order to Show Cause, Petitioners and I have started to inform Respondents of this application and Petition.
5. **No prior application for this relief against these respondents has been made in this or any other Court.**
6. I hereby certify that the foregoing statements made by me are true to the best of my knowledge, information and belief.

Dated: April 25, 2008

/s/ Edward D. Fagan

Edward D. Fagan, Petitioners' Counsel

**Exhibit 1 - List of Petitioners**

1. Twana Adams
2. Marie Addoo
3. Maryam Ayazi
4. Olga Batyreva
5. Ming Bell
6. David Berkowitz
7. Jonathan Berlyne
8. Jill Budnick
9. Roslyn Burks
10. Jaime Castro
11. Gloria Chavez
12. Judith Cohen
13. Josefina Cruz
14. James Cullen
15. Diane Daniels
16. Michael Ebewo
17. Boubakar Fofana
18. Louisa Ganis
19. Roselyne Gisors
20. Diana Gonzalez
21. Bob Grant
22. Evelyn Hanlon
23. Joanne Hart
24. Lisa Hayes
25. Wendy Hazen
26. Arnulfo Hinestroza
27. Michael Hollander
28. Eleanor Johnson
29. Rina Johnson
30. Rafal Kowal
31. Jane Levine
32. Florian Lewenstein
33. Hazel Martinez

**Exhibit 1 - List of Petitioners**

34. Michael McLoughlin

35. Raymond Nunge

36. Karen Ornstein

37. Julianne Polito

38. Alena Radke-Gabriel

39. Thomasina Robinson

40. Denise Russo

41. Sidney Rubinfeld

42. Paul Santucci

43. Jennifer Saunders

44. Jacueline Sawyer

45. Brandi Scheiner

46. Alan Schlesinger

47. Alex Schreiber

48. Linda Seiffert

49. Barbara Segall

50. Daniel Smith

51. Helena Tarasow

52. Gilda Teel

53. EustoquioTorres-Nogueras

54. Ivan Valtchek

55. Jaqueline Wade

56. Nahid Wakili

57. Nicholas Watson

58. Michael Westbay

59. George Zanetis

60. Mauricio Zapata

61. Beverly Zimler-Rosenfeld



NYSBA
NEW YORK STATE BAR ASSOCIATION

## Public Sector Labor and Employment Law (2006)

This program, more advanced than the 2004 Public Sector Employment Law Primer course, provides practitioners in the area with a valuable resource to explore some of the more complex issues of municipal employee labor relations.

The program includes five topics: (1) Issues relating to post-impasse procedures, such as mediation, fact finding and interest arbitration; (2) Issues relating to collective bargaining, such as negotiating 403(b) plans that conform to the IRS Code and drafting of settlement agreements to insure that they are in accordance with various tax laws; (3) An overview of recent Public Employment Relations Board cases that have had an impact in public sector labor practice; (4) Issues relating to retiring or already retired employees, such as negotiating retirement incentives and the unique issues that arise in dealing with the New York State Retirement Systems; and (5) A presentation on the sometimes thorny ethical issues when representing municipal employers and employees.

This program is geared to the practitioner who is currently practicing in the field.

### Program Contents

- Hot Topics Before PERB
- Issues Relating to Retirement
- 403(b) Compliance in Collective Bargaining
- Post-Impasse Procedures
- Ethical Considerations

### Program Speakers

**Seth Greenberg, Esq. (Program Planning Co-Chair)**
Greenberg Burzichelli Greenberg P.C.
—Lake Success

**Stephanie M. Roebuck, Esq. (Program Planning Co-Chair)**
Keane & Beane, P.C.
—White Plains

**Michael C. Axelrod, Esq.**
Certilman Balin Adler & Hyman, LLP
—East Meadow

**Howard C. Edelman, Esq.**
Attorney at Law
—Rockville Centre

**John Gaal, Esq.**
Bond, Schoeneck & King, PLLC
—Syracuse

**Deborah M. Gaines, Esq.**
Office of Labor Relations
—New York City

Exhibit 2

Local Top Sellers
1 Creative Technolo...
2 Apple iPod Silver...
3 Microsoft Zune 30...
4 Apple iPod nano B...
5 Creative MuVo V100
6 Zune 30 GB Black
7 SanDisk Sansa...
8 SanDisk Sansa e...
9 Apple iPod touch...
10 SanDisk Sansa e...
Microsoft Zune 30 GB White
Product Rating:
Trend: 26%
Best Price $179
from Office Depot
Zune 80GB Black Digital Media Player... more
VIEW OFFER
Grab this Widget!

**Web Results**

1 - 10 out of 81 total results for **Attorneys Employment and Labor Relations** near **New York, NY**

1. Employment Lawyer
   You Have Rights-Get Help Today You May Deserve Compensation!
   Sponsored by: www.EmployeeRights.com/ [Found on Ads by Google]
2. Employment Lawyers, Employment Attorneys - New York
   Katten Muchin Rosenman LLP Labor and Employment attorneys pride themselves on listening to each ... New York, NY 10022 Phone: 212 940-3000 Fax: 212 940-3111 ...
   www.lawmemo.com/firms/ny/ [Found on Google, Yahoo! Search, Ask.com]
3. Attorneys-Labor & Employment Law in Brooklyn New York (NY ...
   Find Attorneys-Labor & Employment Law in Brooklyn New York (NY), in Switchboard.com Yellow Pages. Get phone, address, driving directions and more.
   www.switchboard.com/Attorneys-Labor+&+Employmen... [Found on Google, Ask.com]
4. NY Employment Attorney
   Have You Been Unlawfully Terminated? Our Firm Can Help.
   Sponsored by: www.GangemiLaw.Com/ [Found on Ads by Google]
5. Lipman & Plesur, LLP - employment lawyers
   He attended the New York State School of Industrial & Labor Relations at Cornell ... He is a member of the National Employment Lawyers Association, ...
   www.lipmanplesur.com/attorneys.html [Found on Google, Yahoo! Search]
6. Labor Relations
   Labor Relations Employment Listed, Search by State & Apply
   Sponsored by: www.iHireHR.com/ [Found on Ads by Google]
7. NYSBA | Home
   ... Attorney at Law â€" Rockville Centre. John Gaal, Esq. Bond, Schoeneck & King, PLLC â€" Syracuse. Deborah M. Gaines, Esq. Office of Labor Relations â€" New York City ... Labor Relations â€" New York ... Labor & Employment Law in New York ...
   www.nysba.org/AM/Template.cfm?Section=All_Recor... [Found on Windows Live, Yahoo! Search]
8. Employment Attorneys
   Find Employment Attorneys now See our Employment Attorneys guide
   Sponsored by: www.comparesharenetwork.com [Found on Ads by Ask.com]
9. Get Info On Your Search
   Get Info on Your Search from 14 search engines in 1.

Exhibit 2

Exhibit 3

THE STATE EDUCATION DEPARTMENT
THE UNIVERSITY OF THE STATE OF NEW YORK

---

In the Matter of
THE NEW YORK CITY DEPARTMENT OF EDUCATION
v
MICHAEL McLOUGHLIN

Section 3020-a Education Law Proceeding (File 5,394)

DATE: June 19, 2007

TIME: 10:36 a.m. to 12:30 p.m.
1:30 p.m. to 2:30 p.m.

LOCATION: New York City Department of Education
Office of Legal Services
49-51 Chambers Street, 6th Floor
New York, New York

BEFORE: ARTHUR A. RIEGEL, ESQ.
Hearing Officer
One Willow Lane
Hewlett Harbor, New York 11557

Exhibit 3

# 2008

# NEW YORK LAWYERS DIARY AND MANUAL®

Bar Directory of the State of New York

*ONE HUNDREDTH NINTH YEAR OF PUBLICATION*

NEW YORK LAWYERS DIARY AND MANUAL®
240 Mulberry Street, P.O. Box 50
Newark, N.J. 07101-0050
(973) 642-1440
(800) 444-4041
FAX (973) 642-4280
E-mail: mail@lawdiary.com
Visit our web site at http://www.lawdiary.com

The New York Lawyers Diary and Manual® is also available on CD-ROM. This electronic format also includes court rules, legal productivity calculators, and an electronic calendar & diary.

Call us at (800) 444-4041, Ext. 2 for further details on this invaluable time saver.

Exhibit 3

(917) 778-6500 .. Gaillard, Kaisha M '03 %K Dodson -485 Lex Av -NY 10017
Galilee, Theodoros A '99 -12-19 157th -Whitestone 11357
(845) 434-3000 .. Gaiman & Krutman -5214 Main Bx368 -S Fallsbrg 12779 Fx:434-3001
(845) 791-4700 .. Gaiman, Robt S '79 -11 Rosen Rd -Monticello 12701 Fx:791-1842
(212) 907-9600 .. Gaines, Larry F '75 (Ingram YGC&S,LLP) -250 Park Av -NY 10177
(845) 225-8403 .. Gainer, Ben S '95 -101 Carolan Rd E -Carmel 10512
(718) 983-8400 .. Gaines, Alan R '82 -2555 Richmond Av -Staten Isl 10314 Fx:494-4192
[illegible]
Gaines, Cherie '81 -812 S Bway -Tarrytwn 10591
(212) 306-7230 .. Gaines, Deborah M '93 %Mayors Ofc Labor Rel -40 Rector -NY 10006 Fx:306-7229
[illegible]
(914) 288-9595 .. [illegible] -White Plns 10601 Fx:288-0850
(212) 554-1234 .. Gaines, Jonathan E '87 %AXA Financial Inc -1290 Av of Amer -NY 10104 Fx:707-3963
(718) 983-9400 .. Gaines, Jonathan S '90 -2555 Richmond Av -Staten Isl 10314
(716) 297-9786 .. Gaines, Kathleen E '85 -4701 Military Rd -Niagara Fls 14305 Fx:297-9634
(718) 983-9400 .. Gaines, Lori M '05 %Gaines & F LLP -2555 Richmond Av -Staten Isl 10314 Fx:494-4192
(631) 834-9786 .. Gaines, Morris '51 -77 Waverly Av -Patchogue 11772 Fx:289-0693
(212) 490-3449 .. Gaines, Richd D '70 -575 Mad Av -NY 10022 Fx:(973) 579-4177
(718) 983-9400 .. Gaines, Spencer H '59 (Gaines & F LLP) -2555 Richmond Av -Staten Isl 10314 Fx:494-4192
(914) 747-3633 .. Gaines, Stephen M '84 OfCnsl Ginsburg & R,PC -100 Summit Lk Dr -Valhalla 10595 Fx:747-9693
(914) 288-9595 .. Gaines, Steven H '76 (Gaines GP&N,LLP) -1 N Bway -White Plns 10601
(631) 583-5203 .. Gaines, Weaver H '69 -Bx98 -Ocean Bch 11770 Fx:583-5203
(212) 983-1300 .. Gainey, Barry J '85 (Gainey & M) -295 Mad Av -NY 10017
(212) 983-1300 .. Gainey & McKenna -295 Mad Av -NY 10017 Fx:983-0383
(212) 674-5151 .. Gainsburg, Roy '57 Holtzbrinck Publishers -175 5th Av -NY 10010
(516) 829-6900 .. Gaioni, John M '82 (Ackerman LCB&L,LLP) -1010 Nrthrn Blvd -Gt Neck 11021
(212) 943-1090 .. Gair, Anthony H '80 (Gair GCS&M) -80 Pine -NY 10005
(212) 943-1090 .. Gair, Danl A '96 %Gair GCS&M -80 Pine -NY 10005
(212) 943-1090 .. Gair Gair Conason Steigman & Mackauf -80 Pine -NY 10005 Fx:425-7513
(718) 451-1200 .. Gairy, Trevor T '86 -4304 Av D -Brklyn 11203 Fx:451-1753
(315) 453-9535 .. Gaiser, Christopher S '87 -1036 7th N -Liverpool 13088 Fx:461-4711
Gaisl, Aayeshe '04 -434 77th -Brklyn 11209
(212) 593-7600 .. Gaisl, Matthew '03 S Harris & Assoc -110 E 59th -NY 10022
Gaiso, Lisa Ann '93 -627 Everdell Av -W Islip 11795
(516) 746-5360 .. Gaissert, Lawr R '95 %Hoffman & S LLP -94 Second -Mineola 11501
(212) 530-1800 .. Gaither, H Rowan IV '96 %Richards K&O LLP -1 World Fncl Ctr -NY 10281
(516) 522-2730 .. Gaitman, Steven J '96 -185 EAB Plz -Uniondale 11556 Fx:522-2575
(718) 918-3835 .. Gajdics, Philip K '94 %Bronx Mun Hsptl -Pelham Pkwy S & Eastchstr Rd -Bronx 10461
(631) 447-1200 .. Gajdos, Michl A '98 (Russo & G) -31 W Main -Patchogue 11772
(212) 768-6700 .. Gajer, Paul A '80 (Sonnenschein N&R LLP) -1221 Av of Amer -NY 10020
(212) 691-3383 .. Gajewski, Paul '88 -15 Sheridan Sq -NY 10014
(607) 772-0603 .. Gaji, Feyi O '95 -36 Oak -Bnghmtn 13905 Fx:723-4059
(212) 421-1300 .. Gajjar, Kalpana '93 Jack Resnick & Sons,Inc -110 E 59th -NY 10022 Fx:758-2948
(718) 762-2953 .. Gaje, Sofronio G '76 -39-01 Main -Flushng 11354
(212) 980-0408 .. Gal, Dov '01 %B Pusch -550 5th Av -NY 10019 Fx:980-7056
(212) 851-9006 .. Gal, Eldad '97 Lovelle Capital -590 Mad Av -NY 10065
(212) 486-5800 .. Galaburda, Adam C '01 Bernstein Invstmnt Rsrch & Mgmt -1345 Av of Amer -NY 10105
(212) 805-6115 .. Galacatos, Theodora '97 %Hon M Pollack -40 Foley Sq -NY 10007
(718) 646-4716 .. Galak, Julieen '04 (J Galak,PC) -3105 Brighton 3rd -Brklyn 11235 Fx:(516) 908-3975
(212) 869-7000 .. Galalis, David J '05 %Feldman W&S LLP -420 Lex Av -NY 10170
(347) 350-6592 .. Galan, Thos J '02 (Galan Law Firm,PC) -1580 74th -Brklyn 11228 Fx:312-6183
Galanes, Philip '92 -28 E 10th -NY 10003
(631) 390-4000 .. Galang, Cristina M '02 %J Bell -201 Old Cntry Rd -Melvl 11747 Fx:385-5833
Galanin, Natalie M '94 -60 E 96th -NY 10128
(212) 370-1300 .. Galano, Anthony III '98 %Ellenoff G&S LLP -370 Lex Av -NY 10017
(631) 757-7108 .. Galano, Donald J '73 -62 Sanne Rd -Northprt 11768
(212) 318-3000 .. Galant, Felice B '02 %Fulbright & J LLP -666 5th Av -NY 10103
(212) 218-5500 .. Galant, Gloria '04 %Seyfarth S LLP -620 8th Av -NY 10018
(212) 592-1400 .. Galant, Jeffrey A '85 Cnsl Herrick,F LLP -2 Park Av -NY 10016
(718) 442-9000 .. Galante, Anthony L '81 (Ameduri G&F) -471 Bement Av -Staten Isl 10310
(212) 775-8700 .. Galante, Joshua G '05 %Kilpatrick S,LLP -31 W 52nd -NY 10019
(518) 272-3311 .. Galante, Joyce M '86 -53 2nd Bx606 -Troy 12181 Fx:272-1280
(212) 468-6000 .. Galante, Paul A '02 %Morrison & F LLP -1290 Av of Amer -NY 10104
(212) 446-5000 .. Galante, Todd M '87 (Selden W,LLC) -70 E 55th -NY 10022
(212) 221-5700 .. Galanter, David '86 OfCnsl Goldberg W&U LLP -1501 Bway -NY 10036
(914) 686-9600 .. Galarce, Carl J '86 (Miller & P,PC) -175 Main -White Plns 10601
(518) 487-5460 .. Galarneau, Eric M '98 %DA -6 Lodge -Albany 12207 Fx:487-5093
(845) 369-0980 .. Galarneau, Judith J '93 -168 S Main -New Cty 10956 Fx:369-7554
(212) 857-8230 .. Galarza, Jennifer A '04 %Baker MM&M,PC -330 W 34th -NY 10001
(516) 797-1600 .. Galarza, Julio Cesear '95 -5020 Sunrise Hwy -Massapequa Pk 11762 Fx:795-8300
(718) 250-2000 .. Galarza, Sandra D '05 DA -350 Jay -Brklyn 11201 Fx:250-2314
(516) 883-3040 .. Galasel, Nancy K '89 -827 Port Wshngtn Blvd -Pt Wash 11050

(718) 633-6066 .. Galasso, Christopher D '88 -6633 Main -Williams... Fx:632-6273
(516) 222-6500 .. Galasso Langione & Botter -377 Oak -Gdn Cty Fx:222-1084
(516) 222-6500 .. Galasso, Peter J '82 (Galasso L&B) -377 Oak -G
(631) 390-4007 .. Galatan, Albert J '92 %J Bell -201 Old Cntry Rd Fx:385-5833
(845) 567-9635 .. Galati, Gary A '73 -253 Rte 17K -Newburgh 1255
Galati, Glenn P '05 -6507 14th Av -Brklyn 11219
(212) 574-1200 .. Galban, John J '85 Cnsl Seward & K LLP -1 Bty
(315) 253-6219 .. Galbato, Riccardo T '95 %Karpinski SG&T -110 13021
(315) 218-8000 .. Galbato, Suzanne O '99 (Bond S&K,PLLC) -1 L -Syracuse 13202
(914) 834-2141 .. Galbo, Andrea '88 -2065 Bstn Post Rd -Larchm
Galbo, Arnold E '56 -115 Admiral Rd -Buffalo 14
Galbo, Gregory A '85 -8806 Bay 16th -Brklyn 112
(718) 332-0151 .. Galbo, Richd A '85 (Galbo & Assoc) -434 Main -S
(716) 634-5525 .. Galbo, Thos S '79 (Ralabate & G) -5792 Main -E
(585) 396-1930 .. Galbraith, Anne S '78 -48 N Main -Canandaigua Fx:396-9678
Galbraith, Diane L '94 -Bx4573 -Ithaca 14852
(607) 273-5475 .. Galbraith, Dirk A '72 (Holmberg GV&M) -200 E B 14850
(212) 425-7200 .. Galbraith, James '77 (Kenyon & K) -1 Bway -N
(212) 479-6000 .. Galbraith, Kevin D '03 %Cooley GK LLP -1114 10036
Galbraith, Lyell G '80 -60 Granger -Canandaig
(585) 546-6448 .. Galbraith, Robt L Jr. '87 (Davidson FCK&G LLP -Rchstr 14614
(607) 255-4196 .. Galbreath, Glenn G '88 %Leg Aid -Myron Ta Fx:255-3269
(718) 229-2828 .. Galchus, Frank M '82 (Galchus & G) -38-50 Ba 11361
(212) 388-3391 .. Galdri, Alberta L '04 Local 328-J Bldg Srvc -1 10013
(212) 506-5000 .. Gale, Adam D '94 OfCnsl Orrick H&S LLP -666 5
(315) 637-3663 .. Gale, Catherine A '79 (Gale & D,LLC) -Bx6527 -S
(914) 946-1400 .. Gale, Catherine F '96 OfCnsl Voute LM&C,LLP -White Plns 10601
(315) 637-3663 .. Gale & Danoks,LLC -Bx6527 -Syracuse 1321
(315) 637-3663 .. Gale, Max D '98 (Gale & D,LLC) -Bx6527 -Syra
(212) 471-0931 .. Gale, Michele M '01 %Adobe Systems Inc -8 W
(516) 767-1200 .. Gale, Peter L '79 (B Clark & Assoc,PC) -22 S B 11050
Gale, Scott S '99 -188 Montague -Brklyn 1120
(518) 782-7700 .. Galeano, Ann-Marie '94 Plug Power Inc -968 A -Latham 12110
(212) 450-4000 .. Galeazzi, Marc A '07 %Davis P&W -450 Lex A
(914) 995-3460 .. Galef, Gwendolyn '97 %DA -111 Martin Luthe -White Plns 10601 Fx:995-3363
(914) 739-8293 .. Galella, Jos P '82 Kenneth Pregno Agency -2 S 10566 Fx:739-0632
Galen, Michele B '83 Burson-Marsteller -230 Pa
(212) 858-1000 .. Galene, Maria T '82 (Pillsbury WSP LLP) -154
(212) 341-7900 .. Galene, Michl L '87 %Brecher FPHW&T,PC -2
Galeota, Richd D '87 -1081 Grand Blvd -Westc
(718) 680-8008 .. Galetta, Helen Z '99 (Villani & G,PC) -8212 3r Fx:238-8212
(585) 419-8800 .. Galewski, Roy R '03 %Harris B PLLC -99 Ga 14534
(718) 856-1010 .. Galezlowski, John A Jr. '81 -69 Delaware Av
(212) 227-0347 .. Galfunt, Heather A '97 %Weiss W&W,PC -11 P
(631) 582-6161 .. Galgano & Burke -300 Rabro Dr -Hauppauge
(914) 428-2323 .. Galgano, George W '00 (Galgano & Assoc) -3 -White Plns 10603 Fx:428-3298
(914) 993-3344 .. Galgano, Jerri-Lynn '00 Blackacre Title Agncy -White Plns 10603
(914) 323-5117 .. Galgano, John L '04 Manhattanville College -2 -Purchase 10577 Fx:694-4406
(516) 248-2500 .. Galgano, Kathleen M '87 (Radmond P&C, LLP -Gdn Cty 11530
(914) 761-4313 .. Galgano, Louis J III '80 -303 Old Tarrytown Rd
(631) 582-6161 .. Galgano, Thos M '75 (Galgano & B) -300 Rab 11788
(518) 797-6289 .. Galgay, Aline D Gloffre '88 -44 Cnty Route 1 Fx:797-9541
(718) 260-8752 .. Galia, Joanna C '02 ACS -345 Adams -Brklyn
(212) 408-5100 .. Galiano, Bernadette K '07 %Chadbourne & P -NY 10112
(212) 806-5400 .. Galiano, Elizabeth S '05 %Stroock &S&L LLP 10038
(212) 986-5900 .. Galiardo, Christopher D '92 Meyers & Galiar 10168
(212) 422-6420 .. Galib, M Salome '99 Govt Devlpmnt Bk -666 5
(212) 351-4000 .. Galil, Yair Yehuda '06 %Gibson D&C LLP -2
(212) 732-3200 .. Galili, Karmit Shlomit '03 %Carter L&M LLP -2
Galin, Douglas M '68 -1 Hidden Pond Ln -Pt C
(212) 450-4000 .. Galin, Ross B '02 %Davis P&W -450 Lex Av
(516) 739-8222 .. Galina, Michl R '86 (Rabinowitz & G) -94 Wil
(212) 573-5000 .. Galindo, Angela L '93 %Ford Fndtn -320 E 43
Galinsky, Shira Y '06 -542 5th Av -Brklyn 112
(516) 729-5507 .. Galioto, Anthony J '98 -166 Euston Rd -Gdn C
(718) 931-7382 .. Galioto, Laurie '94 Galioto Law Ofc -3342 A
(212) 299-2000 .. Galish, Susan M '94 %NYMEX -1 North End Fx:301-4700
(212) 227-4072 .. Galis-Menendez, Isabel V '86 Law Dept -100 Fx:788-0387
(516) 742-0370 .. Galison, David P '97 (Galison & G) -1539 Fra 11501 Fx:742-6477
(516) 742-0370 .. Galison, Edw '69 (Galison & G) -1539 Frank Fx:742-6477
(212) 592-1400 .. Galison, Marni J '99 %Herrick,F LLP -2 Park

## Public Sector Labor and Employment Law (2006)

This program, more advanced than the 2004 Public Sector Employment Law Primer course, provides practitioners in the area with a valuable resource to explore some of the more complex issues of municipal employee labor relations.

The program includes five topics: (1) Issues relating to post-impasse procedures, such as mediation, fact finding and interest arbitration; (2) Issues relating to collective bargaining, such as negotiating 403(b) plans that conform to the IRS Code and drafting of settlement agreements to insure that they are in accordance with various tax laws; (3) An overview of recent Public Employment Relations Board cases that have had an impact in public sector labor practice; (4) Issues relating to retiring or already retired employees, such as negotiating retirement incentives and the unique issues that arise in dealing with the New York State Retirement Systems; and (5) A presentation on the sometimes thorny ethical issues when representing municipal employers and employees.

This program is geared to the practitioner who is currently practicing in the field.

### Program Contents

- Hot Topics Before PERB
- Issues Relating to Retirement
- 403(b) Compliance in Collective Bargaining
- Post-Impasse Procedures
- Ethical Considerations

### Program Speakers

**Seth Greenberg, Esq. (Program Planning Co-Chair)**
Greenberg Burzichelli Greenberg P.C.
—Lake Success

**Stephanie M. Roebuck, Esq. (Program Planning Co-Chair)**
Keane & Beane, P.C.
—White Plains

**Michael C. Axelrod, Esq.**
Certilman Balin Adler & Hyman, LLP
—East Meadow

**Howard C. Edelman, Esq.**
Attorney at Law
—Rockville Centre

**John Gaal, Esq.**
Bond, Schoeneck & King, PLLC
—Syracuse

**Deborah M. Gaines, Esq.**
Office of Labor Relations
—New York City

Local Top Sellers
1 Creative Technolo...
2 Apple iPod Silver...
3 Microsoft Zune 30...
4 Apple iPod nano B...
5 Creative MuVo V100
6 Zune 30 GB Black
7 SanDisk Sansa...
8 SanDisk Sansa e...
9 Apple iPod touch...
10 SanDisk Sansa e...
Microsoft Zune 30 GB White
Product Rating
Best Price
Grab this Widget

**Web Results**

1 - 10 out of 81 total results for **Attorneys Employment and Labor Relations** near **New York, NY**

1. Employment Lawyer
   **You Have Rights-Get Help Today You May Deserve Compensation!**
   Sponsored by: www.EmployeeRights.com (Found on Ads by Google)
2. Employment Lawyers, Employment Attorneys New York
   **Katten Muchin Rosenman LLP Labor and Employment attorneys pride themselves on listening to each ... New York, NY 10022 Phone: 212 940-3000 Fax: 212 940-3111 ...**
   www.lawmemo.com/firms/ny/ (Found on Google, Yahoo! Search, Ask.com)
3. Attorneys-Labor & Employment Law in Brooklyn New York (NY ...
   **Find Attorneys-Labor & Employment Law in Brooklyn New York (NY). in Switchboard.com Yellow Pages. Get phone, address, driving directions and more.**
   www.switchboard.com/Attorneys-Labor+&+Employmen... (Found on Google, Ask.com)
4. NY Employment Attorney
   **Have You Been Unlawfully Terminated? Our Firm Can Help.**
   Sponsored by: www.GangemiLaw.Com (Found on Ads by Google)
5. Lipman & Plesur, LLP - employment lawyers
   **He attended the New York State School of Industrial & Labor Relations at Cornell ... He is a member of the National Employment Lawyers Association. ...**
   www.lipmanplesur.com/attorneys.html (Found on Google, Yahoo! Search)
6. Labor Relations
   **Labor Relations Employment Listed. Search by State & Apply.**
   Sponsored by: [illegible] (Found on Ads by Google)
7. NYSBA | Home
   **... Attorney at Law â€" Rockville Centre. John Gaal, Esq. Bond, Schoeneck & King, PLLC â€ Syracuse. Deborah M. Gaines, Esq. Office of Labor Relations â€" New York City ... Labor Relations â€" New York ... Labor & Employment Law in New York ...**
   www.nysba.org/[illegible] (Found on [illegible])
8. Employment Attorneys
   **Find Employment Attorneys Now [illegible]**
   Sponsored by: www.comparesharenetwork.com (Found on Ads by Ask.com)
9. Get Info On Your Search
   **Get Info on Your Search from 14 search engines in 1.**



THE NEW YORK CITY DEPARTMENT OF EDUCATION
JOEL I. KLEIN, *Chancellor*
OFFICE OF THE CHANCELLOR
51 Chambers Street, Room 604 New York, NY 10007

April 17, 2008

**VIA E-MAIL: sebarb@att.net**
Stuart E. Bauchner, Esq.
299 Riverside Drive - # 6d
New York, New York 10025

**Re: Disciplinary case of Mauricio Zapata**

Dear Arbitrator Bauchner:

This letter is written to advise you that on April 15, 2008 the Office of the Corporation Counsel served an Affirmation of Intent to Move for Permission to Appeal ("Affirmation of Intent") the order of Justice Sheila Abdus-Salaam, which purported to grant Mr. Zapata a stay of the Education Law 3020-a proceedings until April 24, 2008. A copy of Justice Salaam's Order and the Affirmation of Intent to Move for Permission to Appeal are annexed hereto. As set forth in the Affirmation of Intent, pursuant to Civil Practice Law and Rules Section 5519(a) the order of Justice Salaam is now stayed. Accordingly, the pre-hearing conference involving the Zapata matter, currently scheduled for April 18, 2008, may proceed.

If you have any questions please do not hesitate to contact me at (212) 374-6749.

Sincerely,

Theresa Europe
Deputy Counsel to the Chancellor
Administrative Trials Unit
(212) 374-6749

Cc: Edward Fagan, Esq.
Mauricio Zapata

Exhibit 4

THE NEW YORK CITY DEPARTMENT OF EDUCATION
JOEL I. KLEIN, Chancellor
OFFICE OF THE CHANCELLOR
51 Chambers Street, Room 604 New York, NY 10007

March 27, 2008

Mr. Stuart E. Bauchner, Arbitrator
299 Riverside Drive- Apt. 6D
New York, New York 10025

**Re: Jane Levine**

Dear Mr. Bauchner:

Please allow this letter to serve as an acknowledgement of receipt on March 26, 2008 of a copy of Jane Levine's request for a stay in the referenced proceeding, dated March 14, 2008. Further, take notice that the Department shall not agree to any adjournment in Ms. Levine's case for the reasons set forth below. The Department will be ready to proceed with the hearing on the date(s) scheduled.

As you know, NYSUT has relieved itself from representing Ms. Jane Levine along with the other Plaintiffs in Teachers4Action, et al. v. Bloomberg, et al. S.D.N.Y. Index No. 08-CV- 54, based on apparent conflict of interest. It is my understanding that NYSUT is not providing Ms. Levine with alternative counsel and that she must retain and bring counsel at her own expense.

The Plaintiffs, including Ms. Levine, have been denied a stay of their proceedings pursuant to the March 25, 2008 memorandum decision of the Magistrate Judge, Honorable Andrew J. Peck. Further, denial of such requested relief was made with the court being fully aware that the Plaintiffs would be obliged to move forward without the benefit of counsel, as the same is clearly stated in Plaintiffs' counsel's motion.

Further, it is the Department's position that a 3020-a arbitrator does not have the authority to stay the proceeding and Ms. Levine would have to seek court intervention, which to this point has denied.

The Department shall not agree to any adjournment in Ms. Levine's case for the reasons set forth hereinabove. The Department will be ready to proceed with the hearing on the date(s) scheduled. Without the aforementioned court intervention, the Department shall proceed with the case.

The Department is asking the arbitrator to advise Ms. Levine that should she fail to appear, the hearing will proceed in her absence.

Exhibit 4

Sincerely,

R. Joseph Coryat
New York City Department of Education
Office of Legal Services
Administrative Trials Unit

cc: Jane Levine
5-16 Dorothy Street
Fair Lawn, New Jersey 10025

Encl. :(1) Endorsed Memorandum and Transcription 3 pages

**NEW YORK STATE SUPREME COURT**
**NEW YORK COUNTY**

**INDEX # ________**

**TEACHERS4ACTION, ON BEHALF OF ITS MEMBERS**

**PETITIONER**

**V.**

**DEBORAH M. GAINES, ET AL**

**RESPONDENTS**

**DECLARATION**

Paul Santucci hereby declares as follows:

1. I am a petitioner in the matter of Teachers4Action et al v. NYC Department of Education, Index # 08/105304, that was filed on the 14th of April 2008.

2. I am also a member of Teachers4Action and a petitioner in the instant action.

3. I am also a member of Teachers4Action and a plaintiff in their federal lawsuit, Teachers4Action et al vs. Bloomberg et al, docket # 08-cv-548 (VM).

4. On April 15, 2008 a 3020-a hearing in my case was conducted by the NYC Department of Education (DOE) and Arbitrator Joshua Javits, in the presence of Edward D. Fagan, Esq., the Teachers4Action attorney in the above referenced federal action.

5. Mr. Fagan entered an objection to the hearing and demanded that Mr. Javits adjourn the hearing in accordance with the principle of collateral estoppel, based on an order to stay the hearings for another Teachers4Action member issued by Judge Sheila Abdus-Salaam.

6. Arbitrator Javits responded that he had been *directed* [emphasis added] to continue the

hearings in spite of the judge's order.

7. Mr. Fagan asked who had directed Arbitrator Javits to continue the hearings.

8. Arbitrator Javits responded that he had been directed by Deborah Marriott of the New York State Education Department.

9. This exchange took place in my presence and I personally heard both parties clearly.

April 24, 2008

Paul Santucci

**DECLARATION UNDER 28 USC § 1746**

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.

Dated: April 24, 2008

Paul Santucci

SWORN TO BEFORE ME THIS
24TH DAY OF APRIL, 2008

Notary Seal

**LINDA BICKHARDT**
**Notary Public of NJ**
**My Commission Exp. FEB 2, 2013**

Exhibit 5

**Stuart E. Bauchner, Esq.**
Arbitrator and Mediator
299 Riverside Drive #6D
New York, NY 10025
212-222-8900

April 1, 2008

Via Express Mail and First Class Mail

Mr. Maurico Zapata
8915 86th Street
Woodhaven, NY 11421

R. Joseph Coryat, Esq.
New York City Department of Education
Office of Legal Services
49-51 Chambers Street
New York, NY 10007

Re: NYC DOE
v. M. Zapata
SED File No. 7,794
Section 3020-a Education Law Proceeding

Dear Mr. Zapata and Mr. Coryat:

This confirms that a pre-hearing conference in the above referenced matter has been scheduled for April 8, 2008, at 9:00 a.m., at the offices of the New York City Department of Education, Office of Legal Services, 49-51 Chambers Street, 6th Floor, New York, NY.

This further confirms that this is the second matter on my hearing calendar and is subject to being called to hearing on any of my scheduled hearing dates. Once called to hearing, the matter will continue on my scheduled hearing dates until completed. My scheduled hearing dates are April 8, April 9, April 10, April 29, April 30, May 8, May 13, May 14, May 28, May 30, June 3, June 4, June 5, June 13, and June 16, 2008. All hearings will take place at the offices of the New York City Department of Education, Office of Legal Services, 49-51 Chambers Street, 6th Floor, New York, NY.

Please note that the applicable collective bargaining agreement between the NYC DOE and the UFT provides that "absent extraordinary circumstances, arbitrators are not to adjourn hearing dates. It should be noted that normally attorney or party scheduling

conflicts are not extraordinary circumstances." Absent an adjournment being granted by the undersigned, pre-hearing conferences and hearings may be conducted even if one party fails to appear. Chawki v. NYC DOE, 833 N.Y.S. 2d 472 (2007)

Please further note that any party granted an adjournment will be charged and responsible for paying a full per diem ($1,400.00) unless the hearing is adjourned with at least 21 days notice.

Very truly yours,

Stuart E. Bauchner

FROM : FAX NO. : Apr. 03 2008 05:12PM P2

EARL R. PFEFFER, Esq.
Arbitrator
153 BELLEVUE AVENUE
MONTCLAIR, NEW JERSEY 07043-1818

(973) 783-5367
FAX (973) 783-5367

March 31, 2008

**BY EXPRESS AND REGULAR MAIL**

Julianne Newman, Esq.
NYC Department of Education
Office of Legal Services
51 Chambers Street – Room 604
New York, New York 10007

Gloria S. Chávez
P.O. Box 721349
Jackson Heights, New York 11372

**Re: NYC Department of Education**
**adv.**
**Gloria S. Chávez**
**SED File# 5,935**

Dear Ms. Newman and Ms. Chávez:

I write to reiterate and confirm that we are scheduled to proceed with testimony in the above matter on Friday, April 4, 2008. The hearing will be convened at 49-51 Chambers Street, New York, NY, and will commence at 10:00 a.m.

As of this date, Ms. Chávez has not advised me regarding the representation issues we discussed on the last hearing date. Although I have urged her to retain counsel in this matter, I have stressed that it is not a requirement and that we will proceed with the hearing even if she is not represented. Only under the most extraordinary circumstances will I entertain any requests by Ms. Chávez to adjourn further these proceedings.

Indeed, my review of applicable case law reveals that where an employee who has requested arbitral review of disciplinary charges receives adequate notice of the proceedings, and is advised that the hearing will go forward as scheduled unless there is proof of the most compelling circumstances for a postponement, the denial of an adjournment request lies in the sound exercise of the arbitrator's discretion. See Chawki v. New York City Department of Education, 39 A.D.3d 321; 833 N.Y.S.2d 472 (1st Dep't, April 17, 2007), appeal denied, 9 N.Y.3d 810, 844 N.Y.S.2d 786 (October 16, 2007).

Although Ms. Chávez has cooperated with all of my scheduling orders, I nevertheless place her on notice that the Appellate Division's decision in Chawki confirmed the appropriateness of the arbitrator's decision to conduct the hearing in the respondent's absence. Thus, a simple failure to appear will not justify a postponement.

Accordingly, the parties each are advised that I will hear and determine this controversy upon the evidence adduced on April 4, 2008, and on hearing dates scheduled thereafter until the record is completed. Ms. Chávez is on notice that she will be granted no additional postponements or adjournments absent proof of the most compelling circumstances.

Very truly yours,

Earl R. Pfeffer

ERP/s

cc: Howard Singer, Esq.

***RANDI E. LOWITT***
***ARBITRATOR***
***11 BEACH STREET***
***NEW YORK, NEW YORK 10013***
***TEL: (908) 256 0091***
***FAX: (908) 234 1248***
relowitt@patmedia.net

**BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND BY REGULAR MAIL**

Ms. Lisa Hayes
105 Maple Road
Huntington Station, New York 11746

Dennis DaCosta, Esq.
Offices of Michael Best, General Counsel to the Chancellor
New York City Department of Education
Office of Legal Services
49-51 Chambers Street, 6th Floor
New York, New York 10007

March 25, 2008

RE: In the Matter of the New York City Department of Education, IS 61 v. Lisa Hayes
Section 3020-a Education Law Proceeding
SED File # 9,771

Dear Ms. Hayes and Mr. DaCosta:

In addition to the Pre-Hearing Conference on the above-captioned case, which is scheduled for 10:00 a.m., Thursday, April 3, 2008 at the offices of the Department of Education, 49-51 Chambers Street, 6th Floor, please be advised of the following:

1. The hearings on the case are scheduled to go forward beginning April 4, 2008.
2. The remainder of the hearing dates for April are April 7, April 8, April 14, and then May 7. Not knowing how many hearing days this case will take, please ensure that you are available for all of the above dates, as well as any additional dates that may be necessary.
3. Article 21G2d of the Collective Bargaining Agreement between the parties provides as follows: *The parties are committed to having these cases heard in an expeditious manner. For this reason, absent extraordinary circumstances, arbitrators are not to adjourn hearing dates. It should be noted that normally attorney or party scheduling conflicts are not extraordinary circumstances.*
4. The hearings will proceed in the absence of either party.

Ms. Hayes, please be advised that the Department has notified me that this case is now assigned to Dennis DaCosta, Esq. He can be reached at (212) 374 6035. You may appear either with counsel or *pro se*. Ms. Hayes, please present your discovery demands to the Department's attorney prior to the Pre-Hearing Conference, if possible, so as to expedite the conference and so as to ensure that the case proceeds as per schedule. Finally, please be advised that the hearing will proceed whether you are able to be present or not, whether your are represented by counsel or not, and whether you are prepared to proceed or not.

Thanking you in advance for your cooperation, I remain

Very truly yours,

RANDI E. LOWITT
ARBITRATOR

***RANDI E. LOWITT***
***ARBITRATOR***
***11 BEACH STREET***
***NEW YORK, NEW YORK 10013***
***TEL: (908) 256 0091***
***FAX: (908) 234 1248***
relowitt@patmedia.net

**BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND BY REGULAR MAIL**

Ms. Lisa Hayes
105 Maplewood Road
Huntington Station, New York 11746

Dennis DaCosta, Esq.
Offices of Michael Best, General Counsel to the Chancellor
New York City Department of Education
Office of Legal Services
49-51 Chambers Street, 6th Floor
New York, New York 10007

March 27, 2008

RE: In the Matter of the New York City Department of Education, IS 61 v. Lisa Hayes
Section 3020-a Education Law Proceeding
SED File # 9,771

Dear Ms. Hayes and Mr. DaCosta:

I am in receipt of Ms. Hayes's letter of March 27 (although, given the date on the Priority Mail Envelope, I assume that it was meant to be dated March 26), in which letter Ms. Hayes states that "Because of very short notice, I don't have any legal representation," and in which letter Ms. Hayes "respectfully request(s) an adjournment of the Pre-Hearing Conference scheduled for Thursday, April 3, 2008 at 10:00 A.M." In light of the request, I am GRANTING THIS ADJOURNMENT. However, please be aware that THIS WILL BE THE ONLY ADJOURNMENT GRANTED. Therefore, please note the following revised schedule for the hearings in the above captioned case:

1. The hearings will occur at the offices of the Department of Education, 49-51 Chambers Street, 6th Floor.
2. The Pre-Hearing Conference on the case is rescheduled to go forward at 10:00 a.m., April 14, 2008.
3. The Hearing will begin on April 28, 2008. As a scheduling courtesy, be advised that the subsequent scheduled dates to be used for this hearing are April 30, May 6, and then May 7. Not knowing how many hearing days this case will take, please ensure that you

are available for all of the above dates, as well as any additional dates that may be necessary.

4. Article 21G2d of the Collective Bargaining Agreement between the parties provides as follows: *The parties are committed to having these cases heard in an expeditious manner. For this reason, absent extraordinary circumstances, arbitrators are not to adjourn hearing dates. It should be noted that normal attorney or party scheduling conflicts are not extraordinary circumstances.*
5. The hearings will proceed in the absence of either party.

Ms. Hayes, **given that I have delayed the pre-hearing conference by a few weeks and the hearing by a few additional weeks, I am giving you more than ample time to hire a lawyer. Therefore, the pre-hearing conference and the hearing will go forward irrespective of whether you are present and whether you are represented by counsel.** Please put these dates on your calendar and be certain to attend.

Please remember that the Department has assigned this case to Dennis DaCosta, Esq. He can be reached at (212) 374 6035. You may appear either with counsel or *pro se*. Ms. Hayes, please present your discovery demands to the Department's attorney **5 days prior** to the Pre-Hearing Conference, as that is when they are due, so as to expedite the conference and so as to ensure that the case proceeds as per schedule. Finally, and again as a reminder, please be advised that the hearing will proceed whether you are able to be present or not, whether you are represented by counsel or not, and whether you are prepared to proceed or not.

Thanking you in advance for your cooperation, I remain

Very truly yours,

RANDI E. LOWITT
ARBITRATOR

cc: Florence Chapin, Esq.

THE NEW YORK CITY DEPARTMENT OF EDUCATION
JOEL I. KLEIN, *Chancellor*

OFFICE OF THE CHANCELLOR
51 Chambers Street, Room 604 New York, NY 10007

March 27, 2008

Mr. Stuart E. Bauchner, Arbitrator
299 Riverside Drive- Apt. 6D
New York, New York 10025

**Re: Jane Levine**

Dear Mr. Bauchner:

Please allow this letter to serve as an acknowledgement of receipt on March 26, 2008 of a copy of Jane Levine's request for a stay in the referenced proceeding, dated March 14, 2008. Further, take notice that the Department shall not agree to any adjournment in Ms. Levine's case for the reasons set forth below. The Department will be ready to proceed with the hearing on the date(s) scheduled.

As you know, NYSUT has relieved itself from representing Ms. Jane Levine along with the other Plaintiffs in Teachers4Action, et al. v. Bloomberg, et al. S.D.N.Y. Index No. 08-CV- 54, based on apparent conflict of interest. It is my understanding that NYSUT is not providing Ms. Levine with alternative counsel and that she must retain and bring counsel at her own expense.

The Plaintiffs, including Ms. Levine, have been denied a stay of their proceedings pursuant to the March 25, 2008 memorandum decision of the Magistrate Judge, Honorable Andrew J. Peck. Further, denial of such requested relief was made with the court being fully aware that the Plaintiffs would be obliged to move forward without the benefit of counsel, as the same is clearly stated in Plaintiffs' counsel's motion.

Further, it is the Department's position that a 3020-a arbitrator does not have the authority to stay the proceeding and Ms. Levine would have to seek court intervention, which to this point has denied.

The Department shall not agree to any adjournment in Ms. Levine's case for the reasons set forth hereinabove. The Department will be ready to proceed with the hearing on the date(s) scheduled. Without the aforementioned court intervention, the Department shall proceed with the case.

The Department is asking the arbitrator to advise Ms. Levine that should she fail to appear, the hearing will proceed in her absence.

01/31/2016 19:50 FAX

003/003

Sincerely,

R. Joseph Coryat
New York City Department of Education
Office of Legal Services
Administrative Trials Unit

cc: Jane Levine
5-16 Dorothy Street
Fair Lawn, New Jersey 10025

Encl. :(1) Endorsed Memorandum and Transcription 3 pages

OFFICE OF LEGAL SERVICES * 52 CHAMBERS STREET * ROOM 308 * NEW YORK, NEW YORK 10007
Telephone: (212) 374-6888 * Fax: (212) 374-5596

Exhibit 6 - Miscellaneous

Page 10

THE NEW YORK CITY DEPARTMENT OF EDUCATION
JOEL I. KLEIN, *Chancellor*
OFFICE OF THE CHANCELLOR
110 Livingston Street - Brooklyn, NY 11201

March 24, 2008

**CERTIFIED AND REGULAR MAIL**

Ms. Olga Batyreva
2007 Surf Avenue
Apt. 15D
Brooklyn, NY 11224

**RE: DOE v. Olga Batyreva**

Dear Ms. Batyreva:

It has come to my attention that you have fired Mr. Edward Wolf as your attorney to represent you against the charges brought against you by the NYC Department of Education. I have also been informed that the New York United Teachers has declined your request that they represent you.

This letter is to advise you that the first day of hearing is scheduled for Monday, March 31, 2008. You must be present at the hearing on that day. Your presence is expected whether or not you have retained new counsel. If you have retained new counsel please have them contact me directly.

The hearing will be held at 49-51 Chambers Street, 6th floor at 10:00 a.m. The building is located between Centre St. and Broadway.

Sincerely,

Susan K. Jalowski, Esq.
Administrative Trials Unit
(212) 374 – 6756

Cc: Jack Tillem, Esq.

OFFICE OF LEGAL SERVICES •110 LIVINGSTON ST • RM 920 • BROOKLYN, NY 11201
Telephone:(718) 935-3690 • Fax:(718) 935-3625

UNITED STATES DISTRICT COURT:
SOUTHERN DISTRICT OF NEW YORK

IN RE:

TEACHERS4ACTION, an unincorporated Association

08-cv-548 (VM)

V.

MICHAEL G. BLOOMBERG, Et Al.

Howard A. Singer an attorney admitted to practice before the Courts of New York State and the Federal Courts therein, knowing the Penalties for perjury herby affirms as follows:

1. I am retained by the plaintiff association for the purpose of rendering legal advice to its members.

2. On March 10, 2008, I was advised by a member of the plaintiff association that Mr. Sidney Rubinfeld, a public school teacher and another Association member was scheduled to have a disciplinary hearing pursuant to section 3020-a of the New York State Education Law.

3. Since one of the possible outcomes of this type of hearing is loss of a tenured teaching position, I enquired whether he had an attorney to represent him and was advised that he did not believe he had one. The United Federation of Teachers (UFT) is obligated to provide an attorney for its members at these hearings.

4. Mr. Rubinfeld was under the impression that since the UFT was a defendant in this action, they would employ an outside attorney for him. Notwithstanding, he had not heard from anyone confirming this arrangement.

5. I then called and spoke with Claude Hirsch, Chief Counsel for the UFT who stated that he was familiar with Mr. Rubinfeld's problem but that the UFT would not supply him with an Attorney.

6. Next I called the Hearing Officer, Martin Sheinman, Esq. and discussed Mr. Rubinfeld's lack of counsel. His position was that the hearing would go on whether Mr. Rubinfeld was represented by counsel or not. He did say that if Mr. Rubinfeld obtained counsel, the hearing could be adjourned for a few days if that counsel requested it in order that he might prepare.

All of the foregoing was reported to the President of the Association and to Mr. Rubinfeld

Dated: March 11, 2008

Howard A. Singer (0320)

Exh. K

8/19/05

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/19/05

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ASSOCIATION OF HOLOCAUST VICTIMS FOR RESTITUTION OF ARTWORK AND MASTERPIECES, a/k/a "AHVRAM," ET AL.,

Plaintiff

-against-

BANK AUSTRIA CREDITANSTALT AG, ET AL.

Defendants.

04 Cv. 3600(SWK)

OPINION & ORDER

**SHIRLEY WOHL KRAM, U.S.D.J.**

Bank Austria Creditanstalt AG ("Bank Austria"), pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 12(b)(1) and 12(b)(6), moves to dismiss Plaintiff's First Amended Complaint ("Complaint"). Plaintiff opposes the motion to dismiss and "cross moves" for jurisdiction discovery, preservation of evidence, depositions de bene esse, limited production of documents, and other relief [sic]. Additionally, Defendant moves for sanctions pursuant to Fed. R. Civ. P. 11.

**BACKGROUND**

Beginning in 1998, several individual and class actions were filed against certain Austrian banks, including Bank Austria and Creditanstalt, in both the

Southern and Eastern Districts of New York, alleging that "the defendant banks had committed various torts and violations of international law arising out of the activities of the Nazis during and after World War II." In re Austrian and German Bank Holocaust Litig., 80 F. Supp. 2d 164 (S.D.N.Y. 2000). All of the actions were then consolidated into a single class action ("Class Action.")[1]

Four years ago, this Court approved a Class Action Settlement. In re Austrian and German Bank Litig., 80 F. Supp. 2d 164 (the "Bank Austria Settlement" or "Settlement"). The decision was affirmed by the Court of Appeals. D'Amato v. Deutsche Bank, 236 F.3d 78 (2d Cir. 2001). The $40 million settlement paid by Bank Austria was

---

[1] One of the cases consolidated was Watman v. Deutsche Bank, 98 Civ. 3938 (SWK)(the "Watman Action"), a class action for equitable and monetary relief stemming from the alleged unlawful receipt and conversion of stolen and/or looted assets and personal property, including "cash, securities, precious metals, jewelry, art treasures and family heirlooms, gold jewelry and gold coins" alleged to have been "deposited . . . into numbered or secret accounts and safe deposit boxes of the defendant German and Austrian banks." Watman, Am. Compl. ¶¶ 36-37. The Plaintiff Class included, inter alia, all victims of Nazi persecution and their heirs who, between 1933 and 1945 . . . had personal property looted from them or Aryanized by the Nazis or their co-conspirators and transferred to the defendant banks." Id. ¶ 15. Lead Counsel for plaintiffs in Watman was Edward D. Fagan. Mr. Fagan is also Plaintiff's counsel and claims to be a member of the purported association, AHVRAM, that has brought the instant action.

deposited into the Court's designated settlement fund and has been used to pay Holocaust survivors and their heirs.

**I. This Case Is Dismissed For Lack Of Subject Matter Jurisdiction**

After first circulating a draft of his Amended Complaint to journalists in Vienna, Austria, Mr. Fagan filed the instant action on May 11, 2004. See Memorandum of Law In Support of Defendant Bank Austria Creditanstalt AG's Motion To Dismiss The First Amended Complaint, dated November 8, 2004, at 8 n.8. Because he failed to properly serve the Defendant, he was given additional time to file an amended pleading, which he did on October 15, 2004. Initially, however, there was some confusion regarding the amended filing because Mr. Fagan had captioned it incorrectly. Finally, the motion to dismiss was fully briefed on January 6, 2005.

Because the procedural defects in this case are dispositive, no factual background will be provided. Plaintiff relies upon two alleged bases for subject matter jurisdiction: (1) the "laws of the City and State of New York, as well as violations of laws of nations and treaties of the United States," (Am. Compl. ¶ 49) and, "violations of International Law, including those as articulated and established by the International Court of Justice, the Law

of Nations, Jus Cogens [sic], treaties entered into by the United States and/or to which the United States is a signatory and are and have been declared cognizable and actionable in the Second Circuit." (Id. ¶ 53); and (2) this case "in part - calls for the Court to enforce and/or act upon certain aspects of" the prior Settlement Agreement in In Re Austrian and German Bank Holocaust Litig.[2]

By statute, "the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." See 28 U.S.C. § 1331. It is axiomatic that jurisdiction exists only "when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987). A well-pleaded complaint must establish "either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on a resolution of a substantial question of federal law." Frazier v. Turning Stone Casino, 254 F. Supp. 2d 295, 302 (N.D.N.Y. 2003). See also Princz v. Fed. Rep. Of Germany, 26 F.3d 1166, 1176 (D.C. Cir. 1994)(complaint seeking Holocaust reparations for

[2] Plaintiff (correctly) appears to have dropped its claim that diversity jurisdiction exists.

plaintiffs' concentration camp injuries sounded in tort and quasi contract, not federal law).

The Amended Complaint in this case does not assert any federal law claims, nor is any question of federal law, much less a substantial one, implicated by the common law claims the Amended Complaint seeks to plead.[3] Amazingly, apart from two passing references to international and treaty law, the Amended Complaint fails to make any specific reference to any federal law. Accordingly, Plaintiff's first proffered basis for jurisdiction is without merit.

Plaintiff's second alleged ground for subject matter jurisdiction, namely that this case "in part - calls for the Court to enforce and/or act upon certain aspects of" the prior Settlement Agreement in In Re Austrian and German Bank Holocaust Litig., is not only without legal basis, it is little more than an end run around the Bank Austria Settlement. While this Court, in its Final Order and Judgment in the Bank Austria settlement, did expressly retain "continuing jurisdiction over the Settlement and

[3] While Count 12 of the Amended Complaint seeks a declaratory judgment, the Declaratory Judgment Act, 28 U.S.C. § 2201, cannot, in the absence of a controversy involving a federal question, confer federal question jurisdiction. Tasini v. New York Times Co., 184 F. Supp. 2d 350, 358 n. 12 (S.D.N.Y. 2002).

Settlement Agreement," see Final Order and Judgment ¶ 5, that settlement cannot confer subject matter jurisdiction here because this is an entirely separate action requiring an independent jurisdictional basis. See, e.g., Peacock v. Thomas, 516 U.S. 349, 355 (1996)("In a subsequent lawsuit involving claims with no independent basis for jurisdiction, a federal court lacks the threshold jurisdictional power that exists when ancillary claims are asserted in the same proceeding as the claims conferring federal jurisdiction"). Indeed, Plaintiff spends the first fifteen pages of an entirely sloppy, misleading and unresponsive brief[4] trying to get out from the Settlement, only then to opportunistically invoke that same 1998 agreement in a vain effort to salvage jurisdiction. In any event, it is abundantly clear that there is no subject matter jurisdiction; accordingly, the case is dismissed.[5]

**II. Plaintiff's Cross-Motion Is Denied**

Plaintiff moves for jurisdictional discovery, preservation of evidence, depositions de bene esse and limited production of documents. These requests are, in

---

[4] Apparently conceding the point, Plaintiff's opposition papers completely ignore Defendant's challenges to subject matter jurisdiction.

[5] Because of the jurisdictional bar, the Court does not reach the issue of whether the 1998 Settlement Agreement precludes this action; Plaintiff's effort to circumvent that agreement is, however, discussed, infra, at 10-15.

addition to being without basis in the law, mooted by the lack of subject matter jurisdiction. They are denied.

**III. The Motion To Impose Sanctions Is Granted**

On February 10, 2005, Defendant, in a detailed and lengthy memorandum, moved, pursuant to Fed. R. Civ. P. 11(b) and 28 U.S.C. § 1927, to impose sanctions on Plaintiff and its principal counsel and co-Plaintiff, Edward D. Fagan. Remarkably, as of the date of this writing, over six months after the sanctions motion was filed, Mr. Fagan has not responded.

**A. Standard For Sanctions Under Rule 11 and 28 U.S.C. § 1927**

Rule 11, which is designed to deter baseless filings and curb abusive litigation, imposes an affirmative duty to conduct a reasonable inquiry into the factual and legal viability of claims. Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 253 (2d Cir. 1985). It requires an attorney to sign every pleading or other paper filed with the court. The signature "certifies to the court that the signer has read the document, has conducted a reasonable inquiry into the facts and the law and is satisfied that the document is well grounded in both, and is acting without any improper motive." Business Guides, Inc. v. Chromatic Communications Enters., 498 U.S. 533, 542 (1991).

Rule 11 is intended to ensure that an attorney will "stop, think and investigate" before filing "baseless papers." Cooter & Gell v. Hartmax Corp., 496 U.S. 384, 398 (1990).

Under Rule 11, sanctions may be imposed on a person who signs a pleading, motion, or other paper for an improper purpose such as to delay or needlessly increase the cost of litigation, or does so without a belief, formed after reasonable inquiry, that the position espoused is factually supportable and is warranted by existing law or a nonfrivolous argument for the extension, modification, or reversal of existing law. See Caisse Nationale de Credit Agricole-CNCA, New York Branch v. Valcorp., 28 F.3d 259, 264 (2d Cir. 1994).

When a district court determines that Rule 11(b) has been violated, it may impose sanctions. Fed. R. Civ. P. 11(c). Both monetary and non-monetary sanctions are permitted. Fed. R. Civ. P. 11(c)(2). In fashioning a sanctions order, the Advisory Committee notes suggest the following considerations: (1) whether the improper conduct was willful or negligent; (2) whether it was part of a pattern of activity, or an isolated event; (3) whether it infected the entire pleading, or only one particular count or defense; (4) whether the person has engaged in similar conduct in other litigation; (5) whether it was intended to

injure; (6) what effect it had on the litigation process in either time or expense; (7) whether the responsible person is trained in law; (8) what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; and (9) what amount is needed to deter similar activity by other litigants. See Rule 11(c) Advisory Comm. Notes (1993).

Separate from Rule 11, a district court has the inherent authority to sanction parties appearing before it for acting in bad faith, vexatiously, wantonly, or for oppressive reasons. See Sassower v. Abrams, 833 F.Supp. 253, 272 (S.D.N.Y. 1993). The Court's inherent power to sanction stems from the very nature of the courts and their need to be able to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. Id.

Additionally, 28 U.S.C. § 1927 provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "To impose sanctions under either authority, a court must find clear evidence that (1) the offending party's claims were entirely without color,

and (2) the claims were brought in bad faith—that is, 'motivated by improper purposes such as harassment or delay.'" Eisemann v. Greene, M.D., 204 F.3d 393, 396 (2d Cir. 2000). There must be a showing of subjective bad faith on the part of the offending attorney. Ted Lapidus, S.A. v. Vann, 112 F.3d 91, 96 (2d Cir. 1997). However, bad faith "can be inferred when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." Vacco v. Operation Rescue Nat'l, 80 F.3d 64, 72 (2d Cir. 1996)(internal quotation marks omitted).

**B. Edward D. Fagan's Conduct In This Litigation Clearly Warrants Sanctions**

Mr. Fagan's actions in this case go far beyond (but certainly include) a lack of preparation and lack of professionalism. In addition to glaringly inadequate filings, utter disregard for the court, its schedule, and the rules of procedure, it is obvious that Mr. Fagan has misrepresented critical facts.[6]

[6] While the jurisdictional bar prevents the Court from determining whether the instant lawsuit is legally barred by the Bank Austria Settlement, to address the Rule 11 and § 1927 applications, the Court must look at that Settlement.

In ¶ 271 of the Amended Complaint, Mr. Fagan asserts that the word "ARTWORK"[7] does not appear in the Settlement Agreement and Release because "the 1998 Claims related EXCLUSIVELY to bank accounts, monies or assets . . . ." Id. ¶ 275. This is totally false. The Settlement Agreement and Release defines "Released Claims" to include, inter alia, claims for "Looted and/or Aryanized Assets," (Settlement Agreement ¶ 1(B)), which specifically include "any and all personal . . . property, including . . . silver, gold, jewelry . . . [and] art masterpieces." Class Action Compl. ¶ 17.[8]

In the instant case, Mr. Fagan also asserts that an alleged scheme to defraud occurring from "the 1950s to the present" falls outside the scope of the Settlement. Am. Compl. at 23 n.3. Again, Mr. Fagan's claim is belied by the Settlement, which states that "actions, conducts, or omissions on or subsequent to January 1, 1947 that result

---

[7] Numerous words and phrases in Mr. Fagan's papers are capitalized, italicized, boldfaced, or underlined. At times, this appears to be for emphasis; however, at other times, it appears entirely random. In any event, the Court refers herein to words and phrases as they appear in Mr. Fagan's submissions.

[8] Further, Mr. Fagan's complaint in the Austrian and German case, Watman, alleged that "cash, securities, precious metals, jewelry, art treasures and family heirlooms, gold jewelry and gold coins" were "deposited . . . into numbered or secret accounts and safe deposit boxes of the defendant German and Austrian banks." See 11/08/04 Moerdler Decl. Ex. 17, Watman Am Compl. ¶¶ 36-37.

from, arise out of or relate to the actions, conduct, or omissions of the Releasees prior to January 1, 1947" are explicitly covered by the Agreement. Settlement Agreement ¶ 7. Moreover, according to that same agreement, the parties specifically agreed that Bank Austria would be released from all claims "from the beginning of time to the date of this Agreement" relating to Holocaust-era conduct and the claims in the Consolidated Class Action Complaint, including those related to "looted and/or Aryanized Assets," which include "art masterpieces." In light of that release, it is, quite frankly, incomprehensible that Mr. Fagan would initiate the instant action.

Mr. Fagan's deceptions are not limited to the above. Despite his representation that AHVRAM, the purported entity of which he claims to be a member and brings this suit on behalf of, "was formed," Am. Compl. at 1 n.1, there is, according to the Defendant, no record of such an entity being formed in New York State as of the filing of the Amended Complaint.[9] See Memorandum In Support of Defendant Bank Austria Creditanstalt AG's Motion To Impose Sanctions, dated February 10, 2005, at 19-20. To that end, Mr. Fagan

[9] As of this writing, Mr. Fagan has offered no evidence that AHVRAM does, or for that matter, has ever, existed.

appears to be seeking damages on behalf of a fictitious entity.

Perhaps most seriously, however, Mr. Fagan is proceeding in direct violation of New York's Champerty Statute and Applicable Disciplinary Rules. Champerty is defined as "maintaining a suit in return for financial interest in the outcome." In re Primus, 436 U.S. 412, 425 n. 15 (1978). Section 488 of the New York Judiciary Law provides, in pertinent part, that:

> An attorney or counselor shall not:
>
> 1. Directly or indirectly, buy, take an assignment of or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, with the intent and for the purpose bringing an action thereon. . .
>
> 3. An attorney or counselor who violates the provisions of this section is guilty of a misdemeanor.

N.Y. Jud. Law § 488 (McKinney 1983). Thus, under New York law, attorneys are prohibited from purchasing an interest in an action where the primary purpose is "to enable the attorney to commence a suit thereon." Sprung v. Jaffe, 3 N.Y. 2d 539, 540 (1957).

In addition, New York Disciplinary Rule 5-103 states in pertinent part that:

> A lawyer shall not acquire a proprietary interest in the cause of action or subject

> matter of litigation he or she is conducting for a client, except that the lawyer may: 1. Acquire a lien granted by law to secure the lawyer's fee or expenses. 2. Except as provided in DR 2-106 [1200.11](C)(2) or, 3. Contract with a client for a reasonable contingent fee in a civil case.

DR 5-1903.

In the Amended Complaint, Mr. Fagan claims to possess "interests in certain of The Stolen Artwork and/or Collections, including but not limited to portions of the Hatvany Collections" by virtue of "Plaintiffs Deutsch who sold and/or transferred to Fagan portions of interests acquired from Hatvany's Heirs in 1973." Am. Compl. ¶¶ 27-28. Accepting Mr. Fagan's allegations as true, it is clear that he acquired these "claims" for the sole purpose of bringing this action. Moreover, by acquiring this proprietary interest in the litigation, Fagan has, at the very least, run afoul of the disciplinary rules.

In light of the preceding, and in accordance with Rule 11, 28 U.S.C. § 1927 and the factors set forth in the Advisory Committee Notes, the Court finds that: (1) Mr. Fagan's claims in this matter are entirely without color; and (2) the claims were brought in bad faith. See Eisemann, 204 F.3d at 396. Though independently each of the following would be sufficient to find bad faith, certainly when aggregated, Mr. Fagan's scattershot

pleadings, his disregard for the court and its rules, his flagrant misrepresentations in the Amended Complaint, his circumvention of the Bank Austria Settlement, and his attempt to profit by buying into the litigation constitute subjective bad faith. Id.; Ted Lapidus, S.A., 112 F.3d at 96. Such a finding is only bolstered by the fact that this case appears to be part of a pervasive and disturbing trend.[10] Additionally, as a graduate of Cardozo Law School with 25 years in practice, Mr. Fagan's conduct is simply inexcusable. Accordingly, pursuant to Rule 11, this Court's inherent power, and 28 U.S.C. § 1927, Edward D. Fagan is hereby formally sanctioned.

In accordance with the formal sanctions, the Court also orders the following:

1. Mr. Fagan is to pay all of to Bank Austria's reasonable litigation costs and fees in connection with this action;[11]

2. Mr. Fagan is fined $5,000.00, which is due immediately, and should be remitted to the Clerk of the Court, United States District

---

[10] At minimum, Mr. Fagan, through AHVRAM, is pursuing cases against Bank Austria, the Russian Federation, the Republic of Germany, the Republic of Hungary, the United States of America, and Sotheby's Holdings.

[11] Bank Austria should, within 21 days of receipt of this Opinion & Order, submit its fees and costs to the Court.

Court, Southern District of New York, 500 Pearl Street, New York, NY 10007.[12]

[12] While the Court, at this time, declines to enjoin Mr. Fagan from filing any actions in federal court related to In re Austrian and German Bank Holocaust Litigation without first seeking permission, the Court may revisit that issue should Mr. Fagan (or any other "association" of which he is purportedly a member), continue to initiate harassment suits.

SO ORDERED.

SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE

Dated: New York, New York
August 19, 2005

Exh. L

11/16/05

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ASSOCIATION OF HOLOCAUST VICTIMS FOR RESTITUTION OF ARTWORK AND MASTERPIECES, a/k/a "AHVRAM," ET AL.,

Plaintiff

-against-

BANK AUSTRIA CREDITANSTALT AG, ET AL.

Defendants.

04 Civ. 3600(SWK)

**OPINION & ORDER**

**SHIRLEY WOHL KRAM, U.S.D.J.**

In May 2004, the Association of Holocaust Victims for Restitution of Artwork and Masterpieces ("AHVRAM") and several individuals (collectively "Plaintiffs") filed a $6.8 billion lawsuit against various corporations, governmental entities, and financial institutions, including Bank Austria Creditanstalt AG ("Bank Austria"), alleging the theft, retention, and sale of artwork looted during the Holocaust. On August 19, 2005, this Court dismissed Plaintiffs' complaint ("August 19 Order"). Ass'n of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG, No. 04 Civ. 3600, 2005 U.S. Dist. LEXIS 17411, at *7 (S.D.N.Y. Aug. 19, 2005). In addition, the Court granted Bank Austria's request for sanctions against

Plaintiffs' counsel, Edward D. Fagan, ordered Mr. Fagan to pay Bank Austria's fees and costs, and fined him $5,000. Id.

Plaintiffs now move for reconsideration of the August 19 Order, leave to amend their complaint, and a stay of the Court's judgment.[1] For the reasons set forth below, the Court denies or dismisses all motions. In addition, the Court establishes the amount of fees and costs due to Bank Austria, and orders Mr. Fagan to pay his fine to the Court immediately.

**I. Plaintiffs' Moving Papers**

On September 16, 2005, Plaintiffs filed a "Notice of Motion Pursuant to FRCP Rule 60," requesting reconsideration of the August 19 Order, leave to amend their complaint, and a stay of the Court's judgment ("Notice of Motion for Reconsideration"). (Pls.' Notice of Mot. Pursuant to FRCP Rule 60, Sept. 16, 2005.) Additionally, Plaintiffs submitted an affidavit signed by Edward D. Fagan ("Fagan Affidavit"). (Fagan Aff. September 16, 2005.) However, Plaintiffs failed to submit a memorandum of law in support of their motion. The Court recognized the omission and, on September 28, 2005, granted Plaintiffs until October 7, 2005 to supplement the motion. As of this Opinion, Plaintiffs have neither submitted supplemental materials nor requested a further

[1] The background of this litigation, and a discussion of the conduct underlying the Court's order of sanctions, is contained in the August 19 Order. Only those facts necessary to the issues presented in this motion are repeated below.

extension. Consequently, the Court decides Plaintiffs' motion on the basis of the papers currently before it.

**A. Plaintiffs' Motion for Reconsideration is Denied**[2]

Plaintiffs move for reconsideration of the August 19 Order "based upon newly discovered evidence and for other equitable reasons" pursuant to Federal Rule of Civil Procedure 60. (Pls.' Notice of Mot. Pursuant to FRCP Rule 60, at 2.) Although Plaintiffs do not specify the subsections of Rule 60 that they believe are applicable, their moving papers only appear relevant to part (b), subsections (2) and (6).

Under Rule 60(b)(2), a party may move the court to reconsider an order when the party presents "newly discovered evidence which by due diligence could not have been discovered" prior to the order. Fed. R. Civ. P. 60(b)(2). "In order to succeed on a motion pursuant to Rule 60(b)(2), the movant must present evidence that is 'truly newly discovered or . . . could not have been found by due diligence.'" See United States v. Potamkin Cadillac Corp., 697 F.2d 491, 493 (2d Cir. 1983) (quoting Westerly Elecs. Corp. v. Walter Kiddie & Co., 367 F.2d 269, 270 (2d Cir. 1966)), cert denied, 462 U.S. 1144 (1983). New

---

[2] Plaintiffs recently appealed the decision underlying this motion for reconsideration. See infra note 4. While the district court may not grant a Rule 60(b) motion without the appellate court's permission once the appellate court has taken an appeal, "the district court can entertain and deny the rule 60(b) motion." Toliver v. County of Sullivan, 957 F.2d 47, 49 (2d Cir. 1992) (per curiam).

evidence offered in support of the motion must be "highly convincing." Kotlicky v. United States Fid. & Guar. Co., 817 F.2d 6, 9 (2d Cir. 1987) (citation omitted).

In support of their motion, Plaintiffs rely on the Fagan Affidavit, which is largely a personal narrative recounting the formation of AHVRAM, clarifying the organization's goals, and restating the merits of the complaint. (Fagan Aff. ¶¶ 3-23, 29-39, 76-82.) These portions of the affidavit present no newly discovered evidence, and are more naturally read as a long overdue response to Bank Austria's motion for sanctions, which challenged the existence of AHVRAM and the validity of the complaint. (Mot. to Impose Sanctions, Mar. 7, 2005.) Because this "evidence" is in no sense newly discovered, it clearly does not comprise proper grounds for reconsideration.

The Fagan Affidavit also alleges that evidence relating to the substance of their complaint has been discovered "since late 2003/2004" (Fagan Aff. ¶ 40) and "in the last few weeks, months, and years" (Fagan Aff. ¶ 69). However, the Affidavit fails to distinguish evidence that was "truly newly discovered" after the Court's August 19 Order from evidence that Plaintiffs discovered in the "months" and "years" before that Order. Even assuming that the Fagan Affidavit alleges any evidence not in Plaintiffs' possession prior to the Court's Order, the Fagan Affidavit fails to explain why any of the allegedly new evidence "could not have

been found by due diligence" other than to suggest, without documentation, the existence of "a conspiracy at the highest levels of government." (Fagan Aff. ¶¶ 50, 71-75.) Plaintiffs' vague explanations for why evidence was not offered earlier are unconvincing and unsubstantiated, leading this Court to "reject the explanations and to consider the 'evidence' not newly discovered." Potamkin Cadillac Corp., 697 F.2d at 493.

Moreover, the Fagan Affidavit's "unsubstantiated conclusory allegations" of new evidence are not "highly convincing," and warrant no change from the Court's prior ruling.[3] Long v. Carberry, 151 F.R.D. 240, 244 (S.D.N.Y. 1993). Plaintiffs' new evidence fails to cure the complaint's "'fundamentally preliminary' defect[:] lack of subject matter jurisdiction." Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A., 606 F.2d 5, 6 (2d Cir. 1979). To warrant reconsideration of their complaint, Plaintiffs must present new evidence providing some indication of the action's jurisdictional basis. Not a single paragraph of the Fagan

---

[3] For example, Plaintiffs purport to have evidence "show[ing] that every individual, institution, government and/or governmental entity involved in the conspiracy against Prof. Hans Deutsch my father [sic] was paid, and/or received something of benefit or value" (Fagan Aff. ¶ 64), but fail to allege any specific transactions. Plaintiffs also offer, "[b]y way of example, Hungarian and Austrian entities and government [sic] received or kept important paintings and collections and/or received monies" (Fagan Aff. ¶ 65), but provide no further detail.

Affidavit bears upon the complaint's jurisdictional deficiency. In short, even if newly discovered, "the evidence presented in the [Fagan Affidavit] itself would not justify overturning the prior decision." In re Joint E. & S. Dist. Asbestos Litig., 774 F. Supp. 116, 120 (S.D.N.Y. 1991).

Under Rule 60(b)(6), a court also has discretion to grant reconsideration of an order for "any other reason justifying relief." Fed. R. Civ. P. 60(b)(6). Relief under Rule 60(b)(6) "is properly invoked where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship." Matarese v. LeFevre, 801 F.2d 98, 106 (2d Cir. 1986) (citations omitted), cert. denied, 480 U.S. 908 (1987). Plaintiffs' submissions provide no support for reconsideration under either of these exceptional grounds. Accordingly, reconsideration under this subsection is inappropriate.

In light of Plaintiffs' failure to present "highly convincing," newly discovered evidence within the meaning of Rule 60(b)(2), and because the Court finds no other reasons justifying reconsideration of its previous Order, Plaintiffs' motion for reconsideration is denied.

**B. Plaintiffs' Request for Permission to File a Second Amended Complaint Is Dismissed for Lack of Jurisdiction**

Plaintiffs also request permission to file a second amended complaint pursuant to Federal Rule of Civil Procedure 15. (Pls.'

Notice of Mot. Pursuant to FRCP Rule 60, at 2.) Due to Plaintiffs' recently filed notice of appeal,[4] the Court is currently without jurisdiction to permit an amendment. See Hernandez v. Coughlin, 18 F.3d 133, 138 (2d Cir. 1994); Denny v. Barber, 576 F.2d 465, 468 (2d Cir. 1978). Consequently, Plaintiffs' request is dismissed.

**C. Plaintiffs' Request for a Stay is Denied**

Finally, Plaintiffs request a stay of the judgment pending their appeal to the Second Circuit.[5] Pursuant to Federal Rule of

---

[4] On September 15, 2005, Plaintiffs appealed the August 19 Order to the Federal Circuit. (Pls.' Not. of Appeal, Sept. 15, 2005.) Apparently recognizing that they filed their appeal with the wrong Circuit, Plaintiffs filed an amended notice of appeal to the Second Circuit two weeks later, this time appealing the August 29, 2005 Judgment of the Court. (Pls.' Am. Not. of Appeal, Sept. 28, 2005.) Whether Plaintiffs' amended notice of appeal is judged to relate back to the original notice of appeal or is considered on its own merits, Plaintiffs' appeal appears to be timely. Fed. R. App. P. 4(a)(1)(A) (allowing 30 days for timely notice of appeal).

[5] The caption of Plaintiffs' Notice of Motion for Reconsideration includes a subsidiary request "for a stay of the August 19, 2005 Opinion & Order," but the body of that document fails to specify the authority by which the stay is requested. The Court construes the motion as seeking a stay of the August 29, 2005 Judgment, rather than the August 19 Order; thus, the automatic 10-day stay provided for in Fed. R. Civ. P 62(a) expired on September 12, 2005, four days before Plaintiffs filed this Motion. A stay pursuant to Fed. R. Civ. P. 62(b), pending disposition of Plaintiffs' Rule 60 motion, is also inappropriate because the Court has disposed of the Rule 60 motion in this very Opinion. Ultimately, the Fagan Affidavit is made in support of "a Stay pending appeal" (Fagan Aff. ¶ 1) and, though Plaintiffs did not properly file an appeal with the Second Circuit until two weeks after this motion, see supra note 4, the Court construes the motion as requesting a stay of the judgment pending the September 28, 2005 appeal.

Civil Procedure 62(d), upon posting a supersedeas bond, a moving party may obtain a stay of judgment pending appeal. See Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., No. 99 Civ. 9294, 2003 WL 22048775, at *1 (S.D.N.Y. Sept. 2, 2003). The Court's August 29, 2005 Judgment requires Plaintiffs' counsel, Mr. Fagan, to pay a $5,000 fine and Bank Austria's reasonable attorney's fees and costs. At this time, Mr. Fagan has neither posted, nor expressed a willingness to post, a supersedeas bond.

The Court may, in its discretion, grant a stay without requiring a supersedeas bond. Marcoux v. Farm Serv. & Supplies, Inc., 290 F. Supp. 2d 457, 485 (S.D.N.Y. 2003). In evaluating the applicability of this narrow exception, a court considers (1) whether movants are likely to prevail on the merits of their appeal; (2) whether, without a stay, movants will be irreparably injured; (3) whether issuance of a stay will substantially harm other parties interested in the proceedings; and (4) where the public interest lies. De la Fuente v. DCI Telecomms., Inc., 269 F. Supp. 2d 237, 240 (S.D.N.Y. 2003) (citing Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). "The party seeking the stay without a bond has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond in the full amount of the judgment." Id.

To evaluate whether Plaintiffs' submission supports a waiver of the bond requirement, the Court looks to the Fagan Affidavit. Regarding the first Hilton factor, the Fagan Affidavit does not address the grounds for dismissal and simply denies that Mr. Fagan's actions warranted sanctions. (Fagan Aff. ¶¶ 79-82). Unsupported denials of liability and a complete failure to contest or attempt to cure the complaint's deficiencies are insufficient to show Plaintiffs' likelihood of success on appeal. Furthermore, nothing in the Fagan Affidavit can be construed to have any bearing on the final three Hilton factors, all of which Plaintiffs have the burden to establish.

In conclusion, because Plaintiffs have failed to post bond to obtain a stay of the judgment and provide insufficient support for the Court to discretionarily waive the bond requirement, the request for a stay of the judgment is denied.[6]

**II. Mr. Fagan's Liability for Bank Austria's Fees and Costs**

On August 19, 2005, the Court sanctioned Mr. Fagan, citing his attempted circumvention of an earlier Bank Austria settlement, his conduct during the course of litigation, and his apparently champertous stake in the action. The Court ordered Mr. Fagan to pay Bank Austria's reasonable litigation fees and

[6] Upon posting a supersedeas bond, Plaintiffs are still entitled to an automatic stay of the judgment. Marcoux, 290 F. Supp. 2d at 485. However, Plaintiffs are required to post bond in the full amount of the judgment. See Harris v. Butler, 961 F. Supp. 61, 62 (S.D.N.Y. 1997).

costs in connection with this action. Ass'n of Holocaust Victims for Restitution of Artwork & Masterpieces, 2005 U.S. Dist. LEXIS 17411, at *12-18 (S.D.N.Y. Aug. 19, 2005). In compliance with the Court's Order, Bank Austria submitted a complete list of the attorney's fees recorded and the costs incurred during its defense of the lawsuit. (Moerdler Decl. Ex. A Sept. 8, 2005.) Alhough Mr. Fagan did not oppose Bank Austria's fee application, the Court feels duty-bound to ensure that the amount of attorney's fees sought is reasonable. Cf. In re Texaco, Inc. S'holder Litig., 20 F. Supp. 2d 577, 589 (S.D.N.Y. 1998) (opining that courts "are obliged to carefully scrutinize applications for counsel fees"), rev'd on other grounds sub nom. Kaplan v. Rand, 192 F.3d 60 (2d Cir. 1999).

**A. Calculating Reasonable Attorney's Fees and Costs**

When assessing attorney's fees as a sanction under Rule 11, district courts in this Circuit often use the "lodestar" method to evaluate the reasonableness of fees. See, e.g., Kirschner v. Zoning Bd. of Appeals of Valley Stream, 159 F.R.D. 391, 395 (E.D.N.Y. 1995). "That method initially estimates the amount of the fee award by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate." Id. at 396 (citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 563 (1986)).

In establishing a reasonable hourly rate, "district courts generally must apply prevailing market rates for comparable attorneys of comparable skill and standing in the pertinent legal community." Savoie v. Merchants Bank, 166 F.3d 456, 463 (2d Cir. 1999). "It is well-established that the prevailing community the district court should consider to determine the lodestar figure is the district in which the court sits." Luciano v. Olsten Corp., 109 F.3d 111, 115 (2d Cir. 1997).

Bank Austria is represented by Stroock & Stroock & Lavan ("Stroock"), a national law firm headquartered in New York City. Stroock commonly represents clients in high-stakes corporate litigation, and the current case is no exception. After representing Bank Austria in its settlement of Holocaust claims over the past several years, negotiations in which Mr. Fagan was intimately involved, Stroock was again called on to defend Bank Austria against the instant complaint and its $6.8 billion prayer for relief. (Am. Compl. ¶¶ 279-89.) Stroock staffed the massive lawsuit with eight different lawyers, ranging from first- and second-year associates to partners and counsel with nearly fifty years of complex litigation experience. (Moerdler Decl. ¶ 7.) Though Bank Austria provides the exact billing rates for each of the attorneys involved in the case,[7] it limits its

[7] Billing rates for Stroock attorneys vary from $245 per hour for first- and second-year associates to $730 per hour for senior

request to $350 per hour for partners staffed on the case and $300 per hour for associates.

While $350 per hour for partners engaged in high-stakes corporate litigation is certainly a reasonable rate, and $300 per hour for mid- to senior-level associates is within reason, see, e.g., Berlinsky v. Alcatel Alsthom Compagnie Generale D'Electricite, 970 F. Supp. 348, 351 (S.D.N.Y. 1997) (awarding $365 per hour to senior associates and up to $495 per hour for seasoned partners); Auscape Int'l v. Nat'l Geographic Soc., No. 02 Civ. 6441, 2003 WL 21976400, at *5 (S.D.N.Y. Aug. 19, 2003) (awarding $215-$495 per hour for associates and partners at a large national law firm), the Court will reduce the hourly rate for hours expended by the two junior associates staffed on the case. For first- and second-year associates, the Court reduces the hourly rate to $225 per hour.[8]

The Court continues its analysis by reviewing the number of hours expended on the litigation. Bank Austria indicates that the eight attorneys assigned to the case expended a total of

---

partners with decades of litigation experience. (Moerdler Decl. ¶ 7.)

[8] The Court recognizes that Bank Austria blended the hourly rates for associates of varying levels of experience. Given the detailed time records Bank Austria has provided, however, the Court is able, and so chooses, to set an exact hourly rate for different classes of associates. The $225 rate used in this Opinion is in line with prevailing authority in this district and nearer the rate Stroock typically bills for its junior associates. (Moerdler Decl. ¶ 7.)

1,309.1 hours. (Moerdler Decl. ¶ 8.) This time was spent drafting several revisions of the motion to dismiss, drafting a motion to quash, and preparing the Rule 11 motion. According to Bank Austria, the fees, billed at customary hourly rates, reached $626,145.00. (Moerdler Decl. ¶ 9.) Under the $350/$300 rate structure detailed in the fee application, Bank Austria would be entitled to $414,895.00 in fees. (Moerdler Decl. ¶ 8.) After reducing the junior associates' hourly rate to $225 per hour, the lodestar amount comes to $404,838.00.

Stroock's records begin on April 1, 2004, the day of Mr. Fagan's Austrian news conference, and end on May 12, 2005, nearly two months after Bank Austria filed its motion for sanctions against Mr. Fagan. While it may be reasonable, and perhaps even wise, to begin preparing for an imminent filing and to monitor the case after formal court submissions have concluded, it is not clear that this time is compensable under Rule 11. The Court would have no power to sanction Mr. Fagan if he had never filed the complaint, Fed. R. Civ. P. 11(b) (limiting sanctionable conduct to representations to the court), and thus it declines to make Mr. Fagan liable for any hours prior to Plaintiffs' filing of the complaint or after Bank Austria filed its motion for sanctions. The removal of the 40.5 hours expended on or before May 11, 2004, and the 0.7 hours

spent after March 7, 2005 reduces the total number of hours to 1,267.9 and the lodestar figure to $390,898.00.

Additionally, while Stroock's fee application does an exemplary job of breaking its hours down by attorney and day, there are a number of time entries that utilize "block billing."[9] While not prohibited, block billing has a tendency to obfuscate the amount of time expended on distinct tasks and introduces an element of vagueness into a fee application, making it difficult to determine if the reported hours are "duplicative or unnecessary." Sea Spray Holdings, Ltd. v. Pali Financial Group, Inc., 277 F. Supp. 2d 323, 325-26 (S.D.N.Y. 2003). Vagueness also plagues a number of time entries that are simply described as "[a]ttention to" a certain task or "research on various issues." See Vishipco Line v. Charles Schwab & Co., No. 02 Civ. 7823, 2003 WL 1936142, at *2 (S.D.N.Y. Apr. 23, 2003); In re Spectre Group, Inc., 185 B.R. 146, 161 (Bankr. S.D.N.Y. 1995).

---

[9] Block billing refers to a single time entry that includes a variety of distinct tasks. See Rodriguez v. McLoughlin, 84 F. Supp. 2d 417, 425 (S.D.N.Y. 1999). Block billing makes it difficult for the court to allocate time to individual activities in order to gauge the reasonableness of time expended on each activity. For instance, a time entry on December 17, 2004 is described as follows: "Continued review of papers in opposition to motion to dismiss and e-mail to litigation team re reply to same; revision of new draft of papers on motion to quash service of process and circulation of same; attention to e-mail with Van Geldern re declaration." (Moerdler Decl. Ex. A at 22.) As this covers time expended on two, or perhaps three, discrete tasks, the Court is at pains to allocate the time expended on each task and make a judgment as to reasonableness.

While the Court recognizes that these time entries may well document legitimate work, there is inadequate detail to transfer all of these fees to Mr. Fagan.

In part because of these instances of block billing and vagueness, the Court is unable to accurately break the fee application into the individual tasks of which it is comprised. In the Court's estimate, Bank Austria spent 623.8 hours drafting the initial version of its motion to dismiss, 189.1 hours revising its motion to dismiss after Plaintiffs filed the amended complaint, 334.63 hours on its motion for Rule 11 sanctions, 62.98 hours on its motion to quash, and 57.38 hours in reply to Plaintiffs' opposition to the motion to dismiss.[10] Based on these tentative figures, the Court is concerned that the number of hours billed may exceed what was reasonably required for the tasks at hand. See Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir. 1992).

First, the Court is concerned that the 812.9 hours spent on multiple drafts of the motion to dismiss were excessive. The complaint was ultimately dismissed on jurisdictional grounds,

---

[10] The Court reaches these numbers by splitting the billing record into tasks according to the dates on which certain motions were filed or work was documented to have begun on a new task. In cases where several tasks overlap, as is the case with the reply brief, motion to quash, and motion for sanctions, the Court divided the overlap period by the number of tasks being worked on at that time. The Court recognizes that this method leaves some accuracy to be desired, but makes its best effort based on the information provided.

and the motion to dismiss focused primarily on the finality of the earlier settlement, jurisdictional arguments, and a lengthy recounting of Mr. Fagan's related lawsuits. While time-consuming evaluation of the earlier settlement and the issues raised by the instant complaint was necessary, comprehensive briefing of complex legal issues was minimal. Additionally, the 300-plus hours spent on the motion for sanctions seems an unwieldy percentage of the total number of hours spent throughout the course of litigation. Essentially, for every three hours spent defending Plaintiffs' action, Bank Austria spent another hour putting together its motion for sanctions. Mr. Fagan's conduct was flagrant, repetitive, and blatant. Bank Austria's motion for sanctions was meticulous and helpful, but the Court hesitates to find that the 334.63 hours spent on the motion were reasonable.

On the other hand, Bank Austria was confronted by the type of lawsuit that is often described as "bet the firm" litigation. Plaintiffs demanded $6.8 billion and were represented by a lawyer that played a substantial role in a multi-million dollar settlement with Bank Austria just years earlier. Putting up an aggressive, and ultimately successful, fight was a reasonable course of action. Cf. Landscape Props., Inc. v. Whisenhunt, 127 F.3d 678, 685 (8th Cir. 1997) (upholding an arguably excessive award to attorneys that defended against frivolous claims, because "the attorneys could not know how the district court

would view the case or their contentions, and they therefore reasonably determined that a careful and through preparation was necessary"). Indeed, the Court would expect Bank Austria to zealously protect the earlier settlement. Moreover, the defense efforts required by Bank Austria were multiplied by Mr. Fagan's conduct throughout the litigation and the broad, imprecise scope of the complaint.[11] The Court also notes that Bank Austria has not sought reimbursement for "time billed by the summer associates, paralegals and librarian-research assistants who worked on the case" (Moerdler Decl. ¶ 5) and has reduced the billing rates of its attorneys. (Moerdler Decl. ¶ 3.) Even still, some reduction for excess is appropriate.

In order to account for these instances of block billing, vagueness, and excess, the Court will reduce the lodestar figure. It is common practice in this Circuit to reduce a fee award by an across-the-board percentage where a precise hour-for-hour reduction would be unwieldy or potentially inaccurate. See, e.g., United States Football League v. Nat'l Football League, 887 F.2d 408, 415 (2d Cir. 1989) (affirming the reduction of billed hours by 10% for vagueness in time entries);

[11] The first complaint ran forty-six pages and included paltry factual allegations, vague jurisdictional allegations, and five prayers for relief, none grounded in federal law. The amended complaint was expanded to eighty-eight pages and included several affidavits, similarly flawed jurisdictional allegations, and twelve prayers for relief. Bank Austria faced an uphill battle to make sense of and rebut, the sprawling complaint.

Sea Spray Holdings, Ltd., 277 F. Supp. 2d at 326 (S.D.N.Y. 2003) (reducing the lodestar figure by 15% to account for block billing and excessive time entries); Libra Bank Ltd. v. Banco Nacional de Costa Rica, 570 F. Supp. 870, 896 (S.D.N.Y. 1983) (reducing the lodestar figure by 20% to account for over-staffing). To better reflect the hours reasonably expended on this matter, the Court reduces the lodestar figure calculated above, $390,898.00, by 25%. Consequently, $293,173.50 is the proper lodestar figure for Bank Austria's reasonable attorney's fees.

Bank Austria also requests $52,347.14 in costs. The bank provides a detailed allocation of these costs (Moerdler Decl. Ex. E), and, after a thorough review, the Court finds them reasonable. This amount is added to the $293,173.50 adjudged in attorneys fees, adding up to a total of $345,520.64 for Bank Austria's reasonable litigation fees and costs.

**B. Attorney's Fees and Costs as a Rule 11 Sanction**

Even after calculating reasonable attorney's fees and costs, the Court must review its measure of sanctions in light of the purposes of Rule 11. The primary purpose of Rule 11 sanctions is deterrence, Caisse Nationale de Credit Agricole-CNCA v. Valcorp, Inc., 28 F.3d 259, 266 (2d Cir. 1994), thus the amount of attorney's fees awarded as a sanction is squarely within the district court's discretion. While the district court

may use the lodestar method to calculate the appropriate sanction amount, it is also within the court's discretion to veer from this calculation and award a lesser amount that appropriately fulfills the deterrent function of Rule 11. Eastway Constr. Corp. v. City of New York, 821 F.2d 121, 122 (2d Cir. 1987), cert denied, 484 U.S. 918 (1987).

In the instant case, Mr. Fagan acts as a named plaintiff, a director of plaintiff organization AHVRAM, and Plaintiffs' lead counsel. Just five years before bringing this suit, Mr. Fagan played an important rcle in a settlement with Bank Austria that released the company from all claims for "Looted and/or Aryanized Assets." (Settlement Agreement § 1(B), Mar. 15, 1999.) The terms of that settlement were clearly stated. In addition, throughout this litigation Bank Austria warned Mr. Fagan that it would seek sanctions if Mr. Fagan refused to withdraw the lawsuit. Mr. Fagan's willingness to file a lawsuit in direct contradiction to the settlement he helped to produce, and in the face of Bank Austria's persistent warnings of a pending Rule 11 motion, convinces the court that to adequately deter Mr. Fagan from bringing baseless suits in the future, he must be held liable for the measure of reasonable fees and costs calculated above. A similar case in the Fifth Circuit informs this Court's decision: "By forcing [Mr. Fagan] to internalize the cost to [Bank Austria] of responding, the award of attorneys' fees

approximates optimal deterrence. It will dissuade [Mr. Fagan] and other lawyers in the future from pursuing exhausted claims without seeming overly punitive or giving [Bank Austria] a windfall." Merriman v. Sec. Ins. Co. of Hartford, 100 F.3d 1187, 1194-95 (5th Cir. 1996); see also Brandt v. Schal Assocs., Inc., 960 F.2d 640, 647 (7th Cir. 1992) ("A reasonably accurate measure of the harm [the plaintiff] has done is what he has cost his opponent. This is not an unreasonable method to deter spurious suits and wasteful trial tactics.").

While the measure of fees ordered by this Opinion is a heavy sanction, Mr. Fagan's behavior during the fee application process has reinforced this Court's conclusion that a heavy sanction is needed to appropriately deter Mr. Fagan from similar behavior in the future. The Court has given Mr. Fagan every opportunity to oppose Bank Austria's fee application. Despite the Court's repeated attempts to contact Mr. Fagan, and its October 26, 2005 order granting Mr. Fagan until November 1, 2005 to submit its opposition to Bank Austria's September 8, 2005 application, the Court received no correspondence from Mr. Fagan until October 31, 2005. Early that morning, in violation of the Judge's Rules for Attorneys 1 and 4, Mr. Fagan left a message on the chambers' voicemail informing the Court that he would submit an opposition in two weeks. As of this Opinion, the Court has received neither an opposition nor a formal request for

extension. This blatant disregard of procedural rules and careless abdication of his duties as a lawyer is characteristic of Mr. Fagan's conduct throughout this litigation. It is apparent to this Court that a heavy sanction is needed to deter Mr. Fagan from the conduct described in the August 19 Order.

As a final matter of the sanctions determination, courts must take into account the financial circumstances of the sanctioned party. Sassower v. Field, 973 F.2d 75, 81 (2d Cir. 1992). Nothing in the record indicates that Mr. Fagan is incapable of sustaining a judgment for attorney's fees. As noted above, Mr. Fagan has failed to submit any papers objecting to Bank Austria's fee application. Consequently, Mr. Fagan has not put the Court on notice of an inability to pay sanctions. Moreover, the Court notes that Mr. Fagan received a substantial attorney's fee award in a recent multi-million dollar settlement approved by this Court, In re Austrian & German Bank Holocaust Litig., No. 98 Civ. 3938, 2003 WL 402795 (S.D.N.Y. Feb. 21, 2003), and is reported to have received millions of dollars for his work in related lawsuits. See Daniel Wise, Handling of Holocaust Suit Leads to Attorney's Sanction, N.Y.L.J., Aug. 23, 2005, at 1. In sum, there is no evidence indicating Mr. Fagan's inability to pay Bank Austria's fees and costs.

Consequently, Mr. Fagan is ordered to pay $345,520.64 for Bank Austria's reasonable litigation fees and costs. This amount

is due in full, absent Mr. Fagan's posting of a supersedeas bond and attendant request for a stay of the judgment.

**III. Mr. Fagan's Fine**

Now that Plaintiffs' motions for reconsideration and a stay of judgment have been denied, Mr. Fagan is ordered to pay the $5,000 fine set by the August 19 Order without delay. If he fails to pay the $5,000 fine or post a supersedeas bond by December 2, 2005, Mr. Fagan should be prepared to show cause as to why he should not be held in contempt for failure to abide by the Court's order.

SO ORDERED.

SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE

Dated: New York, New York
November 16, 2005

Exh. M

Doc# 323

U.S. DISTRICT COURT FILED AUG 16 2007 S.D. OF N.Y.

34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE: SKI TRAIN FIRE IN KAPRUN AUSTRIA ON NOVEMBER 11, 2000 — 01 MDL # 1428 (SAS)

---

This document relates to the following actions:

---

JOHANN BLAIMAUER, et al.,

Plaintiffs,

- against -

OMNIGLOW CORPORATION, et al.,

Defendants.

**OPINION & ORDER**

95058

03–CV–8960 (SAS)

---

HERMAN GEIER, et al.,

Plaintiffs,

- against -

OMNIGLOW CORPORATION, et al.,

Defendants.

03–CV–8961 (SAS)

---

NANAE MITSUMOTO, et al.,

Plaintiffs,

- against -

THE REPUBLIC OF AUSTRIA, et al.,

Defendants.

06–CV–2811 (SAS)

---

---------------------------------------------------------------X
NANAE MITSUMOTO, et al., :
Plaintiffs, :
- against - : 07–CV–935 (SAS)
ROBERT BOSCH CORPORATION, et al., :
Defendants. :
---------------------------------------------------------------X
---------------------------------------------------------------X
JOOP H. STADMAN, et al., :
Plaintiffs, :
- against - : 07–CV–3881 (SAS)
AUSTRIAN NATIONAL TOURIST OFFICE INC., et al., :
Defendants. :
---------------------------------------------------------------X
---------------------------------------------------------------X
RASTKO and DRAGICA FERK, et al., :
Plaintiffs, :
- against - : 07–CV–4104 (SAS)
OMNIGLOW CORPORATION, et al., :
Defendants. :
---------------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

These cases arise from a disaster that occurred on November 11, 2000, in which a ski train in Kaprun, Austria caught fire, killing 155 people. American

and foreign survivors and/or relatives of those who died in the fire brought a number of lawsuits in federal court against numerous defendants alleging, *inter alia*, negligence and strict liability. The Judicial Panel on Multidistrict Litigation assigned these actions to this Court for coordinated or consolidated pretrial proceedings. The actions within this multidistrict litigation ("MDL") fall easily into two groups – those filed on behalf of American plaintiffs,[1] and those filed on behalf of foreign plaintiffs. There are five actions falling in the latter category, all of which are being prosecuted by Edward D. Fagan, James F. Lowy, and Robert J. Hantman.[2]

Defendants now jointly move to disqualify Fagan as counsel in these proceedings on several grounds, including the filing of a personal bankruptcy petition giving rise to a conflict of interest with his clients in violation of ethical rules.[3] In addition, defendants jointly move, pursuant to section 1927 of title 28 of

---

1 *See, e.g.*, *Habblett v. Omni-Glow Corp.*, Nos. 01 MDL 1428, 02 Civ. 2492 (filed April 1, 2002); *Habblett v. Siemens AG*, Nos. 01 MDL 1428, 01 Civ. 6554 (filed July 19, 2001).

2 The underlying facts related to the instant matters are summarized in Part III below. For a more thorough discussion of the procedural history of this MDL, see *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, Nos. 01 MDL 1428, 01 Civ. 6554, 01 Civ. 7242, 04 Civ. 1402, 2005 WL 1523508, at *1-2 (S.D.N.Y. June 27, 2005); *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 403, 404 (S.D.N.Y. 2002).

3 By letter to the Court dated May 23, 2007, the American plaintiffs joined in defendants' motion to disqualify Fagan. *See* 5/23/07 Letter from Jay J. Rice,

the United States Code, for an order imposing sanctions against all three foreign plaintiffs' counsel for alleged misrepresentations made by them concerning the testimony of two so-called "whistleblower" witnesses who were deposed by defense counsel in Germany in April 2007.[4] For the reasons stated below, defendants' motion is granted in part with respect to Fagan; it is denied with respect to Hantman and Lowy.

## II. DISQUALIFICATION OF COUNSEL

### A. Applicable Law

"'The power of federal courts to disqualify attorneys in litigation pending before them has long been assumed without discussion.'"[5] Whether to disqualify an attorney lies within the court's discretion.[6] Disqualification is only warranted, however, in the rare circumstance where an attorney's conduct "might

---

counsel for American plaintiffs, to the Court ("5/23/07 Rice Letter").

4 To avoid duplicative briefing, only two defendants, Siemens Transportations Systems, Inc. and Bosch Rexroth Corporation, filed briefs in support of defendants' motion for disqualification and sanctions.

5 1 M. Silberberg, *Civil Practice in the Southern District of New York* § 4.17 at 4-21 (quoting *Board of Educ of City of N.Y. v. Nyquist*, 590 F.2d 1241, 1245-46 (2d Cir. 1979)).

6 *See Cheng v. GAF Corp.*, 631 F.2d 1052, 1055 (2d Cir. 1980), *vacated on other grounds*, 450 U.S. 903 (1981).

taint the case."[7] For even where a motion to disqualify opposing counsel is "made in the best of faith," courts must be mindful that such motions, when granted, invariably cause delay and have the immediate adverse effect of separating parties from their chosen representative.[8] "In general, then, a district judge should disqualify the offending counsel [only] when the integrity of the adversarial process is at stake."[9]

Thus, in this Circuit, "disqualification has been ordered only in essentially two kinds of cases," the more relevant of which is "where an attorney's conflict of interests in violation of Canon 5 . . . of [The American Bar Association] Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client."[10] The American Bar Association Code of Professional Responsibility ("Code"), as adopted by the New York courts,

---

7 *Papanicolaou v. Chase Manhattan, N.A.*, 720 F. Supp. 1080, 1083 (S.D.N.Y. 1989) (citing *Nyquist*, 590 F.2d at 1246).

8 *Nyquist*, 590 F.2d at 1246.

9 *Papanicolaou*, 720 F. Supp. at 1083 (citing *Nyquist*, 590 F.2d at 1246).

10 *Nyquist*, 590 F.2d at 1246 (citations omitted). Canon 5 of the New York Code of Professional Responsibility is entitled "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." The other basis for disqualification is where an attorney is in a position to potentially use or misuse privileged information, in violation of Canons 4 and 9 of the Code of Professional Responsibility. *See Nyquist*, 590 F.2d at 1246.

sets forth the appropriate guidelines for attorneys' professional conduct in the United States District Courts in this state.[11] The Code consists of three separate but interrelated parts, including Canons, which are "statements of axiomatic norms."[12] Within each Canon are corresponding Ethical Considerations and Disciplinary Rules. The Ethical Considerations are "aspirational in character and represent the objectives toward which every member of the profession should strive."[13] The Disciplinary Rules, however, are "mandatory in character;"[14] they "state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action."[15] Applications of the Code to resolve disqualification motions necessarily require a fact-specific analysis.[16]

---

11 *See NCK Organization Ltd. v. Bregman*, 542 F.2d 128, 129 n.2 (2d Cir. 1976); *King v. Fox*, No. 97 Civ. 4134, 2005 WL 741760, at *2-3 (S.D.N.Y. Mar. 31, 2005); *Arifi v. de Transport du Cocher, Inc.*, 290 F. Supp. 2d 344, 348 (E.D.N.Y. 2003).

12 New York Code of Prof. Resp., Preliminary Statement, *reprinted in* N.Y. Jud. Law App.

13 *Id.*

14 *Id.*

15 *Kittay v. Kornstein*, 230 F.3d 531, 538 n.3 (2d Cir. 2000).

16 *See Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 753 (2d Cir. 1975) ("'When dealing with ethical principles, it is apparent that we cannot paint with broad strokes. The lines are fine and must be so marked. Guide-posts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and

For the purposes of this motion, the most critical rules are those embodied in Canon 5 of the Code and its related Ethical Considerations and Disciplinary Rules.[17] Specifically, Disciplinary Rule 5-101 provides:

> A lawyer shall not . . . continue employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests, unless a disinterested lawyer would believe that the representation of the client will not be adversely affected thereby and the client consents to the representation after full disclosure of the implications of the lawyer's interest.[18]

Ethical Consideration 5-1 is also relevant and states that: "[t]he professional judgment of a lawyer should be exercised . . . solely for the benefit of the client and

---

precise application of precedent.'" (quoting *United States v. Standard Oil Co.*, 136 F. Supp. 345, 367 (S.D.N.Y. 1955)).

17 *See Nyquist*, 590 F.2d at 1246 (emphasizing that trial judges in this Circuit utilize their power to disqualify counsel only "where necessary to preserve the integrity of the adversary process," such as where an attorney's conflict of interest violates Canon 5 of the Code).

18 DR 5-101, 22 N.Y. Comp. Codes R. & Regs. § 1200.20. Additionally, Disciplinary Rule 5-103 provides that "[a] lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he or she is conducting for a client . . . ." DR 5-103, 22 N.Y. Comp. Codes R. & Regs. § 1200.22(a). Although "reasonable" contingent fees in civil cases are one exception to this rule, *id.* § 1200.22(a)(2), the fact that Fagan's financial survival depends on the size of his share of any settlement proceeds in these cases renders Fagan's contingent fee arrangement unreasonable under the circumstances. *See Landsman v. Moss*, 579 N.Y.S.2d 450, 453 (2d Dep't 1992) (contingent fee agreement unreasonable where it created a genuine risk that a conflict of interest could arise which might affect attorney's ability to zealously represent client's interests).

free of compromising influences and loyalties . . . . [T]he lawyer's personal interests . . . should [not] be permitted to dilute the lawyer's loyalty to the client."[19]

**B. Fagan's Personal Bankruptcy[20]**

On June 1, 2006, Fagan's creditors filed an involuntary Chapter 7 bankruptcy petition against him in the United States Bankruptcy Court for the District of New Jersey.[21] On February 14, 2007, the date on which the bankruptcy proceedings against Fagan were to begin, Fagan superseded the proceedings by filing a *pro se* Chapter 11 Bankruptcy Petition in the Middle District of Florida.[22] According to Fagan's Chapter 11 filings, he has accumulated $13.6 million in outstanding debts.[23] Notably, among Fagan's creditors are two of foreign plaintiffs' expert witnesses in this case: Dr. Carl Abraham (a purported scientific expert), to whom Fagan owes $75,000 in "professional fees," and Norbert

---

19 EC 5-1, N.Y. Code of Prof. Responsibility.

20 Unless otherwise stated, all facts cited herein are taken from the parties' submissions and are undisputed.

21 Case No. 06-14863-NLW.

22 Case No. 8:07-bk-1109-PMG ("*In re Fagan*").

23 *See In re Fagan*, Chapter 11 Case Management Summary filed March 30, 2007 ("Chapter 11 Summary"), Exhibit ("Ex.") 11 to Declaration of Paul P. Rooney, counsel for defendant Bosch Rexroth Corporation ("Rooney Decl."), at 2.

Gschwend (a purported marketing expert), to whom Fagan owes $3,000,000 in "loans".[24]

Most importantly, Fagan has admitted that his *single most significant* source of funding for his Chapter 11 reorganization plan is a hoped-for settlement of the Kaprun-related litigation pending before this Court.[25] Indeed, Fagan's Chapter 11 Summary gives a brief outline of the facts underlying this litigation and then pointedly states: "Fagan represents approximately 100 victims in that case. Upon reason and belief, there was a $16,000,000.00 offer for a global settlement and it is expected that this litigation will result in a substantial recovery which will also fund the Plan of Reorganization."[26] The Summary is silent as to what portion of this settlement will go to his clients and how much he will recover in fees.

During a May 7, 2007 deposition related to his bankruptcy, Fagan also revealed that until April 23, 2007, he failed to file his federal income tax returns

---

24 *In re Fagan*, List of Creditors Holding 20 Largest Claims filed March 30, 2007, Ex. 12 to Rooney Decl. at 1-2. Fagan also owes, *inter alia*, $100,000 in personal loans to his co-counsel Lowy; $3,000,000 in alimony and child support to his former wife; and four separate default judgments which collectively total over $4,000,000. *See id.*

25 *See* Chapter 11 Summary at 1; Transcript of 341 Meeting of Creditors held March 14, 2007 ("3/14/07 341 Mtg. Tr."), Ex. 17 to Rooney Decl., at 83 ("[T]he only way that I'm going to be able to fund this thing is if I can settle the Kaprun case and some of the others . . . ." (Fagan)).

26 Chapter 11 Summary at 1.

for the seven years from 2000 through 2006.[27] Fagan also admitted that he had not filed his state or local tax returns for that same seven-year period.[28]

### C. Disqualification Is Required

In recent years, Fagan has engaged in a pattern of unethical behavior. Indeed, this is not the first court to find Fagan's conduct worthy of reproach and sanctions.[29] Fagan's continued participation in the cases at bar presents one of the rare situations in which an attorney's violations of ethical rules warrant his

---

27 See *In re Fagan*, Unofficial Transcript of the Deposition of Edward D. Fagan taken by the U.S. Trustee on May 7, 2007 ("5/7/07 Fagan Tr."), Ex. 18 to Rooney Decl., at 7-8. The willful failure to file federal tax returns is a felony punishable by up to five years in prison. *See* 26 U.S.C. § 7203.

28 *See* 5/7/07 Fagan Tr. at 86.

29 Fagan's misconduct is not limited to his misrepresentations to this Court regarding foreign plaintiffs' so-called "whistleblower" witnesses. As further discussed below, Fagan was sanctioned by Judge Shirley Wohl Kram of this Court in August 2005, and by Magistrate Judge Viktor Pohorelsky of the United States District Court for the Eastern District of New York in February of this year. *See infra* Part III. Additionally, the New Jersey Office of Attorney Ethics has charged Fagan with misappropriating approximately $400,000 from the trust accounts of two Holocaust survivors whom Fagan represented in lawsuits filed against Swiss banks; these charges could lead to disbarment. *See Credit-Counseling Provision No Bar to Involuntary Bankruptcy Petitions*, 185 N.J. Law J. 659, 660 (2006); *Holocaust Lawyer Disputes Ethics Charges: Disciplinary Case Against Fagan Proceeds Slowly*, Newark Star-Ledger, Mar. 23, 2006, at 50; *Holocaust Lawyer Fights His Own Court Battle Victims' Attorney Mounts Defense in Ethics Hearing*, Newark Star-Ledger, Nov. 17, 2005, at 14.

disqualification.[30] Although an attorney's personal bankruptcy does not in itself constitute adequate grounds for disqualification, Fagan's Chapter 11 case gives rise to an impermissible conflict of interest between himself and his clients, and illustrates a degree of financial irresponsibility which severely undermines this Court's confidence in his ability to adequately represent foreign plaintiffs in this MDL.

A review of Fagan's Chapter 11 submissions makes plain that he has no means to represent his clients. He lacks any staff and has no business or trust accounts. Nor does Fagan have any malpractice insurance, which is particularly troubling given that he currently has two judgments entered against him for malpractice.[31] Experts and court reporters he has retained in this case have not been paid. Moreover, several of the cases in this MDL were only recently filed by Fagan and are likely to impose heavy costs.[32] If they are ever to make it through

---

30 A "district court bears the responsibility for the supervision of the members of its bar." *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975) (also noting that the court's "dispatch of this duty is discretionary in nature" and "will be upset only upon a showing that an abuse of discretion has taken place").

31 *See In re Fagan*, Transcript of Proceedings held April 23, 2007 ("4/23/07 Bankr. Tr."), Ex. 19 to Rooney Decl., at 7.

32 *See Stadman v. Austrian Nat'l Tourist Office Inc.*, No. 07 Civ. 3881 (filed May 17, 2007); *Ferk v. Omniglow Corp.*, No. 07 Civ. 4104 (filed May 25, 2007). *See also* 6/27/07 Letter from Fagan to the Court (arguing that this Court's June 19, 2007 ruling dismissing foreign plaintiffs' actions on the ground of *forum non conveniens*, is inapplicable to *Ferk* because *Ferk* is predicated on different legal

rounds of discovery – let alone trial – they will require hundreds of thousands of dollars to cover depositions, document productions, and other litigation costs. Against this backdrop, Fagan's lack of financial resources and his personal history of financial irresponsibility render him incompetent to continue prosecuting these actions.

As counsel for the American plaintiffs observes, Fagan's inadequate finances violate several disciplinary rules, especially those embodied in Canon 5 of the Code.[33] There can be little doubt that Fagan's professional judgment in these cases has been and will continue to be seriously affected by his personal interests in this litigation.[34] Fagan has staked his financial future on the outcome of this

---

theories, including fraudulent conveyance).

33 *See* 5/23/07 Rice Letter at 2 (citing DR 6-101, 22 N.Y. Comp. Codes R. & Regs. § 1200.38, which provides, in pertinent part, that a lawyer shall not "[h]andle a legal matter without preparation adequate to the circumstances").

34 Apart from this violation of Canon 5 of the Code, the extent to which Fagan is personally and financially invested in the outcome of this litigation violates "the broad admonition of Canon 9 of the Code that an attorney . . . avoid even the *appearance* of impropriety." *Fund of Funds, Ltd. v. Arthur Anderson & Co.*, 567 F.2d 225, 232 (2d Cir. 1977) (emphasis added) (citing DR 9-101). *See also id.* (finding that the district court erroneously "glossed over the teaching of Canon 9 that even an appearance of impropriety requires prompt remedial action"); *Silver Chrysler Plymouth*, 518 F.2d at 757 (recognizing that Canon 9's requirement that attorneys avoid even the appearance of professional impropriety "dictates that doubts should be resolved in favor of disqualification" (citing *Hull*, 513 F.2d at 571)). Because it is clear that Fagan must be disqualified under Canon 5, I do not reach the issue of whether Fagan's violations of Canon 9, or any other Canon of the Code, would alone support disqualification. *See Fund of Funds*, 567 F.2d at

litigation; he himself told the Florida Bankruptcy Court that the linchpin of his Chapter 11 plan is the attorney's fees he hopes to recover if and when a global settlement is reached in the Kaprun cases. The fact that Fagan is relying on this case to cover such substantial personal debts seriously undermines this Court's confidence in his ability to devise a prudent litigation strategy for his clients, to assess whether any proposed settlement offer is fair to his clients, or to otherwise conduct himself as a fiduciary of his clients' interests.[35]

Additionally, there is no indication in the record that Fagan's clients are aware they have entrusted their claims to someone who (a) has no means to properly prosecute them and (b) is relying on earning a large fee in order to cover substantial personal debts. In the absence of detailed, explicit consent waivers from each of his purported clients, Fagan's blatant conflict of interest cannot be countenanced.[36]

---

234.

35 "In New York, as elsewhere, it is beyond doubt that a lawyer is bound to conduct himself as a fiduciary or trustee of his or her client's interests, and that he or she must exercise the utmost good faith, honesty, integrity and fidelity." *Fund of Funds*, 567 F.2d at 234 (invoking Canon 5 in disqualifying an attorney from further participating in litigation) (citations omitted).

36 It remains unclear whether Fagan possesses powers of attorney for each of his purported clients. By Order dated May 18, 2007, the Court directed counsel to provide the Court with sworn affidavits from each foreign plaintiff affirming his or her respective fee agreement. Counsel has yet to fully comply with this Order. I thus harbor doubts as to whether Fagan's clients are fully aware of the current

It is also obvious that the reason Fagan finally filed his federal income tax returns in April 2007 was to prevent the dismissal or conversion of his Chapter 11 proceeding.[37] Defendants argue that Fagan's delay in filing his federal taxes is, in itself, grounds for immediate disbarment from this Court.[38] But the issue of

---

procedural posture of their claims, let alone the extent to which Fagan has a personal financial interest in their claims.

37 Under federal bankruptcy law, a party-in-interest to a Chapter 11 proceeding may move to have the case dismissed or converted into a Chapter 7 proceeding upon showing that the debtor failed to timely file his tax returns. *See* 11 U.S.C. § 1112(b)(4). *Accord Matter of Santiago Vela*, 87 B.R. 229, 232 (D.P.R. Bankr. 1988) (failure to file tax returns is unreasonable delay allowing for conversion of Chapter 11 case into a Chapter 7). At the hearing before the bankruptcy court in Florida concerning the U.S. Trustee's motion to dismiss Fagan's Chapter 11 case for cause, the U.S. Trustee stated that immediately prior to the hearing, Fagan's attorney handed her what appeared to be originals of tax returns for the years 2000 through 2006. The trustee further commented "frankly, I have never seen anything quite like them. For instance, for the year – I'll just pick one here. Oh, there's no tax liability for any year. Not one single year is there tax liability." 4/23/07 Bankr. Tr. at 7.

38 *See* Defendant Bosch Rexroth Corporation's Memorandum of Law in Support of Motion for Sanctions Under 28 U.S.C. § 1927 and to Disqualify Edward D. Fagan, Esq. as Plaintiffs' Counsel ("Def. Mem.") at 19. Geoffrey C. Hazard, a well-recognized expert on attorney ethics, has described the connection between being an honest tax payer and an ethical lawyer this way: "Criminal violations of the tax laws are almost always related to fitness to practice law, even if the offense arises in the lawyer's private rather than professional life. Lawyers who engage in intentional tax fraud ought to be punished professionally . . . because [they have] taken advantage of a system that relies upon self-discipline and self-reporting . . . . Those who wish to challenge their tax liability are given ample opportunity to do so through legal procedures; tax cheats are thus violating the very concept of the rule of law, and this is intolerable in a lawyer." 2 Geoffrey C. Hazard, Jr., *The Law of Lawyering* § 65.4 at 65-69 (2007).

disbarment is properly dealt with by institutional disciplinary mechanisms, not by this Court.[39] For disqualification purposes, the lesson to be drawn from Fagan's egregious delay in filing his federal taxes is that his extreme lack of financial responsibility and accountability seriously calls into question his ability to prosecute these actions.

Specifically, Fagan's tax-related conduct demonstrates an unequivocal inability to handle finances.[40] While this is not typically grounds for disqualification, it does gives rise to a conflict of interest here, because plaintiffs' counsel is currently prosecuting these cases (and continuing to file new ones) solely on a contingency-fee basis. Additionally, as noted below in Part II.B., Fagan has engaged in bad faith litigation tactics which themselves warrant sanctions and fines. Fagan thus perpetuates a cycle whereby his personal

---

39 The Court is referring this matter to this Court's Disciplinary Committee.

40 It bears emphasis that whether an attorney's personal bankruptcy or failure to pay taxes displays financial irresponsibility warranting court intervention is a very fact-specific inquiry that turns on the particulars of the attorney and the underlying litigation being prosecuted or defended. Here, the fact that Fagan has pointedly admitted that his Kaprun-related attorneys' fees will be the single most significant source of financing for his Chapter 11 reorganization is critical to my finding that his financial irresponsibility will negatively affect the outcome of this litigation. *Cf. In re van Riper*, 808 N.Y.S.2d 815 (3d Dep't 2006) (disbarring attorney after conviction of one count of tax fraud); *In re Anonymous*, 74 N.Y.2d 938, 939 (1989) (noting that in evaluating a bar applicant's moral character, "[a] determination of unfitness must rest not on the fact of bankruptcy but on conduct reasonably viewed as incompatible with a lawyer's duties and responsibilities as a member of the Bar").

indebtedness continues to grow – in significant part as result of expenses related to this litigation – and he thereby becomes increasingly dependent on obtaining a settlement sufficiently sizeable to fund his Chapter 11 plan.

It is worth noting that another conflict of interest exists between Fagan and foreign plaintiffs' two retained experts, to whom Fagan is personally indebted. Because Fagan cannot confirm his Chapter 11 plan absent a positive result for the foreign plaintiffs in these cases, Fagan's debts to Dr. Abraham (who is owed $75,000) and Gschwend (who is owed $3,000,000) will remain unpaid until Fagan is able to obtain a favorable settlement or verdict in this litigation. Dr. Abraham and Mr. Gschwend are thus in a position whereby their compensation as expert witnesses is contingent on the outcome of these cases. Under these circumstances, Fagan's retention of them violates Disciplinary Rule 7-109 of the Code, which provides that "[a] lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the outcome of his or her testimony *or the outcome of the case*."[41] This violation of the Code not only constitutes an impermissible conflict of interest, but also underscores the overall appearance of professional impropriety that Fagan brings to this litigation.

---

[41] DR 7-109, 22 N.Y. Comp. Codes R. & Regs. § 1200.40(c) (emphasis added).

Moreover, Fagan has already been sanctioned by this Court for having a remarkably similar conflict of interest with respect to litigation he prosecuted on behalf of victims of the Nazi Holocaust.[42] The court in that litigation determined that, in reality, Fagan was "seeking damages on behalf of a fictitious entity" and dismissed the action for lack of subject matter jurisdiction.[43] The court also held that "most seriously, however, Fagan [was] proceeding in direct violation of New York's Champerty Statute and Applicable Disciplinary Rules. Champerty is defined as 'maintaining a suit in return for financial interest in the outcome.'"[44] Apparently, Fagan had purchased interests in stolen artwork for the sole purpose of bringing actions involving that artwork. Citing various provisions of New York law, including Disciplinary Rule 5-103, the court held that Fagan's proprietary interest in the litigation ran afoul of legal and ethical rules.[45] As a result of this interest and additional misconduct – including Fagan's various "deceptions" – the court imposed sanctions on Fagan, ordering him to pay his adversary's litigation

---

42 *See Association of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG ("Association of Holocaust Victims I")*, No. 04 Civ. 3600, 2005 WL 2001888, at *5 (S.D.N.Y. Aug. 19, 2005).

43 *Id.*

44 *Id.* (quoting *In re Primus*, 436 U.S. 412, 425 n.15 (1978)).

45 *See id.* (citations omitted).

costs and fees, and fining him $5,000.[46] The court also noted with dismay that Fagan's litigation tactics "appear[ed] to be part of a pervasive and disturbing [personal] trend."[47]

This past February, Fagan was again formally sanctioned, this time by the Eastern District of New York.[48] By way of background, Fagan had been terminated as co-counsel for plaintiffs in well-publicized litigation involving the now abolished South African apartheid regime. In response to his termination, Fagan "hastily instituted" a related action in the same district and, in "full view of the international and national media," personally served a subpoena on his former co-counsel.[49] The court quashed the subpoena on the ground that it was purely

---

46 Fagan moved for reconsideration of and a stay of these rulings, which the court denied. *See Association of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG ("Association of Holocaust Victims II")*, No. 04 Civ. 3600, 2005 WL 3099592 (S.D.N.Y. Nov. 17, 2005). The court further held that Fagan owed a total of $345,520.64 in litigation costs and expenses, and ordered him to immediately either pay a $5,000 fine or post a supersedeas bond. *See id.* at *8.

47 *Association of Holocaust Victims I*, 2005 WL 20001888, at *5 (listing related actions being prosecuted by Fagan).

48 *See Molefi v. The Oppenheimer Trust*, No. 03 Civ. 5361, 2007 WL 538547, at *2-4 (E.D.N.Y. Feb. 15, 2007).

49 *Id.* at *1.

"retaliatory" and "patently frivolous" and awarded Fagan's former co-counsel nearly $15,000 in attorneys' fees and costs.[50]

These prior sanctions bolster my finding that his disqualification in the instant cases is required. Although Fagan's personal stake in this MDL differs from that which he had in the Holocaust litigation discussed above, it is just as unprofessional and deserving of rebuke. In resolving this motion in favor of disqualification, the Court has attempted to strike a balance between foreign plaintiffs' interest in being represented by counsel of their choice, and the need to maintain high ethical standards within the profession.[51] By Fagan's own admissions, he has been forced into bankruptcy due to massive debts totaling millions of dollars, and the main source of funding for his Chapter 11 plan are proceeds from a hypothetical global settlement of Kaprun-related litigation. With such a flagrant personal interest in the outcome of these cases, Fagan simply cannot be allowed to continue participating as counsel.[52]

---

50 *Id.* at *8.

51 *See Fund of Funds*, 567 F.2d at 236-37 ("[A]bove all else, we must maintain public trust in the integrity of the Bar.").

52 In opposition to the motion for his disqualification, Fagan submitted a memorandum of law which cites to relevant case law, but neglects to apply the law to these facts. *See* Consolidated Submissions in Opposition to Motion for Sanctions Against Edward Fagan, Robert Hantman and James Lowy Related to Whistleblower Depositions and to Disqualify Edward Fagan ("Pl. Mem.") at 9-14. Rather, Fagan's memorandum is rife with unsupported and conclusory statements,

## III. SANCTIONS

### A. Applicable Law

A district court has the "inherent authority to sanction parties appearing before it for acting in bad faith, vexatiously, wantonly, or for oppressive reasons."[53] This authority "stems from the very nature of the courts and their need to be able to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."[54]

In addition to this inherent power, section 1927 of title 28 of the United States Code allows a court to impose sanctions when an attorney "'so

---

such as: "There is abundant evidence that the Motion to Disqualify is a litigation tactic designed to prejudice the Kaprun victims and survivor claims." *Id.* at 14. Fagan also attaches declarations of "independent ethics counsel" who opine that Fagan's continued participation in these cases raises no improper conflict of interests. *See, e.g.*, Declaration of Ethics Expert Richard Grayson. Upon review, these declarations are useless. They cite no case law, contain only vague summaries of the law (*e.g.*, "There is no per se rule that prohibits a lawyer from continuing to represent clients when the lawyer has filed a bankruptcy petition."), and unsupported assertions of fact (*e.g.*, "The cooperating lawyers, together with their clients, want Fagan to continue representing them."). *Id.* at 2. Nowhere do these declarations address the conflict raised by Fagan's bankruptcy or otherwise allude to Fagan's substantial debts, or his important admission that his Chapter 11 plan presumes he will receive a large fee from a settlement of this litigation, or the fact that he owes millions of dollars to two of foreign plaintiffs' expert witnesses.

53 *Association of Holocaust Victims I*, 2007 WL 2001888, at *3 (citing *Sassower v. Abrams*, 833 F. Supp. 253, 272 (S.D.N.Y. 1993)).

54 *Id.* (citation omitted).

multiplies the proceedings in any case unreasonably and vexatiously.'"[55] Thus, the statute "imposes an obligation upon attorneys throughout the entire litigation to avoid dilatory tactics."[56] Where an attorney fails to meet this obligation, courts may order him "to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."[57]

An award of sanctions under either the court's inherent authority or section 1927 requires a finding of bad faith on the part of the offending attorney.[58] Bad faith may be inferred when counsel's actions are "'so completely without merit so as to require the conclusion that they must have been undertaken for some improper purpose such as delay.'"[59]

---

55 *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999) (quoting 28 U.S.C. § 1927)).

56 *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*, 73 F.3d 1253, 1261 (2d Cir. 1996).

57 28 U.S.C. § 1927.

58 *See United States v. International Bd. of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991) ("Bad faith is the touchstone of an award under [section 1927]."); *Association of Holocaust Victims I*, 2007 WL 2001888, at *4 (citing *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96 (2d Cir. 1997)).

59 *Vacco v. Operation Rescue Nat'l*, 80 F.3d 64, 72 (2d Cir. 1996) (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986)). *Accord Keller v. Mobil Corp.*, 55 F.3d 94, 99 (2d Cir. 1995) (listing acts which could justify sanctions under the "bad faith" test, including "'making several insupportable bias recusal motions and repeated motions to reargue . . . [and] continually engaging in obfuscation of the issues, hyperbolism and groundless presumptions in addition to

B. **Whistleblower Testimony**

On April 12 and 13, 2007, foreign plaintiffs' counsel and a majority of defendants' counsel traveled to Germany to depose foreign plaintiffs' so-called "whistleblower" witnesses. Although Fagan refused to disclose the identities of these witnesses, they were eventually revealed to be Maria Steiner and Georg Schwarz, both of whom had testified at the already-concluded Austrian criminal proceedings related to the Kaprun ski train disaster.

Defendants assert that they were forced to depose Ms. Steiner and Mr. Schwarz in Germany at great expense only to learn that these individuals were not, in fact, "secret," nor were they whistleblowers, and that they lacked the knowledge Fagan said they had. Specifically, defendants point to representations made by Fagan during a conference before this Court on December 28, 2006.[60] Defendants illustrate this point with a side-by-side comparison chart – one column quotes Fagan's representations regarding the whistleblowers' purported knowledge; the other column quotes their actual deposition testimony.[61] The evidence is clear and overwhelming: Fagan drastically misrepresented the knowledge of these witnesses

insinuating the court [is] biased'" (quoting *Hudson Motors P'ship v. Crest Leasing Enters.*, 845 F. Supp. 969, 978 (E.D.N.Y. 1994))).

60 *See* 12/18/06 Conference Transcript ("12/18/06 Conf. Tr.") at 40-43.

61 *See* Def. Mem. at 2-6.

– indeed, they had practically no relevant information whatsoever. For instance, Fagan told the Court that one of his whistleblowers – later identified as Georg Schwarz – "is a person who has technical knowledge of the train operations . . . has technical knowledge about the products, parts and systems that were on the train and in the tunnel . . . has knowledge about the dangerous products that were put on the train or were allowed to be put on the train . . . ."[62] But at his deposition, Mr. Schwarz – who had once been employed as a ski lift operator at the Kaprun ski resort – candidly admitted that he lacked any such knowledge.[63] The same is true with respect to Fagan's representations regarding the other purported whistleblower, Maria Steiner.[64] In short, while some of Fagan's representations as to his so-called whistleblowers could generously be construed as mere exaggeration, others were quite patently false.

### C. Fagan's Conduct in this Litigation Warrants Sanctions

"Mr. Fagan's actions in [these cases] go beyond (but certainly include) a lack of preparation and lack of professionalism. In addition to glaringly

---

62 12/18/06 Conf. Tr. at 41-42.

63 *See* April 12 and 13, 2007 Deposition of Georg Schwarz Transcript, Ex. 2 to Rooney Decl. ("Schwarz Tr."), at 44-45.

64 *See* Def. Mem. at 4-6 (comparing Fagan's representations about Ms. Steiner to Ms. Steiner's actual testimony).

inadequate filings, [and] utter disregard for [ethical standards of conduct] . . . it is obvious that Mr. Fagan has misrepresented critical facts" relating to his so-called whistleblower witnesses.[65]

Not only did Fagan misrepresent the knowledge of his so-called whistleblowers, he also misrepresented the status of Ms. Steiner and Mr. Schwarz as secret witnesses whose identity needed to remain confidential for the sake of their safety. On several occasions, in Court and in sworn affidavits, Fagan characterized Ms. Steiner and Mr. Schwarz as "whistleblowers" who were fearful and afraid of intimidating tactics by defendants and their counsel.[66] Under this pretext, Fagan obtained an order of confidentiality from this Court. It is now clear, however, that Fagan's representations were patently false and served absolutely no purpose save to instill a melodramatic air of menace to these proceedings.[67]

In his January 10, 2007 Declaration, under the boldfaced heading "FEAR FOR HIS FAMILY'S SAFETY AND WELL-BEING," Fagan wrote the following about Mr. Schwarz:

> It was common knowledge that other [employees of defendant Gletscherbahnen Kaprun Aktiengesellschaft ("GBK"), which

---

[65]    *Association of Holocaust Victims I*, 2005 WL 2001888, at *4.

[66]    *See, e.g.*, 12/18/07 Conf. Tr. at 41-42; 4/25/07 Conf. Tr. at 29-32.

[67]    Def. Mem. at 8.

> owns the ski resort] (such as engineer [Walter] Steiner[68]) after coming forward, were ostracized, alienated, and subjected to ridicule and economic and social isolation in Kaprun. According to the witness, after [Walter] Steiner came forward, he, his wife and his family were "dead" in Kaprun. He is very concerned that certain [ski resort] lawyers, such as Dr. Thomas Frad and his firm, not be given access to this information as he is fearful of retribution and retaliation. He is fearful for his and his families' safety and welfare in Austria.[69]

Mr. Schwarz's deposition testimony completely contradicts Fagan's assertions. Several times during his deposition, Mr. Schwarz was asked, point-blank, whether he was ever threatened or intimidated because of anything he might have said or might know in connection with the ski train disaster; each time, Mr. Schwarz gave a resounding "No."[70]

---

68 Walter Steiner, the husband of Maria Steiner, worked as an engineer and conductor at the Kaprun ski resort for twenty-five years. He died in February 2007. *See* April 13, 2007 Deposition Transcript of Maria Steiner, Ex. 7 to Rooney Decl. ("Steiner Tr."), at 8-9.

69 *See* "Fagan Jan. 10, 2007 Declaration Related to 'Whistleblower'" dated January 16, 2007, Ex. 3 to Rooney Decl., ¶ 33. I also note that in practically all of Fagan's submissions to the Court, various words and phrases are capitalized, boldfaced, italicized and/or underlined. Whether this is stylistic or for emphasis or simply random is unclear. Numerous sentences are also incomplete and lack punctuation. This is not only peculiar, but also incomprehensible given that Fagan has been previously reprimanded in this Court for filing such hap-hazardly drafted papers. *See Association of Holocaust Victims I*, 2005 WL 2001888, at *4 n.7.

70 *See* Schwarz Tr. at 52.

Nor was Ms. Steiner a stealth witness with reason to fear for her safety upon a disclosure of her identity. Indeed, Ms. Steiner was already well-known to all parties because she was mentioned *by name* in the written opinion of the judge in the Austrian criminal case arising out of the ski train disaster which took place in 2002. In that decision, the Austrian judge wrote:

> The statements made by Maria Steiner were not convincing to the Court at all. The witness left a psychologically striking impression upon the Court, hid behind rumors, and gave no specific comments. The information provided by the witness could not be used at all in establishing the truth, and the identification and naming of the witness on the part of the private parties *is not viable.*[71]

Nevertheless, Fagan noticed Ms. Steiner's deposition and insisted that her identity remain confidential. Fagan further claimed, in submissions to this Court, that Ms. Steiner would testify to, among other things, that her husband was an employee at the ski resort and that she has firsthand knowledge relevant to defendant GBK's liability and spoliation of evidence.[72] Not surprisingly, however, Ms. Steiner's deposition, taken in April 2007, provided no such evidence.[73]

---

[71] Def. Mem. at 7 (quoting the report of the Austrian criminal court) (emphasis added).

[72] *See* Foreign Plaintiffs' "Summary of 2nd Whistleblower," Ex. 6 to Rooney Decl.

[73] *See* Steiner Tr. at 85-86; 93-94.

In sum, Fagan made false representations concerning the so-called whistleblowers and he obtained an order of confidentiality from this Court under false pretenses. Aside from being highly unprofessional, such tactics suggest utter disregard for the Court. In light of the preceding, this Court finds that Fagan's claims regarding his witnesses were made in bad faith. This finding is bolstered by the fact that Fagan had been previously warned and sanctioned by Judge Kram of this Court for working similar deceptions that wasted judicial resources. As a result, pursuant to this Court's inherent power and section 1927, Edward D. Fagan is hereby fined $5,000 and is ordered to reimburse defendants for litigation costs and expenses relating to the depositions of Ms. Steiner and Mr. Schwarz.

**D. Messrs. Hantman and Lowy**

Defendants' request for sanctions against Hantman and Lowy, in addition to Fagan, are not unfounded. Either of their own volition or at the prompting of Fagan, Hantman and Lowy have written inflammatory letters to parties and the Court accusing defendants and non-parties of plotting to intimidate and threaten plaintiffs' witnesses.[74] Apparently, prior to Mr. Schwarz's deposition,

---

[74] *See* 4/12/07 Email from Hantman to all parties, Ex. 8 to Rooney Decl. ("As one of the lawyers for the plaintiffs, I was advised that one of the plaintiffs witnesses – a whistle blower – received a very disturbing and intimidating phone call over the weekend. Fagan has the details."); 4/13/07 Letter from Lowy to the Court, Ex. 10 to Rooney Decl. (claiming that prior to the depositions in Germany, "one or more of defendants or GBK" violated the Court's orders and engaged in "witness tampering").

he received at least one telephone call from Dr. Johannes Stieldorf – an Austrian attorney who is currently prosecuting civil cases in Austria on behalf of victims of the ski train disaster – who attempted to discourage Mr. Schwarz from participating in the U.S. litigation.[75] Based on this telephone call, Fagan, Hantman and Lowy sent a flurry of communications to the Court about a scandal involving a conspiracy amongst certain defendants to bribe and intimidate witnesses and to "leak" information about the U.S. litigation to Dr. Stieldorf, who plaintiffs' counsel persistently characterize as an agent of GBK, despite the fact that he represents *plaintiffs* in the Austrian litigation.[76] This brief summary does not do justice to the urgency and sensationalism of Fagan and his co-counsel's communications to the Court.[77]

Additionally, both before and after the depositions in Germany, Hantman and Lowy repeatedly stated in correspondence to the Court that they represent the foreign plaintiffs together with Fagan. And as recently as this past June, Fagan also requested that all correspondence for this litigation be sent to him

---

75 *See* 4/25/07 Conf. Tr. at 29-32.

76 *See id.* at 32.

77 In response to Fagan's conspiracy theory this Court was driven to inquire whether he was hallucinating. *See* 4/25/07 Conf. Tr. at 29-32.

care of Hantman's office.[78] Nevertheless, because the overwhelming majority of misrepresentations concerning the whistleblowers were made solely by Fagan, and because there is little evidence in the record supporting an inference of bad faith on behalf of Hantman and Lowy, who hardly ever broke their courtroom silence, I decline to sanction them.[79]

---

[78] *See* 6/6/07 Conf. Tr. at 44.

[79] Indeed, when Hantman and Lowy attended conferences in these actions, they sat silently next to Fagan at plaintiffs' table; the Court cannot recall a single instance where they interjected or otherwise addressed the Court, either to agree, supplement, or disagree with Fagan's representations. *See also* Declaration of Robert J. Hantman dated June 14, 2007 (Docket No. 164; Case No. 03 Civ. 8960) ¶ 7 ("[D]efendants [sic] counsel seeks to impute certain knowledge to me as a result of my standing next to Fagan, when he addressed the Court."); *id.* ¶ 12 (". . . I find it incredulous that any of the defendants seriously relied upon my representations in attending the depositions when I made none and I have no authority or decision making power to do so as all defense counsel are aware."); *id.* ¶¶ 15-16 ("As to my e-mail, I do believe it is not proper to discourage a witness from testifying regardless of who discourages that person while I did not know [sic] who called the witnesses at the time this information was conveyed to me by Mr. Fagan. I submit that my e-mail was neither threatening nor improper under the circumstances and, if those who received it had no participation [sic], it is hard to believe that it would have had any impact on anyone.").

## IV. CONCLUSION

For the reasons stated above, defendants' motion – in which the American plaintiffs join – to disqualify Edward D. Fagan from further participating in these proceedings is granted.[80] It is furthered ordered that

1. Fagan is fined $5,000.00, which is due immediately and should be remitted to the Clerk of the Court, United States District Court, Southern District of New York, 500 Pearl Street, New York, New York 10007.

2. Defendants are directed to submit to the Court, within thirty (30) days of receipt of this Order, statements of reasonable litigation costs and fees in connection with the depositions of Maria Steiner and Georg Schwarz that took place in Germany on April 12 and 13, 2007.

3. If Hantman and Lowy are retained to represent any foreign plaintiffs, they shall enter appearances within thirty (30) days of the date of this Order, together with copies of all retainer agreements.

4. If no counsel has entered an appearance on behalf of any foreign plaintiff within thirty (30) days from the filing of

---

80 Foreign plaintiffs have also filed a motion for sanctions against certain defendants and non-parties, as well as a motion for the disqualification of Gordon E. Haesloop and his firm, Bartlett McDonough, Bastone & Monaghan, LLP, counsel for defendant Omniglow Corporation. *See* Motion to Disqualify Haesloop & Firm (filed March 23, 2007) and Motion for Sanctions against Omniglow, Cyalume, Haesloop & Firm and St. Paul / Travelers based on Spoliation of Evidence (filed March 26, 2007). Both of these motions, as well as their accompanying affidavits and declarations, are rife with incomplete sentences, conclusory and illogical legal arguments, and unsupported factual allegations. What *is* clear from foreign plaintiffs' moving papers, however, is that their motions are predicated on disputed issues of material fact – *i.e.*, GBK's alleged spoliation of evidence. Accordingly, foreign plaintiffs' motions are denied at this time.

this Order, that plaintiff must notify the Court of his or her intention to proceed *pro se.* If no such notice is received within sixty (60) days of this Order, the Clerk of Court shall enter a Judgment dismissing these actions.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
August 16, 2007

- Appearances -

*For Foreign Plaintiffs:*

Edward D. Fagan, Esq.
Five Penn Plaza, 23rd Floor
New York, New York 10001
(646) 378-2225

James F. Lowy, Esq.
International Law Group, LLC
3907 Henderson Boulevard, Suite 200
Tampa, Florida 33629
(813) 288-9525

Robert J. Hantman, Esq.
Hantman & Associates
1313 Avenue of the Americas, Suite 406
New York, New York 10019
(212) 684-3933

*For American Plaintiffs:*

Jay J. Rice, Esq.
Nagel Rice, LLP
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 618-0400

Robert Swift, Esq.
Kohn, Swift & Graf, P.C.
One South Broad Street, Suite 2100
Philadelphia, Pennsylvania 19107
(215) 238-1700

Kenneth P. Nolan, Esq.
Speiser Krause Nolan & Granito
140 East 45th Street, 34th Floor
New York, New York 10017
(212) 661-0011

*For Defendant Bosch Rexroth Corporation and as Liaison Counsel for all Defendants:*

Paul P. Rooney, Esq.
Reed Smith LLP
599 Lexington Avenue, 28th Floor
New York, New York 10022
(212) 521-5435

*For Defendant Siemens Transportation Systems, Inc.:*

Brant W. Bishop, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

Ryan M. Morettini, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
(212) 446-4800

Robert W. Littleton, Esq.
Littleton Joyce Ughetta & Park LLP
39 Broadway, 34th Floor
New York, New York 10006
(212) 404-5777

*For Defendant Robert Bosch Corp.:*

Arnd N. von Waldow, Esq.
Paul P. Rooney, Esq.
Reed Smith LLP
599 Lexington Avenue, 28th Floor
New York, New York 10022
(212) 521-5435

*For Defendant Wika Instrument Corp.:*

Eileen T. McCabe, Esq.
Stephen Roberts, Esq.
William Lalor, Esq.
Mendes & Mount LLP
750 Seventh Avenue
New York, New York  10019
(212) 261-8000

*For Defendant Hydac Technology Corp.:*

Nancy Ledy-Gurren, Esq.
Ledy-Gurren, Bass & Siff LLP
475 Park Avenue South
New York, New York  10016
(212) 447-1111

*For Defendants American Cyanamid Inc. and Omniglow Corp.:*

E. Gordon Haesloop, Esq.
Bartlett McDonough, Bastone & Monaghan LLP
300 Old Country Road
Mineola, New York  11501
(516) 877-2900

*For Defendant Exxon Mobil:*

John F. Tully, Esq.
Robert Owen, Esq.
Fulbright & Jaworski LLP
666 Fifth Avenue
New York, New York  10103
(212) 318-3000

Exh. N

DOC # 354

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/28/08

U.S. DISTRICT COURT FILED JAN 2 8 2008 S.D. OF N.Y.

MICROFILMED JAN 2 9 2008 -12 00 AM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE: SKI TRAIN FIRE IN KAPRUN AUSTRIA ON NOVEMBER 11, 2000

MDL # 1428 (SAS)

---

This document relates to the following actions:

---

JOHANN BLAIMAUER, et al.,

Plaintiffs,

- against -

OMNIGLOW CORPORATION, et al.,

Defendants.

03-CV-8960 (SAS)

---

HERMAN GEIER, et al.,

Plaintiffs,

- against -

OMNIGLOW CORPORATION, et al.,

Defendants.

03-CV-8961 (SAS)

---

NANAE MITSUMOTO, et al.,

Plaintiffs,

- against -

THE REPUBLIC OF AUSTRIA, et al.,

Defendants.

06-CV-2811 (SAS)

---

**ORDER**

| | |
|---|---|
| NANAE MITSUMOTO, et al.,<br><br>Plaintiffs,<br><br>- against -<br><br>ROBERT BOSCH CORPORATION, et al.,<br><br>Defendants. | 07–CV–935 (SAS) |
| JOOP H. STADMAN, et al.,<br><br>Plaintiffs,<br><br>- against -<br><br>AUSTRIAN NATIONAL TOURIST OFFICE INC., et al.,<br><br>Defendants. | 07–CV–3881 (SAS) |
| RASTKO and DRAGICA FERK, et al.,<br><br>Plaintiffs,<br><br>- against -<br><br>OMNIGLOW CORPORATION, et al.,<br><br>Defendants. | 07–CV–4104 (SAS) |

SHIRA A. SCHEINDLIN, U.S.D.J.:

By motion filed on January 24, 2008, Edward D. Fagan yet again moved this Court to reconsider its denial of his motion for the Court to recuse

itself from the above-captioned actions, most recently set forth by Order dated January 3, 2008 (the "January 3 Order"). As Mr. Fagan is well-aware, he has been disqualified as counsel in the above-captioned actions by Order and Opinion dated August 16, 2007, and he may no longer act on behalf of his former clients.[1] Moreover, these actions are currently the subject of an appeal and a petition for writ of mandamus pending in the Second Circuit Court of Appeals. As a result, this Court now lacks jurisdiction over Mr. Fagan's challenges.[2] As the Court has previously stated, "Mr. Fagan's remedy, if any, lies with the Court of Appeals."[3]

Because the above-captioned cases are no longer before this Court and because Mr. Fagan no longer appears before the Court in any action as either a party or as counsel, he has been ordered on numerous occasions to discontinue making any further motions or directing any correspondence to this Court. Mr. Fagan's blatant disregard of the Court's Orders, despite repeated warnings, warrants the imposition of sanctions and only a brief response to his most recent motion.

---

[1]    *See United States v. Speed Joyeros*, No. 00 Cr. 960, 2001 WL 1597803, at *3-4 (E.D.N.Y. Oct. 19, 2001) (stating that "if an attorney or firm is disqualified, he or it is disqualified for the entire case," including "any appearance in court, the preparation of any legal papers filed with the court, or any correspondence with the court on behalf of any [parties] in this case").

[2]    *See* Fed. R. App. P. 4(a)(4)(B)(i). *See also Stone v. Immigration & Naturalization Serv.*, 514 U.S. 386, 402 (1995).

[3]    *See* 1/3/08 Order.

By Order dated December 26, 2007 (the "December 26 Order"), the Court recused itself sua sponte with respect to any future proceedings in the action captioned *Edward D. Fagan, Dr. Bernd Geier, and Dr. Gerhard Podovsovnik v. James F. Lowy, International Law Group, LLC, Robert J. Hantman, and Hantman & Associates*, 07 Civ. 10293, pursuant to 28 U.S.C. § 455(a). Pursuant to the January 3 Order, the Court, inter alia, reiterated its recusal from that action and denied Mr. Fagan's request by letter dated January 2, 2008 to also recuse itself from the *In re Ski Train Fire in Kaprun Austria on November 11, 2000 ("Ski Train")* cases. Furthermore, Mr. Fagan was directed to discontinue making any motions or transmitting any further correspondence to the Court on the grounds that he is no longer counsel to any party in the *Ski Train* cases, and because any remedy he seeks now lies with the Court of Appeals.

Mr. Fagan has insisted upon flagrant violation of those Orders, and continues to make frivolous motions that have amounted to harassment of the Court. As noted above, on January 24, 2008, Mr. Fagan, purportedly on behalf of plaintiffs in the above-captioned actions, filed yet another motion requesting reconsideration of the January 3 Order and an expedited pre-motion conference. In that motion, Mr. Fagan makes immaterial and baseless accusations that the Court recused itself from the action in which Mr. Fagan appears as a plaintiff after reviewing papers submitted in that action, contrary to the Court's own

representation in the December 26 Order. Mr. Fagan claims that because the Court referred to the action's caption as including plaintiffs "Dr. Bernd Beier and Dr. Gerhard Podovsovnik," in addition to Mr. Fagan, the Court must have reviewed the parties' submissions and therefore did not recuse itself sua sponte.[4]

Mr. Fagan's accusations are baseless and warrant only a brief response. As an initial matter, the Court's representation in the December 26 Order that it had not reviewed any submissions in deciding to recuse itself sua sponte from the action is accurate and is properly understood to refer to any substantive review of those submissions. To the extent that any review of submissions was made, it was very narrowly limited only to a review of the case captions on those submissions in an effort to properly identify the case. This is in accordance with the Court's long-standing practice of including all parties' names in a case caption where applicable. Indeed, while Mr. Fagan now inappropriately attempts to cast a sinister light on the Court's use of a caption that includes other plaintiffs in addition to himself, Mr. Fagan's own Notice of Appearance, filed with this Court on November 26, 2007, refers to the case 07 Civ. 10293 in the caption

---

4 *See* 1/24/08 Declaration in Support of Motion for (i) Reconsideration of January 3, 2008 Order (Entered on Jan. 11, 2008), (ii) Pre-Motion Conference Pursuant to FRCP 16 and (iii) For Other Just and Equitable Relief ("Fagan Decl.") ¶¶ 6, 19.

as "Fagan, et al. v. Lowy, et al."[5] The Court, acting on plaintiff's representation in its own filing that the case includes plaintiffs in addition to Mr. Fagan as indicated by the "et al.," then endeavored only to apprise itself of the full caption that applied to the action. Mr. Fagan's characterization of the Court's effort to use a comprehensive caption (whether that caption is now accurate or not) for the case as demonstrative of "bias, prejudice and inappropriate conduct"[6] is simply unfounded.

Mr. Fagan's motion for reconsideration of the January 3 Order is denied, as well as his motion for a pre-motion conference. The Clerk of the Court is directed to close this motion [Document No. 353]. Mr. Fagan has been previously warned that the Court may impose sanctions if he continues to violate its Orders, yet this warning has not deterred him from doing so. As a result, Mr. Fagan is fined $500.00 which is due immediately, and should be remitted to the Clerk of the Court, United States District Court, Southern District of New York,

---

5 *See* 11/26/07 Notice of Appearance Filed by Edward D. Fagan, Esq., attached hereto as Exhibit A.

6 Fagan Decl. ¶ 28.

500 Pearl Street, New York, New York 10007.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:  New York, New York
        January 25, 2008



- Appearances -

Edward D. Fagan, Esq.
Five Penn Plaza, 23rd Floor
New York, NY 10001
(646) 378-2225

*For Defendant Bosch Rexroth Corp., Robert Bosch Corp.:*

Neil Rosolinsky, Esq.
Reed Smith LLP
599 Lexington Avenue, 28th Floor
New York, NY 10022
(212) 549-0391

*For Defendant Siemens Transportation Systems, Inc. and as Liaison Counsel for all Defendants:*

Brant W. Bishop, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

Ryan M. Morettini, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022
(212) 446-4800

Robert W. Littleton, Esq.
Littleton Joyce Ughetta & Park LLP
39 Broadway, 34th Floor
New York, NY 10006
(212) 404-5777

*For Defendant Wika Instrument Corp.:*



Eileen T. McCabe, Esq.
Stephen Roberts, Esq.
William Lalor, Esq.
Mendes & Mount LLP
750 Seventh Avenue
New York, NY 10019
(212) 261-8000

*For Defendant Hydac Technology Corp.:*

Nancy Ledy-Gurren, Esq.
Ledy-Gurren, Bass & Siff LLP
475 Park Avenue South
New York, NY 10016
(212) 447-1111

*For Defendants American Cyanamid Inc. and Omniglow Corp.:*

E. Gordon Haesloop, Esq.
Bartlett McDonough, Bastone & Monaghan LLP
300 Old Country Road
Mineola, NY 11501
(516) 877-2900

*For Defendant Exxon Mobil:*

John F. Tully, Esq.
Robert Owen, Esq.
Fulbright & Jaworski LLP
666 Fifth Avenue
New York, NY 10103
(212) 318-3000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FAGAN, et al, PLAINTIFF, - vs - LOWY, et al, DEFENDANTS. | CIVIL ACTION 07-CV-10293(UA) (action removed Nov. 13, 2007 from NY Supreme Court) |

## NOTICE OF APPEARANCE

To the Clerk of this Court and all parties of record:

Kindly enter or re-enter (as the case may be) my appearance as a Pro Se Litigant in the above referenced matter.

Dated: November 26, 2007
New York, NY

/s/ Edward D. Fagan (electronically signed)

Edward D. Fagan, Esq.
5 Penn Plaza, 23rd Floor
New York, NY 10001
Tel. (646) 378-2225
Fax (646) 417-5558
Plaintiff
Email: faganlawintl@aim.com



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused the foregoing

**NOVEMBER 26, 2007 NOTICE OF APPEARANCE**

to be electronically filed with the Clerk of the Court and electronically served upon all counsel of record.

Dated: November 26, 2007
New York, NY

/s/ Edward D. Fagan (electronically signed)
Edward D. Fagan Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CHAMBERS OF JUDGE SHIRA A. SCHEINDLIN
NEW YORK, NEW YORK 10007
Telephone (212) 805-0246
Telefax (212) 805-7920

## FACSIMILE COVER SHEET

The information contained in this facsimile message is intended only for the use of the individual or entity named below. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone, and return the original message to us at the above address via the U.S. Postal Service.

ADDRESSEE: Brant Bishop, Esq.

ADDRESSEE FACSIMILE TELEPHONE NUMBER: 202-879-5200

NAME OF COMPANY: Kirkland & Ellis LLP

COMPANY TELEPHONE NUMBER: 202-879-5000

CITY AND STATE: Washington DC

DATE TRANSMITTED: 1/25/08 TIME TRANSMITTED: 6:00pm.

SENDER/NAME: JUDGE SHIRA A. SCHEINDLIN

OPERATOR: Jennifer A. Lee

CASE NAME: In re Ski Train

DOCKET NUMBER: 01-MDL-1428

NUMBER OF PAGES Including Cover Sheet: 10

**PLEASE DELIVER IMMEDIATELY!!**

MESSAGE: ~~LETTER~~ ORDER ENDORSEMENT

** IT IS ORDERED that counsel to whom this ~~LETTER~~ ORDER ENDORSEMENT is faxed is responsible for notifying all parties and retaining verification of such in your case file. Do not Fax such verification to Chambers.

_X_ Original will NOT follow ____ Original WILL follow

Exh. O

S.D.N.Y. - N.Y.C.
01-md-1428
Scheindlin, J.

# United States Court of Appeals
FOR THE
SECOND CIRCUIT

---

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 29th day of February, two thousand eight,

Present:

Hon. José A. Cabranes,
Hon. Rosemary S. Pooler,
Hon. Robert D. Sack,
*Circuit Judges.*

---

In re Ski Train Fire in Kaprun Austria on November 11, 2000.

Rudolf Kern, *et al.*,

*Plaintiffs-Appellants,*

v.

Leitner Lifts USA Inc., *et al.*

*Defendants-Appellees.*

07-4121-cv (L)
07-5317-cv (con.)

---

In re Kaprun Foreign Victims and Survivors Heirs and Family Representatives.

*Petitioners.*

08-0327-op

---

The above-noted matters are consolidated for purposes of this order. Appellants, through now-disqualified counsel, Edward Fagan, move for an extension of time to file their brief in the appeal filed under 07-4121-cv. Appellees move to dismiss the appeals filed under 07-4121-cv and 07-5317-

SAO-JS

cv. Appellants also petition for a writ of mandamus in the proceeding filed under 08-0327-op. Upon due consideration, it is hereby ORDERED that Edward Fagan show cause, within twenty one days of the date of this order, why he should be permitted to continue representing the appellants in these cases. Specifically, counsel is ordered to submit to this Court evidence that: (1) the appellants are aware of the district court's disqualification order; (2) the appellants wish to continue with these appeals and the mandamus proceeding; (3) the appellants wish for Fagan to represent them in this Court; and (4) the district court's disqualification order was an abuse of discretion, and should not extend to the matters currently before this Court. Fagan is also ordered to address this Court's appellate jurisdiction. See Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 440 (1985) ("We hold that orders disqualifying counsel in civil cases . . . are not collateral orders subject to appeal as "final judgments" within the meaning of 28 U.S.C. § 1291."); Hageman v. City Investing Co., 851 F.2d 69, 71 (2d Cir. 1988) ("[W]hen there is a judgment in a consolidated case that does not dispose of all claims which have been consolidated, there is a strong presumption that the judgment is not appealable absent Rule 54(b) certification."). The appellees may address these matters in a response to Fagan's submission, filed within ten days of the filing of Fagan's submission. Accordingly, the pending motions and mandamus petition are held in abeyance pending counsel's response to this order. No extensions of time to respond to this order will be granted.

In addition, Fagan is enjoined from filing any further submissions in any proceeding filed in this Court, with the exception of his response to this order, until further order of the Court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

By: ____________________

Exh. P

S.D.N.Y. - N.Y.C.
01-md-1428
Scheindlin, J.

# United States Court of Appeals
FOR THE
SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 2nd day of April, two thousand eight,

Present:

Hon. José A. Cabranes,
Hon. Rosemary S. Pooler,
Hon. Robert D. Sack,
*Circuit Judges.*

In re Ski Train Fire in Kaprun Austria on November 11, 2000.

Rudolf Kern, *et al.*,

*Plaintiffs-Appellants,*

v.

Leitner Lifts USA Inc., *et al.*,

*Defendants-Appellees.*

07-4121-cv (L)
07-5317-cv (con.)

In re Kaprun Foreign Victims and Survivors Heirs and Family Representatives,

*Petitioners.*

08-0327-op

The above-noted matters are consolidated for purposes of this order. Appellants, through counsel, Edward Fagan, move for an extension of time to file their brief in the appeal filed under 07-4121-cv. Appellees move to dismiss the appeals filed under 07-4121-cv and 07-5317-cv. Appellants also petition for a writ of mandamus in the proceeding filed under 08-0327-op.

SAG: JS

On February 29, 2008, we issued an order directing counsel for the appellants, Edward Fagan, to address this Court's appellate jurisdiction and to show cause why he should be permitted to continue as counsel in these cases. Although Fagan filed a timely response, he did not address this Court's appellate jurisdiction. Upon due consideration, it is hereby ORDERED that the appeals docketed under 07-4121-cv and 07-5317-cv are DISMISSED for lack of appellate jurisdiction. *See Kamerman v. Steinberg*, 891 F.2d 424, 429-30 (2d Cir. 1989); *In re Repetitive Stress Injury Litigation*, 11 F.3d 368, 372 (2d Cir. 1993); *Cunningham v. Hamilton County*, 527 U.S. 198, 204 (1999).

In addition, upon review of the response to the February 29, 2008 order and the record, we find that the district court's disqualification order was not a clear abuse of discretion or a usurpation of power, and it should extend to the matters currently before this Court. *See In re von Bulow*, 828 F.2d 94, 97 (2d Cir. 1987)); *Interco Sys. v. Omni Corporate Servs.*, 733 F.2d 253, 255 (2d Cir. 1984) . Accordingly, it is hereby ORDERED that the mandamus petition is DENIED, in part, with respect to any challenge to the district court's disqualification of Fagan and any challenge to the district court's orders denying relief requested by Fagan subsequent to his disqualification, and Edward Fagan is DISQUALIFIED as counsel in the present cases before this Court, as well as any future cases relating to the underlying litigation. No further submissions filed by Fagan will be accepted by this Court with respect to the underlying litigation, except for a petition for rehearing of this order or pleadings related to an appeal to the Supreme Court.

It is further ORDERED that the remaining portions of the mandamus petition – with respect to evidence spoliation and a request for assignment to a different district court judge – will be dismissed if new counsel does not enter an appearance within 14 days of the filing of this order.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

By: Judy Pisnanont
Judy Pisnanont, Motions Staff Attorney

SAO-JS