UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
TEACHERS4ACTION, et al.,

                                                Plaintiffs,

                   -against-

MICHAEL G. BLOOMBERG, et al.,

                                        Defendants.

**DECLARATION OF BLANCHE GREENFIELD IN SUPPORT OF CITY DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**08 civ. 548 (VM) (AJP)**

------------------------------------------------------------------------x

      **BLANCHE GREENFIELD**, an attorney duly admitted to practice law before the bar of this Court, declares, under the penalty of perjury, as follows:

      1.      I am an Assistant Corporation Counsel in the office of Michael A. Cardozo, Corporation Counsel of the City of New York, attorney for Defendants Mayor Michael Bloomberg, Chancellor Joel Klein, the City of New York, and the New York City Board of Education (sued herein as the "Department of Education") (hereinafter collectively referred to as "City defendants") in the above-captioned action.

      2.      I submit this declaration in order to place before the Court certain documents cited or relied upon by plaintiffs' in their Second Amended Complaint, certain transcripts of conferences held before this Court, and the prior pleadings filed by plaintiffs in this action.

      3.      Annexed hereto as Exhibit "A" is a copy of the Complaint filed on or about January 21, 2008.

4.      Annexed hereto as Exhibit "B" is a copy of the transcript of the conference held before the Court on January 28, 2008.

5.      Annexed hereto as Exhibit "C" is a copy of the transcript of the conference held before the Court on February 8, 2008.

6.      Annexed hereto as Exhibit "D" is a copy of the Amended Complaint served on City defendants on or about February 25, 2008.

7.      Annexed hereto as Exhibit "E" is a copy of the transcript of the conference held before the Court on May 1, 2008.

8.      Annexed hereto as Exhibit "F" is a copy of the Second Amended Complaint served on June 2, 2008.

9.      Annexed hereto as Exhibit "G" is Article Fifteen of the collective bargaining agreement entered into by the Department of Education with the United Federation of Teachers.

10.     Annexed hereto as Exhibit "H" is Article 21 of the collective bargaining agreement entered into by the Department of Education with the United Federation of Teachers.

**WHEREFORE**, for the reasons set forth in City defendants' memorandum of law submitted in support of their motion to dismiss, City defendants respectfully request that

this Court issue an order dismissing the Second Amended Complaint in its entirety, with fees and

costs and for such other and further relief as the Court deems just and proper.

Dated: New York, New York
      July 7, 2008

Blanche Greenfield
Assistant Corporation Counsel

EXHIBIT "A"

RECEIVED

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK 08 JAN 21 PM 12: 53

U.S. DISTRICT COURT

JUDGE MARRERO

```
-------------------------------------X
TEACHERS4ACTION,                     :
        On behalf of its Members     :
        And By Florian Lewenstein,   :
        Its Treasurer and Spokesperson, :
JOHN DOE & JANE DOE TEACHERS 1 - 50- :
                                     :
                PLAINTIFFS           :
                                     :
        - VS -                       :
                                     :
MICHAEL G. BLOOMBERG,                :
JOEL KLEIN,                          :
NEW YORK CITY                        :
        DEPARTMENT OF EDUCATION,     :
SUPERINTENDENTS 1 - 10; and          :
PRINCIPALS 1 – 10;                   :
                                     :
                DEFENDANTS           :
-------------------------------------X
```

CIVIL ACTION

08 CV 0548

JAN 2 2008
U.S.D.C. S.D. N.Y.
CASHIERS

COMPLAINT
(JURY TRIAL DEMANDED)

## INTRODUCTION

Upon information and belief, Plaintiffs' allegations are that from 2000 until today, the

New York City Board of Education has implemented a scheme that discriminates against its

most qualified teachers. The goal is to reduce salaries by forcing teachers to quit or be fired.

This goal is accomplished through "Temporary Reassignment Centers" (known as "Rubber

Rooms") to which the "targeted" teachers are sent. The plan involves Principals notifying

"targeted" teachers that they are removed from classes, stripped of teaching responsibilities and

reassigned to a Rubber Room, where they wait until (i) charges are brought or they are coerced

into accepting deals that include fines and can lead to their terminations. Currently almost 1,000

teachers languish in Rubber Rooms in violation of their due process rights and the chance to

clear their names and be restored to their classrooms. The Rubber Rooms constitute racist and

discriminatory policies, are the functional equivalent of modern day "internment camps" where

"targeted" teachers are banished for months, or even years, before they can fight unfounded charges. The Rubber Rooms undermine sound education policies and deprive students of qualified competent teachers.   The Rubbers Rooms constitutes a fraudulent plan, scheme and/or enterprise through which these Defendants came together to target a particular group of teachers in violation of, Federal laws, including among others, the 5th and 14th Amendments, 42 U.S.C. § 2000 e ("Title VII of the Civil Rights Act of 1964"), 29 U.S.C. § 621 ("Age Discrimination in Employment Act of 1967"), 42 U.S.C. § 1981 ("Civil Rights Act of 1991"), 18 U.S.C. § 1962 et seq. ("The RICO Statute"), 18 U.S.C. § 1341 ("Wire Fraud") and 18 USC 1343 ("Mail Fraud"), relevant New York State laws including New York Consolidated Law, Chap. 40, Part Three, Title K, Art. 190 ("Schemes to Defraud"), New York Consolidated Law, Chap. 40, Part Four, Title X, Art. 460 ("Enterprise Corruption"), as well as NY and Federal laws related to misuse of public funds.

## COMPLAINT

## JURISDICTION

1) The Court has original jurisdiction over Plaintiffs' claims based upon alleged violations of the 5th and 14th Amendments, 42 U.S.C. § 2000 e ("Title VII of the Civil Rights Act of 1964"), 29 U.S.C. § 621 (Age Discrimination in Employment Act of 1967), 42 U.S.C. § 1981 ("Civil Rights Act of 1991"), 18 U.S.C. § 1962 et seq. ("The RICO Statute"), 18 U.S.C. § 1341 ("Wire Fraud") and 18 USC 1343 ("Mail Fraud") and Federal laws related to misuse of public funds.

2) The Court has ancillary and/or supplemental jurisdiction of all Plaintiffs'' state law claims pursuant to 28 USC § 1367.

3) Each of the claims of the named Plaintiffs exceeds the statutory limit of this Court, exclusive of attorneys' fees, costs and interest.

## VENUE

4)  Venue is proper in this Court because one or more of the Plaintiffs live in this judicial

district, and one of more of the Defendants live and/or do business in this district, and/or the

Defendants' unlawful acts occurred within this judicial district.

## PARTIES

### Plaintiffs

5)  Plaintiff Teachers4Action[1] is an unincorporated association pursuant to Gen. Association

Laws Art. 3.

6)  Plaintiff Florian Lewenstein is the Treasurer and Spokesperson of Plaintiff Teachers4Action

and is authorized and has standing to commence and prosecute this action, individually and

on behalf of Plaintiff Teachers4Action.

7)  Plaintiffs John Does and Jane Does 1 – 100[2] are teachers who fall into certain categories,

including but not limited to (i) teachers who are presently re-assigned to Rubber Rooms; (ii)

teachers in the midst of the administrative discipline process and against whom false charges

have been brought; (ii) teachers who were forced, harassed, intimidated and/or coerced to

accept onerous or unfair deals, (ii) teachers who suffer loss of property, loss of pay and other

monetary losses; (iii) teachers who suffer physical or emotional injuries from being forced

into Rubber Rooms; (iv) teachers who cannot get other jobs; and (v) teachers who are

otherwise being targeted and victimized as part of the fraud, scheme and enterprise.

---

[1] Teachers4Action™® are in the process of obtaining formal approval by the New York State
Department of Education as a Not-For-Profit Corporation and is seeking similar status under the
IRS Code Section 501(c ) (3).

[2] The names John Doe and Jane Doe are being used to maintain the teachers' identities because
the teachers are fearful of further retaliation.

3

## Defendants

8) Defendant Michael G. Bloomberg ("Bloomberg") is the Mayor of New York City and in that capacity has direct control over the New York City Public Schools.

9) Defendant Joel Klein ("Klein") is the Chancellor of the New York City Department of Education and together with Bloomberg has control over the New York City Public Schools.

10) Defendant New York City Department of Education ("DOE") is Plaintiffs' employer.

11) Superintendents 1 – 10 are persons who were involved with the targeting of teachers and the fraud, scheme and enterprise as noted below.

12) Principals 1 – 10 are persons who had direct contact with Plaintiffs in the schools to which they were assigned before they were targeted in the fraud, scheme and enterprise as noted below.

## FACTS COMMON TO ALL CAUSES OF ACTION

13) Starting in or about 2002, the office of the Mayor of New York City assumed direct control over the New York City Public Schools.

14) In or about 2003, the DOE was completely reorganized under control of the Office of the Mayor.

15) Since 2000, the DOE has systematically implemented and carried out a plan that discriminates against Plaintiffs' members, who are among the most qualified teachers in NYC and perhaps in the country.

16) The plan and scheme called for the Superintendents and Principals to help Bloomberg, Klein and the DOE reduce the budget for the various districts and schools.

17) The plan and scheme called for Plaintiff Teachers4Action members, and other teachers that fit a certain criteria, to be targeted for discrimination, harassment and intimidation.

4

18) This would be accomplished by the "targeted" teachers being accused of certain false charges, including but not limited to their (i) allegedly being insubordinate, (ii) their work allegedly being substandard, (iii) their allegedly being physically or emotionally abusive to students or (iv) any other allegedly improper conduct.

19) Once accused of the false charges the "targeted" teachers were to be immediately "re-assigned" to "Temporary Reassignment Centers" (more commonly known as "Rubber Rooms").

20) The targeted teacher would be banished to the Rubber Rooms without just cause and without due process.[3]

21) The "targeted" teachers are/were (i) removed from classes, (ii) stripped of teaching responsibilities and (iii) reassigned to a Rubber Room.

22) The "targeted" teachers are/were (i) those who were over a certain minimum age, (ii) those who had achieved a high pay and benefits level and who had been employees of the DOE for more than a dozen years, (iii) those who dared to challenge and/or question DOE practices and / or the "Rubber Room" procedures, (iv) whistle blowers and (v) those who dared to demand their rights, including seniority transfers and/or due process rights.

23) The "targeted" teachers are/were forced to wait in the Rubber Rooms without due process and the chance to clear their names and be restored to their classrooms.

24) Another goal of the Rubber Room process is to coerce, harass, intimidate and terrorize the "targeted" teachers so that they will be fearful for their personal and professional well-being and will then retire or resign or be "forced" to accept deals involving ruinous fines or termination.

---

[3] The Rubber Rooms are in part the result of agreements made between Plaintiffs' union, the United Federation of Teachers and Defendants Bloomberg, Klein and the DOE; however the implementation of the Rubber Room practices and concept are discriminatory and violate the targeted teachers rights.

25) Once in the Rubber Rooms, the "targeted" teachers are forced to wait until charges are brought, or until they agree to deals that lead to fines, improper charges and/or records placed in their permanent files and can also include termination.

26) The Rubber Room practice involves knowing, intentional, careless, reckless, negligent and/or otherwise improper waste and abuse of public funds.

27) The Rubber Room and the practice of targeting teachers as described above, is/was part of the fraud, scheme and plan to harass and discriminate against certain teachers, hereinafter referred to as "The Fraudulent Scheme".

28) At all times relevant hereto, Defendants Bloomberg and Klein, and/or persons acting in their name and with their authority, were ultimately responsible for the approval of The Fraudulent Scheme.

29) At all times relevant hereto, Defendant DOE and its officials and/or representatives, were charged with the implementation of The Fraudulent Scheme.

30) At all times relevant hereto, Defendant Superintendents were responsible to Defendants Bloomberg, Klein and the DOE to insure that The Fraudulent Scheme was carried out as per the instructions of Defendants Bloomberg, Klein and DOE.

31) At all times relevant hereto, Defendant Principals were responsible to Defendant Superintendents that The Fraudulent Scheme was carried out as per the instructions of Defendants Bloomberg, Klein and DOE.

32) At all times relevant hereto, and to insure that The Fraudulent Scheme was carried out according to the instructions of Defendants Bloomberg, Klein and DOE, the Defendants caused certain written handbooks and/or manuals to be created and distributed which Defendants Superintendents and Principals were to required and/or directed to follow.

33) At all times relevant hereto, the aforesaid written handbooks and/or manuals were mailed and/or electronically delivered to Defendants Superintendents and Principals as part of The Fraudulent Scheme.

34) At all times relevant hereto, in addition to the aforesaid written handbooks and/or manuals Defendants Bloomberg, Klein and DOE caused additional policies and/or guidelines to be created and distributed to Defendants Superintendents and Principals which they were in turn required and/or directed to follow as part of The Fraudulent Scheme.

35) As of early 2000, there were approximately 300 teachers reportedly accused of "misconduct" and/or "incompetence" who were banished to "Rubber Rooms" as part of The Fraudulent Scheme. *See Exhibit 1 – NY Times Article dated March 1, 2000.*

36) As teachers' years of employment, experience and tenure increased so too was the need to banish more and more teachers to the Rubber Rooms, all of which was accomplished by an increasing number of teachers accused of "misconduct" and/or "incompetence" so that they could be banished to "Rubber Rooms", as part of The Fraudulent Scheme.

37) Starting in or about 2004, Defendants Bloomberg, Klein and the DOE, determined that the number of teachers targeted had to be increased so that they could achieve the goal of the Fraudulent Scheme, reduce payroll at the expense of qualified teachers by subjecting them to The Fraudulent Scheme, targeting, harassment, intimidation, coercion and banishment to Rubber Rooms.

38) Upon information and belief, a "Confidential" revision to prior manuals was distributed, by mail and/or electronic transmission, with directions to Defendants Superintendents and Principals outlining and directing them as to what practices they were to follow as part of the Fraudulent Scheme.

39) Upon information and belief, additional instructions and directions were given directly to

Defendants Superintendents and Principals outlining and directing them as to what practices

they were to follow as part of the Fraudulent Scheme.

40) The additional instructions, directions and policies as set forth in the "Confidential" manual,

were followed by the Defendants Superintendents and Principals and caused a dramatic

increase in the reports of alleged "misconduct" and/or "incompetence" and new categories

for discipline were included to, such as "insubordination", all of which was designed to

further the goal of The Fraudulent Scheme.

41) By of mid 2005, there were reportedly over four hundred teachers who had been banished to

"Rubber Rooms" as part of The Fraudulent Scheme.  *See Exhibit 2 – National Council of*

*Teacher Equality Bulletin dated June 8, 2005.*

42) By mid 2006, there were reportedly approximately 600 "targeted" teachers who had been

banished to "Rubber Rooms" as part of The Fraudulent Scheme.  *See Exhibit 3    April 24,*

*2007 Village Voice Article.*

43) As of 2006, Defendants were already on notice on the basis of reports issued by the Office of

Special Commissioner of Investigations ("SCI") that the charges against only half of the

"targeted" teachers" were substantiated. *See Exhibit 3    Village Voice Article.*

44) As of 2006, Defendants Bloomberg, Klein and the DOE, intentionally, maliciously,

recklessly, carelessly and/or negligently, disregarded the findings of the SCI and actually

directed and increased The Fraudulent Scheme so that more and more teachers were

unlawfully "targeted".

45) By the end of 2007, there were estimates ranging from "over 700" to "757" "targeted"

teachers who had been banished to "Rubber Rooms" as part of The Fraudulent Scheme.  *See*

*Exhibits 4 & 5 – Oct. 15, 2007 New York Sun Article and Sept. 25, 2007 New York Post Article.*

46) The primary purpose of The Fraudulent Scheme was/is to reduce the school budgets.

47) The Rubber Room practice is racist and discriminatory.

48) The Rubber Rooms are the modern day equivalent of "internment camps" where the "targeted" teachers are banished for months, or even years, before they can fight unfounded "charges."

49) Many of the "targeted" teachers in the Rubber Rooms are paid in whole or part from New York State or Federally Funded programs.

50) While in the Rubber Rooms, the "targeted" teachers are still being paid and the "substitute" and/or replacement teachers are also being paid.

### First Cause of Action – RICO Enterprise

51) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

52) The Defendants associated with one another in an enterprise the activities of which affected, interstate as defined in 18 U.S.C. § 1962(c).

53) The Defendants conspired with one another to violate § 1962(c).

54) The Defendants' conduct (hereinafter "The Fraudulent Scheme and/or Enterprise") as relates specifically to this case of action included the conspiracy to "target" teachers who are/were:

    a.    those who were over a certain minimum age;

    b.    those had achieved a high pay and benefits level;

    c.    those who had been employees for more than a minimum number of years;

    d.    those who dared to challenge and/or question the "Rubber Room" procedures;

    e.    those who acted as whistle blowers regarding DOE misconduct, and

    f.    those who dared to demand or insist upon their due process rights.

55) The Fraudulent Scheme and/or Enterprise also included Defendants conspiring with one
another to, among other things:

    a.    force the targeted teachers to wait in the Rubber Rooms without due process and the
chance to clear their names and be restored to their classrooms

    b.    coerce, harass, intimidate and terrorize the "targeted" teachers so that they will be
fearful for their personal and professional well-being so that they would be "forced"
to retire, resign or accept deals involving ruinous fines or termination.

56) To accomplish The Fraudulent Scheme and/or Enterprise, Defendants utilized the US mail
and used electronic means including but not limited to telephone, faxes and emails.

57) Manuals, instructions, directions and confidential materials that were part of The Fraudulent
Scheme were exchanged between Defendants Bloomberg, Klein, DOE, Superintendents and
Principals during the period from 2000 to the present.

58) Also, Defendants sent notices and other documents that were part of The Fraudulent Scheme
and/or Enterprise to Plaintiffs via the US mail.

59) Defendants use of mail and wire services in the furtherance of The Fraudulent Scheme and/or
Enterprise constitutes and/or satisfied the predicate act of racketeering under federal mail
fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343.

60)    As a direct and proximate result of The Fraudulent Scheme and/or Enterprise, Plaintiffs
suffered monetary and other damages.

    **WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or
in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their
individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii)

exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier

of fact; and (iii) attorneys' fees, interest and costs of suit.

## Second Cause of Action - Fraud

61) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the

same were repeated fully and at length herein.

62) The Defendants associated with one another to defraud the Plaintiffs and other targeted

teachers out of salaries and benefits.

63) The Defendants conspired with one another to defraud the "targeted" teachers:

    a.     who were over a certain minimum age;

    b.     who had achieved a high pay and benefits level;

    c.     who had been employees for more than a minimum number of years;

    d.     who dared to challenge and/or question the "Rubber Room" procedures;

    e.     who acted as whistle blowers regarding DOE misconduct, and

    f.     who dared to demand or insist upon their due process rights.

64) The Defendants conspired with one another to, among other things:

    a.    force the targeted teachers to wait in the Rubber Rooms without due process and the

    chance to clear their names and be restored to their classrooms

    b.    coerce, harass, intimidate and terrorize the "targeted" teachers so that they will be

    fearful for their personal and professional well-being so that they would be "forced"

    to retire, resign or accept deals involving ruinous fines or termination.

65) The Defendants' conspiracy to defraud the targeted teachers included false allegations

against Plaintiffs and targeted teachers by placing designations in their files and/or charging

teachers (i) of alleged "misconduct", (ii) of allegedly being "incompetent", or (iii) of

allegedly being "insubordinate".

66) At the time Defendants made the aforesaid charges against the targeted teachers, they knew the charges to be false and untrue.

67) The filing of the aforesaid charges is/was part of the fraud against the targeted teachers.

68) As a direct and proximate result of the aforesaid fraud, Plaintiffs suffered monetary and other damages.

69)      As a direct and proximate result of aforesaid wrongful acts, Plaintiffs suffered monetary and other damages.

        WHEREFORE, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Third Cause of Action - Discrimination

70) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

71) The Fraudulent Scheme and/or Enterprise was designed to and did in fact target certain teachers for discrimination and harassment.

72) The Fraudulent Scheme and/or Enterprise discriminated against teachers:

      a.      who were over a certain minimum age;

      b.      who had achieved a high pay and benefits level;

      c.      who had been employees for more than a minimum number of years;

      d.      who dared to challenge and/or question the "Rubber Room" procedures;

      e.      who acted as whistle blowers regarding DOE misconduct, and

      f.      who dared to demand or insist upon their due process rights.

73) As part of their discriminatory practices, among other things, Defendants:

    a.  forced the targeted teachers to wait in the Rubber Rooms without due process and the chance to clear their names and be restored to their classrooms

    b.  coerced, harassed, intimidated and terrorized the "targeted" teachers so that they would 1 be fearful for their personal and professional well-being so that they would be "forced" to retire, resign or accept deals involving ruinous fines or termination.

74) At the time Defendants discriminated against the targeted teachers, they knew their actions were discriminatory and unlawful.

75)     As a direct and proximate result of the aforesaid discrimination, Plaintiffs suffered monetary and other damages.

     **WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Fourth Cause of Action - Harassment

76) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

77) The Fraudulent Scheme and/or Enterprise was designed to and did in fact target certain teachers for discrimination and harassment.

78) The Fraudulent Scheme and/or Enterprise harassed teachers:

    a.  who were over a certain minimum age;

    b.  who had achieved a high pay and benefits level;

    c.  who had been employees for more than a minimum number of years;

13

    d.    who dared to challenge and/or question the "Rubber Room" procedures;

    e.    who acted as whistle blowers regarding DOE misconduct, and

    f.    who dared to demand or insist upon their due process rights.

79) As part of the harassment, among other things, Defendants:

    a.    forced the targeted teachers to wait in the Rubber Rooms without due process and the chance to clear their names and be restored to their classrooms

    b.    coerced, intimidated and terrorized the "targeted" teachers so that they would l be fearful for their personal and professional well-being so that they would be "forced" to retire, resign or accept deals involving ruinous fines or termination.

80) At the time Defendants harassed the targeted teachers, they knew their actions were discriminatory and unlawful.

81) As a direct and proximate result of the aforesaid harassment, Plaintiffs suffered monetary and other damages.

    **WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

**Fifth Cause of Action**
**Violation of 5th Amendment Due Process, Equal Protection and Due Process Rights**

82) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

83) The Fraudulent Scheme and/or Enterprise was designed to interfere with Plaintiffs and other target teachers "teachers licenses", salaries and due process rights to have the unfounded allegations and charges expeditiously investigated and resolved.

84) The Fraudulent Scheme and/or Enterprise was designed to cause targeted teachers to be faced with "unsupported" or "false" or "fabricated" charges, which caused them to be placed in the Rubber Rooms, where they waited for months and years without a chance to clear their names and protect their salaries, licenses and property rights.

85) While in the Rubber Rooms, teachers were deprived of due process and/or the chance to clear their names and be restored to their classrooms

86) While in the Rubber Rooms, teachers were coerced, harassed, intimidated and terrorized so that they would be fearful for their personal and professional well-being so that they would be "forced" to retire, resign or accept deals involving ruinous fines or termination.

87) Defendants' aforesaid acts, violate the 5th Amendment to the Constitution by depriving Plaintiffs of their due process rights and were otherwise unlawful.

88) As a direct and proximate result of the aforesaid violation of Plaintiffs' due process rights, Plaintiffs suffered monetary and other damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Sixth Cause of Action
### Violation of 14th Amendment –Enacting of Laws that Violate Due Process Rights

89) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

90) During the period from 2000 to the present, Defendants implemented and/or enforced laws, legislation, statutes and/or administrative procedures[1] which were intended to interfere with Plaintiffs and other target teachers "teachers licenses", salaries and due process rights.

91) During the period from 2000 to the present, Defendants implemented and/or enforced laws, legislation, statutes and/or administrative procedures designed to frustrate targeted teachers' ability to expeditiously defend themselves against the "unsupported" or "false" or "fabricated" charges, which caused them to be placed in the Rubber Rooms, where they waited for months and years without a chance to clear their names and protect their salaries, licenses and property rights.

92) The laws, legislation, statutes and/or administrative procedures, implemented and/or enforced by Defendants, deprived Plaintiffs of due process and/or the chance to clear their names and be restored to their classrooms

93) As a direct and proximate result of the Defendants implemented and/or enforced laws, legislation, statutes and/or administrative procedures, in violation of Plaintiffs' due process rights, Plaintiffs suffered monetary and other damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

---

[1] The laws, legislations, statutes and administrative regulations include and are not limited to those which regulate the "3020 a" hearings, which are the only means by which the targeted teachers can defend themselves, but which are little more than "Kangaroo Courts" where the teachers do not have a chance to be exonerated and must ultimately accept deals or administrative rulings that include ruinous fines or termination.

### Seventh Cause of Action
### Violation of 42 U.S.C. § 2000 e ("Title VII of the Civil Rights Act of 1964")

94) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

95) The Fraudulent Scheme and/or Enterprise was designed to and did in fact target certain teachers for discrimination and harassment.

96) The Fraudulent Scheme and/or Enterprise discriminated against teachers:

    a.    who were over a certain minimum age;

    b.    who had achieved a high pay and benefits level;

    c.    who had been employees for more than a minimum number of years;

    d.    who dared to challenge and/or question the "Rubber Room" procedures;

    e.    who acted as whistle blowers regarding DOE misconduct, and

    f.    who dared to demand or insist upon their due process rights.

97) As part of their discriminatory practices, among other things, Defendants:

    a.  forced the targeted teachers to wait in the Rubber Rooms without due process and the chance to clear their names and be restored to their classrooms

    b.  coerced, harassed, intimidated and terrorized the "targeted" teachers so that they would l be fearful for their personal and professional well-being so that they would be "forced" to retire, resign or accept deals involving ruinous fines or termination.

98) At the time Defendants discriminated against the targeted teachers, they knew their actions were discriminatory and unlawful.

99)    Defendant aforesaid discrimination of the targeted teachers violate 42 U.S.C. § 2000 e ("Title VII of the Civil Rights Act of 1964").

100)    As a direct and proximate result of the aforesaid discrimination, Plaintiffs suffered monetary and other damages.

101)    As a direct and proximate result of aforesaid wrongful acts, Plaintiffs suffered monetary

and other damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or

in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their

individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii)

exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier

of fact; and (iii) attorneys' fees, interest and costs of suit.

**Eighth Cause of Action**
**Violation of 29 U.S.C. § 621 ("Age Discrimination in Employment Act of 1967")**

102)    Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if

the same were repeated fully and at length herein.

103)    The Fraudulent Scheme and/or Enterprise was designed to and did in fact target certain

teachers for discrimination and harassment.

104)    The Fraudulent Scheme and/or Enterprise discriminated against teachers:

    a.    who were over a certain minimum age;

    b.    who had achieved a high pay and benefits level;

    c.    who had been employees for more than a minimum number of years;

    d.    who dared to challenge and/or question the "Rubber Room" procedures;

    e.    those who acted as whistle blowers regarding DOE misconduct, and

    f.    who dared to demand or insist upon their due process rights.

105)    As part of their discriminatory practices, among other things, Defendants:

    a.    forced the targeted teachers to wait in the Rubber Rooms without due process and the

        chance to clear their names and be restored to their classrooms

b.  coerced, harassed, intimidated and terrorized the "targeted" teachers so that they
    would be fearful for their personal and professional well-being so that they would be
    "forced" to retire, resign or accept deals involving ruinous fines or termination.

106)  At the time Defendants discriminated against the targeted teachers, they knew their
      actions were discriminatory and unlawful.

107)  Defendant aforesaid discrimination of the targeted teachers violate 29 U.S.C. § 621
      ("Age Discrimination in Employment Act of 1967").

108)  As a direct and proximate result of the aforesaid discrimination, Plaintiffs suffered
      monetary and other damages.

      **WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or
in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their
individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii)
exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier
of fact; and (iii) attorneys' fees, interest and costs of suit.

**Ninth Cause of Action**
**Violation of 42 U.S.C. § 1981 ("Civil Rights Act of 1991")**

109)  Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if
      the same were repeated fully and at length herein.

110)  The Fraudulent Scheme and/or Enterprise was designed to and did in fact target certain
      teachers for discrimination and harassment.

111)  The Fraudulent Scheme and/or Enterprise discriminated against teachers:

      a.  who were over a certain minimum age;

      b.  who had achieved a high pay and benefits level;

      c.  who had been employees for more than a minimum number of years;

      d.  who dared to challenge and/or question the "Rubber Room" procedures;

19

  e.  who acted as whistle blowers regarding DOE misconduct, and

  f.  who dared to demand or insist upon their due process rights.

112) As part of their discriminatory practices, among other things, Defendants:

  a.  forced the targeted teachers to wait in the Rubber Rooms without due process and the

    chance to clear their names and be restored to their classrooms

  b.  coerced, harassed, intimidated and terrorized the "targeted" teachers so that they

    would ɫ be fearful for their personal and professional well-being so that they would be

    "forced" to retire, resign or accept deals involving ruinous fines or termination.

113) At the time Defendants discriminated against the targeted teachers, they knew their

  actions were discriminatory and unlawful.

114) Defendant aforesaid discrimination of the targeted teachers violate 42 U.S.C. § 1981

  ("Civil Rights Act of 1991").

115) As a direct and proximate result of aforesaid wrongful acts, Plaintiffs suffered monetary

  and other damages.

   **WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or

in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their

individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii)

exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier

of fact; and (iii) attorneys' fees, interest and costs of suit.

### Tenth Cause of Action - Misuse of Public / Taxpayer Funds

116) Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if

  the same were repeated fully and at length herein.

117) The Fraudulent Scheme and/or Enterprise involves the use of monies that are Federal,

  State and Municipal monies that are intended for specific educational purposes.

118)    As a direct and proximate result of The Fraudulent Scheme and/or Enterprise, Defendants

are causing excessive and/or wasteful payments to be made for educational purposes

programs.

119)    As a direct and proximate result of The Fraudulent Scheme and/or Enterprise,

Defendants are paying "substitute" teachers for services that can, should and would be

performed by the targeted teachers but for the fact that they are forced to sit in the Rubber

Rooms.

120)    The Fraudulent Scheme and/or Enterprise involves misuse and/or waste of public funds

allocated for educational purposes, for which Defendants should account so that the monies

can be refunded and then used for proper educational purposes.

**WHEREFORE,** Plaintiffs demand accounting by Defendants jointly severally and/or in

the alternative for (i) the misuse and/or waste of public funds, and (ii) attorneys' fees, interest

and costs of suit.

### Eleventh Cause of Action - Intentional / Negligent Infliction of Emotional Distress

121)    Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if

the same were repeated fully and at length herein.

    a.    The Fraudulent Scheme and/or Enterprise targeted certain teachers (i) who were

over a certain minimum age; (ii) who had achieved a high pay and benefits level; (iii)

who had been employees for more than a minimum number of years; (iv) who dared to

challenge and/or question the "Rubber Room" procedures; (v) who acted as whistle

blowers regarding DOE misconduct (vi) who dared to demand or insist upon their due

process rights, (vii) by forcing the targeted teachers to wait in the Rubber Rooms without

due process and the chance to clear their names and be restored to their classrooms and

(viii) by coercing, intimidating and terrorizing the "targeted" teachers so that they would

be fearful for their personal and professional well-being so that they would retire, resign or be "forced" to accept deals involving ruinous fines or termination.

122)     The Defendants aforesaid acts were intentional, malicious, reckless, careless, negligent, unlawful and/or improper.

123)     As a direct and proximate result of Defendants aforesaid acts, Plaintiffs suffered emotional injuries, trauma and other related damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Twelfth Cause of Action - Tortious Interference with Contract and Property Rights

124)     Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

a.     The Fraudulent Scheme and/or Enterprise targeted certain teachers (i) who were over a certain minimum age; (ii) who had achieved a high pay and benefits level; (iii) who had been employees for more than a minimum number of years; (iv) who dared to challenge and/or question the "Rubber Room" procedures; (v) who acted as whistle blowers regarding DOE misconduct (vi) who dared to demand or insist upon their due process rights, (vii) by forcing the targeted teachers to wait in the Rubber Rooms without due process and the chance to clear their names and be restored to their classrooms and (viii) by coercing, intimidating and terrorizing the "targeted" teachers so that they would be fearful for their personal and professional well-being so that they would retire, resign or be "forced" to accept deals involving ruinous fines or termination.

125)    The Defendants aforesaid acts were intentional, malicious, reckless, careless, negligent, unlawful and/or improper and were designed to interfere with Plaintiffs contracts, licenses and property rights.

126)    As a direct and proximate result of Defendants aforesaid acts, Plaintiffs suffered monetary and other damages.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

## Thirteenth Cause of Action - Libel, Slander & Defamation

127)    Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if the same were repeated fully and at length herein.

128)    The Defendants acts involved false charges being placed in the targeted teachers' files.

129)    The false charges include allegations that the targeted teachers (i) were allegedly guilty of "misconduct", (ii) were allegedly guilty of "substandard" work, (iii) were allegedly guilty of "physically or emotionally abusing students" and/or (iv) were allegedly guilty of being "insubordinate".

130)    The false charges placed or caused to be placed by Defendants in Plaintiffs files, constituted libel, slander and defamation.

131)    At the time Defendants made and/or caused the charges to be made and/or placed in Plaintiffs files, Defendants knew them to be false.

132)    The Defendants aforesaid libelous, slander and/or defamatory statements were

intentional, malicious, reckless, careless, negligent, unlawful and/or improper and were

designed to cause damage to Plaintiffs.

133)    As a direct and proximate result of Defendants libelous, slander and/or defamatory

statements, Plaintiffs suffered monetary and other damages.

    **WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or

in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their

individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii)

exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier

of fact; and (iii) attorneys' fees, interest and costs of suit.

### Fourteenth Cause of Action - Injunctive Relief

134)    Plaintiffs repeat and reallege each of the allegations as set forth above in ¶¶ 12 to 50 as if

the same were repeated fully and at length herein.

135)    Plaintiffs' confinement to the Rubber Rooms causes Plaintiffs to suffer immediate and

irreparable harm and damages for which monetary damages are inadequate.

136)    Defendants' placement of false charges in Plaintiffs' employment files, Plaintiffs to

suffer immediate and irreparable harm and damages for which monetary damages are

inadequate.

137)    The Fraudulent Scheme and/or Enterprise which has Plaintiffs confined to the Rubber

Rooms interferes with Plaintiffs' ability to quickly defend themselves against the false

charges so that they can clear their names, have the false charges and all references thereto

removed from their files and be restored to their class rooms and teaching responsibilities.

138)    Every day that the Plaintiffs are confined to the Rubber Rooms, they suffer additional

damages for which monetary relief is inadequate.

24

139)    The ongoing 3020 a Hearings as implemented and/or enforced by Defendants violates

Plaintiffs' due process rights.

140)    The requirement that Plaintiffs participate in the 3020 a Hearings as Defendants are

attempting to enforce them, as presently constituted and which are the functional equivalent

of "Kangaroo Courts", causes Plaintiffs to suffer additional damages for which monetary

relief is inadequate.

**WHEREFORE,** Plaintiffs demand judgment for the following injunctive and equitable

relief (i) closing the Rubber Rooms, (ii) directing that the 3020a Hearings be immediately

enjoined and Plaintiffs not be required to participate in the 3020a Hearings as Defendants are

attempting to enforce them, (iii) enjoining Defendants from issuing any findings or judgments

against Plaintiffs resulting from pending or concluded 3020a hearings, (iv) attempting to enforce

any previously issued findings and/or judgments against Plaintiffs resulting from the 3020a

Hearings dating back to 2000; (v) enjoining Defendants from disclosing to any third party the

false charges that were placed in Plaintiffs' files; (vi) attorneys' fees, interest and costs of suit;

and (vii) such other and further relief as is equitable.

Dated:  January 21, 2008
      New York, NY

Edward D. Fagan Esq.
5 Penn Plaza, 23rd Floor
New York, NY  10001
Tel. (646) 378-2225
Fax (646) 304-6446
Email: cd.fagan@global-litigation-partners.com

25

# EXHIBIT     1

Speed Is Urged In Disciplining Of Teachers - New York Times

1 of 3

The New York Times

http://query.nytimes.com/gst/fullpage.html?res=9C01E0DD1039F932A35750C0A966...

# Speed Is Urged In Disciplining Of Teachers

By ANEMONA HARTOCOLLIS

March 1, 2000

Every day, 300 New York City teachers accused of misconduct or incompetence -- more than are employed in many suburban school systems -- are paid to show up in district offices and do nothing while they wait for a longstanding system of disciplinary hearings to grind on, sometimes for years. Most of the teachers spend the day reading the newspaper.

Yesterday, Harold O. Levy, the interim schools chancellor, said he was so outraged when he learned of a case that dragged on for three years while a teacher accused of hitting children and calling them "subhuman" received $150,000 in salary and pension benefits, that he decided to crack down.

In a memo sent to the seven members of the Board of Education and a letter to arbitrators, Mr. Levy said he would try to speed the disciplinary process by striking sluggish arbitrators from eligibility lists, ordering Board of Education lawyers to refuse adjournments and asking the State Education Department to withhold payment for arbitrators until the proceedings end.

By September, he said, he wants to cut the backlog of disciplinary cases in half.

"This is a disgrace, a waste of public funds and demeaning to the morale of our vast majority of qualified, hard-working teachers," Mr. Levy said in the letter sent to arbitrators used by the Board of Education.

Randi Weingarten, president of the teachers' union, said she supported Mr. Levy's efforts to streamline the disciplinary process, and educational experts applauded the move for demonstrating how problems long viewed as intractable can be changed through strong management.

"This is one of those things that many people in the system knew about, only everybody let it ride," said Robert Berne, vice president of development at New York University. "I think he's going to take aim at those, and I think that's a plus."

Since he was appointed interim chancellor four weeks ago, Mr. Levy has taken a series of small but pointed actions aimed at leaving his mark on the huge bureaucracy even if he stays on for only a few months. His predecessor, Rudy Crew, had been criticized by his own board for having strong ideas but failing to follow through.

Although state law requires disciplinary hearings for teachers, known as 3020a hearings, to be completed within four months, the average

2 of 3

hearing in New York City drags on for 18 months and costs the system $100,000 in salary and benefits for the sidelined teacher, Mr. Levy said in a memo sent yesterday to the seven-member Board of Education. The longest case has been unresolved for seven years.

Mr. Levy blamed "institutionalized indolence" for much of the delay and said the board had spent $19 million a year just to hire substitute teachers to replace the ones enmeshed in disciplinary proceedings. He said arbitrators, who are paid $500 to $1,000 a day, routinely refuse to schedule consecutive hearing days, even though it is required by law, and often work less than the full day they bill for.

He said he was disturbed to learn that arbitrators try to create balanced track records, finding for teachers some times and the Board of Education other times, so they will not incur the enmity of either side and fail to be rehired.

There are now 372 full-time Board of Education employees assigned to district offices, the memo said. Of these, 267 are tenured teachers, 34 are teachers without tenure, 8 are principals, one is an assistant principal, 5 are custodians and 57 have other jobs he did not identify.

These employees, Mr. Levy said in his memo, sit in "rubber rooms," so called because the teachers have nothing to do and are bouncing off the walls with boredom.

Mr. Levy said he wanted to close the rubber rooms within 30 days, and he directed Howard S. Tames, executive director of the board's personnel division, to find work outside the classroom for those employees to do.

In a letter to all arbitrators, he warned that as of June 2000, he would not allow his legal staff to pick any arbitrator "who has a significant, unexplained backlog, or who by his or her actions demonstrates a lack of courage to dismiss teachers who should not be in the classroom."

Mr. Levy said he was particularly upset to learn that one arbitrator, Margaret S. Leibowitz, had taken more than three years -- including 19 months just for deliberation -- to reach a decision dismissing Clifton Hill, an elementary school teacher.

Mr. Hill was accused of "using unnecessary force against students," including striking one, and referring to some students as "subhuman," according to court papers. He denied those charges at the hearings and was ultimately dismissed for insubordination, lateness and absences, a lawyer for the city said.

He was charged in June 1996, and Ms. Leibowitz, who took the case a month later, did not reach a decision to fire him until September 1999. While waiting for a decision, Mr. Hill received $150,000 in salary and benefit contributions.

When the board refused to pay $4,500, the last installment, of Ms. Leibowitz's arbitration fees on the ground that she had violated state deadlines, she sued, board officials said. Yesterday, Mr. Levy and the board countersued for $150,000 in damages, plus interest and costs.

Ms. Leibowitz's lawyer, Harvey Mars, declined to comment yesterday. Neither the Board of Education nor the corporation counsel's office could provide a number for Mr. Hill or his lawyer.

Anthony P. Coles, senior adviser to Mayor Rudolph W. Giuliani, said he saw Mr. Levy's move as a first step in attacking job guarantees for teachers.

Speed Is Urged In Disciplining Of Teachers - New York Times

http://query.nytimes.com/gst/fullpage.html?res=9C01E0DD1039F932A35750C0A966...

"I think he's raising a question as to whether or not tenure has become an obstacle in making sure we have the best possible teachers in our classrooms," Mr. Coles said. "That's a good question to raise."

Mr. Levy did not propose eliminating tenure, but he did suggest that teachers have been given tenure cavalierly. He said he was surprised, given a work force of 78,000 teachers, that the board had sought to dismiss only three teachers for incompetence in the last two years. Most proceedings are brought for misconduct, like corporal punishment or absenteeism, or a combination of misconduct and incompetence.

Board officials said Mr. Levy wanted principals and superintendents to review teachers more seriously before granting tenure, extending their three-year probation if they did not make the grade or refusing tenure altogether. As it is, tenure is granted almost automatically.

Mr. Levy hinted that during contract negotiations, he would pursue other measures to root out incompetent teachers. He said that establishing incompetence was now a difficult process requiring intense perseverance by the principal. Every critical letter can be grieved, and resolving those grievances can take years.

"These problems go to the heart of ridding the system of teachers who cannot perform, and must be a subject of collective bargaining," Mr. Levy said.

Copyright 2008 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Back to Top

3 of 3

1/20/08 10:29 AM

EXHIBIT    2

1 of 12

Latest Issue
Archives
Subscribe/Respond
TQB Cartoons
Search TQ Topics

National Council on Teacher Quality

NCTQ News Bulletin    Publications    Press Room    NCTQ Databases    About Us    Contact Us

## TQ Bulletin

**TEACHER QUALITY BULLETIN** – Volume 6, Number 10
June 08, 2005

Welcome to the Teacher Quality Bulletin!
TQ Bulletin is a monthly e-mail newsletter brought to you by the National Council on Teacher Quality.

In this issue:

Tenure

Effective Teaching

Retention

Pay and Benefits

Et Cetera

Teacher Preparation and Licensure

National Council on Teacher Quality - NCTQ

## Tenure

### NEW YORK'S $20 MILLION RUBBER ROOM
June 08, 2005

Newsday reported last week on yet another bureaucratic nightmare in New York City: over four hundred teachers are currently reporting to "borough suspension sites"--empty rooms where allegedly "abusive and inept" teachers wait for their cases to be ruled on by the NYC Department of Education.

They're commonly referred to as "rubber rooms" because the teachers in them have nothing to do--sort of a grown-up detention period. It's a detention period that can last for months or even years, though, and teachers get paid the whole time. The City is spending over $20 million a year on paying these teachers--a lot of money to pay people who are doing nothing.

While the Big Apple may engage in this practice on a grander scale than most school districts, it's a problem that all school districts live with. It's a practice the private sector wouldn't tolerate even if businesses could afford to let fired employees languish around the company lounge" for months on end.

Ellen Yan, Newsday, May 31, 2005

## Retention

### NYC TEACHERS' UNEXAMINED EXODUS
June 08, 2005

Ironically, while New York City spends millions of dollars paying allegedly abusive teachers to twiddle their thumbs in "rubber rooms," many of the Big Apple's more capable teachers keep flying

EXHIBIT    3



NYC Life

## Class Dismissed

Lousy teachers or just political victims: there's got to be a better way to settle teacher disputes than New York's rubber rooms

**by Mara Altman**
April 24th, 2007 11:53 AM

Imagine that your boss wants you to sign a document accusing you of something you don't believe you did—a fireable offense like assaulting someone at work, for example—and your response is not only to refuse to sign, but to let loose a damning accusation that your boss was making up the allegation.

And, for good measure, you call your boss "fat."

Now, in just about any industry you can think of, this would not bode well for your continued employment. But in this case, we're not talking about just any kind of workplace, but perhaps the most dysfunctional employee-employer interface in the history of paychecks.

In other words, the New York City public school system.

When, three years ago, Georgia Argyris, a teacher, was presented with a letter accusing her of yanking the arm of a kindergartner at P.S. 50 in East Harlem, she let loose with a stream of accusations at her principal, Rebekah Mitchell, and added some unkind words about Mitchell's weight.

At another kind of job, Argyris might have called on a union representative to help her fend off what she considered baseless claims (she was denied one). Or she might have been immediately terminated after calling attention to her boss's waistline (she wasn't). Or at the least, the allegations against her, and her counterclaims, might have been reviewed in a timely manner by an impartial third party, someone who wasn't the recipient of Argyris's unwise outburst.

But no, this is the public school system, and there's only one way New York knows how to deal with teachers accused of bad behavior: send them off to a Kafkaesque holding pen, where taxpayers continue to pay their salaries for months as they wait for the glacial pace of what passes for justice, meted out by a sluggish school district and intransigent union.

Argyris, not formally charged with any wrongdoing, would spend the next *year and a half* in this limbo, paid by taxpayers to sit in a childless classroom with other teachers awaiting their own hearings.

It's not hard to see why teachers call this place the "rubber room," where they spend months—and even years, some simply waiting to see what they've been charged with.

The Department of Education, naturally, says that teachers end up for long periods in rubber rooms because their union—the United Federation of Teachers—has made it so difficult to fire lousy teachers.

The UFT, on the other hand, says that it's the DOE that abuses rubber rooms, sending teachers there that principals consider troublemakers. In other words, the union tends to see the rubber room system as the Guantánamo Bay of the school world, where political prisoners are sent by dictatorial principals. (Not surprisingly, the teachers doing time in rubber rooms we spoke to tended to agree with this view.)

Meanwhile, as teachers spend month after month reporting to mind-numbingly boring rooms waiting to be found incompetent (in some cases), or fit to return to teaching (in others), you pay. And pay.

: : : : : : : : : : :

The UFT and the DOE each claim no knowledge of the origin of rubber rooms. One longtime employee says they have existed since at least the late 1960s, but in a different form.

Teachers at that time who were accused of wrongdoing were reassigned to their district office where they were put to work—filing, typing up reports, and organizing data.

Today, teachers simply rot.

When Argyris reported to 333 Seventh Avenue in Manhattan , one of 13 rubber rooms the district euphemistically refers to as Reassignment Centers, she soon realized that her "job" now consisted of joining about 70 other reassigned teachers in daylong sessions of staring at a wall.

"I felt like a vegetable in a chair," she says.

Rubber room hours match that of a typical school day—Argyris would sign in at 8:30 a.m. and be released at 3:20 in the afternoon, with a 50-minute lunch break. Like something out of a dystopian fairy tale, however, this school had no children, just a few cafeteria workers, social workers, and custodians who shared the same lot.

In 2000, there were 385 teachers assigned to rubber rooms. Last month, that number had climbed to 662. Argyris, while she sat and stared at a wall, was paid $62,646 a year. The DOE pays about $33 million a year just in salaries to the teachers in rubber rooms—an amount that doesn't include the salaries of investigators working on the cases of rubber room teachers, the upkeep of the reassignment centers, or the substitute teachers who replace employees like Argyris.

Because teachers in rubber rooms are awaiting their cases to be heard, they aren't technically being punished. But they are restricted from numerous activities—they can't use MP3 players, telephones, or laptop computers. (Most flout those rules, however, and use various devices openly.)

Teachers say they soon learn that their peers are territorial and often cranky. One young teacher serving his fifth month tells the Voice the first thing he was told by a supervisor was not to sit in seats claimed by others. Fights have broken out over less, he was told.

"It's high school on steroids," he says. "Or maybe a mixture between a minimum security prison and a senior home."

To keep occupied, teachers read, play games like Scrabble or chess, or work on their screenplays. Art teachers work on paintings. Masters

http://www.villagevoice.com/generic/show_print.php?id=76433&page=altman&issue=0...

degrees get completed. Last year at the Seventh Avenue rubber room, a group of teachers taught each other to knit. Exercise is a popular activity.

Jeremy Garrett, a former teacher, has spent the last two years producing a film about rubber rooms by sneaking in cameras. He says he's known some teachers who actually didn't mind spending years doing little more than showing up every day for a paycheck. "There are people on the inside who are milking the system," Garrett says. "You'd have to expect that, though."

After a recent day of staring at walls, five teachers currently serving time at a rubber room met at a nearby coffee shop. For the benefit of a reporter, they had prepared freshly printed handouts and an agenda, activities they obviously missed. They gave a bullet-point outline, summarizing the reasons they had been reassigned. Each, not surprisingly, claimed to be in the rubber room on trivial or inflated charges.

The DOE, however, says that teachers are only sent to rubber rooms for serious reasons. Some teachers, the DOE says, need to be separated from children because they've been accused of harmful behavior, like sex offenses. Others are awaiting discipline after investigators have confirmed allegations of incompetence or misconduct. And others are in rubber rooms because they've been accused of crimes by outside agencies.

But Argyris, as she sat in the rubber room in 2004, had been given no official reason why she'd been sent there. Previous principals had given her high praise for her work with kindergartners. Lyle Walford, an interim principal who worked with Argyris, says that she was a "great teacher," but also assertive. "She's outspoken," Walford tells the Voice. "She doesn't take any guff from anyone."

A former model, Argyris looked young for her age. She claims that from the first day of Mitchell's arrival, the new principal disliked Argyris for some reason, and the accusations of yanking a child's arm was just part of a strategy to get rid of her. The district counters that Argyris had a record of poor attendance, was often late to class, and that Mitchell found herself having to cover for the kindergarten teacher.

Late into the second month of the 2004 school year, a mother of one of the kindergartners said that her daughter's coat was missing and that her arm had been pulled. The student was on Argyris's roster. Argyris maintains she was absent the day of the incident and that the student in question was in another teacher's class. The district, however, countered in a hearing that the records were clear—on the date of the incident, the student was in Argyris's class. Mitchell interviewed some children and concluded that Argyris had mishandled the child. But Jeff Huart, a UFT investigator, tells the Voice that the investigation wasn't so clear-cut. "All I do know is that a bona fide eyewitness said the kid was not hit," he says. "The mother and two other kids came back and said Argyris did not hit the kid."

Argyris had never been charged with misconduct before. "She was a well-respected kindergarten teacher and all of a sudden she is an evil person that deserves to be booted from the school?" says a veteran teacher with more than a decade experience at the school. "It doesn't make sense."

Mitchell asked Argyris to sign a letter admitting to roughing up the child, Argyris refused to sign, and that's when she made her outburst about the principal's size. The principal then reported the incident to the regional superintendent, and Argyris was reassigned to the Seventh Avenue rubber room. "She lunged toward me when I gave her the letter," Mitchell tells the Voice. "It's a serious allegation and it warranted her being reassigned." But before she left, Argyris secretly made an audiotape of a conversation she had with assistant principal Angela Carniolo, who, in a transcript of the tape, appears to express some sympathy for her.

Argyris went to the rubber room confused and upset. She says she constantly had the urge to cry. Every 10 minutes, she says, she'd get up and go to the bathroom. She composed a letter to Chancellor Joel Klein that was never answered. She called the union frequently and rarely got through.

Two months later, still awaiting formal charges, Argyris was scheduled for a grievance hearing over her allegations that she'd been falsely accused. Perhaps naively, she believed she could play her secretly recorded tape of the assistant principal expressing sympathy for her and then get to return to her kindergarten classroom. "That didn't happen," she says.

When Argyris revealed the presence of the tape, the meeting was immediately adjourned. (Mitchell later gave Camiolo a poor rating, and Camiolo has been demoted to a teaching job at another elementary school.)

After the aborted hearing, Argyris went back to the rubber room, where her mental state deteriorated. A therapist prescribed her antidepressants.

"I became a worthless lump that didn't do anything anymore," she says.

On a recent visit to 25 Chapel Street in Brooklyn, a Reassignment Center opened in 2005 and housing at least 100 occupants, a *Voice* reporter found teachers sitting on either side of a long room, just about wide enough for two Cadillacs to park side by side. The teachers looked sedated, like passengers after a cross-country flight, and the room was stuffy with a musty smell, as if the ventilation system hadn't been working right.

A food-delivery boy soon slipped through the door with a bag that smelled like greasy stir-fry. One woman wore a sweat suit, read a magazine, and had her feet up on a chair. Some were sleeping, their heads lulling against the wall, while others played chess and dominos or kept to themselves.

After a room supervisor discovered the intrusion, the reporter was forced out of the room into a hall, where several teachers were power-walking for exercise, but others soon gathered, anxious to speak about their experiences. "You can't use my name," one teacher said pleadingly. "There's a history of retribution. I have to pay my bills, pay for my child and for rent. This is the only job I've had my whole adult life and this is all happening before I'm proven guilty. We're all guilty, but did nothing wrong."

After about an hour, two suit-clad DOE employees arrived. "The head of human resources," one teacher murmured to the next. The crowd scattered. A few moments later, a guard came into the hall and asked the unapproved visitors to leave. When asked why, the guard just shrugged.

Most press mentions of the teachers exiled to the rubber room involve extreme cases that tend to inflame the tabloids. The Office of the Special Commissioner of Investigation (SCI), an independent body headed by Richard Condon and designed to investigate wrongdoings in the DOE, posts press releases of teachers found guilty on its website, where they make for tab fodder.

On March 7, the SCI made public the case of 30-year-old Marcia Amsterdam, who engaged in sexual intercourse with a 13-year-old boy from her school. In another widely reported case, a teacher's lewd e-mails to a 16-year-old student produced six years of litigation (during which the teacher received $300,000 in compensation).

But out of 592 SCI investigations completed in 2006, only 259 were substantiated. The majority of cases are investigated by the Office of Special Investigations (OSI), which is part of the DOE and handles misdemeanor cases like incompetence and corporal punishment. "Before I was there, I thought this place was filled with thieves and molesters," one teacher tells the *Voice*. "There are people with quirks, but we're not all bad."

Even though many inside are still awaiting decisions, the rubber room has become synonymous with guilt. Some teachers are too embarrassed to tell close family members about their reassignment. One teacher, who has been inside for more than six months, tells the Voice he's managed to keep the truth from his wife.

Teacher advocates say the investigation process wouldn't be so mentally damaging if it could only be handled more quickly. The Voice spoke to teachers who had been serving time in rubber rooms from two months to three years. The DOE says it can't produce an average length of stay, because the district only started keeping track in 2005. According to their contract, teachers must be formally charged within six months of being reassigned or be returned to the classroom. But being charged can then add many more months as a case slowly works its way through a complicated process.

"The length of the process depends on the complexity of allegations and case," DOE spokeswoman Melody Meyer says. "Some investigations take days, others take months."

There are currently only 18 hearing officers handling misconduct cases. Each officer is contracted to meet only five times a month. The backlog of cases is immense.

"We have been saying for years that we want these people out of these places much more quickly," UFT president Randi Weingarten says. "There is no reason for them to be sitting six months or longer without charges being filed."

Hearing officers are chosen jointly by the DOE and the UFT, but are paid for by the New York State Education Department. With New York City officers making up to $1,900 a day, it's a lucrative part-time job, which some critics say leads these officers to overly compromising opinions. "You make a lot of money," says Julia Cohen, a lawyer who specializes in education law. "you want to satisfy both sides."

By July 2005, Argyris still hadn't heard any decisions from the December grievance hearing and the names and faces of her students grew vague in her mind. She had been transferred to a Livingston Street rubber room where she said one man routinely ate crumbs off the floor and where she saw a woman attack a man with a cane.

The Livingston Street rubber room was soon closed and Argyris was transferred to the Chapel Street facility, where the teachers had formed tight cliques. A daily spectacle, she says, was a young couple who had met during their reassignment and had converted a corner of the room into a small love nest, complete with air mattress, sleeping bags, small fridge, and a portable DVD player.

Argyris says that she found a companion too. But it didn't dawn on her, she says, that a teacher accused of telling a student he was going to throw the boy from a window might not make the best boyfriend.

In January 2006, Argyris filed a restraining order after her rubber room boyfriend beat her up. Photographs show that the whites of her eyes were stained red with blood. Black and blue marks ran the circumference of her neck.

Meanwhile, she passed her sixth-month mark in the rubber room without charges, but that milestone didn't, as her contract promised, put her back in a classroom. Instead, the UFT told her to keep showing up. But that was becoming more difficult. She started attending less frequently. And then, in February, she finally received formal charges—for her rubber room absences.

Because of Argyris's numerous absences (65 over the 18-month period), the DOE told her it planned to dock nine months of her salary. If she didn't agree, she would be fired. Instead, she hired a private attorney who drew up another settlement. She agreed to pay $2,500 and

stipulated that if she accumulated another 55 minutes in tardiness, she would be automatically terminated.

The UFT was unhappy that Argyris had signed a private settlement with the district, but it's common for teachers to seek such agreements after they spend months in reassignment. The rubber rooms, in other words, wear them down. (In such settlements, the district collected $310,000 in fines last year.)

Edward Wolf, a lawyer, has made a living for almost two decades defending teachers. He says settling can be dangerous, because the teacher's name will never be cleared: "You're leaving your client with a dirty reputation," he says. "The teacher's got a rap sheet now and it's easy just to bump him off."

But the alternative—waiting for the hearing process to conclude—is increasingly a crapshoot. Last year, 200 teachers were charged with wrongdoing, but only eight were exonerated. Wolf said that five years ago it was common to win several consecutive cases, but now wins are rarer.

After her settlement, Argyris was still stuck in a rubber room. In March 2006, the UFT filed a special complaint on her behalf, charging that principal Mitchell had created a harassing work environment which had led to Argyris being reassigned. An arbitrator ultimately ruled against Argyris, saying that Mitchell had not harassed her.

But during preparations for the grievance hearing, to everyone's surprise, it was found that principal Mitchell had written a letter about a year and a half earlier—in January 2005—rescinding her original allegations that Argyris had yanked a child's arm.

"There was a document exonerating her," UFT investigator Huart says. "I was flabbergasted that this document even existed."

After 18 months in purgatory, Argyris was suddenly released from the rubber room. The teacher was told she could immediately return to her old school, as if nothing had ever been wrong.

Stunned and emotionally spent, Argyris was overwhelmed.

Just thinking of returning to school after so long an absence made Argyris dizzy.

Garrett, the documentary filmmaker, says he's seen several teachers come out of rubber rooms and experience difficulty assimilating to classrooms. "The amount of time you're away from your school indicates something bad to your colleagues," he said. "But really it's the inefficiency of the system."

Argyris shuddered at the idea of being under the supervision of the same woman who accused her of wrongdoing in the first place. "Why would they send me back to the school with that woman?" asked Argyris. "It's like they were setting me up to fail."

The first few days, Argyris failed to show up, which she attributes to feelings of intense anxiety. When she finally came to school, she was offered a third grade class instead of kindergarten, the grade she'd always taught. Argyris asked the union to provide an aide to accompany her in the room; she wanted a witness so that she couldn't be accused of corporal punishment again. The aide was denied, as was a transfer to a kindergarten classroom. Mitchell says Argyris's return was a disaster. "She usually spent the day sleeping in the teachers' lounge or went out in the neighborhood. I was often asked by parents who was the person screaming into the phone or lying in the teachers' lounge." A doctor recommended medical leave for Argyris, but as her medical issues were being resolved, Argyris surpassed the 55-minute tardy stipulation in her settlement agreement. She was terminated a little more than one month after returning to her

school.

Her case won't die, however. The UFT and DOE continue to battle over the original allegations made against her. The DOE seemed incensed that the Voice was interested in the Argyris matter; it sent over records of a nine-year-old accusation that Argyris had made racially insensitive remarks to a district employee. Argyris denies the allegation, and was never disciplined for the incident. Repeatedly, DOE officials warned the Voice not to write about any aspect of the Argyris case.

Many teachers don't return to school after the rubber room—one retire; one woman the Voice talked to vowed to go to private schools; one young man said that when he was cleared he hoped to get a job in another state; another young teacher gave up after a few months in the rubber room and took up nursing.

But the DOE says that the numbers of teachers involved is small. "We're talking about 662 people out of a workforce of 80,000 teachers and roughly 6,000 administrators," Meyer says. "The vast majority is not affected."

The union, meanwhile, says that the rubber room system is preferable to the alternative: suspending teachers without pay until their cases were adjudicated. "There would be even more delays. Cases would drag on forever," Weingarten says. "We want these cases dealt with as soon as possible and not delayed for months and months . . . More than three years ago, I proposed creating a super-arbitrator system to clear the backlog of cases. The DOE rejected that."

Meanwhile, stuck with the rubber room system, life—or something like it—goes on in the city's reassignment centers. Jeremy Garrett, the former teacher who was sneaking into rubber rooms with videocameras to make his film, was arrested on April 18 when teachers objected to his presence. He was charged with criminal trespass.

And also last week, one teacher the Voice talked to, Ronald Mortensen Jr., a physical education teacher who worked with special education students, was run over and killed by a car on his lunch break. He was serving his second stint in the rubber room.

EXHIBIT    4

# The New York Sun

October 15, 2007 Edition > Section: New York > Printer-Friendly Version

## UFT Asserts It May Sue City
## Discipline of Teachers in 'Rubber Rooms' Angers Weingarten

BY ELIZABETH GREEN - Staff Reporter of the Sun
October 15, 2007
URL: http://www.nysun.com/article/64521

ADVERTISEMENT

The group, which has dubbed itself the Teacher Reassignment Center SWAT Team, has been compiling pages of documentation on the so-called rubber rooms where teachers accused of charges ranging from incompetence to sexual assault are held as they await a hearing. More than 700 teachers now sit in rubber rooms, where they receive full pay but cannot enter a classroom, a Department of Education spokeswoman, Melody Meyer, said.

Ms. Weingarten said yesterday she hopes the investigation will end with a deal between the union and the city, and not in the courtroom. The result, she said, will hinge on how the Department of Education responds to new guidelines the plans to send in a letter next week. "If we make a proposal and the Board of Education says, 'No, forget about it,' then we have a problem," Ms. Weingarten said.

She called the issue a "test case" for her new cooperative stance with city officials.

A lawsuit is one route of cooperation fails, the head of the investigative group, Betsy Combier, said.

The centers hold teachers accused of misconduct ranging from criminal charges to incompetent teaching. Tenured teachers cannot simply be fired or pushed to leave their jobs because the UFT contract requires that they first receive a hearing. A panel of arbitrators then decides whether the teacher will be fired, fined, or allowed back in the classroom with no discipline.

Just 11 rooms hold the 700-plus teachers whose cases have not yet been resolved. The backlog has left some teachers on the city payroll for as long as two years before a decision is reached. In the meantime, teachers in the rooms pass the time by watching television, reading books, and writing.

A complaint the UFT sent to a deputy chancellor at the Department of Education, Kathleen Grimm, recently noted the crowded rooms' poor conditions, including inadequate toilet facilities and electrical violations such as exposed wiring.

Ms. Combier said her conversations with about 70 teachers so far suggest that a majority in the rubber rooms are also being denied due process rights — that is, they have been taken out of the classroom and placed in a center for as long as two years without any information as to why. "It's a public relations nightmare for the Board of Education," Ms. Combier said. "They will never live this down. I won't let them."

A Department of Education spokesman, David Cantor, said cooperation is a possibility. "We'll work with the UFT

ADVERTISEMENT



THE DNA ANCESTRY PROJECT

www.dnaancestryproject.com

Ads by Google

Our aim is to test President Randi Weingarten's public decree with the city, a new group within the United Federation of Teachers is arguing that the union take a tough stance on the treatment of teachers who have been disciplined.

http://www.nysun.com/pf.php?id=64521&v=7282480021

1/20/08 10:24 AM

1 of 2

UFT Asserts It May Sue City

2 of 2

http://www.nysun.com/pf.php?id=64521&v=7282480021

whenever we can," he said. "But don't be mistaken. The teachers in the rubber rooms have been accused of serious misconduct and crimes. We will not keep them with kids in schools simply because their contract says they must continue to be paid."

He said there are a few cases in which the city does not tell teachers why they are charged as a way of protecting the investigations against them. He said "virtually all" teachers know why they are in rubber rooms.

Ms. Weingarten's promise to ramp up pressure on the issue of rubber rooms comes as she is facing more pressure to act from inside her union and beyond. Factions have formed within the union to fight on behalf of teachers in rubber rooms, making suggestions ranging from hiring more staff to defend teachers to issuing subpoenas of state agencies on their behalf. One group, the Teacher Advocacy Group, plans to picket the union's Lower Manhattan headquarters Wednesday following a delegate assembly meeting, a retired teacher who is advising the group, Norman Scott, said. The group will carry signs charging that the union has "dropped the ball" on protecting teachers.

An independent filmmaker has also added to the ire with a documentary called "The Rubber Room," which several teachers said has generated interest from such high-profile outlets as Comedy Central's "The Daily Show."

Some in the union ridiculed Ms. Weingarten's push for compromise, saying it will not resolve what they described as the UFT's failure to provide teachers in rubber rooms with strong legal representation. "They need people that have some kind of understanding and background in employment investigations. They have nothing," a teacher who was placed in a rubber room and who is also a lawyer, Jeffrey Kaufman, said.

Ms. Weingarten's new team includes Ms. Comber, who said she has previous paralegal experience, and two journalists at the union's newspaper.



THE DNA INQUIRY PROJECT
www.dnainquiryproject.com

1/20/08 10:24 AM

EXHIBIT    5



# WHY IS THE CITY PAYING 757 PEOPLE TO DO NOTHING?

By ANGELA MONTEFINISE and MELISSA KLEIN

http://www.nypost.com/php/pfriendly/print.php?url=http://www.nypost.com/seven/093...

http://www.nypost.com/php/pfriendly/print.php?url=http://www.nypost.com/seven/093...

*September 30, 2007* -- Just before 9 a.m., they file into large, sometimes windowless rooms.

In some cases, they punch time cards; in others, they scribble their names on a sign-in sheet.

They take their places in plastic chairs either grouped around tables or scattered haphazardly.

Some immediately pull out crossword puzzles or books. Some knit. Others hold golf-putting contests. One takes out his guitar and strums.

One day last week, another, wearing a leotard and tights, spread out on the floor and stretched before practicing ballet against a wall in a corner.

Nearby, gazing out a window, a man slowly fell asleep, his head in his hands.

It's all in a day's work on the city payroll.

For seven hours a day, five days a week, hundreds of Department of Education employees - who've been accused of wrongdoing ranging from buying a plant for a school against the principal's wishes to inappropriately touching a student - do absolutely no work.

In an investigation inside the nine reassignment centers called "rubber rooms" where these employees are sent, The Post has learned that the number of salaried teachers sitting idly waiting for their cases to be heard has exploded to 757 this year - more than twice the number just two years ago - at a cost of about $40 million a year, based on the median teacher salary.

The city pays millions more for substitute teachers and employees to replace them and to lease rubber-room space.

Meanwhile, the 757 -- paid from $42,500 to $93,400 a year - bring in lounge chairs to recline, talk on their cellphones and watch movies on portable DVD players, according to interviews with more than 50 employees.

David Pakter, 62, has been in a rubber room for a year for buying a plant for his school and giving students watches he'd made, he said.

The DOE would not discuss ongoing investigations.

Pakter, a former "teacher of the year" honored at City Hall during Rudy Giuliani's mayoral tenure, just bought a new Jaguar with his $90,000 salary for "doing absolutely nothing."

"It's a present from [Schools Chancellor] Joel Klein," Pakter said. "I want to teach, they won't let me teach, but they'll pay me enough to buy a car. Can someone explain this to me?"

Another rubber-room attendant said she was unaware of the reason she'd been assigned there for more than a month. Yet another, an Army reservist who spent almost 3½ years in a rubber room before he retired, begged to be able to go to Iraq instead of staying in DOE Siberia.

Sam Lazarus, a social-studies teacher and union rep at Bryant HS in Long Island City, said he and his spotless 23-year teaching record were shipped off to a Queens rubber room last spring that was so "filled to the rafters" that he was forced to sit in a plastic chair outside the room.

"I think I'm the only one who actually had a grievance to get into a rubber room," said Lazarus, who was in this "detention" for six weeks before accusations of verbally abusing a student were dropped.

Some say the teachers themselves are to blame - their union contract requires a hearing before any tenured employee can be fired.

"The reason the rubber room exists is because of worn-out and, quite frankly, irrelevant union contracts that do more to protect people's jobs than they do to protect kids," said Jeanne Allen, president of the Center for Education Reform, based in Washington, D.C.

Adding to that issue is the fact that the 20 arbitrators who review cases meet, on average, five times a month, or twice a month in the summer, making for a painfully slow and inefficient system.

Meanwhile, some teachers feel they're being attacked in a "guilty until proven innocent" atmosphere in which more powerful principals can easily remove teachers who question the system and students can easily get teachers they don't like removed by making up accusations.

The union now counsels its members to avoid becoming too involved - including even in breaking up student fights - because it could land them in a rubber room.

"Teachers are scared. The system wants to cover itself, not protect us," said Lenny Brown, a physics teacher who landed in the rubber room over accusations that he touched a student's breast in front of the class - a charge he vehemently denies.

The DOE admits it has become more proactive in trying to fire teachers.

"I've been pushing to try to charge more cases," said DOE general counsel Michael Best. "Sometimes I'd rather be more aggressive in terms of things, in getting folks who we should be trying to terminate terminated."

But Best says the system, governed by state law and contractual obligations, is cumbersome.

4 of 4

http://www.nypost.com/php/pfriendly/print.php?url=http://www.nypost.com/seven/093...

"I think everybody would like to resolve these cases more quickly," he said.

Randi Weingarten, president of the United Federation of Teachers, says the union is not interested in protecting bad teachers and adds that she is willing to compromise to fix the system. She hopes the future holds a quicker process and a rubber-room system where teachers will at least be working.

The city used to assign teachers under review administrative duties, but that ended with the 2002 school reorganization when district-run rubber rooms were turned into larger, citywide cells.

The DOE says it's handcuffed by a clause in the teacher contract saying rubber-room residents cannot be given "non-teaching duties," but the UFT says administrative work is just fine.

"Right now, the system is terrible for everyone," said Weingarten. "It's in everyone's interest, I think, to change it."

*Additional reporting by Susannah Cahalan and Kathianne Boniello*

*angela.montefinise@nypost.com*

**Home**

NEW YORK POST is a registered trademark of NYP Holdings, Inc. NYPOST.COM, NYPOSTONLINE.COM, and NEWYORKPOST.COM
are trademarks of NYP Holdings, Inc.
Copyright 2008 NYP Holdings, Inc. All rights reserved.

1/20/08 10:38 AM

EXHIBIT "B"

81SHTEAC.txt

1

```
      81SHTEAC
 1    UNITED STATES DISTRICT COURT
 1    SOUTHERN DISTRICT OF NEW YORK
 2    -------------------------------x
 2
 3    TEACHERS4ACTION, et al.,
 3
 4                 Plaintiffs,
 4
 5          v.                              08 Civ. 548 (VM)
 5
 6    MICHAEL G. BLOOMBERG, et al.,
 6
 7                 Defendants.
 7
 8    -------------------------------x
 8
 9
 9                                     New York, N.Y.
10                                     January 28, 2008
10                                     10:40 a.m.
11
11    Before:
12
12                      HON. ANDREW J. PECK
13
13                                     Magistrate Judge
14
14                         APPEARANCES
15
15    REGUS WORLDWIDE OFFICE CENTERS
16          Attorneys for Plaintiffs
16    BY:  EDWARD D. FAGAN
17
17    MICHAEL A. CARDOZO,
18    Corporation Counsel of the
18    City of New York
19          Attorney for Defendants
19    BY:  BLANCHE GREENFIELD
20          Assistant Corporation Counsel
20
21
21
22
22
23
23
24
24
25
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

```
      81SHTEAC
 1          (In open court)
 2          THE COURT:  I assume, Mr. Fagan, you have handed this
 3    to Ms. Greenfield as well.
 4          MR. FAGAN:  I did, your Honor.
 5          THE COURT:  Give me a minute to read it.
 6          MR. FAGAN:  Thank you, Judge.
```

Page 1

81SHTEAC.txt

```
 7              (Pause)
 8              THE COURT:  I have read the complaint and I have read
 9    Mr. Fagan's letter to Judge Marrero, which was memo endorsed
10    sending it over to me.  With that, I guess this is your
11    application, Mr. Fagan.  So proceed.
12              MR. FAGAN:  Thank you, your Honor.  First of all, your
13    Honor, I wanted to introduce my client.  The gentleman to my
14    right is Florian Lewenstein.  He is the named plaintiff in the
15    entity called Teachers4Action, and behind me sit eight or
16    nine --
17              THE COURT:  I hope they are not math teachers.
18              MR. FAGAN:  Well, I am certainly not, your Honor.
19              -- teachers who are affected by what is going on and
20    teachers, some of whom I will refer to by name during the
21    course of the hearing and some of whom are concerned about
22    retaliation, which is one of the things that I mentioned.
23              THE COURT:  Let me ask you this.  To the extent you
24    have John Does 1 to 50 and Jane Does 1 to 50 as plaintiffs,
25    what does that mean?  Are you planning on making the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                            3

81SHTEAC

```
 1    appropriate application to the court to have anonymous
 2    plaintiffs?  Frankly, absent something that makes this
 3    different than any other employment discrimination or
 4    employment-related case, retaliation would be against the law.
 5    That doesn't mean that no employer ever retaliates, but I
 6    cannot think of a single employment case that I have had in the
 7    13 years I have been on the bench with an anonymous plaintiff.
 8              MR. FAGAN:  Your Honor, I am familiar with the hurdle
 9    that we must reach in order to go forward with anonymous
10    plaintiffs.  I am prepared to start amending the complaint,
11    make that application.  I can make that application to your
12    Honor by the end of this week.
13              As your Honor pointed out, I may not be successful,
14    and I don't want to waste the court's time.  What I would
15    propose to do would be to disclose those people in certain
16    categories who are prepared to disclose their identity, to
17    identify them specifically.
18              THE COURT:  Time out.  Let's be very clear because
19    there are a lot of issues with respect to the complaint, and
20    perhaps I should let Ms. Greenfield do her own work, but to the
21    extent it affects my docket, either you are going to amend the
22    complaint and change John Doe to Sherlock Holmes, John Watson,
23    and whatever the names are -- obviously, I am using fictitious
24    names, hopefully with a literature teacher back there.  Either
25    you are going to amend and name actual teachers or there is no
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                            4

81SHTEAC

```
 1    point in motion papers that say Sherlock Holmes is willing to
 2    be named but here is why the other people shouldn't.  So either
 3    amend them for those who are willing to be named or make your
 4    application with respect to the anonymous plaintiffs.
 5              I am not 100 percent up on the case law, but it
 6    strikes me as a losing proposition.  So if you are going to
 7    make that motion, make sure that you have dotted your Is and
 8    crossed your Ts because otherwise you are just wasting your
 9    money or your client's money and my time.
10              MR. FAGAN:  May I have until Friday to either make
11    that motion or amend the complaint to name those specific
```
                                Page 2

81SHTEAC.txt
```
12  individuals in those categories?
13          THE COURT:  And to drop the John Does?
14          MR. FAGAN:  And to drop the John Does.
15          THE COURT:  That is fine.
16          Let me ask another question while we are lining up our
17  plaintiffs.  Is Teachers4Action incorporated or unincorporated,
18  and what is it and what is its standing?
19          MR. FAGAN:  It is an unincorporated association,
20  Judge, of teachers.
21          THE COURT:  Is it a real organization or is it just a
22  group of people who got together because the UFT isn't doing
23  what they want done?
24          MR. FAGAN:  No, Judge, it is a real organization.
25  They have already communicated with the State Board of
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                    5
81SHTEAC
```
1   Education in order to get the forms -- the State Board has to
2   pass on anything that mentions the name education, any
3   organization that proposes to do that.  They are in the process
4   of doing that.
5           Mr. Lewenstein, the named plaintiff, is a teacher.  He
6   is not just an officer of the company, of the association.  By
7   the time we get further down the line, the next week or so, we
8   hope to be able to provide you not just with the application
9   that has been made to the State Board, Department of Education,
10  but also the documents that show that they have got it and at
11  least there is provisional authority for the association.
12          THE COURT:  All right.  Are all members of the
13  association people who are in the temporary reassignment
14  centers or does it have a different membership?
15          MR. FAGAN:  Every member of the association as is
16  presently constituted is sitting confined in a rubber room
17  somewhere.  Later on they will have other goals, there are
18  other things they are going to do, but for these purposes, for
19  now, every one of the people that are in the courtroom today
20  and Mr. Lewenstein and the members of the association itself,
21  Teachers4Action, are confinees in these rubber rooms.
22          THE COURT:  OK.  Continue.
23          MR. FAGAN:  Your Honor, may my client interrupt for 30
24  seconds?  I don't know what he wanted to ask me.
25          THE COURT:  Yes.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                    6
81SHTEAC
```
1           MR. FAGAN:  Thank you.
2           (Pause)
3           MR. FAGAN:  Judge, we came before the court because
4   there are certain emergent issues.  This is not a normal case
5   in the sense of it can go its normal process for motion
6   practice.  The reason for that is there are, as I put on the
7   outline, there are certain issues that are pressing for which
8   we submit emergency relief is appropriate in some form.  It may
9   not be complete.  It may not be everything that we wanted.  But
10  there has to be something in order to protect a group of people
11  who have been targeted and who are in one stage or another
12  along the way to being terminated, further confined, harassed,
13  retaliated against, or fined.
14          The reason I say that is the history of what has gone
15  on with the rubber rooms, as it relates to our application
16  today, is a history where people are, according to us, deprived
```
                            Page 3

81SHTEAC.txt
17  of their due process rights pursuant to New York State law.
18  They are sent into these rubber rooms, where they are literally
19  confined.  They have to punch in time clocks.  They walk in
20  every morning, they punch in a time card.  They can't leave.
21  Some of them are actually confined to --
22          THE COURT:  They are here today.
23          MR. FAGAN:  Actually, they are here today.  They are
24  allowed to take personal days, your Honor.
25          We are concerned about the issue of retaliation.  I
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                    7
81SHTEAC
1   will get to the issue of retaliation, but I only want to focus
2   on the emergency issues right now.
3          The emergency issues fall into, I would say, three
4   categories.  One of them is an issue of preservation of
5   documents.  This is not to suggest anything nefarious is going
6   to be done by the DOE.  But I am mindful of your Honor's
7   decision in In Re NTL.  The concern that we have is that
8   somewhere within this vast behemoth of the DOE and all its
9   offices and all its computers and all its recordkeeping
10  systems, the exact same thing that your Honor encountered in
11  the NTL case is going to happen.  There is going to be --
12          THE COURT:  Are you familiar with the case law with
13  respect to preservation orders in this district?
14          MR. FAGAN:  I am, your Honor.
15          THE COURT:  So how do you satisfy that standard?
16          MR. FAGAN:  I satisfy that standard, your Honor, by --
17          THE COURT:  I guess since you claim to be familiar,
18  what case are you relying upon?
19          MR. FAGAN:  Actually, I briefed the issue in a case
20  called, in the Kaprune case.
21          The issue with regard to preservation -- I do
22  apologize, your Honor.  I left my computer at Fed-Ex.  I came
23  running over.  I have all that information there.
24          What I am relying on is the issue of the necessity to
25  preserve documents that are going to automatically be recycled
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                    8
81SHTEAC
1   and could be destroyed in the normal --
2          THE COURT:  I guess what I am saying is, once the
3   litigation has commenced, which it has, if not beforehand, the
4   Department of Education has a duty under the federal rules, and
5   you may have now served to wake them up and get this in
6   Ms. Greenfield's control a lot sooner than normally an
7   assistant would be assigned to the case, etc., but under the
8   rules automatically they have preservation obligations.  For
9   the court to impose an order under Treppel v. Biovail Corp.,
10  the leading case in this district by Judge Francis, there has
11  to be more than just it's a big organization and maybe they
12  won't do what they are supposed to do.  If they don't do what
13  they are supposed to do without any court order for
14  preservation up front, they are going to have NTL-like problems
15  down the road.  But why should the court impose an order?
16          MR. FAGAN:  The reason that the court should impose an
17  order on them, your Honor, is because, number one, during the
18  past -- the teachers who are here, different teachers can
19  provide testimony that they have asked for information and been
20  denied the information.
21          THE COURT:  That doesn't mean it's been destroyed;
                              Page 4

81SHTEAC.txt
22  that just means they are not entitled to it.
23          MR. FAGAN:  Your Honor, that is correct.
24  Mr. Lewenstein also is a computer expert, and Mr. Lewenstein
25  had communications with people at the DOE where they talk about
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                                    9

81SHTEAC
1   the e-mail files are regularly deleted.  The e-mail records are
2   regularly deleted because the DOE system is not, or the way
3   their servers are set up they are not big enough or they choose
4   to implement a system where the employees are regularly told to
5   delete e-mails.
6          Now, again, I am not suggesting anything nefarious,
7   but what I am suggesting is the DOE is a huge organization.
8   There is a way, I believe, to structure a very simple order
9   that informs these people that the procedures that they are
10  implementing right now are procedures that they cannot utilize
11  going forward.  They are destroying e-mails related to
12  communications between teachers, they are destroying e-mails
13  related to the rubber rooms and the use of the rubber rooms,
14  and I submit they are also destroying information related to
15  requests that have been made by politicians, city council
16  people, and even the teachers themselves to gain access to the
17  information.
18          I believe we will be able to meet that hurdle.  We can
19  do it by way of affidavits and submissions.  I raised the issue
20  because it is a very serious issue.
21          THE COURT:  Let me hear from Ms. Greenfield on it and
22  then if we do have to have formal motion practice on it, you
23  will put in your affidavits.  But remember, something that says
24  we tell people to delete e-mails so as not to clog up the
25  system or even e-mails unless saved are deleted automatically
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                                    10

81SHTEAC
1   every 30 days, all the stuff that, frankly, is the same at
2   almost any big corporation is a very different story than what
3   happens when a federal lawsuit where federal rules are
4   triggered will apply.
5          Ms. Greenfield.
6          MS. GREENFIELD:  First of all, good morning, your
7   Honor.  I haven't seen you in quite some time.
8          Counsel started by talking about a group of people.
9   Your Honor, we are not here on a pleading which addresses a
10  group of people.  We are here on a pleading where only one
11  named plaintiff is named and there are no factual allegations
12  in the complaint that shows he has any viable cause of action.
13          Also, while counsel is now speaking about e-mails, I
14  would note that in all the correspondence I have from counsel,
15  while they note the need, he notes the need for this meeting,
16  there is nothing specifically addressed which puts us on notice
17  about what information plaintiffs are claiming are in jeopardy
18  of being destroyed.
19          The reassignment centers, your Honor, there is no
20  secret about what the reassignment centers are.  Everybody in
21  the Board of Education knows about it.  I don't know what type
22  of e-mails would bring any additional facts forward to the
23  court about the reassignment centers.  They are there.
24  Plaintiff can speak about it.  People at the Board of Education
25  can speak about it.  The UFT can speak about it.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         Page 5

81SHTEAC.txt
(212) 805-0300

11

81SHTEAC
1          I can't speak to particular e-mails because I really
2   don't know what counsel is talking about.  The Board of Ed has
3   system-wide e-mail addresses, but I don't know what e-mails
4   counsel is talking about that pertain to the claims of this
5   particular plaintiff.
6          This particular plaintiff, Mr. Lewenstein, from what I
7   understand, your Honor -- and, again, this case was brought to
8   my attention at 4:30 Friday evening, thank you -- he had an
9   allegation of corporal punishment at the end of June 2007.  It
10  was investigated by OSI commencing in September of 2007.  There
11  was a contact made to the student at issue, his parent, I
12  believe it was September 14, 2007.  On September 17, 2007,
13  Mr. Lewenstein was removed from the classroom and sent to a
14  reassignment center.  OSI continued its investigation,
15  substantiated the allegation, but sent it back to the Office of
16  Legal Services.  They determined that only a letter of
17  reprimand was appropriate.  He was returned to the classroom in
18  early January of '08.
19         Following that, there was another allegation of verbal
20  corporal punishment made, and he has since been reassigned
21  again to the reassignment rooms.
22         That is the facts that we have right now.  Based on
23  that factual scenario, I don't know how this pleading states a
24  viable cause of action, and, therefore, I believe any
25  discussion regarding discovery or preserving any records, your
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

12

81SHTEAC
1   Honor, is wholly inappropriate.
2          MR. FAGAN:  I thank you for setting forth that
3   chronology, but the chronology that was just set forth by
4   Ms. Greenfield underscores the need for not just preservation
5   of evidence but access to evidence.  What Ms. Greenfield just
6   allocuted was 100 percent inaccurate as it relates to a very
7   specific period of time.
8          In September, the OSI did not contact the student.
9   The student was out of the country.  Mr. Lewenstein was sitting
10  very comfortably in his school doing work until one thing
11  happened.  On January, the 15th, Mr. Lewenstein sent a letter
12  to the Mayor and to the Board of Education informing them that
13  he believed they were in violation of his rights and the
14  teachers' rights and asking them to do certain things.  The
15  very next day Mr. Lewenstein -- I'm sorry, the same day
16  Mr. Lewenstein gets a letter, that is hand delivered to him
17  there in school, that he is being sent back to this rubber
18  room, the reassignment center.
19         If that is your record, Ms. Greenfield, then I urge
20  the court on that record alone to give us access to every
21  e-mail that names --
22         THE COURT:  We have two different issues.  One is
23  preservation.
24         MR. FAGAN:  Yes, Judge.
25         THE COURT:  The other is motions with respect to the
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

13

81SHTEAC
1   complaint, which I have to tell you has lots of motions to be
2   aimed at.  Unless you are telling me -- let's try to be fair
                      Page 6

81SHTEAC.txt

3  across the board here.
4          Are you telling me that Mr. Lewenstein or
5  Teachers4Action has gone to the EEOC?
6          MR. FAGAN:  Some have.
7          THE COURT:  I am not talking some.  I have got at the
8  moment one named individual plaintiff and an organization.  So
9  even assuming that, has either Mr. Lewenstein or
10 Teachers4Action filed a Title VII or ADEA complaint with the
11 EEOC?
12         MR. FAGAN:  On behalf of the teachers, the UFT went to
13 the EEOC.
14         THE COURT:  UFT isn't a party here.
15         MR. FAGAN:  It is not, your Honor.
16         THE COURT:  Maybe it should be.
17         Is there a right to sue letter with respect to
18 Mr. Lewenstein or Teachers4Action or anyone else you are going
19 to be bringing in as a named plaintiff?
20         MR. FAGAN:  There is a right to sue by the union on
21 behalf of its members through the EEOC.  I can produce that
22 letter.  That came --
23         THE COURT:  Who does that give the right to bring the
24 action?  If it is the UFT, then you don't have standing under
25 Title VII or the ADEA.  Frankly, I am not sure why the UFT
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    14
81SHTEAC
1  isn't in here whether as a plaintiff or a defendant to the
2  extent you are attacking a system that is quasi-contractual or
3  perhaps fully contractual.
4          MR. FAGAN:  Your Honor, one of the things that we had
5  envisioned was we had hoped to avoid a fight with the UFT.  It
6  is possible that we need to bring them in as a defendant.
7          On the issue of whether or not Mr. Lewenstein has
8  filed or Teachers4Action filed with the EEOC, they didn't.  But
9  the union did.
10         THE COURT:  How does that give you, and are you within
11 the statutory period, number one, even if that gave the right
12 to sue, and, secondly, I would have to see the letter, but I
13 don't see how the fact that party A gets a right to sue letter
14 means that party B with a similar claim gets a right to sue.
15         For example -- put the UFT aside -- if Mr. Lewenstein
16 had gotten a Title VII right to sue letter from the EEOC, that
17 would not mean that any of the ten people in the back could
18 piggyback it.
19         MR. FAGAN:  Your Honor, what the court is bringing up
20 is a very interesting issue as it relates to what it is that
21 the UFT can do and what it is that the UFT can't do.
22         THE COURT:  I am not interested in what the UFT can
23 do.  I am interested in what you can do.
24         MR. FAGAN:  That is correct, your Honor, and I
25 appreciate that.  What I am suggesting is that there are
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    15
81SHTEAC
1  certain elements of the complaint that may be subject to a
2  challenge of failing to go through the EEOC process.  That is
3  possible.  There are other elements to the complaint that I
4  submit are not subject to that type of challenge.  I am
5  prepared to deal with the issues of the various motions to
6  dismiss.
7          THE COURT:  What I am suggesting, counsel, is that,
                                Page 7

81SHTEAC.txt
```
 8    with all due respect to having this for a broader audience than
 9    this court, if you want to --
10              MR. FAGAN:  I was just looking to see if there was a
11    broader audience, your Honor.  Just plaintiffs.
12              THE COURT:  whether it is grandstanding for your
13    clients, there was an article in the Daily News and it didn't
14    come from this court.  So whether you planted it or they just
15    happened to pick it up, I don't know.  But in any event, where
16    I am going, without all the other things, is you have 14 causes
17    of action, at least three or more of which do not seem to state
18    a claim, certainly as pled, and possibly much more.
19    Preservation is one thing.  As I say, whether I enter a
20    preservation order or not, the city, the Department of
21    Education is under an automatic obligation with the lawsuit
22    having been started to preserve documents and electronically
23    stored information, and if they don't, they do so at their
24    peril.  But to the extent you are talking about emergency
25    access to the documents, I am not going to let this case be
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                   16
81SHTEAC
```
 1    used as a way to get documents for use in the UFT, Board of Ed
 2    hearings that come out of these reassignment centers or
 3    anything else.  So frankly, I fail to see any emergency.
 4              MR. FAGAN:  May I address that issue?
 5              THE COURT:  Well, first, let's address whether -- I
 6    guess I would say this.  You have said you wanted until Friday
 7    to name certain additional plaintiffs.  Unless you are going to
 8    either argue that the UFT right to sue letter, which you then
 9    have to attach to the complaint, is timely and gives your folks
10    a right to sue in their own name, etc., etc., and that each
11    one, what is their Title VII claim -- I mean, frankly, you are
12    being very creative here, but this isn't a Title VII case.  It
13    is certainly not a global Title VII case.  I mean, just looking
14    at your client sitting next to you and the ten people in the
15    back, not every single race, creed, etc., can be discriminated
16    against by a global policy.
17              Now, it may be that the principal of P.S. XYZ has it
18    in for Caucasians and the principal of junior high school 80
19    has it in for a different ethnic group or a racial group and
20    all of that, but let's cut the garbage from this complaint.  If
21    you have what it seems to be is a pure due process case, let's
22    get to the -- misuse of public tax payer funds.  Have you
23    looked at the standing cases with respect to that?  I mean, I
24    don't want to start saying Rule 11, but if you want all sorts
25    of nice, quick relief, get the garbage out of the complaint.
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                   17
81SHTEAC
```
 1    Because if there is a motion to dismiss, I am not sure what I
 2    am going to do with discovery.  As it is, you are here two days
 3    to five days, whatever it is, after the complaint has served on
 4    some but not all defendants, or even if it is all defendants,
 5    you are here because of emergency relief in terms of a
 6    preservation order.
 7              MR. FAGAN:  May I address that, Judge?
 8              THE COURT:  Yes.
 9              MR. FAGAN:  I am not addressing it in the context of
10    people who can't be specifically identified.  There are very
11    specific examples.
12              By the way, the court's comment about grandstanding, I
```
                            Page 8

81SHTEAC.txt
```
13   am not grandstanding here.  I wanted my clients to come here so
14   that they could hear your Honor, understand how the case is
15   going, understand all of this, because I specifically do not
16   want to play the game of, I will tell you what the judge said
17   and I will tell you what I think the judge said.  I wanted them
18   to hear it directly from your Honor and to see the exchange.
19   That is why they are here.
20            Two of them, however, are here for very specific and
21   very emergent relief.  For example --
22            THE COURT:  They are not plaintiffs yet, though.  That
23   is my problem.
24            MR. FAGAN:  Your Honor, they are named as John Does.
25   I can --
```
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

81SHTEAC
```
1            THE COURT:  You want to amend the complaint, amend it.
2    I will listen to the claim for emergency relief, but I think
3    from what you have said and what you have said in your letter,
4    the emergency relief is they have got a hearing of some sort
5    before the Board of Ed coming up.  This is not discovery for
6    that purpose.  Damages can alleviate any concerns.
7            MR. FAGAN:  Actually, your Honor, in certain of these
8    circumstances damages cannot relieve some of these concerns.  I
9    will give you two examples.  One example is a gentleman named
10   Mr. McLaughlin, who is here.  Mr. McLaughlin, the time within
11   which Mr. McLaughlin has to file his Article 78 motion for
12   relief expires today.
13           THE COURT:  How long does one have to file an Article
14   78?
15           MR. FAGAN:  Four months.
16           THE COURT:  Why is that my problem if he waited until
17   the day before it expires?
18           MR. FAGAN:  Your Honor, the reason that it has now
19   become your Honor's problem is we filed the complaint.  The
20   complaint has to do with certain issues as they relate to these
21   people, including their violation of due process.
22   Mr. McLaughlin's due process rights, we submit, in the context
23   of the complaint were violated.  I met these people three weeks
24   ago.  We have had meetings every single week.  What I learned
25   is, last night, that a stipulation was -- he was, let's call
```
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

81SHTEAC
```
1    it, encouraged to execute a stipulation, and the time within
2    which he has to attack that under Article 78 and based on the
3    information that we now know expires today.
4            The reason we need that emergency relief is, one, no
5    one is interested in pursuing a course of action that is going
6    to further cause injuries and damages to these people.  It is
7    not just money, Judge.  Some of these teachers are charged with
8    very serious offenses.  I am not suggesting that --
9            THE COURT:  What is the relief you are requesting with
10   respect to this Mr. McLaughlin?
11           MR. FAGAN:  What I am requesting, Judge, with respect
12   to Mr. McLaughlin is -- I set that forth in the proposed
13   evidence preservation order.  It would actually be converted to
14   a proposed production order.  One, I want the time within which
15   or I submit the time within which he would have to file his
16   Article 78 should be stayed.
17           THE COURT:  What is my authority to do that?
```
                                  Page 9

81SHTEAC.txt

18          MR. FAGAN:  That is the problem.  I don't believe your
19   Honor has that authority.
20          THE COURT:  That makes two of us.
21          MR. FAGAN:  Because I don't believe your Honor has
22   that authority, then what Mr. McLaughlin needs is he needs to
23   get access to the -- he needs to get access to those e-mails.
24          THE COURT:  He is not going to get them today.  Come
25   on, be serious.

                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              20
81SHTEAC
1           MR. FAGAN:  He is not, your Honor, but if he doesn't
2    get them, Mr. McLaughlin's deal was cut at the end of
3    September.  If your Honor remembers what I talked about --
4           THE COURT:  What you are asking for is, in essence,
5    some form of preliminary injunctive relief when your clients
6    have sat on their duff until the day before the deadline.  You
7    may have picked your worst example because even assuming I said
8    to Ms. Greenfield, you have made a persuasive case, Mr. Fagan,
9    go produce the e-mails, it certainly can't be done between
10   11:30 or 12:00 when she gets back to her office and 5:00 today.
11          So once the Article 78 deadline has passed,
12   Mr. McLaughlin will bring his Article 78 and get whatever
13   relief the state courts give him, including any discovery that
14   the Article 78 court is going to give him, or they won't.  I
15   don't see the issue.
16          MR. FAGAN:  Let me go back to the issue of sitting on
17   their duff.  These clients have not sat back passively.  They
18   have utilized literally every opportunity that they could short
19   of commencing this lawsuit in order to gain access to the
20   evidence, including -- Judge, I am only explaining to you and
21   responding to the issue of sitting back passively.  They have
22   not sat back passively.
23          Number one, they have attempted to get the information
24   through freedom of information law under New York State rules,
25   and they have been denied.

                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              21
81SHTEAC
1           THE COURT:  Excuse me.  Have they taken that to court?
2           MR. FAGAN:  No, Judge.  It just happened.
3           THE COURT:  But why me?  Why am I so lucky, Mr. Fagan?
4           MR. FAGAN:  The reason you are so lucky, your Honor,
5    is because these particular -- this concept of the rubber rooms
6    and the 3028 process are not just violation of due process,
7    these people are actually considered they are confined.  The
8    reason it came to you -- I actually expected us --
9           THE COURT:  This has been going on for years, has it
10   not?
11          MR. FAGAN:  It has, your Honor, but it has only
12   increased in the last two years.  It has gotten --
13          THE COURT:  So even the last two years, what I am
14   basically suggesting, if you want to make motions, I will let
15   you make motions.  I don't see that you have got a record on
16   this complaint.  And with the McLaughlin example, even assuming
17   that John Doe No. 1 is Mr. McLaughlin, I don't see this.  What
18   I see is a challenge, in essence an injunctive relief type
19   challenge, to the temporary reassignment centers or, in your
20   language, the rubber rooms to that process.  The court will
21   decide that.
22          The good news for you, as you have appeared in front
                          Page 10

81SHTEAC.txt
23  of me, I believe, and Ms. Greenfield has certainly appeared in
24  front of me, the good news is you are in a rocket docket
25  generally.  So things will move.  But they are not going to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    22
81SHTEAC
1   move with document discovery until a document demand is served
2   that deals with whoever the named plaintiffs are.  And of
3   course, if there is significant motion practice against your
4   complaint, since you have thrown in everything except the
5   kitchen sink, that may stay discovery.  I don't know that yet.
6   I haven't heard from Ms. Greenfield about that.  But if she
7   isn't annoyed by the Title VII and ADEA claims, I certainly am
8   absent seeing a right to sue letter, which is nowhere referred
9   to in the complaint about UFT right to sue, etc.
10          So what I am suggesting is you and your clients really
11  need to step back, take a deep breath, and do this right.
12          MR. FAGAN:  May I add two more examples, your Honor?
13          THE COURT:  No, because I don't have a document
14  request.  I can't do anything absent a document request.  If
15  you want to serve a document request on Ms. Greenfield after
16  you amend the complaint, be my guest.
17          MR. FAGAN:  Thank you, Judge.
18          THE COURT:  I will deal with the repercussions of that
19  or whether discovery is stayed or anything else.  But neither
20  she nor I can figure out what you want when we have got John
21  Doe plaintiffs, and it is unclear, are you attacking the policy
22  memos from Joel Klein and whoever else in central board set up
23  these so-called rubber rooms or are we attacking the way it
24  applied to Mr. Lewenstein, Mr. McLaughlin, and other
25  unidentified people?  I don't know that.  I am sure
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    23
81SHTEAC
1   Ms. Greenfield doesn't know that.
2           When the complaint is amended to make that clear --
3   frankly, the factual allegations of the complaint seem to be
4   there are rubber rooms, my clients are suffering, now let me
5   come up with 14 different causes of action without really
6   saying how that applies.  So take a step back.  Fix it.  Once
7   the amended complaint is served, serve a document request.  You
8   want to make any other motions, you can make them in writing
9   subject to Rule 11, with client affidavits and legal research,
10  and I will deal with them.  If you want to make a motion to
11  expedite anything, we will deal with that.
12          MR. FAGAN:  Your Honor, in light of the court's
13  statement about a document request, may we have permission to
14  serve subpoenas on third parties?  The reason I say that is --
15          THE COURT:  Who?
16          MR. FAGAN:  The UFT.
17          THE COURT:  I guess my question is, is the UFT, and
18  this gets back to the shape of the pleadings and necessary
19  parties, is the UFT a necessary party?  I don't want them going
20  through discovery in part as a nonparty if either you are going
21  to bring them in or the city is going to bring them in in 30
22  days or less when the city is to answer the complaint.
23          Let me ask you, because I am reading between the lines
24  here, is the temporary reassignment center process something
25  that is either contractual or has been negotiated in part with
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                            Page 11

81SHTEAC.txt

81SHTEAC
1   the UFT and the Board of Ed?
2           MS. GREENFIELD:  Your Honor, it is my understanding
3   that that whole process came about because teachers are paid
4   during the time of their reassignment and it was agreed, and,
5   your Honor, I will have to go back and get more information,
6   that this is where teachers would go to receive their pay
7   during this period when they are under investigation or
8   whatever else is going on before charges are preferred or after
9   charges are preferred.  Depending on the seriousness of the
10  allegations, some teachers, it is determined that they should
11  not be returned to the classroom and this is where they remain
12  while they receive their full salary.
13          MR. FAGAN:  Again, unfortunately, I don't believe
14  Ms. Greenfield -- perhaps I am wrong.  That is not what my
15  client just told me.  There is no contractual provision that
16  authorizes the existence or confinement in rubber rooms.
17  Number two, the law --
18          THE COURT:  Let's take away adjectives.  Is there
19  something in the contract that says, or if not the contract the
20  side letters, agreement between the UFT, that if a teacher is
21  coming up on charges that they will be paid their salary and
22  assigned to central board or district office and taken out of
23  their school?
24          MR. FAGAN:  Not according to what my client just told
25  me.  The law upon which the issue comes up is a law which
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

81SHTEAC
1   specifically states that the teachers can be suspended with
2   pay, but there is no provision to assign them to a rubber room
3   and no provision in letters that have been sent by the UFT to
4   my clients that suggest that the creation of the rubber rooms
5   is a contractual creation between the UFT and the DOE.
6           We have also checked before we came in here today that
7   outside of the City of New York the rubber room process or the
8   temporary reassignment center process is not utilized.  There
9   are no such things.  It is a unique creature --
10          THE COURT:  The UFT is in New York City.  I am not
11  saying this is a nationwide practice or even statewide.  The
12  question is, what is the UFT's role in this?
13          MR. FAGAN:  But the UFT has to go by the state law,
14  which is 3020(a).  3020(a) has no provision for the rubber
15  rooms, has no provision for the reassignment, and some of the
16  teachers -- we can make a motion on the issue of the rubber
17  rooms.  I am prepared to do that.
18          If Ms. Greenfield produces a document to me that says
19  there is a contract that specifically authorizes the existence,
20  the creation, confinement into rubber rooms, I will be happy to
21  review that.  That was one of the things I was asking for or I
22  was going to ask for in my suggestion about evidence
23  preservation and documents to be produced.  It was whatever
24  documents they have on the creation of rubber rooms, the
25  implementation of rubber rooms, the assignment to the rubber
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

81SHTEAC
1   rooms, I think we should get.
2           THE COURT:  All right.  Here is what I will let you
3   do.  You can subpoena the UFT at this point with a preservation
                            Page 12

81SHTEAC.txt

 4  subpoena so that they are on notice of this lawsuit and the
 5  obligation to preserve whatever it is you want them to
 6  preserve, subject, of course, to their objecting.  But at least
 7  that will put them on notice as of today, if they don't read
 8  the paper, they don't consider the newspaper binding, that they
 9  have got potential involvement here whether as a party or as a
10  witness.
11          But I am not producing any documents to you until I
12  see what the new complaint looks like, whether there is a
13  motion to dismiss in whole or in part, and where we are going
14  with all of this, subject to any other emergency-based motions
15  that you may make.
16          MR. FAGAN:  Apropos of that, Judge, may I make the
17  following suggestion, because I know this is a rocket docket
18  and I certainly don't want to burden the court with unnecessary
19  allegations in a complaint or unnecessary motion practice.
20          We are filing our amended complaint by Friday, and I
21  will do that.  Included in that I would request permission,
22  since I also asked in the letter this should be considered a
23  premotion conference, I would like permission to file a motion
24  to compel certain discovery, evidence preservation issues.  I
25  will make that.  Combined with that, if your Honor wants to
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              27

    81SHTEAC
 1  jump down to the third item on my proposed agenda, it is not
 2  just the defendants who wish to make motions.  I believe that
 3  there is a motion for partial summary judgment to be made --
 4          THE COURT:  Then why are we bothering with discovery?
 5  You can't have it both ways.
 6          Rule number one, each side gets one summary judgment
 7  motion per case.  You want to make it now, go right ahead.  The
 8  city responds with 56(f) that they need discovery from you,
 9  that is fine.  Frankly, since at the moment we have one
10  plaintiff or one and a half if the organization has standing,
11  all of this talk -- I brought you in quickly because you said
12  emergency -- all of this is premature.  You want to make a
13  partial summary judgment motion on what?  What violates the
14  law?
15          MR. FAGAN:  The rubber room process.
16          THE COURT:  As far as I am concerned, you want to do
17  this without discovery, let's just jump to the summary judgment
18  stage.  I am not giving you expedited discovery for an
19  expedited partial summary judgment motion.
20          MR. FAGAN:  Judge, I was talking about establishing a
21  schedule.  A moment earlier --
22          THE COURT:  The schedule is very simple.  We are going
23  to have a date for you all to come back and see me in a week or
24  two after I have seen your complaint, see what Ms. Greenfield's
25  response to it is, and since you and I have done most of the
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              28

    81SHTEAC
 1  talking I will give her the opportunity to get up and shoot
 2  herself in the foot or otherwise --
 3          MS. GREENFIELD:  I am going to save it for my motion
 4  papers, your Honor.
 5          THE COURT:  But seriously, I could give you a complete
 6  discovery schedule now and say, OK, you have got three months
 7  for discovery, you have got six months for discovery, whatever
 8  makes sense, but are you able to tell me now how many
                        Page 13

81SHTEAC.txt
9   plaintiffs we are talking about?  And I guess the other thing,
10  as we get into each plaintiff, was assignment to the temporary
11  reassignment center appropriate, which it seems to me is an
12  arbitrable issue or whatever you call the UFT process, that
13  whole process, or are we dealing with, is there something in
14  general in the way that if people have to spend their
15  eight-hour workday or however long teachers work, which is less
16  than eight, if they have to spend 9 to 3 in the reassignment
17  center room, it may be a waste of my tax money, but is the
18  issue is that improper?  So I really don't know what you would
19  want to move on.
20      I am not likely to consider, and of course substantive
21  motions go back to Judge Marrero absent consent from all of
22  you, but the court is not likely to look at is Mr. Lewenstein's
23  case valid, meaning -- I will rephrase it.  Is the Department
24  of Education's reason for assigning him into the so-called
25  rubber room valid, did he really physically or verbally abuse a
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              29
81SHTEAC
1   student or any of that, as opposed to was he given whatever due
2   process rights he was entitled to under the Fifth and
3   Fourteenth Amendment and the education law and whatever else
4   may apply.
5       So I really think you need to think about it.  This is
6   not the replacement for the Article 78s that each affected
7   individual can bring after whatever action the Board of Ed
8   takes based on the facts of those particular hearings.
9       MR. FAGAN:  Your Honor, I absolutely agree.  One of
10  the suggestions that I might make to expedite the process is, I
11  certainly don't want to file an amended complaint making
12  certain allegations, on good faith, that don't need to occupy
13  the court's time when in fact Ms. Greenfield has told the court
14  on the record that she believes that there is some document
15  that authorizes the creation of these rubber rooms.  She
16  believes there is a contract provision, there is something
17  there that authorizes this.
18      THE COURT:  I am not sure she said contract as opposed
19  to that it has been discussed with the UFT.
20      MR. FAGAN:  Well, your Honor, that is precisely the
21  point that I wanted to get to, which is I am not looking for a
22  whole pie, I am not looking to create a complaint that has
23  frivolous causes of action.  I am looking for a very specific
24  issue.
25      THE COURT:  Generally the complaint comes first and
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              30
81SHTEAC
1   discovery comes second.
2       MR. FAGAN:  It does, your Honor, except in this
3   particular instance, when your Honor was so careful to explain
4   to us about the way we should go forward in this case, and I am
5   very mindful of that, and I am also mindful of the issue of the
6   standing and the issue of whether or not it is even appropriate
7   to include a challenge to the rubber room, what your Honor
8   focused on was the second part of the equation.  The second
9   part of the equation is if it is appropriate to assign a
10  plaintiff or to discipline a plaintiff.  That is the second
11  part.  But the first part is the creation of the rubber rooms
12  themselves.
13      There is no question that Mr. Lewenstein or other
                            Page 14

81SHTEAC.txt
14    people could in fact, pursuant to contract, pursuant to state
15    law, be charged with whatever the offenses are.  That is not
16    the issue.  That comes later, whether those charges are proven,
17    and that is not going to be before the court, I don't believe.
18    what goes before the court is whether or not on January, the
19    15th, in the afternoon, it was appropriate for the Department
20    of Education -- January 15th of this year, for the Department
21    of Education to send Mr. Lewenstein to a preassigned room in
22    which he is going to be confined.
23              The creation of the rubber room --
24              THE COURT:  Does he want to get paid?
25              MR. FAGAN:  He has a right to be suspended with pay,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                      31
      81SHTEAC
1     your Honor.  That is the law.  What Ms. Greenfield said --
2              THE COURT:  How is this any different than when police
3     officers are put on administrative duty?
4              MR. FAGAN:  In their precinct.
5              MS. GREENFIELD:  That is not accurate.
6              MR. FAGAN:  In their precinct, Judge.
7              THE COURT:  First of all, there is a difference
8     between a precinct and a school.
9              MR. FAGAN:  Let me give you an example of that.
10             Actually, she is not here.  I'm sorry.  She is not
11    here because she lives in Queens, she teaches in Queens, and
12    she was assigned to a rubber room in Staten Island.
13             These teachers are being sent outside of their
14    district.  They are being sent to confinement centers, and all
15    I ask for is if Ms. Greenfield has a document that talks about
16    the creation of the rubber rooms, let us have it.  One
17    document.
18             THE COURT:  Then what?  Then the case is over?
19             MR. FAGAN:  No, Judge.  well, it could be over for
20    them.
21             The issue is the rubber rooms, is it a violation of
22    due process -- one of the issues in the case -- is it a
23    violation of due process for the teachers to be confined to the
24    rubber rooms, sent to the rubber rooms, reassigned to the
25    rubber rooms.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                      32
      81SHTEAC
1              THE COURT:  Why do we need any discovery on that at
2     all?
3              MR. FAGAN:  The reason we need that discovery is that
4     one of Ms. Greenfield's defenses, and she said it to your
5     Honor, one of her defenses is there is some type of right that
6     exists between the DOE and the UFT that allows them, pursuant
7     to agreement or contract, to send the --
8              THE COURT:  Let me put it a different way and then let
9     me hear from Ms. Greenfield.
10             Assuming it is not covered by the UFT but the UFT
11    hasn't grieved it and hasn't challenged it, what is it in some
12    law that prevents an employer, even a municipal employer, from
13    saying we have brought you up on charges, the validity of the
14    charges have to be assumed to be true for purposes of your
15    challenge to the rubber room, and we have decided that to make
16    sure you are not out earning money doing something else or that
17    you are not getting a benefit by being suspended with pay, we
18    are going to make you stay in.  I know you say it is
                              Page 15

81SHTEAC.txt
```
19  confinement, and maybe then one gets into how bad are the
20  conditions in the room, but what would prevent an employer from
21  saying, you work with children.  Because of the charges against
22  you, you should not be in a school building with children so
23  report to the central office or report to Staten Island and sit
24  in this room from 9 to 3, whatever your normal workday is,
25  punch in and out so that we know whether you are taking sick
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

81SHTEAC
```
 1  leave or personal days or whether you are the equivalent of
 2  working and we are going to pay you for that until the charges
 3  are resolved?
 4         MR. FAGAN:  Your Honor, what prohibits that is the law
 5  itself.  The law does not provide -- I am talking about the
 6  state law -- does not provide for the confinement of teachers
 7  into any other location.  If they want to be suspended, they
 8  are suspended with pay or if --
 9         THE COURT:  I'm sorry.  If the law just says, and you
10  read it to me before, that the Board of Ed or any other
11  educational district has the right to suspend the teacher with
12  pay and that is all it says, what prevents the board from
13  adopting what it considers reasonable regulations to deal with
14  that?
15         MR. FAGAN:  Your Honor, now we are getting to the
16  issue of the reasonable regulations and the creation of the
17  rubber rooms, and here is why I say that.
18         The law also provides that each of these teachers be
19  provided notice of their charges.  First of all, there has to
20  be an executive session which is convened within five days,
21  voted on, and every teacher who is going to be charged has to
22  receive notice that there has been an executive session, they
23  voted on it, the majority of the people have voted that there
24  are going to be charges made.  That is pursuant to the state
25  law.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

81SHTEAC
```
 1         Second, once they do that, then the teachers
 2  themselves have a right to -- they have to be notified not just
 3  five days of the charges, then they have to be given very
 4  specific notice of what the charges are, with their opportunity
 5  to defend.  They also, right after that, and I can quote the
 6  sections but I would rather paraphrase them for your Honor.
 7  They also have a right to have expedited hearings, they have a
 8  right to have an unbiased arbitrator, and they have a right to
 9  have closure.  The process is supposed to be a quick,
10  definitive process so that those teachers who are, let's say,
11  unfortunately --
12         THE COURT:  Now you are changing the issue.
13         MR. FAGAN:  No, your Honor, I am not changing the
14  issue.  I am going to the heart of the rubber rooms.
15         The heart of the rubber rooms are confinement.  They
16  are retaliatory.  This is not a process whereby teachers are
17  sitting there until they get their day in court.  This is a
18  process where some teachers sit there for months and years
19  before they are ever given notice of the charges.  This is not
20  an issue of saving taxpayers money.  This is an issue of
21  costing taxpayers money.  This is not an issue of efficient use
22  of public employees.
23         By the way, these are not teachers --
```
Page 16

81SHTEAC.txt

24          THE COURT:  When I run for mayor and get elected, we
25    can deal with policy issues.  This is a question of law.  But
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

                                                                    35
      81SHTEAC
1     OK.
2                MR. FAGAN:  It is, your Honor.
3                THE COURT:  Let me hear from Ms. Greenfield.
4                MS. GREENFIELD:  Your Honor, I agree, I believe we are
5     mixing some issues here.  One, we have a strict issue of law.
6     We don't need discovery about whether or not there are these
7     reassignment centers.  There are.  It seems like counsel is
8     arguing no matter what we do not have the right pursuant to
9     education law to take people out of their school and reassign
10    them to these places.  Whether we can or cannot is an issue of
11    law.
12               Then there is the issue of whether or not they are
13    getting proper notice or timely notice of the charges against
14    them, and then whether or not they are getting timely hearings.
15    I would just like to note, your Honor, the one named plaintiff
16    we have before us was not charged.  The allegation of corporal
17    punishment was substantiated but it was determined not to go
18    forward with charges and all he received was a letter of
19    reprimand.
20               The allegation was made in June of '07.  He was back
21    in the classroom by January of '08.  That is what we are
22    talking about.  That is the factual scenario that we have here.
23    Until we have other plaintiffs and other factual scenarios, it
24    is hard for me to express to the court what I really think this
25    case is about because I think it is about a lot of different
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

                                                                    36
      81SHTEAC
1     things, a lot of different challenges.  But, your Honor, to me,
2     they all seem to be legal challenges.  Not whether or not in
3     this case the charges should have been substantiated against
4     me, but whether or not the process that was employed from the
5     initiation of the reassignment to the rubber room until
6     bringing the charges violated due process.  Again, I don't see
7     the need for all this discovery on those legal issues.
8                MR. FAGAN:  She is absolutely right with one caveat.
9     She went right to the heart of it.
10               MS. GREENFIELD:  Thank you.
11               MR. FAGAN:  By the way, with respect to
12    Mr. Lewenstein --
13               THE COURT:  I don't care if the timing is off on that.
14    Let's get to the legal issues.
15               MR. FAGAN:  The legal issue in this case, your Honor,
16    is, are the rubber rooms -- is it permissible to assign these
17    teachers and confine them to the rubber rooms, full stop.  Then
18    there are other things that come after that, but that is one of
19    the threshold issues in this case.
20               Ms. Greenfield has told us, and it is in the record,
21    that she believes there is some type of an understanding that
22    allows that process.
23               THE COURT:  You are missing the point.  You are
24    totally missing the point.
25               MR. FAGAN:  I am trying to get discovery.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

                                                                    37
                                Page 17

81SHTEAC.txt
81SHTEAC
```
 1              THE COURT:  I understand that.  That point I
 2    understand.
 3              MR. FAGAN:  And I have moved very far back.
 4              THE COURT:  Candor is sometimes useful.
 5              MR. FAGAN:  Judge, I moved very far back to just one
 6    single issue.  what is it?  Let her produce to us whatever she
 7    has --
 8              THE COURT:  You are missing the point or, as you
 9    candidly admitted, you want discovery of all this regardless of
10    the point.
11              MR. FAGAN:  Not regardless, your Honor.  with respect,
12    not regardless.
13              THE COURT:  Let's move on.
14              I guess my question is this.  On the one hand you want
15    to move quickly, and since I run a rocket docket I appreciate
16    that.  On the other hand -- Ms. Greenfield shook her head -- as
17    the defense counsel she doesn't.
18              My question is this.  You have got to amend the
19    complaint.  Can you do it by Friday or are we being foolish and
20    would you rather have either until Monday, and ruin your
21    weekend, or next Friday?
22              If you don't want your case to get bogged down, get
23    rid of the John Does, unless you are prepared to make a motion,
24    which you better have good case law on because I don't think
25    you have a chance here, number one.  Number two, what is the
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    38
81SHTEAC
```
 1    facts as to each plaintiff, and you have got lots of the same
 2    argument.  The fraudulent scheme involved.  Is this age
 3    discrimination?  Is it race discrimination?
 4              MR. FAGAN:  It is age discrimination, your Honor, and
 5    I didn't have a chance to -- we weren't pleading Title VII --
 6              THE COURT:  Stop.  You were pleading Title VII.
 7              MR. FAGAN:  We weren't pleading Title VII as race,
 8    creed, national origin.  We were pleading it as amended under
 9    the 1991 Civil Rights Act that includes specific age
10    discrimination.
11              THE COURT:  Then you have separate causes of action
12    for Title VII and the ADEA.  The ADEA is the amendment to Title
13    VII to get age in it.
14              Secondly, you have got a 1981 claim, which, unless I
15    am really rusty, is only for race.
16              MR. FAGAN:  Your Honor, I can pull that out.  I simply
17    believe that 1981 was amended by 1999 to include a paragraph
18    for age.  It was an amendment.
19              THE COURT:  I find that doubtful.  But I guess what I
20    am saying is this.  If you are going to do it -- RICO, come on.
21    Give me a break.  This is a Fifth and Fourteenth Amendment due
22    process case.
23              If you want to get to the heart of the matter,
24    including getting some discovery -- I am not telling you what
25    to do.  You are a lawyer.  You get paid to make these
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    39
81SHTEAC
```
 1    decisions.  But if you are bringing any of these causes of
 2    action in your amended complaint, and that is why I am saying
 3    if Friday is too soon, take more time and let's agree on that,
 4    I want you to have researched it.  Does your client have
```
                             Page 18

81SHTEAC.txt

5  standing under the tenth cause of action to bring a claim for
6  misuse of taxpayer funds.  The Supremes have just recently
7  dealt with that in the religious context in something else.  I
8  can't say I can swear to the case law off the tip of my tongue.
9          Tortious interference with contract rights.  You can't
10 interfere with your own contract.
11         So please do your research.  Get rid of the junk here.
12 Get specific facts as to specific plaintiffs, if that is what
13 you are challenging.  Plaintiff Holmes has been in the rubber
14 room for four months with no charges brought and the rubber
15 room is miles away from his or her home.  Whatever.  Get rid of
16 the boilerplate here.  I mean, for a 20-something page
17 complaint, it says very little.
18         MR. FAGAN:  That is correct, your Honor.  The purpose
19 of --
20         THE COURT:  You don't have to justify this one.
21 Justify your next one.
22         MR. FAGAN:  May I just speak with my client for a
23 second?
24         THE COURT:  Sure.
25         (Pause)
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                    40
81SHTEAC
1          MR. FAGAN:  I would actually opt for destroying my
2  weekend and going for Monday to file, your Honor.
3          THE COURT:  That is fine.
4          MR. FAGAN:  My suggestion, if I can make a suggestion,
5  Judge.
6          THE COURT:  Yes.
7          MR. FAGAN:  My suggestion would be that, we have got
8  so far the issue of preservation, subpoena to the UFT for
9  preservation, preservation subpoena out to the UFT.  We will
10 serve with the amended complaint, we will serve discovery
11 requests on the UFT.
12         THE COURT:  UFT or the board?
13         MR. FAGAN:  I misspoke.  They confuse me sometimes
14 they are so close.  The DOE.  I will make those very specific,
15 with the specific types of e-mails, with the information.  That
16 way when we come back to your Honor, let's say mid-next week,
17 unless your Honor is going to push it sooner, when we come back
18 then, hopefully Ms. Greenfield --
19         THE COURT:  How about throw into your time schedule,
20 it would really be nice if you and Ms. Greenfield talked to
21 each other and perhaps some of this can be cut through.
22         MR. FAGAN:  I offered that, and I am hopeful that
23 after --
24         THE COURT:  Offered that?  She learned about the case
25 when my secretary called the clerk at 4:30 and said who is
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                    41
81SHTEAC
1  assigned to that and they said nobody.  Ms. Greenfield is the
2  supervisor, so she is stuck with it for now.
3          MS. GREENFIELD:  And thank you for that.
4          Your Honor, counsel did give me the sheet of paper
5  this morning and I said this was a no go.  But obviously once I
6  get the amended pleading, we will certainly have a meet and
7  confer with counsel to see what we can do with respect to his
8  discovery.
9          MR. FAGAN:  Is it inappropriate to ask the court to
                        Page 19

81SHTEAC.txt
```
10  consider directing Ms. Greenfield to produce whatever documents
11  she has with regard to the creation of the --
12          THE COURT:  Yes.
13          MR. FAGAN:  It is inappropriate to ask for that?
14          THE COURT:  You can ask, but the request is denied.
15          There is absolutely no reason -- either that is a
16  legal issue or -- look, I know your desperate issue here is to
17  get discovery for some reason.  I thought lawyers usually like
18  to win a case, not just get discovery.
19          What Ms. Greenfield said was in the context of should
20  the UFT be involved here, she said, as I recall, and you have
21  all got the transcript, something to the effect of this issue
22  has been addressed with the UFT.  She didn't say the UFT
23  contract requires it or anything else.  Frankly, I think from
24  what Ms. Greenfield is saying and from what you are saying that
25  as to the ability to do this it seems to be the board's
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    42
81SHTEAC
```
1   position that they have the unilateral right to do it.  To the
2   extent that any unilateral right when dealing with city unions,
3   particularly UFT, is, well, we have the right to do it but if
4   the UFT is going to scream bloody murder we might try to talk
5   to them and work something out, that may be an additional
6   defense that the city has that the UFT has not challenged this.
7   It doesn't mean that they need the UFT on board for this
8   necessarily.
9           In any event, I am not ordering them to do anything
10  other than preserve, and even preservation is difficult because
11  still, other than whatever you have mentioned today, other than
12  that, it is unclear to me what you want in discovery.
13          So what you are going to do is serve a document demand
14  on Ms. Greenfield.  You are going to state what form you want
15  ESI in and all that good stuff, and she is going to respond.
16  We will see whether that is expedited, whether it is delayed
17  because of motion practice, because you did a terrible job of
18  amending your complaint, or whatever.
19          But with all due respect, and with all due respect to
20  the teachers sitting in the back, some of whom may become named
21  plaintiffs shortly, to the extent this is a due process
22  challenge to the rubber rooms, it is mostly a legal issue and
23  it is not something, considering that the rubber rooms have
24  been around for several years, not something that it would
25  appear to require immediate injunctive or other jumping through
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    43
81SHTEAC
```
1   hoops relief absent some motion papers, that you have not yet
2   filed, that would convince me otherwise.
3           The fact that Mr. McLaughlin has until the end of the
4   day today to bring an Article 78 or that someone else sitting
5   in the back of the room has a month to bring an Article 78, I
6   am not interfering with the state court process.  People will
7   do what they have to do in state court.  The state courts are
8   more than adequate to protect their rights with respect to
9   that.
10          Moreover, on all of this, you keep calling it
11  confinement like being arrested.  Certainly in Section 1983
12  cases against the police department or police officers have
13  come up with ways for the jury to compensate people for being
14  falsely confined.
```
                               Page 20

81SHTEAC.txt

```
15          So there is very little that, considering the passage
16    of time in general on the reassignment centers, even if it may
17    be novel for some of your clients, it is unlikely that you can
18    make a showing for injunctive relief or other everybody has to
19    jump through hoops.
20          Moreover, to the extent your requests to
21    Ms. Greenfield for documents, including ESI, are tailored,
22    specific, etc., you have a better chance of getting the court
23    to order that than if it is a blunderbuss request that says
24    every e-mail that talks about the rubber rooms.
25          MR. FAGAN:  Thank you, Judge.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

44

81SHTEAC
```
1           THE COURT:  So use your time wisely in both amending
2     the complaint and drafting appropriate document requests and we
3     will go from there.
4           MR. FAGAN:  Your Honor, what we will do --
5           THE COURT:  Your client is waving at you.
6           MR. FAGAN:  May I speak to him for a moment?
7           THE COURT:  Yes.
8           MR. FAGAN:  Thank you, Judge.
9           (Pause)
10          MR. FAGAN:  Judge, my client pointed out that one of
11    the issues in the rubber room, and I am saying this not to
12    upset the court but there are some issues going on as it
13    relates to things that are happening in the rubber room and
14    things for which, whether it is injunctive relief or guidance
15    from the court, direction to Ms. Greenfield and to the DOE, it
16    would be helpful.
17          What has happened literally in the last two weeks is
18    that when the DOE learned of the potential action and then when
19    the DOE learned of the action itself, the confinement became
20    even -- and I am using the term confinement and I don't mean to
21    say it to negate what the court has said.  I think we will be
22    able to prove that it is confinement.  The confinement within
23    the rubber rooms has become even more restrictive, where they
24    are preventing the teachers from even sitting and talking
25    together about what is going on.  They are preventing the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

45

81SHTEAC
```
1     teachers -- in a certain way it is draconian.
2           I am not suggesting that the court has any affidavits
3     to this.  The only evidence is that my client, Mr. Lewenstein,
4     could attest to it.  He leaned over and said to me to please
5     make the court aware of this.
6           What I would suggest is that until we come back here
7     next week the DOE should understand that restrictions in the
8     rubber room to people congregating, talking -- by the way, they
9     are not doing anything in the rubber room.  They don't have any
10    jobs in the rubber room.  They sit in a room as if they are
11    wearing dunce caps, in a room this size.  These are not
12    teachers who are accused of the types of conduct that one would
13    think merits this.  These are teachers who are accused of
14    incompetence, teachers who are accused of potential
15    insubordination.
16          So my suggestion, your Honor, is that until we come
17    back here, the DOE and the court, even by way of suggestion on
18    the record, needs to understand these people have a right to
19    sit and talk, they have a right to meet, they have a right to
```
Page 21

81SHTEAC.txt
20  move about the rubber rooms, they have a right to talk about
21  the lawsuits, they have a right to plan.  I think that is the
22  First Amendment.  whether they are confined in the rubber room
23  or they are outside talking, they should be entitled to move
24  about freely.  And I can put him on the stand.  He can attest
25  to it --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

46

81SHTEAC
1               THE COURT:  Not today.
2               MR. FAGAN:  OK, Judge.
3               THE COURT:  It is 10 to 12.
4               MR. FAGAN:  Thank you, Judge.
5               THE COURT:  when do you want to come back?  How does
6   Friday, the 8th sound?
7               MS. GREENFIELD:  Your Honor, can I just get my
8   appointment book from the back?
9               (Pause)
10              MS. GREENFIELD:  Perfect.  Same time, your Honor?
11              THE COURT:  Let's move it up to 9:30.
12              MS. GREENFIELD:  Your Honor, could we do 10:00?
13              THE COURT:  Sure.  February 8 at 10:00.
14              Usual drill.  I am going to require both sides, unless
15  there is an economic or other objection, to purchase the
16  transcript --
17              MS. GREENFIELD:  It is done already, your Honor.
18              THE COURT:  -- which contains the court's rulings such
19  as they are.  I don't think I have ruled on anything that was
20  definitive enough that it is appealable, so to speak, but for
21  the record and since your clients are sitting here so they know
22  for the future, or maybe they are your clients, pursuant to 28,
23  U.S. Code, Section 636 and Federal Rules of Civil Procedure 6
24  and 72, any party that is aggrieved by any of my rulings at
25  these conferences has ten business days to file objections with
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

47

81SHTEAC
1   Judge Marrero.
2               Failure to file such objections within the ten
3   business day period constitutes a waiver of those objections
4   for all further purposes, including appeals to the Second
5   Circuit or beyond.  The ten business days starts running
6   immediately, any time you hear my ruling at a conference,
7   regardless of how long it takes you to get the transcript.
8               All right.  I guess, not that I -- I won't put any
9   comments on other than to say it is my practice at first
10  conferences to remind the parties that they do have the option
11  pursuant to 28, U.S. Code, Section 636(c) to have the case in
12  front of me for all purposes, including jury trial, should the
13  case get that far.  Otherwise, you will be in front of me for
14  some things and back to Judge Marrero for substantive motions
15  and trial.  That, of course, requires unanimous consent.  So if
16  one of you jumped up now and said, I consent, it doesn't matter
17  unless you both consent.  Then you are back with Judge Marrero.
18              MR. FAGAN:  I will defer to Judge Greenfield.
19              MS. GREENFIELD:  My mother always wanted me to be a
20  judge.
21              MR. FAGAN:  We have known each other for eleven years,
22  Judge.
23              MS. GREENFIELD:  And he said I don't look a day older.
24              THE COURT:  Before I age any further, I will just say,
Page 22

81SHTEAC.txt
25    if you want to talk to your clients -- I know Ms. Greenfield
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                                    48
81SHTEAC
1    and her colleagues always have to run it up the flagpole at
2    Corp. Counsel for strange reasons.  So if you want to tell me
3    anything about that at the February 8th conference, that is
4    fine.
5             MS. GREENFIELD:  Thank you, your Honor.
6             THE COURT:  I prefer that you get back to me on a
7    combined neutral basis, where one of you flips a coin and does
8    the report for both of you and just says either there is
9    consent, here is the signed form, there isn't consent, without
10   saying I consented but he/she didn't, or that the issue is
11   still under advisement and will get decided further down the
12   road.
13            MR. FAGAN:  Your Honor, because sometimes I don't
14   remember everything that went on, can I just summarize what I
15   believe were what the court allowed us to do?
16            THE COURT:  Sure.  Amend your complaint by Monday,
17   serve a preservation subpoena on the UFT as narrowly drawn as
18   possible, and make sure that they understand that it is for
19   preservation, not production.  Serve a document demand
20   simultaneous with the amended complaint on Ms. Greenfield, and
21   narrow your complaint as much as possible.
22            Also, by the way, and this is no longer a summary, it
23   is somewhat new, you have got not only the Department of
24   Education as a department but John Doe defendants and Mayor
25   Bloomberg and Joel Klein.  If you need all those folks, first
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                                    49
81SHTEAC
1    of all, I doubt there should be anonymous superintendents or
2    principals.  Your clients know who did what, and then you would
3    have to serve them.  But if this is a challenge not to what
4    happened to one particular client, as you have said, but are
5    the rubber rooms themselves appropriate, that seems to be that
6    the DOE is the appropriate defendant.  But you will do what you
7    all want on that.
8             Seriously, Mr. Fagan, if the complaint has as much
9    junk in it when it is amended as it does now, I will be very
10   inclined to stay discovery while there are motions aimed at it.
11            MR. FAGAN:  Thank you.
12            THE COURT:  Take the hint.
13            MR. FAGAN:  I got the hint, Judge, and we will include
14   more specific allegations as to each plaintiff.
15            THE COURT:  And less causes of action.
16            MR. FAGAN:  Less causes of action and more named
17   defendants.
18            THE COURT:  That I wasn't necessarily inviting other
19   than -- seriously, I am not sure that the UFT doesn't have to
20   be here.  You will do what you want and the city will do what
21   it wants, and the UFT, once it gets your preservation subpoena,
22   might move to intervene if no one else brings them in.  I will
23   worry about all that.
24            Make sure the complaint says what it is you are
25   challenging, not just this amorphous we don't like the process,
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                                    50
81SHTEAC

                          Page 23

```
                                81SHTEAC.txt
     1    and make sure your document requests are narrow and focused and
     2    we will go from there.
     3              See you next week.
     4              MR. FAGAN:  Thank you, Judge.
     5              MS. GREENFIELD:  Thank you, your Honor.
     6              (Adjourned)
     7
     8
     9
    10
    11
    12
    13
    14
    15
    16
    17
    18
    19
    20
    21
    22
    23
    24
    25
```

<div align="center">
SOUTHERN DISTRICT REPORTERS, P.C.<br>
(212) 805-0300
</div>

EXHIBIT "C"

8288TEAC.txt

```
        8288TEAC
  1     UNITED STATES DISTRICT COURT
  1     SOUTHERN DISTRICT OF NEW YORK
  2     ------------------------------x
  2
  3     TEACHERS4ACTION, et al.,
  3
  4                 Plaintiffs,
  4
  5            v.                          08 Cv. 548 (VM)
  5
  6     MICHAEL G. BLOOMBERG, et al.,
  6
  7                 Defendants.
  7
  8     ------------------------------x
  8
  9                                      February 8, 2008
  9                                      10:10 a.m.
 10
 10     Before:
 11
 11                         HON. ANDREW J. PECK
 12
 12                                      Magistrate Judge
 13
 13                         APPEARANCES
 14
 14     EDWARD D. FAGAN
 15          Attorney for Plaintiffs
 15
 16     MICHAEL A. CARDOZO
 16          Corporation Counsel of the City of New York
 17     BLANCHE GREENFIELD
 17          Assistant Corporation Counsel
 18
 18
 19
 19
 20
 20
 21
 21
 22
 22
 23
 24
 25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

2

```
        8288TEAC
  1            (Case called)
  2            MS. GREENFIELD:  Good morning, your Honor.
  3            MR. FAGAN:  Good morning, your Honor.
  4            THE COURT:  I guess my question, Mr. Fagan, is why are
  5     we here today if there is no amended complaint?
  6            To put it another way, don't court orders mean
  7     anything?
  8            MR. FAGAN:  Yes, your Honor, they do mean something,
  9     and I called on Wednesday.
 10            First of all, when I was here last time, I had
```

Page 1

8288TEAC.txt
11   mentioned to the Court that my computer had been lost.  I went
12   back.  It was in fact stolen.  I have been trying to gather the
13   data that was on the e-mails that I had sent out.  I have been
14   trying to get that back.
15         I called to speak with Ms. Greenfield on Wednesday
16   about adjourning today.  I called specifically your Honor's
17   chambers, explained the situation, talked about possibly having
18   the conference next week and --
19         THE COURT:  Who did you speak to?
20         MR. FAGAN:  I spoke with Patricia, I believe is your
21   Honor's clerk.  The explanation was it's a scheduling
22   conference.  The judge doesn't like to adjourn scheduling
23   conferences.  I called Ms. Greenfield back, explained that to
24   her, and then we both agreed that we would come in today.
25         Your Honor, they do mean something to me.
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              3
     8288TEAC
1          THE COURT:  Where, even if you had to scroll it with
2    crayon, was the request for an adjournment of the deadline for
3    filing an amended complaint?  Forget about whether this
4    conference is necessary.  You may recall, I am sure you do, you
5    said last Monday or Tuesday, whenever it was, Judge, I will get
6    you the amended complaint by Friday.  And I said, Are you sure
7    you can do it that fast?  I gave you till Monday to give you
8    extra days, etc.  We are now sitting here Friday.  You have
9    violated a court order.
10         MR. FAGAN:  Your Honor, I was going to send in a
11   letter.  I did not send in a letter requesting an adjournment
12   of the time within which to file the amended complaint because
13   I expected to come in and explain to your Honor today --
14         THE COURT:  Forget it.  You're wasting my time.
15   You're wasting the time of the eight or ten of your clients who
16   are sitting here.
17         I can't give you a schedule until I know who the
18   plaintiffs are.  When are you going to amend the complaint?
19         MR. FAGAN:  By Monday, your Honor.
20         THE COURT:  I have heard that song before.
21         MR. FAGAN:  Your Honor, since the time that happened,
22   I went out and bought a new computer to try to gather the
23   information.  My client didn't go to Europe.  He stayed here in
24   the United States to try to gather it.  And I committed to Ms.
25   Greenfield just now, actually outside, I told her that we were
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              4
     8288TEAC
1    going to provide her with the identities of the named
2    plaintiffs and he has been working on the bio so that we can
3    provide that.  We are able to do that.  I had this conversation
4    with my client this morning.
5          THE COURT:  I am giving you one last chance.  If you
6    want Monday, I will order Monday.  If you want a week from
7    Monday, I will order a week from Monday.  But, if by 5 p.m. on
8    whatever date you choose there is not an amended complaint in
9    the ECF system and physical hard copy on my desk, I will impose
10   sanctions.  So pick your date.
11         MR. FAGAN:  Judge, actually, I was expecting Monday at
12   11:59 because there are times when I file very late at night.
13   Monday the end of the day is fine with me.  If the Court wants
14   to have that because Monday at 5 p.m. is the deadline, I can
15   tell the judge --
                            Page 2

8288TEAC.txt
16          THE COURT:  I don't care.  You're missing the point.
17  Since it's not here -- stop, please.  Since it's not here by
18  today, and I am not just interested in the ECF copy but a copy
19  that I can read without having to use government paper to print
20  it out, etc., etc., pick your date.  If you file ECF by
21  midnight on Monday so you want until Tuesday at 5 p.m., I don't
22  care.
23          MR. FAGAN:  It will be on your desk by 12 noon on
24  Tuesday.
25          THE COURT:  You will have till the end of business on
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                5

8288TEAC
1   Tuesday.  I don't care how you do it.  I am not going to be
2   here Tuesday.  Actually, the court is closed on Tuesday, so if
3   you want Wednesday the 13th, that's the date.
4           MR. FAGAN:  Thank you, Judge.
5           THE COURT:  Now, how many named plaintiffs are we
6   going to have, approximately?
7           MR. FAGAN:  Between 18 to 35.
8           THE COURT:  And you have spoken to all of them, not
9   just your client?
10          MR. FAGAN:  No, Judge.  I have spoken to all of them.
11  And before their names go in the complaint, they are going to
12  sign off on the description of who they are, how we describe
13  them, and putting them into each one of the causes of action.
14          THE COURT:  OK.  At the risk of repeating myself,
15  that's a lot of work to do.  If you're sure it's the 13th,
16  that's fine.
17          Just listen to me for a minute.  I don't want you to
18  make a commitment you can't keep, and I don't want a further
19  amendment down the road saying, I only was able to get our act
20  together for 10 of them or 18 of them and now I want to add 17
21  more a week later.  I don't care when you do this, but I want
22  it done once, I want it done right, and I want you to tell me
23  now, this is the last warning, the last issue, when you want to
24  do it by.  If it is by Wednesday the 13th at 5 p.m., that's
25  fine.  You want till the end of the week, you want another
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                6

8288TEAC
1   week, it's not going to matter other than we can't do much in
2   this case till we see what the complaint looks like.
3           MR. FAGAN:  No, Judge.  Wednesday is fine.
4           I would like to alert the Court to the following.
5   There will be plaintiffs who are named, and we have very
6   specific descriptions of those plaintiffs, and then there will
7   be an attachment to the complaint which includes names of
8   additional plaintiffs that are going to fall into one of the
9   different categories.  It's not going to have the level of
10  specificity that we have as to the dozen that we have already
11  got, but it's going to name who they are, what has happened to
12  them, what the damages are and what the basis for relief is and
13  in which section they go to.
14          THE COURT:  Why?  I don't understand an appendix
15  method.  They are either a plaintiff or they are not a
16  plaintiff.
17          MR. FAGAN:  Here is why, Judge.  Since we were here
18  last time, and contrary to your Honor's admonition to the DOE,
19  there has been retaliation.  This is not speculative.  There
20  has been retaliation against a bunch of these teachers and some
                                Page 3

8288TEAC.txt
21   of these teachers are fearful of putting --
22          THE COURT:  Stop.  I am not accepting John Does.
23          MR. FAGAN:  I wasn't saying John Doe, your Honor.
24          THE COURT:  I must be missing something and it would
25   be much easier if I were reading the complaint instead of
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    7
     8288TEAC
1    listening to all of this.  What I am interested in is are all
2    of these people people who have signed a retainer agreement
3    with you?
4           MR. FAGAN:  Yes.
5           THE COURT:  Then why aren't they all in the body of
6    the complaint?
7           MR. FAGAN:  Your Honor, some will be -- you know what,
8    I will put them all in the body of the complaint.  What I am
9    suggesting to your Honor is there is going to be much more
10   detail about some of them than there is about others.  That's
11   all I am suggesting.
12          THE COURT:  I am asking why.
13          MR. FAGAN:  Because some of these people cannot gain
14   access to the information, and they cannot sit and do the work
15   in their locations where they are confined because the DOE has
16   prevented them from bringing in computers to work with.
17          THE COURT:  Stop, please.  Mr. Fagan, please.  That's
18   why there are nights.  That's why there are weekends.  Either
19   you're ready to bring a complaint for these people that meets
20   Rule 11, that meets the pleading standards of the Bell Atlantic
21   Cromley standard and all of those cases or you're not.
22          I really don't understand what you're telling me, and
23   I guess what I will say is, you're the plaintiffs' lawyer, do
24   what you want, but there will not be discovery in this case
25   until we have a clean complaint and any motion to dismiss or
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    8
     8288TEAC
1    anything else that may have to be aimed against it, unless I
2    decide that a motion to dismiss is not likely to resolve
3    things.
4           MR. FAGAN:  All I was saying was some of them will
5    have more detail than others.  That's all I was saying.  I was
6    actually specifically saying some of the named plaintiffs would
7    be included by name in an appendix in the exact same way they
8    were included in EEOC complaints, the exact same way.
9           As far as the standards, the Court should also know
10   that what we are also going to put into the complaint, and it's
11   going to come by a letter to the Court, we expect to be asking
12   either your Honor or Judge Marrero for a preliminary injunction
13   hearing, consistent with Burlington, consistent with the
14   standards in this circuit as far as the chilling of free
15   speech.
16          THE COURT:  Please stop.  First of all, you're paying
17   by the page.  Secondly, my time is not unlimited.  If you want
18   to move for a preliminary injunction, make the motion.  It goes
19   to Judge Marrero, unless you and Ms. Greenfield stipulate to
20   have it in front of me, or unless Judge Marrero refers it to me
21   for some purposes.
22          Do what you have to do.  Do it right.  I am not giving
23   you premotion clearance, I just want you to be clear on that.
24   If Judge Marrero requires premotion clearance, you have got to
25   ask him for it.  Whatever you have got to do to make a
                          Page 4

8288TEAC.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

8288TEAC
1   preliminary injunction motion, quite frankly, I think you're
2   wasting your time, but that's your prerogative.
3           The reason I say it, just so you know where I am
4   coming from, is the rubber rooms, to use your term, have been
5   going on for quite some time.  So for you to meet the
6   preliminary injunction standard for what is in essence an
7   affirmative injunction as opposed to a negative one, I assume,
8   you're either asking for an injunction that says obey the law,
9   don't retaliate, which is somewhat meaningless, or you're
10  asking for an injunction to somehow stop or change the way the
11  rubber rooms operate, which strikes me, gut reaction, obviously
12  without seeing any papers from you, other than the initial
13  complaint, is you're asking for the court to bend over
14  backwards, jump through hoops and do all sorts of amazing
15  things, without there being any reason for that hurry since you
16  have waited this long both to amend the complaint and, more
17  importantly, you have waited this long from the initiation of
18  the rubber room process until now.  But you will make the
19  motion and you will convince Judge Marrero or me, whoever winds
20  up dealing with it, that it has merit.
21          MR. FAGAN:  I will, Judge.  Just so the Court will
22  know, there is not just precedent in this circuit, but Judge
23  Marrero himself has issued an order, set standards for
24  preliminary injunction hearings.  He did it last year in a case
25  called Somoza.  We have the standards both of the Supreme Court
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

8288TEAC
1   and within this district talking about adverse actions by an
2   employer against an employee.  I am not worried about that,
3   Judge.
4           THE COURT:  Make your motion.
5           MR. FAGAN:  Thank you.
6           THE COURT:  Subject to Judge Marrero's premotion
7   clearance rules, if any.
8           I guess I will put it to the two of you.  I am not
9   prepared to start discovery in this case, which is why we had
10  this conference for today, without knowing what the complaint
11  is, what the claims are.  If you're telling me that you have
12  gone from 14 claims to one or two, and you want to tell me what
13  it is, I might reconsider.
14          MR. FAGAN:  I can do that, Judge.
15          THE COURT:  Go ahead.
16          MR. FAGAN:  We are talking about hostile work
17  environment.  We are talking about --
18          THE COURT:  Has there been an EEOC complaint?
19          MR. FAGAN:  There has, your Honor.
20          THE COURT:  By who?
21          MR. FAGAN:  By Jennifer Saunders.  She is actually not
22  here.
23          THE COURT:  Slow down one minute.  You told me there
24  are going to be 18 to 35 plaintiffs.  Obviously, there may be
25  different claims for different plaintiffs.  How many of them
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

8288TEAC
1   went to the EEOC?
Page 5

8288TEAC.txt

2      MR. FAGAN:  To my knowledge, as far as hostile work
3   environment, there's at least one.  I don't know which of the
4   others from -- we are talking about a very specific rubber
5   room, which is at 333 Seventh Avenue.
6      THE COURT:  You have got one Title VII hostile
7   environment claim.  When did the right to sue letter get
8   issued?
9      MR. FAGAN:  The right to sue letter hasn't been
10  issued.
11     THE COURT:  Then you can't be here, can you?
12     MR. FAGAN:  Actually, Judge, I will submit the case
13  law that I believe will satisfy your Honor, Judge Marrero, and
14  the standards for why it is that we can take this action with
15  regard to these particular violations at this time.
16     Let me continue on.
17     THE COURT:  No.  It really makes no sense for me to do
18  this orally because I don't think what you're doing makes
19  sense.  If you say there are cases that say you can do it, in
20  the complaint submit whatever backup you want to convince me to
21  allow you any discovery.  Otherwise discovery is stayed pending
22  further order of the Court.
23     MR. FAGAN:  Your Honor, let me continue because there
24  are certain areas of discovery which, with all due respect, I
25  think your Honor needs to hear this.
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            12
    8288TEAC
1      We were here last time.  Your Honor asked me --
2      THE COURT:  With all due respect, counsel, although
3   there seems to have been a slight disconnect between my
4   secretary and you, but in this case, unlike my normal caseload,
5   this case is so confusing, I will leave that as the word,
6   without knowing what the new complaint is, I can't do anything
7   for you.
8      MR. FAGAN:  I was attempting to give you a summary of
9   responding to what your Honor said last time, which was to weed
10  out what your Honor called garbage.  I am attempting to explain
11  that to you.
12     THE COURT:  You have got a hostile environment claim.
13  What else?
14     MR. FAGAN:  We have got a retaliation claim.
15     THE COURT:  Again, under the EEOC laws, Title VII or
16  whatever?
17     MR. FAGAN:  Yes.
18     THE COURT:  OK.
19     MR. FAGAN:  We have got an age discrimination claim,
20  and the plaintiff is here.  We have an EEOC letter.  We have
21  got a claim against the UFT for a breach of duty of fair
22  representation.
23     THE COURT:  Now we have got a new party who is not
24  even here today.
25     MR. FAGAN:  We do, your Honor, but I have already
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            13
    8288TEAC
1   spoken to the counsel for the UFT who indicated they were going
2   to come in as an amicus.  I didn't understand how they would be
3   doing that, but I spoke with Charles Moerdler of Stroock
4   Stroock & Lavan.  They were aware of this case.  Actually, they
5   were inquiring themselves about where the EEOC letter was that
6   they themselves have.  The plaintiff in that case is a
                        Page 6

8288TEAC.txt
```
 7  gentleman named Mr. Sid Rubenfeld.  He is here.
 8              I would say those are the primary causes of action.
 9          THE COURT:  How many secondaries are there?
10          MR. FAGAN:  What I would like to be able to do is give
11  your Honor not just the complaint but the application for very
12  limited discovery, the way your Honor had specified I should do
13  it.  We have additional information.  I am not asking for lots
14  of discovery.  I am not going to ask for that.  We have very
15  pointed information and discovery requests.  I will do that,
16  together with the filing of the complaint, and I will do that
17  in a way that I believe your Honor will have an opportunity to
18  consider it.
19              I have already spoken with Ms. Greenfield.  We are
20  scheduled to speak on Tuesday to discuss the issue of who the
21  plaintiffs are, what type of relief it is that we need, where
22  we are going with the complaint, whether we are going for a
23  permanent injunction, whether we are asking for an interim
24  injunction.  We did what your Honor directed us to do.  The
25  thing I didn't do was file the complaint in time, and I would
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                    14
8288TEAC
```
 1  like the Court to consider the explanations that I gave for why
 2  it is that it wasn't done.
 3          THE COURT:  Except for one other thing, and I won't
 4  belabor it, which is if you called my secretary on Wednesday,
 5  which is what you said, the complaint was due on Monday.
 6          MR. FAGAN:  Yes, your Honor.
 7          THE COURT:  Fine.  Let's put it this way.  The UFT is
 8  not here yet.  Obviously you have to serve them.  If you want
 9  to make a letter application to me to allow limited discovery
10  from the City or the UFT after they are served, you can make
11  that application and attached to that your proposed Rule 34
12  request or whatever it is.  But at the moment, until I see what
13  this case is about today, not what it was about a month ago
14  when you filed the original complaint, less than a month ago, I
15  am not prepared to allow discovery to go forward, in
16  part -- never mind the in part.  I am not prepared to allow
17  discovery to go forward yet.
18              Moreover, you asked for an emergency conference
19  previously which is how you got here.  The City's time to
20  answer the original complaint, let alone any amended complaint,
21  has not yet run.  UFT hasn't been served yet with anything.
22  Normally that would trigger a whole period of time for them to
23  answer, time for a 26(f) conference, etc., etc.  While I am
24  running a rocket docket, it is not to be for the benefit of
25  getting discovery for the sake of discovery.  It is to get the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                    15
8288TEAC
```
 1  case appropriately moving.
 2              So when I see the complaint, we can deal with all of
 3  that.
 4          MR. FAGAN:  Thank you, Judge.
 5          THE COURT:  Ms. Greenfield, anything to say from the
 6  City?
 7          MS. GREENFIELD:  No, your Honor.  Having been thinking
 8  about it while I am sitting here, I think I will save my
 9  comments until I see a copy of the amended complaint.
10          THE COURT:  By the way, one other question, Mr. Fagan.
11  who are the defendants going to be?
```
                        Page 7

                          8288TEAC.txt
12          MR. FAGAN:  The defendants are going to be --
13          THE COURT:  Besides the UFT.
14          MR. FAGAN:  -- the same named defendants that we have
15   got, Bloomberg, Mayor Bloomberg, Chancellor Klein, the Board of
16   Education, the New York State Department of Education, the UFT,
17   and several principals and superintendents specifically who
18   were involved in some of the actions against the teachers
19   themselves.
20          THE COURT:  All right.  Ms. Greenfield, quick
21   question.  Is the proper defendant the DOE or the City or both?
22          MS. GREENFIELD:  It could be either, your Honor.
23          THE COURT:  The DOE, unlike the police department, is
24   suable?
25          MS. GREENFIELD:  Yes, your Honor.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                   16
     8288TEAC
1           THE COURT:  OK.
2           MS. GREENFIELD:  Just to be clear, we don't represent
3    the New York State Department of Education.  The AG's office
4    would have to be served.
5           THE COURT:  State agency, I don't know what their
6    involvement is on this.  I don't need to know.  Serve them.
7    That will take longer.
8           I assume that the principals and superintendents have
9    to be individually served, unless you make some other
10   arrangement with Ms. Greenfield, which she may or may not be
11   able to do.
12          MR. FAGAN:  We were prepared to serve and we intended
13   to serve them all individually and directly.
14          THE COURT:  All right.  When does it make sense to
15   come back having allowed all the players to be involved?
16   Normally I would say, OK, we will bring you back next Friday,
17   but I am a little concerned we will not have the new players,
18   the Attorney General's Office, the UFT, and anybody else here
19   by then.
20          MR. FAGAN:  My suggestion would be that we bifurcate
21   it a little bit.  I will tell you why.  The issues as they
22   relate to the UFT and the issues as they relate to the State of
23   New York are discrete and the requests that we are making as it
24   relates to the Department of Education is something that, after
25   your Honor sees the complaint, after your Honor sees the letter
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                   17
     8288TEAC
1    request with regard to discovery, and after your Honor sees a
2    copy of the letter that we are sending to Judge Marrero about
3    the request for a preliminary injunction, I do believe it would
4    be appropriate for your Honor to call us back in next Friday,
5    the following Monday, as soon as is convenient, and that
6    application, when we are going to be here next time, doesn't
7    need to involve at this point the UFT or New York State because
8    they are discrete issues as it relates to the Board of
9    Education.
10          THE COURT:  Ms. Greenfield, any views?
11          MS. GREENFIELD:  Yes, your Honor.  Having not seen the
12   amended complaint, I don't know that I can rely on counsel's
13   representation that they are discrete issues because I don't
14   really know what the issues are.  Obviously, as it goes to a
15   hostile work environment or retaliation allegedly committed by
16   the Department of Education, I don't need these other parties.
                              Page 8

8288TEAC.txt

17  But if it relates to the reassignment centers or anything else,
18  I believe that I would need to see what the specific
19  allegations are before I can determine if the UFT or the New
20  York State Department of Education should be involved in any
21  discovery or conferences involving those matters.
22      THE COURT:  Frankly, I am not exactly sure what the
23  state's role is, but I certainly wonder whether it's
24  appropriate to do anything without the UFT, who may be, if not
25  sitting in between your two tables, may have an interest in
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                                            18

8288TEAC
 1  some of the things the plaintiffs want, albeit even though
 2  you're suing them as a defendant.
 3      One of the problems I would have is I don't want the
 4  department to have to go through certain aspects of discovery
 5  twice because you frame it in one way and then the UFT frames
 6  it a different way.
 7      I am also not sure, and maybe Ms. Greenfield can help
 8  me on this, once the principals and superintendents are served,
 9  are they going to be, if requesting it, represented by you, by
10  the UFT, or, because of potential conflicts all across the
11  board here, by something else?
12      MS. GREENFIELD:  Your Honor, as the Court is probably
13  aware, the principals are not represented by the UFT.
14      Again, not having seen the allegations, we all know
15  that the individuals cannot be defendants in a Title VII
16  action; it is the employer.  I don't know what the specific
17  allegations are as to them or the causes of action asserted,
18  but with respect to any individual plaintiff, I would have to
19  interview the principal to find out what happened and determine
20  if representation is appropriate, and if we decline
21  representation, then they would either be represented by their
22  union or by their own privately retained counsel.
23      MR. FAGAN:  What I committed to do with Ms.
24  Greenfield, before your Honor even came in, was to give her the
25  specifics as to each of the plaintiffs by noon today.  I have
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                                            19

8288TEAC
 1  got those.  My client is here.  We also included the specific
 2  principals so she can conduct her investigation as it relates
 3  to who these people are.  And then what will happen, your
 4  Honor, is they can make whatever decision it is that they want
 5  to do with regard to the principals.  I don't believe we need
 6  the principals here, I don't believe that we need the
 7  superintendents here at the hearing as it relates to the DOE.
 8      THE COURT:  Don't sue them then.
 9      Look, it is highly unusual to have hearings in a case
10  without all parties being present.  I don't know mean the
11  individuals but their lawyers.  This is a public courtroom.  I
12  am perfectly happy to have all of your plaintiffs here, or
13  whoever the people in the back of the room are, but what I am
14  saying is it is unusual, and I bent over backwards to give you
15  an immediate hearing on your preservation order, but I think we
16  really need to let this case fall into a normal pattern of
17  getting people served and represented, etc.
18      So if you have urgency between now and the 13th,
19  rethink how many new parties you need to bring in.  The UFT, we
20  talked about last time, is probably a necessary party.  Whether
21  the principals individually are necessary defendants as opposed
            Page 9

8288TEAC.txt

22   to witnesses under the umbrella of the DOE or whatever, I leave
23   it to you to structure your case, but I am not going to do this
24   merely to satisfy your convenience, meaning let's get everybody
25   served and represented and worry about starting discovery at
<div align="center">SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300</div>

20

8288TEAC

1   that point, unless you need something for the preliminary
2   injunction hearing, which Judge Marrero will then send you back
3   to me to deal with.
4           MR. FAGAN:  All I was trying to do is be responsive to
5   when your Honor raised the issue of bringing us back on Friday.
6   The only ones that I believe would be relevant to bringing us
7   back --
8           THE COURT:  You're repeating yourself and you're not
9   listening to what I just said, which is I see no reason to do
10   anything until everybody who is being sued is represented.
11           MR. FAGAN:  Yes, Judge.
12           THE COURT:  That means we are talking 30 to 60 days
13   from now.
14           MR. FAGAN:  Unless there is an issue that we have
15   articulated by way of a request for either a preliminary
16   injunction hearing or an emergent matter, which I already
17   indicated I would be submitting by way of letters.
18           THE COURT:  Then I will deal with that when I receive
19   the letter, but I am telling you now if you need discovery to
20   deal with an upcoming, whatever the hearings are called, I am
21   not going to give it to you.  If you need discovery for the
22   preliminary injunction motion, you will have to state that when
23   you make the preliminary injunction motion.  If you need
24   discovery because you're curious or whatever, wait until
25   everybody is served and consider dropping the excess baggage.
<div align="center">SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300</div>

21

8288TEAC

1           MR. FAGAN:  Thank you, Judge.  I wasn't suggesting
2   anything other than that.  I wasn't asking nor did I intend to
3   ask for full-blown discovery.
4           THE COURT:  Any discovery.  You get no discovery until
5   everyone is served unless there is an emergency.  The emergency
6   would be the preliminary injunction and we will see what is in
7   your preliminary injunction motion papers.
8           MR. FAGAN:  Yes.  Thank you.
9           THE COURT:  At this point, I am not going to schedule
10   a date.  When all defendants have appeared via counsel, you
11   will contact me, or whenever you want relief on something you
12   will contact me and you will follow the rules, which is you
13   will send me copies of everything you give to Judge Marrero and
14   we will go from there.  Discovery is stayed, however, pending
15   further order of the Court.
16           MR. FAGAN:  Thank you, Judge.
17           THE COURT:  I think, Mr. Fagan, in fairness to our tax
18   dollars, you're buying today's transcript.
19           MR. FAGAN:  OK.  Thank you.
20           THE COURT:  And making a free copy available to Ms.
21   Greenfield.
22           One last thing.  It's not my issue per se, but I want
23   to make it clear to your clients and the Board of Ed, if these
24   folks are supposed to be in school, in school meaning, as you
25   call it, the rubber room, in order to get paid, then I assume
<div align="center">SOUTHERN DISTRICT REPORTERS, P.C.
Page 10</div>

8288TEAC.txt
(212) 805-0300

8288TEAC
1   this is sick leave or personal time or whatever.  They are not
2   necessary.  They are welcome to be here, but if the Board of Ed
3   only pays people who have to be somewhere, none of them have to
4   be here.  I want to make sure there is no misunderstanding on
5   that.
6           MR. FAGAN:  we will certainly take that with regard to
7   future hearings.  I didn't know who should be here or who
8   shouldn't be here.  The reason that these plaintiffs are here
9   is each of these are the named plaintiffs.  They needed to be
10  here --
11          THE COURT:  They did not need to be here.  If you
12  wanted them to be here, that's another story.
13          MR. FAGAN:  I didn't finish.  I am sorry.  I didn't
14  finish my sentence.  With respect to the Court, I was going to
15  say something.  It's OK.  I understand it's the Court's
16  position they didn't need to be here today.  I will instruct
17  them they should not consider it as a necessary day and they
18  should consider it to be sick leave.  Some of them actually
19  have already been terminated so it doesn't matter whether they
20  were sick or not.
21          THE COURT:  I didn't want there to be any confusion so
22  that later when they are told they are not getting paid or
23  something, you call that retaliation or you say that the judge
24  wanted them here or anything like that.  I am happy to have
25  them here, but not at the tax dollar expense.
            SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

8288TEAC
1           OK.  Make your arrangements with the court reporter.
2           (Adjourned)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

EXHIBIT "D"

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

Teachers4Action,
    On behalf of its Members
    And By Florian Lewenstein,
    Its President and Spokesperson,
Twana Adams;
Marie Addoo;
Ming Bell;
David Berkowitz;
Jonathan Berlyne;
James J. Cullen;
Diane Daniels
Boubakar Fofana;
Alena Radtke-Gabriel;
Denise Goebel;
Diana Gonzalez;
Robert H. Grant;
Wendy Hazen;
Michael Hollander;
Rafal Robert Kowal;
Michael McLoughlin
Raymond Nunge;
Karen Ornstein;
Sakina Popatia;
Beverly Zimler-Rosenfeld;
Sidney Rubinfeld;
Denise Russo;
Jennifer Saunders;
Alex Schreiber;
Linda L. Seiffert;
Barbara Segall;
Eustoquio Torres-Nogueras;
Nahid Wakili;
Michael Westbay; and
Mauricio Zapata,

                Plaintiffs,

    - vs -

Michael G. Bloomberg,
    Mayor of New York City;
City of New York;
Joel Klein,
    Individually and in his capacity as
    Chancellor of New York City

CIVIL ACTION
08-cv-548 (VM)

AMENDED COMPLAINT
(WITH JURY DEMAND)

```
       Department of Education;              :
New York City Department of Education;      :
Randi Weingarten;                           :
       Individually and as President of     :
       United Federation of DOE staff;      :
United Federation of DOE staff;             :
Betsy Combier,                              :
       Individually and as agent / representative :
       Of United Federation of DOE staff,  :
                            Defendants.     :
-----------------------------------------------------X
```

## INTRODUCTION

This action is predicated upon a wrongful course of action that was designed to

unlawfully reduce the budget for New York City Public Schools by reducing the number of

tenured teachers, including Plaintiffs. To accomplish that goal, Defendants individually and/or

jointly (i) violated Plaintiffs' Speech, Association, Due Process, Equal Protections – 1st, 5th & 14th

Amendments and Other Constitutionally Protected Rights & Freedoms; (ii) harassed plaintiffs

and created a hostile work environment; (iii) discriminated against Plaintiffs because of age; (iv)

retaliated against Plaintiffs when they attempted to speak out to report these violations; (v)

constructively discharged certain Plaintiffs; (vi) breached contracts with Plaintiffs; (vii) breached

their fiduciary duties to Plaintiffs, including the Duty of Fair Representation; (viii) aided &

abetted others in the breach of contract or breach of fiduciary duties or negligent acts against

Plaintiffs; (ix) failed to properly supervise its/their employees, agents, consultants and others

who caused damages to Plaintiffs; (x) conspired to defraud, interfere with claims and rights

and/or cause other damages to Plaintiffs; (xi) caused Plaintiffs to be falsely confined and (xii) for

Injunctive Relief. These wrongful acts violated, and the injunctive relief is necessary to address,

the violations of Plaintiffs' constitutional, statutory and contractual rights.

## COMPLAINT

### JURISDICTION

1)      The Court has original jurisdiction over Plaintiffs' claims based upon alleged

violations of the 1st, 5th and 14th Amendments, 29 U.S.C. § 621 ("Age Discrimination in

Employment Act of 1967"), 29 U.S.C. §§ 623(a)(1) and (2), 42 U.S.C. § 1981 ("Civil Rights Act

of 1991"), 42 U.S.C. § 1983 and the Anti-Relation Provisions of Title VII and other laws.

2)      The Court has ancillary and/or supplemental jurisdiction of all Plaintiffs' state law

claims pursuant to 28 U.S.C. § 1367.

3)      The claims of each named Plaintiff exceeds the statutory limit of this Court,

exclusive of attorneys' fees, costs and interest.

### VENUE

4)      Venue is proper in this Court because one or more of the Plaintiffs live in this

judicial district and one of more of the Defendants live and/or do business in this district, and/or

the Defendants' unlawful acts occurred within this judicial district.

### PARTIES

#### Plaintiffs

5)      Plaintiff Teachers4Action[1] is an unincorporated association pursuant to Gen.

Association Laws Art. 3.

6)      Plaintiff Florian Lewenstein (hereinafter "Lewenstein") is the President and

Spokesperson of Plaintiff Teachers4Action and is authorized and has standing to commence and

prosecute this action, individually and on behalf of Plaintiff Teachers4Action.

---

[1] Teachers4Action™® are in the process of obtaining formal clearance by the New York State Department of
Education as a Not-For-Profit Corporation and is seeking similar status under the IRS Code Section 501(c)(3).

*Teachers4Action et al v. Bloomberg et al, 08-cv-548 (VM)(AJP) -- Feb. 22, 2008 Amended Complaint - Page 3*

coerced to accept onerous or unfair deals; (iv) teacher who suffer loss of property, loss of pay and other monetary losses; (v) DOE staff who suffer physical or emotional injuries from being forced into Rubber Rooms; (vi) DOE staff who cannot get other jobs; (vii) DOE staff who are otherwise being targeted and victimized as part of the wrongful course of action.

### Defendants

9)      Defendant Michael G. Bloomberg ("Bloomberg") is the Mayor of New York City and in that capacity has direct control over the New York City Public Schools.

10)     Defendant City of New York  ("City") is a municipal corporation that is responsible for the conditions in the New York City Public Schools.

11)     Defendant Joel Klein ("Klein") is the Chancellor of the New York City Department of Education and together with Bloomberg has control over the New York City Public Schools.

12)     Defendant New York City Department of Education ("DOE") is Plaintiffs' employer.

13)     Defendant Randi Weingarten ("Weingarten") is the President of the United Federation of DOE staff.

14)     Defendant United Federation of DOE staff ("UFT") is the bargaining agent for and maintains a fiduciary relationship with Plaintiffs.

15)     Defendant Betsy Combier ("Combier") is a representative of Defendant UFT.

### GENERAL FACTS

16)     Starting in or about 2002, Defendants Bloomberg, City, Klein and DOE determined and agreed that it would be in the best interests of the City public schools, including all students and educators involved for the office of the Mayor of New York City to assume

direct control over the New York City Public Schools and Defendant DOE.  In June 2002, the

NYS legislature authorized the NYC Mayor to assume direct control of the NYC public schools.

17)    In or about 2003, in furtherance of this agreement, Defendants Klein and DOE

agreed to the complete reorganization of the DOE so that it came under the control of Defendant

Bloomberg.

18)    Defendants Bloomberg and Klein were not motivated to enact this reorganization

out of the best interests of the City public schools, including all students and educators; instead

the motive was primarily financial.

19)    Defendants Bloomberg and Klein sought to use the reorganization as a way to

achieve drastic budget reductions.

20)    The budget reductions were to be achieved in part by a series of actions that were

intended to get rid of certain tenured DOE staff, such as Plaintiffs, who had committed no

offense for which they could be fired or suspended without pay.

21)    Defendants Bloomberg and Klein and others in Defendant DOE conceived a plan

through which tenured DOE staff such as Plaintiffs:

a)    would be accused of a variety of allegations that rise to the level of an

offense for which they could be fired or suspended;

b)    would be harassed and placed in hostile work environments;

c)    would be sent to "Temporary Reassignment Centers" where they would be

further subjected to harassment and hostile work environment;   *See Exhibit 2;*

d)    would be deprived of their constitutional and due process rights;

e)    would be deprived of their rights and the protections afforded them

pursuant to NYS Education Law §§ 3020 and 3020(a);

f)      would be forced to resign, quit or be subjected to ruinous fines and other financial consequences.

22)     Defendants Bloomberg and Klein used the Temporary Reassignment Centers (commonly known as "Rubber Rooms") in furtherance of wrongful acts against Plaintiffs.

23)     Defendants Bloomberg, City, Klein and DOE determined that if their plan to undermine the rights and violate the contracts of tenured DOE staff such as Plaintiffs, was to succeed, they needed to adopt a position that the Rubber Rooms were being used as a place to "keep" DOE staff accused of *"serious misconduct and crimes . . . who (Defendant DOE would) not keep . . . with kids in schools simply because their contract says they must continue to be paid."*

24)     At the time Defendants Bloomberg, City, Klein and DOE adopted this policy, they knew that their statements about the Rubber Rooms and the DOE staff "reassigned" to the Rubber Rooms were false and misleading.

25)     Defendants Bloomberg, City, Klein and DOE also agreed and determined to implement a plan through which tenured DOE staff such as Plaintiffs would be subjected to administrative procedures and/or hearings processes that were designed to violate Plaintiffs' constitutional, statutory and contractual rights and through which Plaintiffs would be further subjected to harassment, intimidation and/or forced into making deals that lead to their resignation, termination and/or ruinous fines.

26)     Defendants Bloomberg, City, Klein and DOE knew that Plaintiffs were entitled to the protection of New York State Law § 3020 that provides in pertinent part as follows:  . . .

*1.      No person enjoying the benefits of tenure shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand*

*twenty-a of this article or . . . or in accordance with alternative disciplinary procedures contained in a collective bargaining agreement covering his or her terms and conditions of employment that becomes effective on or after September first, nineteen hundred ninety-four; provided, however, that any such alternate disciplinary procedures contained in a collective bargaining agreement that becomes effective on or after September first, nineteen hundred ninety-four, must provide for the <u>written election by the employee</u> of either the procedures specified in such section three thousand twenty-a or the alternative disciplinary procedures contained in the collective bargaining agreement . . . and must result in a disposition of the disciplinary charge within the amount of time allowed therefore under such section three thousand twenty-a. (emphasis added).*

27)    Defendants Bloomberg, City, Klein and DOE knew that Plaintiffs were entitled to the protections provided by New York State Education Law § 3020(a) and that before disciplinary procedures could be commenced and/or before the imposition of any penalties against Plaintiffs, the following procedures must be followed:

*. . . All charges against a person enjoying the benefits of tenure . . . . <u>shall be in writing and filed with the clerk or secretary of the school district or employing board</u> . . .*

*. . . . 2. (a) Upon receipt of the charges, the clerk or secretary of the school district or employing board shall immediately notify said board thereof. <u>Within five days after receipt of charges, the employing board, in executive session, shall determine, by a vote of a majority of all the members of such board, whether probable cause exists</u> to bring a disciplinary proceeding against an employee pursuant to this section. If such determination is affirmative, a <u>written statement specifying the charges in detail, the maximum penalty which will be imposed by the board if the employee does not request a hearing or that will be sought by the board if the employee is found guilty of</u>*

*the charges after a hearing and outlining the employee's rights under this*
*section, shall be immediately forwarded to the accused employee by certified*
*or registered mail, return receipt requested or by personal delivery to the*
*employee.*

*. . . 2. (b) The employee may be suspended pending a hearing on the charges*
*and the final determination thereof. The suspension shall be with pay . . .*

*. . . 2. (c) Within ten days of receipt of the statement of charges, the employee*
*shall notify the clerk or secretary of the employing board in writing whether*
*he or she desires a hearing on the charges and when the charges concern*
*pedagogical incompetence or issues involving pedagogical judgment, his or*
*her choice of either a single hearing officer or a three member panel . . .*
*Where an employee requests a hearing in the manner provided for by this*
*section, the clerk or secretary of the board shall, within three working days of*
*receipt of the employee's notice or request for a hearing, notify the*
*commissioner of education of the need for a hearing . . .*

*. . . 3. Hearings. a. Notice of hearing. Upon receipt of a request for a hearing*
*in accordance with subdivision two of this section, the commissioner of*
*education shall forthwith notify the American Arbitration Association*
*(hereinafter "Association") of the need for a hearing and shall request the*
*association to provide to the commissioner forthwith a list of names of*
*persons chosen by the association from the association's panel of labor*
*arbitrators to potentially serve as hearing officers together with relevant*
*biographical information on each arbitrator. Upon receipt of said list and*
*biographical information, the commissioner of education shall forthwith send*
*a copy of both simultaneously to the employing board and the employee . . . .*

*. . . 3/ b. (i) Hearing officers. . . A hearing officer shall not be eligible to serve*
*as such if he or she is a resident of the school district . . . an employee, agent*
*or representative of the employing board or of any labor organization*
*representing employees of such employing board, has served as such agent or*
*representative within two years of the date of the scheduled hearing, or if he /*
*she is then serving as a mediator or fact finder in the same school district . . .*

. . . *3 b. (ii) Not later than ten days after the date the commissioner mails to the employing board and employee the list of potential hearing officers and biographies provided to the commissioner by the association, the employing board . . . employee, individually or through their agents or representatives, shall by mutual agreement select a hearing officer from said list to conduct the hearing and shall notify the commissioner of their selection* . . .

. . . *3. b. (iv) In those cases in which the employee elects to have the charges heard by a hearing panel, the hearing panel shall consist of the hearing officer, selected in accordance with this subdivision, and two additional persons, one selected by the employee and one selected by the employing board, from a list maintained for such purpose by the commissioner of education. The list shall be composed of professional personnel with administrative or supervisory responsibility, professional personnel without administrative or supervisory responsibility, chief school administrators, members of employing boards and others selected from lists of nominees submitted to the commissioner by statewide organizations representing DOE staff, school administrators and supervisors and the employing boards* . .

. . . *3 c. Hearing procedures. . . . The employee shall have a reasonable opportunity to defend himself or herself and an opportunity to testify in his or her own behalf . . . (i) The hearing officer selected to conduct a hearing under this section shall, within ten to fifteen days of agreeing to serve as such, hold a pre-hearing conference which shall be held in the school district or county seat of the county, or any county, wherein the employing school board is located . . . (iii) At the pre-hearing conference the hearing officer shall have the power to: (A) issue subpoenas; (B) hear and decide all motions, including but not limited to motions to dismiss the charges; (C) hear and decide all applications for bills of particular or requests for production of materials or information, including, but not limited to, any witness statement (or statements), investigatory statement (or statements) or note (notes), exculpatory evidence or any other evidence, including district or student records, relevant and material to the employee's defense. . . . (iv) Any pre-*

*hearing motion or application relative to the sufficiency of the charges, application or amendment thereof, or any preliminary matters shall be made upon written notice to the hearing officer and the adverse party no less than five days prior to the date of the pre-hearing conference. Any pre-hearing motions or applications not made as provided for herein shall be deemed waived except for good cause as determined by the hearing officer . . . (vi) During the pre-hearing conference, the hearing officer shall determine the reasonable amount of time necessary for a final hearing on the charge or charges and shall schedule the location, time(s) and date(s) for the final hearing. . . . <u>The day or days scheduled for the final hearing shall not be postponed except upon the request of a party and then only for good cause shown</u> as determined by the hearing officer . . . <u>In all cases, the final hearing shall be completed no later than sixty days after the pre-hearing conference unless the hearing officer determines that extraordinary circumstances warrant a limited extension.</u>*

*. . . 4. Post hearing procedures. (a) <u>The hearing officer shall render a written decision within thirty days of the last day of the final hearing,</u> or in the case of an expedited hearing within ten days of such expedited hearing, and shall forthwith forward a copy thereof to the commissioner of education who shall immediately forward copies of the decision to the employee and to the clerk or secretary of the employing board. <u>The written decision shall include the hearing officer's findings of fact on each charge, his or her conclusions with regard to each charge based on said findings and shall state what penalty or other action, if any, shall be taken by the employing board</u> . . . If the employee is acquitted he or she shall be restored to his or her position with full pay for any period of suspension without pay and the charges expunged from the employment record . . . <u>The hearing officer shall indicate in the decision whether any of the charges brought by the employing board were frivolous as defined in section eight thousand three hundred three-a of the civil practice law and rules.</u>*

<div align="right">

*(emphasis added)*

</div>

28)    Defendants Bloomberg, City, Klein and DOE knew that NYS Education Laws §§ 3020 and 3020(a) provided safeguards for the investigation, prosecution and discipline of tenured DOE staff, such as Plaintiffs [3].

29)    Defendants Bloomberg, City, Klein and DOE also knew that if they afforded the Plaintiffs and others the protections of NYS Education Laws §§ 3020 and 3020(a), they would not be able to accomplish the goal of payroll reduction through termination of Plaintiffs and other tenured DOE staff

30)    To achieve their goals, Defendants Bloomberg, City, Klein and DOE, communicated their goals and intentions to Defendant Weingarten and UFT and sought the assistance and/or cooperation of Defendant Weingarten and UFT.

31)    Defendant Weingarten is an educated and licensed attorney who should have immediately realized that what Defendants Bloomberg, City, Klein and DOE sought to do was a violation of the constitutional, statutory and contractual rights of Plaintiffs and other tenured DOE staff.

32)    As part of its obligations to Plaintiffs, Defendant UFT provides lawyers for Plaintiffs against whom accusations were made which subjected them to the administrative hearings and process pursuant to NYS Education Law §§ 3020 and 3020(a).

33)    The assistance that Defendants Bloomberg, City, Klein and DOE sought from Defendants Weingarten and UFT was that Defendants Weingarten and UFT in essence do

---

[3] Plaintiffs' claims herein should not be construed as to suggest that Defendant DOE does not and should not have the authority to properly and legally investigate, prosecute and discipline tenured DOE staff. The issues presented in this lawsuit do not address the merits of any claims and/or charges that have been filed against the named Plaintiffs. Those issues are not before the Court. Plaintiffs claims are that Defendants violated, failed to comply with or chose to attempt to implement in an unlawful manner, the provisions of NYS Education Law 3020 and 3020(a) that were designed and/or enacted to provide Plaintiffs and others with due process and other constitutional safeguards.

-----------------------

nothing and sit idlely as Defendants Bloomberg, City, Klein and DOE subjected Plaintiffs to harassment, discrimination and violation of their constitutional and contractual rights.

34)    The assistance that Defendants Bloomberg, City, Klein and DOE also needed was that the lawyers who were appointed by Defendant UFT to represent Plaintiffs in response to whatever charges and/or allegations were made against them would not attempt to assert Plaintiffs due process and/or constitutional rights or adherence to the procedures and requirements of NYS Education Law §§ 3020 and 3020(a).

35)    As a result of the agreement reached between Defendants Bloomberg, City, Klein and DOE on the one hand and Defendants Weingarten and UFT on the other hand the following occurred, among other things:

a)    Prior to Plaintiffs being charged, Defendant DOE did not properly and timely follow the notice and probable cause provisions of NYS Education Law §§3020 and 3020(a);

b)    After Plaintiffs were charged, Defendant DOE did not properly and timely follow the procedures of NYS Education Law §§3020 and 3020(a) with regard to election of remedies;

c)    After Plaintiffs were charged, Defendant DOE did not follow the procedures of NYS Educations Law §§ 3020(a) with regard to affording Plaintiffs charged with incompetence the right to a three member panel;

d)    After Plaintiffs were charged, Defendant DOE did not follow the procedures of NYS Educations Law §§ 3020(a) with regard to affording Plaintiffs the right to impartial arbitrators selected from an AAA list of arbitrators from outside the City of New York;

e)    After Plaintiffs were charged, Defendant DOE did not follow the procedures of NYS Educations Law §§ 3020(a) with regard to affording Plaintiffs the right to arbitrators who had not served within the last two years;

f)    After Plaintiffs were charged, Defendant DOE did not follow the procedures for adequate representation, subpoenaed testimony, introduction of evidence and reasonable adjournments for good cause.

*See Exhibits 3 – 8.*

36)    The lawyers who Defendant UFT paid to represent Plaintiffs during the 3020(a) process were given instructions, either orally or in writing, that they were not to advise Plaintiffs of their rights and were not to challenged Defendant DOE on the issues of NYS Education Law §§ 3020 and 3020(a) requirements such as (i) notification and probable cause; (ii) election of remedies; (iii) right to a three member panel of arbitrators; (iv) right to impartial arbitrators selected from an AAA list of arbitrators from outside the City of New York; (v) right to arbitrators who had not served within the last two years; and (vi) right to adequate representation, subpoenaed testimony, introduction of evidence and reasonable adjournments for good cause.

37)    The lawyers paid by Defendant UFT to represent Plaintiffs during the 3020(a) process were given additional instructions, either orally or in writing, that they were to explain to the Plaintiffs that instead of fighting the charges, they should make deals to accept as little punishment as was possible to get the procedures over as quickly as possible and so they could be returned to their jobs.

38)    In fact it was never the plan of Defendants Bloomberg, City, Klein and DOE, or Defendants Weingarten and UFT, to have Plaintiffs returned to their jobs.

39)     The plan was to (i) keep Plaintiffs in the Rubber Rooms; (ii) violate and/or allow the violation of NYS Education Laws §§ 3020 and 3020(a); (iii) deprive Plaintiffs of their rights; (iv) create a hostile work environment that would compel Plaintiffs to quit, be terminated and/or be subjected to ruinous fines; (v) mislead Plaintiffs and the public about the true motives behind Defendants Bloomberg, City, Klein and DOE's failure to comply with NYS Education Law §§ 3020 and 3020(a) and use of the Rubber Rooms and (vi) retaliate against any Plaintiff who objected and sought to speak out against and/or enforce his/her rights.

40)     As a result of the actions of Defendants Bloomberg, Klein, DOE, Weingarten and UFT,

a)     Plaintiffs were deprived of the notice and probable cause provisions of NYS Education Law §§3020 and 3020(a);

b)     Plaintiffs were not given the election of remedies choices as provide by NYS Education Law §§ 3020 and 3020(a);

c)     Plaintiffs were not provided with the choice of a three member panel, pursuant to NYS Educations Law §§ 3020(a);

d)     Plaintiffs were not provided with the choice of impartial arbitrators from outside the City of New York, pursuant to NYS Educations Law §§ 3020(a);

e)     Plaintiffs were not given a choice of arbitrators who had not served within the last two years as required by NYS Educations Law §§ 3020(a); and

f)     Plaintiffs were not allowed the rights to adequate representation, subpoenaed testimony, introduction of evidence and reasonable adjournments for good cause, as required by NYS Educations Law §§ 3020(a).

41)    Defendants Bloomberg, City, Klein and DOE also sought to harass Plaintiffs and to make the conditions within their "workplace" and the terms of Plaintiffs' employment untenable, so as to:

a)    retaliate against Plaintiffs for seeking to enforce their constitutional and contractual rights;

b)    retaliate against Plaintiffs for speaking out against the deplorable conditions in the workplace and/or in the Rubber Rooms;

c)    retaliate against Plaintiffs for attempting to expose the Defendants wrongful acts and/or conditions within the NYC public school system;

d)    intimidate others from coming forward to support and/or join in Plaintiffs' allegations of Defendants' wrongful acts and/or conditions within the NYC public school system;

e)    intimidate others from coming forward to and/or in defense of the charges against Plaintiffs.

42)    To accomplish this goal, Plaintiffs were:

a)    forced to endure verbal and physical harassment and intimidation in their schools and in the Rubber Rooms;

b)    subjected to dangerous physical conditions in their schools and in the Rubber Rooms;

c)    removed from classrooms and subjected to solitary confinement in closets, empty windowless offices or other small spaces;

e)    subjected to ridicule, insults and abusive attacks by principals and other administrators;

f)    intimidated and made to be fearful of speaking out against the abuses, conditions and wrongful acts;

g)    intimidated, harassed and prevented from speaking out against the abuses, unlawful conduct and/or other improper acts that Defendants should have prevented and which Defendants did not want to become public or for which Defendants did not want to be held accountable; and

h) were otherwise retaliated against.

43)    The hostile work environment and other acts by Defendants Bloomberg, City, Klein and DOE against Plaintiffs were designed to and did in fact:

a)    discourage other DOE staff from coming forward to assert their constitutionally protected rights including but not limited to freedom of speech and freedom of association; and

b)    discourage other DOE staff, similarly situated to Plaintiffs, from coming forward to speak out and/or "blow the whistle" and attempt to prevent or stop the abuses of and/or wrongful acts of which Plaintiffs were aware and sought to report;

44)    The hostile work environment and other acts by Defendants Bloomberg, City, Klein and DOE against Plaintiffs resulted in termination, demotion, decrease in salary or wage, less distinguished titles, material loss in benefits, prevention of and/or interference with Plaintiffs ability to compete for and secure positions and assignments to which they were entitled, significantly diminished responsibilities, or other acts designed to humiliate Plaintiffs and subject them to particular situations that were embarrassing and not consistent with their status, positions and/or experience.

45)    The hostile work environment and other wrongful acts by Defendants Bloomberg, City, Klein and DOE against Plaintiffs were not mere inconvenience to Plaintiffs and were not alteration of Plaintiffs' job responsibilities.  They were instead a complete change in the terms and conditions of Plaintiffs' employment and tenure that were designed to force Plaintiffs to quit or to create excuses through which Plaintiffs could be fired, albeit unlawfully and improperly.

46)    In addition, the wrongful acts by Defendants Bloomberg, City, Klein and DOE against Plaintiffs were intended to interfere with Plaintiff's current or future employment as tenured DOE staff.

47)    In addition to the hostile work environment and other wrongful acts by Defendants Bloomberg, City, Klein and DOE against Plaintiffs, some Plaintiffs were also subjected to involuntary transfers to locations and/or facilities at which Plaintiffs (i) were not permitted to engage in their normal work activities, (ii) were not permitted to perform and/or engage in the duties and assignments for which they were hired, (iii) were not allowed to participate in, compete for and/or benefit from additional work and/or assignments to which they would have otherwise been permitted but for the transfer or "reassignment", (iv) were limited in their freedoms to move about, communicate and/or associate with others, (v) were forced to sit in assigned seats, in uncomfortable work locations and deprived of the normal equipment, access to resources and/or other support to which they would normally be entitled, (vi) were guarded by professional security personnel, and (vii) otherwise forced to remain in locations not of their choosing and not within the scope of the duties for which they were hired.

48)    Defendants Bloomberg, City, Klein and DOE intended and Defendants Weingarten and UFT allowed, Plaintiffs to be transferred to and remain in Rubber Room locations  (i) were they were subjected to harassment, threats and/or intimidation, and (ii) that

Defendants Bloomberg, City, Klein and DOE knew were unsafe and/or inappropriate for Plaintiffs "reassignment".

49)    Defendants Bloomberg, City, Klein and DOE intended, and Defendants Weingarten and UFT allowed, some Plaintiffs to be "reassigned" out of their schools and to remain in Rubber Rooms on the basis of charges for which such "reassignment" was not warranted, including but not limited to their (i) alleged insubordination, (ii) work allegedly being substandard, or (iii) other allegedly improper conduct, which did not rise to the level of "serious misconduct" that endangered the welfare of the students or other persons in their schools.

50)    Defendants Bloomberg, City, Klein and DOE intended, and Defendants Weingarten allowed, Plaintiffs to be transferred to and kept in Rubber Rooms because they (i) are/were over a certain minimum age, (ii) had achieved a high pay and benefits level and who had been employees of the DOE for more than a dozen years, (iii) dared to challenge and/or question DOE practices and / or the "Rubber Room" procedures, (iv) are whistle blowers and/or (v) who dared to demand their rights, including seniority transfers and/or due process rights.

51)    Defendants Bloomberg, City, Klein and DOE intended, and Defendants Weingarten and UFT allowed, Plaintiffs to be transferred to and kept in Rubber Rooms so that (i) they would not interfere with the plans to achieve the budget reductions; (ii) they would not expose the constitutional and contractual and due process violations, (iii) they would not expose the hostile work environment and (iv) they would not expose the other wrongful acts going on in the NYC Public Schools.

52)    Defendants Bloomberg, City, Klein and DOE intended, and Defendants Weingarten and UFT allowed, Plaintiffs to become unacceptable pawns or sacrifices in

Defendant Bloomberg, City, Klein and DOE's efforts to reduce the budget by terminating or reducing the number of tenured DOE staff.

53)    Defendants Bloomberg, City, Klein and DOE intended and Defendants Weingarten and UFT allowed, Plaintiffs to be:

a)    confined in Rubber Rooms for weeks, months and/or years in direct violation of NYS Education Laws §§ 3020 and 3020(a);

b)    deprived of their constitutional and contractual rights to expeditiously clear their names so that they could be returned to their responsibilities in the schools and to their privileges, status and/or assignments.

54)    As a result of Defendants Bloomberg's, City's, Klein's and DOE's actions against Plaintiffs and other tenured DOE staff, and Defendants Weingarten's and UFT's actions and/or refusals to act to protect the rights of Plaintiffs and other tenured DOE staff, the instances of (i) failure to comply with provisions of NYS Education Law §§ 3020 and 3020(a), (ii) unlawful use of and confinement to Rubber Rooms, (iii) violation of due process, (iv) age discrimination, (v) harassment and hostile work environment, and (vi) retaliation have increased and worsened[4].

55)    As of mid – 2006, Defendants Bloomberg, City, Klein and DOE, and Defendants Weingarten and UFT, knew that their actions directed at Plaintiffs and/or violations of the constitutional and/or contractual rights of Plaintiffs, and other tenured DOE staff, were wrong and the charges were unsubstantiated; however the charges stayed on file.

---

[4] In 2000, approximately 300 DOE staff reportedly accused of "misconduct" and/or "incompetence" had been banished to Rubber Rooms. *NY Times, March 1, 2000.* By mid 2005, over four hundred DOE staff were in Rubber Rooms. *National Council of Teacher Equality Bulletin dated June 8, 2005.* By mid 2006, approximately 600 DOE staff were in Rubber Rooms. *April 24, 2007 Village Voice Article.* DOE staff so that by the end of 2007, there were over 700 DOE staff banished to Rubber Rooms. *Oct. 15, 2007 New York Sun Article and Sept. 25, 2007 New York Post Article.*

56)    Despite this knowledge, from 2006 to the present, Defendants Bloomberg, City, Klein and DOE, with the full knowledge of Defendant UFT and Weingarten, increased their wrongful acts against Plaintiffs and other tenured DOE staff so that the situation has become urgent. *See Exhibits 10, 18, 19, 21, 22 & 23.*

57)    In 2004, the crisis became more urgent, with (i) violation of tenured DOE staff contractual and due process rights, (ii) dangerous and hostile work environment, (iii) retaliation against DOE staff who sought to speak out against the violations, and in support of their rights and to expose the problems in the NYC public school system, and (iv) Rubber Room violations were known to Defendants Weingarten and UFT but they took no legal action to protect Plaintiffs or to fix the abuses.

58)    In early 2007 Defendants Weingarten and the UFT refused to help Plaintiffs and other DOE staff trapped in Rubber Rooms by refusing to recognize the Rubber Room locations as UFT chapters and appointing UFT representatives to protect them. *See Exhibit 18.*

59)    In September 2007 Defendants Weingarten and UFT took no legal action after they received the EEOC right to sue letter to protect Plaintiffs and others from the ongoing age discrimination. *See Exhibit 9.*

60)    In September 2007 Defendant Combier solicited Defendants Weingarten and UFT to hire her and appoint her as their representative.

61)    In October 2007 the situation with Plaintiffs and other tenured DOE staff became embarrassing for Defendants Weingarten and UFT, and Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT sought to mollify and/or mislead the public into thinking that something was going to be done to protect Plaintiffs or other tenured DOE staff.

62)    In October 2007 Defendants Weingarten and UFT appointed a "Rubber Room Task Force" with Defendant Combier as Defendant UFT's official representative. *See Exhibits 20 & 21.*

63)    As explained below, Defendant Weingarten and UFT had no intention to allow its "Rubber Room Task Force" to take any meaningful action on behalf of Plaintiffs or other tenured DOE staff.

64)    The October 2007 appointment of the UFT "Rubber Room Task Force" by Defendants Weingarten and UFT was nothing more than a public relations move that was supported by Defendants Bloomberg, City, Klein and DOE.

65)    In November 2007 Defendants Weingarten, UFT and/or Combier claimed to have evidence related to (i) violations of Plaintiffs' and other DOE staff's constitutional, due process and contractual rights, (ii) harassment and hostile work environment, (iii) age discrimination, (iv) contract violations, (v) abuses in the NYC public School system, and (vi) dangerous conditions and improper use of Rubber Rooms Room. Again, Defendants Weingarten, UFT and/or Combier took no action.

66)    It became apparent that Defendants Weingarten, UFT and/or Combier were not acting in the best interests of Plaintiffs and were doing nothing more than using public relations "gimmicks" to try to make it appear as if they were actually taking action to protect Plaintiffs and other DOE staff, when they took no legal action and failed to act, as Plaintiffs and other DOE staff were forced to remain in Rubber Rooms and forced into 3020(a) hearings or post hearing processes that violated their due process, constitutional and contractual rights.

67)     Defendants Weingarten, UFT and Combier put their personal interests ahead of the interests of the Plaintiffs to whom they owed duties and on whose behalf they claimed they were taking action to protect Plaintiffs' rights.

68)     After Defendants Weingarten, UFT, Combier or the so called "Rubber Room Task Force" failed to take any action to protect DOE staff, Plaintiff Teachers4Action was formed and sought to take the actions to protect Plaintiffs and tenured DOE staff.

69)     On January 15, 2008, Plaintiff Teachers4Action notified Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT of their demands that Defendant DOE comply with Plaintiffs' constitutional and contractual rights.  *See Exhibit 11.*  The notification was circulated to the media and area politicians, who had previously been asked for assistance. *See Exhibit 12.*

70)     In response to Plaintiff Lewenstein's January 15, 2008 notification on behalf of Plaintiff Teachers4Action and its members, Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT retaliated against Plaintiff Teachers4Action and its members. Defendant DOE reassigned Plaintiff Lewenstein to the Rubber Room on that day with new allegations of verbal abuse. Defendant Weingarten wrote a letter on that day to the media and area politicians refuting Teachers4Action's allegations and stating that Defendant UFT is in negotiations with Defendant DOE to resolve the Rubber Room problem. *See Exhibits 13, 14 & 17.*

71)     On January 21, 2008, Plaintiffs Teachers4Action and Florian Lewenstein filed the instant lawsuit.

72)     Immediately after the filing, Defendants Bloomberg, City, Klein, DOE, Weingarten, UFT and Combier, jointly and/or individually looked for ways to interfere with Plaintiffs' ability to prosecute this action.

73)    As an example of Defendants' interference with Plaintiffs' rights and Plaintiffs'
rights to prosecute this action Defendant DOE, through its agent Lorraine Haynes, further
restricted Plaintiffs' ability to speak with one another, meet and associate with one another, to
respond to the increased inquiries by other tenured DOE staff who sought to join Plaintiff
Teachers4Action and to prepare their claims in this case. *See Exhibit 15 & 16.*

74)    At all times relevant hereto, Defendants Weingarten and UFT remained silent and
did nothing to support Plaintiffs' rights or to stop the violation of their rights and the unlawful
use of the Rubber Rooms.

75)    On February 8, 2008, Defendant UFT 's Representative Defendant Combier
attended the Court Conference at which it was announced by Plaintiffs that Defendant UFT
would be made a party to this litigation.   After the hearing and continuing to the present,
Defendant Combier sought to intimidate and/or threaten Plaintiffs and their attorney, and to
interfere with the Plaintiffs' rights to prosecute this lawsuit with representation of their choosing.

76)    Defendants Weingarten, UFT and Combier sought to interfere with Plaintiffs'
claims and sought to use one websites, over which Defendant Combier had control or with which
she could guarantee placement, other publications, emails and phone calls, to promote the
interests of Defendants Weingarten, UFT and Combier at the expense of Plaintiffs' claims.

77)    Defendants Weingarten, UFT and Combier's actions were and continue to be
prejudicial to Plaintiffs' claims, violated their duty of fair representation and demonstrated a
conflict of interest between them and the Plaintiffs.

78)    In addition to the above referenced direct actions by Defendants DOE, Defendants
Weingarten, Combier and UFT have retaliated against Plaintiffs by telling them that if they
continue to be part of this complaint, they would be in serious trouble, could lose their jobs, and

that lawyers who were appointed and are paid by Defendant UFT will not represent Plaintiffs in the NYS Education Law § 3020(a) hearings.

<div align="center">

**First Cause of Action -**
**Violation / Interference with Constitutionally Protected Rights – 1st, 5th & 14th Amendment**
**Freedom of Speech & Association and Due Process & Equal Protection Rights**
<u>**(against Defendants Bloomberg, City, Klein, DOE, Weingarten & UFT)**</u>

</div>

79)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 16 to 78 as if the same were repeated fully and at length herein.

80)    Plaintiffs have the following constitutional and contractual rights:

a)    Prior to being charged, Plaintiffs are entitled to notice and probable cause hearings and provisions of NYS Education Law §§3020 and 3020(a);

b)    After being charged, Plaintiffs are entitled to the election of remedies of provisions of NYS Education Law §§ 3020 and 3020(a);

c)    After being charged, Plaintiffs charged with incompetence are entitled to a three member panel to hear their charges pursuant to NYS Educations Law § 3020(a);

d)    After being charged, Plaintiffs are entitled to impartial arbitrators to be chosen from an AAA list of arbitrators from outside NYC, pursuant to procedures of NYS Educations Law § 3020(a);

e)    After being charged, Plaintiffs are entitled to arbitrators who had not served within the last two years, pursuant to the procedures of NYS Educations Law § 3020(a);

f)    After being charged, Plaintiffs were entitled to adequate representation, subpoenaed testimony, introduction of evidence and reasonable adjournments for good cause.

81)    Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT sought to mislead Plaintiffs and to interfere with their enforcing their rights pursuant to NYS Education Law §§ 3020 and 3020(a) related to (i) notification and probable cause; (ii) election of remedies; (iii) right to a three member panel of arbitrators if charged with incompetence; (iv) right to impartial arbitrators selected from an AAA list of arbitrators from outside the City of New York; (v) right to arbitrators who had not served within the last two years; and (vi) right to adequate representation, subpoenaed testimony, introduction of evidence and reasonable adjournments for good cause.

82)    Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT:

a)    deprived Plaintiffs of the notice and probable cause provisions of NYS Education Law §§ 3020 and 3020(a);

b)    deprived Plaintiffs of the election of remedies choices as provide by NYS Education Law §§ 3020 and 3020(a);

c)    deprived Plaintiffs charged with incompetence of the choice of a three member panel, pursuant to NYS Educations Law § 3020(a);

d)    deprived Plaintiffs of the choice of impartial arbitrators from outside the City of New York, pursuant to NYS Educations Law § 3020(a);

e)    deprived Plaintiffs of their choice of arbitrators who had not served within the last two years as required by NYS Educations Law § 3020(a); and

f)    deprived Plaintiffs of their rights to adequate representation, subpoenaed testimony, introduction of evidence and reasonable adjournments for good cause, as required by NYS Educations Law § 3020(a).

83)     Defendants Bloomberg, City, Klein and DOE harassed Plaintiffs and made the conditions within their "workplace" and the terms of Plaintiffs' employment intolerable by:

a)     retaliating against Plaintiffs to try to prevent them from seeking to enforce their constitutional and contractual rights;

b)     retaliating against Plaintiffs for speaking out against the deplorable conditions in the workplace and/or in the Rubber Rooms;

c)     retaliating against Plaintiffs for attempting to expose the Defendants wrongful acts and/or conditions within the NYC public school system;

d)     intimidating others from coming forward to support and/or join in Plaintiffs' allegations of Defendants wrongful acts and/or conditions within the NYC public school systems;

e)     intimidating others from coming forward to and/or in defense of the charges against Plaintiffs.

84)     Defendants Bloomberg, City, Klein and DOE:

a)     subjected Plaintiffs to endure verbal and physical harassment and intimidation in their schools and in the Rubber Rooms;

b)     subjected Plaintiffs to dangerous physical conditions in their schools and in the Rubber Rooms;

c)     removed Plaintiffs from classrooms and subjected them to solitary confinement in closets, empty windowless offices or other small spaces;

e)     subjected Plaintiffs to ridicule, insults and abusive attacks by principals and other administrators;

f)    intimidated Plaintiffs and made them to be fearful of speaking out against the abuses, conditions and wrongful acts;  and

g)    intimidated, harassed and prevented Plaintiffs from speaking out against the abuses, unlawful conduct and/or other improper acts that Defendants should have prevented and which Defendants did not want to become public or for which Defendants did not want to be held accountable.

85)    When Plaintiffs sought to enforce and attempted to speak out in support of and to demand their due process, constitutional and/or statutory rights, Defendants Bloomberg, City, Klein and DOE sought to stop Plaintiffs from speaking and/or associating with others with similar interests and/or rights. *See Exhibit 27.*

86)    Defendants Bloomberg's, Klein's and DOE's wrongful conduct was designed to interfere with Plaintiffs and other tenured DOE staff, to interfere with Plaintiffs "certifications and licenses", to interfere with Plaintiffs' salaries and due process rights and to interfere with Plaintiffs rights as guaranteed by NYS Education Law §§ 3020 and 3020(a) and to have the charges expeditiously investigated and adjudicated through fair and impartial hearings.

87)    Defendants Bloomberg, City, Klein and DOE caused Plaintiffs to be subjected to, and Defendant Weingarten and UFT allowed Plaintiffs to be subjected to, charges, that caused them to be improperly "re-assigned" and confined to the Rubber Rooms, where they waited for months and years without a chance to clear their names and protect their salaries, licenses and property rights. *See Exhibit 28.*

88)    While in the Rubber Rooms, Plaintiffs were deprived of their due process rights and/or the chance to clear their names and be restored to their classrooms.

89)     While in the Rubber Rooms, Plaintiffs were coerced, harassed, intimidated and terrorized so that they would be fearful for their personal and professional well-being, so that they would be "forced" to retire, resign or accept deals involving ruinous fines or termination. *See Exhibit 29.*

90)     Defendants Bloomberg, City, Klein and DOE implemented, caused and/or enforced, and Defendant Weingarten and UFT allowed Defendant Bloomberg, City, Klein and DOE, to implement, cause and/or enforce laws, legislation, statutes and/or administrative procedures[5] against Plaintiffs which were intended to interfere with Plaintiffs and other tenured DOE staff, "certifications and licenses", salaries and due process rights.

91)     Defendants Bloomberg, City, Klein and DOE implemented, caused and/or enforced, and Defendant Weingarten and UFT allowed Defendant Bloomberg, City, Klein and DOE, to implement, cause and/or enforce laws, legislation, statutes and/or administrative procedures that were designed to frustrate Plaintiffs' ability to expeditiously defend themselves against the charges that caused them to be placed in the Rubber Rooms, where they waited for months and years without a chance to clear their names and protect their salaries, certifications, licenses and property rights.

92)     Defendants Bloomberg's, Klein's and DOE's aforesaid acts, violate the 5th and 14th Amendments to the Constitution by depriving Plaintiffs of their due process rights and were otherwise unlawful.

93)     Defendants Bloomberg's, Klein's and DOE's actions also violate 42 U.S.C. §1983 which states:

---

[5] The laws, legislations, statutes and administrative regulations include and are not limited to those which regulate the "3020(a)" hearings process, which are the only means by which Plaintiffs can defend themselves, but which are little more than "Kangaroo Courts" where the DOE staff do not have a chance to be exonerated and must ultimately accept deals or administrative rulings that include ruinous fines or termination.
-------------------------

*Teachers4Action et al v. Bloomberg et al, 08-cv-548 (VM)(AJP) - Feb. 22, 2008 Amended Complaint - Page 29*

> *"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, and citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress".*

94)    Defendants Bloomberg's, Klein's and DOE's acts were designed to interfere with and/or deprive Plaintiffs of their property rights.

95)    Defendants Bloomberg's, Klein's and DOE's acts were designed to interfere with and/or deprive Plaintiffs of their due process, statutory, constitutional and/or contractual rights.

96)    Defendants Bloomberg's, Klein's and DOE's use of Rubber Rooms, age discrimination, harassment, hostile work environment, retaliation and failure to provide Plaintiffs with the protections afforded by the provisions of NYS Education Law §§ 3020 and 3020(a) violates 42 U.S.C. § 1983.

97)    Defendants Bloomberg's, Klein's and DOE's attempts to prevent Plaintiffs from speaking out against violations of their rights, speaking out about the conditions and abuses in the NYC public school systems, and attempting to speak out against the use of Rubber Rooms, attempt to prevent plaintiffs from getting others to support and provide evidence to them, to defend themselves.

98)    Defendants Bloomberg's, Klein's and DOE's attempts to prevent Plaintiffs from associating with others to discuss the violations of their rights, speaking out about the conditions and abuses in the NYC public school system, and attempting to speak out against the use of Rubber Rooms, attempt to prevent plaintiffs from getting others to support and provide evidence to them, to defend themselves.

99)    Defendants Bloomberg's, Klein's and DOE's attempts to prevent Plaintiffs from speaking to and associating with others violated Plaintiffs First Amendment rights.

100)    As a direct and proximate result of Defendants Bloomberg's, Klein's and DOE's aforesaid acts, Plaintiffs suffered monetary and other damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Second Cause of Action –
### Harassment & Hostile Work Environment
### (against Defendants Bloomberg, City, Klein & DOE)

101)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 16 to 78 as if the same were repeated fully and at length herein.

102)    Defendants Bloomberg, City, Klein and DOE subjected Plaintiffs to be confined in and/or allowed Plaintiffs to remain in locations where they were subjected to emotional and psychological dangers and/or intimidation and in some instances solitary confinement in closets, empty windowless offices or other small spaces.

103)    Defendants Bloomberg, City, Klein and DOE subjected Plaintiffs to (i) ridicule, insults and abusive verbal attacks and/or assaults and (ii) intimidation and fear of speaking out against the abuses, conditions and wrongful acts.

104)    Defendants Bloomberg, City, Klein and DOE transferred Plaintiffs from locations and conditions where, as a result of the experience, credentials, skills and status that they had achieved and earned, Plaintiffs were recognized as elite or privileged, to locations where they were less prestigious and where they were subjected to further verbal and physical harassment and intimidation.

105)     Defendants Bloomberg, City, Klein and DOE subjected Plaintiffs to radical changes in the nature and quality of the work given to them and in most instances Plaintiffs were completely deprived of any work responsibilities whatsoever.

106)     Defendants Bloomberg, City, Klein and DOE caused Plaintiffs to be transferred to locations where they were not allowed to perform the discretionary and/or managerial functions of the positions for which they were hired, to positions where the work, if any, was that which could be performed by clerical and lower-level personnel.

107)     Defendants Bloomberg, City, Klein and DOE used the Rubber Rooms to:

   a)     discriminate against Plaintiffs because of their age or positions;

   b)     subject Plaintiffs to verbal and physical harassment and intimidation;

   c)     subject Plaintiffs to dangerous physical conditions; *See Exhibit 24* ; and

   d)     subject Plaintiffs to emotional and psychological dangers and/or intimidation by keeping Plaintiffs like prisoners. *See Exhibit 25.*

108)     Defendants Bloomberg, City, Klein and DOE caused Plaintiffs to be subjected to solitary confinement in closets, empty windowless offices or other small spaces.

109)     The Rubber Rooms were used by Defendant Bloomberg, City, Klein and DOE to subject Plaintiffs to (i) ridicule, insults and abusive verbal attacks and/or assaults and (ii) intimidation, and fear of speaking out against the abuses, conditions and wrongful acts.

110)     Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms was part of their efforts to (i) retaliate against Plaintiffs; (ii) dissuade and/or discourage Plaintiffs and other tenured DOE staff from coming forward to assert their constitutionally protected rights, including, but not limited to, freedom of speech and freedom of association; and (iii) dissuade and/or discourage Plaintiffs and other tenured DOE staff from coming forward to speak out

and/or "blow the whistle" and attempt to prevent or stop them from reporting abuses and/or other wrongful acts within the NYC public school system.

111)    Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms and abuse of the New York State Education Law §§ 3020 and 3020(a) disciplinary process is adverse to, and a material change in, the terms and conditions of Plaintiffs' employment through termination, demotion, decrease in salary or wage, less distinguished titles, material loss in benefits, prevention of and/or interference with Plaintiffs' ability to compete for and secure positions and assignments to which they are entitled, significantly diminished responsibilities, or other acts designed to humiliate Plaintiffs and subject them to particular situations that are embarrassing and not consistent with their status, positions and/or experience.

112)    Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms are not mere inconveniences or alterations of job responsibilities but are rather a complete change in the terms and conditions of Plaintiffs' employment and tenure designed to force Plaintiffs to quit or to create excuses through which Plaintiffs could be fired, albeit unlawfully and improperly.

113)    Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms was part of their efforts to interfere with Plaintiff's current or future employment as tenured DOE staff.

114)    Defendants Bloomberg, City, Klein and DOE use the Rubber Rooms as a means to involuntarily transfer Plaintiffs to locations and/or facilities at which Plaintiffs (i) are not permitted to engage in their normal work activities, (ii) are not permitted to perform and/or engage in the duties and assignments for which they were hired, (iii) are not allowed to participate in, compete for and/or benefit from additional work and/or assignments to which they would have otherwise been permitted but for the transfer or "reassignment", (iv) are limited in

their freedoms to move about, communicate and/or associate with others, (v) are forced to sit in assigned seats, in uncomfortable work locations and deprived of the normal equipment, access to resources and/or other support to which they would normally be entitled, (vi) are guarded by professional security personnel, and (vii) are otherwise forced to remain in locations not of their choosing and not within the scope of the duties for which they were hired. *See Exhibits 24 & 25.*

115)    Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms was intended to subject Plaintiffs to conditions, assignment, relocation, denigration of responsibility, status and duties that caused a setback to their careers as tenured DOE staff.

116)    Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms was part of their efforts to transfer Plaintiffs to locations and subject them to conditions where, as a result of the experience, credentials, skills and status that they had achieved and earned, and where Plaintiffs were recognized as elite or privileged, to locations that were less prestigious and where Plaintiffs were subjected to radical changes in nature and quality of the work given to them, and in most instances Plaintiffs were completely deprived of any work responsibilities whatsoever.

117)    Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms was part of efforts to transfer Plaintiffs to locations where they were not allowed to perform the discretionary and/or managerial functions of the positions for which they were hired, to positions where the work, if any, was that which could be performed by clerical and lower-level personnel.

118)    The conditions that Defendants Bloomberg, City, Klein and DOE created in the schools before Plaintiffs were transferred to the Rubber Rooms, and the conditions that

Defendants Bloomberg, City, Klein and DOE created in the Rubber Rooms themselves, were part of Defendants' harassment and the creation of a hostile work environment.

119)    As a direct and proximate result of Defendants Bloomberg's, City's, Klein's and DOE's subjecting Plaintiffs to harassment and a hostile work environment, Plaintiffs suffered monetary and other damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Third Cause of Action –
### Age Discrimination (against Defendants Bloomberg, City, Klein & DOE)

120)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 16 to 78 as if the same were repeated fully and at length herein.

121)    Defendants Bloomberg, City, Klein and DOE discriminated against Plaintiffs because they were older and tenured DOE staff and/or employees.

122)    Defendants Bloomberg, City, Klein and DOE selected Plaintiffs and other tenured DOE staff to be terminated or subjected to harassment, hostile work conditions, violations of constitutional and due process rights so that they could have an excuse to terminate Plaintiffs and thereby reduce the budget for the NYC public schools.

123)    Defendants Bloomberg, City, Klein & DOE subjected Plaintiffs to "arbitrary age limits" and implemented practices that "worked to the disadvantage of older persons" by arbitrarily refusing to promote employment of older persons based on their ability rather than age.

124)    29 U.S.C. § 621 (The Age Discrimination in Employment Act of 1967 - "ADEA") provides in pertinent part that it is unlawful to implement "arbitrary age limits" and to implement practices that "may work to the disadvantage of older persons;" to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment.

125)    Defendants Bloomberg, City, Klein and DOE knew that their actions against Plaintiffs were unlawful and violated the ADEA.

126)    Prior to the filing of this lawsuit, Plaintiffs claims related to age discrimination were made against Defendant DOE and their age discrimination claim was denied by the Equal Employment Opportunity Commission ("EEOC").  *See Exhibit 9 & 10.*

127)    Defendants Weingarten and UFT were aware of the age discrimination by Defendants Bloomberg, City, Klein and DOE but after receiving the right to sue letter from the EEOC, Defendants Weingarten and UFT took no action.

128)    Plaintiff Rubinfeld was a Plaintiff involved and/or included in the age discrimination claim that Defendant UFT made but failed to pursue.

129)    Plaintiff Westbay also filed an age discrimination complaint with and was denied by the EEOC.

130)    Plaintiffs Rubinfeld and Westbay have standing to initiate and prosecute theirs and the other age discrimination claims of members of Teachers4Actions against Defendant DOE. *See Exhibit 9.*

131)    At the time Defendants Bloomberg, City, Klein and DOE discriminated against Plaintiffs on the basis of their age, Defendants Bloomberg, City, Klein and DOE knew that their actions were discriminatory and unlawful.

132)    As a direct and proximate result of Defendant Bloomberg's, City's, Klein's and DOE's aforesaid age discrimination, Plaintiffs suffered monetary and other damages.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

**Fourth Cause of Action –
Retaliation (against Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT)**

133)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 16 to 78 as if the same were repeated fully and at length herein.

134)    The specific acts of retaliation as they relate to each Plaintiff are set forth in Exhibit 1.

135)    Defendants Bloomberg, City, Klein and DOE retaliated against Plaintiffs (i) by filing administrative charges against them; (ii) by causing Plaintiffs to be subjected to disciplinary hearings and procedures pursuant to NYS Education Law §§ 3020 and 3020(a); (iii) by causing Plaintiffs to be re-assigned to the Rubber Rooms; (iv) by interfering with Plaintiffs' freedom of speech and freedom of association; and (v) by intimidating Plaintiffs and others from speaking out about the due process violations and the wrongs within the NYC public school system.

136)    Defendants Bloomberg, City, Klein and DOE threatened Plaintiffs that if they did not agree to some form of punishment and/or fine, they would be subjected to potentially ruinous fines , suspension without pay and/or termination and loss of certifications and/or licenses.

137)    Defendants Bloomberg, City, Klein and DOE threatened Plaintiffs that if they attempted to object to the manner in which Defendants Bloomberg, City, Klein and DOE were conducting the administrative hearings pursuant to NYS Education Law §§ 3020 and 3020(a), Plaintiffs would be subjected to additional punishment, including potentially ruinous fines, suspension without pay and/or termination and loss of certifications and/or licenses.

138)    After the filing of the instant lawsuit, Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT threatened Plaintiffs that if they did not agree to some form of punishment and/or fine, they would be subjected to potentially ruinous fines, suspension without pay and/or termination and loss of certifications and/or licenses.

139)    After the January 15, 2008 letter by Plaintiffs Teachers4Action and Lewenstein to Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT protesting (i) Defendants' violation of Plaintiffs' due process rights, (ii) Defendants' violations of Plaintiffs' constitutional and contractual rights, (iii) Defendants' age discrimination, and (iv) the other wrongful conduct and/or abuses that occurred within the NYC public school system, Defendants Bloomberg, City, Klein, DOE, Weingarten and DOE retaliated against and/or caused the retaliation against Plaintiff Lewenstein by filing new charges against him and by sending him back to the Rubber Room. *See Exhibit 13.*

140)    After the January 25, 2008 letter to Defendant DOE's representative Lorraine Haynes and Defendants Klein, DOE, Weingarten and UFT protesting (i) Defendants' violation of Plaintiffs' due process rights, (ii) Defendants' violations of Plaintiffs' constitutional and

contractual rights, and (iii) the other wrongful conduct and/or abuses that occurred within the Rubber Rooms, Defendants Bloomberg, City, Klein, and DOE retaliated against and/or caused the retaliation against Plaintiff Lewenstein by filing new charges. *See Exhibit 16*

141)    After the filing of the instant lawsuit, Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT threatened Plaintiffs that if they did not withdraw from the instant lawsuit, or if they insisted on pursuing claims, they would be deprived of the lawyers who were representing Plaintiffs in the 3020(a) Administrative Hearings, and who were provided and paid for by Defendant UFT.

142)    Defendants Bloomberg's, City's, Klein's, DOE's, Weingarten's and UFT's retaliation against and/or causing the retaliation of Plaintiffs was designed to dissuade others from asserting his/her/their First Amendment and other constitutional rights.

143)    As a direct and proximate result of Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT retaliating against and/or causing the retaliation of Plaintiffs, their First Amendment and other constitutionally protected rights have been prejudiced and Plaintiffs suffered monetary and other damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Fifth Cause of Action
### – Constructive Discharge (against Defendants Bloomberg, City, Klein and DOE)

144)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 16 to 78 as if the same were repeated fully and at length herein.

----------------------------

*Teachers4Action et al v. Bloomberg et al, 08-cv-548 (VM)(AJP) · Feb. 22, 2008 Amended Complaint · Page 39*

145)     Defendants Bloomberg, City, Klein and DOE knew that they could not get Plaintiffs to quit.

146)     Since Defendants Bloomberg, City, Klein and DOE knew that they could not get Plaintiffs to quit, Defendants Bloomberg, City, Klein and DOE determined to harass Plaintiffs and to create a hostile work environment through which Plaintiffs would quit or would agree to early retirement and/or deals that led to their dismissal.

147)     Defendants Bloomberg, City, Klein and DOE made Plaintiffs' working conditions intolerable with the intention of causing Plaintiffs to involuntarily resign or give up some of their benefits.

148)     Defendants Bloomberg, City, Klein and DOE deliberately and/or intentionally created an intolerable workplace environment so that Plaintiffs would be forced to resign and/or give up some of their benefits.

149)     Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms and failure to provide Plaintiffs with the protections afforded by the provisions of NYS Education Law §§ 3020 and 3020(a) was part of Defendants deliberate and/or intentional creation of an intolerable workplace environment.

150)     Defendants Bloomberg's, City's, Klein's and DOE's creation of a hostile work environment constitutes constructive termination of Plaintiffs or deprivation of other benefits.

151)     As a direct and proximate result of Defendants Bloomberg's, City's, Klein's and DOE's constructive discharge, Plaintiffs suffered monetary and other damages

**WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court,

(ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate

trier of fact; and (iii) attorneys' fees, interest and costs of suit.

<p align="center"><strong>Sixth Cause of Action –</strong><br><strong>Breach of Contract (against Defendants Bloomberg, City, Klein and DOE)</strong></p>

152)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 16 to

78 as if the same were repeated fully and at length herein.

153)    Defendant DOE and Plaintiffs have a valid and binding contract.

154)    The terms of the contract guaranteed Plaintiffs rights to a safe and non hostile

work environment, a salary, rights to per session work, benefits, other rights related to their work

status as tenured DOE staff, as well as due process rights related to the NYS Education Law §§

3020 and 3020a hearing procedures.

155)    Defendants Bloomberg, City, DOE and Klein did not want to honor the terms of

the contract with Plaintiffs.

156)    Defendants Bloomberg, City, DOE and Klein sought to break the terms of the

contract with Plaintiffs so that they could reduce the budget of the NYC school system.

157)    The terms of the contract between Plaintiffs and Defendant DOE, prohibited

Defendants Bloomberg, City, DOE and Klein from targeting Plaintiffs and other tenured DOE

staff (i) who were over a certain minimum age; (ii) who had achieved a high pay and benefits

level; (iii) who had been employees for more than a minimum number of years; (iv) who dared

to challenge and/or question the "Rubber Room" procedures; (v) who acted as "whistle blowers"

regarding DOE misconduct (vi) who dared to demand or insist upon their due process rights,

(vii) by forcing Plaintiffs to wait in the Rubber Rooms without due process and the chance to

clear their names and be restored to their classrooms and (viii) by coercing, intimidating and

terrorizing Plaintiffs so that they would be fearful for their personal and professional well-being

so that they would retire, resign or be "forced" to accept deals involving ruinous fines or termination.

158)    Defendants Bloomberg, City, Klein and DOE breached the terms of the contract with Plaintiffs by Defendants Bloomberg's, City's, Klein's and DOE's targeting of Plaintiffs and other tenured DOE staff (i) who were over a certain minimum age; (ii) who had achieved a high pay and benefits level; (iii) who had been employees for more than a minimum number of years; (iv) who dared to challenge and/or question the "Rubber Room" procedures; (v) who acted as "whistle blowers" regarding DOE misconduct (vi) who dared to demand or insist upon their due process rights, (vii) by forcing Plaintiffs to wait in the Rubber Rooms without due process and the chance to clear their names and be restored to their classrooms and (viii) by coercing, intimidating and terrorizing Plaintiffs so that they would be fearful for their personal and professional well-being so that they would retire, resign or be "forced" to accept deals involving ruinous fines or termination.

159)    Defendants Bloomberg's, City's, DOE's and Klein's breach of contract was intentional, malicious, reckless, careless, negligent, unlawful and/or improper and was also designed to interfere with Plaintiffs' due process, licenses and property rights.

160)    As a direct and proximate result of Defendants Bloomberg's, City's, DOE's and Klein's breach of contract, Plaintiffs suffered monetary and other damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

**Seventh Cause of Action – Breach of Fiduciary Duty and Duty of Fair Representation
(against Defendants Weingarten and UFT)**

161)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 16 to 78 as if the same were repeated fully and at length herein.

162)    Defendants UFT and Weingarten are agents for Plaintiffs with regard to certain matters, including certain matters related to Plaintiffs' contract with Defendant DOE.

163)    Defendants UFT and Weingarten also assumed certain responsibilities and claim to protect the constitutional and contractual rights of Plaintiffs and other DOE staff.

164)    Defendants UFT and Weingarten hold themselves out as *"fighting to make sure DOE staff are treated with respect and dignity, have a voice in the education of their students and are given the resources they need to succeed in the classroom".*

165)    Defendants UFT and Weingarten hold themselves out as advocates for union members, including Plaintiffs.

166)    Defendants UFT and Weingarten are aware that Defendants Bloomberg, City, Klein and DOE were engaged in efforts to interfere with and/or deprive Plaintiffs of their due process, statutory, constitutional and/or contractual rights.

167)    Defendants UFT and Weingarten have been on notice and aware that Defendants Bloomberg, City, Klein and DOE were (i) violating Plaintiffs 1st, 5th and 14th Amendment Rights, (ii) discriminating against Plaintiffs on the basis of age, (iii) harassing Plaintiffs and subjecting Plaintiffs to hostile work environments, (iv) retaliating against Plaintiffs and otherwise violating Plaintiffs' due process, constitutional and/or contractual rights.

168)    Defendants UFT and Weingarten were on notice and aware that Defendants Bloomberg's, City's, Klein's and DOE's actions were intended and/or designed to get Plaintiffs to quit, be fired and/or otherwise be subjected to ruinous fines.

169)    Defendants UFT and Weingarten were on notice and aware:

(a) Of the hostile work environment and dangerous conditions in the Rubber
Rooms and have done nothing about them;

(b) That Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber
Rooms and failure to provide Plaintiffs with the protections afforded by the
provisions of NYS Education Law 3020 and 3020(a) violates Plaintiffs' due
process, statutory, constitutional and/or contractual rights and have done
nothing about them;

(c) That Defendants Bloomberg, City, Klein and DOE have discriminated against
Plaintiffs on the basis of their age and failed to take any actions;

(d) That Defendants Bloomberg, City, Klein and DOE have discriminated against
Plaintiffs in an effort to get them to quit, be fired and/or otherwise be subject
to ruinous fines and have done nothing about them; and

(e) That Defendants Bloomberg, City, Klein and DOE have created a hostile
work environment and have done nothing about it.

170)    Defendants UFT and Weingarten owe and owed Plaintiffs a duty of fair
representation in dealings with Defendants Bloomberg, City, Klein and DOE.

171)    Despite their knowledge of Defendant Bloomberg's, City's, Klein's and DOE's
wrongful acts, Defendants UFT and Weingarten did nothing. *See Exhibit 30.*

172)    Defendants UFT and Weingarten's failure to act to protect Plaintiffs' rights
violated their duty of fair representation to Plaintiffs.

173)    Defendants UFT and Weingarten's discrimination and retaliation against and/or
harassment of Plaintiffs violate their duty of fair representation to Plaintiffs.

174) Defendants UFT's and Weingarten's failure to act, and discrimination and retaliation against and/or harassment of Plaintiffs, violate their duty of fair representation to Plaintiffs.

175) Defendants UFT's and Weingarten's aforesaid breach of their duty of fair representation constituted bad faith and was in reckless disregard for Plaintiffs' rights.

176) As a direct and proximate result of Defendants Weingarten's and UFT's breach of fair representation, Plaintiffs suffered monetary damages and emotional injuries, trauma and other related damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

**Eighth Cause of Action – Aiding & Abetting Breach of Fiduciary Duty**
**(against Defendants Weingarten and UFT)**

177) Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 16 to 78 as if the same were repeated fully and at length herein.

178) Defendants Weingarten and UFT were aware of their contractual and fiduciary duties to Plaintiffs.

179) Defendants Weingarten and UFT were aware that Defendants Bloomberg, City, Klein and DOE were engaged in the above mentioned wrongful acts, including but not limited to (i) violating Plaintiffs 1st, 5th and 14th Amendment Rights, (ii) discriminating against Plaintiffs on the basis of age, (iii) harassing Plaintiffs and subjecting Plaintiffs to a hostile work environment,,

(iv) retaliating against Plaintiffs and (v) otherwise violating Plaintiffs' due process, constitutional and/or contractual rights.

180)    Defendants Weingarten and UFT were aware that Defendants Bloomberg, City, Klein and DOE required the assistance of Defendants Weingarten and UFT to (i) violate Plaintiffs 1st, 5th and 14th Amendment Rights, (ii) discriminate against Plaintiffs on the basis of age, (iii) harass Plaintiffs and subject Plaintiffs to a hostile work environment, (iv) retaliate against Plaintiffs and (v) otherwise violate Plaintiffs' due process, constitutional and/or contractual rights.

181)    Defendants Weingarten and UFT provided assistance to Defendants Bloomberg, City, Klein and DOE through Defendants Weingarten's and UFT's failure and/or refusal to act to protect Plaintiffs from (i) violation of their 1st, 5th and 14th Amendment Rights, (ii) discrimination on the basis of age, (iii) harassment and a hostile work environment, (iv) retaliation and (v) other violation of Plaintiffs' due process, constitutional and/or contractual rights.

182)    The assistance that Defendants Weingarten and UFT provided to Defendants Bloomberg, City, Klein and DOE was through Defendants Weingarten's and UFT's refusal to act and Defendants Weingarten's and UFT's directions to the lawyers representing Plaintiffs who were paid for by UFT.

183)    The assistance that Defendants Weingarten and UFT provided to Defendants Bloomberg, City, Klein and DOE was (i) to make announcements that they would take action but then take no action, (ii) to fail to pursue the age discrimination claim after receiving the EEOC right to sue letter, (iii) to intentionally appoint unqualified and/or inexperienced persons such as Defendant Combier to serve on its "Rubber Room Task Force" and (iv) cause Plaintiffs to be

threatened that if they continued to participate in the instant lawsuit, they would be terminated or they would lose the lawyers that the UFT was paying for to represent Plaintiffs in the 3020(a) administrative hearings.

184)    As a direct and proximate result of Defendants Weingarten's and UFT's aiding and abetting breach of fiduciary duty and breach of fair representation, Plaintiffs suffered monetary damages and emotional injuries, trauma and other related damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Ninth Cause of Action – Negligence Hiring, Retention & Supervision (against Defendants Bloomberg, City, Klein and DOE)

185)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 16 to 78 as if the same were repeated fully and at length herein.

186)    Defendants Bloomberg, City, Klein and DOE, hired and retained principals and other administrators who they knew, or should have known, would carry out the Defendants plan to target Plaintiffs and other tenured DOE staff.

187)    Defendants Bloomberg, City, Klein and DOE, hired and retained principals and other administrators who they knew, or should have known, had a hatred and/or dislike of tenured DOE staff, were envious of tenured DOE staff positions, status and privileges and who had a propensity for the type of harassment, retaliation and conduct that were designed to cause Plaintiffs to be charged and sent to Rubber Rooms.

188)    Defendants Bloomberg, City, Klein and DOE knew or should have known that the Plaintiffs' supervisors had a propensity for anger, belligerence, violence, jealousy, discrimination, hostility and retaliation.

189)    As a direct result of Defendants Bloomberg's, City's, Klein's and DOE's negligent hiring, retention and supervision of Plaintiffs' supervisors with their propensity for anger, belligerence, violence, jealousy, discrimination, hostility and retaliation, Plaintiffs suffered monetary damages and emotional injuries, trauma and other related damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

**Tenth Cause of Action – Negligence Hiring, Retention & Supervision**
**(against Defendants Weingarten and UFT)**

190)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 16 to 78 as if the same were repeated fully and at length herein.

191)    Defendants Weingarten and UFT hired and retained lawyers to represent Plaintiffs who, Defendants Weingarten knew, or should have known, would not advise Plaintiffs of their rights and were not to challenge Defendant DOE on the issues of NYS Education Law §§ 3020 and 3020(a) requirements such as (i) notification and probable cause; (ii) election of remedies; (iii) right to a three member panel of arbitrators when charged with incompetence; (iv) right to impartial arbitrators selected from an AAA list of arbitrators from outside the City of New York; (v) right to arbitrators who had not served within the last two years; and (vi) right to adequate

representation, subpoenaed testimony, introduction of evidence and reasonable adjournments for good cause.

192) Defendants Weingarten and UFT knew that the lawyers they paid for had a propensity and personality that they would intimidate or frighten Plaintiffs into believing that instead of fighting the charges, they should make deals to accept as little punishment as was possible to get the procedures over as quickly as possible and so they could be returned to their jobs.

193) Defendants Weingarten and UFT hired and retained Defendant Betsy Combier to be its representative on the "Rubber Room Task Force".

194) At the time Defendants Weingarten and UFT hired and retained Betsy Combier, they knew or should have known of (i) her lack of experience, (ii) her animosity toward others, (iii) her propensity to allow her ego and emotions to guide whatever actions she took or would take as their representative, (iv) her inexperience with regard to legal claims that she had made and lost against the Defendants City, Klein, DOE and others, (v) her propensity for use of her websites to further her personal goals rather than for legitimate and lawful purposes in furtherance of the interests of Plaintiffs, other tenured DOE staff and other DOE staff to whom Defendants Weingarten, Combier and UFT owed fiduciary duties and/or duty of fair representation.

195) As a direct result of Defendants Weingarten's and UFT's negligent hiring, retention and supervision of Defendant Combier, Plaintiffs were threatened, harassed and the instant claims were damaged, thereby causing Plaintiffs to suffer monetary damages and emotional injuries, trauma and other related damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

## Eleventh Cause of Action – Misrepresentation, Conspiracy & Fraud[6]

196)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 16 to 78 as if the same were repeated fully and at length herein.

197)    Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT had the duty to (i) protect the Plaintiffs' due process, statutory, constitutional and/or contractual rights, (ii) comply with NYS Education law 3020 and 3020(a), (iii) notify Plaintiffs of their right to a three person panel to consider any allegations of alleged incompetence upon which or for which Defendants sought to discipline Plaintiffs, (iv) provide impartial arbitrators to consider allegations of alleged misconduct upon which or for which Defendants sought to discipline Plaintiffs and (v) provide prompt hearings related to allegations of alleged misconduct upon which or for which Defendants sought to discipline Plaintiffs.  Defendants made statements and omissions regarding these duties which they knew were false at the time they were made. Defendants made these misrepresentations for the purpose of inducing Plaintiffs to rely on the statements.  Plaintiffs relied on the statements to their detriment and as a result suffered injuries including but not limited to being forced into 3020(a) hearings in which the did not have a three

---

[6] In response to the comments by the Hon. Andrew J. Peck at the January 28, 2008 Conference, Plaintiffs have, for the time being, omitted the RICO cause of action.  However, pursuant to FRCP 15 and subject to future discovery, Plaintiffs reserve their right to amend the complaint to include a RICO cause of action to conform to the facts and evidence.

---------------------------

member panel, did not have impartial arbitrators, were forced to await hearing for months and years and suffered other damages.

198)     Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT sought to deprive Plaintiffs, or allowed Plaintiffs to be deprived, of their due process, statutory, constitutional and/or contractual rights.

199)     Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT sought to misrepresent to Plaintiffs what were their due process, statutory, constitutional and/or contractual rights.

200)     Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT conspired with one another to deprive Plaintiffs of their due process, statutory, constitutional and/or contractual rights.

201)     Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT conspired with one another to interfere with and/or defraud Plaintiffs out of their due process, statutory, constitutional and/or contractual rights to the safeguards provided by and compliance with NYS Education law 3020 and 3020(a).

202)     Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT conspired with one another to interfere with and/or deprive Plaintiffs out of their right to a three person panel to consider any allegations of alleged incompetence upon which or for which Defendant DOE sought to discipline Plaintiffs.

203)     Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT conspired with one another to interfere with and/or deprive Plaintiffs out of their right to proper probable cause considerations related to allegations of alleged misconduct upon which or for which Defendant DOE sought to discipline Plaintiffs.

204)    Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT conspired with one another to interfere with and/or deprive Plaintiffs out of their right to impartial arbitrators to consider allegations of alleged incompetence or misconduct upon which or for which Defendant DOE sought to discipline Plaintiffs.

205)    Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT conspired with one another to interfere with and/or deprive Plaintiffs out of their right to prompt hearings related to allegations of alleged incompetence or misconduct upon which or for which Defendant DOE sought to discipline Plaintiffs.

206)    Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT conspired with one another to interfere with and/or deprive Plaintiffs out of their right to fair and impartial consideration of applications, subpoenaed testimony, requests for extensions of time, representation by or substitution of counsel and fair hearings related to allegations of alleged incompetence or misconduct upon which or for which Defendant DOE sought to discipline Plaintiffs.

207)    Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT conspired with one another to violate Plaintiffs' and other tenured DOE staff's due process and contractual rights, to facilitate the "reassignment" of Plaintiffs and other tenured DOE staff to the Rubber Rooms and/or to facilitate disciplinary letters to be placed in Plaintiffs files without fair and impartial review and/or investigation of the allegations.   *See Exhibit 26.*

208)    At the time Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT conspired with one another to place and/or make charges against Plaintiffs, they knew they were violating Plaintiffs' due process and contractual rights, to facilitate the "reassignment" of Plaintiffs and other tenured DOE staff to the Rubbers Rooms and/or to facilitate disciplinary

letters to be placed in Plaintiffs files without fair and impartial review and/or investigation of the allegations.

209)    The fraud and conspiracy to defraud Plaintiffs was done with actual and/or constructive knowledge that Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT were depriving Plaintiffs of their due process, statutory, constitutional and/or contractual rights.

210)    At the time Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT conspired with one another, they did so knowing that they were not entitled to deprive Plaintiffs of the aforesaid due process, statutory, constitutional and/or contractual rights.

211)    The making and/or filing of the aforesaid charges against Plaintiffs was in furtherance of the fraud and/or conspiracy to defraud Plaintiffs.

212)    As a direct and proximate result of Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT misrepresentations, conspiracy and fraud, Plaintiffs suffered monetary and other damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

## Twelfth Cause of Action -- False Confinement
### (against Defendants Bloomberg, City, Klein and DOE)

213)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 16 to 78 as if the same were repeated fully and at length herein.

214)    The Rubber Rooms, closets, empty windowless offices or other small spaces are not workplaces.

215)    The Rubber Rooms, closets, empty windowless offices or other small spaces are locations where Plaintiffs are confined, guarded and their movements restricted.

216)    Plaintiffs are not permitted to come and go from the Rubber Rooms, closets, empty windowless offices or other small spaces as they please.

217)    Plaintiffs are not permitted to meet and/or freely move about the Rubber Rooms, closets, empty windowless offices or other small spaces .

218)    Defendants Bloomberg's, City's, Klein's and DOE's use of the Rubber Rooms, closets, empty windowless offices or other small spaces to confine Plaintiffs is/was improper.

219)    Plaintiffs' relocation and reassignment to the Rubber Rooms, closets, empty windowless offices or other small spaces constitutes unlawful confinement and/or false imprisonment.

220)    As a direct and proximate result of confinement in the Rubber Rooms, closets, empty windowless offices or other small spaces Plaintiffs suffered monetary and other damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

## Thirteenth Cause of Action - Injunctive & Equitable Relief

221)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 16 to 78 as if the same were repeated fully and at length herein.

222)    As a result of Defendants' Bloomberg's, City's, Klein's, DOE's, Weingarten's, UFT's and Combier's actions, Plaintiffs are being subjected to among other things:

a)     hearings that have been convened in violation of NYS Education Law §3020(a);

b)     imposition of decisions, fines, suspension without pay, termination and/or other penalties resulting from hearings that were convened in violation of NYS Education Law § 3020(a);

c)     retaliation for attempting to exercise their 1st Amendment rights and freedoms related to informing others, assisting others and getting assistance from others in relation to the violation of their constitutional and contractual rights, the age discrimination, hostile work environment, false confinement, and other abuses within the NYC public school system, which are having a chilling affect on Plaintiffs freedom of speech and association; and

d)     threats that if they do not withdraw from this lawsuit they will be subjected to further damages, including firing and loss of their legal representation.

223)     As a result of Defendants' Bloomberg's, City's, Klein's, DOE's, Weingarten's and UFT's actions, Plaintiffs are also being deprived of their contractual rights which require that certain Plaintiffs be restored to service for violation of the provisions of their contract with Defendant DOE relating to their due process rights, investigations, reassignments to Rubber Rooms and preferring of charges.

224)     Defendants' actions are having a chilling affect on the Plaintiffs' ability to speak out about the abuses and are causing others to be frightened of coming forward to corroborate Plaintiffs' allegations or participate in this lawsuit. Some Plaintiffs have been intimidated or coerced into withdrawing from this lawsuit.

225)     Defendants' actions are prejudicing and adversely affecting the public's interest

related to the NYC public schools and the over-arching interest in insuring that competent – rather than the least expensive - teachers are available and part of the education pool.

226)    Defendants' Bloomberg's, City's, Klein's, DOE's, Weingarten's and UFT's wrongful conduct which has caused and/or allowed Plaintiffs to be confined, or continue to be confined, in the Rubber Rooms interferes with Plaintiffs' ability, constitutional and contractual rights, to quickly defend themselves against the preferred charges so that they can clear their names, have the charges and all references thereto removed from their files and be restored to their class rooms and teaching responsibilities.

227)    Every day that Plaintiffs are required to participate in or subjected to the processes which violate NYS Education Law § 3020 and 3020(a), and every day that Plaintiffs are confined to the Rubber Rooms, they suffer additional damages for which monetary relief is inadequate.

228)    Defendants' Bloomberg, City, Klein, DOE, Weingarten and UFT's practices of keeping certain Plaintiffs, such as Plaintiff Hazen, in solitary confinement and/or subjecting other Plaintiffs to other intolerable and unconscionable punishment, causes Plaintiffs to suffer additional damages for which monetary relief is inadequate.

229)    Defendants' Bloomberg's, City's, Klein's, DOE's, Weingarten's and UFT's practices of forcing certain Plaintiffs, such as Plaintiffs Gonzalez or Goebel, to travel 2 – 3 hours in each direction every day or to incur hundreds of dollars per month in extra traveling expenses just to attend the Rubber Room center to which they were arbitrarily re-assigned, causes Plaintiffs to suffer additional damages for which monetary relief is inadequate.

230)    Defendants' practices of retaliation and threats of imposition or enforcement of onerous findings, termination, threatened fines, constructive discharge and withdrawal of

counsel, as against certain plaintiffs such as Plaintiffs Berkowitz, Goebel, McLoughlin and Saunders, causes Plaintiffs to suffer additional damages for which monetary relief is inadequate.

231)    Defendants' Bloomberg's, City's, Klein's, DOE's, Weingarten's and UFT's practices of confining Plaintiffs (i) to dangerous Rubber Rooms – such as the 333 Seventh Avenue and the 125th Street Rubbers Room (at which representative Plaintiffs Saunders and Adams are confined) or (ii) to hostile environment Rubber Rooms in Queens and Brooklyn (at which representative Plaintiffs Hollander and Torres-Nogueras are confined), causes Plaintiffs to suffer additional damages for which monetary relief is inadequate.

232)    Defendants' Bloomberg's, City's, Klein's, DOE's, Weingarten's and UFT's practices of retaliation and interference with freedoms of speech for attempts to speak out against the due process violations and other wrongs in the NYC public school system, as against certain plaintiffs such as Plaintiffs Lewenstein and Fofana, causes Plaintiffs to suffer additional damages for which monetary relief is inadequate.

233)    Defendants' Bloomberg's, City's, Klein's, DOE's, Weingarten's, UFT's and Combier's practices of attempting to interfere with Plaintiffs' prosecution of, and participation in, this lawsuit, causes Plaintiffs to suffer additional damages for which monetary relief is inadequate.

WHEREFORE, Plaintiffs demand judgment for the following injunctive and equitable relief;

(i)    directing that the 3020(a) hearings be immediately enjoined and Plaintiffs not be required to participate in the 3020(a) hearings as Defendants are attempting to enforce them;

(ii)    enjoining Defendant DOE from issuing any findings or judgments against Plaintiffs resulting from pending or concluded 3020(a) hearings;

(iii)    enjoining Defendant DOE from attempting to enforce any previously issued findings and/or judgments against Plaintiffs resulting from the 3020(a) Hearings dating back to 2000;

(iv)    enjoining Defendant DOE from further retaliation against Plaintiffs for attempting to exercise their 1st Amendment rights and freedoms related to informing others, assisting others and getting assistance from others in relation to the violations of their constitutional and contractual rights, the age discrimination, hostile work environment, false confinement, and other abuses within the NYC public school system;

(v)    closing the dangerous and hostile environment Rubber Rooms and returning Plaintiffs to administrative assignments in their schools, or in the alternative establishing adequate, safe and non-hostile alternate locations and/or workplaces;

(vi)    enjoining all Defendants from further threats that if Plaintiffs do not withdraw from this lawsuit they will be subjected to further damages, including firing and loss of their legal representation;

(vii)    for attorneys' fees, interest and costs associated with this application; and

(viii)    such other and further relief as is equitable.

Dated: February 22, 2008
      New York, NY

/s/ Edward D. Fagan (electronically signed)
Edward D. Fagan Esq. (EF-4125)
5 Penn Plaza, 23rd Floor
New York, NY 10001
Tel. (646) 378-2225
Fax (646) 304-6446
Email: faganlawintl@aim.com

EXHIBIT "E"

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt

1

851rteac
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   TEACHERS4ACTION, et al.,
3
4                   Plaintiffs,
4
5               v.                          08 Civ. 548 (VM)
5
6   MICHAEL G. BLOOMBERG, et al.,
6                                           Conference
7                   Defendants.
7
8   ------------------------------x
8                                           New York, N.Y.
9                                           May 1, 2008
9                                           4:00 p.m.
10  Before:
10
11          HON. ANDREW J. PECK
11
12                                          Magistrate Judge
12
13          APPEARANCES
13
14
14
15  EDWARD D. FAGAN, ESQ.
15      Attorney for Plaintiffs
16
16
17  MICHAEL A. CARDOZO
17  Corporation Counsel for the City of New York
18      Attorney for City Defendants
18  BLANCHE GREENFIELD
19      Assistant Corporation Counsel
19
20
20
21  STROOCK & STROOCK & LAVAN LLP
21      Attorneys for Defendant UFT
21  CHARLES G. MOERDLER, ESQ.
22  DINA KOLKER, ESQ.
22
23
23
24  ADAM S. ROSS, ESQ.
24      Attorney for Defendant UFT
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

851rteac
1           (Case called)
2           THE COURT:  Mr. Fagan, I guess this is your
3   application.
4           MR. FAGAN:  It is my application, your Honor.
5           First of all, I wanted to say that I find myself in a
6   case with both a colleague whom I've known for many years and
7   an old nemesis against whom I've fought many battles.  To quote
8   someone that your Honor knows, life is infinitely stranger than
9   anything which the mind of man could invent.  I apologize to
                        Page 1

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt

10  the Court if I offended it by making an application.  I believe
11  the application was made in good faith.  I hope that starting
12  today and moving forward we can move the case along with the
13  things behind us behind us and the things in front of us in
14  front of us.
15          THE COURT:  That's fine.
16          MR. FAGAN:  Thank you, your Honor.
17          Your Honor, the application that I have is based on
18  several different matters all of which relate to some things
19  that I believe could expeditiously move this case along.  They
20  started, your Honor, as you recall, with an issue of an email
21  that was intercepted.  The interception of the email is
22  significant for two reasons.  Forget about the content of the
23  email, forget about what it has to do with.
24          The interception of the emails provides a potential
25  independent basis for an additional cause of action.  In
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                3
   851rteac
1   addition to which the sender of the emails, the source of the
2   emails, is a party or could be a party over which we have to
3   make an additional claim.
4          THE COURT:  And it could be one of your clients.
5          MR. FAGAN:  It could be one of our clients, your
6   Honor.  The importance of being able to ascertain that as
7   quickly as possible is so that we will know is it someone on
8   the other side of these proceedings, on the other side of the
9   caption, or is it someone within our group.  I can tell your
10  Honor I have spoken to all the named plaintiffs, I've spoken to
11  all the people within our group, I've spoken to Mr. Lewenstein;
12  it is not from our plaintiffs.
13          I also spoke with Ms. Greenfield about two and a half
14  weeks ago.  I explained to her the importance of preserving and
15  getting immediate access to the fax log.  The reason for that
16  is these two documents, whatever they are, however they came
17  in, they started out as just being two documents.  Then we
18  discovered the existence of a fax cover sheet.  But when one
19  looks at the documents themselves, they are missing the types
20  of things that would normally come when you look at a fax.
21          THE COURT:  I understand that.  We also had a prior
22  conference at which Ms. Europe, is it? England, somebody from
23  the board of ed. -- help me out with the name.
24          MS. GREENFIELD:  You're right, your Honor, Ms. Europe.
25          THE COURT:  Ms. Europe said, although she was not
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                4
   851rteac
1   under oath at the time -- I try not to have to put any lawyer
2   under oath in these proceedings.  She represented as an officer
3   of the court that the blank fax cover sheet that is blank of the
4   usual fax transmittal information that we often or always see
5   on fax sheets was indeed blank, that the cover sheet was just
6   handwritten information.
7          I guess the question is the fax log may well be an
8   easy thing.  I'm not sure if there is one or what the computer
9   or fax capabilities is.  If that's all you want, let us try to
10  get to the heart of this case and not spend too much time or
11  money on what may or may not be a sideshow, however important
12  you think this issue is.
13          Let me ask Ms. Greenfield first -- and as those of you
14  know who have been in this before, and Mr. Moerdler welcome to
                              Page 2

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt

15  you and your colleagues, I try and cut through the paperwork
16  and get to the heart of things -- I assume that was a board of
17  ed. fax machine.
18         MS. GREENFIELD:  Your Honor, if I may for a moment.
19  First of all, I really strenuously object to counsel's
20  reference in his letters and in this courtroom to his referring
21  to the email as intercepted.  He cites to a statutory provision
22  which talks about the interception of transmissions.  As the
23  Court is fully aware, this was not an interception of some type
24  of covert or overt the operation by the Department of Education
25  but rather a fax that was sent to them unsolicited.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

851rteac

1          That being said, I don't remember which court
2   conference it was, your Honor.  It may have been after the
3   April 11th conference, I went back to the Department of
4   Education office, Teresa Europe's office, to check the inbox or
5   the box where they would normally keep the summary sheets of
6   the faxes that come in.
7          I'm going to go a little bit out of chronology here.
8   I subsequently spoke to their tech person to get some
9   information about their fax machine, which is a Brother fax
10  machine.  Apparently, that fax machine spits out, I'm sorry for
11  lack of a better word, those summaries every 50 faxes that are
12  received.
13         When I went to the office, they don't maintain them as
14  my office does.  As a litigation office, we save those fax
15  summary sheets.  They didn't have for that date or any dates
16  before that time.  When I spoke to the tech person, he told me
17  that the memory of that fax machine is I think approximately
18  200 faxes.  And when he checked, it wasn't going back to the
19  4th.
20         That being said, your Honor, I think what I need to
21  add is in, addition to that fax that was sent to the Department
22  of Education, an email, more than one email, was sent to an
23  attorney in the discipline unit as well as to Terry Europe,
24  where Mr. Lewenstein's email that is the subject of counsel's
25  application was attached.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

851rteac

1          THE COURT:  Let me make sure I got that.  An email was
2   received by Ms. Europe and somebody else at the board of ed.,
3   and they also had the two documents in dispute attached?
4          MS. GREENFIELD:  The April 3rd email from Mr.
5   Lewenstein, the one that starts "To All," "Hello All," "Hi
6   All."
7          THE COURT:  They are both April 3 and they are both
8   "Hi All."  But one of the two emails.
9          MS. GREENFIELD:  Yes, your Honor.
10         THE COURT:  I guess the question now becomes:  Subject
11  to further argument by Mr. Fagan, with the milk already spilt
12  or the water under the dam, or whatever the appropriate bad
13  analogy is, on the faxes, should we be focusing on the emails
14  for a minute?
15         MR. FAGAN:  Your Honor, does the Court want me to
16  address the issue of the faxes first or the emails?
17         THE COURT:  Sure.
18         MR. FAGAN:  The issue of the faxes, if those fax logs
19  are gone, then I want the opportunity to make an NTL

Page 3

        (71438530)_(1)_05 01 08 - MJ Peck Conference.txt
20  application, an application for sanctions under NTL. We were
21  here, your Honor, on April 10th. Ms. Greenfield was here in
22  court on that day. That's the first time we find out about
23  this fax log. The fax cover sheet, I'm sorry, I misspoke.
24          The reason we need this information is we believe that
25  it's highly --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    7
    851rteac
1           THE COURT: Stop for one minute. It may be, and maybe
2   I will change my mind on which you should address first, that
3   who sent the email may well give you the information you need,
4   assuming that there is not going to be any claim that the email
5   is privileged or something else.
6           Let me hear from Ms. Greenfield on whether you're
7   willing to produce the emails or email. Yes, it is emails.
8           MS. GREENFIELD: Yes, they are emails, your Honor. We
9   have been waiting for the plaintiff's application which the
10  Court gave them permission to file on April 11th regarding the
11  privilege of emails. We have been waiting. We were here on
12  April 11th. I checked the fax machine at that time. I did not
13  contact the sender of the emails that Ms. Europe received to
14  confirm whether that individual is the one who sent the fax. I
15  did not.
16          THE COURT: Let's take this in baby steps, since it's
17  4:15 and there are a lot of you here and there are
18  demonstrations supposedly going on outside or something.
19          MS. GREENFIELD: They're over, your Honor.
20          THE COURT: That's good. So you all can get home
21  after this. But I'd like to have that happen sooner rather
22  than later.
23          Do you have any problem turning over the two emails
24  you referred to?
25          MS. GREENFIELD: No, your Honor.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    8
    851rteac
1           THE COURT: Do so. Mr. Moerdler?
2           MR. MOERDLER: If your Honor please, if the Court will
3   permit me a preliminary question that you posed, which is: Is
4   there a claim that the contents of email are privileged being
5   based on something that Mr. Fagan did or did not say? If the
6   answer to that question is yes -- is it yes, Mr. Fagan?
7           MR. FAGAN: The answer is the emails themselves, the
8   Florian Lewenstein emails, are privileged.
9           MR. MOERDLER: Is that because of something that
10  discloses advice you gave?
11          MR. FAGAN: It's because it discloses advice I gave,
12  because it discloses litigation strategy. We outlined that
13  in --
14          MR. MOERDLER: That's all I want to know. Your Honor,
15  at this point I'm required under the canons to advise the Court
16  that the representation by Mr. Fagan that it discloses advice
17  that he gave constitutes a violation of the disciplinary rules
18  of the State of New York as adopted in the model code in that
19  it represents an attempt to intimidate an adjudicatory officer,
20  an administrative judge, by a threat of an ethics violation.
21  I'm constrained to ask the Court to forward this to the
22  disciplinary committee for the First Department.
23          MR. FAGAN: Your Honor, so we can be clear, I'm happy
24  that Mr. Moerdler finally made that application so I can
                            Page 4

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt
25    finally get Mr. Moerdler himself before the disciplinary
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

851rteac
1    committee on the outstanding issues between him and me.
2         THE COURT:  Gentlemen, gentlemen, stop.  Anyone who
3    wants to go to the disciplinary committee has the absolute
4    right, as I understand it, to do so on their own.
5         MR. FAGAN:  Thank you, your Honor.
6         THE COURT:  At this point I'm not taking any action on
7    disciplinary matters to the First Department, to this court's
8    disciplinary committee.
9         I will note for the record -- and maybe we'll get to
10   that, maybe everybody will calm down and we can start talking
11   about this case on the merits instead of whatever -- that I did
12   read not the attachments but Mr. Moerdler's affidavit submitted
13   to Judge Marrero with respect to the disqualification
14   application, which ends with him asking me to submit you to the
15   Southern District disciplinary committee.
16        As of now, absent further papers on that subject, if
17   you two want to beat each other up in front of various
18   disciplinary committees, you don't need my permission to make
19   the appropriate filing.  I'm not doing it yet, for anybody.
20        MR. FAGAN:  Thank you, your Honor.
21        THE COURT:  With that, I think we were back to will
22   you give them the emails and, to make matters easier or faster
23   now, maybe, can you tell who the email sender is?
24        MS. GREENFIELD:  Your Honor, I think there is one
25   other issue that needs to be addressed.  We have these letters
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

851rteac
1    that counsel keep sending requesting the Court have this
2    conference and the Court granted counsel permission to make a
3    motion, and that hasn't been done yet.
4         THE COURT:  I'm not saying the document is privileged,
5    that if it is privileged the privilege hasn't been waived, or
6    anything else.  To the extent that you all would like to spend
7    my tax dollars on the city side and your own time and money
8    doing motions, I will get to them when I get to them.  But it
9    may well be that once we see who the sender of the material at
10   least via email is, that the allegations that you somehow
11   intercepted -- you or your client, not you personally --
12   intercepted communications or that there is a privilege that
13   wasn't waived or anything else -- and there we go.
14        On a very fast read, to either of you know who Krinsky
15   is?
16        MS. GREENFIELD:  Your Honor, I don't know him
17   personally.  He has litigated against my office.
18        MR. FAGAN:  I know him.  His name is Richard Krinsky.
19   He is not one of us, your Honor.  We will take the appropriate
20   action.
21        What is important, your Honor, is to also
22   communicate -- may I go back now to the fax, the issue of the
23   fax?  Now that we have this, I assume that this is the only
24   email.  Is this the only email?
25        THE COURT:  There are two of them here.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

851rteac

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt

1  MS. GREENFIELD: There are two. I believe Mr. Krinsky
2 also sent an email, the same email, to another attorney. His
3 name begins with a T-A-E. But he didn't keep his email. It
4 was sent to Terry Europe, but he doesn't have the email that
5 Mr. Krinsky sent him. It's the same one.
6  MR. FAGAN: Could we then have a very simple order
7 that Ms. Greenfield turns over whatever emails she's got,
8 however many there are, Bates stamp them according to your
9 Honor's rules, and that will be the end of the issue as it
10 relates to the emails?
11  THE COURT: Any problem with that? I take it it's
12 just these two.
13  MS. GREENFIELD: There was an email that wasn't about
14 Mr. Lewenstein. I think it recited a case, had a case
15 citation. But this is the one that's April 4th at 12:41, to
16 Nancy Ryan, which has the Lewenstein email underneath it, and
17 then the one dated April 7th at 10:36, which refers to Denise
18 Gobell, who used to be a plaintiff in this lawsuit. I'm sorry,
19 your Honor. Underneath that one is the other email about
20 matter of NTSE Communications, Inc.
21  THE COURT: Is that the email --
22  MS. GREENFIELD: The other email.
23  THE COURT: So the two stapled things, one of which is
24 two pages, the April 4 email, and the other of which is 7
25 pages, the last email in the chain being an April 7 at 10:36
     SOUTHERN DISTRICT REPORTERS, P.C.
      (212) 805-0300

               12
851rteac
1 a.m. email to Teresa Europe, are those the only two emails that
2 the board of ed. has about the Florian email that was the
3 subject of prior proceedings in this proceeding?
4  MS. GREENFIELD: Your Honor, you know they have the
5 email that was faxed.
6  THE COURT: Right. In terms of emails, these are the
7 only emails received by the board of ed., yes?
8  MS. GREENFIELD: By email, yes.
9  THE COURT: Thank you.
10  MR. FAGAN: Your Honor, I'll accept that
11 representation. What we'll do, Ms. Greenfield and I will mark
12 these so we have them clearly documented.
13  THE COURT: That's fine.
14  MR. FAGAN: May I go back to the issue of the fax
15 machine, your Honor?
16  THE COURT: Yes.
17  MR. FAGAN: I have a Brother fax machine. I've had
18 Brother fax machines. For anyone to suggest that the brother
19 fax machine does not print out something at the top of the fax
20 I believe is --
21  THE COURT: What would you like to do? Do you want
22 Ms. Europe's deposition to see if she whited it out despite
23 saying that she didn't? Do you want to hire a tech person?
24 I'm not taking lawyer representations about technology. Do you
25 want to higher Kroll? Do you want to hire any of the
     SOUTHERN DISTRICT REPORTERS, P.C.
      (212) 805-0300

               13
851rteac
1 e-discovery vendors? Do you want to hire whoever? I'm not
2 endorsing anyone, just one name came to mind. Do you want to
3 spend your money on that?
4  MR. FAGAN: I would like Ms. Europe's deposition on
5 the issue of that fax, that fax transmission of the email.
         Page 6

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt

```
 6          THE COURT:  I will give it to you, and I will
 7   thereafter shift costs under Rule 37 if nothing new is
 8   developed, considering it as if it's a motion.
 9          Ms. Greenfield, keep your time records.  I know you're
10   not an hourly employee.
11          MS. GREENFIELD:  We do keep time records, your Honor.
12   We're required.
13          THE COURT:  Good.
14          MS. GREENFIELD:  Your Honor, I would like to object,
15   however.  This is not an issue of how the Department of
16   Education went out and snuck and got a communication of the
17   plaintiff.  The issue right now is plaintiff's claim of
18   privilege as to these documents.  He can assert them in a
19   motion without any of this other information.
20          THE COURT:  I'm trying to do this cost-effectively for
21   all of you and, frankly, efficiently for my time.
22          If this is the only issue that puts aside everything
23   else about these emails, I would be willing to give you an hour
24   deposition of Ms. Europe strictly limited to the receipt of the
25   faxed version of the Florian emails under cover of the plain
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                14

851rteac
```
 1   white sheet of paper on which are the words, "Terry, Something
 2   you should see 4/4/08" and a phone or fax number which I think
 3   is Ms. Europe's, period.
 4          If she says, and the Court credits it, that however
 5   strange it may be, there was no fax header on this, I will be
 6   expecting you to pay counsel's costs with respect to the
 7   deposition.
 8          MR. FAGAN:  Your Honor, one more thing.  In addition
 9   to finding out from her how it comes in, we also need to find
10   out -- she sends it to someone else.  She sends the email
11   itself, these two pages and the cover sheet, she sends that to
12   somewhere else.  What we need is it comes in and it goes out.
13          THE COURT:  I've heard nothing that it went out
14   anywhere.  If it does, the question is, so what?
15          MR. FAGAN:  Let me tell you why that's relevant, your
16   Honor.  If it goes out that day from the fax machine into which
17   it came, then there will be a log there also.  There should be
18   a fax legend on that.  The importance of that your Honor is
19   what we need to be able to do is track it backward.
20          THE COURT:  This like an if on top of an if.  If what
21   you are suggesting seems to be that Ms. Europe was smart enough
22   to white it out and perjure herself before this Court, or its
23   equivalent even though she was not technically under oath, but
24   she then willy-nilly sent it out to other people with the
25   incoming fax legend that it originally came in from, that's
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                15

851rteac
```
 1   lots and lots of ifs.
 2          If you tell me that you're not asking for any other
 3   relief on these emails, I will give you that one-hour
 4   deposition of Ms. Europe.  If you're still telling me you want
 5   all sorts of sealings and callbacks and injunctions about the
 6   use of the emails and other proceedings, then you are going to
 7   have to do what you were told to do three or four weeks ago,
 8   which is make an appropriate motion that these are indeed
 9   privileged emails and were not revealed directly or indirectly
10   to the board of ed. by one of your clients.
```

Page 7

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt

11          MR. FAGAN:  Your Honor, we did in fact file an order
12 to show cause.  We submitted an order to show cause with a
13 declaration from Florian Lewenstein.
14          THE COURT:  If you're prepared to say that that is
15 your motion and that's what you want to rest on, that's fine,
16 I'll wait for opposition papers and I'll rule on it.  That does
17 not -- well, I won't preview the ruling.
18          MR. FAGAN:  Your Honor, what I'm suggesting to the
19 Court is that the issue that we have about the email, I think
20 what we ought to do is first, as your Honor suggested, first
21 have the deposition of Ms. Europe, limit it to this one-hour
22 deposition, which is fine, allow us to make inquiry about the
23 coming in and the going out.  The going out is important, your
24 Honor.
25          Then, based on that, I would hope that the Court would
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              16
851rteac
1 also give us an opportunity to bring our own expert.  We don't
2 need the actual machine.  All we have to know is the model
3 number.  She said it was a Brother fax.  We don't know the
4 model number.
5          THE COURT:  Counsel, this is putting the cart before
6 the horse.  Where is all of this going?  You wanted to know who
7 leaked it to the board of ed.  You now know at least one person
8 who leaked it to the board of ed.  Do what you want.
9          MR. FAGAN:  Thank you, your Honor.
10          THE COURT:  If you want to sue that person in state
11 supreme, whatever.  You're not suing them here.  That's a
12 separate cause of action.
13          MR. FAGAN:  Yes, your Honor.
14          THE COURT:  If you want to go to the U.S. Attorney's
15 office, since you cited a criminal statute, be my guest.  I'm
16 not endorsing it.  I think it's ridiculous.  But, because right
17 now you used the word "interception," etc., you now know at
18 least in one way that it's not the board of ed. -- I hate to
19 insult the board of ed., but I'm not sure they have the
20 technical ability to intercept faxes.  But be that as it may.
21          If you want to do what you want to do outside of my
22 courtroom, that's fine.  If you want to do everything that you
23 have put forth in your order to show cause, then what you have
24 to do is prove to me that this is a privileged email that was
25 misused by the board of ed.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              17
851rteac
1          Right now, being as Mr. Krinsky got the email -- I
2 don't know where -- as far as the board of ed. is concerned,
3 it's not a privileged document.  If you have some remedy
4 against Mr. Krinsky or if there is somebody else and it's super
5 relevant that Professor Moriarty sent them the fax, you see the
6 relevance.  As of this point, unless you prove that Krinsky
7 stole something or whatever, there is no privilege.
8          MR. FAGAN:  Your Honor, I'm not suggesting that the
9 game is afoot nor that Moriarty is in here.  What I am
10 suggesting, however, is that under 18 U.S.C. 2511(d)(2) no one
11 has to actually reach out to intercept the email.  As long as
12 they were not a knowing, intended recipient, if they used the
13 emails in an inappropriate way, there may be a potential
14 problem for them.
15          THE COURT:  Bring a lawsuit in state supreme or go to
                        Page 8

```
          (71438530)_(1)_05_01_08 - MJ Peck Conference.txt
16    the U.S. Attorney's office.
17              MR. FAGAN:  Thank you, your Honor.
18              THE COURT:  I'm sorry.  2511 what?
19              MR. FAGAN:  2511(2)(d).
20              THE COURT:  Let me read it, since we're talking
21    criminal statutes.  Thank on.
22              MR. FAGAN:  Going down to sub (a).
23              THE COURT:  There is no sub (a).
24              MR. FAGAN:  Your Honor, I cited the actual statute.
25              THE COURT:  I have 18 U.S.C. 2511.  I've got (2).
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                              18
      851rteac
1               MR. FAGAN:  (d).
2               THE COURT:  Yes.  (d) has no subparts.  So either you
3     have an outdated U.S. Code or mine, which is the 2008 bench
4     book edition, has somehow been superseded.
5               MR. FAGAN:  Your Honor, before I come back here on
6     2511(d)(2), I'll be happy to provide the exact quote.  I took
7     the quote directly from Loewen Law.
8               THE COURT:  That was your first mistake.  That's why
9     we have the U.S. Code.
10              Please, please, please.  In any event, if you want to
11    sue them, if you want to go to the U.S. Attorney's office,
12    that's not my problem.
13              MR. FAGAN:  All we want to do right now, your Honor,
14    is follow up on the issue of the fax machine itself.
15              THE COURT:  Why?
16              MR. FAGAN:  Why, your Honor?
17              THE COURT:  The only purpose is to pursue a claim in
18    another court.  Let the U.S. Attorney do its discovery.  They
19    have great subpoena powers, they have great warrant powers.  I
20    sign their search warrants, when justified, the weeks I'm on
21    criminal duty.  If they want to do it, fine.  If my friends in
22    state supreme want to deal with it, they can deal with it.
23              Right now the only issue that had this Court concerned
24    was that they somehow are misusing a confidential document.
25              MR. FAGAN:  That's correct.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                              19
      851rteac
1               THE COURT:  As of now, whatever the fax of the Florian
2     email was, that same day they got it in an email from, as to
3     them, a nonprivileged, legitimate source.  If you want to
4     pursue Mr. Krinsky, that's fine.  My knowledge of 2511 from the
5     weeks I'm on criminal duty would not seem to have it apply to
6     the board of ed. in any way, shape, or form here.
7               Let's move on to the substance of this litigation.
8               MR. FAGAN:  I agree, your Honor.  But we do want that
9     one-hour deposition of Ms. Europe.  What we will find from
10    that -- I'm not going to speculate about what we'll find.  But
11    your Honor offered the deposition.  The deposition is
12    important.
13              THE COURT:  Mr. Moerdler, what is your hourly rate?
14              MR. MOERDLER:  My hourly rate the last time I looked
15    is $875 an hour.  Outrageous, I agree.
16              THE COURT:  Careful, because that's on the record,
17    with a smile.
18              MR. MOERDLER:  I understand that.  Still my view.
19              THE COURT:  Ms. Greenfield, what's your hourly rate?
20              MS. GREENFIELD:  Your Honor, the last time this came
                                Page 9
```

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt

```
21  up was many, many years ago.  And then I was at 250.  I don't
22  know what it is now.  That was before I was a supervisor or
23  maybe the beginning years as a supervisor.  I don't know, your
24  Honor.
25          THE COURT:  Everyone slow down and let me talk.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

851rteac
```
 1  Assuming Ms. Greenfield's rate hasn't gone up, that's $1,125
 2  that you and your client will be on the hook for if you get
 3  nothing from this deposition, because I'm treating it as part
 4  of a Rule 37 motion.  Unless you get her to admit that indeed
 5  there was a fax legend on the fax that she received or that she
 6  faxed it out in such a way that that fax legend appeared, I am
 7  going to charge these costs to you.
 8          If that is acceptable to you, I will give you the
 9  deposition despite Ms. Greenfield's objection and the minor, if
10  not nonexistent, relevance of it now.  If that is not
11  acceptable, then I'm going to ask you to make a motion for
12  whatever you want so I can use officially Rule 37's powers as
13  well as my inherent powers on it.
14          MR. FAGAN:  What your Honor is doing, I believe, is
15  prejudging an issue and imposing costs before I have --
16          THE COURT:  They will not be imposed upon you if you
17  prevail.  I'm just giving you your risks.
18          MR. FAGAN:  If your Honor is going to limit me to the
19  ability of asking her basically the one question of did she
20  white out the incoming fax legend, then I've already got her
21  statement on the record.
22          THE COURT:  That's why I wonder what you're doing in
23  this deposition.
24          MR. FAGAN:  The reason for the deposition, your Honor,
25  is that document has been through three iterations.  It appears
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

851rteac
```
 1  at different times with different markings on it.  Now we find
 2  out about the emails.  This is the first time we found out
 3  about the emails.
 4          THE COURT:  You've convinced me.  No deposition unless
 5  you make a motion.  Let's move on.
 6          MR. FAGAN:  Your Honor, I'm prepared to pay it.  I'm
 7  simply objecting to that predetermination.
 8          THE COURT:  Counsel, the predetermination is based on
 9  this:  Either Ms. Europe lied to me, in which case she will be
10  referred to the disciplinary committees by this Court, or she
11  didn't lie, and that when she received this fax it is in the
12  way it is attached to your April 18th letter to Judge Marrero,
13  which is to say as the 4408 white sheet of paper with no fax
14  legends.
15          MR. FAGAN:  Your Honor, I'll pay for the deposition,
16  we'll get her statement, and then we'll take the necessary
17  steps.
18          MS. GREENFIELD:  Your Honor, I just want to clarify
19  one issue because there is a little confusion here.  Counsel is
20  talking about whether or not Ms. Europe sent out this email or
21  this fax.  The fact is that Mr. Lewenstein's letter was sent
22  out by email to my office.  I don't know that it was the email
23  that was faxed or the email --
24          THE COURT:  Since you presumably therefore have the
25  copy, see what fax legends are on it, and, without waiver of
```

Page 10

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

851rteac

1  privilege if there was anything substantive, present to Mr.
2  Fagan the appropriate fax legends, etc.  If it merely shows a
3  fax from Ms. Europe to your office and no prior fax legends,
4  which sometimes can be seen if one takes it and refaxes things
5  around -- either it has it or it doesn't.  Please.  It's 4:45.
6  Let's try to get to some merits.
7            What else?
8            MR. FAGAN:  That was it on the issue of the faxes and
9  the emails.
10           THE COURT:  Good.
11           MR. FAGAN:  Can we have a date by which we can take
12  this deposition, your Honor?
13           THE COURT:  How soon do you want it, how soon is it
14  convenient for at least the lawyers who are here who will be in
15  attendance?  Two weeks?
16           MR. MOERDLER:  Your Honor, either I or one of my
17  colleagues will be there at any time the Court names.
18           MR. FAGAN:  And your colleagues will be there at their
19  rate, not yours?
20           THE COURT:  Obviously.  And try to find a less senior
21  colleague so the prices don't go up, if there is anyone who
22  bills higher than you.
23           MS. GREENFIELD:  Your Honor, I'll confer with Ms.
24  Europe, because she is disciplinary counsel and there are other
25  hearings and things scheduled.  I will speak to her tomorrow.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

23

851rteac

1            THE COURT:  Within two weeks unless there is
2  absolutely insuperable inability to find an hour that works for
3  the principal players here.  That's the end of the email saga,
4  right?
5            MR. FAGAN:  Yes, your Honor.
6            THE COURT:  Good.  Now let's get to my agenda, which
7  is:  where are we on responding to the complaint?  UFT I assume
8  still has more time.  where are we from the city?
9            MR. MOERDLER:  If I may be heard for a moment.  It is
10  my understanding from Mr. Fagan directly that he proposes to,
11  as he has repeatedly stated he will, serve yet another amended
12  complaint.  He must do so, because there is an inconsistency
13  between the complaint that's on file, what was served, and the
14  like.  As I understand it, he proposes to make those
15  inconsistencies now consistent.
16           There are parties named in one pleading that are not
17  named in another.  There are people that are not in the caption
18  but they are tucked away somewhere in the exhibit and they are
19  plaintiffs.  I'd like to have a pleading to respond to.
20           MR. FAGAN:  Your Honor, when we were here last time,
21  your Honor gave a very specific date by which we would file our
22  amended complaint.  We didn't attempt to go out afterwards and
23  file another pleading without having everybody in, everybody
24  served.  They are all here.
25           THE COURT:  Can everybody learn to get to the point?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

24

851rteac

1  Are you filing another amended complaint or not?
                        Page 11

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt
```
 2          MR. FAGAN:  I would like to, your Honor.
 3          THE COURT:  To drop or add?
 4          MR. FAGAN:  To specifically add names.
 5          THE COURT:  To add just additional plaintiffs?
 6          MR. FAGAN:  Additional plaintiffs and one additional
 7   cause of action, an LMRDA cause of action.
 8          THE COURT:  Against the UFT?
 9          MR. FAGAN:  Against the UFT, yes, your Honor.
10          THE COURT:  I'm rusty on my labor relations.  Does
11   that have to go before the NLRB first?
12          MR. FAGAN:  No, your Honor.  Actually, your Honor
13   decided the case, it was Operaji v. UFT.  Part of that was an
14   LMRDA case.  It does not have to go to the board first.  The
15   court has discretion to allow that complaint.  I can give your
16   Honor the case law in a letter if you want.  But it's allowed.
17          THE COURT:  I guess the only thing I'll say on that,
18   my recollection of my prior decision was that it was a hybrid
19   claim.  Is that what you are doing here or something else?
20          MR. FAGAN:  It's because of the actions that have
21   occurred in the last month and a half to two months which
22   allows us to have the LMRDA claim, your Honor.
23          THE COURT:  Is it a hybrid claim or a direct LMRDA
24   claim?
25          MR. FAGAN:  It's a direct LMRDA claim.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                              25
851rteac
```
 1          THE COURT:  I guess I will tell you this.  If you want
 2   to amend to add that, I don't know if the UFT or the city is
 3   currently planning to move to dismiss, and Mr. Moerdler is
 4   shaking head yes, frankly, unless something has changed and
 5   since you have a lot of folks here who I assume are your
 6   clients, I am not going to be trying in this lawsuit
 7   disciplinary hearings as to individual plaintiffs.
 8          I guess what I'm trying to say is on the number of
 9   plaintiffs, to the extent that a lot of this case involves
10   policies, the policy of the board of ed. to have these rubber
11   rooms, with quotes around "rubber rooms," as I always do, the
12   policy of the UFT not to represent your clients because of the
13   mere fact that you have sued them, the policy of how these
14   hearings are conducted, to the extent that's what we're looking
15   at, I sincerely doubt that you need any more than the very
16   numerous plaintiffs that you already have and indeed probably
17   don't need more than a handful.
18          Knowing that discovery is still stayed other than this
19   one-hour deposition of Ms. Europe on this particular
20   extravaganza of the emails, because of the importance you've
21   put on that, if you want to take more time and make a lengthier
22   motion to dismiss -- I run a rocket docket, but I'm not sure
23   that I'm going to allow what sounds like it is going to be very
24   extensive discovery until the pleadings are fully resolved.
25          If with that caveat and that warning you want to do
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                              26
851rteac
```
 1   one more amendment, then, unless somebody really objects -- and
 2   Mr. Moerdler, who is good with body language, is shaking his
 3   head in the no direction that he doesn't object -- tell me when
 4   you want to do it.
 5          MR. FAGAN:  By next Friday, your Honor.  Do you want
 6   to make it longer?
```
                         Page 12

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt

7    MR. LEWENSTEIN:  Yes.
8    THE COURT:  Mr. Lewenstein and I are on the same page,
9  which is the last time you were so gung-ho you needed two or
10  three extra extensions.  I'd rather use my rubber stamp that
11  says extension granted for something else.  Tell me what you
12  need, do it.  If you do it faster than the absolute end date,
13  that's fine.  What date do you and Mr. Lewenstein want?
14    MR. FAGAN:  He would like 30 days.
15    THE COURT:  If you get it in sooner, that's great.
16  I'm not sure that I will, if I give you 30 days, extend it
17  thereafter.  So don't leave it until the last minute.  Fine.
18  Is this up to the second or third amended?
19    MR. FAGAN:  This is the second amended.
20    THE COURT:  Second amended complaint due July 1.
21    MR. FAGAN:  No, no.  June 1, your Honor.
22    THE COURT:  Thank you.  I was looking at the wrong
23  place on the calendar.  Due June 2, since I don't think we'll
24  make you file on a Sunday.  You need to get it into the ECF
25  system, which means try not to have nearly as many pages, or if
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                            27
851rteac
1  you do, talk to the ECF folks.  That's beyond my technical
2  abilities, too.
3    MR. FAGAN:  I will, your Honor.
4    THE COURT:  I know the UFT is planning a motion to
5  dismiss, from Mr. Moerdler's body language.
6    MR. MOERDLER:  Yes, your Honor.
7    THE COURT:  Ms. Greenfield, is the city?
8    MS. GREENFIELD:  Your Honor, from a review of the
9  current pleadings, there was a motion to dismiss at least in
10  part.  I really would have to see the second amended complaint.
11    THE COURT:  All right.  Response to the complaint,
12  which I assume will be a motion to dismiss, what's your
13  pleasure?  Two weeks, 20 days, 30 days?  No more than that,
14  please.
15    MR. MOERDLER:  I think I'd like to take 20 days, if I
16  may, your Honor.
17    MS. GREENFIELD:  He has better staff than I do, your
18  Honor.  I was looking more for 30 days, especially if the
19  complaint.
20    MR. MOERDLER:  That's fine.
21    THE COURT:  June 30 for the motion to dismiss.  And to
22  the extent between now and June 30 that the three principal
23  lawyers can sit down and perhaps find a way to simplify the
24  pleadings and avoid motion practice, you will make Judge
25  Marrero and me very happy, and I guess you'll make Judge
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                            28
851rteac
1  Marrero even happier, since at this point the motion to dismiss
2  goes to him.  He may retaliate by sending it to me for a report
3  and recommendation, but I'm just here to serve.
4    Do you know now whether you'll need more than the
5  normal two weeks to respond, or do you want to wait until you
6  see the motions and ask for more time at that point?
7    MR. FAGAN:  I'd like to see the motions first, your
8  Honor.
9    THE COURT:  In the event that the complaint comes in
10  earlier than June 2, you'll have 30 days from whenever it is to
11  respond.  If Mr. Fagan and his clients move faster, that will
                        Page 13

just give you more time to deal with the motion. But these are the outside dates.

Since discovery is still going to be stayed at this point, what else do we need to do?

MR. FAGAN: Actually, your Honor, I'd like to address that issue of discovery being stayed. The Court had said once before that discovery was stayed until all the parties were in. If necessary, I'll make a formal application for limited discovery. I think there are things that we could do in order to assist in preparing for the motion to dismiss and our responses to the motion to dismiss.

THE COURT: Motions to dismiss are based on the pleadings. However many smoking guns you find in their documents or whatever they would find in yours can't be

submitted on the motion to dismiss.

If you want to make an application in this regard on paper with a copy of your proposed limited discovery attached, I'll listen to the motion and expect a relatively prompt response from whichever defendant you're aiming it at or both defendants, and we'll go from there.

MR. FAGAN: Thank you, Judge.

MS. GREENFIELD: Your Honor, I have one issue. As counsel pointed out previously, the UFT defendants were served with an amended complaint that has 29 plaintiffs and the city was served with an amended complaint that has 31 plaintiffs.

THE COURT: For at least one of those plaintiffs I did a memo endorsement.

MS. GREENFIELD: Denise Gobell, that's correct. The other one was Betina Propikeya.

THE COURT: Talk to Mr. Fagan and see if you all can work out how many plaintiffs there will be in the next version of it. Please, part of the problem may be because of the bulk of the documents. Let's make sure that what gets sent to me as a courtesy copy, what gets filed in ECF, and what gets served on Ms. Greenfield and Mr. Moerdler, and I guess we have the missing defendant of Ms. Combiner, however that is pronounced --

MR. MOERDLER: I believe we are now going to be acting for her. She has now retained us.

THE COURT: So you will accept service of the second amended on her behalf?

MR. MOERDLER: Yes.

THE COURT: Make sure that what you give each of them, me, and the ECF version are all the same.

MR. FAGAN: Your Honor, in fact what was --

THE COURT: You don't need to explain to me whether there was a glitch previously or whether they can't count. Just get it right this next time without saying you didn't get it right previously.

MR. FAGAN: We will, your Honor.

THE COURT: Thank you. Mr. Moerdler?

MR. MOERDLER: Your Honor, I would like to make two requests. The first request is that, if possible, the names of the plaintiffs be in the caption rather than scattered elsewhere.

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt
```
17          THE COURT:  That is required and has to be so in the
18  complaint.
19          MR. MOERDLER:  Secondly, I would ask that we be served
20  with any exhibits that may be filed or may be deemed to be part
21  at the same time as we get the pleading.
22          THE COURT:  So ordered.
23          MR. MOERDLER:  Thank you.
24          THE COURT:  Any exhibits to the complaint?
25          MR. FAGAN:  Yes, your Honor.  Just for clarification,
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                31
851rteac
```
1   because it is important, Mr. Moerdler, did you not receive an
2   exhibit binder with the amended complaint?
3           MR. ROSS:  When we received the service copy, we
4   received a binder of exhibits, yes.  But that was different
5   than what was filed.
6           THE COURT:  Whatever.  Get it right, folks, please.
7           MR. FAGAN:  Thank you, Judge.
8           THE COURT:  Officially, for the record, since you
9   reminded me that my prior stay was until all parties were
10  served, discovery is stayed until further order of the Court in
11  response to Mr. Fagan's motion or anyone else's application to
12  allow discovery other than the one-hour Ms. Europe deposition.
13          At the risk of prolonging things, let me ask one other
14  question.  This is for everybody.  We seem to be in continuing
15  circles upon circles in that, as I understood it, one of the
16  prior issues was that the, whatever they're called, internal
17  board of ed. disciplinary hearings were taking too long, which
18  is why the plaintiffs were, in plaintiffs' view, being held in
19  the disciplinary rooms, the so-called rubber rooms, longer than
20  appropriate.
21          I believe, from reading between the lines or maybe
22  reading on the lines, that previously the UFT represented
23  teachers at these hearings.  No?
24          MR. MOERDLER:  The UFT does not represent teachers at
25  the hearings.  NYSUT, an entity which is not a party to this
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                32
851rteac
```
1   litigation, does.  We do not.
2           THE COURT:  What does that stand for?
3           MR. MOERDLER:  New York State United Teachers.
4           THE COURT:  N-Y-S-U-T.  OK.  And they are not doing it
5   anymore, is that where things stand?  I thought it was UFT
6   lawyers.
7           MR. MOERDLER:  Your Honor, I'll say it as briefly as I
8   know how.  The applications, comments, affidavits, and
9   assertions made by Mr. Fagan persuaded NYSUT that it had an
10  ethical conflict when it was charged with having engaged in
11  misconduct by the misrepresentation.  Therefore, it recused
12  itself from representing the teachers.
13          THE COURT:  At the risk of prolonging my misery, or
14  your misery for having to be in front of me -- I can't
15  pronounce it right -- should NYSUT be a party to this action?
16  Frankly, I always thought we were dealing only with the UFT.
17          MR. FAGAN:  Your Honor, we were dealing only with the
18  UFT.  The reason that NYSUT gave for withdrawing its
19  representation is because it had a conflict of interest between
20  two clients, meaning the teachers and the UFT.  That's in the
21  letter from this Mr. Sandner.
```
                                Page 15

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt

22          What we have done since that time is, in light of your
23    Honor's stay -- your Honor indicated that if we wanted a stay
24    of the 3028 hearings, we had to go to the state court.  We are
25    in fact going to the state court in multiple proceedings.  We
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    33
      851rteac
1     are even going to the Appellate Division because there are
2     inconsistent stay orders coming from judges.  There are four
3     judges.  Three of them have ruled one way, another one has
4     ruled another way, and all of it is causing confusion.
5           I will consult with my clients about whether we join
6     NYSUT in this litigation or we deal with them in the state
7     court.
8           THE COURT:  Where I was going with all of this was not
9     to add more parties to my lawsuit but to ask, and I guess I'm
10    now asking in the air with a party that isn't here, why there
11    could not be the appropriate conflict waiver or whatever it is
12    to allow what I thought was UFT counsel, who I now learn is
13    NYSUT counsel, to represent teachers at these disciplinary
14    hearings so that life can move forward?  I'm probably not
15    saving myself any work, but I guess I'm saying four or more
16    judges in New York Supreme and five or more in the Appellate
17    Division --
18          MS. GREENFIELD:  And me.
19          THE COURT:  And Ms. Greenfield.
20          MR. FAGAN:  Your Honor, we welcome that suggestion and
21    that advice.
22          MR. MOERDLER:  Your Honor, I believe under the New
23    York State canons, that would be unethical.
24          THE COURT:  It's a nonwaivable conflict?
25          MR. MOERDLER:  Absolutely nonwaivable.
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    34
      851rteac
1           THE COURT:  OK.  Now that I'm not a practicing lawyer,
2     I don't keep my fingers on those rules as much as I had to in
3     the old days.  I do think that I don't know what the expenses
4     of all this are to the plaintiffs.  I certainly know what the
5     expense is to the overworked federal and state court system are
6     and the expense of time.  It is really time for the parties
7     here to step back and see what can be done to put an end to
8     five or eight or however many lawsuits are going around all
9     over the place and see what can be resolved.
10          Obviously, certain things can't be resolved that are
11    in front of this Court.  But the hearings going forward, not
12    going forward, using private lawyers, not using private
13    lawyers, using NYSUT lawyers, I would strongly recommend that,
14    without violating ethical obligations that Mr. Moerdler has
15    referred to, if there is a way to calm this down and get some
16    real substantive progress --
17          This case started in front of me, just to be clear,
18    the complaint was filed in January and I saw you on an
19    emergency application on January 28th.  We are now looking at
20    an second amended complaint due June 2, a motion to dismiss
21    coming at the end of June, which means the briefing schedule
22    will run deeply into the summer.  That means there won't be a
23    decision before the next school term begins in September, as
24    well as whatever else is going on in the state courts.
25          If there is a way for lawyers to be as creative in
                SOUTHERN DISTRICT REPORTERS, P.C.
                         Page 16

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt
(212) 805-0300

35

851rteac
1  settling parts of these issues as they are in bringing multiple
2  litigations, it is now time to start going in that direction.
3  Maybe it's impossible, but I certainly would suggest that you
4  try that.
5          MR. FAGAN:  May I take one step further based on that
6  suggestion, your Honor?  Would the Court permit me to make an
7  application for the appointment of a special master on certain
8  of these issues?  Perhaps the Court doesn't need to get
9  involved in it, but perhaps if the parties all sit down with
10  someone that has authority.
11          THE COURT:  There are two issues as to that.  One, in
12  some ways it is a rare case in a court with very active
13  magistrate judges where special masters actually get appointed.
14  Moreover, special masters don't work for free.  Magistrate
15  judges do work the congressional salary equivalent of working
16  for free.  If you're prepared to pay for a special master that
17  is acceptable to all parties, I would consider it, if all
18  parties want to split the cost.
19          Look, we all know there are lots of good mediation
20  companies out there, former Judge Rosenblatt of the New York
21  Court of Appeals, who is a friend of mine, JAMS/Endispute or I
22  guess they are now just JAMS, and numerous other former judges
23  affiliated with organizations or on their own.  If it's to deal
24  with settlement, there are ways to do it.
25          Frankly, I'm not sure that the biggest picture can be
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

36

851rteac
1  settled here.  From what I have read in your complaint and
2  various other things, the UFT was trying to work with the board
3  of ed. in dealing with some of these problems but wasn't
4  successful, or maybe still are trying to deal with it.
5          I have a great ego, but I think there may be limits to
6  how far I or anyone else as a special master can resolve these
7  sort of problems.  Frankly, if we're going that route, there
8  are regular mediators who deal under I guess it's PERB or
9  whatever with these sort of issues in a contractual sense.
10  Whether they are allowed to get involved in this or not, I
11  don't have a clue.
12          MR. FAGAN:  I was just following up, your Honor.
13          THE COURT:  Be creative.  If you want to pay for a
14  special master, chat with your opposing counsel and see if they
15  are willing to chip in.  If not, if you and your clients are
16  willing to deal with that, if you want a settlement, first of
17  all, you don't need my permission to have a settlement
18  conference in front of somebody else.
19          Even if you did, if you agree that you want to do it
20  at whoever's expense and you want me to appoint your agreed-
21  upon mediator as a special master to give them some additional
22  settlement powers -- I'm not sure that in settlement anybody
23  has any power other than hoping the parties can reach an
24  applicable resolution.  I'm willing to hear you all be
25  creative, but the court has no money to pay special masters.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

37

851rteac
1          MR. FAGAN:  I didn't expect it, Judge.  Thank you.
2          THE COURT:  I'm not going to schedule another
                              Page 17

(71438530)_(1)_05 01 08 - MJ Peck Conference.txt
3  conference. Let's hope that the requests for emergent relief
4  on anybody's side are kept to where it's really essential. If
5  a request is made, it will be acted upon promptly. What the
6  results will be of any such request remain to be seen. I think
7  you've seen I'm not shy bringing you all in when you are doing
8  what you are supposed to be doing and have an emergency problem
9  that is related directly or indirectly apparently to this
10 Court.
11          MR. FAGAN:  Thank you, your Honor.
12          THE COURT:  The usual drill. First, pursuant to 28
13 U.S. Code Section 636 and Federal Rules of Civil Procedure 6
14 and 72, although I suppose you all know this by now, anyone who
15 has any objections to anything I've ruled upon today has ten
16 business days to file those objections with Judge Marrero. The
17 ten business days starts immediately, since you're hearing what
18 I've ruled, you have heard what I have ruled regardless of how
19 long it takes you to get the transcript from our crack court
20 reporter.
21          Failure to file objections constitutes a waiver of
22 those occasions for all further purposes, including any
23 ultimate appeals to the Second Circuit or, heaven forbid,
24 beyond that to our friends in Washington.
25          Also, it is my practice to have the court reporter
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                                    38
851rteac
1  take down all the arguments, all the rulings, all the
2  kibitzing, all the Sherlock Holmes references, whatever may go
3  on at a conference, and to require the parties to pay for the
4  transcript and buy the transcript so it's of record for any
5  further use, whether that's refreshing my memory or if Judge
6  Marrero has to get involved or anything else. Unless I hear
7  any economic objection now, on a 50-50 basis between the
8  plaintiff and the two defendants --
9          MR. FAGAN:  Your Honor, with respect, it ought to be
10 one third, one third, one third, I submit.
11          THE COURT:  On this hearing there really was
12 uniformity between the city and UFT, so 50-50 seems fair. It
13 may well be there are going to be issues, if we ever get to the
14 merits, where the UFT will really be sitting at your table and
15 you and the UFT will pay half collectively and the city will
16 pay the other half. By suing them, you've forced them to sit
17 at a different table than they otherwise might be at. But
18 since they didn't resolve this issue to your client's
19 satisfaction, I understand that they are sitting at the defense
20 table. So 50-50.
21          We are adjourned.
22          (Adjourned)
23
24
25
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

EXHIBIT "F"

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

| | | |
|---|---|---|
| Teachers4Action, Inc. | : | |
|     On behalf of its Members | : | CIVIL ACTION |
|     And By Florian Lewenstein, | : | 08-cv-548 (VM)(AJP) |
|     Its President and Spokesperson, | : | |
| Twana Adams; | : | |
| Olga Batyreva; | : | |
| Ming Bell; | : | |
| David Berkowitz; | : | |
| Jonathan Berlyne; | : | |
| Jill Budnick; | : | |
| Roslyn Burks; | : | |
| Anthony Caminiti; | : | |
| Jaime Castro; | : | |
| Gloria Chavez | : | |
| Judith Cohen; | : | |
| Josefina Cruz; | : | |
| James J. Cullen; | : | |
| Diane Daniels; | : | |
| Michael Ebewo; | : | |
| Boubakar Fofana | : | |
| Louisa Ganis; | : | |
| Roslyn Gisors; | : | |
| Diana Gonzalez; | : | |
| Joanne Hart; | : | |
| Lisa Hayes; | : | |
| Wendy Hazen; | : | |
| Arnulfo Hinestroza; | : | |
| Michael Hollander; | : | |
| Eleanor Johnson; | : | |
| Rina Johnson; | : | |
| Rafal Robert Kowal; | : | |
| Jane Levine; | : | |
| Hazel Martinez; | : | |
| Michael McLoughlin | : | |
| Raymond Nunge; | : | |
| Julianne Polito; | : | |
| Alena Radtke-Gabriel; | : | |
| Thomasina Robinson; | : | |
| Denise Russo; | : | |
| Paul Santucci; | : | |
| Jennifer Saunders; | : | |
| Jacqueline Sawyer; | : | |
| Brandi Scheiner; | : | |

---------------------------

Alan Schlesinger                          :
Alex Schreiber;                           :
Barbara Segall;                           :
Linda L. Seiffert;                        :
Daniel Smith;                             :
Helena Tarasow;                           :
Gilda Teel;                               :
Eustoquio Torres-Nogueras;                :
Jacqueline Wade;                          :
Nahid Wakili                              :
Nicholas Watson;                          :
Michael Westbay                           :
Mauricio Zapata, and                      :
                          Plaintiffs,     :              SECOND
         - vs -                           :        AMENDED COMPLAINT
                                          :        (WITH JURY DEMAND)
Michael G. Bloomberg,                     :
     Mayor of New York City;              :
City of New York;                         :
Joel Klein,                               :
     Individually and in his capacity as  :
     Chancellor of New York City          :
     Department of Education;             :
New York City Department of Education;    :
Randi Weingarten;                         :
     Individually and as President of     :
     United Federation of Teachers;       :
United Federation of Teachers;            :
Betsy Combier,                            :
     Individually and as agent / representative :
     Of United Federation of Teachers,:
                          Defendants.    :
---------------------------------------------------X


<u>INTRODUCTION</u>

         This action is predicated upon a wrongful course of action that was designed to attack the

institution of tenure and to unlawfully reduce the budget for New York City Public Schools by

reducing the number of tenured teachers, including Plaintiffs.  To accomplish that goal,

Defendants individually and/or jointly (i) violated Plaintiffs' Free Speech, Association, Due

Process, Equal Protections – 1st, 5th & 14th Amendments and Other Constitutionally Protected

Rights & Freedoms; (ii) harassed Plaintiffs and created a hostile work environment; (iii)

retaliated against Plaintiffs when they stood up for their rights; (iv) constructively discharged

certain Plaintiffs; (v) breached contracts with Plaintiffs; (vi) breached their fiduciary duties to

Plaintiffs, including the Duty of Fair Representation; (vii) aided & abetted others in the breach of

contract or breach of fiduciary duties or negligent acts against Plaintiffs; (viii) failed to properly

supervise its/their employees, agents, consultants and others who caused damages to Plaintiffs;

(ix) conspired to defraud, interfere with claims and rights and/or cause other damages to

Plaintiffs; and (x) caused Plaintiffs to be falsely confined. These wrongful acts violated

Plaintiffs' constitutional, statutory and contractual rights.

## **COMPLAINT**

## **JURISDICTION**

1) The Court has original jurisdiction over Plaintiffs' claims based upon alleged violations
   of the 1st, 5th and 14th Amendments, 29 U.S.C. §§ 623(a)(1) and (2), 42 U.S.C. § 1981
   ("Civil Rights Act of 1991"), 42 U.S.C. § 1983 and the Anti-Relation Provisions of Title
   VII and other laws, 29 U.S.C. §§ 411 Sec. 101.a (2), (4) and (5), §§ 529 Sec. 609, §§ 415
   Sec. 105, and §§ 439 Sec. 209. b ("Labor-Management Reporting and Disclosure Act of
   1959," hereinafter "LMRDA"); as well as violations of Title VII of the Civil Rights Act
   of 1964, as amended, 42 U.S.C. § 2000e et seq.

2) The Court has ancillary and/or supplemental jurisdiction of all Plaintiffs' state law claims
   pursuant to 28 U.S.C. § 1367.

3) The claims of each named Plaintiff exceed the statutory limit of this Court, exclusive of
   attorneys' fees, costs and interest.

## VENUE

4) Venue is proper in this Court because one or more of the Plaintiffs live in this judicial

district and one of more of the Defendants live and/or do business in this district, and/or

the Defendants' unlawful acts occurred within this judicial district.

## PARTIES

### Plaintiffs

5) Plaintiff Teachers4Action, Inc.[1] is a not-for-profit corporation incorporated in the State of

New York.

6) Plaintiff Florian Lewenstein (hereinafter "Lewenstein") is the President and

Spokesperson of Plaintiff Teachers4Action, Inc. and is authorized and has standing to

commence and prosecute this action, individually and on behalf of Plaintiff

Teachers4Action, Inc.

7) Teachers4Action, Inc. Plaintiffs are teachers and guidance counselors, both tenured and

untenured, who fall into certain categories, including but not limited to (i) teachers who

are presently re-assigned to Temporary Reassignment Centers (hereinafter "Rubber

Rooms"); (ii) teachers who are being targeted for re-assignment to Rubber Rooms; (iii)

teachers in the midst of the administrative disciplinary process and against whom charges

have been brought; (iv) teachers who were previously re-assigned to Rubber Rooms and

who were terminated, fined and/or suspended without pay, or forced, harassed,

intimidated and/or coerced to accept onerous or unfair deals; (v) teachers who suffer loss

of property, loss of pay and other monetary losses; (vi) teachers who suffer physical or

emotional injuries from being forced into Rubber Rooms; (vii) teachers who cannot get

---

[1] Teachers4Action, Inc.™® is in the process of obtaining tax exempt status under the IRS Code Section 501(c)(3).

other jobs; and (viii) teachers who are otherwise being targeted and victimized as part of
the wrongful course of action.

## Defendants

8) Defendant Michael G. Bloomberg (hereinafter "Bloomberg") is the Mayor of New York
City and in that capacity has direct control over the New York City Public Schools.

9) Defendant City of New York (hereinafter "City") is a municipal corporation that is
responsible for the conditions in the New York City Public Schools.

10) Defendant Joel Klein (hereinafter "Klein") is the Chancellor of the New York City
Department of Education and together with Bloomberg has control over the New York
City Public Schools.

11) Defendant New York City Department of Education (hereinafter "DOE") is Plaintiffs'
employer.

12) Defendant Randi Weingarten (hereinafter "Weingarten") is the President of the United
Federation of Teachers.

13) Defendant United Federation of Teachers (hereinafter "UFT") is the collective bargaining
agent for, and maintains a fiduciary relationship with, Plaintiffs.

14) Defendant Betsy Combier (hereinafter "Combier") is a representative of Defendant UFT.

## GENERAL FACTS

15) Starting in or about 2002, Defendants Bloomberg, City, Klein and DOE determined and
agreed that it would be in the best interests of the City public schools, including all
students and educators involved, for the office of the Mayor of New York City to assume
direct control over the New York City Public Schools and Defendant DOE.  In June
2002, the NYS legislature authorized the NYC Mayor to assume direct control of the

NYC public schools.

16) In or about 2003, in furtherance of this agreement, Defendants Klein and DOE agreed to

the complete reorganization of the DOE so that it came under the control of Defendant

Bloomberg.

17) Defendants Bloomberg and Klein were not motivated to enact this reorganization out of

the best interests of the City public schools, including all students and educators; instead

the motive was primarily financial.

18) Defendants Bloomberg and Klein sought to use the reorganization as a way to achieve

drastic budget reductions and to attack the institution of tenure.

19) Defendant Bloomberg has repeatedly and publicly committed himself to undermining

and/or ending the institution of tenure, and he has on a number of occasions

unsuccessfully attempted to persuade the NYS Legislature to support his efforts.

20) Defendants Bloomberg and Klein and others in Defendant DOE conceived a plan

(hereinafter "The Plan") through which teachers, such as Plaintiffs:

   a)  would be targeted and written up for a variety of allegations that rise to the level

       of an offense for which they could be terminated or suspended;

   b)  would be harassed and subjected to hostile work environments;

   c)  would be reassigned to Temporary Reassignment Centers (hereinafter "Rubber

       Rooms")  where they would be further subjected to harassment and hostile work

       environments;

   d)  would be subjected to disciplinary proceedings under NYS Education Law §

       3020-a (hereinafter "3020-a hearings");

   e)  would be deprived of their constitutional and due process rights;

f)   would be deprived of the rights and the protections afforded them pursuant to

NYS Education Law §§ 3020 and 3020-a;

g)   would be deprived of the rights and protections afforded them under the

Collective Bargaining Agreement Article 21G (hereinafter "Article 21G");

h)   would be forced through adverse determinations or coerced stipulations to resign

or retire, or be subjected to suspension without pay, ruinous fines and other

financial consequences; and

i)   would be subjected to 3020-a hearings conducted by Arbitrators from a

permanent "Rotational Panel," whose dependence on the lucrative fees that are

enriching them causes them to do Defendants' bidding in furtherance of The Plan;

21) Defendants Bloomberg and Klein used the Rubber Rooms in furtherance of wrongful acts

against Plaintiffs.

22) Defendants Bloomberg, City, Klein and DOE determined that if The Plan was to succeed,

they needed to adopt a position that the Rubber Rooms were being used as a place to

"keep" teachers accused of *"serious misconduct and crimes . . . who (Defendant DOE*

*would) not keep . . . with kids in schools simply because their contract says they must*

*continue to be paid."*

23) At the time Defendants Bloomberg, City, Klein and DOE adopted this policy, they knew

that their statements about the Rubber Rooms and the teachers "reassigned" to the

Rubber Rooms were false and misleading. The great majority of teachers reassigned to

Rubber Rooms are accused of incompetence, or misconduct that in no way suggests they

are a danger to children, even if the allegations against them are true. (*See Exhibit 1*)

24) Defendants Bloomberg, City, Klein and DOE depended on a provision of NYS Education

Law § 3020(4), which provides in pertinent part as follows:

> a. *Notwithstanding any inconsistent provision of law, the procedures set forth in section three thousand twenty-a of this article and subdivision seven of section twenty-five hundred ninety-j of this chapter may be modified by agreements negotiated between the city school district of the city of New York and any employee organization representing employees or titles that are or were covered by any memorandum of agreement executed by such city school district and the united federation of teachers on or after June tenth, two thousand two...(iii) the provisions of subdivisions one and two of this section shall not apply to agreements negotiated pursuant to this subdivision*
>
> *(emphasis added)*

25) NYS Education Law § 3020(4) contains a special provision for Defendants Bloomberg, City, DOE and Klein to enter into a Collective Bargaining Agreement with Defendant UFT to modify the disciplinary proceedings for tenured teachers as set out in NYS Education Law § 3020-a.

26) Moreover, teachers employed by Defendant DOE are not afforded the written election provided by NYS Education Law § 3020(1) to teachers in other school districts in New York State that allow them to choose between the disciplinary procedures set out in their Collective Bargaining Agreement and the disciplinary procedures set out in NYS Education Law § 3020-a. *(See Exhibit 2)*

27) Defendants Bloomberg, City, Klein, DOE, UFT and Weingarten knew that Plaintiffs were nonetheless entitled to the fundamental due process protections provided by NYS Education Law § 3020-a, as set out in NYS Education Law § 3020(4).

> a. ...*Where such procedures are so modified: (i) compliance with such modified procedures shall satisfy any provision of this chapter that requires compliance with section three thousand twenty-a of this article; ...that no person enjoying the benefits of tenure shall be disciplined or removed during a term of employment except for just cause*
>
> *(emphasis added)*

28) Defendants Bloomberg, City, Klein, DOE, UFT and Weingarten knew that NYS Education Laws §§ 3020 and 3020-a provided safeguards for the investigation,

prosecution and discipline of tenured teachers such as Plaintiffs that Defendants

deliberately negotiated away, in contravention of Plaintiffs' constitutional and statutory

rights.

> *Note: Plaintiffs' claims herein should not be construed as to*
> *suggest that Defendant DOE does not and should not have*
> *the authority to properly and legally investigate, prosecute*
> *and discipline tenured Teachers. The issues presented in this*
> *lawsuit do not address the merits of any claims and/or*
> *charges that have been filed against the named Plaintiffs.*
> *Those issues are not before the Court. Plaintiffs' claims are*
> *that Defendants violated, failed to comply with, or chose to*
> *attempt to implement in an unlawful manner, the provisions*
> *of NYS Education Law §§ 3020 and 3020-a that were*
> *designed and/or enacted to provide Plaintiffs and others with*
> *due process and other constitutional safeguards.*

29) Defendants Bloomberg, City, Klein and DOE knew that if they afforded Plaintiffs and

other teachers the protections of NYS Education Law §§ 3020 and 3020-a, they would

not be able to accomplish The Plan through termination, resignation or retirement of

Plaintiffs and other teachers.

30) To carry out The Plan, Defendants Bloomberg, City, Klein and DOE communicated their

goals and intentions to, and sought the assistance and/or cooperation of, Defendants

Weingarten and UFT, who at times actively cooperated in furtherance of The Plan, and at

other times did nothing to protect teachers being targeted and victimized by The Plan.

31) Defendant Weingarten is an educated, licensed and experienced attorney who should

have immediately realized that what Defendants Bloomberg, City, Klein and DOE sought

to do was a violation of the constitutional, statutory and contractual rights of Plaintiffs

and other tenured teachers.

32) Nevertheless, in furtherance of The Plan, Defendants Bloomberg, City, Klein, DOE, UFT and Weingarten entered into a Collective Bargaining Agreement that abrogated Plaintiffs' constitutional and statutory due process rights.

33) Prior to Defendant Weingarten's tenure as Defendant UFT's president, Article 21 of the Collective Bargaining Agreement that deals with the disciplinary procedures for tenured teachers was protective of the due process rights to which tenured teachers are entitled.

34) Starting with the first contract negotiated by Defendant Weingarten in 2002, Article 21 of the Collective Bargaining Agreement was rewritten in its entirety in such a way as to strip tenured teachers of virtually all their due process rights protections.

35) Prior to the Collective Bargaining Agreement that went into effect in 2002 the DOE disciplinary proceedings followed NYS Education Law § 3020-a: (*See Exhibits 3 and 4*)

    a) teachers could choose an expedited hearing or binding arbitration to resolve their disciplinary charges;

    b) hearing officers were selected by mutual agreement between the Board of Education (hereinafter "BOE") and the teacher, from a list of Arbitrators provided by the American Arbitration Association (hereinafter "AAA"), along with their biographical information;

    c) when the charges concerned pedagogical incompetence or issues involving pedagogical judgment, the teacher was afforded the choice of either a single hearing officer or a three- member panel;

    d) expedited hearings were conducted by three-member panels;

    e) to assure impartiality, a hearing officer was not eligible to serve if s/he was under the jurisdiction of the BOE, an employee, representative or agent of the

BOE or of any labor organization representing employees of the BOE, had served

as such representative or agent within two years of the date of the scheduled

hearing, or if s/he was then serving as a mediator or fact finder in the City.

f) tenured teachers could only be suspended without pay if:

    i. their charges were upheld following 3020-a disciplinary hearings; or

    ii. they were convicted of a serious felony such as possession of drugs or drug

    paraphernalia, or the sexual abuse of a minor.

36) Starting with the Collective Bargaining Agreement that went into effect in 2002, and

through the present, the disciplinary proceedings deviated severely from NYS Education

Law § 3020-a: (*See Exhibit 5*)

a) teachers are no longer afforded the election of a three- member panel in place of

a single arbitrator;

b) Defendant DOE can now elect to discipline tenured teachers regarding absences

and/or lateness through an expedited hearing process if termination is not sought,

in proceedings that will be informal, and where the normal rules of trial

procedures and evidence will not apply;

c) a permanent "Rotational Panel" of Arbitrators has been established to conduct

3020-a hearings;

d) the Arbitrators on the panel are selected by Defendants DOE and UFT;

e) Arbitrators serve for a period of at least one year, conducting hearings

continuously;

f) some Arbitrators serve for years, at the pleasure of Defendants DOE and UFT;

g)  Arbitrators on the panel are dependent on the income from their continuous service;

h)  the Arbitrators have an improper relationship with Defendants;

i)  an Arbitrator for a 3020-a hearing is selected from the Rotational Panel, and the teacher has no say, nor can s/he object to the Arbitrator's assignment;

j)  the Arbitrators routinely violate the rules of arbitration and the requirements of Article 21G and NYS Education Law §§ 3020 and 3020-a.

k)  in other words, the protections of NYS Education Law § 3020-a that were meant to insure the impartiality of the Arbitrators have been eliminated in their entirety;

l)  a tenured teacher can now be suspended without pay after a hearing where testimony of witnesses is not required and cross examination is not allowed, and where a probable cause arbitrator determines that "probable cause" exists that the teachers has committed "serious misconduct," such as possession of drugs or drug paraphernalia, or sexual abuse of a minor.

37) In furtherance of The Plan, Defendants Bloomberg, DOE, Klein, UFT and Weingarten conspired to deprive tenured teachers of their due process rights as set out in NYS Education Law §§ 3020 and 3020-a.

38) Defendants Weingarten and UFT failed to properly advise Defendant UFT's membership of the import of the changes to Article 21G prior to the contract's ratification.

39) Under the provisions of Article 21G Defendants Bloomberg, City, DOE, Klein, UFT and Weingarten proceeded to empower a permanent "Rotational Panel" of Arbitrators earning up to $1,900.00 per day to conduct 3020-a hearings that are the equivalent of "Kangaroo Courts," where the Arbitrators do Defendants' bidding to violate Plaintiffs' due process

rights by, amongst other things, ignoring the timing requirements of NYS Education Law §§ 3020 and 3020-a and Article 21G, colluding with Defendant DOE to coerce Plaintiffs into onerous stipulations involving resignation, retirement, suspension without pay, and/or ruinous fines, or rendering negative determinations in almost every case brought before them, including termination and loss of licensure, suspension without pay, and/or ruinous fines.

40) Defendants Bloomberg, City, DOE, Klein, UFT and Weingarten further conspired to violate Plaintiffs' and other teachers' due process rights by re-assigning them to Rubber Rooms and allowing them to wait for months and years without having formal charges lodged against them, in violation of Article 21G, while being excluded from applying for per session jobs and summer school jobs to which they would otherwise be entitled.

41) As part of its obligations to Plaintiffs and other teachers, Defendant UFT, through the New York State United Teachers (hereinafter "NYSUT"), provides lawyers paid for by UFT membership dues for Plaintiffs and other teachers against whom accusations are made which subject them to 3020-a hearings.

42) Defendants Bloomberg, City, Klein and DOE further sought assistance from Defendants Weingarten and UFT, that they in essence do nothing and sit idle as Defendants Bloomberg, City, Klein and DOE subject Plaintiffs to harassment, discrimination and violation of their constitutional, statutory and contractual rights.

43) Defendants Bloomberg, City, Klein and DOE also needed assistance from the UFT, that the NYSUT lawyers who were appointed to represent Plaintiffs and other teachers in response to whatever charges and/or allegations were made against them would not zealously assert their due process and/or constitutional rights, or adherence to the

------------------------

procedures and requirements of NYS Education Law §§ 3020 and 3020-a and the

Collective Bargaining Agreement, to which Plaintiffs and other teachers are entitled.

44) As a result of the agreement reached between Defendants Bloomberg, City, Klein and

DOE on the one hand, and Defendants Weingarten and UFT on the other hand,

Defendant DOE did not properly follow, amongst other requirements, (i) the conduct of

fair 3020-a hearings with impartial arbitrators; (ii) assuring adequate representation for

teachers; and (iii) the timing requirements as set out in NYS Education Law § 3020-a

and the Collective Bargaining Agreement.

45) The NYSUT lawyers who Defendant UFT paid to represent Plaintiffs during the 3020-a

process were given instructions, either orally or in writing, that they were not to advise

Plaintiffs of their rights and were not to challenge Defendant DOE on the issues of NYS

Education Law §§ 3020 and 3020-a requirements that were wrongfully abrogated in the

Collective Bargaining Agreement negotiated by Defendants Bloomberg, City, Klein,

DOE, UFT and Weingarten.

46) The NYSUT lawyers paid by Defendant UFT to represent Plaintiffs during the 3020-a

process were given additional instructions, either orally or in writing, that they were to

persuade or coerce Plaintiffs that instead of fighting their charges, they should make deals

to accept as little punishment as was possible to get the procedures over as quickly as

possible, so they could be returned to their jobs.

47) In fact it was never the plan of Defendants Bloomberg, City, Klein and DOE, or

Defendants Weingarten and UFT, to have Plaintiffs returned to their jobs.

48) The Plan involved (i) keeping Plaintiffs in the Rubber Rooms; (ii) violating and/or

allowing the violation of NYS Education Laws §§ 3020 and 3020-a; (iii) depriving

Plaintiffs of their rights; (iv) creating a hostile work environment that would compel Plaintiffs to quit, be terminated and/or be subjected to ruinous fines; (v) misleading Plaintiffs and the public about the true motives behind Defendants Bloomberg's, City's, Klein's and DOE's failure to comply with NYS Education Law §§ 3020 and 3020-a and use of the Rubber Rooms, and (vi) retaliating against any Plaintiff who objected and sought to speak out against and/or enforce his/her rights.

49) Defendants Bloomberg, City, Klein and DOE also sought to harass Plaintiffs and to make the conditions within their "workplace" and the terms of Plaintiffs' employment untenable, so as to:

   a)  retaliate against Plaintiffs for seeking to enforce their constitutional and contractual rights;

   b)  retaliate against Plaintiffs for speaking out against the deplorable conditions in the workplace and/or in the Rubber Rooms;

   c)  retaliate against Plaintiffs for attempting to expose Defendants' wrongful acts and/or conditions within the NYC public school system;

   d)  intimidate others from coming forward to support and/or join in Plaintiffs' allegations of Defendants' wrongful acts and/or conditions within the NYC public school system; and

   e)  intimidate others from coming forward in defense of the charges against Plaintiffs.

50) To accomplish this goal, Plaintiffs were:

   a)  forced to endure verbal and physical harassment and intimidation in their schools and in the Rubber Rooms;

b) subjected to dangerous physical conditions in their schools and in the Rubber
   Rooms;

c) removed from classrooms and subjected to solitary confinement in closets, empty
   windowless offices or other small spaces;

d) subjected to ridicule, insults and abusive attacks by principals and other
   administrators;

e) intimidated and made to be fearful of speaking out against the abuses, conditions
   and wrongful acts;

f) intimidated, harassed and prevented from speaking out against the abuses,
   unlawful conduct and/or other improper acts that Defendants should have
   prevented, and which Defendants did not want to become public, or for which
   Defendants did not want to be held accountable; and

g) otherwise retaliated against.

51) The hostile work environment and other acts by Defendants Bloomberg, City, Klein and
    DOE against Plaintiffs were designed to, and did in fact:

a) discourage other teachers from coming forward to assert their constitutionally
   protected rights, including but not limited to, freedom of speech and freedom of
   association; and

b) discourage other teachers, similarly situated to Plaintiffs, from coming forward to
   speak out and/or "blow the whistle" and attempt to prevent or stop the abuses of
   and/or wrongful acts of which Plaintiffs were aware and sought to report;

52) The hostile work environment and other acts by Defendants Bloomberg, City, Klein and
    DOE against Plaintiffs resulted in termination, demotion, decrease in salary or wage, less

distinguished titles, material loss in benefits, prevention of and/or interference with Plaintiffs ability to compete for and secure positions and assignments to which they were entitled, significantly diminished responsibilities, or other acts designed to humiliate Plaintiffs and subject them to particular situations that were embarrassing and not consistent with their status, positions and/or experience.

53) The hostile work environment and other wrongful acts by Defendants Bloomberg, City, Klein and DOE against Plaintiffs were not mere inconvenience to Plaintiffs and were not alteration of Plaintiffs' job responsibilities. They were instead a complete change in the terms and conditions of Plaintiffs' employment and tenure that were designed to force Plaintiffs to quit, or to be subjected to 3020-a hearings through which Plaintiffs could be terminated, albeit unlawfully and improperly.

54) In addition, the wrongful acts by Defendants Bloomberg, City, Klein and DOE against Plaintiffs were intended to interfere with Plaintiffs' current or future employment as tenured teachers.

55) In addition to the hostile work environment and other wrongful acts by Defendants Bloomberg, City, Klein and DOE against Plaintiffs, some Plaintiffs were also subjected to involuntary transfers to locations and/or facilities at which Plaintiffs (i) were not permitted to engage in their normal work activities, (ii) were not permitted to perform and/or engage in the duties and assignments for which they were hired, (iii) were not allowed to participate in, compete for and/or benefit from additional work and/or assignments to which they would have otherwise been permitted but for the transfer or "reassignment", (iv) were limited in their freedoms to move about, communicate and/or associate with others, (v) were forced to sit in assigned seats, in uncomfortable work

locations and deprived of the normal equipment, access to resources and/or other support

to which they would normally be entitled, (vi) were guarded by professional security

personnel, and (vii) otherwise forced to remain in locations not of their choosing and not

within the scope of the duties for which they were hired.

56) Defendants Bloomberg, City, Klein and DOE intended, and Defendants Weingarten and

UFT allowed, Plaintiffs to be transferred to and remain in Rubber Room locations (i)

where they were subjected to harassment, threats and/or intimidation, and (ii) that

Defendants Bloomberg, City, Klein and DOE knew were unsafe and/or inappropriate for

Plaintiffs' "reassignment".

57) Defendants Bloomberg, City, Klein and DOE intended, and Defendants Weingarten and

UFT allowed, some Plaintiffs to be "reassigned" out of their schools and to remain in

Rubber Rooms on the basis of charges for which such "reassignment" was not warranted,

including but not limited to their (i) alleged insubordination, (ii) work allegedly being

substandard, or (iii) other allegedly improper conduct which did not rise to the level of

"serious misconduct" that endangered the welfare of the students or other persons in their

schools.

58) Defendants Bloomberg, City, Klein and DOE intended, and Defendants Weingarten and

UFT allowed, Plaintiffs to be transferred to and kept in Rubber Rooms because they (i)

had achieved a high pay and benefits level, (ii) dared to challenge and/or question DOE

practices and / or the "Rubber Room" procedures, (iii) are "whistle blowers," and/or (iv)

dared to demand their rights, including seniority transfers and/or due process rights.

59) Defendants Bloomberg, City, Klein and DOE intended, and Defendants Weingarten and

UFT allowed, Plaintiffs to be transferred to and kept in Rubber Rooms so that (i) they

would not interfere with The Plan; (ii) they would not expose the constitutional and contractual and due process violations, (iii) they would not expose the hostile work environment and (iv) they would not expose the other wrongful acts going on in the NYC Public Schools.

60) In furtherance of The Plan, Defendants Bloomberg, City, Klein and DOE intended, and Defendants Weingarten and UFT allowed, Plaintiffs to become targets, unacceptable pawns, or sacrifices.

61) Defendants Bloomberg, City, Klein and DOE intended, and Defendants Weingarten and UFT allowed, Plaintiffs to be:

a) confined in Rubber Rooms for weeks, months and/or years in direct violation of NYS Education Law §§ 3020 and 3020-a and Article 21G;

b) deprived of their constitutional and contractual rights to expeditiously clear their names so that they could be returned to their responsibilities in their schools and to their privileges, status and/or assignments.

62) As a result of Defendants Bloomberg's, City's, Klein's and DOE's actions against Plaintiffs and other tenured teachers, and Defendants Weingarten's and UFT's actions and/or failure to act to protect the rights of Plaintiffs and other tenured teachers, the instances have increased and worsened of (i) failure to comply with provisions of NYS Education Law §§ 3020 and 3020-a, (ii) unlawful use of and confinement to Rubber Rooms, (iii) violation of due process, (iv) harassment and hostile work environment, and (v) retaliation. (*See Exhibit 1*)

63) With full knowledge that they were violating the constitutional, statutory and contractual rights of Plaintiffs and other teachers, Defendants Bloomberg, City, Klein and DOE, with

the tacit complicity of Defendants Weingarten and UFT, increased their wrongful acts against Plaintiffs and other teachers, so that the situation has become urgent.

64) In 2004, the crisis became even more urgent, with (i) violation of tenured teachers' contractual and due process rights, (ii) dangerous and hostile work environment, (iii) retaliation against teachers who sought to speak out against the violations, and in support of their rights, and to expose the problems in the NYC public school system, and (iv) Rubber Room violations that were known to Defendants Weingarten and UFT but for which they took no legal action to protect Plaintiffs or to fix the abuses.

65) Defendants Weingarten and UFT refused to help Plaintiffs and other teachers trapped in Rubber Rooms, by refusing to recognize the Rubber Room locations as UFT chapters and appointing UFT representatives to protect them.

66) In September 2007 Defendant Combier solicited Defendants Weingarten and UFT to hire her and appoint her as their representative.

67) Toward the end of 2007, in response to the worsening situation with Plaintiffs and other tenured teachers, and the failure of Defendants Weingarten and UFT to take any responsible action to help teachers, Defendants Weingarten and UFT determined to try to mollify Plaintiffs and/or mislead the public into thinking that they were taking action to protect Plaintiffs or other tenured teachers.  In fact, Defendants Weingarten and UFT did nothing and in essence abandoned Plaintiffs and other tenured teachers.

68) In October 2007, as part of the efforts to mislead Plaintiffs, other tenured teachers and the public, Defendants Weingarten and UFT appointed a "Rubber Room Task Force," with Defendant Combier as one of Defendant UFT's official representatives.

69) In reality, Defendants Weingarten and UFT had no intention to allow its "Rubber Room Task Force" to take any meaningful action, and they gave the "Rubber Room Task Force" no support and no authority to take any meaningful action on behalf of Plaintiffs or other tenured teachers.

70) The October 2007 appointment of the UFT "Rubber Room Task Force" by Defendants Weingarten and UFT was nothing more than a public relations "gimmick" that was supported by Defendants Bloomberg, City, Klein and DOE.

71) As of November 2007 Defendants Weingarten, UFT and/or Combier "claimed" that they had evidence related to (i) violations of Plaintiffs' and other teachers' constitutional, due process and contractual rights, (ii) harassment and hostile work environment, (iii) contract violations, (iv) abuses in the NYC public school system, and (v) dangerous conditions and improper use of Rubber Rooms. However, Defendants Weingarten, UFT and/or Combier again took no action.

72) By the end of December 2007, it became apparent that Defendants Weingarten, UFT and/or Combier (i) were not acting in the best interests of Plaintiffs, (ii) had no intention of taking action based on the alleged evidence they had amassed, and (iii) were engaging in public relations posturing and "gimmicks" to try to make it appear as if they were actually taking action to protect Plaintiffs and other teachers, when in fact they took no legal action and failed to act.

73) By the end of December 2007, Plaintiffs and other teachers remained in Rubber Rooms and continued to be forced into 3020-a hearings or post hearing processes that violated their due process, constitutional and contractual rights.

---

74) Defendants Weingarten, UFT and Combier put, and continue to put, their personal interests ahead of the interests of Plaintiffs and other teachers to whom they owe duties, and on whose behalf they claimed, and were obligated, to take action to protect Plaintiffs' and other teachers' rights.

75) One or more Plaintiffs, individually and/or collectively, urged Defendants Weingarten, UFT and Combier to take action related to the instant claims, the due process, constitutional and contractual violations, but nothing was done.

76) When it became apparent that Defendants Weingarten, UFT, Combier and/or the so called "Rubber Room Task Force" failed to take any action to protect Plaintiffs and other teachers, Plaintiff Teachers4Action, Inc. was formed and sought to take the actions to protect Plaintiffs and other teachers.

77) On January 15, 2008, Plaintiff Teachers4Action, Inc. notified Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT of their demands that Defendant DOE comply with Plaintiffs' constitutional and contractual rights. The notification was widely circulated to the media and area politicians, who had previously been asked for assistance.

78) In response to Plaintiff Teacher4Action's January 15, 2008 notification on behalf of Plaintiffs and other teachers, Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT retaliated against Plaintiff Teachers4Action, Inc. and its members, by doing the following:

   a) Defendant DOE immediately reassigned Plaintiff Lewenstein to the Rubber Room with new allegations of "verbal abuse."

b) Defendant Weingarten wrote a letter to the media and area politicians refuting Teachers4Action, Inc.'s allegations and claiming that Defendant UFT was in negotiations with Defendant DOE to resolve the Rubber Room problem.

79) On January 21, 2008, Plaintiff Teachers4Action, Inc. filed the instant lawsuit.

80) Immediately after the filing, Defendants Bloomberg, City, Klein, DOE, Weingarten, UFT and Combier, jointly and/or individually again started to retaliate against Plaintiffs and now also looked for ways to interfere with Plaintiffs' ability to prosecute this action.

81) In response to Plaintiffs (i) filing of this complaint, (ii) challenging and contesting Defendants UFT's and Weingarten's policy and management objectives, (iii) starting to expose the problems with Article 21G of the Collective Bargaining Agreement, (iv) engaging in public protests against Defendant DOE's actions related to the 3020-a hearings, and (v) starting to assert the violation of their due process, constitutional and contractual rights, Defendants retaliated by among other things:

a) interfering with Plaintiffs' rights and Plaintiffs' rights to prosecute this action; and

b) directing that administrators and security personnel in the Rubber Rooms restrict Plaintiffs' ability to speak and otherwise communicate with one another, and to meet and associate with one another, to respond to the increased inquiries by other teachers who sought to join Plaintiff Teachers4Action, Inc. and to prepare their claims in this case.

82) As part of the retaliation, Defendants Weingarten and UFT remained silent and did nothing to support Plaintiffs' rights or to stop the violation of their rights and the unlawful use of the Rubber Rooms.

--------------------------

83) From February 2008 to present, Defendant UFT, Weingarten and Combier retaliated against Plaintiffs named or identified with this action by means of (i) intimidation, (ii) harassment, (iii) threats, (v) dissemination / publication of false and/or defamatory statements and (vi) interception, publication and use of confidential materials.

84) As the Plaintiffs continued to prosecute this complaint, Defendants Weingarten, Combier and UFT increased their retaliation and pressure on Plaintiffs, by conspiring with Defendant DOE to:

    a) accelerate the 3020a hearings against Plaintiffs;

    b) cause Plaintiffs to be stripped of their counsel, who were paid for by Defendant UFT with monies they received from Plaintiffs' union dues; and

    c) subject Plaintiffs to further financial and emotional intimidation and circumstances, as a result of Plaintiffs being left helpless in the 3020-a hearings that are controlled by Defendant DOE.

85) From February 2008 to present, Defendant DOE also assisted and collaborated with Defendants UFT's, Weingarten's and Combier's retaliation by providing Defendant UFT Representative Combier with access and opportunity to trap and confront Plaintiffs who are confined in Rubber Rooms, so that they can be subjected to Defendants' further harassment, intimidation, threats, coercion, false accusations and offers of bribes, to coerce, cajole and persuade them to withdraw from the instant lawsuit.

86) As further retaliation for Plaintiffs' continued efforts to (i) challenge and contest Defendants UFT's and Weingarten's policy and management objectives, (ii) start to expose the problems with Article 21G of the Collective Bargaining Agreement, (iii) engage in public protests against Defendant DOE's actions related to the 3020-a hearings,

and (iv) attempt to expose the violations of their due process, constitutional and contractual rights, Defendants DOE and UFT and its representatives started to engage in ex-parte communications, and to assist the Arbitrators conducting the 3020-a process in their efforts to cause Plaintiffs further financial, personal and emotional stresses.

87) From April 2008 to the present, Defendant DOE and the Arbitrators have stepped up the level of harassment, intimidation and interference with Plaintiffs, both in the Rubber Rooms and the 3020-a hearings.

88) From April 2008 to the present, Defendants have retaliated against Plaintiffs by arbitrarily and capriciously abridging their rights to assemble, to discuss, and otherwise communicate in the Rubber Rooms, for the purpose of defending their rights and prosecuting their lawsuits.

89) From April 2008 to the present, Defendants have retaliated against Plaintiffs by subjecting them to different restrictions and conditions from other teachers in the Rubber Rooms and within the workplace, and treating them as if they were criminals or already convicted of serious allegations.

90) From April 2008 to the present, Defendant DOE has sought to use its position of authority to trick, coerce or intimidate Plaintiffs into 3020-a hearings, when they are/were stripped of counsel by Defendant UFT, and in which Plaintiffs are/were tricked into making statements against their interests, or where the record is/was manipulated so exculpatory and/or explanatory statements and/or evidence is/was omitted from the record, thereby causing Plaintiffs further damages and prejudice.

91) Starting in April/May 2008, Defendant DOE started to retaliate against certain Plaintiffs by increasing the financial and emotional pressures on such Plaintiffs who suffer from

certain emotional and/or physical disabilities or financial stresses.   In this regard,

Defendant DOE and/or its representatives started to communicate with physicians and

credit and/or public assistance agencies in an effort to provide or get information

improperly and unlawfully to use against Plaintiffs.

92) In May 2008 Defendant DOE continued to retaliate by (i) preventing Plaintiffs from

access to and/or use of their printers and fax equipment, (ii) restricting Plaintiffs access to

and communication with one another, (iii) interference with Plaintiffs' ability to freely

move about the Rubber Rooms, (iv) forcing certain Plaintiffs into meetings with

adversaries during which Plaintiffs were subjected to threats intimidation and harassment,

(v) engaging in verbal abuse and harassment of Plaintiffs and (vi) discriminating against

Plaintiffs by treating them differently in all respects from other teachers in the Rubber

Rooms who are not part of the instant lawsuit.

<div align="center">

**First Cause of Action -**
**Violation / Interference with Constitutionally Protected Rights –**
**1st, 5th & 14th Amendment**
**Freedom of Speech & Association and Due Process & Equal Protection Rights**
**(against Defendants Bloomberg, City, Klein, DOE, Weingarten & UFT)**

</div>

93) Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 15 to 92 as if

the same were repeated fully and at length herein.

94) Plaintiffs have the following constitutional and contractual rights:

       a)  After being charged, Plaintiffs are entitled to impartial Arbitrators;

       b)  After being charged, Plaintiffs are entitled to adequate representation.

95) Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT sought to mislead

Plaintiffs and to interfere with their enforcing their rights pursuant to NYS Education

Law §§ 3020 and 3020-a related to the right to (i) impartial Arbitrators, and (ii) adequate legal representation.

96) Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT:

    a)  deprived Plaintiffs of the choice of impartial Arbitrators; and

    b)  deprived Plaintiffs of their rights to adequate representation.

97) Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT deprived Plaintiffs and other teachers of their due process rights to 3020-a hearings with impartial Arbitrators, and a hearing process that is fair and impartial, by negotiating Article 21G in contravention of NYS Education Law §§ 3020 and 3020-a.

98) Under the provisions of Article 21G Defendants Bloomberg, City, DOE, Klein, UFT and Weingarten proceeded to empower a permanent "Rotational Panel" of Arbitrators earning up to $1,900.00 per day to conduct 3020-a hearings that are the equivalent of "Kangaroo Courts," where Arbitrators do Defendants' bidding to violate Plaintiffs' due process rights by, amongst other things, ignoring the timing requirements of NYS Education Law §§ 3020 and 3020-a and Article 21G, colluding with Defendant DOE to coerce Plaintiffs into onerous stipulations involving resignation, retirement, suspension without pay, and/or ruinous fines, or rendering negative determinations in almost every case brought before them, involving termination and loss of licensure, suspension without pay, and/or ruinous fines.

99) Article 21G is unconstitutional, because it strips Plaintiffs and other teachers of their constitutional due process protections, and the protections guaranteed by NYS Education Law §§ 3020 and 3020-a.

100)    Defendants Bloomberg, City, Klein and DOE harassed Plaintiffs and made the

conditions within their "workplace" and the terms of Plaintiffs' employment intolerable

by:

a)  retaliating against Plaintiffs to try to prevent them from seeking to enforce

their constitutional and contractual rights;

b)  retaliating against Plaintiffs for speaking out against the deplorable

conditions in the workplace and/or in the Rubber Rooms;

c)  retaliating against Plaintiffs for attempting to expose the Defendants

wrongful acts and/or conditions within the NYC public school system;

d)  limiting Plaintiffs' ability to associate, assemble, discuss and/or

communicate for the purpose of defending themselves, to inform other

teachers about their constitutional, statutory and contractual rights, and to

allow other teachers to assist them in their defense;

e)  intimidating others from coming forward to support and/or join in

Plaintiffs' allegations of Defendants wrongful acts and/or conditions

within the NYC public school systems; and

f)  intimidating others from coming forward to and/or in defense of the

charges against Plaintiffs.

101)    Defendants Bloomberg, City, Klein and DOE:

a)  subjected Plaintiffs to endure verbal and physical harassment and

intimidation in their schools and in the Rubber Rooms;

b)  subjected Plaintiffs to dangerous physical conditions in their schools and

in the Rubber Rooms;

c) removed Plaintiffs from classrooms and subjected them to solitary confinement in closets, empty windowless offices or other small spaces;

d) subjected Plaintiffs to ridicule, insults and abusive attacks by principals and other administrators;

e) intimidated Plaintiffs and made them to be fearful of speaking out against the abuses, conditions and wrongful acts; and

f) intimidated, harassed and prevented Plaintiffs from speaking out against the abuses, unlawful conduct and/or other improper acts that Defendants should have prevented and which Defendants did not want to become public or for which Defendants did not want to be held accountable.

102) When Plaintiffs sought to enforce and attempted to speak out in support of and to demand their due process, constitutional and/or statutory rights, Defendants Bloomberg, City, Klein and DOE sought to stop Plaintiffs from speaking and/or associating with others with similar interests and/or rights.

103) Defendants Bloomberg's, Klein's and DOE's wrongful conduct was designed to interfere with Plaintiffs and other tenured teachers, to interfere with Plaintiffs' "certifications and licenses," to interfere with Plaintiffs' salaries and due process rights, and to interfere with Plaintiffs rights as guaranteed by NYS Education Law §§ 3020 and 3020-a, to have the charges expeditiously investigated and adjudicated through fair and impartial hearings.

104) Defendants Bloomberg, City, Klein and DOE caused Plaintiffs to be subjected to, and Defendant Weingarten and UFT allowed Plaintiffs to be subjected to, charges that caused them to be improperly "re-assigned" and confined to the Rubber Rooms, where

they waited for months and years without a chance to clear their names and protect their salaries, licenses and property rights.

105)    While in the Rubber Rooms, Plaintiffs were deprived of their due process rights and/or the chance to clear their names and be restored to their classrooms.

106)    While in the Rubber Rooms, Plaintiffs were coerced, harassed, intimidated and terrorized so that they would be fearful for their personal and professional well-being, so that they would be "forced" to retire, resign or accept deals involving ruinous fines or termination.

107)    Defendants Bloomberg, City, Klein and DOE negotiated and implemented Article 21G, which was intended to interfere with Plaintiffs' and other teachers', "certifications and licenses", salaries and due process rights.

108)    Defendants Bloomberg, City, Klein and DOE negotiated and implemented Article 21G, which was designed to frustrate Plaintiffs' and other teachers' ability to expeditiously defend themselves against the charges that caused them to be placed in the Rubber Rooms, where they waited for months and years without a chance to clear their names and protect their salaries, certifications, licenses and property rights.

109)    Defendants Bloomberg's, Klein's and DOE's aforesaid acts, violate the 5th and 14th Amendments to the Constitution by depriving Plaintiffs of their due process rights and were otherwise unlawful.

110)    Defendants Bloomberg's, Klein's and DOE's actions also violate 42 U.S.C. §1983 which states:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, and citizen of the United States or

> *other person within the jurisdiction thereof to the deprivation of any*
> *rights, privileges, or immunities secured by the Constitution and laws,*
> *shall be liable to the party injured in an action at law, suit in equity, or*
> *other proper proceeding for redress".*

111)    Defendants Bloomberg's, Klein's and DOE's acts were designed to interfere with

and/or deprive Plaintiffs of their property rights.

112)    Defendants Bloomberg's, Klein's and DOE's acts were designed to interfere with

and/or deprive Plaintiffs of their due process, statutory, constitutional and/or contractual

rights.

113)    Defendants Bloomberg's, Klein's and DOE's use of Rubber Rooms, harassment,

hostile work environment, retaliation and failure to provide Plaintiffs with the protections

afforded by the provisions of NYS Education Law §§ 3020 and 3020-a violates 42 U.S.C.

§ 1983 and Plaintiffs' constitutional due process protections.

114)    Defendants Bloomberg's, Klein's and DOE's attempts to prevent Plaintiffs from

speaking out against violations of their rights, speaking out about the conditions and

abuses in the NYC public school system, and attempting to speak out against the use of

Rubber Rooms, attempt to prevent Plaintiffs from getting others to support and provide

evidence to them, to defend themselves, violates 42 U.S.C. § 1983 and Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and Plaintiffs'

constitutional due process protections.

115)    Defendants Bloomberg's, Klein's and DOE's attempts to prevent Plaintiffs from

associating with others to discuss the violations of their rights, speaking out about the

conditions and abuses in the NYC public school system, and attempting to speak out

against the use of Rubber Rooms, attempt to prevent plaintiffs from getting others to

support and provide evidence to them, to defend themselves, violates 42 U.S.C. § 1983

and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and

Plaintiffs' constitutional due process protections.

116)        Defendants Bloomberg's, Klein's and DOE's attempts to prevent Plaintiffs from

speaking to and associating with others violated Plaintiffs' First Amendment rights.

117)        As a direct and proximate result of Defendants Bloomberg's, Klein's and DOE's

aforesaid acts, Plaintiffs suffered monetary and other damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly, severally and/or

in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their

individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii)

exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier

of fact; and (iii) attorneys' fees, interest and costs of suit.

<div align="center">

**Second Cause of Action –**
**Harassment & Hostile Work Environment**
**(against Defendants Bloomberg, City, Klein & DOE)**

</div>

118)        Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 15 to

92 as if the same were repeated fully and at length herein.

119)        Defendants Bloomberg, City, Klein and DOE subjected Plaintiffs to be confined

in and/or allowed Plaintiffs to remain in locations where they were subjected to

emotional and psychological dangers and/or intimidation, and in some instances solitary

confinement in closets, empty windowless offices or other small spaces.

120)        Defendants Bloomberg, City, Klein and DOE subjected Plaintiffs to (i) ridicule,

insults and abusive verbal attacks and/or assaults and (ii) intimidation and fear of

speaking out against the abuses, conditions and wrongful acts.

121)    Defendants Bloomberg, City, Klein and DOE transferred Plaintiffs from locations
and conditions where, as a result of the experience, credentials, skills and status that they
had achieved and earned, Plaintiffs were recognized as elite or privileged, to locations
where they were less prestigious and where they were subjected to further verbal and
physical harassment and intimidation.

122)    Defendants Bloomberg, City, Klein and DOE subjected Plaintiffs to radical
changes in the nature and quality of the work given to them, and in most instances
Plaintiffs were completely deprived of any work responsibilities whatsoever.

123)    Defendants Bloomberg, City, Klein and DOE caused Plaintiffs to be transferred to
locations where they were not allowed to perform the discretionary and/or managerial
functions of the positions for which they were hired, to positions where the work, if any,
was that which could be performed by clerical and lower-level personnel.

124)    Defendants Bloomberg, City, Klein and DOE used the Rubber Rooms to:

    a)   subject Plaintiffs to verbal and physical harassment and intimidation;

    b)   subject Plaintiffs to dangerous physical conditions; and

    c)   subject Plaintiffs to emotional and psychological dangers and/or
        intimidation by keeping Plaintiffs like prisoners.

125)    Defendants Bloomberg, City, Klein and DOE caused Plaintiffs to be subjected to
solitary confinement in closets, empty windowless offices or other small spaces.

126)    The Rubber Rooms were used by Defendant Bloomberg, City, Klein and DOE to
subject Plaintiffs to (i) ridicule, insults and abusive verbal attacks and/or assaults and (ii)
intimidation, and fear of speaking out against the abuses, conditions and wrongful acts.

127)    Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms was part of their efforts to (i) retaliate against Plaintiffs and other teachers; (ii) dissuade and/or discourage Plaintiffs and other teachers from coming forward to assert their constitutionally protected rights, including, but not limited to, freedom of speech and freedom of association; and (iii) dissuade and/or discourage Plaintiffs and other teachers from coming forward to speak out and/or "blow the whistle," and attempt to prevent or stop them from reporting abuses and/or other wrongful acts within the NYC public school system.

128)    .Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms and abuse of the NYS Education Law §§ 3020 and 3020-a disciplinary process is adverse to, and a material change in, the terms and conditions of Plaintiffs' employment through termination, demotion, decrease in salary or wage, less distinguished titles, material loss in benefits, prevention of and/or interference with Plaintiffs' ability to compete for and secure positions and assignments to which they are entitled, significantly diminished responsibilities, or other acts designed to humiliate Plaintiffs and subject them to particular situations that are embarrassing and not consistent with their status, positions and/or experience.

129)    Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms is not mere inconvenience or alteration of job responsibilities but is rather a complete change in the terms and conditions of Plaintiffs' employment and tenure, designed to force Plaintiffs to quit, or to create conditions through which Plaintiffs could be terminated, albeit unlawfully and improperly.

130)    Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms was part of their efforts to interfere with Plaintiff's current or future employment as tenured teachers.

131)    Defendants Bloomberg, City, Klein and DOE use the Rubber Rooms as a means to involuntarily transfer Plaintiffs to locations and/or facilities at which Plaintiffs (i) are not permitted to engage in their normal work activities, (ii) are not permitted to perform and/or engage in the duties and assignments for which they were hired, (iii) are not allowed to participate in, compete for and/or benefit from additional work and/or assignments to which they would have otherwise been permitted but for the transfer or "reassignment", (iv) are limited in their freedoms to move about, communicate and/or associate with others, (v) are forced to sit in assigned seats, in uncomfortable work locations and deprived of the normal equipment, access to resources and/or other support to which they would normally be entitled, (vi) are guarded by professional security personnel, and (vii) are otherwise forced to remain in locations not of their choosing and not within the scope of the duties for which they were hired.

132)    Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms was intended to subject Plaintiffs to conditions, assignment, relocation, denigration of responsibility, status and duties that caused a setback to their careers as tenured teachers.

133)    Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms was part of their efforts to transfer Plaintiffs from locations where, as a result of the experience, credentials, skills and status that they had achieved and earned, and where Plaintiffs were recognized as elite or privileged, to locations that were less prestigious, and where Plaintiffs were subjected to radical changes in the nature and quality of the

work given to them, and in most instances Plaintiffs were completely deprived of any work responsibilities whatsoever.

134)    Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms was part of an effort to transfer Plaintiffs to locations where they were not allowed to perform the discretionary and/or managerial functions of the positions for which they were hired, to positions where the work, if any, was that which could be performed by clerical and lower-level personnel.

135)    The conditions that Defendants Bloomberg, City, Klein and DOE created in the schools before Plaintiffs were transferred to the Rubber Rooms, and the conditions that Defendants Bloomberg, City, Klein and DOE created in the Rubber Rooms themselves, were part of Defendants' harassment and the creation of a hostile work environment.

136)    As a direct and proximate result of Defendants Bloomberg's, City's, Klein's and DOE's subjecting Plaintiffs to harassment and a hostile work environment, Plaintiffs suffered monetary and other damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants jointly, severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

<div align="center">

**Third Cause of Action –
Retaliation
<u>(against Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT)</u>**

</div>

137)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 15 to 92 as if the same were repeated fully and at length herein.

138)    Defendants Bloomberg, City, Klein and DOE retaliated against Plaintiffs (i) by interfering with Plaintiffs' freedom of speech and freedom of association; (ii) by targeting Plaintiffs and others who acted as "whistle blowers" and spoke out about the due process violations and the wrongs within the Rubber Rooms and the NYC public school system, and (iii) by intimidating Plaintiffs and others from acting as "whistle blowers" and speaking out about the due process violations and the wrongs within the Rubber Rooms and the NYC public school system.

139)    Defendants Bloomberg, City, Klein and DOE threatened Plaintiffs that if they did not agree to some form of punishment and/or fine, they would be subjected to potentially ruinous fines, suspension without pay, and/or termination and loss of certifications and/or licenses.

140)    Defendants Bloomberg, City, Klein and DOE threatened Plaintiffs that if they attempted to object to the manner in which Defendants Bloomberg, City, Klein and DOE were conducting the administrative hearings pursuant to NYS Education Law §§ 3020 and 3020-a, Plaintiffs would be subjected to additional punishment, including potentially ruinous fines, suspension without pay and/or termination and loss of certifications and/or licenses.

141)    Defendants Bloomberg, City, Klein DOE, Weingarten and UFT threatened Plaintiffs, or allowed Plaintiffs to be threatened, that if they did not agree to some form of punishment and/or fine, they would be subjected to potentially ruinous fines, suspension without pay and/or termination and loss of certifications and/or licenses.

142)    After the January 15, 2008 letter by Plaintiffs Teachers4Action, Inc. to Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT protesting (i)

Defendants' violation of Plaintiffs' due process rights, (ii) Defendants' violations of Plaintiffs' constitutional and contractual rights, and (iii) the other wrongful conduct and/or abuses that occur within the NYC public school system, Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT retaliated against and/or caused the retaliation against Plaintiff Teacher4Action, Inc.'s president by filing new allegations against him and sending him back to the Rubber Room.

143)    After the January 25, 2008 letter to Defendants Klein, DOE, Weingarten and UFT protesting (i) Defendants' violation of Plaintiffs' due process rights, (ii) Defendants' violations of Plaintiffs' constitutional and contractual rights, and (iii) the other wrongful conduct  and/or abuses that occur within the Rubber Rooms, Defendants Bloomberg, City, Klein, and DOE retaliated against and/or caused the retaliation against Plaintiff Teachers4Action, Inc.'s president by filing new allegations against him.

144)    Defendants Weingarten and UFT, through their representative Defendant Combier, caused slanderous and threatening material to be posted / published on web sites controlled by Defendant Combier.

145)    Defendants Weingarten and UFT, through their representative Defendant Combier, conducted meetings, discussions and telephone calls to Plaintiffs for the purpose of threatening and intimidating them, and to present deliberate and knowing misinformation about the instant lawsuit.

146)    Defendants Weingarten, UFT and Combier threatened Plaintiffs that if they did not withdraw from the instant lawsuit, or if they insisted on pursuing their claims, they would be deprived of the lawyers who were representing Plaintiffs in the 3020-a hearings, and who were retained and paid for by Defendant UFT.

147)     After the filing of the Amended Complaint on February 25, 2008, the NYSUT

lawyers who are paid by Defendant UFT did in fact withdraw representation from

Plaintiffs undergoing 3020-a hearings.

148)     Defendants Bloomberg, City, Klein and DOE have insisted, and have directed the

Arbitrators, that Plaintiffs continue with their 3020-a hearings with or without legal

representation, and the Arbitrators have complied with Defendants' demands.

149)     Defendants Bloomberg, City, Klein and DOE have directed, or caused to be

directed, that several Plaintiffs be subjected to evaluation by Defendant DOE's Medical

Division, as a result of which they can be summarily terminated.

150)     A DOE attorney called a Plaintiff's doctor to intimidate the doctor into revealing

confidential medical information protected by the federal HIPPA statute, and further to

intimidate the Plaintiff.

151)     Defendants Bloomberg's, City's, Klein's, DOE's, Weingarten's and UFT's

retaliation against, and/or causing the retaliation of, Plaintiffs was designed to dissuade

others from asserting their First Amendment and other constitutional rights.

152)     Defendants Bloomberg's, City's, Klein's, DOE's, Weingarten's and UFT's

retaliation against, and/or causing the retaliation of, Plaintiffs was designed to dissuade

others from "blowing the whistle" about wrong doing in the NYC public school system

and the Rubber Rooms in violation of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e et seq.

153)     Defendants Bloomberg's, City's, Klein's, DOE's, Weingarten's and UFT's

retaliation against, and/or causing the retaliation of, Plaintiffs demonstrates their disdain

for "whistle blowers" who report wrong doing in the NYC public school system and the

Rubber Rooms, and their absolute commitment to thwart their constitutional free speech efforts to reveal the wrong doing.

154)     Defendants Weingarten's and UFT's retaliation against, and/or causing the retaliation of, Plaintiffs is a violation of 29 U.S.C. 411 Sec. 101. a (2), (4) and (5), and 29 U.S.C. 529 Sec. 609.

155)     As a direct and proximate result of Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT retaliating against and/or causing the retaliation of Plaintiffs, Plaintiffs suffered monetary and other damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly, severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Fourth Cause of Action –
### Constructive Discharge
### <u>(against Defendants Bloomberg, City, Klein and DOE)</u>

156)     Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 15 to 92 as if the same were repeated fully and at length herein.

157)     Defendants Bloomberg, City, Klein and DOE knew that they could not get Plaintiffs to quit.

158)     Since Defendants Bloomberg, City, Klein and DOE knew that they could not get Plaintiffs to quit, Defendants Bloomberg, City, Klein and DOE determined to harass Plaintiffs and to create a hostile work environment through which Plaintiffs would quit or would agree to early retirement and/or deals that led to their resignation or dismissal.

159)    Defendants Bloomberg, City, Klein and DOE made Plaintiffs' working conditions intolerable with the intention of causing, or forcing, Plaintiffs to involuntarily resign or give up some of their benefits.

160)    Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms and failure to provide Plaintiffs with the protections afforded by the provisions of NYS Education Law §§ 3020 and 3020-a was part of Defendants' deliberate and/or intentional creation of an intolerable workplace environment.

161)    Defendants Bloomberg's, City's, Klein's and DOE's creation of a hostile work environment constitutes constructive termination of Plaintiffs or deprivation of other benefits.

162)    As a direct and proximate result of Defendants Bloomberg's, City's, Klein's and DOE's constructive discharge, Plaintiffs suffered monetary and other damages

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly, severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Fifth Cause of Action –
### Breach of Contract
### (against Defendants Bloomberg, City, Klein and DOE)

163)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 15 to 92 as if the same were repeated fully and at length herein.

164)    Defendant DOE and Plaintiffs have a valid and binding contract.

165)      The terms of the contract guaranteed Plaintiffs rights to a safe and non-hostile

work environment, a salary, rights to per session work and summer school work, benefits,

other rights related to their work status as tenured teachers, as well as limited due process

rights related to the NYS Education Law §§ 3020 and 3020a hearing procedures.

166)      Defendants Bloomberg, City, DOE and Klein did not want to honor the terms of

the contract with Plaintiffs.

167)      Defendants Bloomberg, City, DOE and Klein sought to break the terms of the

contract with Plaintiffs so that they could reduce the budget of the NYC school system

and undermine the institution of tenure.

168)      The terms of the contract between Plaintiffs and Defendant DOE, prohibited

Defendants Bloomberg, City, DOE and Klein from targeting Plaintiffs and other tenured

teachers (i) who had achieved a high pay and benefits level; (ii) who dared to challenge

and/or question the "Rubber Room" procedures; (iii) who acted as "whistle blowers"

regarding DOE misconduct (iv) who dared to demand or insist upon their due process

rights, (v) by forcing Plaintiffs to wait in the Rubber Rooms without due process and the

chance to clear their names and be restored to their classrooms and (vi) by coercing,

intimidating and terrorizing Plaintiffs so that they would be fearful for their personal and

professional well-being, so that they would retire, resign or be "forced" to accept deals

involving ruinous fines or termination.

169)      Defendants Bloomberg, City, Klein and DOE breached the terms of the contract

with Plaintiffs by Defendants Bloomberg's, City's, Klein's and DOE's targeting of

Plaintiffs and other tenured teachers (i) who had achieved a high pay and benefits level;

(ii) who dared to challenge and/or question the "Rubber Room" procedures; (iii) who

acted as "whistle blowers" regarding DOE misconduct (iv) who dared to demand or

insist upon their due process rights, (v) by forcing Plaintiffs to wait in the Rubber Rooms

without due process and the chance to clear their names and be restored to their

classrooms and (vi) by coercing, intimidating and terrorizing Plaintiffs so that they would

be fearful for their personal and professional well-being, so that they would retire, resign

or be "forced" to accept deals involving ruinous fines or termination.

170)     Defendants Bloomberg's, City's, DOE's and Klein's breach of contract was

intentional, malicious, reckless, careless, negligent, unlawful and/or improper, and was

also designed to interfere with Plaintiffs' due process, licenses and property rights.

171)     As a direct and proximate result of Defendants Bloomberg's, City's, DOE's and

Klein's breach of contract, Plaintiffs suffered monetary and other damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly, severally and/or

in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their

individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii)

exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier

of fact; and (iii) attorneys' fees, interest and costs of suit.

<div align="center">

**Sixth Cause of Action –**
**Breach of Fiduciary Duty and Duty of Fair Representation**
**Violations of Labor-Management Reporting & Disclosure Act**
**(against Defendants Weingarten and UFT)**

</div>

172)     Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 15 to

92 as if the same were repeated fully and at length herein.

173)     Defendants UFT and Weingarten are agents for Plaintiffs with regard to certain

matters, including certain matters related to Plaintiffs' contract with Defendant DOE.

174)    Defendants UFT and Weingarten also assumed certain responsibilities and claim
to protect the constitutional and contractual rights of Plaintiffs and other teachers.

175)    Defendants UFT and Weingarten hold themselves out as *"fighting to make sure
teachers are treated with respect and dignity, have a voice in the education of their
students and are given the resources they need to succeed in the classroom".*

176)    Defendants UFT and Weingarten hold themselves out as advocates for union
members, including Plaintiffs.

177)    Defendants UFT and Weingarten are aware that Defendants Bloomberg, City,
Klein and DOE were engaged in efforts to interfere with and/or deprive Plaintiffs of their
due process, statutory, constitutional and/or contractual rights.

178)    Defendants UFT and Weingarten have been on notice and aware that Defendants
Bloomberg, City, Klein and DOE were (i) violating Plaintiffs 1st, 5th and 14th Amendment
Rights, (ii) harassing Plaintiffs and subjecting Plaintiffs to hostile work environments,
(iii) retaliating against Plaintiffs and otherwise violating Plaintiffs' due process,
constitutional and/or contractual rights.

179)    Defendants UFT and Weingarten were on notice and aware that Defendants
Bloomberg's, City's, Klein's and DOE's actions were intended and/or designed to get
Plaintiffs to quit, be terminated and/or otherwise be subjected to suspension without pay
or ruinous fines.

180)    Defendants UFT and Weingarten were on notice and aware:

    a)    Of the hostile work environment and dangerous conditions in the Rubber Rooms
and have done nothing about them;

----------------------------

*Teachers4Action, Inc. et al v. Bloomberg et al, 08-cv-548 (VM)(AJP) – June 2, 2008 Amended Complaint – Page 44*

b) That Defendants Bloomberg's, City's, Klein's and DOE's use of Rubber Rooms and failure to provide Plaintiffs with the protections afforded by the provisions of NYS Education Law §§ 3020 and 3020-a violates Plaintiffs' due process, statutory, constitutional and/or contractual rights and have done nothing about it;

c) That Defendants Bloomberg, City, Klein and DOE have discriminated against Plaintiffs in an effort to get them to quit, be terminated and/or otherwise be subject to ruinous fines and have done nothing about it; and

d) That Defendants Bloomberg, City, Klein and DOE have created a hostile work environment and have done nothing about it.

181)    Defendants UFT and Weingarten owe and owed Plaintiffs a duty of fair representation in dealings with Defendants Bloomberg, City, Klein and DOE.

182)    Despite their knowledge of Defendant Bloomberg's, City's, Klein's and DOE's wrongful acts, Defendants UFT and Weingarten did nothing.

183)    Defendants UFT's and Weingarten's failure to act to protect Plaintiffs' rights violate their duty of fair representation to Plaintiffs.

184)    Defendants UFT's and Weingarten's discrimination and retaliation against and/or harassment of Plaintiffs violate their duty of fair representation to Plaintiffs.

185)    Defendants UFT's and Weingarten's discrimination and retaliation against and/or harassment of Plaintiffs violate 29 U.S.C. 411 Sec. 101. a (2) ("LMRDA – Freedom of Speech and Assembly").

186)    Defendants UFT's and Weingarten's discrimination and retaliation against and/or harassment of Plaintiffs violate 29 U.S.C. 411 Sec. 101. a (4) ("LMRDA – Protection of Right to Sue").

187)    Defendants UFT's and Weingarten's discrimination and retaliation against and/or harassment of Plaintiffs violate 29 U.S.C. 411 Sec. 101. a (5) and 29 U.S.C. 529 Sec. 609 ("LMRDA – Safeguards Against Improper Disciplinary Action").

188)    Defendants UFT's and Weingarten's failure to inform UFT members about the provisions of the LMRDA violate 29 U.S.C. 415 Sec. 105 ("LMRDA – Information as to Act").

189)    Defendants Weingarten's and Combier's repeated and knowing false statements regarding the true nature and intent of Article 21G, and regarding their purported efforts to help teachers in the Rubber Rooms, violate 29 U.S.C. 439 Sec. 209. b ("LMRDA – Criminal Provisions").

190)    Defendants UFT's and Weingarten's aforesaid breach of their duty of fair representation constitutes bad faith and is in reckless disregard for Plaintiffs' rights.

191)    As a direct and proximate result of Defendants Weingarten's and UFT's breach of fair representation, Plaintiffs suffered monetary damages and emotional injuries, trauma and other related damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants jointly, severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

**Seventh Cause of Action –**
**Aiding & Abetting Breach of Fiduciary Duty**
**(against Defendants Weingarten and UFT)**

192)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 15 to

92 as if the same were repeated fully and at length herein.

193)    Defendants Weingarten and UFT were aware of their contractual and fiduciary

duties to Plaintiffs.

194)    Defendants Weingarten and UFT were aware that Defendants Bloomberg, City,

Klein and DOE were engaged in the above mentioned wrongful acts, including but not

limited to  (i) violating Plaintiffs 1st, 5th and 14th Amendment Rights, (ii) harassing

Plaintiffs and subjecting Plaintiffs to a hostile work environment,, (iii) retaliating against

Plaintiffs and (iv) otherwise violating Plaintiffs' due process, constitutional and/or

contractual rights.

195)    Defendants Weingarten and UFT were aware that Defendants Bloomberg, City,

Klein and DOE required the assistance of Defendants Weingarten and UFT to (i) violate

Plaintiffs 1st, 5th and 14th Amendment Rights, (ii) harass Plaintiffs and subject Plaintiffs

to a hostile work environment, (iii) retaliate against Plaintiffs and (iv) otherwise violate

Plaintiffs' due process, constitutional and/or contractual rights.

196)    Defendants Weingarten and UFT provided assistance to Defendants Bloomberg,

City, Klein and DOE through Defendants Weingarten's and UFT's failure and/or refusal

to act to protect Plaintiffs from (i) violation of their 1st, 5th and 14th Amendment Rights,

(ii) harassment and a hostile work environment, (iii) retaliation, and (iv) other violations

of Plaintiffs' due process, constitutional and/or contractual rights.

--------------------------

197)    The assistance that Defendants Weingarten and UFT provided to Defendants

Bloomberg, City, Klein and DOE was through Defendants Weingarten's and UFT's

failure and/or refusal to act, and Defendants Weingarten's and UFT's directions to the

lawyers representing Plaintiffs who were paid for by UFT, and Defendant's Weingarten's

and UFT's directions to NYSUT to withdraw legal representation from Plaintiffs and/or

their failure or refusal to act on behalf of the Plaintiffs who were left without legal

representation.

198)    The assistance that Defendants Weingarten and UFT provided to Defendants

Bloomberg, City, Klein and DOE was (i) to make announcements that they would take

action but then take no action, (ii) to intentionally appoint unqualified and/or

inexperienced persons such as Defendant Combier to serve on its "Rubber Room Task

Force" and (iii) cause Plaintiffs to be threatened that if they continued to participate in the

instant lawsuit, they would be terminated or they would lose the lawyers that the UFT

was paying for to represent Plaintiffs in the 3020-a administrative hearings, and (iv) to

direct NYSUT to withdraw legal representation from Plaintiffs, or to fail and/or refuse to

act on behalf of the Plaintiffs who were left without legal representation.

199)    As a direct and proximate result of Defendants Weingarten's and UFT's aiding

and abetting breach of fiduciary duty and breach of fair representation, Plaintiffs suffered

monetary damages and emotional injuries, trauma and other related damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly severally and/or

in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their

individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii)

exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier

of fact; and (iii) attorneys' fees, interest and costs of suit.

### Eighth Cause of Action –
### Negligence Hiring, Retention & Supervision
### (against Defendants Bloomberg, City, Klein and DOE)

200)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 15 to
92 as if the same were repeated fully and at length herein.

201)    Defendants Bloomberg, City, Klein and DOE, hired and retained principals and
other administrators who they knew, or should have known, would carry out the
Defendants' plan to target Plaintiffs and other tenured teachers.

202)    Defendants Bloomberg, City, Klein and DOE, hired and retained principals and
other administrators who they knew, or should have known, had a hatred and/or dislike of
tenured teachers, were envious of tenured teachers' positions, status and privileges, and
who had a propensity for the type of harassment, retaliation and conduct that were
designed to cause Plaintiffs to be charged and sent to Rubber Rooms.

203)    Defendants Bloomberg, City, Klein and DOE knew or should have known that the
Plaintiffs' supervisors had a propensity for anger, belligerence, violence, jealousy,
discrimination, hostility and retaliation.

204)    In fact, Defendants Bloomberg, City, Klein and DOE, knowing the nature of their
school administrators, published a manual in 2004 to assist those administrators in
successfully targeting teachers to be disciplined, sent to Rubber Rooms, and terminated.

205)    Defendants Bloomberg, City, Klein and DOE, hired and retained attorneys to
prosecute Plaintiffs and other teachers charged with incompetence and/or misconduct for
which they would be subject to 3020-a hearings, who they knew, or should have known,
would cooperate in The Plan that targets Plaintiffs and other tenured teachers for

------------------------------

termination, involuntary resignation or retirement, or onerous deals involving suspension without pay and/or ruinous fines.

206)    Defendants Bloomberg, City, Klein and DOE, hired and retained attorneys who they knew, or should have known, had a hatred and/or dislike of Plaintiffs and other teachers, and who had a propensity for the type of harassment, retaliation and conduct that were designed to cause Plaintiffs to involuntarily resign or retire, or accept onerous deals involving suspension without pay and/or ruinous fines.

207)    Defendants Bloomberg, City, Klein and DOE knew or should have known that the attorneys had a propensity for anger, belligerence, violence, jealousy, discrimination, hostility and retaliation that would be directed against Plaintiffs and other teachers.

208)    Defendants Bloomberg, City, Klein and DOE knew or should have known that the attorneys would, in furtherance of The Plan, engage in unethical conduct, such as improper ex parte communications with Arbitrators and others, directing Arbitrators to do their bidding, and coercing Plaintiffs and other teachers to accept onerous deals involving suspension without pay and/or ruinous fines.

209)    As a direct result of Defendants Bloomberg's, City's, Klein's and DOE's negligent hiring, retention, direction and supervision of Plaintiffs' supervisors, with their propensity for anger, belligerence, violence, jealousy, discrimination, hostility and retaliation, Plaintiffs suffered monetary damages and emotional injuries, trauma and other related damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly, severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii)

exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier

of fact; and (iii) attorneys' fees, interest and costs of suit.

## Ninth Cause of Action –
## Negligence Hiring, Retention & Supervision
## (against Defendants Weingarten and UFT)

210)    Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 15 to

92 as if the same were repeated fully and at length herein.

211)    Defendants Weingarten and UFT hired and retained NYSUT lawyers to represent

Plaintiffs who, Defendants Weingarten knew, or should have known, would not advise

Plaintiffs of their rights, and were not to challenge Defendant DOE on the issues of NYS

Education Law §§ 3020 and 3020-a requirements such as (i) right to impartial Arbitrators

and (ii) right to adequate representation.

212)    Defendants Weingarten and UFT knew that the lawyers they paid for had a

propensity and personality that they would intimidate or frighten Plaintiffs into believing

that instead of fighting the charges, they should make deals to accept as little punishment

as was possible to get the procedures over as quickly as possible and so they could be

returned to their jobs.

213)    Defendants Weingarten and UFT hired and retained Defendant Betsy Combier to

be its representative on the "Rubber Room Task Force".

214)    At the time Defendants Weingarten and UFT hired and retained Betsy Combier,

they knew or should have known of (i) her lack of experience, (ii) her animosity toward

others, (iii) her propensity to allow her ego and emotions to guide whatever actions she

took or would take as their representative, (iv) her inexperience with regard to legal

claims that she had made and lost against Defendants City, Klein, DOE and others, (v)

her propensity for use of her websites to further her personal goals rather than for legitimate and lawful purposes in furtherance of the interests of Plaintiffs, other tenured teachers and other teachers to whom Defendants Weingarten, Combier and UFT owed fiduciary duties and/or duty of fair representation.

215)     As a direct result of Defendants Weingarten's and UFT's negligent hiring, retention and supervision of the NYSUT attorneys and Defendant Combier, Plaintiffs were threatened and harassed, and the instant claims were damaged, thereby causing Plaintiffs to suffer monetary damages and emotional injuries, trauma and other related damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Tenth Cause of Action –
### Misrepresentation, Fraud & Conspiracy to Violate Plaintiffs Rights [4]

216)     Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 15 to 92 as if the same were repeated fully and at length herein.

217)     Defendants NYC, Bloomberg, DOE, Klein, UFT and Weingarten associated with one another in The Plan, pursuant to which they intended to violate Plaintiffs rights.

218)     The Plan by Defendants NYC, Bloomberg, DOE, Klein, UFT and Weingarten

---

[4] Plaintiffs' original complaint included a Cause of Action based upon alleged RICO violations. The RICO Cause of Action was not included in Plaintiffs' Amended Complaint dated February 22, 2008. Based on the documents, deposition testimony and objective facts that will be produced by Defendants in discovery, Plaintiffs believe that there may be a reasonable basis to seek the Court's permission pursuant to FRCP 15 to amend the complaint one more time to include the RICO Cause of Action.

*Teachers4Action, Inc. et al v. Bloomberg et al, 08-cv-548 (VM)(AJP) – June 2, 2008 Amended Complaint – Page 52*

was designed to and did in fact:

    a.  violate Plaintiffs' constitutionally protected rights to free speech, association, property and due process as they are granted and guaranteed by the 1st, 5th and 14th Amendments;

    b.  violate Plaintiffs' Civil Rights to freedom of speech and associations and due process as they are granted and guaranteed by 28 USC § 1963;

    c.  violate Plaintiffs' rights and protections against retaliation, discrimination, harassment and other unlawful acts as they are granted and guaranteed by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.;

    d.  violate Plaintiffs' rights and protections to speak out and challenge Union management and Union policies as those rights are granted and guaranteed by the 29 U.S.C. §§ 411 Sec. 101.a (2), (4) and (5), §§ 529 Sec. 609, §§ 415 Sec. 105, and §§ 439 Sec. 209.b -- the Labor Relations Management and Reporting Act; and

    e.  violate Plaintiffs' rights and protections as granted and guaranteed under the Federal Whistleblower Protection Act;

219)    The Plan also included the "targeting" of Plaintiffs and others who:

    a)  achieved a high pay and benefits level;

    b)  reported instances of unlawful activities by other persons within the NYC public school system;

    c)  sought to expose and/or report instances and/or conditions within the NYC public school system that endangered the safety and well-being of students,

Plaintiffs and other teachers;

d) challenged, questioned, reported, cooperated in investigations and/or spoke publicly about conditions and policies in the NYC public school system;

e) challenged, questioned, reported, cooperated in investigations and/or spoke publicly about conditions in the "Rubber Rooms" to which Plaintiffs and other teachers were confined;

f) challenged, questioned, reported, cooperated in investigations and/or spoke publicly about what they believed to be improper policies or management decisions in the Defendant UFT;

g) demanded that Defendants DOE and UFT comply with and respect their obligations to Plaintiffs to protect their due process, constitutional and contractual rights; and

h) sought to blow the whistle and avail themselves of the protections of the Federal and NYS Whistleblower acts as they exercise their constitutional rights to act as "whistle blowers" regarding DOE and UFT misconduct.

220)    The Plan also involved Defendants conspiring with one another to, among other things:

a) force the targeted teachers to wait in the Rubber Rooms without due process and

the chance to clear their names and be restored to their classrooms

    b)   coerce, harass, intimidate and terrorize the "targeted" teachers so that they would

        be fearful for their personal and professional well-being, so that they would be

        "forced" to retire, resign or accept deals involving ruinous fines or termination.

221)      The Plan involved Defendants' use of the US mail and used electronic means,

including but not limited to telephone, faxes and emails, by which to communicate

their objectives, agree upon implementation, and agree upon which Defendant and/or

its representatives would carry out which part of The Plan.

222)      In furtherance of The Plan, during the period from 2002 to the present, Defendants

Bloomberg, NYC, Klein and DOE and/or their agents, servants and/or employees conspired

with one another to create and distribute manuals, instructions, directions and confidential

materials through which the targeting of Plaintiffs and others was to be implemented and

which materials originated with and/or were exchanged between them and DOE agents,

servants and/or employees.

223)      In furtherance of The Plan, during the period from 2002 to the present, Defendants

UFT and Weingarten and/or their agents, servants and/or employees conspired with one

another to create and distribute manuals, instructions, directions and confidential materials

through which Defendants UFT and Weingarten supported the targeting of Plaintiffs and

other teachers, or failed or refused to act to protect Plaintiffs and other teachers who were

being targeted.

224)      Defendants Bloomberg, NYC, Klein, DOE, Weingarten and/or UFT had the duty

to (i) protect the Plaintiffs' due process, statutory, constitutional and/or contractual rights,

(ii) comply with NYS Education Law §§ 3020 and 3020-a, (iii) provide impartial

Arbitrators to consider allegations of incompetence and/or misconduct upon which or for

which Defendant DOE sought to discipline Plaintiffs, and (iv) provide prompt hearings

related to allegations of incompetence and/or misconduct upon which or for which

Defendants sought to discipline Plaintiffs.

225)     During the period from 2002 to present, Defendants Bloomberg, NYC, Klein,

DOE, UFT Weingarten and/or Combier made material misrepresentations of fact about,

among other things, Article 21G, NYS Education Law §§ 3020 and 3020-a, the

arbitration panel and Plaintiffs' rights.

226)     At the time Defendants Bloomberg, NYC, Klein, DOE, UFT Weingarten and/or

Combier made the aforesaid material misrepresentations of fact about, among other

things, Article 21G, NYS Education Law §§ 3020 and 3020-a, the Arbitrators or the

arbitration panel and Plaintiffs' rights, they knew them to be false.

227)     The purpose for making the aforesaid false statements was, among other things,

to:

    a)  deceive Plaintiffs and other tenured teachers into participating in the 3020a

      hearings;

    b)  deceive Plaintiffs and other tenured teachers about their rights under Article 21G

      and NYS Education Law §§3020 and 3020a;

    c)  force plaintiffs and other teachers into Rubber Rooms;

    d)  subject Plaintiffs to undue financial, physical and emotional stresses; and

    e)  coerced Plaintiffs and other teachers to stipulate to resignation, retirement,

      suspension without pay, and/or arbitrary and capricious and ruinous fines.

228)    Defendants made these misrepresentations for the purpose of inducing Plaintiffs

to rely upon the statements and to refrain from insisting upon their constitutional, due

process and contractual rights.

229)    To their detriment, Plaintiffs and other teachers relied upon these statements in

the belief that they were true.

230)    As a result of the superior economic, political, labor and emotional pressures that

Defendants exerted on Plaintiffs, Plaintiffs were unable to discover that Defendants

aforesaid statements were false and designed to cause harm to Plaintiffs.

231)    As a result of the concealment of evidence by Defendants, Plaintiffs were unable

to discover that Defendants' aforesaid statements were false and/or designed to cause

harm to Plaintiffs.

232)    The aforesaid misrepresentations, fraud and conspiracy was also intended to

coerce Plaintiffs into 3020-a hearings in which they did not have impartial Arbitrators,

had inadequate or no legal representation, and were forced to await hearings for months

and years, during which time they suffered severe financial, physical and emotional

damages.

233)    Defendants Bloomberg, NYC, Klein, DOE, Weingarten, UFT and/or Combier

also sought to conspire to deprive Plaintiffs, or allow Plaintiffs to be deprived, of their

constitutional, due process, statutory and/or contractual rights.

234)    The aforesaid misrepresentations, fraud and conspiracy, were also designed to

interfere with and/or deprive Plaintiffs of:

a) the right to a three person panel to consider any allegations of incompetence or poor pedagogical judgment upon which or for which Defendant DOE sought to discipline Plaintiffs; and

b) the right to 3020-a hearings rather than probable cause hearings related to allegations of "serious" misconduct upon which or for which Defendant DOE sought to discipline Plaintiffs by suspending them without pay.

235)     As part of the aforesaid misrepresentations, fraud and conspiracy, Defendants empowered and/or implemented a "Rotational Panel" of expensive Arbitrators who were hand-selected and vetted and who were placed in their positions so that they would give the appearance of due process, when in fact they were not impartial, and were placed in their positions to do the bidding of Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT to, among other things:

a) improperly, arbitrarily and capriciously impose discipline, including termination, suspension without pay, and ruinous fines, that is accomplished through the denial of Plaintiffs' due process rights as they face allegations of incompetence or misconduct;

b) selectively targeting and pushing Plaintiffs into hearings related to allegations of incompetence or misconduct upon which or for which Defendant DOE sought to discipline Plaintiffs; and

c) interfering with, and/or depriving Plaintiffs of, their right to fair and impartial consideration of applications, subpoenaed testimony, requests for extensions of time, adequate representation by or substitution of counsel, and fair hearings related to allegations of incompetence or misconduct upon which or for which Defendant DOE sought to discipline Plaintiffs.

236)    Defendants also conspired with one another to violate Plaintiffs' and other

tenured teachers' due process and contractual rights, to facilitate the "reassignment" of

Plaintiffs and other tenured teachers to the Rubber Rooms, and/or to facilitate

disciplinary letters to be placed in Plaintiffs' files without fair and impartial review

and/or investigation of the allegations, in contravention of NYS Education Law §§ 3020

and 3020-a and NYS Supreme Court decisions such as Sticco vs. Board of Education.

237)    At the time Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT

conspired with one another to place and/or make charges against Plaintiffs, they knew

they were violating Plaintiffs' due process and contractual rights to facilitate the

"reassignment" of Plaintiffs and other teachers to the Rubbers Rooms and/or to facilitate

disciplinary letters to be placed in Plaintiffs' files without fair and impartial review

and/or investigation of the allegations.

238)    The fraud and conspiracy to defraud Plaintiffs was done with actual and/or

constructive knowledge that Defendants Bloomberg, City, Klein, DOE, Weingarten and

UFT were depriving Plaintiffs of their constitutional, due process, statutory and/or

contractual rights.

239)    At the time Defendants Bloomberg, City, Klein, DOE, Weingarten and UFT

conspired with one another, they did so knowing that they were not entitled to deprive

Plaintiffs of the aforesaid constitutional, due process, statutory and/or contractual rights.

240)    As a direct and proximate result of Defendants' aforesaid misrepresentations,

fraud and conspiracy to violate Plaintiffs rights, Plaintiffs suffered monetary and other

damages.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly, severally and/or in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii) exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier of fact; and (iii) attorneys' fees, interest and costs of suit.

### Eleventh Cause of Action –
### False Confinement and Resulting Physical & Emotional Injuries
### <u>(against Defendants Bloomberg, City, Klein and DOE)</u>

241) Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 15 to 92 as if the same were repeated fully and at length herein.

242) The Rubber Rooms, closets, empty windowless offices or other small spaces are not workplaces.

243) The Rubber Rooms, closets, empty windowless offices or other small spaces are locations where Plaintiffs and other teachers are confined, guarded and their movements restricted.

244) Plaintiffs and other teachers are not permitted to come and go from the Rubber Rooms, closets, empty windowless offices or other small spaces as they please.

245) Plaintiffs and other teachers are not permitted to meet and/or freely move about the Rubber Rooms, closets, empty windowless offices or other small spaces.

246) The Rubber Rooms do not meet the relevant and applicable safety, fire and health standards and are in fact unsafe and dangerous facilities.

247) Defendants Bloomberg, City, Klein and DOE are aware of the safety, fire and health violations in the Rubber Rooms and knowingly subject Plaintiffs and other teachers to unsafe and dangerous conditions.

248)     Defendants Bloomberg's, City's, Klein's and DOE's use of the Rubber Rooms,
closets, empty windowless offices or other small spaces to confine Plaintiffs is/was
improper.

249)     Plaintiffs' and other teachers' relocation and reassignment to the Rubber Rooms,
closets, empty windowless offices or other small spaces constitutes unlawful confinement
and/or false imprisonment.

250)     As a direct and proximate result of confinement in the Rubber Rooms, closets,
empty windowless offices or other small spaces, Plaintiffs suffered monetary, physical,
emotional and other damages.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly, severally and/or
in the alternative for damages as follows (i) compensatory damages per Plaintiff, based on their
individual circumstances, and in an amount in excess of the jurisdictional limit of the Court, (ii)
exemplary, special and/or punitive damages in an amount to be determined by the ultimate trier
of fact; and (iii) attorneys' fees, interest and costs of suit.

### Twelfth Cause of Action -
### Declaratory Judgment Pursuant 28 USC § 2201 et seq.

251)     Plaintiffs repeat and re-allege each of the allegations as set forth above in ¶¶ 15
to 92  as if the same were repeated fully and at length herein.

252)     Pursuant to 28 USC 2201 et seq. (hereinafter "The Declaratory Judgment Act"):

> . . . . a case of actual co troversy withi  its jurisdictio  . . . upo   the
> fili  c of a   appropriate pleadi  ci h ay declare the richts a  d other lecal
> relatio  s of a  y i  terested party seeki  c such declaratio  i whether or
> ot further relief is or could ce soucht.

253)      The issues presented as they relate to Article 21G and certain of the due

process violations, certain of the acts of retaliation and harassments, certain acts

as related to the conduct of the 3020-a hearings against Plaintiffs and the

withdrawal of Plaintiffs' counsel based upon a purported "conflict of interest"

declared by Defendant UFT, the unlawful confinement in the Rubber Rooms and

a)   3020-a hearings convened in violation of NYS Education Law §§ 3020 and 3020-
a;

b)   imposition of decisions, fines, suspension without pay, termination and/or other

penalties resulting from hearings that were convened in violation of NYS

Education Law §§ 3020 and 3020-a;

c)   coercion to enter into stipulations involving resignation, retirement, suspension

without pay, and/or arbitrary, capricious and ruinous fine;

d)   retaliation for attempting to exercise their 1st Amendment rights and freedoms

related to informing others, assisting others and getting assistance from others, in

relation to the violation of their constitutional and contractual rights, hostile work

environment, false confinement, and other abuses within the City public school

system, which are having a chilling affect on Plaintiffs freedom of speech and

association; and

e)   threats that if they do not withdraw from this lawsuit they will be subjected to

further damages, including termination,

all are ripe for Declaratory Judgment.

WHEREFORE, Plaintiffs request Declaratory Judgment that (i) Article 21G is void, (ii)

the 3020-a hearings as conducted by the DOE violate Plaintiffs' due process rights, (iii) the

forcing of Plaintiffs into hearings without counsel violates their due process rights, (iv) the

retaliation and harassment of Plaintiffs by Defendants violate their due process, constitutional

and contractual rights, (v) violate the 1st, 5th & 14th Amendments, violate anti-retaliation

provisions of Title VII, (vi) violate the Federal Whistleblower Protection Act, (vii) violate the

Labor Management Disclosure and Reporting Act, and (viii) the Rubber Rooms are dangerous

and hazardous and should be immediately closed.


Dated:  June 2, 2008                    /s/ Edward D. Fagan (electronically signed)
        New York, NY                        Edward D. Fagan Esq. (EF-4125)
                                            5 Penn Plaza, 23rd Floor
                                            New York, NY  10001
                                            Tel. (646) 378-2225
                                            Fax (888) 845-8593
                                            Email: faganlawintl@aim.com

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------X

Teachers4Action,                              :
    On behalf of its Members          :
    And By FlorianLewenstein,          :
    Its President and Spokesperson,   :
        Et al                        :
                            :
          Plaintiffs,           :
    - vs -                                      :
                            :
Michael G. Bloomberg,                    :
   Mayor of New York City;              :
City of New York;                    :
Joel Klein,                                        :
   Individually and in his capacity as   :
   Chancellor of New York City           :
   Department of Education;              :
New York City Department of Education; :
Randi Weingarten;                        :
   Individually and as President of       :
   United Federation of DOE staff;       :
United Federation of DOE staff;         :
Betsy Combier,                               :
   Individually and agent/representative :
   Of United Federation of DOE staff,    :
          Defendants.   :

----------------------------------------------------X

CIVIL ACTION
08-cv-548 (VM)

=================================================================

**EXHIBITS TO AMENDED COMPLAINT – JUNE 2, 2008**

=================================================================

# Exhibit 1

## (3020a Statistics)

**to**

**Plaintiffs' June 2, 2008 Amended Complaint Teachers4Action et al v Bloomberg et al 08-cv-548 (VM)(AJP)**

## Frequency of 3020-a Charges
### 1995 -2005

| Charges | Count | % of Total |
|---|---|---|
| Incompetence | 176 | 30% |
| Improper Student Contact | 128 | 22% |
| Corporal Punishment | 59 | 10% |
| Insubordination | 47 | 8% |
| Off Campus Misconduct | 42 | 7% |
| Student Safety | 21 | 4% |
| Cheating | 21 | 4% |
| Lack of Certification | 9 | 2% |

Source : New York State School Boards Association

## 3020-a Decisions

| Year (1995-2005) | 95 | 96 | 97 | 98 | 99 | 00 | 01 | 02 | 03 | 04 | 05 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Terminate | 8 | 8 | 10 | 8 | 10 | 15 | 13 | 22 | 34 | 22 | 20 | 170 |
| Unpaid Suspension | 9 | 5 | 16 | 11 | 14 | 19 | 24 | 21 | 28 | 32 | 34 | 213 |
| Fine | 2 | 3 | 5 | 5 | 5 | 4 | 5 | 5 | 11 | 11 | 17 | 73 |
| Reprimand | 0 | 1 | 3 | 1 | 0 | 5 | 7 | 3 | 2 | 3 | 3 | 28 |
| Acquit | 3 | 4 | 8 | 3 | 5 | 11 | 17 | 16 | 10 | 4 | 4 | 85 |
| Other | 0 | 0 | 0 | 1 | 0 | 0 | 4 | 0 | 1 | 3 | 2 | 11 |
| **Total** | 22 | 21 | 42 | 29 | 34 | 54 | 70 | 67 | 86 | 75 | 80 | **580** |

Compare 800, the current number of rubber rooms' inmates, to the 580 3020a cases for a whole decade for the entire state.

Note the low number of acquittals, less than 15% of the teachers tried.

### DOE's assault on teachers unabated

| Years | Number of Inmates |
|---|---|
| March 2005 | 315 |
| March 2006 | 500 |
| March 2007 | 651 |

New York Post, 9/30/07

Exhibit 1

# *Exhibit  2*

## *(NYS Education Law § 3020a)*

*to*

*Plaintiffs' June 2, 2008 Amended Complaint*
*Teachers4Action et al v Bloomberg et al*
*08-cv-548 (VM)(AJP)*

Welcome to Loislaw, Legal Research That's Comprehensive and Easy-to-Use

2/22/08 11:23 AM

# New York Consolidated Laws

🗀 New York Consolidated Laws
🗀 CHAPTER 16 OF THE CONSOLIDATED LAWS — EDUCATION LAW
🗀 TITLE IV TEACHERS AND PUPILS
🗀 ARTICLE 61 TEACHERS AND SUPERVISORY AND ADMINISTRATIVE STAFF

## § 3020 Educ. Discipline of teachers.

1. No person enjoying the benefits of tenure shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article or in accordance with alternate disciplinary procedures contained in a collective bargaining agreement covering his or her terms and conditions of employment that was effective on or before September first, nineteen hundred ninety-four and has been unaltered by renegotiation, or in accordance with alternative disciplinary procedures contained in a collective bargaining agreement covering his or her terms and conditions of employment that becomes effective on or after September first, nineteen hundred ninety-four; provided, however, that any such alternate disciplinary procedures contained in a collective bargaining agreement that becomes effective on or after September first, nineteen hundred ninety-four, must provide for the written election by the employee of either the procedures specified in such section three thousand twenty-a or the alternative disciplinary procedures contained in the collective bargaining agreement and must result in a disposition of the disciplinary charge within the amount of time allowed therefor under such section three thousand twenty-a.

2. No person enjoying the benefits of tenure shall be suspended for a fixed time without pay or dismissed due to a violation of article thirteen-E of the public health law.

3. Notwithstanding any inconsistent provision of law, the procedures set forth in section three thousand twenty-a of this article and subdivision seven of section twenty-five hundred ninety-j of this chapter may be modified or replaced by agreements negotiated between the city school district of the city of New York and any employee organization representing employees or titles that are or were covered by any memorandum of agreement executed by such city school district and the council of supervisors and administrators of the city of New York on or after december first, nineteen hundred ninety-nine. Where such procedures are so modified or replaced: (i) compliance with such modification or replacement procedures shall satisfy any provision in this chapter that requires compliance with section three thousand twenty-a, (ii) any employee against whom charges have been preferred prior to the effective date of such modification or replacement shall continue to be subject to the provisions of such section as in effect on the date such charges were preferred, (iii) the provisions of subdivisions one and two of this section shall not apply to agreements negotiated pursuant to this subdivision, and (iv) in accordance with paragraph (e) of subdivision one of section two hundred nine-a of the civil service law, such modification or replacement procedures contained in an agreement negotiated pursuant to this subdivision shall continue as terms of such agreement after its expiration until a new agreement is negotiated. Notwithstanding any inconsistent provision of law, the commissioner of

Exhibit 2

Page 1

education shall review any appeals authorized by such modification or replacement procedures within fifteen days from receipt by such commissioner of the record of prior proceedings in the matter subject to appeal. Such review shall have preference over all other appeals or proceedings pending before such commissioner.

4. a. Notwithstanding any inconsistent provision of law, the procedures set forth in section three thousand twenty-a of this article and subdivision seven of section twenty-five hundred ninety-j of this chapter may be modified by agreements negotiated between the city school district of the city of New York and any employee organization representing employees or titles that are or were covered by any memorandum of agreement executed by such city school district and the united federation of teachers on or after June tenth, two thousand two. Where such procedures are so modified: (i) compliance with such modified procedures shall satisfy any provision of this chapter that requires compliance with section three thousand twenty-a of this article; (ii) any employee against whom charges have been preferred prior to the effective date of such modification shall continue to be subject to the provisions of such section as in effect on the date such charges were preferred; (iii) the provisions of subdivisions one and two of this section shall not apply to agreements negotiated pursuant to this subdivision, except that no person enjoying the benefits of tenure shall be disciplined or removed during a term of employment except for just cause; and (iv) in accordance with paragraph (e) of subdivision one of section two hundred nine-a of the civil service law, such modified procedures contained in an agreement negotiated pursuant to this subdivision shall continue as terms of such agreement after its expiration until a new agreement is negotiated.

b. Any modifications to the procedures set forth in section three thousand twenty-a of this article and subdivision seven of section twenty-five hundred ninety-j of this chapter shall not change the manner in which the fees and expenses of such proceedings pursuant to the aforesaid sections are paid.

(As amended by Laws 2000, ch. **3**, Sec. 1; Laws 2002, ch. **93**, Pt. J, Sec. 1, eff. June 25, 2002.)

Effective Date: Laws 2000, ch. **3**, Sec. 2, provided that:

"This act shall take effect immediately [Jan. 31, 2000], and shall be deemed to authorize and apply to a memorandum of agreement executed by the city school district of the city of New York and the council of supervisors and administrators of the city of New York on or after December 1, 1999."

Copyright © 2008 Loislaw.com, Inc. All Rights Reserved

Exhibit 2

Page 2

# *Exhibit  3*

## *(NYS Education Law § 3020-a)*

## *to*

## *Plaintiffs' June 2, 2008 Amended Complaint Teachers4Action et al v Bloomberg et al 08-cv-548 (VM)(AJP)*

## New York Consolidated Laws

☐ **New York Consolidated Laws**
☐ **CHAPTER 16 OF THE CONSOLIDATED LAWS — EDUCATION LAW**
☐ **TITLE IV TEACHERS AND PUPILS**
☐ **ARTICLE 61 TEACHERS AND SUPERVISORY AND ADMINISTRATIVE STAFF**

**§ 3020-a Educ. Disciplinary procedures and penalties.**

1. Filing of charges. All charges against a person enjoying the benefits of tenure as provided in subdivision three of section one thousand one hundred two, and sections two thousand five hundred nine, two thousand five hundred seventy-three, twenty-five hundred ninety-j, three thousand twelve and three thousand fourteen of this chapter shall be in writing and filed with the clerk or secretary of the school district or employing board during the period between the actual opening and closing of the school year for which the employed is normally required to serve. Except as provided in subdivision eight of section two thousand five hundred seventy-three and subdivision seven of section twenty-five hundred ninety-j of this chapter, no charges under this section shall be brought more than three years after the occurrence of the alleged incompetency or misconduct, except when the charge is of misconduct constituting a crime when committed.

2. (a) Disposition of charges. Upon receipt of the charges, the clerk or secretary of the school district or employing board shall immediately notify said board thereof. Within five days after receipt of charges, the employing board, in executive session, shall determine, by a vote of a majority of all the members of such board, whether probable cause exists to bring a disciplinary proceeding against an employee pursuant to this section. If such determination is affirmative, a written statement specifying the charges in detail, the maximum penalty which will be imposed by the board if the employee does not request a hearing or that will be sought by the board if the employee is found guilty of the charges after a hearing and outlining the employee's rights under this section, shall be immediately forwarded to the accused employee by certified or registered mail, return receipt requested or by personal delivery to the employee.

(b) The employee may be suspended pending a hearing on the charges and the final determination thereof. The suspension shall be with pay, except the employee may be suspended without pay if the employee has entered a guilty plea to or has been convicted of a felony crime concerning the criminal sale or possession of a controlled substance, a precursor of a controlled substance, or drug paraphernalia as defined in article two hundred twenty or two hundred twenty-one of the penal law; or a felony crime involving the physical or sexual abuse of a minor or student.

(c) Within ten days of receipt of the statement of charges, the employee shall notify the clerk or secretary of the employing board in writing whether he or she desires a hearing on the charges and when the charges concern pedagogical incompetence or issues involving pedagogical judgment, his or her choice of either a single hearing officer or a three member panel. All other charges shall be heard by a single hearing officer.

(d) The unexcused failure of the employee to notify the clerk or secretary of his or her desire for a hearing within ten days of the receipt

Exhibit 3                                                              Page 1

of charges shall be deemed a waiver of the right to a hearing. Where an employee requests a hearing in the manner provided for by this section, the clerk or secretary of the board shall, within three working days of receipt of the employee's notice or request for a hearing, notify the commissioner of education of the need for a hearing. If the employee waives his or her right to a hearing the employing board shall proceed, within fifteen days, by a vote of a majority of all members of such board, to determine the case and fix the penalty, if any, to be imposed in accordance with subdivision four of this section.

3. Hearings. a. Notice of hearing. Upon receipt of a request for a hearing in accordance with subdivision two of this section, the commissioner of education shall forthwith notify the American Arbitration Association (hereinafter "association") of the need for a hearing and shall request the association to provide to the commissioner forthwith a list of names of persons chosen by the association from the association's panel of labor arbitrators to potentially serve as hearing officers together with relevant biographical information on each arbitrator. Upon receipt of said list and biographical information, the commissioner of education shall forthwith send a copy of both simultaneously to the employing board and the employee.

b. (i) Hearing officers. All hearings pursuant to this section shall be conducted before and by a single hearing officer selected as provided for in this section. A hearing officer shall not be eligible to serve as such if he or she is a resident of the school district, other than the city of New York, under the jurisdiction of the employing board, an employee, agent or representative of the employing board or of any labor organization representing employees of such employing board, has served as such agent or representative within two years of the date of the scheduled hearing, or if he or she is then serving as a mediator or fact finder in the same school district. Notwithstanding any other provision of law, the hearing officer shall be compensated by the department with the customary fee paid for service as an arbitrator under the auspices of the association for each day of actual service plus necessary travel and other reasonable expenses incurred in the performance of his or her duties. All other expenses of the disciplinary proceedings shall be paid in accordance with rules promulgated by the commissioner of education.

(ii) Not later than ten days after the date the commissioner mails to the employing board and the employee the list of potential hearing officers and biographies provided to the commissioner by the association, the employing board and the employee, individually or through their agents or representatives, shall by mutual agreement select a hearing officer from said list to conduct the hearing and shall notify the commissioner of their selection.

(iii) If the employing board and the employee fail to agree on an arbitrator to serve as a hearing officer from said list and so notify the commissioner within ten days after receiving the list from the commissioner, the commissioner shall request the association to appoint a hearing officer from said list.

(iv) In those cases in which the employee elects to have the charges

Exhibit 3

Welcome to Loislaw, Legal Research That's Comprehensive and Easy-to-Use                                                    2/22/08 11:24 AM

heard by a hearing panel, the hearing panel shall consist of the hearing officer, selected in accordance with this subdivision, and two additional persons, one selected by the employee and one selected by the employing board, from a list maintained for such purpose by the commissioner of education. The list shall be composed of professional personnel with administrative or supervisory responsibility, professional personnel without administrative or supervisory responsibility, chief school administrators, members of employing boards and others selected from lists of nominees submitted to the commissioner by statewide organizations representing teachers, school administrators and supervisors and the employing boards. Hearing panel members other than the hearing officer shall be compensated by the department of education at the rate of one hundred dollars for each day of actual service plus necessary travel and subsistence expenses. The hearing officer shall be compensated as set forth in this subdivision. The hearing officer shall be the chairman of the hearing panel.

c. Hearing procedures. (i) The commissioner of education shall have the power to establish necessary rules and procedures for the conduct of hearings under this section. Such rules shall not require compliance with technical rules of evidence. Hearings shall be conducted by the hearing officer selected pursuant to paragraph b of this subdivision with full and fair disclosure of the nature of the case and evidence against the employee by the employing board and shall be public or private at the discretion of the employee. The employee shall have a reasonable opportunity to defend himself or herself and an opportunity to testify in his or her own behalf. The employee shall not be required to testify. Each party shall have the right to be represented by counsel, to subpoena witnesses, and to cross-examine witnesses. All testimony taken shall be under oath which the hearing officer is hereby authorized to administer. A competent stenographer, designated by the commissioner of education and compensated by the state education department, shall keep and transcribe a record of the proceedings at each such hearing. A copy of the transcript of the hearings shall, upon request, be furnished without charge to the employee and the board of education involved.

(ii) The hearing officer selected to conduct a hearing under this section shall, within ten to fifteen days of agreeing to serve as such, hold a pre-hearing conference which shall be held in the school district or county seat of the county, or any county, wherein the employing school board is located. The pre-hearing conference shall be limited in length to one day except that the hearing officer, in his or her discretion, may allow one additional day for good cause shown.

(iii) At the pre-hearing conference the hearing officer shall have the power to:

(A) issue subpoenas;

(B) hear and decide all motions, including but not limited to motions to dismiss the charges;

(C) hear and decide all applications for bills of particular or requests for production of materials or information, including, but not limited to,

Exhibit 3

Page 3

any witness statement (or statements), investigatory statement (or statements) or note (notes), exculpatory evidence or any other evidence, including district or student records, relevant and material to the employee's defense.

(iv) Any pre-hearing motion or application relative to the sufficiency of the charges, application or amendment thereof, or any preliminary matters shall be made upon written notice to the hearing officer and the adverse party no less than five days prior to the date of the pre-hearing conference. Any pre-hearing motions or applications not made as provided for herein shall be deemed waived except for good cause as determined by the hearing officer.

(v) In the event that at the pre-hearing conference the employing board presents evidence that the professional license of the employee has been revoked and all judicial and administrative remedies have been exhausted or foreclosed, the hearing officer shall schedule the date, time and place for an expedited hearing, which hearing shall commence not more than seven days after the pre-hearing conference and which shall be limited to one day. The expedited hearing shall be held in the local school district or county seat of the county or any county, wherein the said employing board is located. The expedited hearing shall not be postponed except upon the request of a party and then only for good cause as determined by the hearing officer. At such hearing, each party shall have equal time in which to present its case.

(vi) During the pre-hearing conference, the hearing officer shall determine the reasonable amount of time necessary for a final hearing on the charge or charges and shall schedule the location, time(s) and date(s) for the final hearing. The final hearing shall be held in the local school district or county seat of the county, or any county, wherein the said employing school board is located. In the event that the hearing officer determines that the nature of the case requires the final hearing to last more than one day, the days that are scheduled for the final hearing shall be consecutive. The day or days scheduled for the final hearing shall not be postponed except upon the request of a party and then only for good cause shown as determined by the hearing officer. In all cases, the final hearing shall be completed no later than sixty days after the pre-hearing conference unless the hearing officer determines that extraordinary circumstances warrant a limited extension.

4. Post hearing procedures. (a) The hearing officer shall render a written decision within thirty days of the last day of the final hearing, or in the case of an expedited hearing within ten days of such expedited hearing, and shall forthwith forward a copy thereof to the commissioner of education who shall immediately forward copies of the decision to the employee and to the clerk or secretary of the employing board. The written decision shall include the hearing officer's findings of fact on each charge, his or her conclusions with regard to each charge based on said findings and shall state what penalty or other action, if any, shall be taken by the employing board. At the request of the employee, in determining what, if any, penalty or other action shall be imposed, the hearing officer shall consider the extent to which the employing board made efforts towards correcting the behavior of the employee which resulted in

Exhibit 3                                                    Page 4

charges being brought under this section through means including but not limited to: remediation, peer intervention or an employee assistance plan. In those cases where a penalty is imposed, such penalty may be a written reprimand, a fine, suspension for a fixed time without pay, or dismissal. In addition to or in lieu of the aforementioned penalties, the hearing officer, where he or she deems appropriate, may impose upon the employee remedial action including but not limited to leaves of absence with or without pay, continuing education and/or study, a requirement that the employee seek counseling or medical treatment or that the employee engage in any other remedial or combination of remedial actions.

(b) Within fifteen days of receipt of the hearing officer's decision the employing board shall implement the decision. If the employee is acquitted he or she shall be restored to his or her position with full pay for any period of suspension without pay and the charges expunged from the employment record. If an employee who was convicted of a felony crime specified in paragraph (b) of subdivision two of this section, has said conviction reversed, the employee, upon application, shall be entitled to have his pay and other emoluments restored, for the period from the date of his suspension to the date of the decision.

(c) The hearing officer shall indicate in the decision whether any of the charges brought by the employing board were frivolous as defined in section eight thousand three hundred three-a of the civil practice law and rules. If the hearing officers finds that all of the charges brought against the employee were frivolous, the hearing officer shall order the employing board to reimburse the state education department the reasonable costs said department incurred as a result of the proceeding and to reimburse the employee the reasonable costs, including but not limited to reasonable attorneys' fees, the employee incurred in defending the charges. If the hearing officer finds that some but not all of the charges brought against the employee were frivolous, the hearing officer shall order the employing board to reimburse the state education department a portion, in the discretion of the hearing officer, of the reasonable costs said department incurred as a result of the proceeding and to reimburse the employee a portion, in the discretion of the hearing officer, of the reasonable costs, including but not limited to reasonable attorneys' fees, the employee incurred in defending the charges.

5. Appeal. Not later than ten days after receipt of the hearing officer's decision, the employee or the employing board may make an application to the New York state supreme court to vacate or modify the decision of the hearing officer pursuant to section seven thousand five hundred eleven of the civil practice law and rules. The court's review shall be limited to the grounds set forth in such section. The hearing panel's determination shall be deemed to be final for the purpose of such proceeding. In no case shall the filing or the pendency of an appeal delay the implementation of the decision of the hearing officer.

Copyright © 2008 Loislaw.com, Inc. All Rights Reserved

Exhibit 3                                                                                                    Page 5

# *Exhibit  4*

## *(UFT Contract Article 21 1995-2000)*

## *to*

## *Plaintiffs' June 2, 2008 Amended Complaint Teachers4Action et al v Bloomberg et al 08-cv-548 (VM)(AJP)*

## UFT Contract 1995-2000 - Article 21

**E. Expedited 3020-a Procedure**

The parties are in agreement that it is in the best interests of the school system and the teacher involved to expedite the proceedings under 3020a in a manner consistent with due process. The parties have therefore agreed to expedite the 3020-a proceedings for charges filed prior to September 1, 1996, in the following manner:

1. The parties shall mutually designate a panel of arbitrators, to be known as the 3020-a impartial chairpersons, selected from the panel of impartials of the State Education Department. The State Education Department shall continue to administer the assignment of 3020-a matters to the panel. The impartials shall be paid their customary rates and the difference between those rates and the rates paid by the State Education Department shall be borne equally by the parties.

2. Charges against tenured teachers shall be processed in accordance with 3020-a; heard by a tripartite hearing panel composed of an impartial chairperson, a Board member and a Union member. As charges are brought to the State Education Department, they shall assign each case in rotation to an impartial chairperson who is available to schedule the case for hearing within thirty (30) calendar days. The impartial chairperson shall hold an informal conference within two weeks of receipt of the charges for the purpose of clarification of issues and expedition of the scheduling of the case which shall be scheduled for consecutive days under the conditions set forth in the regulations of the Commissioner. The cost of daily and/or expedited transcripts, when requested, shall be shared equally by the parties if mutually requested and by one party if not mutually requested. The parties shall submit any memoranda of law within two weeks of the receipt of the transcripts. Decisions in each case shall be issued within two weeks of the closing of the record.

3. Disciplinary charges against tenured teachers filed prior to September 1, 1996 shall continue under these provisions. Subsequently, Section 3020a of the Education Law without modification shall be the exclusive mechanism utilized for all disciplinary charges filed against tenured teachers.

**F. Disciplinary Arbitration Option**

Tenured teachers facing disciplinary charges filed prior to September 1, 1996 may elect final and binding arbitration, in lieu of the expedited 3020a procedure above.

1. Within 10 working days of receipt of the Statement of Charges, the teacher, on a prescribed form, shall notify the Board and the Union of the desire to pursue one of the following procedures:

    a. No hearing
    b. Expedited 3020-a procedure
    c. Final and binding Arbitration

Exhibit 4                                                                                    Page 1

2. The unexcused failure by the teacher to elect an option within ten working days of the receipt of charges will be deemed a waiver of the right to arbitration, and as provided by law, a waiver of the right to a hearing under 3020-a. In the event of a late election for arbitration, the arbitrator will determine, as a threshold issue, whether the failure to make the election within 10 working days shall be excused.

3. It is understood that the teacher is bound by the alternative selected and will not be permitted to pursue more than one procedure.

4. If the teacher chooses to pursue the arbitration procedure all applicable provisions of Article 22C of this Agreement [attached] and Article 75 of the Civil Practice Laws and Rules shall apply.

a. The parties shall mutually designate a panel of arbitrators who shall be assigned cases by rotation and who shall schedule such assigned cases and informal conferences on the same basis and within the time frame as set forth in the expedited 3020-a procedure.

b. All hearings shall be conducted in accordance with the rules and procedures in the AAA's Voluntary Labor Arbitration Rules. The Arbitrator's powers include the power to conduct hearings; decide motions and hold pre- hearing conferences; administer oaths and affirmations; compel the attendance of witnesses and the production of documents; issue subpoenas; and take whatever actions are necessary to expeditously resolve the case or render a determination. The Board and the teacher may present statements of fact, witnesses, documentary and other evidence and argument, and may cross-examine the witnesses of the other party. The hearings shall be transcribed with the cost of transcription shared by the Board and the Union. The cost of daily and/or expedited transcripts shall be shared equally by the parties if mutually requested, and by one party if not mutually requested. The expenses of witnesses for either side shall be paid by the party producing such witnesses. Memoranda of law shall be submitted within two weeks of the receipt of transcripts.

c. The Arbitrator shall issue a written decision within two weeks after the closing of the record. The decision shall fully detail the arbitrator's conclusions and any finding of facts; and state the penalty, if any. Such penalty may include an oral or written reprimand, a fine, a suspension for a fixed time without pay, or a dismissal. An acquitted teacher shall be restored to his/her position and all charges shall be expunged from the teacher's record.

d. Any fees and expenses in excess of that paid by the State Education Department, including the Arbitrator's rate, shall be born equally by the Board and the Union.

e. Any arbitration determination shall be final and binding, subject only to judicial review under Article 75 of the CPLR.

f. Disciplinary charges against tenured teachers filed prior to September 1, 1996 shall continue under these provisions. Subsequently, Section 3020a of the Education Law without modification shall be the exclusive mechanism utilized for all disciplinary charges filed against tenured teachers.

Exhibit 4

Page 2

Article 22 – Arbitration

C. Arbitration

A grievance dispute which was not resolved at the level of the Chancellor under the grievance procedure may be submitted by the Union to an arbitrator for decision if it involves the application or interpretation of this Agreement. Grievances involving the exercise of Board discretion under any term of this Agreement may be submitted to arbitration to determine whether the provision was disregarded or applied in a discriminatory or arbitrary or capricious manner so as to constitute an abuse of discretion, namely: whether the challenged judgment was based upon facts which justifiably could lead to the conclusion as opposed to merely capricious or whimsical preferences, or the absence of supporting factual reasons.

A grievance may not be submitted to an arbitrator unless a decision has been rendered by the Chancellor under the grievance procedure, except as provided in Section B4g of this Article, and except in cases where, upon expiration of the 20-day time limit for decision the Union filed notice with the Chancellor of intention to submit the grievance to arbitration no decision was issued by the Chancellor within five school days after receipt of such notice.

The proceeding shall be initiated by the Union filing with the Board a notice of arbitration. The notice shall be filed within 15 school days after receipt of the decision of the Chancellor under the grievance procedure or, where no decision has been issued in the circumstance described above, three days following the expiration of the five school day period provided above. The notice shall include a brief statement setting forth precisely the issue to be decided by the arbitrator and the specific provision of the Agreement involved. The parties shall jointly schedule the arbitration hearings.

A panel of six arbitrators shall be designated by mutual agreement of the parties to serve for any case or cases submitted to them in accordance with their availability to promptly hear and determine the case or cases submitted.

Effective February 1, 1993, a panel of seven arbitrators shall be designated by mutual agreement of the parties to serve for any case or cases submitted to them in accordance with their ability to promptly hear and determine the case or cases submitted;

Arbitrators shall serve one year terms which extend from September 1 through August 31 of the following year. Arbitrators who are selected after September 1 shall hear cases for a minimum of one year, with a term ending on August 31;

Arbitrators will be continued for additional one year terms, unless either party discontinues the services of any of the panel arbitrators by notification to the other party by May 15 that such arbitrators shall not be selected for an additional term. Arbitrators not selected by the parties to serve an additional term will be notified jointly by the parties; [see provisions at end]

Arbitrators who are not continued for an additional term shall finish any case they have begun hearing;

Exhibit 4                                                                                                          Page 3

If a panel arbitrator(s) is not continued for an additional one year term, a replacement(s) shall be selected to serve on the panel by the mutual agreement of the parties. Should agreement not be reached in sufficient time to ensure that the replacement arbitrator(s) commences service on September 1, the parties shall maintain the same number of hearing dates which would have existed if the replacement arbitrator(s) could have provided dates starting in September. The parties further agree to schedule the same number of dates, regardless of the number of arbitrators on the panel, normally scheduled in a school year. This maintenance of service shall be accomplished in the following manner:

a.  First, by requesting additional hearing dates from the panel arbitrators; and

b.  If necessary, by requesting hearing dates from arbitrators previously agreed upon for this purpose; and

c.  If necessary, by requesting that the American Arbitration Association provide simultaneously to each party an identical list of names of persons chosen from the Panel of Labor Arbitrators, as outlined in Rule 12 of the A.A.A. Labor Arbitration Rules (as amended and in effect January 1, 1992).

The parties agree to enter into a stipulation of facts whenever possible in advance of the hearing. The parties seek the most expeditious decisions in arbitrations and will not normally file briefs or order transcripts. If either or both parties order transcripts, it shall be on an expedited basis. The parties may agree to file post-hearing briefs. However, if a party unilaterally files a brief, it shall be filed within five working days of the hearing or receipt of the transcript, if one is ordered. The other party shall have the right to file a reply brief within five working days of receipt of the brief.

The voluntary labor arbitration rules of the American Arbitration Association shall apply to the proceedings insofar as they relate to the hearings and fees and expenses.

The arbitrator shall issue his decision not later than 30 days from the date of the closing of the hearings or, if oral hearings have been waived, then from the date of transmitting the final statements and proofs to the arbitrator. The decision shall be in writing and shall set forth the arbitrator's opinion and conclusions on the issues submitted. The arbitrator shall limit his decision strictly to the application and interpretation of the provisions of this Agreement and he shall be without power or authority to make any decision:

1.  Contrary to, or inconsistent with, or modifying or varying in any way, the terms of this Agreement or of applicable law or rules or regulations having the force and effect of law;

2.  Involving Board discretion under the provisions of this Agreement, under Board by-laws, or under applicable law, except that the arbitrator may decide in a particular case whether the provision was disregarded or applied in a discriminatory or arbitrary or capricious manner so as to constitute an abuse of discretion, namely whether the challenged judgment was based upon facts which justifiably could lead to the conclusion as opposed to merely capricious or whimsical preferences or the absence of supporting factual reasons;

Exhibit 4                                                                                      Page 4

3. Limiting or interfering in any way with the powers, duties and responsibilities of the Board under its by-laws, applicable law, and rules and regulations having the force and effect of law.

The decision of the arbitrator, if made in accordance with his jurisdiction and authority under this Agreement, will be accepted as final by the parties to the dispute and both will abide by it.

The arbitrator may fashion an appropriate remedy where he finds a violation of this Agreement. To the extent permitted by law, an appropriate remedy may include back pay. The arbitrator shall have no authority to grant a money award as a penalty for a violation of this Agreement except as a penalty is expressly provided for in this Agreement.

The arbitrator's fee will be shared equally by the parties to the dispute.

The Board agrees that it will apply to all substantially similar situations the decision of an arbitrator sustaining a grievance and the Union agrees that it will not bring or continue, and that it will not represent any employee in, any grievance which is substantially similar to a grievance denied by the decision of an arbitrator.

The provisions of Article 22 C (Arbitration) shall apply to grievances arising under Article 21 A (Teacher Files) except that:

1. Cases shall be submitted to an arbitrator designated by mutual agreement of the parties.

2. Awards shall be issued within five days after the close of the hearing and without opinions.

3. The voluntary labor arbitration rules of the A.A.A. shall apply to the proceedings insofar as they relate to the hearings.

4. Periodic consultations shall be held to monitor these procedures.

Exhibit 4

Page 5

# *Exhibit  5*

## *(UFT Contract Article 21G 2007-2009)*

### *to*

### *Plaintiffs' June 2, 2008 Amended Complaint*
### *Teachers4Action et al v Bloomberg et al*
### *08-cv-548 (VM)(AJP)*

Teachers Contract 2007-2009

# ARTICLE TWENTY-ONE
# DUE PROCESS AND REVIEW PROCEDURES

## G. Education Law §3020-a Procedures

Tenured teachers facing disciplinary charges filed, or in the case of Section 1 "Time and Attendance", discipline pursuant to that Section, will be subject to Section 3020-a of the Education Law as modified by paragraphs 1-10 below.

### 1. Time and Attendance

If the Board seeks to discipline a tenured pedagogue regarding absences and/or lateness but seeks a penalty short of termination, the following expedited procedure will apply:

The Board will notify the employee that it intends to bring disciplinary action against the employee pursuant to this section. The Board will include in this notice the employee's attendance record and any other documentation it intends to introduce at the hearing and a statement that pursuant to this section the arbitrator may award any penalty, or take other action, short of termination.

Within 15 calendar days following this notice, the employee must notify the Board in writing of the nature of his\her defense and submit any documentation s\he intends to submit into evidence as well as a medical release for any medical documents related to such defense.

If either party believes that it requires additional documents, it may request a telephonic conference with the arbitrator.

The expedited hearing will occur within one month of the Board's notification to the employee mentioned above. The hearing will be informal and the normal rules of trial procedure and evidence shall not apply. The arbitrator will issue an award and short decision within 15 calendar days of the hearing. The arbitrator's award will be final and binding on all parties. The award may be introduced in another Education Law §3020-a hearing and any findings shall be binding on the §3020-a arbitrator.

One arbitrator, agreed upon between the parties, will hear all absence and lateness cases hereunder. The parties may expand the number of arbitrators if necessary. The arbitrator will hear 4 cases per hearing date on a staggered schedule, but in no situation will one case take more than 1/2 a day. The parties may expand the number of cases heard in a day if they deem it practical.

Exhibit 5

Page 1

**Rotational Panel**

As discussed and agreed upon, all parties would be served better by the implementation of a permanent arbitration panel. The panel members must be agreeable to both sides, however, if the parties cannot agree to a full complement of 20 panel members, additional impartial arbitrators shall be selected by the parties in accordance with the American Arbitration Association (AAA) procedures (strike and rank method) from list(s) provided by the AAA until the desired number (20) is reached to establish such permanent panel.

Panel members shall serve for a maximum of a one-year term. At the expiration of such term, the parties must agree to have arbitrators continue to serve on the panel, and if not, replacement members will be elected by the method outlined above. Removal prior to the end of the one-year term must be for good and sufficient cause upon mutual agreement of the parties.

Any arbitrator who agrees to serve on the rotational panel must agree to the following terms:

a.    Each arbitrator selected to serve on this rotational panel must agree to provide five (5) consecutive hearing dates per month for the months of September through June and two (2) hearing dates for the months of July and August. Consecutive days may be construed to mean five (5) dates within two (2) weeks unless otherwise agreed.

b.    Arbitrators must provide three (3) dates, within ten (10) to fifteen (15) calendar days from the date the case was assigned to him or her, for a pre-hearing conference. One of the dates shall be at 9:00 a.m. Advocates must accept one (1) of the three (3) dates offered or it will be assumed that the date or dates offered at 9:00 a.m. is (or are) acceptable. Said dates must be in compliance with Education Law §3020-a (within 10 to 15 days from the date selected to serve).

c.    At the pre-hearing conference, arbitrators must provide and parties must accept five (5) consecutive hearing dates within the statutory timeframe as delineated in Education Law §3020-a. Consecutive days may be construed to mean five (5) dates within two (2) weeks unless mutually agreed.

d.    The parties are committed to having these cases heard in an expeditious manner. For this reason, absent extraordinary circumstances, arbitrators are not to adjourn hearing dates. It should be noted that normally attorney or party scheduling conflicts are not extraordinary circumstances.

e.    In all cases, as delineated in Education Law §3020-a the final hearing shall be completed no later than 60 days from the pre-hearing conference and the written decision must be rendered within 30 days from the final hearing date.

Exhibit 5                                                                                                    Page 2

f.   There is a presumption that charges against the same employee will be consolidated unless the arbitrator finds that to do so would deny a fair hearing. Additionally, in routine matters, any motions must be made and responded to orally. Thereafter, a decision shall be rendered on the issue the same date the motion was made. Should the arbitrator find that written motion practice is necessary, either party reserves the right to respond orally but in no case shall motion practice take place outside the scope of the timelines as outlined in Education Law §3020-a.

Failure to abide by these rules shall be "good and sufficient" grounds for removal of an arbitrator.

### 3. Expedited Hearings

Prior to the pre-hearing conference, the Board shall determine whether the nature of the case would permit offering Respondent expedited arbitration rather than regular arbitration of the case. If the Respondent accepts the offer of expedited arbitration, the hearing shall proceed in accordance with the expedited procedure set forth below and the Board may not seek a penalty to exceed six (6) months suspension or the equivalent monetary penalty. Should the Respondent reject the offer of expedited arbitration, the case shall proceed in accordance with the regular arbitration proceeding and the Board may seek any penalty including termination.

Where the offer of expedited arbitration was rejected, the arbitrator (or the arbitration panel) shall not be informed of the offer of expedited arbitration nor that the offer was rejected.

Cases heard under the expedited arbitration procedure shall be completed in three (3) consecutive days. Each advocate shall be provided equal time to present his or her respective case. Cross-examination usually will not go beyond the scope or duration of the direct examination.

During the course of the hearings, should the evidence reveal more serious misconduct than originally charged, the arbitrator, upon his or her initiative, or upon the Board's motion, is empowered for good cause to end the expedited proceeding and order a new, regular arbitration proceeding before a different arbitrator. At the regular arbitration, the Board may seek any penalty including termination. Upon a showing of unavailability during the regular arbitration, the prior record of a completed witness who testified in the expedited arbitration shall be admissible.

Exhibit 5                                                                                          Page 3

### 4. Investigations

Where the Board conducts an investigation of an employee and the employee has been reassigned to administrative duties pending the outcome of such investigation, the parties agree that the employee will be restored to service no later than 6 months from the date of his or her removal unless Education Law §3020-a charges have been preferred against the employee. Should the employee be restored to service, this event does not preclude the Board from subsequently preferring Education Law §3020-a charges against the employee. If charges are preferred, the employee shall remain reassigned, at the Board's discretion, pending the outcome of the disciplinary process. This requirement to restore an employee to service after 6 months does not include investigations conducted by the Special Commissioner of Investigation or investigations that are related to criminal prosecutions.

### 5. Serious Misconduct

The parties agree that certain types of alleged misconduct are so serious that the employee should be suspended without pay pending the outcome of the disciplinary process. Serious misconduct shall be defined as actions that would constitute:

- the felony sale, possession, or use of marijuana, a controlled substance, or a precursor of a controlled substance or drug paraphernalia as defined in Article 220 or 221 of the Penal Law, or
- any crime involving physical abuse of a minor or student (crimes involving sexual abuse of a minor or student are addressed in paragraph 6 below.), or
- any felony committed either on school property or while in the performance of teaching duties, or
- any felony involving firearms as defined in Article 265 of the Penal Law.

If an employee is accused of committing serious misconduct, the employee shall be removed from payroll for a term not to exceed two (2) months after a finding by the "probable cause arbitrator" that there is probable cause to believe that the actions alleged were committed by the employee and that they constitute "serious misconduct" as defined above. Probable cause exists when evidence or information which appears reliable discloses facts or circumstances making it likely that such conduct occurred and that such person committed the conduct. To establish probable cause, the investigator assigned to the matter must be present and testify under oath before the arbitrator. The Board may also be required to produce signed statements from the victim or witnesses, if any. Thereafter, the Respondent shall have an opportunity to respond orally to the offer of proof. The arbitrator may ask relevant questions or may make further inquiry at the request of Respondent. The hearing shall not require testimony of witnesses nor shall cross-examination be permitted.

Exhibit 5

Said probable cause hearing usually shall not exceed one half of a hearing day.

One arbitrator, agreed to by both parties, shall be assigned to hear all probable cause matters for a period of one year. If the parties cannot agree upon one arbitrator, each party shall select one arbitrator who together will select the probable cause arbitrator.

Should the Board meet its burden of establishing probable cause of serious misconduct, the employee shall remain suspended without pay during the pendency of the disciplinary action, but in no event shall such period exceed two months except as set forth herein.

The parties expect that these cases shall be completed within two (2) months. However, where it is not possible to complete the hearing within the two (2) month period despite the best efforts of all parties, and where the arbitrator believes that the evidence already presented tends to support the charges of serious misconduct, the arbitrator may extend the period of suspension without pay for up to thirty (30) days in order to complete the proceedings.

If the Respondent requests not to have the case proceed for a period of thirty (30) days or more and that request is granted, during the period of this adjournment, the Respondent shall remain in non-paid status. As noted above, however, the parties are committed to having these cases heard in an expeditious manner. For this reason, absent extraordinary circumstances, arbitrators are not to adjourn hearing dates.

While suspended without pay pending the arbitration hearing on serious misconduct charges, the Respondent may continue his or her existing health coverage, except that in no event shall the Respondent be entitled to continue his or her existing health coverage for more than six (6) months while on non-paid status except at the absolute discretion of the Chancellor. In the event that the Respondent is exonerated of all serious misconduct charges, the employee shall be restored to his or her position and be entitled to receive back pay and be made whole for the amount of time he or she remained off payroll. In the event that the arbitrator finds the employee guilty of the serious misconduct and imposes a penalty less than termination, the arbitrator shall decide whether and to what extent a reinstated employee shall be entitled to receive any back pay for the time the employee was suspended without pay.

The parties agree that these types of cases shall receive the highest priority, and, upon the Board's request, hearings may be held on such matters during any days previously committed by a rotational panel to other employees, as set forth above. In other words, hearings for serious misconduct take precedence over other disciplinary matters, and the Board may require adjourning other cases previously scheduled before the assigned arbitrator during that time frame in order for that arbitrator to hear serious misconduct cases within the two-month time frame.

Exhibit 5                                                                                    Page 5

### 6. Sexual Offenses Involving Students or Minors

A tenured pedagogue who has been charged under the criminal law or under §3020-a of the New York State Education Law with an act or acts constituting sexual misconduct (defined below) shall be suspended without pay upon a finding by a hearing officer of probable cause that sexual misconduct was committed.

A rebuttable presumption of probable cause shall exist where the Special Commissioner of Investigations ("SCI") substantiates allegations of sexual misconduct, or a tenured pedagogue has been charged with criminal conduct based on act(s) of sexual misconduct.

A report from the Chancellor's Office of Special Investigations ("OSI") substantiating allegations of sexual misconduct is relevant evidence of probable cause but does not create a rebuttable presumption of probable cause.

In §3020-a proceedings, a mandatory penalty of discharge shall apply to any tenured pedagogue a) found by a hearing officer to have engaged in sexual misconduct, or b) who has pleaded guilty to or been found guilty of criminal charges for such conduct.

The §3020-a hearing should be completed within two months, but the suspension without pay shall be extended one additional month if the hearing has not been completed, unless the Board has received an adjournment or otherwise delayed the proceeding. The suspension without pay shall also be extended until a criminal action is resolved and any §3020-a proceeding is also completed.

If the §3020-a hearing results in a dismissal of the charges or if the criminal proceeding ends in an acquittal or dismissal (and the Board has decided not to prefer charges), the pedagogue shall be entitled to back pay with interest for the entire period of the suspension without pay.

For purposes of this section, sexual misconduct shall include the following conduct involving a student or a minor who is not a student: sexual touching, serious or repeated verbal abuse (as defined in Chancellor's Regulations) of a sexual nature, action that could reasonably be interpreted as soliciting a sexual relationship, possession or use of illegal child pornography, and/or actions that would constitute criminal conduct under Article 130 of the Penal Law against a student or minor who is not a student.

A letter of agreement dated October 2, 2005 regarding sexual misconduct is attached as Appendix G.

Exhibit 5                                                                    Page 6

### 7. Other Felony Offenses

Tenured pedagogues who have been convicted of, or who have pled guilty to, any felony not addressed in paragraph 5, above shall be suspended without pay pending the final outcome of the Education Law §3020-a disciplinary proceeding. The §3020-a hearing should be completed within two months, but the suspension without pay shall be extended one additional month if the hearing has not been completed, unless the Board has received an adjournment or otherwise delayed the case.

### 8. Discovery Procedures

To effectuate the purpose of the statute, the parties agree that Education Law §3020-a authorizes the following in advance of the hearing:

Both sides will exchange witness lists, witness statements, and physical evidence (e.g., photographs) at least before the presentation of their direct case and earlier upon motion to the arbitrator.

The Respondent shall receive copies of investigatory statements, notes, other exculpatory evidence, and relevant student records after in camera review.

The Board shall receive evidence and documents from the Respondent upon a showing during the hearing that it is relevant.

Additionally, if the case has stemmed from an investigation conducted by the Special Commissioner of Investigation (SCI), the Board will provide the entire SCI file to Respondent, including exculpatory evidence, during the discovery phase of the §3020-a hearing unless such information is privileged. Failure to do so shall form the basis of such evidence being precluded from introduction in the §3020-a proceedings. This provision remains subject to the Family Educational Rights and Privacy Act.

### 9. Incompetence Cases

The parties agree that in the spirit of progressive discipline, rather than necessarily charge an employee with incompetence, an employee who receives an unsatisfactory rating for the first time may be offered the opportunity to enroll in the Peer Intervention Program ("PIP") for a term of one year. Refusal to enter the PIP program is admissible in any future disciplinary proceedings. The parties further agree that during the first school term of the intervention, no formal observations will be made. During the second school term, although the employee will still be in the PIP, the administration is free to conduct observations and to rate the employee accordingly. Since the end-of-year rating will be based on these observations, a minimum of two (2) observations shall be conducted during the second school term. PIP may not be invoked by the employee once the disciplinary process has commenced.

Exhibit 5

Pursuant to, and as further described in section J "Peer Intervention Plus Program" below, during their participation in the Peer Intervention Plus Program ("PIP Plus"), participating teachers shall not be charged with incompetence pursuant to Education Law §3020-a. The fact that an employee has declined to participate or that the BOE has denied a request to participate or has not offered the teacher an opportunity to participate in the programs will be admissible in §3020-a proceedings. Observation reports of the consulting teachers will be admissible in §3020-a proceedings.

## 10. Attorney Teams

Each Board attorney will be paired with a Union attorney for four (4) consecutive cases. Should one case settle, another case between the same attorneys shall be substituted for the case settled in an effort to utilize the dates set by the parties with the arbitrator.

## H. False Accusations

Knowingly false accusations of misconduct against employees will not be tolerated.

If an accusation of sexual misconduct or physical abuse against an employee is found by the Board or Special Commissioner of Investigation to have been knowingly false when made, the Board will take the following actions to restore the falsely accused employee's reputation: removing all references to the charges from the employee's personnel file(s) and adding evidence of the unfounded nature of the charge to departmental files that may have to be maintained to satisfy other legal requirements, if any; and restoring any back pay owed with interest and, at the employee's request, confirming to any regulatory agency the finding that the employee was falsely accused. In addition, where the knowingly false accusation was made by a student of the employee, absent compelling and extraordinary circumstances the student will be permanently reassigned from the employee's class.

Exhibit 5

EXHIBIT "G"

## ARTICLE FIFTEEN
## RATES OF PAY AND WORKING CONDITIONS
## OF PER SESSION TEACHERS

### A. Rates of Pay

1.  Except as otherwise provided in 3 below, the hourly compensation of per session teachers shall be:

| Effective Date | Rate |
|---|---|
| October 13, 2007............ | $39.98 |
| May 19, 2008................ | $41.98 |

2.  The same hourly compensation prescribed above shall be in effect for per session teachers who are on Youth Board payrolls and are employed in a Board of Education per session activity.

3.  Teachers employed in the New Suspension Program's summer school program ("the Suspension Program") will be paid at the rate of 1/1147 of their regular annual salary per hour.[3]

### B. Extracurricular Activities

#### 1. Athletic

Interscholastic/Intramural sports in day academic and vocational high schools, junior high schools and special day schools, day treatment centers and institutional settings:

### Schedule of Maximum Number of Sessions (School Year)
### Effective School Year 2007-2008
(A session is defined as two (2) clock hours beyond the school day.)

BASEBALL

| | | |
|---|---|---|
| | Boys Jr. Varsity | 36 |
| | Boys Varsity | 96 |

BASKETBALL

| | | |
|---|---|---|
| | Boys Alt HS | 72 |
| | Boys Jr. Varsity | 66 |
| | Boys Varsity | 108 |
| | Girls Alt HS | 72 |
| | Girls Jr. Varsity | 66 |
| | Girls Varsity | 108 |

BOWLING

| | | |
|---|---|---|
| | Boys Varsity | 48 |
| | Coed Alt HS | 36 |
| | Girls Varsity | 48 |

CREW

| | | |
|---|---|---|
| | Coed Varsity | 72 |
| | Assistant Coach | 36 |

CRICKET

| | | |
|---|---|---|
| | Coed Varsity | 48 |

CROSS COUNTRY

---

[3] See paragraph 6 of Appendix I.

|  |  |  |
|---|---|---|
|  | Boys Varsity | 48 |
|  | Girls Varsity | 48 |
|  | Assistant Coach | 27 |
| FENCING |  |  |
|  | Coed Varsity | 48 |
| FOOTBALL |  |  |
|  | Boys Jr. Varsity | 90 |
|  | Boys Varsity | 132 |
|  | Assistant Coach | 132 |
| GOLF |  |  |
|  | Boys Varsity | 48 |
|  | Girls Varsity | 48 |
| GYMNASTICS |  |  |
|  | Boys Varsity | 84 |
|  | Girls Varsity | 84 |
| HANDBALL |  |  |
|  | Boys Varsity | 48 |
|  | Girls Varsity | 48 |
| INDOOR TRACK |  |  |
|  | Boys Varsity | 72 |
|  | Girls Varsity | 72 |
|  | Assistant Coach | 36 |
| LACROSSE |  |  |
|  | Boys Jr. Varsity | 42 |
|  | Boys Varsity | 72 |
|  | Girls Varsity | 72 |
| OUTDOOR TRACK |  |  |
|  | Boys Varsity | 66 |
|  | Girls Varsity | 66 |
|  | Assistant Coach | 36 |
| SOCCER |  |  |
|  | Boys Varsity | 72 |
|  | Girls Varsity | 72 |
| SOFTBALL |  |  |
|  | Coed Alt HS | 51 |
|  | Girls Jr. Varsity | 42 |
|  | Girls Varsity | 96 |
| SWIMMING |  |  |
|  | Boys Varsity | 72 |
|  | Girls Varsity | 72 |
| TENNIS |  |  |
|  | Boys Varsity | 48 |
|  | Girls Varsity | 48 |
| VOLLEYBALL |  |  |
|  | Boys Varsity | 60 |
|  | Girls Jr. Varsity | 41 |

|                   |    |
|-------------------|----|
| Girls Varsity     | 60 |
| Alt. Program      | 42 |
| WRESTLING         |    |
| Boys Varsity      | 72 |

**Sessions** shall be computed as follows:

An afternoon of coaching football ..............................2 sessions
An afternoon of coaching (exclusive of football) ..........1 session
A regularly scheduled football game.............................3 sessions
A regularly scheduled game of basketball
or baseball; track, cross country, soccer,
swimming meet, handball, fencing,
bowling, tennis, golf, wrestling or other
regularly scheduled game for the activities
listed above…………………............................................2 sessions
(A session is defined as two (2) clock hours beyond the school day)

**2. Non-Athletic**

**a.** Major non-athletic extracurricular projects in day academic high schools, day vocational high schools, day junior high schools:

### Schedule of Maximum Number of Sessions (School Year)
### Effective School Year 2007-08

Teacher in charge of school magazine:  18 sessions per issue; maximum 72 sessions for four (4) or more issues.

Teacher in charge of school newspaper:  6 sessions per issue; maximum 72 sessions for 12 or more issues.

Teacher in charge of senior year book:  34 sessions.

Teacher in charge of major school play or operetta:  55 sessions.

Assistant(s) to teacher in charge of major school play or operetta:  32 sessions for one assistant; 52 sessions for two or more assistants. (See Footnote (3)).

Teacher in charge of other musical project:  34 sessions.

Assistant(s) to teacher in charge of other major musical project:  32 sessions for one assistant; maximum of 42 sessions for two or more assistants. (See Footnote (3)).

Teacher in charge of band, orchestra or chorus: two (2) sessions each performance. (See Footnote (2)).

**Sessions** shall be computed in accordance with the following regulations:   (See Footnote (4)).

| | |
|---|---|
| An afternoon of extra service ................................. | 1 session |
| An afternoon of full rehearsal ................................. | 2 sessions |
| An evening or non-school day rehearsal ................. | 3 sessions |
| An afternoon performance (play, operetta, etc.) (See Footnote (1)) ..................................................... | 2 sessions |
| An evening or non-school day performance (play, operetta, etc. Not applicable to teacher in charge of band, orchestra or chorus) ...... . | 3 sessions |

**Footnotes:** (1). The term "afternoon" shall include extra service either after or before the teacher's regular school day. In some schools this service may be rendered in the morning.

(2). For purposes of compensating a teacher in charge of band, orchestra or chorus, performances shall be only those given evenings, Saturdays or holidays and shall not include performances at graduation, parents' meetings, etc.

(3). Where two or more assistants are required, the aggregate compensation paid to all assistants is limited to the maximum number of sessions provided. Assignment of individual assistants to sessions within the maximum limitation shall be made by the school principal.

(4). A session is defined as two (2) clock hours beyond the school day.

   **b. All City High School Music Program**: Maximum Number of Teachers to be Assigned:

All City Orchestra..................................................................... 5
All City Band............................................................. 5
All City Marching Band.............................................. 5
All City Jazz Ensemble................................................. 5
   Maximum Number of Sessions per
Teacher Assigned...................................................... 42

**Sessions** shall be computed in accordance with the following regulations:
   A morning of coaching or rehearsal on Saturday
   or other non-school day (9:00 a.m. to 12:30 p.m.)..........1 session
   A dress rehearsal (only if conducted on a
   non-school day, and limited to one dress
   rehearsal per school year) (9:00 a.m. to 3:00 p.m.)........... 2 sessions[4]
   An evening performance limited to one
   performance per school year.................................1 session

## C. Working Conditions
### 1. Sick Leave
Teachers employed on a regular basis in per session activities will be granted sick leave with pay for absence from duty due to personal illness as follows:

   a. One session during each month of service, or two sessions during the month of August, will be granted to those employed in summer day high schools, summer evening high schools, summer junior high schools, summer special day schools, day treatment centers, and institutional settings; summer day elementary schools, summer evening elementary schools for adults, and vacation day camps.

   b. One session after each period of 20 sessions of service will be granted to those employed in evening high and trade schools, after school centers, evening community and youth and adult centers, adult education classes, and the special after school instructional help program.

   c. Applications for excuse with pay for absence due to personal illness must be accompanied by a certificate of a physician, except that teachers in summer activities

---

[4] The parties disagree as to whether a dress rehearsal is one or two sessions.

shall be granted refunds for illness on application without a statement from a physician for no more than one session per summer.

    d.  Such sick leave shall not be cumulative from one school year to another school year nor from one per session activity to another per session activity, but shall be transferred to the teacher's regular cumulative absence reserve.

**2. Retention**

    Prior service shall govern in the retention of per session teachers employed on a regular basis in per session activities as follows:

    a.  Teachers with at least two years of continuous satisfactory service in a particular activity shall have priority for retention in the same activity for the following school year. Teachers with retention rights in an activity will not lose those rights if their service is interrupted for a period of not more than one year because of sick leave without pay or involuntary change of day school session, or sabbatical leave. Such teachers must return to service in the same activity at the first reorganization of the activity following the interruption of their service for the reasons stated above.[5]

    b.  Teachers who have been granted priority for retention in one per session activity shall not be granted such priority for any other per session activity.

    c.  Teachers will be permitted to serve in more than one per session activity only if no other qualified applicants are available. The Union shall be given a list of per session positions which are held by teachers who have no retention rights in those positions and who are serving in more than one per session activity. Per session activities of 25 hours or less and certain other activities as mutually agreed between the Board and the Union are not counted when determining the number of per session activities served in.

    d.  No teacher who had retention rights in a per session activity on September 1, 1969, shall be displaced by reason of the Chancellor's determining that thereafter the position need not be held by a teacher. During the period he/she remains employed in that per session position, the incumbent having retention rights as of September 1, 1969, shall be paid at the teacher compensation rate prescribed in this Agreement.

    e.  If a per session position occupied by a teacher is terminated and is subsequently restored within the period of six months, the restored position shall be offered to its last teacher incumbent before any other person is employed to fill it.

    f.  A teacher with retention rights who is promoted to teacher in charge shall not lose his/her retention rights as a teacher in the activity in the event that he/she receives an unsatisfactory rating as teacher in charge.

    g.  So long as they continue to exercise their retention rights, no per session teachers who had retention rights in an adult education activity on September 8, 1987 shall be displaced by reason of the provisions of Article Fourteen (Rates of Pay and Working Conditions of Adult Education Teachers) of this Agreement unless a layoff or reduction in hours of a primary adult education employee would result. The rights of a per session teacher who acquires retention rights in an adult education activity after September 9, 1987 shall be subordinate to the rights of primary adult education teachers as set forth in Article Fourteen, A, E (Hours), F (Excessing) and G (Layoff and Recall). In addition, the Board agrees to follow a policy of attrition with respect to those per session teachers who

---

[5] Certain former SOS employees have retention rights for work in the 2008 Suspension Summer Program in accordance with paragraph 7 of Appendix I.

had retention rights in an adult education activity on September 8, 1978 so long as they continue to exercise their retention rights in the adult education activity.

### 3. Appeals from Unsatisfactory Ratings

Per session teachers who receive unsatisfactory ratings shall be entitled to the review procedures before the Chancellor as prescribed in Section 5.3.4 of the by-laws of the Board of Education.

### 4. Selection of New Per Session Teachers[6]

a. Selections for evening high schools, summer day high schools, and summer evening high schools will be made centrally in order of seniority within the system from applicants in the following order of priority: regularly appointed teachers in license, regular substitute teachers in license, regularly appointed teachers out-of-license subject, and regular substitute teachers out-of-license with prior experience in the out-of-license subject.

b. In summer junior high schools, priority will be given to applicants serving in Title I schools. Selection will be made centrally in order of seniority within the system from applicants in the following order of priority: regularly appointed teachers in license, regular substitute teachers in license, regularly appointed teachers out-of-license with prior experience in the out-of-license subject and regular substitute teachers out-of-license with prior experience in the out-of-license subject.

c. For junior high school after school study centers (tutorial), selection will be made by the same method except that it will not operate system-wide.

d. For summer day elementary schools and elementary school study centers, selection will be made according to seniority with two exceptions: (i) priority will be given to qualified teachers in Title I schools; (ii) not more than 10 percent of the positions may be filled from applicants who, in the principal's judgment, possess special qualifications, except that this 10 percent limitation shall not apply to teachers who have retention rights in another per session position.

e. For vacation day camps, selection will be made in the following order of priority: (i) classroom teachers with vacation day camp license who have served previously in vacation day camps; (ii) classroom teachers with vacation day camp license who have not served previously in vacation day camps.

f. For high school after school study centers (tutorial) selection will be made by the same method as provided in 4-a above, except that it will not operate system-wide.

g. For non-summer adult education activities selection will be made in the following order of priority: (i) Primary adult education employees assigned to thirty hours and fifty minutes per week, for up to six per session hours in any week, including any substitute service; (ii) day school teachers with appropriate adult education licenses who have served satisfactorily in adult education activities; (iii) day school teachers with appropriate adult education licenses who have not served previously in adult education activities.

Selection for summer adult education per session activities shall be in the following order of priority: (i) appointed adult education teachers, by license; (ii) primary adult education teachers by discipline; (iii) day school teachers with appropriate license; (iv) other qualified applicants.

---

[6] Selection rights of teachers in the Suspension Summer Program are set forth in Appendix I, paragraph 6.

h.  Applicants for per session employment who are not employed in the Board's regular day school program or adult education program shall be considered for selection only if no qualified day school teacher or adult education employee is available.

### 5.  Evening High School Non-Teaching Assignments

In evening high schools, assignments to positions for which there is a compensatory time allowance shall be made in accordance with the same procedures as are provided for such assignments in the day high schools in Article Seven of this Agreement.

### 6.  Reduction in Per Session Positions

If the number of per session positions in an activity is reduced, teachers will be released on the basis of least seniority in the activity.  If positions are subsequently restored within a year in the per session activity teachers shall be reemployed on the basis of seniority.

### 7.  Teacher Files

The procedures of Article Twenty-One A entitled "Teacher Files" shall apply to teacher files maintained for their per session employment.

### 8.  Sabbatical Leave

Teachers whose sabbatical leave begins August 1 will complete the per session activity in which they are serving, but may not return to the activity until the summer following completion of the sabbatical.

### D. Consultation

The head of each per session activity, or his/her representative, and the Union committee for the activity shall meet once each term in non-working hours to consult on matters of policy involving the professional interests of the per session teachers and on questions relating to the implementation of this Agreement.

### E.  Definitions

The following are per session activities within the meaning of this Article: vacation day camps; after school centers; evening community and youth and adult centers; evening elementary schools for adults; summer evening elementary schools for adults; fundamental adult education day classes; summer day high schools; summer evening high schools; summer junior high schools; summer special day schools; day treatment centers; institutional settings; summer day elementary schools; evening high and trade schools; the special after-school instructional help program; and extra-curricular athletic and non-athletic programs in day academic and vocational high schools, day junior high schools and special day schools, day treatment centers and institutional settings; and the suspension summer program.


## ARTICLE SIXTEEN
## LEAVES

### A.  Cumulative Absence Reserves and Sick Leave

1.  Teachers on regular appointment reinstated after retirement will be credited with the cumulative reserves remaining to their credit upon retirement and such reserves as they accumulated as regular substitutes.

2.  Teachers on regular appointment who resign or retire will be credited upon resuming service as regular substitute teachers with 120/200 of the unused cumulative reserves remaining to their credit upon resignation or retirement.

92

EXHIBIT "H"

## ARTICLE TWENTY
## MATTERS NOT COVERED

With respect to matters not covered by this Agreement which are proper subjects for collective bargaining, the Board agrees that it will make no changes without appropriate prior consultation and negotiation with the Union.

The Board will continue its present policy with respect to sick leave, sabbatical leaves, vacations and holidays except insofar as change is commanded by law.

All existing determinations, authorizations, by-laws, regulations, rules, rulings, resolutions, certifications, orders, directives, and other actions, made, issued or entered into by the Board of Education governing or affecting salary and working conditions of the employees in the bargaining unit shall continue in force during the term of this Agreement, except insofar as change is commanded by law.

## ARTICLE TWENTY-ONE
## DUE PROCESS AND REVIEW PROCEDURES

### A. Teacher Files

Official teacher files in a school shall be maintained under the following circumstances:

1. No material derogatory to a teacher's conduct, service, character or personality shall be placed in the files unless the teacher has had an opportunity to read the material. The teacher shall acknowledge that he/she has read such material by affixing his/her signature on the actual copy to be filed, with the understanding that such signature merely signifies that he/she has read the material to be filed and does not necessarily indicate agreement with its content. However, an incident which has not been reduced to writing within three months of its occurrence, exclusive of the summer vacation period, may not later be added to the file.

2. The teacher shall have the right to answer any material filed and his/her answer shall be attached to the file copy.

3. Upon appropriate request by the teacher, he/she shall be permitted to examine his/her files.

4. The teacher shall be permitted to reproduce any material in his/her file.

5. Members may not grieve material in file, except that if accusations of corporal punishment or verbal abuse against a UFT-represented employee are found to be unsubstantiated, all references to the allegations will be removed from the employee's personnel file.

However, the teacher shall have the right to append a response to any letter. If disciplinary charges do not follow, the letter and response shall be removed from the file three years from the date the original material is placed in the file.

6. The following issues shall not be the basis for discipline of pedagogues: a) the format of bulletin boards; b) the arrangement of classroom furniture; and c) the exact duration of lesson units.

### B. Counseling Memos

Supervisors may issue counseling memos. Counseling memos are not disciplinary. Counseling memos provide the opportunity for supervisors, in a non-disciplinary setting, to point out to employees areas of work that the supervisor believes need improvement. Counseling memos should include the supervisor's proposals for how such improvement

may be achieved.  Any employee who receives a counseling memo may request from the supervisor either suggestions for how to improve or requests for the supervisor to model such improvement for the member.  Counseling memos are a vehicle for supportive improvement.

1.  A counseling memo may only be written to an employee to make him/her aware of a rule, regulation, policy, procedure, practice or expectation.  A counseling memo cannot include any disciplinary action or threat of disciplinary action.

a.  "Counseling Memo" must appear at the top of the memo in bold print and capital letters.  At the conclusion of the memo the following must appear in bold print:

"A counseling memo is not disciplinary in any manner and cannot be used in action against an employee except to prove notice if the employee denies notice."  If the language required in (a) is not included in the memo, it must be added.

b.  A counseling memo must be presented to an employee within one (1) month of the latest incident recounted in the memo.  The memo may only reference similar prior incidents that occurred no more than four (4) months from the date of the latest incident.

2.  Counseling memos may not be used in any action or evaluation involving an employee in the bargaining unit ("U" rating, per session job, etc.) except to establish that the employee who denies knowledge of a rule, regulation, policy, procedure, practice or expectation was given prior notice of it, or to impeach factual testimony.

a.  Counseling memos may not be used in the rating of an employee in the bargaining unit.

b.  Counseling memos may not be referred to in, or attached to, any other letter sent to an employee for their official school file.

3.  Counseling memos may not be grieved.

Any employee who receives a counseling memo shall have the right to answer within one (1) month of receipt of the counseling memo and the answer shall be attached to the file copy of the counseling memo.

4.  All counseling memos will be permanently removed from employee's official school files three (3) years after the latest incident referred to in the memo.

**C. Summons**

1.  A teacher summoned by the principal to a conference which may lead to disciplinary action for reasons of misconduct may be accompanied, at his/her option, by the chapter leader or his/her designated alternate.

2.  Teachers summoned to the office of a community or high school superintendent or to the Division of Human Resources shall be given two days notice and a statement of the reason for the summons, except where an emergency is present or where considerations of confidentiality are involved.

Whenever an employee is summoned for an interview for the record which may lead to disciplinary action, he/she shall be entitled to be accompanied by a representative who is employed by the city school system, or by an employee of the Union who is not a lawyer, and he/she shall be informed of this right.  However, where the community or high school superintendent or the Division of Human Resources permits an attorney who is not a member of the city school system to represent any participant in the interview, the employee shall be entitled to be represented by an attorney.  An interview which is not held in accordance with these conditions shall not be considered a part of the employee's personnel file or record and neither the fact of the interview nor any

statements made at the interview may be used in any subsequent Board proceeding involving the employee. It is understood that informal conferences, such as those between a community or assistant superintendent and a teacher, or the Division of Human Resources and a teacher, for professional improvement, may be conducted off the record and shall not be included in the employee's personnel file or record.

3. Incidents investigated by the Chancellor or by a governmental investigatory agency must be reduced to writing by the appropriate supervisor within 6 months and 12 months respectively from the date the incident either occurred or should have been discovered by the appropriate school officials. Employees must receive a complete copy of any such writing and an opportunity to answer in writing and to have such response attached. The writing may not be incorporated into the employee's personnel file or record, unless this procedure is followed, and any such writing will be removed when an employee's claim that it is inaccurate or unfair is sustained.[10]

**D. Discontinuance of Probationary Service and Appeals of Unsatisfactory Ratings**

1. Regular substitutes and teachers on probation, except as provided in subparagraph 2 below, shall be entitled to the review procedures before the Chancellor as prescribed in Section 4.3.2 of the by-laws of the Board of Education.

By-law 4.3.2 procedures for the review of a recommendation by a superintendent for discontinuance of probationary service of a teacher shall be modified to provide for the following:

a. The 4.3.2 committee shall be a tripartite committee of professional educators, one selected by the teacher, one by the Board and a third selected by the other two from a list agreed upon by the Board and the Union.

b. The committee will make an advisory recommendation to the community school board or the Chancellor for central programs within 20 days after the hearing.

c. The costs of the teacher's representative shall be paid by the teacher. The costs of the Board's representative shall be paid by the Board. The costs of the mutually selected member of the committee shall be shared by the Board and the teacher.

2. Teachers on probation who have completed at least three years of service on regular appointment in the school shall be entitled, with respect to the discontinuance of their probationary service, to the same review procedures as are established for tenured teachers under Section 3020-a of the Education Law.

3. Teachers who receive doubtful or unsatisfactory ratings may appeal under Section 4.3.1 of the by-laws of the Board of Education.

**E. Suspension**

Any teacher who is suspended pending hearing and determination of charges shall receive full compensation pending such determination and imposition of any penalty except as set forth in Article 21G5 and 21G6.

**F. Rating "Not Applicable"**

A rating of "Not Applicable (NA)" is to be used only in situations where a pedagogical employee is reassigned out of his/her regular assignment for disciplinary reasons. The "NA" rating will apply only for the period of reassignment, cannot be used in any proceeding as evidence of wrongdoing and will not otherwise affect any other rights afforded in the Agreement where ratings are an issue.

---

[10] The parties disagree as to the applicability of Section 10 of the October 2005 MOA to this Article 21C3.

## G. Education Law §3020-a Procedures

Tenured teachers facing disciplinary charges filed, or in the case of Section 1 "Time and Attendance", discipline pursuant to that Section, will be subject to Section 3020-a of the Education Law as modified by paragraphs 1-10 below.

### 1. Time and Attendance

If the Board seeks to discipline a tenured pedagogue regarding absences and/or lateness but seeks a penalty short of termination, the following expedited procedure will apply:

The Board will notify the employee that it intends to bring disciplinary action against the employee pursuant to this section. The Board will include in this notice the employee's attendance record and any other documentation it intends to introduce at the hearing and a statement that pursuant to this section the arbitrator may award any penalty, or take other action, short of termination.

Within 15 calendar days following this notice, the employee must notify the Board in writing of the nature of his\her defense and submit any documentation s\he intends to submit into evidence as well as a medical release for any medical documents related to such defense.

If either party believes that it requires additional documents, it may request a telephonic conference with the arbitrator.

The expedited hearing will occur within one month of the Board's notification to the employee mentioned above. The hearing will be informal and the normal rules of trial procedure and evidence shall not apply. The arbitrator will issue an award and short decision within 15 calendar days of the hearing. The arbitrator's award will be final and binding on all parties. The award may be introduced in another Education Law §3020-a hearing and any findings shall be binding on the §3020-a arbitrator.

One arbitrator, agreed upon between the parties, will hear all absence and lateness cases hereunder. The parties may expand the number of arbitrators if necessary. The arbitrator will hear 4 cases per hearing date on a staggered schedule, but in no situation will one case take more than ½ a day. The parties may expand the number of cases heard in a day if they deem it practical.

### 2. Rotational Panel

As discussed and agreed upon, all parties would be served better by the implementation of a permanent arbitration panel. The panel members must be agreeable to both sides, however, if the parties cannot agree to a full complement of 20 panel members, additional impartial arbitrators shall be selected by the parties in accordance with the American Arbitration Association (AAA) procedures (strike and rank method) from list(s) provided by the AAA until the desired number (20) is reached to establish such permanent panel.

Panel members shall serve for a maximum of a one-year term. At the expiration of such term, the parties must agree to have arbitrators continue to serve on the panel, and if not, replacement members will be elected by the method outlined above. Removal prior to the end of the one-year term must be for good and sufficient cause upon mutual agreement of the parties.

Any arbitrator who agrees to serve on the rotational panel must agree to the following terms:

a.  Each arbitrator selected to serve on this rotational panel must agree to provide five (5) consecutive hearing dates per month for the months of September through June and two (2) hearing dates for the months of July and August.  Consecutive days may be construed to mean five (5) dates within two (2) weeks unless otherwise agreed.

b.  Arbitrators must provide three (3) dates, within ten (10) to fifteen (15) calendar days from the date the case was assigned to him or her, for a pre-hearing conference. One of the dates shall be at 9:00 a.m.  Advocates must accept one (1) of the three (3) dates offered or it will be assumed that the date or dates offered at 9:00 a.m. is (or are) acceptable.  Said dates must be in compliance with Education Law §3020-a (within 10 to 15 days from the date selected to serve).

c.  At the pre-hearing conference, arbitrators must provide and parties must accept five (5) consecutive hearing dates within the statutory timeframe as delineated in Education Law §3020-a.  Consecutive days may be construed to mean five (5) dates within two (2) weeks unless mutually agreed.

d.  The parties are committed to having these cases heard in an expeditious manner. For this reason, absent extraordinary circumstances, arbitrators are not to adjourn hearing dates.  It should be noted that normally attorney or party scheduling conflicts are not extraordinary circumstances.

e.  In all cases, as delineated in Education Law §3020-a the final hearing shall be completed no later than 60 days from the pre-hearing conference and the written decision must be rendered within 30 days from the final hearing date.

f.  There is a presumption that charges against the same employee will be consolidated unless the arbitrator finds that to do so would deny a fair hearing. Additionally, in routine matters, any motions must be made and responded to orally. Thereafter, a decision shall be rendered on the issue the same date the motion was made. Should the arbitrator find that written motion practice is necessary, either party reserves the right to respond orally but in no case shall motion practice take place outside the scope of the timelines as outlined in Education Law §3020-a.

Failure to abide by these rules shall be "good and sufficient" grounds for removal of an arbitrator.

### 3.  Expedited Hearings

Prior to the pre-hearing conference, the Board shall determine whether the nature of the case would permit offering Respondent expedited arbitration rather than regular arbitration of the case.  If the Respondent accepts the offer of expedited arbitration, the hearing shall proceed in accordance with the expedited procedure set forth below and the Board may not seek a penalty to exceed six (6) months suspension or the equivalent monetary penalty.  Should the Respondent reject the offer of expedited arbitration, the case shall proceed in accordance with the regular arbitration proceeding and the Board may seek any penalty including termination.

Where the offer of expedited arbitration was rejected, the arbitrator (or the arbitration panel) shall not be informed of the offer of expedited arbitration nor that the offer was rejected.

Cases heard under the expedited arbitration procedure shall be completed in three (3) consecutive days.  Each advocate shall be provided equal time to present his or her respective case.  Cross-examination usually will not go beyond the scope or duration of the direct examination.

114

During the course of the hearings, should the evidence reveal more serious misconduct than originally charged, the arbitrator, upon his or her initiative, or upon the Board's motion, is empowered for good cause to end the expedited proceeding and order a new, regular arbitration proceeding before a different arbitrator. At the regular arbitration, the Board may seek any penalty including termination. Upon a showing of unavailability during the regular arbitration, the prior record of a completed witness who testified in the expedited arbitration shall be admissible.

**4. Investigations**

Where the Board conducts an investigation of an employee and the employee has been reassigned to administrative duties pending the outcome of such investigation, the parties agree that the employee will be restored to service no later than 6 months from the date of his or her removal unless Education Law §3020-a charges have been preferred against the employee. Should the employee be restored to service, this event does not preclude the Board from subsequently preferring Education Law §3020-a charges against the employee. If charges are preferred, the employee shall remain reassigned, at the Board's discretion, pending the outcome of the disciplinary process. This requirement to restore an employee to service after 6 months does not include investigations conducted by the Special Commissioner of Investigation or investigations that are related to criminal prosecutions.

**5. Serious Misconduct**

The parties agree that certain types of alleged misconduct are so serious that the employee should be suspended without pay pending the outcome of the disciplinary process. Serious misconduct shall be defined as actions that would constitute:

- the felony sale, possession, or use of marijuana, a controlled substance, or a precursor of a controlled substance or drug paraphernalia as defined in Article 220 or 221 of the Penal Law, or
- any crime involving physical abuse of a minor or student (crimes involving sexual abuse of a minor or student are addressed in paragraph 6 below.), or
- any felony committed either on school property or while in the performance of teaching duties, or
- any felony involving firearms as defined in Article 265 of the Penal Law.

If an employee is accused of committing serious misconduct, the employee shall be removed from payroll for a term not to exceed two (2) months after a finding by the "probable cause arbitrator" that there is probable cause to believe that the actions alleged were committed by the employee and that they constitute "serious misconduct" as defined above. Probable cause exists when evidence or information which appears reliable discloses facts or circumstances making it likely that such conduct occurred and that such person committed the conduct. To establish probable cause, the investigator assigned to the matter must be present and testify under oath before the arbitrator. The Board may also be required to produce signed statements from the victim or witnesses, if any. Thereafter, the Respondent shall have an opportunity to respond orally to the offer of proof. The arbitrator may ask relevant questions or may make further inquiry at the request of Respondent. The hearing shall not require testimony of witnesses nor shall cross-examination be permitted.

Said probable cause hearing usually shall not exceed one half of a hearing day.

One arbitrator, agreed to by both parties, shall be assigned to hear all probable cause matters for a period of one year. If the parties cannot agree upon one arbitrator, each party shall select one arbitrator who together will select the probable cause arbitrator.

Should the Board meet its burden of establishing probable cause of serious misconduct, the employee shall remain suspended without pay during the pendency of the disciplinary action, but in no event shall such period exceed two months except as set forth herein.

The parties expect that these cases shall be completed within two (2) months. However, where it is not possible to complete the hearing within the two (2) month period despite the best efforts of all parties, and where the arbitrator believes that the evidence already presented tends to support the charges of serious misconduct, the arbitrator may extend the period of suspension without pay for up to thirty (30) days in order to complete the proceedings.

If the Respondent requests not to have the case proceed for a period of thirty (30) days or more and that request is granted, during the period of this adjournment, the Respondent shall remain in non-paid status. As noted above, however, the parties are committed to having these cases heard in an expeditious manner. For this reason, absent extraordinary circumstances, arbitrators are not to adjourn hearing dates.

While suspended without pay pending the arbitration hearing on serious misconduct charges, the Respondent may continue his or her existing health coverage, except that in no event shall the Respondent be entitled to continue his or her existing health coverage for more than six (6) months while on non-paid status except at the absolute discretion of the Chancellor. In the event that the Respondent is exonerated of all serious misconduct charges, the employee shall be restored to his or her position and be entitled to receive back pay and be made whole for the amount of time he or she remained off payroll. In the event that the arbitrator finds the employee guilty of the serious misconduct and imposes a penalty less than termination, the arbitrator shall decide whether and to what extent a reinstated employee shall be entitled to receive any back pay for the time the employee was suspended without pay.

The parties agree that these types of cases shall receive the highest priority, and, upon the Board's request, hearings may be held on such matters during any days previously committed by a rotational panel to other employees, as set forth above. In other words, hearings for serious misconduct take precedence over other disciplinary matters, and the Board may require adjourning other cases previously scheduled before the assigned arbitrator during that time frame in order for that arbitrator to hear serious misconduct cases within the two-month time frame.

### 6. Sexual Offenses Involving Students or Minors

A tenured pedagogue who has been charged under the criminal law or under §3020-a of the New York State Education Law with an act or acts constituting sexual misconduct (defined below) shall be suspended without pay upon a finding by a hearing officer of probable cause that sexual misconduct was committed.

A rebuttable presumption of probable cause shall exist where the Special Commissioner of Investigations ("SCI") substantiates allegations of sexual misconduct, or a tenured pedagogue has been charged with criminal conduct based on act(s) of sexual misconduct.

116

A report from the Chancellor's Office of Special Investigations ("OSI") substantiating allegations of sexual misconduct is relevant evidence of probable cause but does not create a rebuttable presumption of probable cause.

In §3020-a proceedings, a mandatory penalty of discharge shall apply to any tenured pedagogue a) found by a hearing officer to have engaged in sexual misconduct, or b) who has pleaded guilty to or been found guilty of criminal charges for such conduct.

The §3020-a hearing should be completed within two months, but the suspension without pay shall be extended one additional month if the hearing has not been completed, unless the Board has received an adjournment or otherwise delayed the proceeding. The suspension without pay shall also be extended until a criminal action is resolved and any §3020-a proceeding is also completed.

If the §3020-a hearing results in a dismissal of the charges or if the criminal proceeding ends in an acquittal or dismissal (and the Board has decided not to prefer charges), the pedagogue shall be entitled to back pay with interest for the entire period of the suspension without pay.

For purposes of this section, sexual misconduct shall include the following conduct involving a student or a minor who is not a student: sexual touching, serious or repeated verbal abuse (as defined in Chancellor's Regulations) of a sexual nature, action that could reasonably be interpreted as soliciting a sexual relationship, possession or use of illegal child pornography, and/or actions that would constitute criminal conduct under Article 130 of the Penal Law against a student or minor who is not a student.

A letter of agreement dated October 2, 2005 regarding sexual misconduct is attached as Appendix G.

### 7. Other Felony Offenses

Tenured pedagogues who have been convicted of, or who have pled guilty to, any felony not addressed in paragraph 5, above shall be suspended without pay pending the final outcome of the Education Law §3020-a disciplinary proceeding. The §3020-a hearing should be completed within two months, but the suspension without pay shall be extended one additional month if the hearing has not been completed, unless the Board has received an adjournment or otherwise delayed the case.

### 8. Discovery Procedures

To effectuate the purpose of the statute, the parties agree that Education Law §3020-a authorizes the following in advance of the hearing:

Both sides will exchange witness lists, witness statements, and physical evidence (e.g., photographs) at least before the presentation of their direct case and earlier upon motion to the arbitrator.

The Respondent shall receive copies of investigatory statements, notes, other exculpatory evidence, and relevant student records after in camera review.

The Board shall receive evidence and documents from the Respondent upon a showing during the hearing that it is relevant.

Additionally, if the case has stemmed from an investigation conducted by the Special Commissioner of Investigation (SCI), the Board will provide the entire SCI file to Respondent, including exculpatory evidence, during the discovery phase of the §3020-a hearing unless such information is privileged. Failure to do so shall form the basis of such evidence being precluded from introduction in the §3020-a proceedings. This provision remains subject to the Family Educational Rights and Privacy Act.

**9.  Incompetence Cases**

The parties agree that in the spirit of progressive discipline, rather than necessarily charge an employee with incompetence, an employee who receives an unsatisfactory rating for the first time may be offered the opportunity to enroll in the Peer Intervention Program ("PIP") for a term of one year.  Refusal to enter the PIP program is admissible in any future disciplinary proceedings.  The parties further agree that during the first school term of the intervention, no formal observations will be made.  During the second school term, although the employee will still be in the PIP, the administration is free to conduct observations and to rate the employee accordingly.  Since the end-of-year rating will be based on these observations, a minimum of two (2) observations shall be conducted during the second school term.  PIP may not be invoked by the employee once the disciplinary process has commenced.

Pursuant to, and as further described in section J "Peer Intervention Plus Program" below, during their participation in the Peer Intervention Plus Program ("PIP Plus"), participating teachers shall not be charged with incompetence pursuant to Education Law §3020-a.  The fact that an employee has declined to participate or that the BOE has denied a request to participate or has not offered the teacher an opportunity to participate in the programs will be admissible in §3020-a proceedings.  Observation reports of the consulting teachers will be admissible in §3020-a proceedings.

**10. Attorney Teams**

Each Board attorney will be paired with a Union attorney for four (4) consecutive cases.  Should one case settle, another case between the same attorneys shall be substituted for the case settled in an effort to utilize the dates set by the parties with the arbitrator.

**H.  False Accusations**

Knowingly false accusations of misconduct against employees will not be tolerated.

If an accusation of sexual misconduct or physical abuse against an employee is found by the Board or Special Commissioner of Investigation to have been knowingly false when made, the Board will take the following actions to restore the falsely accused employee's reputation: removing all references to the charges from the employee's personnel file(s) and adding evidence of the unfounded nature of the charge to departmental files that may have to be maintained to satisfy other legal requirements, if any; and restoring any back pay owed with interest and, at the employee's request, confirming to any regulatory agency the finding that the employee was falsely accused.  In addition, where the knowingly false accusation was made by a student of the employee, absent compelling and extraordinary circumstances the student will be permanently reassigned from the employee's class.

**I.  Peer Intervention Program (PIP)**

The Board and the Union recognize that instructional services should be delivered by a highly qualified and motivated staff, accorded the respect and professional treatment to which they are entitled.  Towards that end the Board and the Union have agreed to provide resources and peer assistance on a voluntary confidential basis to staff who have completed probation and who believe that their teaching competence will benefit from that assistance in the manner provided below:

118

1.  The Peer Intervention Panel shall be composed of nine members, six of whom shall be selected by the Union and three of whom shall be administrators selected by the Board.

2.  This Panel will set qualifications and procedures for the selection of intervenors, an alternative careers liaison and a coordinator of the program. The Panel shall advertise, as needed, the intervenor, coordinator and alternative careers liaison positions on a Citywide basis, posting the qualifications and procedures previously developed. The program's professional staff shall be selected in accordance with the posted procedure.

3.  The Panel will also design and continually monitor a professional development program that enables the selected staff to meet the goals set forth above.

4.  The intervenors shall serve for four year renewable terms.

5.  Any teacher who has a reasonable basis for needing such assistance and/or receives a U-rating or formal warning may request assistance from the Peer Intervention Program, in writing on a form promulgated by the Panel. The Panel will review requests and promptly notify the teacher of its determination as to whether assistance will be provided in that case. Such communications will be kept completely confidential.

6.  The intervenor will develop a plan to assist the participating teacher tailored to the specific needs of that teacher and will work with the teacher directly for not more than one year.

7.  For three months following the start of the intervention period, supervisors will not evaluate or observe the participating teacher. However, supervisors will otherwise continue to exercise their responsibilities.

8.  The Board, the Union, and the participating teacher agree that for any disciplinary action other than an appeal of a previous U-rating, all time limitations within which to bring such actions will be tolled for the three month period in which the supervisor does not evaluate or observe the participating teacher. For such U-rating appeals, the parties agree that the time limitations are tolled for the entire period of intervention.

9.  All communications between the intervenor and the participating teacher shall be completely confidential. As a condition of involvement in the program, all participants in the program, including the intervenor and the participating teacher, must consent to the confidentiality provisions set forth in this paragraph. The Board and Union agree that the intervenor, or any other person involved in the peer intervention program shall not be subpoenaed by the Board or the Union or called to testify, produce documents or participate in any other way concerning the intervention in any proceedings under §3020-a of the Education Law as modified by Article 21G above (hereinafter "§3020-a proceeding"). No arbitrator, in any proceeding under the parties' control, shall accept evidence regarding such communications. If PIP is used as a remedy in a §3020-a proceeding or if the parties agree to use it as a settlement to such a proceeding, this paragraph continues to apply except that if the intervention was not successful a statement from the program saying "PIP was attempted and was not successful" may be submitted into evidence in any subsequent §3020-a proceeding with respect to charges concerning teaching competence.

10. Except as otherwise herein provided, the Union, the Board or any participating teacher may exercise any constitutional, statutory, regulatory or contractual right otherwise provided by law, regulation or contract.

11. The Board agrees to make available on a best efforts basis alternative career opportunities in the Board and/or the City for teachers who decide to leave the teaching profession in the course of or following intervention through access to other employment alternatives within the system and/or the City; and/or retraining/redeployment through the Board of Education or New York City.

12. Administrative procedures for effectuation of these provisions will be formulated by the Panel in consultation with the Board and the Union and thereafter distributed by the Panel.

13. These procedures relate solely to issues of competency and no other grounds of discipline.

14. The acts of the panel, intervenor, coordinator, Union and Board shall be final.

## J. Peer Intervention Plus Program ("PIP Plus")

1. The existing Peer Intervention Program (PIP) will work with any teachers who would like assistance (as capacity permits) except those in danger of receiving charges pursuant to Education Law §3020-a for incompetence who have been recommended for the new program established below.

2. A new program (PIP Plus) will be created for tenured teachers in danger of receiving charges pursuant to §3020-a for incompetence, which will be staffed by independent consulting teachers. These consulting teachers will not be employed by the Board of Education and will not be active members of the UFT, and instead will be provided by an independent third party vendor, mutually agreed to by the parties, pursuant to a contract in a form developed by the Board and approved by the UFT.

3. Consulting teachers in the PIP Plus will develop plans to assist the participating U-rated tenured teachers, tailored to the specific needs of the teachers. During their participation in the PIP Plus, participating teachers will not be charged with incompetence pursuant to §3020-a. Observation reports of the consulting teachers will be provided to the participating teachers, and will be admissible in §3020-a proceedings. Participation in the program is voluntary. A principal may recommend participation or a teacher may volunteer to participate. The fact that an employee has declined to participate or that the Board has denied a request to participate or has not offered the teacher an opportunity to participate in the programs will be admissible in §3020-a proceedings.

4. A labor/management committee will review the PIP Plus program annually and agree on necessary changes, if any.

5. The existing Peer Intervention Program will not be decreased in size because of the establishment of this new PIP Plus program.

## K. Medical Review Procedures

### 1. Requests for Medical Examination of Teachers

The report of the immediate supervisor requesting examination of a teacher pursuant to Education Law §2568 shall be made in duplicate. A copy of the report shall be forwarded to the teacher.

### 2. Skin Test

The Board and the Union shall seek legislation to permit employees a choice of skin test or X-Ray. Until such legislation is enacted teachers in this system will be given a skin test. The skin test will be administered by the Department of Health. Where a skin

test result proves to be positive, the Board may require an X-Ray test. An enabling resolution to this effect was adopted by the Department of Health on May 6, 1962.

**3. Injury In the Line of Duty**

In order to provide for an expeditious handling of injury in the line of duty claims, the following is provided:

a. Within five school days of a claim of injury in the line of duty requiring an employee to be absent, the superintendent shall make a determination as to whether the accident occurred in the line of duty.

b. Where the employee is in a non-pay status pending a determination by the Medical Bureau of the duration of absence attributable to injury in the line of duty, the Medical Bureau will make its determination within ten days of the employee's submitting himself or herself for the required physical examination.

**4. Medical Report and Review**

a. The report of the Medical Bureau on a teacher who was called for medical evaluation shall, upon written request of the teacher, be sent to the teacher's physician within 25 days after the evaluation.

b. Upon the teacher's request to the Medical Bureau, his/her physician shall have the right to examine his/her medical file.

c. A regular teacher shall have the right to an independent evaluation by a medical arbitrator selected from rotating panels of doctors to be selected by mutual agreement of the Board and the Union if the finding of the Medical Bureau to the Chancellor has resulted in:

(1) Placement of the teacher on a leave of absence without pay for more than one month; or

(2) Termination of the teacher's services; or

(3) A recommendation for disability retirement; or

(4) A denial of a leave with or without pay for more than one month.

A request for an independent evaluation of the finding of the Medical Bureau shall be submitted in writing by the teacher to the Division of Human Resources within 10 school days of receipt of notice from the Division of Human Resources that he/she has been placed on leave of absence without pay for more than one month, or that his/her services have been terminated, or that he/she has been recommended for disability retirement, or that he/she has been denied a leave with or without pay for more than one month. The Board and the Union may agree on a case by case basis to permit, in special circumstances, an independent medical evaluation to teachers who do not otherwise qualify for one under this Agreement.

The medical arbitrator shall examine the teacher and consult with the teacher's physician and the Board's physician. The arbitrator's authority shall be limited to determining the medical aspects of the teacher's claim. The arbitrator's decision shall be rendered within 10 days after he/she has completed the evaluation of the teacher, and if made within his/her authority under this Agreement shall be accepted as final and binding by the Board and the teacher.

The fee of the medical arbitrator shall be shared equally by the Board and the teacher.

121