# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

Teachers4Action et al,

                 **Plaintiffs**   :

        **v.**                       :

Bloomberg et al,

                 **Defendants.**  :

Civil Action #
08-cv-548 (VM)(AJP)

------------------------------------------------------- X

*U.S. DISTRICT COURT S.D.N.Y.*
*08 AUG 11 PH 7:38*
*RECEIVED*

===================================================

## NOTICE OF FILING

===================================================

Edward D. Fagan hereby declares and says:

1. I am Plaintiffs counsel and I hereby file the following documents for the Court's consideration.

2. Plaintiffs' Joint Declaration in Opposition to Defendants' Motions to Dismiss and in support of Plaintiffs' Notice of Cross Motion.

3. Supporting Memorandum of Plaintiffs' Due Process & Constitutional Law Expert – Prof. Bruce Afran.

4. Supporting photographs of 7th Avenue Rubber Room.

5. Supporting DVD entitled Rubber Room Movie, related to conditions in Rubber Room.

6. Plaintiffs Memorandum of Law in Opposition to Defendants Motion to Dismiss and in Support of Plaintiffs' Notice of Cross Motion.

7. The foregoing statements by me are true to the best of my knowledge, information and belief.

Dated: August 11, 2008
        New York, NY

/s/ Edward D. Fagan (electronically signed)
Edward D. Fagan Esq.
5 Penn Plaza, 23rd Floor
New York, NY 10001
Tel. (646) 378-2225
Plaintiffs' Counsel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing

### NOTICE OF FILING

along with supporting Affidavits/Declarations and Accompanying Memorandum of Law are being filed with the Clerk of the Court.

Hard copies of the papers are being hand delivered to the Hon. Andrew J. Peck USMJ and to counsel of record Blanche Greenfield Esq. Office of Corporation Counsel 10 Church Street, 4th Floor, New York, NY and Charles Moerdler Esq. of Stroock Stroock & Lavan 180 Maiden Street, New York, NY

Dated: August 11, 2008                    Edward D. Fagan (electronically signed)
        New York, NY                              Edward D. Fagan, Esq.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------ X
Teachers4Action et al,                           :    Civil Action #
                                     Plaintiffs  :    08-cv-548 (VM)(AJP)
          v.                                     :
                                                 :
Bloomberg et al,                                 :
                                    Defendants.  :
------------------------------------------------ X
```

U.S. DISTRICT COURT
S.D.N.Y.
08 AUG 11  PM 7:40
RECEIVED

## PLAINTIFFS JOINT DECLARATION IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND IN SUPPORT OF PLAINTIFFS' NOTICE OF CROSS MOTION FOR INJUNCTIVE AND OTHER RELIEF

Plaintiffs hereby jointly declare and say as follows:

1. I am a plaintiff in the above matter and I make this Declaration in Opposition to Defendants' Motion to Dismiss and in Support of Plaintiffs' Notice of Cross Motion for Injunctive and Other Relief.

### Introduction

1. The complaint contains twelve causes of Action as follows: Count 1 – Violation / Interference with 1st, 5th & 14th Amendment Rights; Count II – Harassment & Hostile Work Environment; Count III – Retaliation; Count IV – Constructive Discharge; Count V –Breach of Contract; Count VI – Breach of Fiduciary Duty and Duty of Fair Representation; Count VII – Aiding & Abetting;  Count VIII – Negligent Hiring, Retention and Supervision; Count IX – Negligent Hiring, Retention and Supervision; Count X – Misrepresentation, Fraud & Conspiracy to Violate Plaintiffs' Rights; Count XI – False Confinement and Resulting Physical & Emotional Injuries;  and Count XII – Declaratory Judgment.

1

2. It is the position of Defendants Michael Bloomberg, City of New York, Joel Klein and New York City Department of Education (hereinafter collectively "NYC Defendants") that I – a tenured public school teacher named in this action- have not provided them with sufficient information about who I am and therefore they do not know what are my claims and that no matter what my claims may be, they have done nothing wrong to me or my fellow Plaintiffs, they have not retaliated against or harassed me, they have not violated my 1st Amendment rights, they have not violated my due process rights, they did not subject me to hostile work environment and they are free to keep me confined in a Temporary Reassignment Centers a/k/a/ Rubber Room for as long as they like, just because they are paying me, a salary.

3. It is the position of Defendants' United Federation of Teachers, Randi Weingarten and Betsy Combier (hereinafter collectively "Union Defendants") that they have faithfully discharged their duties to protect me and that they have not breached any duty owed to me including the duty of good faith and fair dealings with me as a Union member.

4. I submit that the Defendants' positions are as factually inaccurate and they are preposterous. And, the Defendants know it.   Worse yet, Defendants' Motions to Dismiss and their conduct in this litigation and the lead up to this litigation shows that they do not care about what they have done to me, they do not care what they are doing to me, they do not care what they are doing to my fellow Plaintiffs and they do not care what they are doing to students in the NYC public school system and to the education system itself.

5. Some of the relevant facts of this case have been set forth (i) in the February 22, 2008 Amended Complaint with Exhibit Binder, (ii) in the June 2, 2008 Second Amended Complaint and (iii) in the prior pleadings [1] and Declarations filed in the Court. Other facts about my individual claims are contained in the files that Defendants maintain about my fellow plaintiffs and me. Defendants' suggestions that they do not know who I am, that they do not what they have done to me, that that they do not know why I sued them and that they have done nothing wrong, strains credulity.

6. Defendants' Motions should be viewed for what they are. An attempt to conceal a conspiracy between the Defendants that (i) led to my being improperly removed from my school and my workplace, (ii) caused me to be placed in a facility that is not a school and not a workplace, (iii) caused me to subjected to hostile work environment, (iv) caused me to be harassed and retaliated against because I dared to speak out against NYC Defendants and Union Defendant policies to which I objected and which I believed needed to be challenged, (v) caused me to be deprived me of my right to professional development, (vi) caused me to be stripped me of my dignity, (viii) caused me to be subjected to dangerous conditions that have resulted in financial, physical and emotional damages, and (ix) caused me to be kept confined in the functional equivalent of "holding cell"

---

[1] As the Court knows, certain Plaintiffs previously produced and submitted to the Defendants and to the Court a description of our particulars (See Composite Exhibit 1 to the February 22, 2008 Amended Complaint). In addition, certain additional data and information which certain Plaintiffs would like to submit has been withheld by Florian Lewenstein - former "custodian of documents" - and we are hopeful that on August 13, 2008 the Court will direct Mr. Lewenstein to immediately turn over those documents, that we and other Plaintiffs need so that the information can be presented to the Court.

*(or as some of my fellow teachers have said is a "purgatory for exiled educators")* where my freedoms are closely monitored by security personnel and video surveillance. Defendants' Motions are also an attempt to conceal their long- term plan to alter the terms of my contractual rights, to change my employment status, to cause me to be improperly terminated, or to cause me to be constructively discharged or forced retirement. In my / this case, to coin a phrase, *"all roads lead to termination and the end of tenure."*

7. I brought this lawsuit because I simply refuse to sit back any longer and allow my constitutional and contract rights to be violated. I beg this Court to consider the totality of the facts, the circumstances of this case and allow the case to proceed.

8. I am informed by my counsel that with regard to Motions to Dismiss, that the complaint needs only to provide the Defendants with reasonable notice of the claims being made against them [2] and that in this regard the Court may also look to certain matters beyond the actual complaint in deciding whether or not the complaint should be permitted to proceed by denying Defendants' Motion.

9. As the Court may know, there are other cases in this Court involving other NYC public school teachers, whose rights have been similarly violated and the Judges in those cases, have allowed the claims to proceed to trial. See *Shapiro et al v New York City Department of Education 06-cv- 1836* (pending before the Hon.

---

[2] I am advised that the pleading requirements under Rule 8 a state that I must provide (1) a *short and concise statement of the grounds for the court's jurisdiction*, (2) *a short and plain statement of the claim showing that (I) am entitled to relief* and (3) *a demand for the relief sought.* For ease of reference as an attachment to this Declaration I am providing a summary of the factual allegations in the Amended Complaint that sets forth these short and concise statements.

Jed S. Rakoff USDJ), and *Fierro v. New York City Department of Education 07-cv-11214* (pending before the Hon. Shira A. Scheindlin USDJ)

10. To my knowledge, there is and has been no case that has come before a New York State or the New York Federal Courts.   And to my knowledge, there has been no case that:

    a.  Addresses the issues presented in this case;

    b.  Challenges the Collective Bargaining Agreement - Article 21-g - as violative of our due process rights;

    c.  Challenges the practice of keeping teachers confined in Rubber Rooms and calls for the Court to declare the Rubber Rooms dangerous and a hostile work environment;

    d.  Exposes how our own Union has and continues to violate the duties to us; and

    e.  Seeks to expose the harassing and retaliatory polices that have been implemented against us.

11. The reason I joined this case is because I believe it is an historic case of first impression.  By allowing this case to move forward to trial, issues of enormous public concern, to wit: the integrity and quality of education that is provided to hundreds of thousands of children within the New York City public school system, will be at issue because the treatment of plaintiff teachers who have dedicated their lives to public education and to children within the system, will be on trial.

12. I have been treated horribly by NYC Defendants and by Union Defendants. I have suffered financial, physical and emotional damages, and had my personal life and my personal schedules interfered with by my *"confinement"* to the Rubber Rooms. The Defendants' actions threaten my professional future and the educational commitments to which I have dedicated my entire adult life.

13. I realize that this situation seems too bizarre to be real. However, no matter how bizarre it may seem, the facts that I will elicit at trial will prove everything that I allege in the complaint. The situation is in fact bizarre. It is in fact surreal. And, it is in fact happening right now.

14. As Sherlock Holmes once said *"the more bizarre a thing is, the less mysterious it proves to be"* and *"there is nothing as deceptive as an obvious fact"*.

15. In this case, what we will show is that the only thing bizarre, mysterious or deceptive is the length to which Defendants have gone and will go to conceal the obvious facts and to keep their actions secret.

16. What Defendants are trying to do is keep the world from knowing what is really going on in our schools and in the Rubber Room prisons to which we – tenured teachers – have been confined. [3]

17. Perhaps more importantly, a trial in this case will help expose the inherent problems in the system-wide policies and practices (and the conspiracy) that were developed, planned and have been implemented by these Defendants who put a greater value on a budget than they do on the education of children in the New

---

[3] Defendant Klein tours the United States promoting a lie – telling other educators to follow the lead that he and Defendant Bloomberg have championed. I hope other school systems do not fall for this game of "smoke and mirrors".

York City public school system.[4]  The facts will show that these Defendants do not care whose rights are violated, they do not care whose contracts they break and they do not care whose lives and health are destroyed in the process.  What they care about is - saving a buck and we are the victims of this policy.[5]  And, there is monetary incentive given to the individual who are responsible for turning us into these victims and who implement these policies.[6]

18. Ultimately, it is my hope that through the trial of these claims, the Judge and jury will be able to consider all the facts and then make a decision having considered what is really going on with our former students – the children - within the NYC public school system.  As part of my claim, I will show this Court how my former student's education was, has been and continues to be damaged because they are deprived of experienced, dedicated and competent tenured teachers such as myself.

19. For ease of reference I am setting forth below the basic categories of wrong doings by these Defendants.  They are:

---

[4] Defendant Bloomberg has made no secret of the fact that it is his plan to get rid of tenure.  To do this, he went out of his way to get a Chancellor who had no teaching and education experience, who does trust the New York City Public System for the education of his own children and whose primary value to this administration is his prosecutorial experience, zeal and skill for destroying large functioning entities. *See US v Microsoft et al.*

[5] At the present time, Defendants are spending tens of millions of dollars to keep us out of the schools and confined in Rubber Rooms, earning salaries and benefits (albeit being deprived of per session additional income).  However in the long run, by getting rid of me and other teachers at the top of the salary scale, the NYC Defendants save much more money in long term salary, pension and benefits.  And, the Union Defendants earn more money in dues because the NYC Defendants are then able to hire more teachers are a lower pay scale and each of those teachers pay dues – so for one of me – they get 2 – 3 other dues paying members.

[6] The facts will show that after three months of removing me – and other higher paid school teachers like me – our salaries are no longer included in the individual school's budget. Therefore, the principal who is responsible for my removal from the school is free to replace me and keep the extra money in his or her budget pocket.

a.  <u>Retaliation</u> - (i) based upon age, race, ethic origin and/or religious beliefs,
    (ii) against Plaintiff as a Whistleblower, (iii) Interference with 1st, 5th &
    14th Amendment Rights, (iv) Interference with My Right to Report and
    Challenge DOE & Union Policies, (v) Filing of Multiple, Outdated,
    Frivolous and/or Incremental Charges designed to get rid of me
    immediately or before I would normally retire and (vi) Unlawful
    Punishment through Unreasonable and Extended Confinement in Rubber
    Room;

b.  <u>Violation of Due Process, Constitutional and Contract Rights</u>; and

c.  <u>Creation of and Subjecting me to the Rubber Room Hostile Work
    Environment</u> and dangerous conditions that cause me (and my fellow
    confinees) to suffer Physical and Emotional Harm and conditions that
    warrant Injunctive Relief. [7]

20. For the reasons set forth below, I pray the Court deny Defendants' Motions and
    Grant my/our Cross Motion.

**Retaliation (i) based on age, race, ethic origin and/or religious beliefs, (ii) against
Plaintiff as a Whistleblower, (iii) Interference with 1st, 5th & 14th Amendment
Rights, (iv) Interference with Right to Report and Challenge DOE & Union Policies,
(v) Filing of Multiple, Outdated, Frivolous and/or Incremental Charges designed to
get rid of me immediately or before I would normally retire and (vi) Unlawful
<u>Punishment through Unreasonable and Extended Confinement in Rubber Room</u>**

21. Certain Plaintiffs have reported and exposed corruption, violations of state
    regulations, violations of Regent's Requirements and sexual misconduct amongst

---

[7] I understand that my counsel is submitting as a separate document for the Court's consideration,
photographs of the conditions in certain Rubber Rooms and a copy of the documentary trailer
entitled "Rubber Room Movie" that predates this action and was created by independent persons
and includes interviews from plaintiffs and non-plaintiffs alike. See
www.rubberroommovie.com .

senior administrators and students.   Examples are:

a.   Plaintiff Twana Adams was targeted because of her race and her ethnic
background.  She spoke out against the District Three Policy through
which the Defendants were implementing a system previously recognized
as discriminatory and referred to "Separate but Equal". Plaintiff Adams
challenged and reported the Defendants policies that created different
mini-schools within a single building.  Plaintiffs Adams complaint was
that the Defendants actions led to ethnic, racial and cultural minorities
receiving disparate educational opportunities to their fellow white and
Hispanic students.  Plaintiff Adams – a black school teacher was fighting
for the minorities – who were suffering under this system.  The Principal
did not like this exposure and Plaintiff Adams was branded unfit and
falsely accused of acts through which the Principal in question was able to
send her to the Rubber Room;

b.   Plaintiff Olga Batyreva was targeted as a result of her age, national origin
as being a Russian immigrant and because she blew the whistle on
Regent's fraud (the graders were not complying with State regulations)
and reported the violations which adversely impacted her Principal and
Vice Principal;

c.   Plaintiff David Berkowitz was retaliated against and harassed because
Plaintiff Berkowitz complained to his Principal Judith Tarlo that after
discovering that his immediate supervisor, Susan Sladowski (Assistant
Principal for Mathematics) and another member of the math department,

Flavia Banu, (both women) were having an extra-marital affair (being concealed from their husbands) and that they were engaging in inappropriate sexual contact and intimacy with one another in public in the school math office, they retaliated against him by giving him inappropriate assignments, mocking and yelling him in front of colleagues and students. Principal Tarlo allowed Ass't Principal Sladowski to continue her harassment that included an assignment to teach class in the boiler room in the school basement. Ultimately, Plaintiff Berkowitz was removed from his school sent to a Rubber Room where he has spent the last few years based upon false accusations that it was he, who engaged in improper sexual contact;

d.  Plaintiff Jonathan Berlyne was harassed and retaliated against because of his religious beliefs, his ethnic Jewish and Israeli background and because he spoke against and challenged Principal Vivian Selenikas' policy of placing favored staff in coveted positions and her campaign to get rid of the senior staff (such as Plaintiff Berlyne) that held those positions.  In response to his reporting of these issues Principal Vivian Selenikas and her Assistant Principal embarked on a campaign that led to false charges, conspiracy to file false charges, suborning perjury of those to file false charges, loss of salary and reassignment to a Rubber Room for years;

e.  Plaintiff Jaime Castro was harassed because of his age, his ethnic group and his Spanish heritage.  The Retaliation dates back to 2001 and Plaintiff Castro may be the longest confinee in the history of the Rubber Rooms.

He was singled out. his bilingual programs were closed, and he was repeatedly brought up on frivolous charges and exonerated. However, Plaintiff Castro was still kept in the Rubber Room. When he was finally able to return to his school. his new Principal. Alberta Rabin, restricted his movements and denied him full access to facilities. He was not given a mono as opposed to a bi-lingual class, forced to teach "out of license", and again removed from the school for a second time falsely accuse of Corporate Punishment and forced to sit another eighteen months until I was again completely exonerated a second time of all charges and sent back to PS 208 on June 20, 2005. I was not given an assignment until September 2005 by Principal Rabin. In October 2005, one month after school started he was falsely accused a third time by Principal Rabin of Corporate Punishment and again sent back to a Rubber Room where he was confined for almost two more years and charges were never preferred against him. From May 15, 2007 until October 2007, Plaintiff Castro I remained at the 7th Avenue Rubber Room was then transferred to the 173rd Street a newly created Washington Heights Rubber Room because of "overcrowded conditions" at the 7th Avenue rubber room and remained there until January 2008 when charges were dismissed. When he was finally allowed to return to work in May 2008 he was told by Principal Susan Greene that he should retire or he would have fifth set of Corporal Punishment charges filed so that he would never be permitted to return to teach. Plaintiff Castro was forced to retire and was constructively

discharged because of his age, ethnic background and Spanish heritage;

f.  Plaintiff Gloria Chavez blew the whistle on the fact that the Principal
    Resnick (See Saunders above) and Ass't Principal Judith Silverman
    withheld State required Oral Examination materials and when they refused
    to administer the test without the materials – she was cited, charges were
    brought against her and she reassigned to the Rubber Room;

g.  Plaintiff Josefina Cruz was targeted because of medical and physical
    disabilities and because blew the whistle on the fact that the Principal
    Resnick (See Saunders above) and Ass't Principal Judith Silverman
    withheld State required Oral Examination materials and when she refused
    to administer the test without the materials – she was cited, charges were
    brought against her and she was reassigned into a Rubber Room;

h.  Plaintiff Judith Cohen was retaliated against for filing an incident report
    against a student after she was attacked with scissors by a student whose
    mother is Principal and a friend of Plaintiff Cohen's Principal;

i.  Plaintiff Roselyne Gisors reported improprieties and filed several reports
    that under the specific direction of Manhattan Superintendent Principal
    Gregory M. Hodge directed Jacqueline June Ronchetti former Counselor
    from Morris HS to change grades for students on the basketball team to
    promote basketball and help them win "Athletic Scholarship."  As a result
    of Plaintiff Gisors blowing the whistle on these violations, because of her
    physical disabilities and while she was having surgery for an on the job
    injury, serious allegations was brought against her, she was removed from

her school and has been in Rubber Room for years where here medical condition has deteriorated and as a result she has been on medical leave. She continues to be harassed and has recently been put off payroll for allegedly failing to appear for hearings or exams, when she was sick;

j.  Plaintiff Joann Hart was retaliated against because the Principal Robert Negron failed to maintain proper safety policies in the school and as a result Plaintiff Hart was attacked by a student and while trying to extricate herself from the danger she faced, she attempted to restrain a student who was a danger to himself, other students and Plaintiff Hart. Instead of allowing the danger to be exposed, Principal Negron accused Plaintiff Hart as being the instigator and of failing to maintain safety in the school;

k.  Plaintiff Michael Hollander reported and filed grievances of overcrowding in the class room and other noncompliance with State standards and the result was that they rated him "unsatisfactory" for two consecutive years – despite having an unblemished record for over 20 years - he received charges, was removed from his school and has been in the Rubber Rooms for years;

l.  Plaintiff Eleanor Johnson was targeted because of her race, ethnic origin and age. She appeared on a New York Morning Talk Show and in that segment she exposed the age discrimination that was rampant in the NYC public school systems and as a result everyday thereafter they subjected her to daily and excessive visits and observations by the Supervisors, Principals and Local Instruction Supervisors until they could create

charges to remove her from the school:

m. Plaintiff Rafal Kowal was targeted because of his ethnic origin and because he voiced his opinion that there needs to be more services for the Slavic population in his High School, that students were dropping out, that many were skipping classes and that many came from families plagued with social and economic problems. In his complaints he explained that Slavic students needed to be helped the same way that provided help to the Latino, African American and Asian population students. However, Principal Domminick Scorrola and the AP for Guidance took Plaintiff Kowal suggestions as being critical of their job and Principal Scorrola went so far as to say the "immigrants who spoke English with an accent (referring to Plaintiff Kowal) should not work in Social Studies Department. In the end, Plaintiff Kowal was removed from his school and has been in the Rubber Rooms for years;

n. Plaintiff Michael McLoughlin is an example of being harassed and retaliated against because he was illegally forced into a 3020a hearing, accused of incompetence, insisted upon his due process rights and tried to demand a three person panel. As a result he was subjected to over 40 days of hearings, dragged out for more than 1 year, and all the while being confined in the Rubber Room. They did this to him to force him to agree to resign so that they could make an example of him to deter other teachers from demanding their due process rights and to just accept change in status from tenured teacher to ATR (similar to a substitute

teacher who can be terminated automatically after three years) or accepting ruinous deals and fines;

o.  Plaintiff Thomasina Robinson was retaliated against by the Principal Neito because Plaintiff Robinson exposed Principal Neito's attempt to implement her own physical education regulations that were not consistent with NYS requirements;

p.  Plaintiff Denise Russo challenged policies in the school, reported improprieties by a school aide Ms. Dory to Vice Principal Vincent Gatto who was supposed to take it to her Principal Robin Connolly (about Aide Dory who children claimed was pushing them, yelling at them and hitting them).  Instead of acting on the claims, the Principal refused came down, yelled at her, accused her of instigating the children and tainting an investigation and then started to file unsatisfactory end of the year ratings, put letters in her file so that she was removed from his school and has been in the Rubber Rooms for years – and the alleged abuser is still in the school;

q.  Plaintiff Paul Santucci made the mistake of reporting his Principal Marta Jimenez [8] of having an extra-marital affair with another employee Samantha Solomon (See Grievance in NYC Defendants files).  As a result, to attempt to keep Plaintiff Santucci quiet, and to thereby avoid any embarrassment for the Principal, Plaintiff Santucci was charged and sent

---

[8] Plaintiffs believe that Defendant Klein targeted Plaintiff Santucci to protect one of his senior staff who is the spouse of Principal Jimenez and whose office is adjacent to Defendant Klein.

to the Rubber Room where he has remained for years;

r.  Plaintiff Jennifer Saunders was targeted because of her race and because
she reported sexual relationship between Ass't Principal Olejnik and a
student. Superintendent Santiago Tavarez lied to protect his Ass't
Principal Olejnik claimed that Plaintiff Saunders filed a false report and
his pay off was a promotion by Defendant Klein to become his New York
City Director of Quality Schools (See Records in Defendants Possession
related to claims against NYC Defendants pending in NY State Court);

s.  Plaintiff Brandi Scheiner was targeted because of her age and because she
wrote letters to report the improper actions of Principal Susan Felder and
Local Instruction Supervisor Jamie Aquino which actions violated the
contracts and subjected her to improper interrogation without
representation and the filing of a claim with the NY Division of Human
Rights – the response was Plaintiff Scheiner get a violation that includes
the egregious misconduct of (i) excessive use of glue, (ii) poor rug
management, (iii) failure to dot an "i", (iv) use of the word "thingy", and
(v) of course the most egregious of all allowing the tail of the a to fall
beneath the line on the chalk board *(See the 237 other violations which
landed Criminal Teacher Scheiner in the Rubber Room Detention Center);*

t.  Plaintiff Linda Seiffert was harassed and retaliated against because she
sought to take a leave of absence under the Family Medical Leave Act
(FMLA), certified by Dr. Jolie Pataki, for medical reasons, for a 12 week
period and the NYC Defendants refused the request and the Union

16

Defendant refused to support and file a grievance.  In retaliation, Plaintiff
Seiffert's job was "terminated" and she was forced into a four month
period without pay – in what she believed was a direct violation of Federal
Law.  When she was finally able to return to work Ass't Principal John
Clifford, had changed her teaching program forced her to accept additional
duties and then when she could not perform them, she was charged and
banished to the Rubber Room; and

u.  Plaintiff Dan Smith blew the whistle on a Title 9 Violation in his school
where the Principal Geraldyne Ambrosio refused to provide equal pay and
funding – as required by Federal Law – to a women's softball team (See
attached Daily News Article April 22. 2008).  As a result, Plaintiff Smith
ended up with false charges and Rubber Room confinement; and

v.  Plaintiff Michael Westbay was discriminated against because of his age
and has been confined to a Rubber Room for years.

22. For more examples related to other teacher. the attached Emails are provided to
show "in each teachers own words" what they have been subjected to, the
damages they were caused to suffer and on what their claims are based.

## Constitutional & Due Process Violations

23. The facts related to the Constitutional Law and Due Process Violations are set
forth more specifically in the Amended Complaint as identified on the annexed
Exhibit.

24. By way of summary only, the constitution and due process violations include:

a.  Creation of a Bias and Prejudiced Permanent Panel;

b. Compelling Teachers in Hearings without Counsel;

c. Allowing for punishment or discrimination of teachers who insist upon full arbitration proceedings;

d. Unilateral determinations of whether or not to re-assign matters for full arbitration hearings;

e. Deprives teachers of right to confront witnesses through cross examination;

f. Allows for Re-assignment, suspension and punishment prior to charges or finding of probable case;

g. Subjects Teachers to Oral Disciplinary Motions without notice;

h. Subjects Teachers to discipline by confinement in Reassignment Centers pending 3020a hearings and prior to any determination that discipline is warranted;

i. Permits probable cause arbitrators to suspend teachers unilaterally and prior to sustaining of charges;

j. Teachers deprived of three person hearing panels, without knowledge that such rights were taken from them;

k. Teachers are left for years in Rubber Rooms as punishment even before they are found guilty of any misconduct;

l. Plaintiffs were provided with lawyers who concealed a potential conflict;

m. The timing requirements of NYS Education Law 3020a were not complied with. For more specifics see attached Chart showing the timing violations.

25. We have retained victims' rights and constitutional law expert Adjunct Prof. Bruce Afran of Rutgers Law School, whose resume is attached.  Our counsel Ed Fagan is also attaching a copy of Prof. Afran's Memo related to some of the violation of our Due Process rights.  Prof. Afran will be one of the experts on whom we will rely at trial.

### Creation of and Subjecting Me to Rubber Rooms - Hostile Work Environments, Dangerous Conditions, Risk of Physical and Emotional Harm for Which Injunctive Relief is Appropriate

26. The effects that the rubber rooms have on teachers are both physical and psychological.

27. Reporting for Rubber Room confinement is demeaning professionally and personally.

28. The time spent in the Rubber Room is filled with having to keep oneself occupied and safe.

29. No one confined to The Rubber Rooms for an extended period of time – myself included - will ever emerge unscathed.

30. I have suffered physically, mentally and financially.  I suffer from Post Traumatic Stress Syndrome, anxiety, insomnia, depression, paranoia, distrust and/or diminished self worth.

31. I am a trained educator.  I have post-graduate degrees.  I was entrusted with the most important job in the world – teaching our children.  And the Defendants through the use of the Rubber Rooms have turned me into a "pariah" / "basket case".

32. Here is an average day for a Rubber Room confinee.

33. After a sleepless or restless night, I awake dreading having to report for "work" because in fact you are not reporting for work, you are reporting for confinement.

34. My employer does not even attempt to make the conditions in the Rubber Rooms approximate my former workplace.

35. In my former work place, I was given a space to work, I was given or had access to a classroom, I had access to a teachers lounge, I had access to a computer or the internet, I had access to technology facilities, I had access to other professionals and the opportunity to have daily interaction with peers working with children and with the students themselves, I had opportunities for professional development and I had the opportunity as a teacher to perform the job for which I was hired.

36. The Rubber Room is the complete antithesis of a workplace.

37. Those who wish to work are not permitted to do so. We do not have a space to work. We do not have a classroom. We do not have access to a teachers lounge. If you do not have your own computer, there is no access to a computer or the internet. There are no technology facilities. There is no access to other professionals, no opportunity for daily interaction with peers working with children or with the students themselves. There is no opportunity for professional development. There is no opportunity as a teacher to perform the job for which I was hired.

38. By design, teachers are forced to sit around tables, in hard plastic chairs and to do nothing for the work day. That is not what I was hired to do.

39. In the Rubber Rooms, we are guarded by security guards and video surveillance, when there were no such guards specifically for us teachers in the schools. In the

rubber room, the guards are not there to protect DOE property, the guards are there to guard, monitor and surveil us, used to guard us.

40. We are referred to by DOE Staff as crazies, patients, pedophiles, losers, a menace to society and "you people".

41. We are subjected to daily embarrassment by DOE staff and our integrity, experience and abilities are constantly denigrated.

42. The Rubber Rooms are for the most part dirty, poorly ventilated, overcrowded and fail to meet NYC building fire and safety code regulations. When I/we reported this, the Defendants did nothing. When the City Inspectors came and cited violations, the Defendants still did nothing.

43. After all, who cares about the nuts in the Rubber Rooms.

44. The Rubber Rooms are literally "ticking time bombs" and the Defendants know it. We have been told over and over again that the only way we are getting out, is if we quit or are fired because we are losers and we have no business being in the NYC public school system. There are people who do not belong in the classrooms and in some instances these people are violent and the Defendants know it. However, we have no way of knowing who is a serious threat to our safety until there is an "incident" in the Rubber Room. There have been bomb threats. Disgruntled and affected teachers have smeared fecal matter on bathroom wall and god help you if you sit in someone's chair or area – as you will face the wrath of a fellow teacher who has been driven to these extremes.

45. The Rubber Rooms are a breeding ground for diseases and medical problems (some teachers have documented emphysema, allergic reasons, virus, phobias,

21

arthritic conditions, nervous distress and other chronic ailments). There is a marked increase of psychological and emotional problems that can be traced directly to the Rubber Room confinements and those records are in Defendants files and when the case goes to trial their callous indifference to our plight will be exposed.

46. For the conditions in the rubber rooms, see Plaintiffs' Prior May and June 2008 Affidavits, the photographs attached and the DVD / Rubber Room Movie.

## Wrongful Acts by Union Defendants

47. I sued The Union because they did nothing for me these many years.

48. They let me "rot" in a Rubber Room for years. They made deals with the NYC Defendants through which I was stripped of certain of my due process rights. They retaliated against me for joining the Teachers4Action case. They removed my 3020a lawyer and refused to waive the conflict so that I could try to protect myself in the 3020a hearings while this Court considered this case.

49. We learned in May 2008 that Defendant Union, without my knowledge, bargained away some or all of my due process rights. We learned this from the 3020a hearing with Olga Batyreva where NYC Defendant's representative Theresa Europe claimed the Union Defendant gave the NYC Defendants a document in which they explained their intentions with regard to my rights to a three person panel. The Court Ordered NYC Defendants to produce this mysterious document and it was given to us in late June 2008. *See attached Declaration of Carol Gerstl.* This confirms that fact that The Union Defendants assisted NYC Defendants in depriving me of my rights to a three person

arbitration panel.

50. The facts are that the Union Defendants allowed biased, prejudiced and interested arbitrators to sit in judgment of me and my fellow plaintiffs, and whose financial wellbeing is dependent on our sitting in Rubber Rooms for years until they get to our case.

51. The facts are the system is not "speedier" and that I/we sit and wait for years at a time being punished even before we have been found to violate any regulations and before any facts have been proven against us.

52. To my knowledge, the acts by the Union Defendants – as described by Ms. Gerstl – demonstrate that the Union Defendants acted without authority and without notice to me or other Plaintiffs when they allowed the NYC Defendants to deprive us of our due proceed rights to the three person panel of arbitrators.

53. The facts will also show that the Union Defendants did before our lawsuit was filed was to create a "Rubber Room Swat Team" was a public relations gimmick designed to further conceal what was going on.

54. The facts will show that the Union Defendants violated our rights by concealing the fact that they were also clients of NYSUT and when we complained about NYSUT counsel's actions, it was the Union that invoked a conflict and refused to waive a conflict by declaring it an "unwaivable" *(See statement of Charles Moerdler at June 11, 2008 Hearing)*. And, as a result, we were stripped of lawyers in the 3020a process and left as lambs to the slaughter.

55. The facts will show that Union conspired with the Union Defendants did nothing for us for years and then only after we filed our lawsuit did they seek to enter into

23

a deal in July 2008. The Agreement between the NYC Defendants and the Union Defendants confirms that teachers should not have been confined in the Rubber Rooms in the first place, that the arbitration panel process violates our due process rights due to timing and other procedural problems. *(See copy of July 2008 Deal – previously submitted).*

56. The facts will also show how we have been retaliated against by the Union Defendants (i) because some of us filed grievances with the Union about the 3020a process or about the conditions in the Rubber Rooms, (ii) because we joined this lawsuit, and (iii) because we have spoken out against the Union Defendants policies and officials.

## Conclusion

57. In view of the foregoing. Plaintiffs pray the Court deny Defendants Motion and grant the relief sought in our Cross Motion.

Dated: August 11, 2008                    _____

24

**DECLARATION UNDER 28 USC § 1746**

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.

Dated: August 11, 2008

## DECLARATION UNDER 28 USC § 1746

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.

Dated: August 11, 2008

_Joann Hart_

## DECLARATION UNDER 28 USC § 1746

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.

Dated: August 11, 2008

**DECLARATION UNDER 28 USC § 1746**

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.

Dated: August 11, 2008

## DECLARATION UNDER 28 USC § 1746

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.

Dated: August 11, 2008                    _Jane Levine_

## DECLARATION UNDER 28 USC § 1746

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.

Dated: August 11, 2008

From: Childtdy <childtdy@aol.com>
Subject: email of declaration page TYPED signed. Alena Radtke-Gabriel
Date: August 11, 2008 3:52:41 PM EDT
To: faganlaw@gmail.com

**DECLARATION UNDER 28 USC § 1746**

I declare, verify, certify and state under the penalty of perjury that the facts and
statements contained above are true and accurate to the best of my knowledge
information and belief.

Dated: August 11, 2008     Alena Radtke-Gabriel

It's time to go back to school! Get the latest trends and gadgets that make the grade on AOL Shopping.

## DECLARATION UNDER 28 USC § 1746

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.

Dated: August 11, 2008

## DECLARATION UNDER 28 USC § 1746

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.

Dated: August 11, 2008

## DECLARATION UNDER 28 USC § 1746

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.

Dated: August 11, 2008

**DECLARATION UNDER 28 USC § 1746**

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.

Dated: August 11, 2008

## DECLARATION UNDER 28 USC § 1746

I declare, verify, certify and state under the penalty of perjury statements contained above are true and accurate to the best of my kn information and belief.

Dated: August 11, 2008

Michael W

Michael We

**DECLARATION UNDER 28 USC § 1746**

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.


Dated: August 11, 2008 _____ *George Zanetis*

To:    Edward Fagan, Esq.

From: Bruce I. Afran, Esq.    Prof. of Law    Rutgers University

Re:    Teachers4Action et al v Bloomberg et al 08-cv-548 (VM)(AJP)
       Summary of Case Law Re: Geographic Disparities in Due Process Rights

===================================================

### Introduction

Among other issues, the Teachers4Action litigation concerns the question of whether the State of New York can impose administrative disciplinary procedures for tenured New York City teachers that differ materially from those that govern disciplinary procedures in other parts of the State.

Education Law § 3020, subd. 1, provides that disciplinary proceedings of tenured public school teachers in New York State are governed by Education Law § 3020-a, a provision that contains a multiplicity of highly specified rules of procedure governing administrative pre-termination disciplinary proceedings. Alternatively, tenured public school teachers may elect to have their administrative disciplinary proceeding governed under the "disciplinary procedures contained in a collective bargaining agreement" with their employing school district. Education Law § 3020, subd. 1. Thus, tenured public school teachers in New York State (except New York City teachers, as described below) may choose a disciplinary proceeding governed by § 3020-a or by the alternate procedures contained in their union's collective bargaining agreement. *Id.*

In contrast, tenured New York City public school teachers are subject to disciplinary proceedings governed solely by the UFT's collective bargaining agreement with the New York City Board of Education.  Education Law § 3020, subd. 3 and 4.  Under §3020, subd.3 and 4, New York City tenured public school teachers must accept due process and administrative procedures imposed by the UFT's collective bargaining agreement that modifies the procedural and substantive rights of §3020-a.[1]

---

[1] The distinctions in procedural and substantive rights between the UFT's collective bargaining agreement and § 3020-a are substantial and represent significant departures from accepted norms of due process.  For example, under the UFT agreement teachers are: 1) denied the right to choose an arbitrator (under § 3020-a the teacher and their school board mutually agree on the selection of the arbitrator); 2) all arbitration motions must be oral and decided on the same day (§ 3020-a requires that all motions be in writing and on five days notice); 3) adjournments are prohibited except in the case of "extraordinary circumstances" (§ 3020-a permits adjournments for "good cause"); 4) adjournments are not granted if a teacher's attorney is unavailable (under § 3020-a attorney unavailability is "good cause" for an adjournment); 5) teachers who refuse expedited hearings are subject to enhanced penalties (under the UFT agreement teachers who accept expedited hearings may be suspended for up to six months while teachers who insist upon a full arbitration may be subject to termination for the same offense); 6) the UFT arbitrator may unilaterally increase the severity of the charges (under § 3020-a only the teacher's school board may approve charges); 7) teachers may be placed on non-teaching duties for up to six months without charge (§ 3020-a permits such suspension only after the employing board has formally approved charges); 8) teachers may be suspended without pay upon a finding by a "probable cause arbitrator" that the teacher has committed a felony (§ 3020-a permits suspension without pay only if a teacher has been convicted of a felony:; 9) the "probable cause arbitrator" may find that a teacher has committed a criminal offense without fact testimony and no cross examination (§ 3020-a permits such a finding only if a teacher has been convicted or pled guilty to a felony); 10) teachers charged with incompetence are tried by a single arbitrator chosen by their union and the Board (under § 3020-a teachers charged with incompetence are given the right to elect a three-member panel selected by the teacher and the Board jointly, a right not available under the UFT agreement).

These differences in basic procedural and substantive rights under § 3020-a and the UFT's collective bargaining agreement are substantial departures from traditional norms of due process. While New York City teachers must accept such "modified" due process

The present question concerns whether New York State may impose procedural rules for teacher disciplinary hearings through collective bargaining in the City of New York that departs substantially from due process protections made available through the legislatively-created system in use in the remainder of the state.

1. <u>The General Rule as to Geographic Disparities in Legislative Treatment.</u>

Geographic distinctions in legal treatment are generally constitutional as long as 1) there is a rational basis for the different legal rights imposed by the legislature between geographic regions and 2) that all persons within the region are treated similarly.

In *Hearne v. City of Chicago*, 185 F.3d 770 (7th Cir. 1999), the court upheld an Illinois state law providing for special termination rules for tenured Chicago public school teachers while leaving intact stronger protections for teachers in other Illinois municipalities. Among the procedural departures imposed by the legislature in *Hearne*, Chicago teachers could lose tenure without a finding of "cause" and were subject to a final determination of their status by the Chicago school board, not by an independent hearing officer. Teachers in other Illinois municipalities could lose tenure only upon a finding of cause by an independent hearing officer whose decisions were binding. 185 F.3d at 772-774.

---

by virtue of § 3020-,subd. 3 and 4, all other tenured New York State public school teachers may electing a disciplinary proceeding under § 3020-a.

Despite the disparate treatment between Chicago teachers and other Illinois teachers, the court in *Hearne* concluded that the legislature, having determined that the Chicago schools were "in the throes of an 'educational crisis.'", 185 F.3d at 772, had the authority to create legal distinctions in tenure treatment based upon the unique demographic needs of the Chicago school district:

> The legislature was entitled to take the position that the optimal way to assure accountability of teaching and non-teaching staff members would be different because of the scale of operations in Chicago. See Pittman v. Chicago Bd. of Educ., 64 F.3d 1098, 1103 (7th Cir. 1995) (noting that "it is common knowledge that the public schools of Chicago are a troubled institution" and that legislatures should be permitted to experiment with methods of governing public institutions without undue interference from courts).... What appears to the plaintiffs as "less generous employment rights" may have seemed to the legislature as increased flexibility for school administrators to take swift action to correct problems. No matter: even this brief discussion demonstrates that a rational basis underlay the General Assembly's decision to give special treatment to Chicago, and we agree with the district court that the complaint failed to state a claim to this extent.

*Hearne* at 775.

In *Reeder v. Kansas City Board of Police Commissioners*, 796 F.2d 1050 (8th Cir. 1986), the Court of Appeals upheld a state law that prohibited political activity by members of the Kansas City police force while placing no such ban on the activities of police in other municipalities. Concluding that the history of corruption in the Kansas City police department justified a legislative ban on political activity on its members, 796 F.2d at 1052-1053, the court found a rational basis for the legislatively-distinct treatment of Kansas City police officers:

> "...when the state chooses to regulate differentially, with the laws falling unequally on different geographic areas of the state, the Equal Protection Clause is not violated so long as there is no underlying discrimination

4

against particular persons or groups. The Equal Protection Clause protects people, not places. McGowan v. Maryland, 366 U.S. 420, 427, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961). So long as all persons within the jurisdictional reach of the statute are equally affected by the law, it matters not that those outside the territorial reach of the law are free to behave differently."

*Reeder* relied upon a series of U.S. Supreme Court holdings that equal protection is not violated by a legislative determination to impose geographically-distinct substantive rights or burdens on residents of a state. See e.g. *North v. Russell*, 427 U.S. 328, 49 L. Ed. 2d 534, 96 S. Ct. 2709 (1976) (upholding a state law requiring lawyer police judges in larger towns but not in smaller municipalities); *McGowan v. Maryland*, 366 U.S. 420, 427, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961) (upholding state law exempting only merchants of a certain county from Sunday closing laws at beach resorts); *Missouri v. Lewis*, 101 U.S. 22 (1879) (upholding legislature's creation of separate court of appeal for Saint-Louis and surrounding counties); *Hayes v. Missouri*, 120 U.S. 68, 30 L. Ed. 578, 7 S. Ct. 350 (1887) (upholding state law permitting 15 peremptory challenges to jurors in cities of more than 100,000 residents while allowing only 8 such challenges to eight in smaller towns); *Salsburg v. Maryland*, 346 U.S. 545, 98 L. Ed. 281, 74 S. Ct. 280 (1954) ( upholding state law permitting use of illegally obtained evidence for gambling offenses in certain counties but not others).

In *Kerssenbrock-Praschma v. Saunders*, 121 F.3d 373 (8th Cir. 1997), the plaintiff challenged a Missouri law that prohibited the transfer of farmland to non-citizens on the ground that the law did not apply in two Missouri counties. Citing the U.S.

Supreme Court's holding in *McGowan v. Maryland*, 366 U.S. 420, 427, 6 L. Ed. 2d

393, 81 S. Ct. 1101 (1961), the court in *Kerssenbrock-Praschma* held that the

legislature is not bound to territorial uniformity so long as all persons in the

territory are treated equally:

> " 'We have held that the Equal Protection Clause relates to equality
> between persons as such, rather than between areas and that territorial
> uniformity is not a constitutional prerequisite. . . . We have noted that the
> prescription of different substantive offenses in different counties is generally
> a matter for legislative discretion.' "

*Kerseenbrock-Praschma, quoting McGowan v. Maryland*, 366 U.S. at 427.  See also

*Minnesota Senior Federation v. Thompson, Secretary of Health and Human Services*, 273 F.3d

805 (8th Cir. 2001) (finding a "rational basis" for Congress' use of geographic

distinctions in pricing Medicare reimbursement rates).

Common to each of these decisions is that the geographic distinction was

created by "act" of the legislature, not by delegation of the legislature to the

collective bargaining of a union acting in concert with a municipality.

In *Hearne* the geographic disparity in teacher disciplinary proceedings for

Chicago teachers was created by act of the Illinois legislature, not by negotiation

between the union and the school board.  Moreover, the legislature in *Hearne*

made an express finding that Chicago schools were in a state of "crisis" that would

justify a departure from the uniform statewide disciplinary procedure. *Id.*  In

contrast to *Hearne*, no such conclusion appears to underlie Education Law § 3020's

exclusion of New York City teachers from the procedural protections of § 3020-a.

The U.S. Supreme Court has recognized that non-legislatively imposed distinctions violate due process. In *Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976), the Supreme Court declared that a regulation of the U.S. Civil Service Commission prohibiting federal employment by aliens violated the due process clause as it was not a Congressionally-determined policy:

> "Since these residents were admitted as a result of decisions made by the Congress and the President...due process requires that the decision to impose that deprivation of an important liberty be made either at a comparable level of government or, if it is to be permitted to be made by the Civil Service Commission, that it be justified by reasons which are properly the concern of that agency." 426 U.S. at 116.

Similarly, since the Legislature has extended § 3020-a due process to all other tenured public school teachers in the state, any deprivation of such rights for New York City teachers should be validated "at a comparable level of government", *Id.*, i.e., by the state legislature, not through the collective bargaining of the UFT, a private union, and a single school district. And, as in *Mow Sun Wong, supra*, no statement of reasons to justify such disparate treatment of New York teachers has been made by the Legislature. *Cf., Hearne*, where the Illinois legislature declared Chicago's schools to be in a state of "crisis". See also *Regents of University of California v. Bakke*, 438 U.S. 265, 305 (1978) (university minority preferences declared unconstitutional where there has been "no determination by the legislature or a responsible administrative agency that the University engaged in a discriminatory practice requiring remedial efforts.").

7

2. <u>New York's Judicial Treatment of Legislatively-Mandated Geographic Disparities.</u>

In New York, the state courts have upheld geographic distinctions by the Legislature in setting separate judicial pay scales for judges in different counties holding the same office.

In *D'Amico v. Crosson*, 226 A.D.2d 34 (App.Div. 4th Dept 1996), the court found that because local costs of living and even judicial calendars differed substantially, the Legislature had a rational basis in providing for higher judicial pay scales in certain counties:

> "In order to survive an equal protection challenge, the geographical distinctions...must have a rational basis [citations omitted]. The test of rationality is satisfied and the legislation will be sustained as long as "the classification created by the statute is rationally related to a legitimate State interest" ( Davis v Rosenblatt, supra, at 170). Thus, the geographical [pay scale] classifications set forth in Judiciary Law 221-d will be upheld if there is" "some ground of difference having a fair and substantial relation" "to the governmental objective purportedly advanced by those classifications [citations omitted]. The dispositive question is whether "disparities in population, caseload, and cost of living" are sufficient to warrant disparate financial treatment of Judges serving in different parts of the State ( Cass v State of New York, supra, at 464; see, Stanger v Crosson, supra; Mackston v State of New York, 200 AD2d 717, supra; Edelstein v Crosson, supra)."

In *Tolub v. Evans*, 58 N.Y.2d 1 (1982), the New York Court of Appeals upheld legislatively-determined pay scales that provided for lower rates of compensation to judicial law secretaries in New York City than for law secretaries outside the City following the merger of the City court system with the State courts. Holding that there was an "adequate factual basis for the *Legislature* to have prescribed different methods of converting court employees onto the unified court

8

budget," 58 N.Y.2d at 9 [emphasis added], the Court found no violation of equal

protection caused by geographically-disparate compensation for law secretaries:

> "[A] statutory scheme will not be struck as violative of equal protection
> merely because it creates differences in geographic areas. ( McGowan v
> Maryland, 366 U.S. 420, 427; Salsburg v Maryland, 346 U.S. 545; Walsh v
> Commonwealth of Mass., supra, at p 158; Matter of Colt Inds. v Finance
> Administrator of City of N.Y., 54 NY2d 533, 544.) As long as the State had
> a rational basis for making such a distinction, it will pass constitutional
> muster under an equal protection challenge.

Central to this decision, however, was the Court of Appeal's recognition

that the City law secretaries "will retain all their former fringe benefits" and that

City fringe benefits "are superior to ones enjoyed by prior State-paid employees".

58 N.Y. 2d at 9.  In contrast, § 3020, subd. 3 and 4 deprived New York City

teachers of broad due process protections formerly enjoyed under section 3020-a

and replaced these with markedly inferior "modified due process" through the

UFT collective bargaining agreement. *See* Footnote 1, *supra*.

Moreover, it is clear from the *Tolub* court's careful analysis that the

disparate compensation scheme law secretaries was the result of a careful

legislative weighing of economic and financial factors in merging the City and

State court systems into a single unified agency:

> "From this, it can be concluded that the Legislature considered the total
> cost of the unification of the court system in enacting the various
> transitional provisions. Even though the effect of these various provisions
> was to create geographic distinctions because an employee's prior status
> depended on the location of his position, there was both an historical and
> rational reason for making the transition in salaries in the manner
> prescribed by the Legislature even though in doing so distinctions would be
> made on the basis of locality."

58 N.Y. 2d at 9.

But the Legislature appears to have made no such weighing of the due process interests of New York City teachers when it enacted § 3020, subd. 3 and 4, the provisions of the Education Law that deny New York City teachers the right to elect disciplinary hearings governed under § 3020-a.

In *Weisman v. Evans*, 56 N.Y.2d 458, it was this very absence of any legislative consideration of the need for disparate geographic treatment that led the Court of Appeals to reject inconsistent salary scales for county court judges. The court in *Weissman* held that there must be "some ground of difference having a fair and substantial relation to the object of the legislation" to sustain geographic discrimination:

> "...a state must demonstrate...that the classification is neither capricious nor arbitrary but rests upon some reasonable consideration of difference or policy'" (Levy v Parker, 346 F Supp 897, 902 [three-Judge court], affd 411 U.S. 978). Stated differently, to meet the test of rationality, which all courts and parties here have agreed is appropriate to this case, it must appear that there is "some ground of difference having a fair and substantial relation to the object of the legislation" (Manes v Goldin, 400 F Supp 23, 29, affd 423 U.S. 1068, supra).

> \*  \*  \*

> So viewed, there is no rational basis for the geographic classification on which the State leans to support its defense of the disparate judicial salaries. That the two separate counties compensated their District Court Judges differently...whatever the asserted justification for that difference, is immaterial to consideration of the claim that there is no warrant for differentiation by the now single employer, the State of New York...since the disparate treatment of the District Courts of Nassau and Suffolk Counties has now long been without rational foundation, there is no choice but to declare it offensive to the plaintiffs' constitutionally protected right to equal protection of the laws of this State.

Because the State in *Weissman* could make no showing of a reasonable "consideration of difference or policy" to justify county court salary discrepancies after the merger of the county courts into a single unified state system, the continued geographic discrepancy violated equal protection. *Weissman*, 56 N.Y.2d at 466. Notable is the court's phrase "reasonable *consideration* of difference or policy", Id. [emphasis added], making it clear that the statute will not survive equal protection unless the Legislature can be shown to have weighed, i.e., given "consideration" to, the differing policy options.[2]

In contrast, in *Matter of Colt Industries, Inc.*, 54 N.Y.2d 533 (1981), the court held that because Nassau County and the five boroughs had a uniquely "high density" and "diversity of property", there was a rational basis for the Legislature to apply different tax assessment standards for these counties than for the rest of the State.

The high court held that "equal protection does not require territorial uniformity of law within a State" unless it can be shown that

> "the Legislature acted unreasonably -- that is, that the Legislature did not have a rational basis for creating such a distinction."

---

[2] Significantly, the court in Weissman rejected the state's argument that absent a suspect classification such as race, the court cannot disturb the legislative decision to impose geographic disparate treatment. Instead, the Court of Appeals required that the state demonstrate "some ground of difference [between the geographic regions] having a fair and substantial relation to the object of the legislation". 56 N.Y. 2d at 465. See also *Manes v Goldin*, 400 F Supp 23, 29, affd 423 U.S. 1068, supra) (finding rational basis for statute providing for higher court filings fees for New York City courts due to the City's "overburdened" budget.).

*Matter of Colt Industries* relied, in part, on an early decision of the U.S. Supreme Court in *Missouri v Lewis*, 101 U.S. 22, 31, where the Court held that a state may legislate separate legal systems to be used in different parts of the state without violating equal protection:

> "If the State of New York, for example, should see fit to adopt the civil law and its method of procedure for New York City and the surrounding counties, and the common law and its method of procedure for the rest of the State, there is nothing in the Constitution of the United States to prevent its doing so. This would not, of itself, within the meaning of the Fourteenth Amendment, be a denial to any person of the equal protection of the laws."

In *Matter of Hogan v Rosenberg*, 24 NY2d 207 (1969), *revd sub nom. Baldwin v New York*, 399 U.S. 66(1970), the Court of Appeals upheld a state law prohibiting jury trials for misdemeanors in New York City while preserving such right outside of the five boroughs.  Central to the court's holding in *Hogan* was the finding that the City's extraordinarily high misdemeanor caseloads justified denying jury trials in New York City while permitting such trials in all other counties.  The court noted that from July, 1966 through December, 1968 the New York City Criminal Court disposed of 321,368 misdemeanor cases, whereas in the next largest city, Buffalo, the City Court disposed of 8,189 cases. *Hogan*, 24 N.Y. 2d at 218.[3]

---

[3] Because it reversed on the ground that the Fifth Amendment required jury trials in all cases involving imprisonment of at least six months, the U.S. Supreme Court made no finding on New York's claim that it could impose geographically-disparate due process rules based on the City courts' higher caseload.  399 U.S. at 73, n. 17.

Conclusion

As these decisions recognize, there is no legal bar to the Legislature's employing separate legal standards for different geographic regions *provided* that the geographic distinction is part of a legislative judgment that reflects "reasonable consideration of difference or policy". *Weissman*, 56 N.Y. 2d at 466. Fatal to a geographic disparity is the failure of the legislature to make a finding justifying such disparate treatment or to promulgate a legislative scheme that embraces a considered weighing of the need for disparate geographic rights. See *Weissman*, *supra*.

In promulgating § 3020, subd. 3 and 4, the Legislature appears to have made no finding that would reflect a "reasonable consideration of difference or policy" between New York City and other regions that would justify the deprivation of procedural due process imposed by the UFT's collective bargaining agreement on New York City teachers. Unlike the City law secretaries in *Tolub v. Evans*, whose benefits and salaries remained intact even though they were less than the state law secretaries, § 3020 has affirmatively deprived New York City teachers of due process rights that they formerly possessed prior to the enactment of §3020, subd. 3 and 4. Moreover, while the *Legislature* may impress distinct legal rights in separate geographic regions where there is "some ground of difference having a fair and substantial relation to the object of the legislation", *Weissman*, *supra*, administrative due process in New York City teacher disciplinary proceedings is

promulgated by collective bargaining of the UFT, a private union, not by the legislative power and therefore outside the authority of precedent.

For these reasons, it would appear that a strong constitutional challenge can be presented to Education Law §3020, subd. 3 and 4 insofar as it denies tenured New York City teachers the due process protections of § 3020-a while preserving such rights for all other tenured New York city teachers.  The absence of an apparent legislative finding supporting such distinctions and the delegation of such lawmaking power to a private union are at odds with the great weight of authority that recognizes the power of the Legislature to impose geographic distinctions where supported by a "reasonable consideration of difference or policy". *Weissman, supra.* The marked departure from traditional norms of administrative due process contained in Article 21-G of the UFT collective bargaining agreement, *see* footnote 1, *supra*, creates a strong basis for a direct challenge to the "modified due process" of the collective bargaining agreement as it departs from the clear legislature protections provided in § 3020-a.

## RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY
### SCHOOL OF LAW–NEWARK

Richard L. McCormick, *President of the University*
Steven J. Diner, *Chancellor of the Newark Campus*
. . . . . . . .
Stuart L. Deutsch, *Dean and Professor of Law*
Cynthia W. Blum, *Professor of Law, Robert E. Knowlton Scholar and*
*Associate Dean for Academic Affairs*
John Leubsdorf, *Professor of Law, Judge Frederick B. Lacey Distinguished Scholar and*
*Associate Dean for Faculty and Research*
Gregory A. Mark, *Professor of Law, Justice Nathan L. Jacobs Scholar and*
*Associate Dean for Institutional Affairs*
Carol Roehrenbeck, *Associate Dean and Director of the Law Library*
Frances V. Bouchoux, *Associate Dean for Academic and Student Services*
Marie L. Melito, *Associate Dean for Administration*
Andrew J. Rothman, *Senior Assistant Dean of Student Services*
Yvette Bravo-Weber, *Assistant Dean for the Minority Student Program and Externships*
Karen Fromkes, *Assistant Dean for Technology*
Linda Garbaccio, *Assistant Dean for Academic Services*
Stephanie Richman, *Assistant Dean for Career Services*
Anita Walton, *Assistant Dean for Admissions*
Ronald K. Chen *(on leave)*

### Professors of Law

Frank Askin, *Robert E. Knowlton Scholar*
Carlos A. Ball, *Judge Frederick Lacey Scholar*
Bernard W. Bell, *Professor of Law, Herbert Hannoch Scholar*
Karima Bennoune, *Arthur L. Dickson Scholar*
Vera Bergelson, *Robert E. Knowlton Scholar*
Donna I. Dennis, *Justice Frederick W. Hall Scholar*
Jon C. Dubin, *Alfred C. Clapp Public Service Scholar*
Gary L. Francione, *Nicholas de B. Katzenbach Distinguished*
*Scholar of Law & Philosophy*
Helen Garten, *Alan Schwarz Scholar*
Carlos Gonzalez, *Herbert Hannoch Scholar*
Stuart P. Green, *Justice Nathan L. Jacobs Scholar*
Alan Hyde, *Sidney I. Reitman Scholar*

Jonathan M. Hyman, *Alfred C. Clapp Public Service Scholar*
Howard Latin, *Justice John J. Francis Scholar*
John M. Payne, *Board of Governors Distinguished Service Professor*
*and Justice Frederick W. Hall Scholar*
James Pope, *Sidney I. Reitman Scholar*
Louis S. Raveson
Sabrina Safrin, *Arthur L. Dickson Scholar*
Peter Simmons, *University Professor*
George Thomas, *Judge Alexander P. Waugh Sr. Distinguished Scholar*
Paul L. Tractenberg, *University Distinguished Service Professor*
*and Alfred C. Clapp Public Service Professor of Law*
David Dante Troutt, *Justice John J. Francis Scholar*
Mark S. Weiner, *Sidney I. Reitman Scholar*

### Emeriti/ae

Cameron Allen
Allan Axelrod, *Justice William Brennan Jr. Professor Emeritus*
Alfred W. Blumrosen, *Thomas Cowan Professor Emeritus*
Norman L. Cantor, *Justice Nathan L. Jacobs Scholar Emeritus*
Robert A. Carter
Charles Davenport, *Arthur L. Dickson Scholar Emeritus*
David Haber
Charles H. Jones

Saul H. Mendlovitz, *Dag Hammarskjöld Professor of Peace*
*and World Order Studies Emeritus*
James C.N. Paul, *Justice William Brennan Jr. Professor Emeritus*
Sidney Lee Posel
Annamay Sheppard, *Alfred C. Clapp Public Service Professor Emerita*
Alfred A. Slocum
Nadine Taub

| Associate Professors of Law | Assistant Professors of Law | Visiting Professors of Law |
|---|---|---|
| Anna Gelpern        Diana Sclar | Joshua D. Blank | Claire Dickerson |
| Suzanne Kim        Keith Sharfman | Steve C. Gold | Tanya Hernandez |
| | Adil A. Haque | |
| | Brandon Paradise | |

## Law Library Faculty

Paul Axel-Lute
Marjorie Crawford

Wei Fang
Dennis Kim-Prieto

Susan Lyons

## Clinical Professors

Esther Canty-Barnes
Laura Cohen
Jack Feinstein
Sandy Freund

Robert Holmes
John R. Kettle, III
Randi Mandelbaum
Penny Venetis

## Associate Clinical Professors

Charles Auffant
Jennifer Rosen Valverde

## Legal Research & Writing Faculty

Amy Bitterman
Marcia Crnoevich
Kimberly Guadagno

Barbara Hoffman
Emily Kline

Ernest Nardone, *Director*
Amy Soled

## Administration

Edna Y. Baugh, *Assistant Director for Clinical Administration*
Bernadette Carter, *Manager, Technology Services*
Roselene Correia, *Assistant to the Associate Dean for Admin.*
Janet Donohue, *Manager of Public Relations*
Nancy Fornarotto, *Coordinator of Financial Aid*
Roberta Geddis, *Assistant to the Dean of Admissions*
Elaine Giordano, *Administrative Assistant*
Alycia M. Guichard, *Supervisor, Street Law Program*
William Hilger, *Unit Computing Specialist*

Jessica Kitson, *Associate Director for Career Services*
Jill Milhorat, *Technical Services Library Associate*
Mary Ann Moore, *Assistant to the Dean*
Josephine Nagle, *Development Assistant*
Charles Ogunnowo, *Unit Computing Specialist*
Mildred Perez, *Administrative Assistant for Student Services*
Daniel Sanders, *Evening Circulation Supervisor*
Francina Skipper, *Director of Administrative Services*
Ruth Rosen Sonshine, *Senior Associate Director of Development*
Wendi L. Taylor, *Recruitment and Events Coordinator*

## Adjunct Faculty

| | | | |
|---|---|---|---|
| Bruce Afran | Michael Dore | Glenn Magpantay | Jonathan Rabinowitz |
| David Albalah | Barry Evenchick | Ira Marcus | Richard Rawson |
| Marilyn Askin | Hon. John Farmer, Jr. | Peter Martin | William Riina |
| Philip Auerbach | Jay N. Fastow | Cynthia Matheke | Bruce Rosen |
| Abed Awad | Decanda Faulk | John F. McMahon, Jr. | Judy Russell |
| Christine Bator | J. Patrick Geraghty | Sheryl Mintz-Goski | William Schroeder |
| Steven C. Bennett | Steven Glazer | T. Gary Mitchell | Joseph Scorese |
| Jonathan Bick | Robert Goldsmith | Brian Morris | Hon. Gary Stein |
| Harold Braff | Amy Gottlieb | Victoria Morrison | Michael J. Sullivan |
| Sandra Bresnick | Nicholas Groombridge | Scott H. Moss | Alan C. Thomas |
| Stephen Buckingham | Michael Gugig | Brian Neary | Michael Tingoli |
| John M. Cannel | Carole Handler | Mitchell M. Novitsky | Peter Tu |
| Anna Charlton | Richard Hunter | Bernard Nussbaum | Susan Volkert |
| Adam I. Cohen | John Janasie | Eric Olson | Denelle Waynick |
| Arnold S. Cohen | Seth Kaplan | Laurence B. Orloff | Richard West |
| Michael B. de Leeuw | George Kenny | Todd Poland | Andrew White |
| Michael DiChiara | David Klingsberg | Fanette Pollack | Hon. Douglas Wolfson |
| James Dobrow | Dale Krouse | Robert S. Popescu | Eupremio Zizza |
| Mendy Dombroff | Allen Levithan | Hon. Sylvia Pressler | |

# RUTGERS

CAMDEN

| Academics | Admissions | Alumni | Career Planning | Faculty | Lawyering Program | Student Life | Law Library | Intranet |

## Bruce Afran
*Adjunct Professor*

Rutgers School of Law - Camden
217 North Fifth Street
Camden, NJ 08102

V: (856) 225-6375
F: (856) 225-6516

afran@camlaw.rutgers.edu

NO PHOTO AVAILABLE

**Biography**

A 1985 graduate of Brooklyn Law School, Bruce Afran also holds a degree in history from the State University of New York at Binghamton where he graduated in 1982.

Since 1986 he has been one of New Jersey's leading civil rights and constitutional lawyers, figuring prominently in cases concerning civil rights, corporate fraud, election reform, immigrant rights and family law. Since 2001, he has been adjunct professor of law at Rutgers University School of Law in Camden where he teaches civil rights, civil liberties and First Amendment law. He regularly consults on matters involving international human rights law, pensions and securities law and has argued cases in many states including New York, Pennsylvania, Michigan, Washington, D.C., South Carolina and Florida and is a national elections counsel to former presidential candidate and consumer advocate Ralph Nader.

A leading public figure in New Jersey, he is a sought-after speaker at forums throughout the state on a wide variety of issues, including civil liberties and civil rights, the environment, middle-eastern affairs and government. As a constitutional lawyer, he has achieved major changes in New Jersey laws that have affected the lives of thousands of residents of this State.

Recently, he came to prominence as one of two lawyers arguing for a special election in New Jersey to replace resigning Governor James E. McGreevy. In one of the longest oral arguments recorded before the Third Circuit Court of Appeals, Afran and co-counsel Carl Mayer argued that the substance of McGreevy's departure from office created a vacancy under the New Jersey constitution that should be filled by election. Though ultimately unsuccessful, the case garnered nationwide attention and renewed focus on the primacy of voting rights.

As an environmental lawyer, Prof. Afran came again to prominence in a litigation that challenged the right of New Jersey municipalities to engage in large-scale commercial deer harvesting. This series of litigation has resulted in the virtual cessation of commercial deer harvests in New Jersey.

In the field of family law, Professor Afran in the 1995 case of Pascale v. Pascale achieved the judicial recognition of non-custodial parents' rights to retain child support funds to spend directly on children, an innovation never before implemented in the United States and which expanded the rights and participation of non-custodial parents in their children's lives.

Prof. Afran's work has also resulted in the elimination of race-based adoption in New Jersey, a practice that left thousands of African American children without permanent adoption placements for years on end. As a result of the first federal action in the United States seeking damages for adoption delays caused by racial matching, Afran, with co-counsel Roger Martindell, succeeded in forcing the elimination of racial matching rules in New Jersey's adoption placements.

As a political figure, Prof. Afran ran for New Jersey's U.S. Senate seat as the Green Party candidate in the 2000 election.

Prof. Afran has frequently appeared on New Jersey's op-ed pages on a variety of legal and political issues and is a co-author of Jews On Trial (KTAV, 2005), an anthology of articles on political trials of Jews in the United States and Europe. In this newly published book, Prof. Afran contributed an exhaustive analysis of the "Atomic Spies" case where he demonstrates that a fundamental absence of due process protections imperiled justice in one of the 20th century's most celebrated trials.

© 2008 Rutgers University School of Law - Camden, 217 North Fifth Street, Camden, NJ 08102 856-225-6375
Contact Us

THE UNIVERSITY OF THE STATE OF NEW YORK
THE STATE EDUCATION DEPARTMENT
TEACHER TENURE HEARING UNIT
---------------------------------------------------------------------------X
In the Matter of the Disciplinary
Proceedings of the
NEW YORK CITY DEPARTMENT OF EDUCATION,                    SED No.

                              Complainant,                AFFIRMATION OF
                                                          CAROL   GERSTL

              -against-


HIPOLITO COLON,

                    Respondent-Tenured Teacher.

---------------------------------------------------------------------------X

        CAROL GERSTL, an attorney admitted to practice in the Courts of the State of New

York, under penalties of perjury, affirms and says:

    1.  I have been employed by the United Federation of Teachers, Local 2, AFT, AFL-CIO

("UFT") since 1995. I am counsel.

    2.  I respectfully submit this affirmation in support of the position that no UFT member

covered by the collective bargaining agreement between the UFT and the Board of Education of the

City School District of the City of New York ("Board") effective from June 1, 2003 to October 12,

2007 ("Agreement") is entitled to the three-person panel as provided by *Education* Law Section

3020-a(2)(c) .

    3.  *Education* Law Section 3020-a(2)(c) states: "Within ten days of receipt of the statement of

the charges, the employee shall notify the clerk or secretary of the employing board in writing

whether he or she desires a hearing on the charges and when the charges concern pedagogical

                                      1

incompetence or issues involving pedagogical judgment, his or her choice of either a single hearing officer or a three member panel. All other charges shall be heard by a single hearing officer."

4. I was intimately involved in the negotiations between the UFT and the Board which resulted in changes to the statutory disciplinary procedures set forth in *Education Law* Section 3020-a. Those changes were first set forth in the collective bargaining agreement between the parties effective from November 16, 2000 through May 31, 2003 although that agreement was not reached until June 10, 2002. Authority to replace the procedures in Education Law Section 3020-a with collectively bargained procedures was specifically authorized in an amendment to Education Law Section 3020(4), which applied to any agreement on or after June 10, 2002. The changes were then continued and expanded upon in the Agreement as referenced above.

5. Having participated directly in those negotiations, I can attest that the UFT intended to replace the system set forth in the *Education Law* with one which would be more just and fair to UFT members as well as speedier. I believe that the negotiated changes to the process achieved those goals.

6. Since that time, the position of the UFT has been that the negotiated process set for in the Agreement amends the process set forth in *Education Law* Section 3020- to the extent that some statutory provisions remain the same and some statutory provisions have been replaced by the improved contractual process. The right to the three-person panel is one aspect of the statutory process which has been replaced by the improved contractual process.

Dated: January 17, 2008
      New York, New York

_____
CAROL GERSTL

2



**UFT**

United Federation of Teachers
A Union of Professionals

June 27, 2008

Joel I. Klein
Chancellor
Department of Education
52 Chambers Street
New York, NY 10007

Dear Chancellor Klein,

This letter will confirm certain mutual understandings and agreements between the Board of Education of the City School District of the City of New York (the "DOE") and the United Federation of Teachers ("UFT").

### Temporary Reassignment Centers ("TRCs")

Effective immediately, the letter the DOE provides to each UFT-represented employee ("Employee") to inform the Employee that he or she has be reassigned to a TRC will indicate the general grounds for each reassignment (where an Employee is being investigated by the Office of the Special Commissioner of Investigation ("SCI"), just that information will be supplied). The DOE will provide all currently reassigned Employees who have not been arrested or charged under Education Law § 3020-a with written confirmation of the general grounds for the reassignment.



Effective with the end of 2007-08 school year, where a UFT-represented employee is reassigned, the amount of time for the Office of Special Investigations ("OSI") to conduct an investigation shall be 90 days; the amount of time to transfer criminal cases to the Administrative Trials Unit ("ATU") shall be 30 days; and the amount of time for the DOE to draft Education Law § 3020-a charges shall be 40 days. The DOE will diligently attempt to comply with these timeframes. The preceding two sentences shall not be enforceable through either the grievance processes set forth in the relevant collective bargaining agreements or any other legal mechanism. Each year, a labor-management committee composed, in equal parts, of UFT and DOE representatives shall meet to discuss whether these time frames are being complied with and, if not, to agree on further actions to be taken with respect to the time frames. This paragraph shall not constitute a waiver of any other rights an Employee may have.

Officers: Randi Weingarten President, Michael Mendel Secretary, Mel Aaronson Treasurer, Robert Astrowsky Assistant Secretary, Mona Romain Assistant Treasurer
Vice Presidents: Carmen Alvarez, Michele Bodden, Richard Farkas, Aminda Gentile, Michael Mulgrew, Frank Volpicella

The DOE has identified a unit within the Division of Human Resources that will be responsible for managing and tracking all reassignment cases, ensuring that all reassignments are made consistent with applicable policy, and working with the other DOE offices involved to make sure that the process is accelerated based on, among others, the initiatives set forth in this letter. This unit will be making regular quarterly reports that will be shared with the UFT.

 Absent unusual circumstances, effective immediately, allegations being investigated by principals will not result in an Employee being removed from his or her school.

 The DOE has conducted a central review of all investigations of currently reassigned Employees conducted by principals and, where appropriate, reassigned Employees back to their schools.

Any reassignments that are not authorized by the Office of Personnel Investigation or OSI will be reviewed by central DOE. The DOE will consult with the UFT within a week to explain this review process and seek to improve it. The DOE will provide the UFT with regular listings of reassigned pedagogues, no less frequently than on a weekly basis, and if the UFT disagrees with any reassignment decisions it can present its objections for consideration to the Office of Labor Relations. Should a principal reassign an Employee without proper approval pursuant to the central DOE process, the central DOE shall return the Employee to the school from which the Employee was reassigned and the principal's school-based budget shall be charged for the salary the Employee earned while reassigned (the agreement contained in this sentence shall not be a mandatory subject of bargaining).

 Wherever possible, Employees reassigned to a TRC will be reassigned in the borough in which such Employee works. Employees who wish to perform duties or activities while assigned to a TRC shall be permitted to do so, with the proposed duty or activity subject to the appropriate supervisor's approval. This paragraph shall not be construed as a modification to Chancellor's Regulation C-770.

The DOE will review issues raised by the UFT with respect to the TRC facilities and work space provided to reassigned Employees. In order to help ensure a safe working environment, the UFT and DOE will work together to develop a facilities protocol for building concerns consistent with the Public Employee Safety and Health Act.

The DOE will continue to submit cases through the expedited time and attendance procedures if the DOE deems the particular case appropriate for that procedure. The DOE will evaluate cases of tenured Employees receiving unsatisfactory rating(s) for poor performance and, where it deems it appropriate, will refer the case to PIP Plus.

The disciplinary process should never be used to retaliate against whistleblowers or for any other illegal reasons. All employees who make a knowingly false allegation shall be subject to discipline, but decisions relating to the imposition of such discipline on non-UFT bargaining unit members shall not be subject to the grievance processes set forth in the relevant collective bargaining agreements.

The UFT and the DOE are committed to exploring innovative settlement approaches that would permit the parties to Education Law § 3020-a proceedings to reach settlement in a greater number of cases brought under Education Law § 3020-a .

*Education Law § 3020-a Hearing Procedures*

The UFT and the DOE, in addition to those agreements set forth in the relevant collective bargaining agreements, have also agreed to the following Education Law § 3020-a hearing procedures:

The permanent arbitration panel provided for in Article 21(G)(2) of the Collective Bargaining Agreement governing Teachers (and the corresponding provisions in the other UFT-DOE collective bargaining agreements) will be expanded from 20 panel members to 28 panel members. A sub-panel of up to 14 individual arbitrators on the permanent arbitration panel will hear cases based predominantly on charges of incompetence (the actual number of arbitrators hearing cases based predominantly on charges of incompetence, up to 14, being determined by the DOE in consultation with the UFT). Arbitrators selected for the permanent panel will be randomly assigned to the sub-panel on a rotational basis each year prior to the deadline for both parties to mutually agree to have arbitrators serve on the permanent panel for an additional one-year term. A labor-management committee composed, in equal parts, of UFT and DOE representatives shall meet as needed to discuss any issues regarding the 3020-a panel or process.

The UFT and DOE will jointly explore the feasibility of expediting the receipt of Education Law § 3020-a hearing transcripts by the UFT and DOE jointly paying the court reporters' fees and then seeking reimbursement from the New York State Education Department.

Without waiver or limitation of any other materials and information that the respondent Employee ("Respondent") is entitled to under Education Law §3020-a and the relevant collective bargaining agreements ("Discovery"), or the timing for providing such other Discovery, at least one week prior to the Pre-Hearing Conference, the DOE's attorney will supply the Respondent (or Respondent's attorney) with the following:

    a. Copies of all letters in the Respondent's personnel file(s) related to the Education Law § 3020-a charges;

    b. Copies of the final report regarding the investigation conducted by either the Special Commissioner of Investigations ("SCI"), the Office of Special Investigations ("OSI") or by a principal; and

    c. Copies of all witness statements related to the charges in the DOE's possession at that time. (The DOE will diligently attempt to obtain all witness statements prior to providing copies to Respondent or Respondent's attorney pursuant to this provision "c" though failure to do so will not be grounds for exclusion of evidence from an Education Law § 3020-a hearing.)

Without waiver or limitation of any other materials and information that the DOE may be entitled to from Respondent, or the timing for providing such other Discovery, at least one week prior to the Pre-Hearing Conference, the Respondent (or Respondent's attorney) will provide a witness list to the DOE's attorney if the Respondent (or Respondent's attorney) has possession of such. Otherwise, a witness list will be provided to the DOE's attorney by Respondent (or Respondent's attorney) whenever practicable one week prior to the presentation of Respondent's defense.

JUN-27-2008  15:32          UFT

P.05

Page 4

This letter shall not constitute a waiver of either the Respondent's or the DOE's right to object to the admissibility of documents obtained in the regular course of discovery pursuant to the Education Law and/or the relevant collective bargaining agreements.



In addition to any other obligations the DOE may have to preserve potential Discovery material, at the time the DOE prefers Education Law § 3020-a charges against an Employee, the Office of Legal Services will send a letter to the relevant principal or school leader requiring the principal or school leader to direct all DOE employees and agents under his/her supervision to preserve (i) any relevant records related to students who may be called to testify and (ii) all relevant class rosters.



At the Pre-Hearing Conference, the DOE's attorney and the Respondent (or Respondent's attorney), along with the Hearing Officer, will attempt to: (i) pre-mark exhibits; (ii) stipulate to any facts which are not in dispute; and (iii) stipulate to the admission of any documents to which there is not a dispute about admissibility.

Every effort should be made for a Respondent to attend the Pre-Hearing Conference as well as for the DOE to have a person available who has authority to approve a settlement of the case.

The DOE will provide the student records for testifying students to the Hearing Officer for in camera inspection by the Hearing Officer prior to the hearing date at which the student testifies. It will continue to be the Hearing Officer's decision, within the requirements of Education Law § 3020-a and the relevant collective bargaining agreements, as to whether, and when, these student records are provided to Respondent or Respondent's attorney. This provision remains subject to the Family Educational Rights and Privacy Act.

The UFT and the DOE shall jointly hold meetings with the Hearing Officers and instruct them with respect to the applicable time limitations in Education Law § 3020-a and the relevant collective bargaining agreements.

## Contract Arbitrations



The 140 arbitration dates that are permitted to be scheduled per year for all UFT grievances shall be increased to 175.

The UFT agrees principals may testify at arbitrations by telephone subject to the following conditions: (i) the principal may not look at any written material or be aided by anyone in the room during his/her testimony except as authorized or directed by the arbitrator; (ii) the principal may not be joined in the room by anyone without notifying the arbitrator, all parties and their representatives; (iii) the UFT district representative, or the UFT district representative's designee, may be present in the room with the principal; and (iv) the principal's testimony shall still be under oath. The sole role of the UFT district representative, or the UFT district representative's designee, shall be to verify the principal's compliance with these conditions; the UFT district representative or designee may not participate in the proceedings except to notify the arbitrator and/or the parties' representatives if he or she believes these conditions are being violated. The UFT district representative, or the UFT district representative's designee, shall not be released from his/her classroom responsibilities for this purpose. Nothing in this agreement

shall in any way limit the right of the UFT arbitration advocate to cross-examine the principal. If the arbitrator orders the principal to testify or be cross-examined in person, the principal shall not be allowed to testify or be cross-examined by telephone.

Nothing in this agreement shall in any way limit the currently existing rights of Employees to attend arbitrations.

The use of the 175 days will be governed in all respects by the rules in the relevant collective bargaining agreements governing the use of the 140 arbitration days, including, but not limited to, rules that exclude certain arbitrations from the 140 day limit. Pursuant to the procedures set forth in Article 21C of the collective bargaining agreement governing teachers (and corresponding provisions of other UFT-DOE collective bargaining agreements) for the selection of arbitrators, the number of arbitrators hearing arbitrations may be increased from seven.

Sincerely,

Randi Weingarten
President
United Federation of Teachers

Agreed and Accepted By:

_____        _____
Joel I. Klein                                             Date
Chancellor
Board of Education of the City School
District of the City of New York